IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| FLYING J INC., et al.,[1] | ) Case No. 08- 13384 (____) |
| Debtors. | ) Joint Administration Requested |

## DECLARATION OF J PHILLIP ADAMS IN
## SUPPORT OF EMERGENCY FIRST DAY PLEADINGS

1.  My name is J Phillip Adams. I am over the age of 18 and competent to testify. I am the Chief Executive Officer and President of Flying J Inc. ("Flying J") a corporation organized under the laws of the State of Utah and a debtor and debtor in possession in the above-captioned chapter 11 cases of Flying J and certain of its affiliates (collectively, the "Debtors"). I am also an officer of several of the other above-captioned Debtors. I have worked for Flying J for more than 28 years. I am generally familiar with the day-to-day operations, businesses, financial affairs and books and records of the Debtors.

2.  Concurrently with the filing of this declaration (the "Declaration") and on the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under title 11 of chapter 11 of the United States Code (the "Bankruptcy Code"). Additionally, I have been advised that the Debtors have filed several motions requesting limited immediate emergency relief (collectively, the "First Day Motions"). I am familiar with the contents of the First Day Motions, and I believe that the relief sought in each is critical to stabilizing the Debtors'

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Flying J Inc. (3458); Big West of California, LLC (1608), Big West Oil, LLC (6982); Big West Transportation, LLC (1056); Longhorn Partners Pipeline, L.P. (0554); Longhorn Pipeline Holdings, LLC (0226), Longhorn Pipeline Inc. (0654). The location of the Debtors' corporate headquarters and the service address for all Debtors is: 1104 Country Hills Drive, Ogden, UT 84403.

operations, preserving the going-concern value of the Debtors' businesses and, ultimately, facilitating a successful reorganization.

3. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information gathered from my review of relevant documents and information supplied to me by other members of the Debtors' management and the Debtors' professional advisors. I am authorized to submit this Declaration on behalf of the Debtors, and I submit this Declaration to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of the First Day Motions. If called upon to testify, I could and would testify competently to the facts set forth herein.

## I.

## **PRELIMINARY STATEMENT**

4. The Debtors and their non-debtor affiliates (collectively, the "Flying J Group") are a fully integrated oil company with operations in the field of exploration, production, refining, transportation, wholesaling and retailing of petroleum products. Flying J, one of the 20 largest privately held companies in America with 2007 consolidated sales in excess of $16.2 billion, is the direct or indirect parent corporation of each of the other members of the Flying J Group.

5. The Flying J Group operates over 200 state-of-the-art travel plazas in 41 states and six Canadian provinces along with convenience stores, restaurants, motels and truck service centers. In addition to usual rest stop services (food, fuel, shower facilities), the Flying J Group offers banking, bulk-fuel programs, communications (wireless Internet connections), fuel cost analysis, insurance and truck fleet sales. Furthermore, the Flying J Group explores for, refines

and transports petroleum products and, I believe, is the largest retail distributor of diesel fuel in North America. Other operations of the Flying J Group include online banking, card processing truck and trailer leasing, and payroll services. In these widespread operations, the Flying J Group employs approximately 16,000 people.

6. Each of the Debtors in these chapter 11 cases is involved in or associated with the Flying J Group's core businesses of petroleum refining, supply and distribution. In particular, Debtors Big West Oil, LLC and Big West of California, LLC own and operate two refineries in North Salt Lake City, Utah and Bakersville, California, respectively, which have the combined capacity to refine over 100,000 barrels of crude oil per day. These Debtors also are responsible for purchasing and transporting crude oil in parts of Utah, Wyoming and Colorado. Debtor Longhorn Pipeline, Inc. and its Debtor subsidiaries own and operate a 700-mile common carrier pipeline with a present capacity of 80,000 barrels per day from the Gulf Coast near Houston to El Paso, Texas.

7. As explained in more detail below, the Debtors have filed these chapter 11 cases to address near-term liquidity constraints brought on by the precipitous drop in the price of oil beginning in the September of 2008 and continuing through the present as well as the recent tightening of credit markets. The Debtors believe that their businesses are fundamentally sound and profitable and that these chapter 11 cases will allow them to resolve their liquidity constraints and emerge as stronger, healthier companies.

## II.

## THE DEBTORS' BUSINESS, OPERATIONS AND CAPITAL STRUCTURE

### A. Corporate History and Structure

8. Since its establishment as a small petroleum marketing company with four retail gasoline stations in 1968, the Flying J Group has grown into a fully integrated petroleum

3

company with a diversified portfolio of ancillary businesses and annual sales exceeding $16.2 billion in 2007. A copy of the Flying J Group's current corporate structure is depicted on the chart attached hereto as **Exhibit A** and incorporated by reference herein. The Debtor entities in these chapter 11 cases are highlighted in yellow.

**B.    General Description of the Debtors' Businesses**

9.    The Flying J Group generates and sells gas and oil products in North America. The Flying J Group's core business centers around the exploration, production, refining, transportation, wholesaling and retail marketing of oil, gas and related energy products, but it also operates a number of other businesses, providing a wide-range of products and services that generally (though not exclusively) fall into the one of three categories: (a) goods, services and programs relating to "highway hospitality;" (b) "fleet and driver" services; and (c) financial, insurance and communications services and programs.

10.    Debtor Flying J conducts its operations through both its Debtor and its non-debtor subsidiaries. Additionally, Flying J shares certain administrative and business functions with its non-debtor affiliates. The Flying J Group (which primarily operates in the U.S.) currently employs over 16,000 people nationwide through its interstate operations, transportation, refining and supply, exploration and production as well as its financial services and communications divisions, and its administrative support of these operations.

11.    Operating across the U.S. and Canada, the Debtors contribute substantially to the Flying J Group being the leading retail distributor of diesel fuel in North America. Specifically, each of the Debtors in these chapter 11 cases is involved in or associated with the Flying J Group's core businesses of petroleum refining, supply and distribution, as further described below.

12.    The Debtors' business operations are highly integrated with the operations of their

4

non-debtor subsidiaries and affiliates. For example, in the ordinary course of business, the Debtors engage in numerous intercompany transactions that generate funds, which flow through either a centralized cash management system or stand-alone cash management systems. These transactions involve arm's-length reimbursement or direct payment for goods, accounts and services bought or sold between, among or on behalf of another Debtor or non-debtor subsidiary or affiliate. The Debtors are generally net sellers in this process and receive approximately $280 million per month on account of such intercompany transactions.

13. In addition, historically, Flying J provides funding to its Debtor and non-debtor subsidiaries and affiliates by means of cash transfers, payment of expenses on behalf of such entities netted against collection of receivables for such entities, and other mechanisms. Because the Debtor or non-debtor subsidiary or affiliate receiving funding generally sweeps cash from its operations to Flying J, cash generally flows to the Debtors as a result of these intercompany loans. Indeed, the intercompany loans enable the continued profitable operations of the non-debtor subsidiaries and generally increase the value of the consolidated Flying J Group at a rate of approximately $11 million per month.

(i) **Petroleum Refining: The Big West Group**

14. The Big West Group of Debtors consists of the following three entities: Big West Oil LLC, a wholly owned subsidiary of Flying J ("BWO"), Big West Oil of California LLC ("BWO California") and Big West Transportation LLC ("BWT").

15. The Big West Group is primarily involved in the business of petroleum refining. Specifically, BWO operates a complex high conversion refinery operated and located in North Salt Lake City, Utah. BWO has approximately 130 employees and supplies fuel products to many Flying J travel plazas and select customers in seven western states in the United States. BWO's facility has a total capacity of approximately 30,000 barrels per day (over one million

gallons) and refines a combination of Utah, Wyoming and Canadian crude oil into high-quality motor fuels and other specialty chemicals, including superior wax products, and a range of petroleum products (e.g., gasoline, diesel, liquid petroleum gases, wax products and fuel oil). BWO is also responsible for the purchasing and transportation of crude oil in parts of Utah, Wyoming and Colorado.

16. On March 15, 2005, BWO, through its subsidiary BWO California, completed a transaction to purchase a refinery owned by Shell Oil Company located in Bakersfield, California (the "Bakersfield Refinery"). The Bakersfield Refinery is located in California's Central Valley and has the capacity to refine up to 70,000 barrels of crude oil per day. The Bakersfield Refinery is supplied by crude oil produced in the San Joaquin Valley, markets products in California and is a major provider of quality motor fuels in central California. BWO California employees over 200 workers, and is a leader in the refining industry, applying new technology to mature processes through our relationship with leading licensors.

(ii) **Supply and Distribution: The Longhorn Group**

17. The Longhorn Group of Debtors consists of the following four entities: Longhorn Pipeline, Inc, a Utah corporation that is a wholly-owned subsidiary of Flying J ("Longhorn Inc."), Longhorn Pipeline Holdings, LLC., a Delaware LLC, ("Longhorn Holdings"), Longhorn Partners GP, L.L.C., a Delaware LLC ("Longhorn GP") and Longhorn Partners Pipeline, L.P., a Delaware limited partnership ("Longhorn LP").

18. The Longhorn Group's business consists of the supply and distribution of refined petroleum products in Texas. On or about August 17, 2006, Longhorn LP, an indirect wholly-owned subsidiary of Longhorn Inc., purchased from Longhorn Pipeline Investors, LLC ("Pipeline Lender") a refined products common carrier pipeline extending 700 miles from the Gulf Coast near Houston to El Paso, Texas where the Debtors also own a terminal with over

1,400,000 barrels of storage capacity (the "Longhorn Pipeline"). The Longhorn Pipeline is an 18 and 20" diameter pipeline that transports refined products to markets in west Texas and the southwestern part of the United States. This strategic pipeline, with an installed capacity of over 70,000 barrels per day, has an ultimate capacity of 225,000 barrels per day. The Longhorn Pipeline is a vital piece of infrastructure enabling Gulf Coast refinery production and water-born barrels available on the Gulf Coast to reach the rapidly growing southwest demand for motor fuels on a long-term basis.

19. Longhorn LP, which is managed by Longhorn GP, owns and operates the Longhorn Pipeline. As is discussed in detail below, the purchase of the Longhorn Pipeline was consummated pursuant to a non-recourse note by and between Pipeline Lender and Longhorn Holdings that is secured by the Longhorn Pipeline owned by Longhorn LP.

C.  **Summary of the Debtors' Capital Structure and Indebtedness**

20. The Debtors' capital structure includes separate debt facilities for the Big West Group, the Longhorn Group and Flying J, as follows:

   (i)  **The Big West Group**

*The Big West Revolver*

21. As of the Petition Date, the Big West Group had approximately $53 million outstanding in secured funded debt under that certain Credit Agreement, by and among BWO and BWO California, as borrowers, BWT as guarantor, Bank of America, N.A., as administrative agent (the "Revolver Agent"), and the lenders party thereto (together with the Revolver Agent, the "Revolver Lenders"), dated as of March 15, 2005 (as amended, the "Big West Revolver").

22. The Big West Revolver is a secured $200 million revolving credit facility maturing on March 15, 2010. The Big West Revolver is secured by the Big West Group's accounts, cash and currency, chattel paper, deposit accounts, documents, instruments, inventory,

payment intangibles, any proceeds of the foregoing and certain shared collateral, including all of Big West Group's contract rights and general intangibles, to the extent not pledged already to Big West Group's lenders under a term loan agreement, investment property and financial assets, to the extent not pledged exclusively to the Revolver Lenders, copy rights, copy right licenses, patents, patent licenses, software, trademarks, trademark licenses, certain commercial tort claims, letter of credit rights relating to the foregoing, supporting obligations relating to the foregoing and proceeds of the foregoing (collectively, the "Revolver Collateral").

23. As is discussed in detail below, on December 19, 2008, the Revolver Agent, on behalf of the Revolver Lenders, accelerated and declared all amounts owing and payable under the Big West Revolver immediately due and payable as a result of the Big West Group's breach of a negative covenant.

*The Big West Term Loan*

24. As of the Petition Date, the Big West Group had approximately $395 million outstanding in secured funded debt under that certain Term Loan Credit Agreement between BWO, as borrower, BWO California and BWT as guarantors, Bank of America, N.A., as administrative and collateral agent (the "Term Loan Agent"), and the lenders party thereto (together with the Term Loan Agent, the "Term Loan Lenders"), dated as of March 15, 2007 (the "Big West Term Loan").

25. The Big West Term Loan provides a secured $400 million term loan credit facility maturing on May 15, 2014. The Big West Term Loan is secured by the Big West Group's equipment, fixtures, certain material supply and transportation contracts, "process-related" general intangibles, all related letter of credit rights and certain supporting obligations related to the foregoing and, to the extent not otherwise included, all accessories and all proceeds of any and all of the foregoing, as well as certain shared collateral with the Revolver Lenders.

8

26. The relative rights of the Revolver Lenders, the Revolver Agent, the Term Loan Lenders and the Term Loan Agent are set forth in that certain Intercreditor and Collateral Agency Agreement, dated May 15, 2007, by and among the Revolver Agent, the Term Loan Agent and each of the Debtors in the Big West Group.

(ii) **The Longhorn Group**

*The Longhorn Revolver*

27. As of the Petition Date, the Longhorn Group had approximately $45 million outstanding in secured funded debt under that certain Revolving Credit Agreement between the Longhorn Group, as borrower, Merrill Lynch Capital Corporation, as administrative agent (the "Longhorn Agent"), and the lenders party thereto (together with the Longhorn Agent, the "Longhorn Lenders"), dated as of December 19, 2007 (the "Longhorn Revolver"). The Longhorn Revolver provides a $120 million revolving credit facility maturing on December 19, 2012.

28. The Longhorn Revolver is secured by certain refined petroleum products in the Longhorn Pipeline (i.e., "linefill"), certain refined petroleum products stored in the Longhorn Group's tanks, certain hedging agreements and transactions, all accounts, general intangibles, payment intangibles, chattel paper, documents and instruments, including all customer swap agreements, collections, the collateral account and cash and securities therein, and any proceeds of the foregoing.

*The Longhorn Note*

29. The purchase of the Longhorn Pipeline was consummated pursuant to that certain Non-Recourse Promissory Note by and between Longhorn Holdings, as borrower, and Pipeline Lender, as lender, dated as of August 17, 2006 (the "Longhorn Note"). The Longhorn Note is secured by a pledge by Longhorn LP of the "hard assets" related to the Longhorn Pipeline,

including the pipeline itself. The principal amount of the Longhorn Secured Note is $215 million and matures on August 17, 2010. The Longhorn Secured Note is subject to reduction in accordance with certain indemnities under the purchase agreement for the Longhorn Pipeline. As of the end of October 2009, the Debtors believe that the Longhorn Group had approximately $166 million outstanding under the Longhorn Note.

### (iii) The Flying J Unsecured Revolver

30. Flying J does not have any secured funded debt as of the Petition Date, but it does own properties subject to mortgages. In addition, Flying J has approximately $90 million outstanding under an unsecured revolving credit facility with Zions Bank.

### (iv) The Debtors' Trade Payables

31. In addition to the Debtors' funded debt, as of the Petition Date, the Debtors owed trade payables to their vendors and suppliers. The Debtors do business under standard industry terms and were generally current with their vendors and suppliers until immediately before the chapter 11 filing.

## III.

## SPECIFIC EVENTS LEADING TO THE CHAPTER 11 CASES

### A. Adverse Market Conditions

32. The Flying J Group is in the midst of a short-term liquidity constraint that is largely the result of the recent precipitous and rapid decline in oil and gas prices. The recent economic crisis has caused a global decline in demand for oil and gas that has negatively impacted prices. The numbers best tell the story: as of December 19, 2008, oil prices have fallen by almost 60% against the previous year and over 75% from the record level of $147 per barrel reached in July 2008.

DB02:7668236.1                                                                                                    900007.0003

33. The more than $100 per barrel decline in oil prices in the last three months has had a real and tangible effect on the Debtors' short-term cash availability. <u>First</u>, the decline in oil prices has led to material declines in the Debtors' liquidity in its retail operations as well as the Debtors' supply and distribution operations, thereby decreasing the Debtors' accounts receivables and the value of their inventory as a result of writing their inventory down in value and shrinkage of their trade payables.

34. <u>Second</u>, the decline in oil prices has limited the Longhorn Group's access to its credit line under the Longhorn Revolver because the decline in the value of the "linefill" collateral required the Longhorn Group to make mandatory prepayments on amounts outstanding thereunder. The Debtors estimate that from the end of September 2008 through the current time, their access to liquid capital has declined by approximately $155 million as a direct or indirect result of the global decline in oil prices.

**B.    Recent Capital Expenditures**

35. In addition to adverse market conditions described above, the Debtors recently were required to replace about 40 miles of the Longhorn Pipeline and make other repairs relating thereto resulting in a significant capital expenditure of approximately $40 million.

**C.    Covenant Default Under the Big West Revolver and the Longhorn Revolver**

36. The combination of exceedingly difficult market conditions and additional capital expenditures by the Longhorn Group ultimately contributed to the Big West Group's inability to comply with the terms of a negative covenant contained in the Big West Revolver with respect to affiliate transactions. Indeed, as the Debtors experienced the liquidity constraints described above, Flying J was unable to satisfy an intercompany payable owing to the Big West Group, a sizeable portion of which related to gains from hedging contracts that Flying J had allocated for the benefit of certain its subsidiaries, including the Big West Group. The existence of the large

intercompany receivable triggered the Big West Group's inability to comply with the negative covenant under the Big West Revolver.

37. On December 19, 2008, the Revolver Agent, on behalf of the Revolver Lenders, notified the Big West Group that it was in default under the Big West Revolver, and as such, it had elected to accelerate and declare all amounts owing and payable thereunder immediately due and payable on December 19, 2008 as a result of the event of default. Subsequent to sending the notice of default to Big West, the Revolver Agent, on behalf of the Revolver Lenders, swept a substantial sum of cash from Big West Group's bank accounts under the Revolver Agent's control.

38. One day later, on December 20, 2008, the Longhorn Agent notified the Longhorn Group of an event of default under the Longhorn Revolver resulting from the Longhorn Group failing to repay approximately $2.7 million under the Longhorn Revolver as a result of further declines in the value of the linefill due to continued decreases in the price of oil. As a result of the event of default, the Longhorn Agent informed the Longhorn Group that it could no longer make or direct any withdrawal from its bank account under the Longhorn Agent's control without the Longhorn Agent's prior written consent.

39. To the best of my knowledge, information and belief, insofar as I have been able to ascertain after reasonable inquiry, the confluence of factors described above, coupled with the current economic environment left, the Debtors with few alternatives to protect their ongoing business operations (thereby maximizing value for all stakeholders) other than to file these chapter 11 cases. The Debtors maintain valuable assets and are part of a profitable enterprise. Through these chapter 11 cases, the Debtors intend to stabilize their business operations by

addressing their short-term liquidity needs so that the Debtors may emerge as stronger companies.

## IV.

## **FIRST DAY REQUESTS FOR RELIEF**

40. I have read the First Day Motions, which are comprised of the following:

- Motion of the Debtors for Entry of an Order Directing Joint Administration of Their Related Chapter 11 Cases;

- Motion of the Debtors for Entry of an Order Authorizing the Debtors (A) to Pay Certain Prepetition Wages, Salaries and Other Compensation, Reimbursable Expenses and Employee Medical and Similar Benefits; and (B) to Continue Their Workers' Compensation Program;

- Motion of the Debtors to for Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue Using Their Existing Cash Management System, Bank Accounts and Business Forms; (B) Maintain Existing Investment Practices; and (C) Continue Ordinary Course Intercompany Transactions;

- Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing the Use of Big West Cash Collateral, (B) Granting Adequate Protection to Prepetition Lenders and (C) Scheduling a Final Hearing; and

- Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing the Use of Longhorn Cash Collateral (B) Granting Adequate Protection to Prepetition Lenders and (C) Scheduling a Final Hearing.

41. I hereby adopt all of the statements and representations in the above-listed First Day Motions as being true and accurate to the best of my knowledge. In doing so, they are incorporated herein by reference.

42. The First Day Motions presented on the emergency basis seek limited relief designed to enable the Debtors to continue their business operations in the immediate near term to prevent disruption and irreparable harm to the Debtors and the entire Flying J Group.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  December 22, 2008                    Respectfully submitted,

                                                                           _____
                                                                           J. Phillip Adams

**<u>Exhibit A</u>**



Flying J Inc. & Subsidiaries — Information System Lookup — December 22, 2008