# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| FLYING J INC., et al.,[1] | ) Case No. 08-13384 (MFW) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) **Bidding Procedures Hearing Date: July 6, 2009 at 11:30 a.m. (EST) (Requested)** |
| | ) **Bidding Procedure Objection Deadline: July 1 at 12:00 p.m. (EST) (Requested)** |
| | ) **Sale Hearing Date: July 27, 2009 at 10:30 a.m. (EST) (Requested)** |
| | ) **Sale Objection Deadline: July 20, 2009 at 4:00 p.m.(EST) (Requested)** |

**MOTION OF THE DEBTORS FOR ENTRY OF (A)AN ORDER APPROVING BIDDING AND NOTICE PROCEDURES AND BREAK-UP FEE IN CONNECTION WITH THE SALE OF (I) SUBSTANTIALLY ALL OF THE ASSETS OF LONGHORN PARTNERS PIPELINE, L.P. AND (II) PETROLEUM PRODUCTS BELONGING TO CERTAIN OF THE DEBTORS, AND (B) AN ORDER (I) APPROVING THE PURCHASE AGREEMENTS BETWEEN THE DEBTORS AND THE PURCHASER, OR SUCH OTHER PURCHASE AGREEMENTS BETWEEN THE DEBTORS AND THE SUCCESSFUL BIDDER; (II) AUTHORIZING THE SALE OF ALL OR SUBSTANTIALLY ALL OF LONGHORN PARTNERS PIPELINE, L.P.'S ASSETS AND PETROLEUM PRODUCTS BELONGING TO CERTAIN OF THE DEBTORS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS; (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH; AND (IV) GRANTING RELATED RELIEF**

Flying J Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), file this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"), (a) establishing

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Flying J Inc. (3458); Big West of California, LLC (1608), Big West Oil, LLC (6982); Big West Transportation, LLC (6984); Longhorn Partners Pipeline, L.P. (0554); Longhorn Pipeline Holdings, LLC (0226), Longhorn Pipeline Inc. (0654). The location of the Debtors' corporate headquarters and the service address for all Debtors is: 1104 Country Hills Drive, Ogden, UT 84403.

bidding and notice procedures (the "Bidding Procedures") and Bid Protections (as defined herein) in connection with the sale (the "Sale") of (i) substantially all of the assets (the "Acquired Assets") of Longhorn Partners Pipeline, L.P. ("Longhorn") and (ii) petroleum products belonging to certain of the Debtors (the "Main Line Fill" and the "Spur Line Fill," collectively, the "Line Fill"),[2] and (b) an order, substantially in the form attached hereto as **Exhibit B** (the "Sale Order"), (i) approving the Purchase Agreements (as defined herein) for the sale of the Acquired Assets and the Line Fill to Magellan Midstream Partners, L.P. or its designated affiliate or affiliates ("Magellan") or the Successful Bidder (each a Purchaser as defined herein) to be identified pursuant to the Bidding Procedures[3]; (ii) authorizing the sale of substantially all of Longhorn's assets and the Line Fill free and clear of all liens, claims, encumbrances and other interests (collectively, the "Encumbrances"); (iii) authorizing the assumption and assignment to Magellan or the Successful Bidder of the executory contracts and unexpired leases identified on Exhibit 1 to **Exhibit E** attached hereto (collectively, the "Assigned Contracts") and (iv) granting certain related relief. In support of this Motion, the Debtors respectfully state as follows:

## Jurisdiction

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[2]   The Line Fill is comprised of approximately 1.23 millions barrels of refined petroleum product. The Main Line Fill, owned by Longhorn Pipeline, Inc., is located in the Pipeline System (as defined in the Purchase Agreement (as defined herein)), in Longhorn storage tanks in Crane, Texas and at Longhorn's El Paso terminal. The Spur Line Fill, owned by Flying J Inc., is located in the section of the Pipeline System from Crane, Texas to Odessa, Texas.

[3]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the APA.

3.     The statutory bases for the relief requested herein are sections 105(a), 363(b), 363(f) and (m), 365, 503 and 507 of title 11 of the United States Code (the "Bankruptcy Code") and rules 2002(a)(2), 6004(a), (b), (c), (e), (f) and (h), 6006(a), (c) and (d), 9007 and 9014 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules") and Rule 6004-1 of the United States Bankruptcy Court District of Delaware Local Rules (the "Local Bankruptcy Rules").

## Relief Requested

4.     By this Motion, the Debtors request the entry of (a) an order approving the Bidding Procedures and Break-Up Fee and (b) an order (i) approving the Purchase Agreements for the sale of the Acquired Assets and the Line Fill to Magellan or the Successful Bidder; (ii) authorizing the sale of the Acquired Assets and the Line Fill free and clear of Encumbrances; (iii) authorizing the assumption and assignment of the Assigned Contracts to Magellan or the Successful Bidder; and (iv) granting certain related relief.

## Background

5.     On December 22, 2008 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of title 11 of the Bankruptcy Code.  On January 5, 2009, the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors (the "Creditors' Committee").

6.     The Debtors and their wholly owned non-debtor subsidiaries (collectively, the "Flying J Group") are a fully integrated oil company with operations in the field of exploration, production, refining, transportation, wholesaling and retailing of petroleum products.  Debtor Flying J Inc. is one of the 20 largest privately held companies in America with 2007 consolidated

3

sales in excess of $16.2 billion and is the direct or indirect parent corporation of each of the other members of the Flying J Group.

7. The Flying J Group operates over 240 retail locations, including state-of-the-art travel plazas, convenience stores, restaurants, motels and truck service centers in 41 states and six Canadian provinces. In addition to usual rest stop services (food, fuel, shower facilities), the Flying J Group offers banking, bulk-fuel programs, communications (wireless Internet connections), fuel cost analysis, insurance and truck fleet sales. Furthermore, the Flying J Group explores for, refines and transports petroleum products and is likely the largest retail distributor of diesel fuel in North America. Other operations of the Flying J Group include online banking, card processing, truck and trailer leasing, and payroll services. In these widespread operations, the Flying J Group employs approximately 14,700 people.

8. Each of the Debtors in these chapter 11 cases is involved in or associated with the Flying J Group's core businesses of petroleum refining, supply and distribution. In particular, Debtors Big West Oil LLC and Big West of California LLC own and operate two refineries in North Salt Lake City, Utah and Bakersfield, California, respectively, which have the combined capacity to refine over 100,000 barrels of crude oil per day. These Debtors also are responsible for purchasing and transporting crude oil in parts of California, Utah, Wyoming and Colorado. Debtor Longhorn Pipeline, Inc. and its Debtor subsidiaries (the "Longhorn Debtors") own and operate an approximately 700-mile common carrier pipeline with installed capacity of over 70,000 barrels per day from the Gulf Coast near Houston to El Paso, Texas.

9. The Debtors have filed these chapter 11 cases to address near-term liquidity constraints brought on by the precipitous drop in the price of oil beginning in September of 2008 and continuing through the present as well as the recent tightening credit markets. The Debtors

4

believe that their businesses are fundamentally sound and profitable and that these chapter 11 cases will allow them to resolve their liquidity constraints and emerge as stronger, healthier companies.

### Recapitalization and Marketing Efforts

10.     Throughout the pendency of these chapter 11 cases, the Debtors and their advisors have explored, and continue to explore, multiple restructuring alternatives, including the sale of specific portions of the Debtors' operations, a new debt or equity capital infusion and a restructuring of the Debtors' balance sheet.  On the Petition Date, the Debtors retained investment banker Blackstone Advisory Services L.P. ("Blackstone")[4] in part to assist the Debtors' board of directors in their evaluation of strategic alternatives.  The Debtors and Blackstone ultimately determined a sale of the Line Fill and a divestiture of the assets held by Longhorn, a wholly owned subsidiary of the Flying J Group, would allow the Debtors to effectively channel these non-core resources to the Debtors' other business operations, as well as possibly provide further liquidity to the Flying J Group and maximize recovery to creditors of both Longhorn and the Debtors' other estates.  In connection with the sale of the Acquired Assets and the Line Fill, the Debtors expanded the scope of Blackstone's retention to include M&A services and also retained Aegis Energy Advisors, Inc., ("Aegis," together with Blackstone, the "Sale Advisors")[5] an investment bank specializing in the energy industry, to market the Acquired Assets and the Line Fill and provide related bid assessment and valuation services.

---

[4]   See *Amended Order Authorizing the Debtors to Retain Blackstone Advisory Services L.P. as Their Investment Banker and Financial Advisor Nunc Pro Tunc to the Petition Date* entered on April 3, 2009 [Docket No. 927].

[5]   See *Order Authorizing the Debtors to Retain Aegis Energy Advisors Corp. as Lead Sale Advisor Nunc Pro Tunc to January 27, 2009* entered on April 3, 2009 [Docket No. 925].

DB02:8325823.1                                                                                    067990.1001

11.     On or around February 2, 2009, the Sale Advisors began soliciting potential third-party buyers in connection with the sale of the Acquired Assets and the Line Fill. The Sale Advisors, with the assistance of the Debtors, identified 128 parties, which included private-equity investors, energy and exploration master limited partnerships, commodities trading firms and fuel refiners and marketers, to receive preliminary informational memoranda. Forty-two of these parties executed confidentiality agreements and received additional information, including a confidential information memorandum. From this pool of parties, the Debtors ultimately received twelve first round bids. After careful review of the bids and related diligence, the Debtors held a second round of bidding, where two parties, one of which was Magellan, submitted binding bids to purchase both the Acquired Assets and the Line Fill. Working closely with the Sale Advisors, the Debtors ultimately determined that Magellan offered the best combination of price, proven financing and ability to cheaply and possibly quickly close the transaction. All told, this extensive marketing and sale process was conducted over a period of almost five months.

### The Stalking Horse Agreements

12.     The Debtors have been in extensive negotiations with Magellan regarding the terms of a possible acquisition. These negotiations culminated in the execution of a stalking horse purchase agreement of substantially all of the assets of Longhorn (the "APA," substantially in the form attached hereto as **Exhibit F**), the Main Line Fill (the "Main Line Fill Purchase Agreement," substantially in the form attached hereto as **Exhibit G**) and the Spur Line Fill (the "Spur Line Fill Purchase Agreement," substantially in the form attached hereto as **Exhibit H**) with Magellan on June 19, 2009. The APA, the Main Line Fill Purchase Agreement and the

Spur Line Fill Purchase Agreement (collectively, the "Purchase Agreements")[6] all outline the terms and conditions of a proposed acquisition of substantially all of the assets of Longhorn and the Line Fill in a sale pursuant to section 363 of the Bankruptcy Code in which Magellan would be the stalking horse bidder. Subject to adjustment in accordance with the APA, the Purchase Price for the Acquired Assets is $250,000,000 (the "Purchase Price"). Magellan has also agreed to purchase the Line Fill at its fair market value, which the Debtors estimate to be approximately $90,000,000 as of June 18, 2009. Subject to the receipt of higher and better proposals through the Bidding Procedures, the Purchase Agreements collectively represent the best alternative currently available to the Debtors.

13.     In an effort to expeditiously move these chapter 11 cases forward, the Debtors are filing the Motion because the Sale will produce the greatest value to the Debtors for the Longhorn assets.

14.     The Debtors intend to sell the Acquired Assets and the Line Fill to Magellan or the highest or best bidder at Auction (if conducted) free and clear of any Encumbrances, with any valid liens on the assets sold to attach to the Sale proceeds. The price to be paid by the ultimate purchaser for the Acquired Assets and the Line Fill and terms and conditions for the sale of such assets will be established at the Auction (if conducted).

15.     The proposed Bidding Procedures and Auction should provide a fair opportunity for open and spirited bidding, taking into account the already robust marketing process that has occurred, and generate the highest or best bid for the Acquired Assets and the Line Fill. The

---

[6]     The summaries of the Purchase Agreements contained in this Motion are qualified in their entirety by reference to the specific terms contained therein. In the event of any inconsistency between the Purchase Agreements and the summary herein, the terms of the Purchase Agreements shall govern.

Debtors *reserve the right not to proceed to Auction or at Auction not to declare a successful bidder.*[7]

## The Break-Up Fee

16.    The APA provides for a break-up fee of $3,750,000 (1.5% of the Purchase Price) (the "Break-up Fee") in the event that the a party other than Magellan is the Successful Bidder (as defined herein) for the Acquired Assets at Auction (as defined herein). If, however, another party is the Successful Bidder at Auction, and on or prior to the last day of the Auction, the applicable waiting period under the HSR Act applicable to the transactions contemplated by the APA has expired or terminated, then the Break-Up Fee shall be $7,500,000 (3.0% of the Purchase Price).

17.    As set forth in the APA, the Breakup Fee is payable only in narrow circumstances. Specifically, all as further described in the APA, Magellan is entitled to the Break-Up fee if a party other than Magellan is the Successful Bidder, the Debtors seek authority to withdraw this Motion or the Debtors announce a stand-alone plan of reorganization or liquidation.

18.    Magellan's willingness to go forward with the APA is expressly conditioned on approval of the Break-Up Fee. Therefore, as discussed in greater detail below, the Debtors submit that the potential benefits of the APA more than justify the Break-Up Fee and submit that agreeing to the Break-Up Fee is a prudent exercise of the Debtors' business judgment.

---

[7]    Per Local Bankruptcy Rule 6004-1(b)(iv) and (c)(i), the Debtors are required to highlight certain provisions of this Motion. The Debtors have formatted (using bold and italics) every such required instance.

## Magellan's Contingent Super-Priority Claim

19.     The Debtors and Magellan have a preexisting relationship. The Debtors engaged Magellan to serve as the Pipeline's third-party operator in January of 2005. Magellan has continued to serve as the third-party operator during the pendency of these chapter 11 cases.

20.     Pursuant to the service agreement (the "Service Agreement") by and between Longhorn and Magellan, the Debtors pay Magellan, among other amounts, a set yearly management fee in the amount of $7.5 million, made in twelve equal monthly installments, (the "Management Fee") for the services rendered as the third-party operator of the Pipeline.

21.     Facing severe liquidity constraints, the Debtors filed the *Motion for Entry of an Order Approving (A) Modifications to the Magellan Services Agreement, (B) Entry Into Supplemental Services Agreement, and (C) Granting of Superpriority Liens* on April 22, 2009 [Docket No. 1063] (the "Magellan Deferral Motion") seeking approval of an agreement whereby Magellan would defer a portion of the Management Fee.

22.     In light of the sale and as part of the Purchase Agreements, Magellan has agreed to defer the Management Fees due through closing on the Purchase Agreements (the "Fee Holiday"). If, however, Magellan is not the Successful Bidder, the deferred Management Fees will be allowed super-priority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code which is payable immediately.

## Marketing Process

23.     The Debtors have taken the following steps to ensure a well-advertised Sale and Auction:

>       (a)     Contact Parties: The Debtors, in consultation with Blackstone and Aegis (the "Sale Advisors"), have developed a list of parties who the Debtors believe may be interested in and who the Debtors reasonably believe would have the financial resources to consummate a competing transaction to that of Magellan (a "Competing Transaction"), which list

9

includes both potential strategic investors and potential financial investors (each, individually, a "Contact Party," and collectively, the "Contact Parties"). As the court is aware, the Debtors have already conducted an extensive marketing process, engaging over 128 potential strategic investors and potential financial investors, thereby ensuring that the Contact Parties are comprised of viable potential bidders. and have been provided sufficient time to participate in the Auction undertaken to date. The Debtors will continue to discuss and may supplement the list of Contact Parties throughout the marketing process, as appropriate.

(b)  Information Package: The Debtors may distribute to each Contact Party an "Information Package" comprising a cover letter, a copy of the Bidding Procedures; and a copy of the Confidentiality Agreement (as defined herein).

(c)  Data Room and Access to Information: Upon execution of a Confidentiality Agreement, in form and substance satisfactory to the Debtors, any party that wishes to conduct due diligence on the Line Fill and the Assets may be granted access to material and confidential information in the Debtors' sole discretion; *provided, however,* that the Debtors have no obligation to provide information after the Bid Deadline (defined below). The Debtors may, in their sole discretion, schedule management presentations and make management otherwise available to selected bidders prior to the Bid Deadline.

### The Bidding Procedures[8]

24.  To ensure the highest or best price is received for the Acquired Assets and the Line Fill, the Debtors have developed the following proposed Bidding Procedures (substantially in the form attached hereto as **Exhibit C**) for the contemplated Auction and Sale:

(a)  Confidentiality Agreements: Any prospective bidder that wishes to receive information regarding the Acquired Assets, the Main Line Fill and/or the Spur Line Fill must execute a confidentiality agreement, in form and substance satisfactory to the Debtors (a "Confidentiality Agreement"). Upon execution and delivery of a Confidentiality Agreement, the Debtors may, in their discretion, provide information to any such prospective bidder, schedule management presentations and

---

[8]  The summary of the Bidding Procedures contained in this Motion is qualified in its entirety by reference to the Bidding Procedures. Any conflict between the terms described in this Motion and the Bidding Procedures shall be resolved in favor of the Bidding Procedures. Capitalized terms used but not otherwise defined in this section shall have the meanings set forth in the Bidding Procedures.

make management otherwise available to selected bidders, in each case prior to the Bid Deadline.

(b)  Qualified Bidders:  In order to be a Qualified Bidder (as hereinafter defined) for the Acquired Assets, the Main Line and/or the Spur Line Fill, a bidder must deliver the Qualified Bid Required Documents (as defined below) **so as to be received by the parties specified in Section 5 of the Bidding Procedures by not later than 4:00 p.m. (prevailing Eastern Time) on July 17, 2009 (the "<u>Bid Deadline</u>")**.

When used herein and without limiting the requirements of the proviso to the first sentence of the first paragraph after Section 3(e) below after delivery of the Funds Certification Notice and satisfaction of the condition set forth in Section 12.1(b) of the Purchase Agreement, "<u>Qualified Bid Required Documents</u>" means:

(i)  a letter, executed by such bidder, (i) setting forth the cash purchase price proposed to be paid by such bidder for the Acquired Assets proposed to be acquired by such bidder and confirming whether such bidder intends to purchase the Main Line Fill and the Spur Line Fill, (ii) stating that the bid submitted by such bidder is irrevocable until the conclusion of the Sale Hearing (as defined in the Sale Order), (iii) stating that such bid and the agreements, exhibits and schedules referred to in clause (b) immediately below, have been duly authorized, executed and delivered by such bidder and that no further internal or equityholder approvals are required with respect to any such matter, (iv) setting forth each regulatory and third-party approval required by such bidder for the consummation of the purchase and sale of the Acquired Assets, the Main Line Fill and the Spur Line Fill, as applicable, and the time period within which such bidder expects to receive such regulatory and third-party approvals (and, in the case, that any such regulatory or third-party approval is expected to take more than 30 days after execution and delivery of a purchase and sale agreement, what actions such bidder is prepared to take to ensure prompt receipt of such approval(s)) and (v) confirming that the bid submitted by such bidder is not conditioned on receipt of financing or the outcome of any due diligence investigation regarding the Acquired Assets, the Main Line Fill or the Spur Line Fill, as applicable;

(ii)  clean purchase and sale agreement(s), duly authorized, executed and delivered by such bidder, for the Acquired Assets consistent in all material respects with clause (a)

11

immediately foregoing, together with all exhibits and schedules to each of the foregoing (the "Modified Purchase Agreements") and marked Modified Purchase Agreements reflecting the variations from, as applicable, the Purchase Agreement, the Main Line Fill Purchase Agreement, the Spur Line Fill Purchase Agreement, and each other exhibit and schedule thereto (with it being understood that the Modified Purchase Agreements for each bidder shall show with precision any changes to the assets, contracts, leases and liabilities to be assumed or purchased by such bidder relative to the Purchaser);

(iii)     to the extent that the bidder is proposing to pay for the Acquired Assets, the Main Line Fill and/or the Spur Line Fill, in whole or in part, from cash on its balance sheet, recent audited financial information and confirmation that such bidder's cash position has not materially decreased, nor is expected to materially decrease, from that reflected in such audited financial information and to the extent that such bidder is proposing to pay for the Acquired Assets, the Main Line Fill and/or the Spur Line Fill with funds from any third-party financing source (whether debt or equity), includes copies of written firm commitments for such financing (including, without limitation, any existing credit facility) executed by all parties thereto;

(iv)     does not request or entitle the bidder to any transaction or break-up fee, expense reimbursement, or similar type of payment; and

(v)     includes a cash deposit in the amount of $12,500,000; *provided, however* that the Secured Lenders shall not be required to provide a cash deposit in the event they exercise their right to credit bid, but only to the extent of their credit bid.

Subject to other bids being deemed Qualified Bids in accordance with this Section 3 of the Bidding Procedures, any bid meeting the above requirements shall constitute a "Qualified Bid" and the bidder submitting such Qualified Bid referred to herein as a "Qualified Bidder"; provided that, if a Funds Certification Notice has been delivered by Buyer in accordance with the Purchase Agreement and the condition set forth in Section 12.1(b) of the Purchase Agreement has been fully satisfied prior to the Bid Deadline, a bid shall only be deemed a "Qualified Bid" if such bid provides value to the Debtors, as determined by the Debtors in their reasonable business judgment after consultation with the Creditors' Committee and the Secured Lenders, of at least $1,000,000 more than the

sum of the value provided to the Debtors by the Purchase Agreement plus the Break-Up Fee. Upon submission of a bid prior to the Bid Deadline (and whether or not such bid is ultimately determined to be a Qualified Bid), the bidder shall, at the request of the Debtors, include information that, in the discretion of the Debtors after consultation with the Creditors' Committee and the Secured Lenders,[9] evidences the bidder's financial wherewithal and operational ability to consummate the transaction proposed by its bid, including, without limitation, such financial and other information setting forth adequate assurance of future performance under section 365 of the Bankruptcy Code in a form requested by the Debtors to allow the Debtors to serve within one business day after such receipt of such information on counter-parties to any contracts or leases being assigned in connection with the proposed sale that have requested, in writing, such information.

Prior to the Auction, the Debtors reserve the right to (a) subject to Section 9 of the Bidding Procedures, solicit bids for the Acquired Assets, the Main Line Fill, and/or the Spur Line Fill, (b) subject to execution and delivery by a bidder of a Confidentiality Agreement, provide information regarding the Acquired Assets, the Main Line Fill and/or the Spur Line Fill and liabilities related thereto, (c) discuss the terms of any bid submitted, and (d) request clarifications or resubmission of any bid, and upon receipt of any such clarification or resubmission, to deem a bid as a Qualified Bid even if it was not such a Qualified Bid prior to such clarification or resubmission;.

For all purposes of the Bidding Process:

(i)    the Purchaser shall be deemed a Qualified Bidder and the Purchase Agreement and, to the extent LPP has not delivered a Line Fill Termination Notice, the Main Line Fill Purchase Agreement and the Spur Line Fill Purchase Agreement shall be deemed a Qualified Bid; and

(ii)   each lender pursuant to the DIP Facility and the Seller Note (collectively, the "Acquired Assets Secured Lenders") and each lender party to the Merrill Lynch Agreement (the "Main Line Fill Secured Lenders", and together with the Acquired Assets Secured Lenders, the "Secured Lenders")), pursuant to the Interim Order Under 11 U.S.C. §§ 105(a), 361, 362(c)(2), 363(e) and 364 and Fed. R. Bank. P. 2002, 4001 and 9014 (I) (A) Authorizing Debtors to Obtain Post-

---

[9]    The Secured Lenders consultation rights are limited in all respects only to issues affecting their collateral.

Petition Financing and (B) Utilize Cash Collateral, and (II) Granting Adequate Protection to Prepetition Secured Parties [Docket No. 1024], have preserved their rights under section 363(k) of the Bankruptcy Code and are hereby deemed Qualified Bidders (in the case of the Acquired Assets Secured Lenders, with respect to the Acquired Assets, and in the case of the Main Line Fill Secured Lenders, with respect to the Main Line Fill); provided, however, that if the Acquired Assets Secured Lenders or the Main Line Fill Secured Lenders, as applicable, intend to submit a credit bid with respect to the Acquired Assets or the Main Line Fill, as applicable, they shall do so in accordance with the requirements of Section 3 of the Bidding Procedures (as adjusted as necessary with respect to clause (c) of Section 3 of the Bidding Procedures to reflect the credit bid) by the Bid Deadline and, if they intend to increase such credit bid, they shall do so at the Auction in order to be a Qualified Bid.

The Debtors shall provide copies of bids, and a list of parties submitting bids, to counsel and financial advisors for the Creditors' Committee and the Secured Lenders as soon as is reasonably practicable after the Bid Deadline or such bid is otherwise received. The Debtors, in consultation with the Creditors' Committee and the Secured Lenders, shall make a determination regarding whether a bid is a Qualified Bid and shall notify bidders whether their bids have been determined to be Qualified Bids by no later than **4:00 p.m. (prevailing Eastern Time) on July 22, 2009** (the "Qualified Bidder Notification Deadline"). The Qualified Bidder Notification Deadline may be extended by the Debtors, in their sole discretion, at any time and from time to time; provided that, if the Qualified Bidder Notification Deadline is extended, the Debtors will promptly notify each bidder that has submitted a Qualified Bid prior to the pre-extension deadline time of such extension.

(c)     Aggregate Bids:  Persons who collectively are referred to as a "Qualified Bidder" need not be Affiliated Persons and need not act in concert with one another and the Debtors may aggregate separate bids from unaffiliated persons to create one "Qualified Bid" from one or more "Qualified Bidders"; provided, however, that all bidders shall remain subject to the provisions of 11 U.S.C. § 363(n) regarding collusive bidding.

(d)     Deadline for Submission:  All bids (including the Secured Lenders' credit bid) must be submitted to the following so as to be received **by the Bid Deadline**:

(i)     Flying J Inc., 1104 Country Hills Drive, Ogden, UT 84403; Attn.: General Counsel;

(ii)     Blackstone Advisory Services L.P., 345 Park Avenue, New York, New York 10154; Attn.: Peter Laurinaitis;

(iii)    Aegis Energy Advisors Corp., 708 Third Avenue, New York, New York, 10017; Attn.: Garfield L. Miller III;

(iv)     Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attn.: Adam C. Paul;

(v)      Young Conaway Stargatt & Taylor, LLP, The Brandywine Building 1000 West Street, Wilmington, Delaware 19801; Attn.: Pauline K. Morgan;

(vi)     Pachulski Stang Ziehl & Jones LLP, 150 California Street, San Francisco, California 94111; Attn.: Debra Grassgreen;

(vii)    Vinson & Elkins LLP, 666 Fifth Avenue, New York, New York 10103; Attn.: Steven M. Abramowitz;

(viii)   Stevens & Lee, P.C., 1105 North Market Street, Wilmington, Delaware 19801; Attn.: John D. Demmy;

(ix)     Magellan Midstream Partners, L.P., One Williams Center, Suite 2800, Tulsa, Oklahoma 74172: Attn.: Lonny Townsend; and

(x)      Fox Rothschild LLP, 919 Market Street, Suite 1600, Wilmington, Delaware 19801; Attn.: Jeffrey Schlerf.

(e)     Evaluation of Qualified Bids:  Prior to the Auction, the Debtors shall determine, in their reasonable business judgment after consultation with the Debtors' financial and legal advisors and the financial and legal advisors for the Creditors' Committee, which of the Qualified Bids (including any bids submitted by or on behalf of the Secured Lenders) is likely to result in the highest or otherwise best offer for the Acquired Assets and, to the extent that a Line Fill Termination Notice has not been delivered by Longhorn prior thereto, the Main Line Fill and the Spur Line Fill (the bid so selected, being referred to herein as the "Starting Bid"). Subject in all respects to the requirements of the Bankruptcy Code, and all rules and regulations (including, without limitation, local rules) promulgated pursuant thereto, and the Bidding Procedures Order, in evaluating whether a Qualified Bid for the Acquired Assets, the Main Line Fill and/or the Spur Line Fill is the highest or otherwise best offer, such bid will be valued by the Debtors, in consultation with its financial and legal advisors and the legal and financial advisors for the Creditors' Committee and the Secured Lenders, based on numerous factors, including, without limitation, the net value and recovery to the Debtors and their stakeholders (including, without limitation, after giving effect to

any purchase price adjustments provided for in such bid), the amount and availability of distributions to the Debtors and their creditors as a result of the proposed transaction, the assets and liabilities included or excluded from the bid (and the resulting effect on value and distributions), the number, type and nature of any changes to the Purchase Agreement, the Main Line Fill Purchase Agreement and/or the Spur Line Fill Purchase Agreement, as applicable, requested by each bidder (and whether any such changes are favorable or not to the Debtors) and the certainty and timing of closing the transactions contemplated by such Qualified Bid.

(f)     No Qualified Bids:  If no Qualified Bids are submitted by the Qualified Bidder Notification Deadline the Auction will be deemed cancelled, the Purchase Agreement will be deemed the Successful Bid, and the Debtors will immediately seek authority to consummate the sale contemplated in the Purchase Agreement with the Purchaser.

(g)     Auction:  In the event that the Debtors receive one or more Qualified Bids from a bidder other than the Purchaser, the Debtors shall conduct an Auction with respect to the Acquired Assets.  The Auction will take place starting at **9:00 a.m. (prevailing Eastern Time) on July 24, 2009** at Kirkland & Ellis, LLP, 601 Lexington Avenue, New York, New York 10022, or at such other place, date and time as may be designated in writing by the Debtors.

Other than the Debtors, only (i) the Purchaser and its advisors, (ii) parties and their advisors that have been advised that they have submitted a Qualified Bid, (iii) counsel and financial advisors to the Creditors' Committee, (iv) counsel and financial advisors for the Secured Lenders, and (v) other parties specified in the Bidding Procedures Order will be permitted to participate in and/or make any statements on the record at the Auction.

Subject to Section 14 of the Bidding Procedures, the Auction shall be governed by the following procedures:

(i)     Only Qualified Bidders shall be entitled to make any subsequent bids at the Auction;

(ii)     Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale;

(iii)     The Qualified Bidders shall appear in person at the Auction, or through a duly authorized representative;

(iv)     Prior to the Auction, the Debtors shall provide copies of the Starting Bid to all Qualified Bidders which have informed the Debtors of their intent to participate in the Auction;

16

(v) All bids will be made and received in one room, on an open basis, and all other Qualified Bidders will be entitled to be present for all bidding, and all material terms of each bid will be fully disclosed to all other Qualified Bidders; provided that the Debtors shall have the right, once a Qualified Bidder has fully disclosed its bid, to meet with such Qualified Bidder privately in a separate break-out room;

(vi) Qualified Bidders may then submit successive bids with the value to the Debtors, as determined by the Debtors in their reasonable business judgment after consultation with the Creditors' Committee and the Secured Lenders, of at least $1,000,000.00 more than the bid at which the Auction commenced and then continue in minimum increments of at least $1,000,000.00 higher than the previous bid;

(vii) The Auction will be conducted in a manner as reasonably determined by the Debtors. Each bidder shall be informed of the terms of the previous bid;

(viii) All Qualified Bidders shall have the right to submit additional bids and make additional modifications to their respective Modified Purchase Agreements at the Auction, provided that any such modifications to the Modified Purchase Agreements, on an aggregate basis and viewed in whole, shall not be less favorable to the Debtors than any prior bid by such party or the preceding bid;

(ix) Debtors will, from time to time, in an open forum, advise Qualified Bidders participating in the Auction of their determination as to the terms of the then highest or otherwise best bid;

(x) The Debtors shall have the right to request any additional financial information that will allow the Debtors to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by one or more of the Modified Purchase Agreements as further amended during the Auction process and any further information that Debtors believe that they reasonably need to better understand the terms of a Qualified Bidder's bid;

(xi) The Purchaser shall be able to use the amount of the Break-up Fee as bidding consideration in the Auction; and

17

(xii)    Prior to the Auction, the Debtors shall notify potential bidders of the Purchaser's projected closing date (the "Projected Closing Date"). For each day after the Projected Closing Date that such Bidder closes the Transaction, if such Bidder is the Successful Bidder at Auction, such party shall pay an additional per diem amount determined as the quotient equal to (A) the product of (i) 12% multiplied by (ii) sum of (x) the purchase price for the Acquired Assets, plus (y) unless a Line Fill Termination Notice has been delivered by Longhorn prior to such time, the Main Line Fill and the Spur Line Fill, plus (z) the full amount of the Break-Up Fee payable to the Purchaser divided by (B) 365, for each day from the Projected Closing Date through the actual closing date with such Successful Bidder; provided, however, that the foregoing does not apply to the Purchaser or the Purchase Agreement.

(h)    After the earlier of (a) the Qualified Bidder Notification Deadline or (b) the Bid Deadline if no Qualified Bids other than the Purchase Agreement are submitted and until the earlier of the entry of the Sale Order and termination of the Purchase Agreement, neither Longhorn, the Debtors nor any of their respective affiliates shall, and the Debtors shall instruct their agents and representatives not to, solicit any inquiries, proposals or offers by, any person (other than the Purchaser and its affiliates, agents and representatives) with respect to a competing transaction for the sale of all or substantially all of the Acquired Assets (other than in the Ordinary Course of Business) (a "Competing Transaction"); provided that the Debtors may negotiate and accept an offer or proposal from any person (other than the Purchaser and its respective affiliates, agents and representatives) with respect to a Competing Transaction that it has not solicited in violation of this Section 9 of the Bidding Procedures.

(i)    Selection of Successful Bidder: The concluding date and time of the Auction shall be stated on the record. At the conclusion of the foregoing steps in the Auction, or as soon thereafter as practicable, the Debtors, in consultation with the Creditors' Committee and the Secured Lenders, will: (i) review each Qualified Bid, and consider each Qualified Bid, in each case as updated through the conclusion of the Auction, on the basis of, among other considerations, the same considerations used by the Debtors in determining the Starting Bid, and (ii) identify the highest or otherwise best offer(s) for the Acquired Assets the Main Line Fill and/or the Spur Line Fill received at the Auction (each, a "Successful Bid" and each party making such a bid, a "Successful Bidder"), as well as identifying the Back-up Bidder (as defined below). The Successful Bidder(s) shall have such rights and responsibilities as set forth in the applicable purchase and sale agreement for such Successful Bidder as agreed at the Auction.

Within one calendar day after conclusion of the Auction, the Successful Bidder shall complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made. The results at the close of the Auction shall be final and no additional bids will be accepted after the close of the Auction.

(j)    Sale Hearing: The Successful Bid will be subject to approval by the Court. The Debtors' presentation of a particular bid to the Court for approval does not constitute the Debtors' acceptance of the bid. The Debtors will be deemed to have accepted a bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing (as defined herein) to approve the sale of the Acquired Assets. Please be advised that the Sale Hearing (the "Sale Hearing") to approve the sale of the Acquired Assets to the Successful Bidder (or the Purchaser if no other Qualified Bid is received) will take place before the **Honorable Mary F. Walrath in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 5th Floor, Courtroom 4, Wilmington, Delaware 19801 at 10:30 a.m. (prevailing Eastern Time) on July 27, 2009,** or at such time thereafter as counsel may be heard. The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other by announcement of the adjournment in open court on the date scheduled for the Sale Hearing. The Successful Bidder and Backup Bidder (as defined below), if any, should be represented by counsel at the Sale Hearing.

(k)    Failure to Consummate Purchase: If an Auction is conducted, the party with the next highest or otherwise best Qualified Bid, as determined by the Debtors in the exercise of their business judgment, at the Auction shall be required to serve as a back-up bidder (the "Back-up Bidder") and keep such bid open and irrevocable until the earlier of 5:00 p.m. prevailing Eastern time on the later of the date (the "Outside Back-up Date") which is 210 days after the Sale Hearing or the closing of the sale transaction with the buyer approved at the Sale Hearing (the "Buyer"). Following the Sale Hearing, if the Buyer fails to consummate an approved Sale because of a breach or failure to perform on the part of such Buyer, the Back-up Bidder will be deemed to have the new Successful Bid, and the Debtors will be authorized, but not required, to consummate the Sale with the Back-up Bidder without further order of the Court. In such case, the defaulting Buyer's deposit, if any, shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available damages from the defaulting Buyer.

(l)    Return of Deposits: Except as otherwise provided in the Bidding Procedures, all deposits shall be returned to each bidder not selected by the Debtors in accordance with the above procedures as the Buyer or the Back-up Bidder by no later than the fifth business day following the

conclusion of the Auction; provided, however, that the interest on such deposit may not be returned until the second business day of the month following such termination. The deposit of the Back-up Bidder shall be held by the Debtors until the earlier of 24 hours after (i) the closing of the sale transaction with the Successful Bidder and (ii) the Outside Back-up Date.

(m) Reservation of Rights: Debtors reserve the right, as they may reasonably determine to be in the interests of their estates, to: (a) determine which bidders are Qualified Bidders; (b) determine which bids are Qualified Bids; (c) determine which Qualified Bid is the highest or otherwise best proposal and which is the next highest or otherwise best proposal; (d) reject any bid that is inadequate or insufficient or for any other reason; (e) refuse to execute a Confidentiality Agreement with, or provide information or access to, any prospective bidder, (f) impose additional terms and conditions with respect to any or all potential bidders (other than the Purchaser); or (g) adjourn or cancel the Auction or Sale Hearing in open court without further notice. Notwithstanding the foregoing, the Debtors may not impair or modify the rights and obligations of the Purchaser under the Purchase Agreement or the right of the Purchaser to credit the Break-Up Fee as part of any subsequent bid for the Acquired Assets.

## Basis for Relief

## I. APPROVAL OF THE BIDDING PROCEDURES IS APPROPRIATE AND IN THE BEST INTEREST OF THE ESTATES AND CREDITORS.

### A. The Proposed Notice of Bidding Procedures and Auction Is Appropriate

25. The Debtors seek to sell the Acquired Assets and the Line Fill through a well advertised Sale and Auction. The Debtors have already taken steps to canvass the market and identify the universe of parties that are capable of taking interest in the Acquired Assets and the Line Fill and maximizing the value received for such assets. The process by which Magellan emerged as the stalking horse involved an extensive solicitation process over a period of five months that initially generated approximately 128 potential buyers. The Debtors hope that an Auction, subject to this Court's approval, should elicit bids from one or more parties and potentially lead to a robust auction of the Acquired Assets and the Line Fill, maximizing the value for the Debtors' estates and their creditors.

20

26.     Under Bankruptcy Rule 2002(a) and (c), the Debtors are required to notify creditors of the proposed sale of the Acquired Assets and the Line Fill, including a disclosure of the time and place of an auction, the terms and conditions of a sale, and the deadline for filing any objections.  The Debtors request notice of the Sale, the Auction, the Sale Hearing, the Cure Amounts and the Bidding Procedures, (the "Sale Notice"), substantially in the form attached hereto as **Exhibit D**, [10] be deemed adequate and sufficient if within five business days of the entry of the Bidding Procedures Order, the Debtors (or their agents) shall serve by first class mail, postage prepaid, copies of the Sale Notice upon the following entities (collectively, the "Notice Parties"):

(a)     all parties entitled to receive notice as of the date hereof pursuant to Bankruptcy Rule 2002(a)(2);

(b)     all parties known to the Debtors who have an interest in or rights to the Acquired Assets;

(c)     all entities who have recorded in the public record any lien, interest or encumbrance in or upon the Acquired Assets or the Line Fill;

(d)     all parties to the Debtors' executory contracts, unexpired leases and real property easements as and when identified that will be assumed and/or assigned in connection with the Sale;

(e)     the Office of the United States Trustee for the District of Delaware;

(f)     applicable federal, state and local governmental authorities or units thereof;

(g)     all taxing authorities having jurisdiction over any of the Acquired Assets or the Line fill, including the Internal Revenue Service;

---

[10]  The Sale Notice and Publication Notice will direct parties to contact Kirkland & Ellis LLP, counsel to the Debtors, or Blackstone Advisory Group, LP, financial advisors to the Debtors, for more information and will provide that any party that wishes to obtain a copy of any related document (subject to any necessary confidentiality agreement) may make such a request in writing to:  (a) Blackstone Advisory Services L.P., 345 Park Avenue, New York, New York 10154; Attn.:   Peter Laurinaitis, facsimile:   (646) 253-7506; (laurinaitis@blackstone.com) or (b) Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attn.: Jeffrey W. Gettleman, Esq., Facsimile:  (312)-862-2200 (jeffrey.gettleman@kirkland.com).

(h) counsel for the Creditors' Committee;

(i) counsel for the agents for the Debtors' prepetition secured and unsecured lenders;

(j) all persons known or reasonably believed to have expressed an interest in acquiring the Acquired Assets or the Line Fill;

(k) counsel for Magellan Midstream Partners, L.P; and

(l) Magellan Midstream Partners, L.P.

27. Within five business days of the entry of the Bidding Procedures Order, the Debtors will publish a notice, substantially in the form attached hereto as **Exhibit E** (the "Publication Notice"), in the National Edition of *The Wall Street Journal* and such other publication(s) as the Debtors and their advisors determine will promote the marketing and sale of the Acquired Assets and the Line Fill to other interested parties whose identities are unknown to the Debtors.

28. The Debtors submit that the notice procedures herein comply fully with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Sale, the Bidding Procedures, the Auction, the Cure Amounts and the Sale Hearing to the Debtors' creditors and other parties in interest that are entitled to notice of the Sale, as well as to those parties who have expressed an interest, or may express an interest, in bidding on the Acquired Assets and the Line Fill. This is especially true given the extensive pre-filing marketing that occurred with respect to the Acquired Assets and Line Fill. Based upon the foregoing, the Debtors respectfully request that this Court approve the notice procedures proposed above.

DB02:8325823.1

067990.1001

**B.    The Bidding Procedures Are Appropriate and Will Maximize the Value Received for the Acquired Assets and the Line Fill**

29.    Bidding procedures should be approved when they provide a benefit to the estate by maximizing the value of the assets. See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 535-537 (3rd Cir. 1999) (detailing situations where bidding incentives are appropriate in bankruptcy because they provide a benefit to the estate); In re Edwards, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate").

30.    The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. See In re Mushroom Transp. Co., Inc., 382 F.3d 325, 339 (3rd Cir. 2004) (debtor-in-possession "had a fiduciary duty to protect and maximize the estate's assets"); Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 573 (3rd Cir. 2003) (same); Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand").

31.    To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy sales. See In re O'Brien Envtl. Energy, 181 F.3d at 537; Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets").

32.    The proposed Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction. Such a process will increase the

likelihood that the Debtors receive the best possible consideration for the Acquired Assets and the Line Fill by helping ensure a competitive and fair bidding process. They also allow the Debtors to undertake the auction process in as expeditious a manner as possible, which is essential to maintaining and potentially maximizing value for the estates.

33.     The Auction and the proposed Bidding Procedures should promote active bidding from interested parties and thus dispel any doubts as to the highest or best offer reasonably available for the Acquired Assets and the Line Fill. The Bidding Procedures are consistent with other procedures previously approved by this Court and other courts, and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings. See In re O'Brien Envtl. Energy, 181 F.3d at 537. See also In re Nortel Networks Inc., Case No. 09-10138 (KG) (Bankr. D. Del. Feb. 27, 2009) [Docket No. 386]; In re VeraSun Energy Corporation, Case No. 08-12606 (BLS) (Bankr. D. Del. Feb. 19, 2009) [Docket No. 699]; In re PPI Holdings, Inc., Case No. 08-13289 (KG) (Bankr. D. Del. Jan. 15, 2009) [Docket No. 156)]; In re Hines Horticulture, Inc., Case No. 08-11922 (KJC) (Bankr. D. Del. Dec. 9, 2008) [Docket No. 355]; In re Leiner Health Products Inc., Case No. 08-10446 (KJC) (Bankr. D. Del. April 10, 2008) [Docket No. 410]; In re Fedders North America, Inc., Case No. 07-11176 (BLS) (Bankr. D. Del. Jan. 9, 2008) [Docket No. 573]; In re Dura Automotive Systems, Inc., Case No. 06-11202 (KJC) (Bankr. D. Del. July 24, 2007) [Docket No. 1486]; In re New Century TRS Holdings, Inc., Case No. 07-10416 (KJC) (Bankr. D. Del. April 20, 2007) [Docket No. 340]; In re Three A's Holdings, L.L.C., Case No. 06-10886 (BLS) (Bankr. D. Del. Sept. 7, 2006) [Docket No. 131].

34.     Thus, the proposed Bidding Procedures are reasonable, appropriate and within the Debtors' sound business judgment under the circumstances.

DB02:8325823.1                                         067990.1001

## C.  The Overbid Increment Is Appropriate

35.    An important component of the Bidding Procedures is the "overbid" provision. Once the Debtors receive bids that they determine to be Qualified Bids (as that term is defined in the Bidding Procedures, and hold the Auction, ***Qualified Bidders must bid in increments of at least $1,000,000.00 higher than the previous bid.*** Such an overbid increment is reasonable under the circumstances, and will enable the Debtors to maximize the value for their assets while limiting any chilling effect on the Sale process. The overbid increment is also consistent with such increments previously approved by this Court and in other courts. See In re Nortel Networks Inc., Case No. 09-10138 (KG) (Bankr. D. Del. Feb. 27, 2009) [Docket No. 386] (approving $500,000 increment); In re Hines Horticulture, Inc., Case No. 08-11922 (KJC) (Bankr. D. Del. Dec. 9, 2008) [Docket No. 355] (approving $500,000 increment); In re Uni-Marts, LLC, Case No. 08-11037 (MFW) (Bankr. D. Del. July 10, 2008) [Docket No. 207] (approving $100,000 increment); Dura Automotive Systems, Inc., No. 06-11202 (KJC) (Bankr. D. Del. July 24, 2007) [Docket No. 1486] (approving $750,000 increment); New Century TRS Holdings, Inc., No. 07-10416 (KJC) (Bankr. D. Del. Apr. 20, 2007) (approving $500,000 increment); Three A's Holdings, L.L.C., No. 06-10886 (BLS) (Bankr. D. Del. Sept. 7, 2006) [Docket No. 131] (approving $500,000 increment).

## D.  The Break-Up Fee is Reasonable and Appropriate

36.    The Break-Up Fee was negotiated at arm's length and in good faith and is necessary to secure Magellan's participation in the Debtors' sale process. The Debtors have determined that pursuing a sale of substantially all of the assets of Longhorn and the Line Fill is in the best interests of the Debtors, their creditors and their estates and, therefore, submit that agreeing to the Break-Up Fee represents an appropriate exercise of the Debtors' business judgment.

37.     Bankruptcy courts have approved bidding incentives, including traditional break-up fees, under the business judgment rule, which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. See, e.g., In re Integrated Res., 147 B.R. at 662 (approving termination fee plus reimbursement of expenses); In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may be "legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking"). The Debtors submit that the Break-Up Fee is reasonable, is  necessary to convince Magellan to go forward with the a sale and that granting the Break-Up Fee represent a valid exercise of the Debtors' business judgment.

**E.     Granting Magellan a Superpriority Administrative Expense is Appropriate Pursuant to Bankruptcy Code Section 364(c)(1)**

38.     In the event that Magellan is not the Purchaser or the Successful Bidder at Auction, the Debtors seek authority to deem any amount owing to Magellan as a result of the Fee Holiday a superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code.

39.     Pursuant to section 364(c), if a debtor cannot obtain postpetition credit on an unsecured basis, a court may authorize such debtor to obtain credit or incur debt that is entitled to superpriority administrative expense status, secured by a senior lien on unencumbered property, or secured by a junior lien on encumbered property. See 11 U.S.C. § 364(c). A debtor seeking financing under section 364(c) of the Bankruptcy Code must make a reasonable effort to seek other sources of unsecured credit, but is granted deference in acting in accordance with its business judgment and, indeed, is not required to seek credit from every possible source. See, e.g., In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving

DB02:8325823.1                                                                     067990.1001

financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders); see also Bray v. Shenandoah Fed. Sav. & Loan Assoc. (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986) ("[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable").

40.     Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); see also In re Garland Corp., 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); In re Stanley Hotel, Inc., 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); Ames, 115 B.R. at 37-39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

41.     Taking into consideration the Debtors' cash flow issues, the lack of alternative financing options of the Longhorn Debtor entities and the critical services provided by Magellan, the Debtors believe that deferring the Management Fee, which is a form of financing, satisfies the business judgment standard necessary to grant a super-priority administrative expense claim against the Longhorn Debtors for any claims arising from the Fee Holiday.

DB02:8325823.1                                                    067990.1001

**F.      The Proposed Notice Procedures for the
         Assigned Contracts and Real Property Easements
         and the Identification of Related Cure Amounts are Appropriate**

42.      As part of the Motion, the Debtors also seek authority under Bankruptcy Code
sections 105(a) and 365 to assume and assign the Assigned Contracts and the Real Property
Easements to the Purchaser.  The Sale Notice identifies the Assigned Contracts and the Real
Property Easements to be assumed and assigned to the Purchaser, as well as any related defaults
required to be cured in accordance with the Purchase Agreements (the "Cure Amounts").  A
copy of the Sale Notice will be served on each of the counterparties to the Assigned Contracts
and the Real Property Easements consistent with the notice procedures requested herein, as
approved by this Court.

43.      The Debtors request that any counterparty to an Assigned Contract that wishes to
obtain adequate assurance information regarding any of the bidders that will or may participate at
the Auction must notify the Debtors in writing, c/o Jeffrey W. Gettleman, Esq., Kirkland & Ellis
LLP, 300 North LaSalle, Chicago, Illinois 60654, email:  jeffrey.gettleman@kirkland.com on or
before July 17, 2009 (the "Request for Adequate Assurance").  The Request for Adequate
Assurance must include an email address and/or postal address to which a response to such
information request can be sent.

44.      If a counterparty to an Assigned Contract timely submits a Request for Adequate
Assurance, the Debtors shall serve such party with any non-confidential information relating to
adequate assurance received by the Debtors as provided in the Bidding Procedures by email
and/or overnight delivery on or before July 21, 2009.  A counterparty to an Assigned Contract
that timely submits a Request for Adequate Assurance shall have until **11:00 a.m. (prevailing
Eastern Time) on July 23, 2009** by which to file an objection to adequate assurance of future
performance by any of the bidders.  If a counterparty to an Assigned Contract does not timely

28

submit a Request for Adequate Assurance and does not timely object to adequate assurance of future performance by any of the bidders **on or before July 17, 2009**, this Court may enter an order forever barring such counterparty to an Assigned Contract from objecting to adequate assurance of future performance.

45.     Except as may otherwise be agreed to by the parties to an Assigned Contract, at or prior to the closing of the Sale, the Purchaser and the Debtors shall each pay their share, as set forth in the APA, in curing those defaults under the Assigned Contracts that need to be cured in accordance with section 365(b) of the Bankruptcy Code, by (a) payment of the undisputed Cure Amounts, and/or (b) reserving amounts with respect to the disputed Cure Amounts.

## II.     APPROVAL OF THE PROPOSED SALE TRANSACTION IS APPROPRIATE AND IN THE BEST INTEREST OF THE ESTATES

46.     In accordance with Bankruptcy Rule 6004, sales of property rights outside the ordinary course of business may be by private sale or public auction.  The Debtors have determined that the sale of the Acquired Assets and the Line Fill, pursuant to the Bidding Procedures and by public auction, should enable them to obtain the highest or best offer for these assets (thereby maximizing the value of their estates) and is in the best interests of their estates and creditors.

47.     Despite the fact the Debtors have already conducted an extensive marketing process for the Acquired Assets and the Line Fill, an auction process will further test the market for the assets.  The Debtors seek to establish a process that will provide the greatest possible recovery for the Debtors' estates as compared to any other available existing alternative.  The bases for the relief requested in this Motion are found in a number of provisions of the Bankruptcy Code and Bankruptcy Rules.  These bases are discussed in detail below.

DB02:8325823.1                                                                          067990.1001

A.    **The Sale of the Acquired Assets and the Line Fill**
      **Pursuant to the Purchase Agreements Is Authorized**
      **by Section 363 as a Sound Exercise of the Debtors' Business Judgment**

48.    Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 105(a) of the Bankruptcy Code provides in pertinent part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

49.    Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor. See, e.g., Meyers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); In re Trans World Airlines, Inc., No. 01-00056, 2001 Bankr. LEXIS 980, at *29 (Bankr. D. Del. Apr. 2, 2001); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991).

50.    Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was given to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith. See In re Delaware & Hudson Ry., 124 B.R. at 176; In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987); In re United Healthcare Sys., Inc., No. 97-1159, 1997 U.S. Dist. LEXIS 5090, at * 13-14 and n.2 (D.N.J. Mar. 26, 1997). The Delaware & Hudson Railway court further held that:

> [o]nce a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale, the court must also determine that the trustee has provided the interested parties

30

with adequate and reasonable notice, that the sale price is fair and reasonable and that the purchaser [or proposed purchaser] is proceeding in good faith.

In re Delaware & Hudson Ry., 124 B.R. at 176.

51.     A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders. See, e.g., In re Abbotts Dairies of Pa, Inc., 788 F.2d 143 (3rd Cir. 1986); In re Lionel Corp., 722 F.2d 1063 (2nd Cir. 1983). In fact, the paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. See Food Barn, 107 F.3d at 564-65 (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); In re Integrated Res., 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the [Debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting In re Atlanta Packaging Prods., Inc., 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

52.     This Court and others uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy sales. See In re Montgomery Ward Holding Corp., Case No. 97-1409 (PJW) (Bankr. D. Del. Aug. 6, 1997); In re Fruehauf Trailer Corp., Case No. 96-01563 (PJW) (Bankr. D. Del. Jan. 31, 1997). See also In re Integrated Res., 147 B.R. at 659 (such procedures "encourage bidding and to maximize the value of the debtor's assets"); In re Fin. News Network, Inc., 126 B.R. 152, 156 (S.D.N.Y. 1991) (as amended) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for an [sic] fair and efficient resolution of bankrupt estates").

DB02:8325823.1

067990.1001

53.     Furthermore, once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." Creditors' Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." In re Integrated Res., 147 B.R. at 656 (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1). Indeed, when applying the "business judgment" standard, courts show great deference to a debtor's business decisions. See Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.), Case No. 89C593, 1989 WL 106838, at *3 (N.D. Ill. Sept. 8, 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion").

54.     The Debtors submit that the proposed Auction and Sale satisfies the "sound business reason test." The prompt sale of the Acquired Assets and the Line Fill presents the best opportunity to maximize the value for the estates in light of the need to preserve the value of the Line Fill and to manage and transition the Acquired Assets to a purchaser. In addition, the Debtors believe that the Bidding Procedures and Sale Notice are the best method by which they can obtain the best price for the Acquired Assets and the Line Fill and provide interested persons with accurate and reasonable notice of the Sale. The Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage participation by

32

financially capable bidders who demonstrate the ability to close a transaction, thereby increasing the likelihood that the Debtors will receive the best possible consideration for the Acquired Assets and the Line Fill by helping ensure a competitive and fair bidding process. The Bidding Procedures also allow the Debtors to undertake the Auction process in as expeditious a manner as possible, which is essential to maintaining and maximizing the value of their estates.

55. The Debtors will test the value of the consideration to be received for the Acquired Assets and the Line Fill through the auction process consistent with the requirements of the Bankruptcy Code, Bankruptcy Rules and pursuant to procedures approved by this Court. Consequently, the fairness and reasonableness of the consideration to be paid by the Purchaser ultimately will be demonstrated by adequate "market exposure" and an open and fair auction process—the best means for establishing whether a fair and reasonable price is being paid.

56. Thus, the Debtors submit that the proposed Bidding Procedures and Sale process will result in the highest or best offer for the Acquired Assets and the Line Fill, and will provide a greater recovery for the Debtors' estates as compared to any other available alternative. Moreover, the terms and conditions of the Purchase Agreements, including the purchase prices, will be tested in the market through an auction process, which will demonstrate the fairness and reasonableness of the consideration being received. Thus, the Debtors' determination to enter into the Purchase Agreements and to sell the Acquired Assets and the Line Fill through an auction process is a valid and sound exercise of their business judgment. Accordingly, the Debtors request that this Court make a finding at the Sale Hearing that the proposed Sale is a proper exercise of its business judgment and is authorized.

DB02:8325823.1

067990.1001

**B.**   **The Sale of the Acquired Assets**
        **and the Line Fill Free and Clear of Encumbrances**
        **and Other Interests Is Authorized By Section 363(f) of the Bankruptcy Code**

57.    The Debtors further submit that it is appropriate to sell the Acquired Assets and the Line Fill free and clear of Encumbrances (other than Assumed Liabilities and Permitted Encumbrances (as each is defined in the respective Purchase Agreements)) pursuant to section 363(f) of the Bankruptcy Code, with any such Encumbrances attaching to the net proceeds of the Sale, as and to the extent applicable.  Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

    a.   applicable nonbankruptcy law permits sale of such property free and clear of such interests;

    b.   such entity consents;

    c.   such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

    d.   such interest is in bona fide dispute; or

    e.   such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

58.    This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

59.    Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Acquired Assets and the Line Fill "free and clear" of liens and interests. In re Dundee Equity Corp., Case No. 89B10233, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one

DB02:8325823.1                                                    067990.1001

of the conditions of § 363(f) have been met"); <u>Citicorp Homeowners Servs., Inc. v. Elliot (In re</u> <u>Elliot)</u>, 94 B.R. 343, 345 (E.D. Pa. 1988) (same); <u>see also</u> <u>Michigan Employment Sec. Comm'n</u> <u>v. Wolverine Radio Co. (In re Wolverine Radio Co.)</u>, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

60.     One or more of the tests of section 363(f) will be satisfied with respect to the Sale of the Acquired Assets and the Line Fill.  In particular, at least section 363(f)(2) will be met in connection with the transactions proposed because each of the parties holding liens on the Acquired Assets and the Line Fill, if any, will consent, or absent any objection to this Motion, will be deemed to have consented to, the Sale.  Any lienholder also will be adequately protected by having their Encumbrances, if any, in each instance against the Debtors or their estates, attach to the cash proceeds of the Sale ultimately attributable to the Acquired Assets and the Line Fill in which such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor had prior to the Sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.  Accordingly, section 363(f) authorizes the transfer and conveyance of the Acquired Assets and the Line Fill free and clear any such Encumbrances.

**C.     The Acquired Assets and the Line Fill**
**Should Be Sold Free and Clear of Successor Liability**

61.     Under the terms of the proposed Purchase Agreements, the Debtors have included a provision whereby the Purchaser will assume and agree to pay, perform and discharge as and when they become due and payable, or will be required to perform, all liabilities on or after consummation of the Purchase Agreements.  Therefore, the Purchaser should not be liable for any of the Debtors' liabilities in connection with the sale of the Acquired Assets and the Line Fill

DB02:8325823.1

067990.1001

as a successor to the Debtors' business or otherwise, unless expressly assumed. Extensive case law exists providing that claims against the winning bidder are directed to the proceeds of a free and clear sale of property and may not be asserted against a buyer subsequently.

62.     Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free from successor liability resulting from pre-existing claims. See MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under section 363(f) of the Bankruptcy Code); Ninth Ave. Remedial Group v. Allis-Chalmers Corp., 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); WBQ P'ship v. Virginia Dept. of Med. Assistance Servs. (In re WBQ P'ship), 189 B.R. 97, 104-05 (Bankr. E.D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation is an "interest" as used in section 363(f))[11]; American Living Sys. v. Bonapfel (In re All Am. of Ashburn, Inc.), 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product liability claims precluded on successor doctrine in a sale of assets free and clear); In re Hoffman, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any interest permissible even though the estate had unpaid taxes) In re New England Fish Co., 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale included free and clear of Title VII employment discrimination and civil rights claims of debtor's employees).

---

[11]  Even courts concluding that Bankruptcy Code section 363(f) does not empower them to convey assets free and clear of claims have nevertheless found that section 105(a) of the Bankruptcy Code provides such authority. See Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (stating that the absence of specific authority to sell assets free and clear of claims poses no impediment to such a sale, as such authority is implicit in the court's equitable powers when necessary to carry out the provisions of title 11).

63.     The purpose of an order purporting to authorize the transfer of assets free and clear of all "interests" would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against the Purchaser arising from the Debtors' pre-sale conduct. Under section 363(f) of the Bankruptcy Code, the Purchaser is entitled to know that the Acquired Assets and the Line Fill are not infected with latent claims that will be asserted against the Purchaser after the proposed transaction is completed.

64.     Accordingly, consistent with the above-cited case law, the order approving the sale of the Acquired Assets and the Line Fill should state that the Purchaser is not liable as a successor under any theory of successor liability, for claims that encumber or relate to the Acquired Assets and the Line Fill, including, without limitation, any Encumbrances arising under a theory of successor liability.

**D.    The Purchaser is a Good Faith Purchaser and is Entitled to the Full Protection of Section 363(m) of the Bankruptcy Code, and the <u>Transfer of the Acquired Assets and the Line Fill Does Not Violate Section 363(n)</u>**

65.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  While the Bankruptcy Code does not define "good faith," the Third Circuit in <u>In re Abbotts Dairies of Pa., Inc.</u>, held that:

> [t]he requirement that a [buyer] act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [Proposed Buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

DB02:8325823.1

067990.1001

788 F.2d at 147 (citations omitted).

66.      Upon execution, the Purchase Agreements will have been negotiated at arm's length and in good faith.   Thus, the Purchaser should be entitled to the full protections of section 363(m) of the Bankruptcy Code.  A party would have to show fraud or collusion between a purchaser and a debtor in possession or trustee or other bidders in order to demonstrate a lack of good faith.  See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269, 276 (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a [purchaser]'s good faith status at a judicial sale involves fraud, collusion between the [purchaser] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders"); see also In re Angelika Films, 57th, Inc., Case No. 97 Civ. 2239, 1997 WL 283412, at *7 (S.D.N.Y. May 29, 1997); In re Bakalis, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998).

67.      By the time of execution of the Purchase Agreements, the Debtors and the Purchaser will have engaged in thorough arm's length negotiations over the terms of the Purchase Agreements, and there will be no fraud or collusion in those negotiations.   Upon execution of the Purchase Agreements, and per the terms of the Purchase Agreements, the Purchaser will have recognized that the Debtors were free to deal with any other party interested in acquiring the Acquired Assets and the Line Fill.  Upon execution of the Purchase Agreements, the Purchaser also will have complied with the provisions in the Bidding Procedures Order and agreed to subject its bid to the competitive bidding procedures set forth in the Bidding Procedures Order.  Additionally, all payments to be made by the Purchaser and other agreements or arrangements entered into by the Purchaser in  connection with the Sale will have been disclosed.

68.      In this case, there is absolutely no indication of fraud or improper insider dealing of any kind.  The Purchase Agreements do not constitute an avoidable transaction pursuant to

section 363(n) and the Purchaser should receive the protections afforded good faith purchasers by section 363(m). Accordingly, the Debtors request that this Court make a finding at the Sale Hearing that the Purchase Agreements reached with the Purchaser were at arm's length and are entitled to the full protections of section 363(m) of Bankruptcy Code.

**E.    Assumption and Assignment of the Assigned Contracts Is Authorized by Section 365 of the Bankruptcy Code**

(i)    *Assumption and Assignment Based on Debtors' Business Judgment*

69.    Section 365(a) and (b) of the Bankruptcy Code authorizes debtors in possession to assume executory contracts or unexpired leases subject to the court's approval, and requires such debtors in possession to satisfy certain requirements at the time of assumption. Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing in relevant part that:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>
> > (A) cures, or provides adequate assurance that the trustee will promptly cure, such default ...;
> >
> > (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> >
> > (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

70. The standard that is applied by the Third Circuit in determining whether an executory contract or unexpired lease should be assumed is the debtor's "business judgment" that the assumption is in its economic best interests. See Sharon Steel Corp. v. National Fuel Gas Distrib. Corp., 872 F.2d 36, 40 (3rd Cir. 1989). See also NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional") (superseded in part by 11 U.S.C. § 1113); In re III Enter., Inc. V, 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) (citations omitted), aff'd, 169 B.R. 551 (E.D. Pa. 1994).

71. It is well established that the court should approve a debtor's motion to assume or reject an executory contract if the debtor's decision is based on its "business judgment." See In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard"); In re Network Access Solutions, 330 B.R. at 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule"); In re Decora Industries, Inc., No. 00-4459(JJF), 2002 WL 32332749, at *8 (D. Del. May 20, 2002); Phar Mor, Inc. v. Strouss Bldg. Assocs., 204 B.R. 948, 952 (N.D. Ohio 1997) ("Courts should generally defer to a debtor's decision whether to reject an executory contract.") (citation omitted).[12]

72. To determine if the business judgment test is met, the court "is required to examine whether a reasonable business person would make a similar decision under similar circumstances." In re Exide Techs., 340 B.R. at 239 ("This is not a difficult standard to satisfy and requires only a showing that rejection will benefit the estate"). Specifically, a court should

---

[12] Further, "[n]othing in the Code suggests that the debtor may not modify its contracts when all parties to the contract consent." In re Network Access Solutions, Corp., 330 B.R. at 74 (citation omitted). While "[s]ection 363 of the Bankruptcy Code allows a debtor to ... modify contracts ... [t]o the extent they are outside the ordinary course of business, court approval is necessary." Id. Regardless, "[t]here is ... no discernable difference in the notice requirements or standard for approval under section 363 and 365." Id.

DB02:8325823.1

067990.1001

find that the Debtor acted prudently, on an informed basis, in good faith, and with the honest belief that the assumption is in the best interests of [the debtor] and the estate." Network Access Solutions, 330 B.R. at 75. Under this standard, a court should approve a debtor's business decision unless that decision is the product of bad faith or a gross abuse of discretion. See Computer Sales Int'l, Inc. v. Federal Mogul (In re Federal Mogul Global, Inc.), 293 B.R. 124, 126 (D. Del. 2003); see also Lubrizol Enters. v. Richmond Metal Finishers, 756 F.2d 1043, 1047 (4th Cir. 1985).

73.    In the present case, the Debtors' assumption and assignment of the Assigned Contracts to the Purchaser meets the business judgment standard and satisfies the requirements of section 365 of the Bankruptcy Code. As discussed above, the transactions contemplated by the Purchase Agreements will provide significant benefits to the Debtors' estates. The Assigned Contracts are necessary for the Purchaser to conduct the business, and, since the Purchaser would not purchase the Acquired Assets and the Line Fill without them, the assumption and assignment of the Assigned Contracts is essential to inducing the highest or best offer for the Acquired Assets and the Line Fill. Further, pursuant to the terms of the proposed Purchase Agreements, 50%, or approximately, $2,500,000, of specified cure payments, plus the first approximately $1,000,000 of additional cure payments, will be borne by the Purchaser. Because the Debtors cannot otherwise obtain the benefits of the Purchase Agreements, and such cure payments are expected to be borne by the Purchaser, the assumption of the Assigned Contracts is a sound exercise of the Debtors' business judgment. Finally, upon consummation of the Sale, the Debtors will no longer continue to operate the business and will have no use for any contracts and leases utilized in that business. Accordingly, to the extent that the Debtors can sell any related executory contracts and unexpired leases to a third party in connection with the sale of

the Acquired Assets and the Line Fill, they will be able generate cash to satisfy claims against the estates.

(ii) *Adequate Assurance of Future Performance Provided Under the Purchase Agreements*

74.    It is necessary to establish an orderly and fair process by which the Debtors and the counterparties to the Assigned Contracts can establish the cure obligations, if any, necessary to be paid under section 365 of the Bankruptcy Code, and by which contract counterparties can request additional information regarding adequate assurance of future payment.

75.    A debtor in possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a), and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement.    See 11 U.S.C. § 365(f)(2).    Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., In re Bygaph, Inc., 596, 605-606 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when the prospective assignee of lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

76.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." EBG Midtown South Corp. v. McLaren/Hart Envtl. Engineering Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), aff'd, 993 F.2d 300 (2d Cir. 1993); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

42

77.     Pursuant to the Bidding Procedures, the Debtors will require potential bidders to provide evidence constituting adequate assurance of future performance to be provided to counterparties to Assigned Contracts upon their request. Specifically, Section 3 of the Bidding Procedures requires each Potential Bidder to provide documentation that:

> at the request of the Debtors, include information that, in the discretion of the Debtors after consultation with the Creditors' Committee and the Secured Lenders, evidences the bidder's financial wherewithal and operational ability to consummate the transaction proposed by its bid, including, without limitation, such financial and other information setting forth adequate assurance of future performance under section 365 of the Bankruptcy Code in a form requested by the Debtors to allow the Debtors to serve within one business day after such receipt of such information on counterparties to any contracts or leases being assigned in connection with the proposed sale that have requested, in writing, such information.

(iii)    *Assignment Permitted, Notwithstanding Anti-Assignment Provisions*

78.     To assist in the assumption, assignment and sale of the Assigned Contracts and the Acquired Assets and Line Fill, the Debtors also request that the Court enter an order providing that anti-assignment provisions therein under applicable law shall not restrict, limit or prohibit the assumption, assignment and sale of the Assigned Contracts or other Assigned Assets or Line Filland are deemed and found to be unenforceable anti-assignment provisions sections 105(a) or 365(f) of the Bankruptcy Code.

79.     Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign unexpired leases and contracts free from such anti-assignment restrictions:

> [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

11 U.S.C. § 365(f)(l).

DB02:8325823.1

067990.1001

80.	Section 365(f)(l), by operation of law, invalidates provisions or applicable lawthat prohibit, restrict or condition assignment of an executory contract or unexpired lease. See, e.g., Coleman Oil Co., Inc. v. Circle K Corp. (In re Circle K Corp.), 127 F.3d 904, 910-11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365" ), cert. denied, 522 U.S. 1148 (1998). Section 365(f)(3) goes beyond the scope of section 365(f)(1) by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof. See, e.g., In re Jamesway Corp., 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (section 365(f)(3) prohibits enforcement of any lease clause creating a right to terminate a lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

81.	Other courts have recognized that provisions that have the effect of restricting assignments cannot be enforced. See In re Rickel Home Centers, Inc., 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 356(f) [sic], courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions."). Similarly, in In re Mr. Grocer, Inc., the court noted that:

> [the] case law interpreting § 365(f)(l) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves ipso facto anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

44

77 B.R. 349, 354 (Bankr. D.N.H. 1987).

82.    Thus, the Debtors request that any anti-assignment provisions or applicable law be deemed not to restrict, limit or prohibit the assumption, assignment and sale of the Assigned Contracts and Real Property Easements and other Acquired Assets and Line Fill and be deemed and found to be unenforceable anti-assignment provisions under the Bankruptcy Code pursuant to sections 105(a) and 365(f) of the Bankruptcy Code.

**F.    The Debtors Will Retain or Have Reasonable Access to Their Business Records to Administer Their Chapter 11 Cases.**

83.    Pursuant to section 7.6 of the Purchase Agreement:

> After the Closing Date, Buyer shall provide to Seller and its Related Persons (after reasonable notice and during normal business hours and without charge to Seller) access to all Business Records for periods prior to the Closing and shall preserve such Business Records until the later of (a) six (6) years after the Closing Date and (b) the required retention period for all Government contact information, records or documents. Such access includes access to any information in electronic form to the extent reasonably available. Buyer acknowledges that Seller has the right to retain originals or copies of Business Records for periods prior to the Closing. Prior to destroying any Business Records for periods prior to the Closing, Buyer shall notify Seller thirty (30) days in advance of any such proposed destruction of its intent to destroy such Business Records, and Buyer will permit Seller to retain such Business Records.

84.    As such, the Debtors will have adequate access to their books and records for purposes of administering their estates, and the estates of the Longhorn Debtors in particular.

**G.    Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate.**

85.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired

lease . . . is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d). The Debtors request that any order approving the Purchase Agreements and the assumption and assignment of the Assigned Contracts be effective immediately by providing that the 10-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

86.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. <u>See</u> Advisory Creditors' Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Creditors' Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 10-day stay period, the leading treatise on bankruptcy suggests that the 10-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 <u>Collier on Bankruptcy</u> ¶ 6004.10 (15th rev. ed. 2006). Furthermore, Collier suggests that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. <u>Id.</u>

87.    To maximize the value received for the Acquired Assets and the Line Fill, the Debtors seek to close the Sale as soon as possible after the Sale Hearing. Accordingly, the Debtors hereby request that the Court waive the 10-day stay period under Bankruptcy Rules 6004(h) and 6006(d) or, in the alternative, if an objection to the sale is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal.

<u>Notice</u>

88.    The Debtors have provided notice of this Motion by electronic mail, facsimile or overnight mail to: (a) all parties entitled to receive notice as of the date hereof pursuant to Bankruptcy Rule 2002(a)(2); (b) all persons known or reasonably believed to have expressed an

46

interest in acquiring the Acquired Assets or the Line Fill; (c) the Office of the United States Trustee for the District of Delaware; (d) counsel for the Creditors' Committee; (e) counsel for the agents for the Debtors' prepetition secured and unsecured lenders; (f) counsel for Magellan Midstream Partners, L.P. and (g) Magellan Midstream Partners, L.P. In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

## <u>No Prior Request</u>

89.     No prior motion for the relief requested herein has been made to this or any other court.

*[The Remainder of This Page Is Intentionally Left Blank]*

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that this Court enter (a) orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** granting the relief requested herein and granting such other and further relief as the Court deems appropriate.

Dated: June 19, 2009
      Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

Pauline K. Morgan (Bar No. 3650)
Edmon L. Morton (Bar No. 3865)
Donald J. Bowman, Jr. (Bar No. 4383)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571–6637
Facsimile: (302) 576–3320

- and -

**KIRKLAND & ELLIS LLP**
David L. Eaton (admitted *pro hac vice*)
Adam C. Paul (admitted *pro hac vice*)
Jeffrey W. Gettleman (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 861-2000
Facsimile: (312) 861-2200

Counsel for the Debtors and Debtors in Possession

DB02:8325823.1                                                                   067990.1001