# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FLYING J INC., <u>et al.</u>,[1] | Case No. 08-13384 (MFW) |
| Debtors. | Jointly Administered |
| | <u>Hearing Date</u>: July 30, 2009 at 3:00 p.m. (ET) (requested) |
| | <u>Objection Deadline</u>: July 23, 2009 at 4:00 p.m. (ET) (requested) |

## MOTION OF THE DEBTORS FOR ENTRY OF A FINAL ORDER (A) AUTHORIZING FLYING J INC. TO OBTAIN POSTPETITION FINANCING, (B) GRANTING LIENS AND SUPERPRIORITY CLAIMS, AND (C) AUTHORIZING FLYING J INC. TO EXECUTE A LETTER OF INTENT RELATING TO THE TARGET ASSETS

Flying J Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, the "<u>Debtors</u>"), file this motion (this "<u>Motion</u>") for entry of a final order (the "<u>Financing Order</u>"),[2] (a) authorizing Flying J Inc. to obtain postpetition financing (the "<u>DIP Facility</u>") on a superpriority administrative claim and first priority lien basis, (b) authorizing Flying J Inc. to execute a letter of intent to sell the Target Assets (as defined below) and (c) granting related relief. In support of this Motion, the Debtors respectfully state as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Flying J Inc. (3458); Big West of California, LLC (1608), Big West Oil, LLC (6982); Big West Transportation, LLC (6984); Longhorn Partners Pipeline, L.P. (0554); Longhorn Pipeline Holdings, LLC (0226); Longhorn Pipeline Inc. (0654). The location of the Debtors' corporate headquarters and the service address for all Debtors is: 1104 Country Hills Drive, Ogden, UT 84403.

[2] The Financing Order will be filed prior to the hearing on this Motion.

067990.1001

## Jurisdiction and Venue

1.      The United States Bankruptcy Court for the District of Delaware (the "Court")

has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core

proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105, 361, 362, 363

and 364 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001 and

9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2

of the Local Rules of Bankruptcy Practice and Procedure of the United States District Court for

the District of Delaware (the "Local Bankruptcy Rules").

## Relief Requested

4.      The Debtors seek authorization for Debtor Flying J Inc. ("Flying J") to obtain

postpetition financing from Pilot Travel Centers LLC (the "DIP Lender" or "Pilot") on a secured

and superpriority basis, subject to the Budget (as defined below), to provide replacement surety

bonds, ensure adequate liquidity to continue operations, prevent anticipated cash flow shortages

and, as further described below, bridge to an anticipated merger or other transaction with Pilot

that will inure to the benefit of all Flying J stakeholders.

5.      Specifically, the Debtors request entry of the Financing Order, which, along with

the DIP Credit Agreement (as defined below), shall be served and filed prior to a final hearing on

this Motion, granting the following relief:

> (a)     authorizing Flying J to enter into the DIP Facility in an amount of up to
> $100 million with Pilot consisting of a revolving line of credit in the
> maximum principal amount of $55 million and Letters of Credit and/or
> performance, surety or similar bonds in the aggregate amount of $45 million
> to be procured by the DIP Lender supporting certain obligations such as fuel
> tax and workers' compensation obligations incurred in the ordinary course of
> Flying J's business (the "DIP Obligations");

(b) authorizing Flying J to execute and deliver any documents necessary to implement the terms of the term sheet, substantially in the form attached hereto as **Exhibit A** (the "DIP Term Sheet") and to perform such other and further acts as may be necessary or appropriate in connection therewith;

(c) subject to the Carve Out (as defined in the DIP Term Sheet and Financing Order), authorizing Flying J to grant a superpriority allowed administrative claim in favor of the DIP Lender pursuant to section 364(c)(1) of the Bankruptcy Code in respect of the DIP Obligations;

(d) as security for the DIP Obligations, the granting of valid, first priority liens on (i) all equity and membership interests in and to (a) Flying J Transportation LLC, (b) AFJ LLC ("AFJ") and (c) certain other entities set forth on Schedule 1 of the DIP Term Sheet; (ii) the real property set forth on Schedule 1 of the DIP Term Sheet; (iii) Flying J's and AFJ's leasehold interests in all plazas/truck stops; (iv) Flying J's rights in and to that certain intercompany receivable owed to it by AFJ in the outstanding principal amount of approximately $50 million; and (v) all proceeds realized from the transactions contemplated by the Acquisition Agreement (as defined below) or Letter of Intent; and (vi) all products and proceeds of the foregoing (collectively, the "Collateral"); and

(e) granting such other and further relief as this Court deems just and proper.

6. The Debtors also seek entry of an order approving and authorizing Flying J to execute a letter of intent with Pilot, in the form attached hereto as **Exhibit B** (the "Letter of Intent") to sell to Pilot the Target Assets (however structured, the "Transaction") pursuant to an acquisition agreement (the "Acquisition Agreement"). Pilot's obligation to close on the DIP Facility is conditioned on the Court's approval, by July 31, 2009, of the Letter of Intent.

7. Specifically, Flying J seeks to sell, in return for consideration consisting of cash and equity, its travel center and trucking operations, corporate headquarters building, certain excess land adjacent to Flying J's travel plazas and certain other Flying J business operations.[3]

---

[3] As the Court is aware, the Debtors are in the process of marketing for sale certain non-core assets that they have deemed not essential to continued operations of their primary businesses, including the Longhorn pipeline and their refinery in Bakersfield, California. These and other assets, including the Debtors' North Salt Lake refinery, will not be purchased by Pilot as part of the acquisition contemplated by the Letter of Intent. Specifically, and as further provided in the Letter of Intent, the "Excluded Business Operations" that Pilot will not acquire as part of the transaction include the Debtors' refinery, oil and gas, credit card, banking, pipeline and insurance operations, the Debtors' airplanes and any and all assets and liabilities associated therewith

As further described in the Letter of Intent, Flying J will be obligated not to encourage or solicit bids or interest from other potential interested third parties for an initial Exclusivity Period (as defined below), the length of which is dependent upon the achievement of certain milestones. Flying J must also refrain from engaging in negotiations regarding any proposed third party acquisition and must notify Pilot of the terms and conditions of any such third party proposal (unless preexisting confidentiality obligations would prohibit such disclosure) for this initial period of exclusivity. The Exclusivity Period is subject to extension upon Pilot's completion of certain tasks related to the Transaction, all as further described below and in the Letter of Intent.

8.      Although there are no guarantees, the Debtors reasonably expect that the Transaction with Pilot would pay all Flying J creditors in full in cash, provide value to Flying J's shareholders, and allow Flying J to exit bankruptcy protection expeditiously as a stronger, healthier business and position Flying J to succeed in today's highly competitive market.

**Background**

9.      On December 22, 2008 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of title 11 of the Bankruptcy Code. On January 5, 2009, the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors (the "Creditors' Committee").

---

(including, without, limitation, their airplane hangars and any and all leases and financing arrangements associated with such airplanes), as well as all real estate neither used in nor adjacent to Flying J's travel plazas. For the avoidance of doubt, Pilot does not intend to purchase any of Flying J's direct or indirect ownership interests in, or any assets of, TCH LLC, Haycock Petroleum Company, Big West Oil, LLC, Big West Oil of California, LLC, Longhorn Pipeline, Inc., Longhorn Partners Pipeline, L.P., Longhorn Pipeline Holdings LLC, Transportation Alliance Bank, Inc., Flying J Enterprise Solutions, Driveline Accounting Services, LLC, Clarity Inc., Fun Runner LLC or Flying J Oil & Gas Inc.

10.     The Debtors and their wholly owned non-debtor subsidiaries (collectively, the "Flying J Group") are a fully integrated oil company with operations in the field of exploration, production, refining, transportation, wholesaling and retailing of petroleum products.  Debtor Flying J Inc. is one of the 20 largest privately held companies in America with 2008 consolidated sales of approximately $18.5 billion and is the direct or indirect parent corporation of each of the other members of the Flying J Group.

11.     The Flying J Group operates approximately 250 retail locations, including state-of-the-art travel plazas, convenience stores, restaurants, motels and truck service centers in 43 states and six Canadian provinces.  In addition to usual rest stop services (food, fuel, shower facilities), the Flying J Group offers banking, bulk-fuel programs, communications (wireless Internet connections), fuel cost analysis, insurance and truck fleet sales.  Furthermore, the Flying J Group explores for, refines and transports petroleum products.  Other operations of the Flying J Group include online banking, card processing, truck and trailer leasing, and payroll services.  In these widespread operations, the Flying J Group employs approximately 14,250 people.

12.     Each of the Debtors in these chapter 11 cases is involved in or associated with the Flying J Group's core businesses of petroleum refining, supply and distribution.  In particular, Debtors Big West Oil LLC and Big West of California LLC own and operate two refineries in North Salt Lake City, Utah and Bakersfield, California, respectively, which have the combined capacity to refine over 100,000 barrels of crude oil per day.  These Debtors also are responsible for purchasing and transporting crude oil in parts of California, Utah, Wyoming and Colorado. Debtor Longhorn Pipeline, Inc. and its Debtor subsidiaries own and operate a 700-mile common carrier pipeline with installed capacity of over 70,000 barrels per day from the Gulf Coast near Houston to El Paso, Texas.

DB02:8456557.1                                                                                               067990.1001

13.     The Debtors have filed these chapter 11 cases to address near-term liquidity constraints brought on by the precipitous drop in the price of oil beginning in September of 2008 and continuing through the first quarter of 2009, as well as the recent tightening credit markets. Apart from certain non-core businesses that have been or will be marketed for sale by the Debtors, the Debtors believe that their businesses are fundamentally sound and profitable and that these chapter 11 cases will allow them to resolve their liquidity constraints and emerge as stronger, healthier companies.

<u>**Summary of Flying J's Secured Indebtedness**</u>

14.     Although Flying J has no appreciable secured funded debt, it is important to note in the context of the proposed debtor in possession financing arrangements that the retail travel plazas are held in various non-debtor subsidiaries including AFJ, and are encumbered by a number of mortgages. Specifically, AFJ and the other non-debtor subsidiaries have mortgages in an outstanding aggregate amount of approximately $205.7 million. No additional liens are being placed on the mortgages under the DIP Facility.

15.     Additionally, pursuant to the Court's *Final Order Under 11 U.S.C. §§ 105, 361, 362, 363 and 364 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors to (A) Obtain Post-Petition Financing and (B) Utilize Cash Collateral, and (II) Granting Adequate Protection to Prepetition Secured Parties* (the "<u>Merrill Lynch DIP Order</u>"), entered on March 9, 2009, the Debtors granted to Merrill Lynch Commodities Inc. a superpriority claim against Flying J to secure the obligations of Longhorn Pipeline Inc. as guarantor and Flying J as borrower under that certain $10 million debtor in possession senior secured revolving credit facility. The terms of the Merrill Lynch DIP Order expressly authorized other superpriority claims at Flying J for future debtor in possession financing facilities. As a result, and consistent

with the terms of the Merrill Lynch DIP Order, the superpriority claim granted under that facility shall be junior to Pilot's superpriority claim under the DIP Facility.

## The Debtors' Necessity for Postpetition Financing

16.    In addition to engaging in negotiations with Pilot regarding the terms of the Transaction, and as a material inducement to Flying J's execution of the Letter of Intent, the parties engaged in extensive, good faith arms length negotiations regarding the proposed DIP Facility.   The DIP Facility constitutes an integral part of the Transaction as it facilitates continued operation of the Debtors' businesses until the Transaction is consummated.  Indeed, as is customary for transactions of this kind, Pilot's obligation to follow through with the Transaction contemplated in the Letter of Intent is conditioned on Flying J's businesses remaining in good standing and no material adverse change having occurred to the businesses.

17.    The Letter of Intent also includes a customary working capital adjustment to the consideration to be paid by Pilot based on differences between the actual working capital at the closing of the Transaction and target net working capital amounts as further described in the Letter of Intent.  Failure to obtain funding could impair Flying J's operations, hindering its ability to maintain asset values and ultimately reducing working capital, to the detriment of the consideration paid by Pilot for Flying J's businesses.   Idling of operations due to lack of financing would make Flying J's assets undesirable not only to Pilot, but also to other potentially interested third parties.

18.    Importantly, the DIP Facility directly addresses the Debtors' immediate need to remedy their acute liquidity needs.  Thus, the proposed financing from Pilot coupled with the Transaction not only solves the impending challenge of resolving Flying J's bankruptcy case, but also provides the Debtors with a short-term solution to their cash constraints.

DB02:8456557.1                                                    067990.1001

19.     These short term cash constraints at the Flying J level arise primarily from the Debtors' well-documented limited working capital base at filing, the need to satisfy certain prepetition obligations over the next several months and the real and impending need to post collateral for replacement surety bonds caused in part by the rapidly approaching August 4, 2009 termination by Great American Insurance Company ("GAIC") of more than $22 million in such surety bonds.[4]  While the Debtors have made substantial progress in these chapter 11 cases on shedding non-core assets, ceasing unprofitable business ventures and downsizing operations, the proposed DIP Facility is critical to addressing the Debtors' significant remaining liquidity and operational challenges.  In every sense of the word, the DIP Facility is vital to the Debtors' ability to continue operations and will benefit Flying J's and the Debtors' estates.

20.     As of July 10, 2009, Flying J had $28.5 million in cash on hand.  While Flying J's core operations continue to be profitable on a group wide basis, without immediate financing the Debtors may experience significant liquidity constraints by September.  Failure to resolve the limitations on the Debtors' businesses posed by these liquidity constraints could undermine Flying J's proposed Transaction with Pilot by causing a material adverse change to Flying J's businesses or by justifying a reduction in the current proposed purchase price by Pilot, thereby harming the Debtors' reorganization efforts and ultimate distributions to creditor constituencies.  Further, the lack of sufficient financing likely will cause significant disruption in the Debtors' business operations even before Flying J exhausts all available liquidity.  This shortfall in liquidity is due to a number of factors.

---

[4]     On April 2, 2009, the Court entered the *Order Approving Entry Into Settlement Agreement With Great American Insurance Company* [Docket No. 909] (the "GAIC Settlement Order"), pursuant to which the Debtors agreed that GAIC would be allowed to terminate all existing surety bonds on or after August 4, 2009.

21.     **First**, the Debtors are currently experiencing significant liquidity pressure from the need to collateralize their prepetition surety bonds.  The prepetition surety bonds secure various obligations, including state workers' compensation obligations and obligations to fund fuel tax licenses.  Pursuant to the GAIC Settlement Order, GAIC, the primary issuer of the Debtors' surety bonds, was given permission to terminate all of its existing surety bonds as early as August 4, 2009.  GAIC has advised the Debtors that it still plans to cancel all bonds on August 4, meaning that the Debtors will need to obtain more than $22 million in replacement surety bonds in short order.  Although the Debtors' other two surety bond providers—CNA Surety Corp. ("CNA") and Zurich Financial Services AG ("Zurich")—have not threatened to terminate bonds and have agreed to take on additional surety bond capacity to cover the shortfall caused by GAIC's terminations, they would also require the Debtors to post collateral to secure not only the replacement bonds, but existing bonds as well.  Additionally, the Debtors have, in certain instances, obtained letters of credit in favor of state workers' compensation authorities to replace the terminated GAIC bonds.[5]  Banks issuing such letters of credit have required the Debtors to post collateral.

22.     Although the Debtors' have, for the most part, successfully arranged with their surety bond providers to refrain from exercising remedies, the Debtors' ability to obtain postpetition financing for Flying J from the DIP Facility will greatly impact whether they can continue to do so.  The Debtors' inability to secure postpetition financing for Flying J likely will trigger demands to collateralize existing surety bonds that the Debtors will not be able to meet

---

[5]     The Debtors' attempts to satisfy the demands of various state authorities to comply with workers' compensation requirements by obtaining letters of credit to replace the terminated GAIC bonds are more fully described in the *Motion of the Debtors for Entry of an Order Authorizing Debtors to Fund and Cause Financial Institutions to Issue Fully Collateralized Letters of Credit and to Increase the Amount of their Existing Security* [Docket No. 1277].

DB02:8456557.1                                                                                                    067990.1001

and still continue to have sufficient liquidity to satisfy their operational and other postpetition demands. Failure to meet these obligations would not only undermine the Debtors' operations thereby risking recoveries to all Debtors, but also the Transaction itself and threaten its consummation or, at the very least, divert funds from the Debtors' operational needs, leading to a deterioration of asset values and negatively impacting the final consideration paid by Pilot for Flying J's assets.

23.     The impending August 4 cancellation of the GAIC surety bonds and the resultant need to collateralize existing and replacement surety bonds represents the single greatest current strain on the Debtors' liquidity. By funding that liquidity need directly, the DIP Facility enables the Debtors to devote their efforts to improving and restructuring their business operations, finalizing the merger agreement with Pilot, and successfully and expeditiously emerging from chapter 11.

24.     The DIP Facility contemplates certain bonds and letters of credit to be procured by the DIP Lender and made available to Flying J to cover, subject to the terms of the Financing Order and DIP Term Sheet, precisely those obligations (*i.e.*, fuel tax and workers' compensation obligations incurred in the ordinary course of Flying J's business) that had previously been covered by the GAIC-issued surety bonds. Therefore, the DIP Facility addresses exactly those liabilities of the Debtors that currently place the Debtors' liquidity position at greatest risk.

25.     **Second**, while the Debtors' management has made significant progress on a variety of initiatives to improve liquidity at Flying J, the absence of postpetition financing has impeded the Debtors' ability to further ameliorate the effects of contracted trade terms imposed by the Debtors' vendors. The Debtors had, as of June 30, 2009, negotiated critical vendor

DB02:8456557.1

067990.1001

agreements pursuant to the *Order Authorizing the Debtors to Pay Prepetition Claims of Critical Vendors and Approving Procedures Related Thereto* [Docket No. 320] with three vendors, securing significant credit concessions from each, which resulted in over $3.7 million in liquidity improvements. The Debtors continue to negotiate agreements with their remaining vendors, the credit terms of which could result in more than $8 million in additional liquidity improvements. Despite these substantial gains, the Debtors believe that the absence of postpetition financing has deterred the Debtors from obtaining additional credit concessions from their remaining vendors. In the absence of a committed source of financing, the Debtors' vendors have shown reluctance to agree to credit terms favorable to the Debtors. The DIP Facility will facilitate smoother negotiations between the Debtors and their vendors by giving such vendors comfort that the Debtors will comfortably have the resources to pay on ordinary credit terms.

26. Further, maintaining healthy relationships with these vendors is key to maintaining Flying J's enterprise value, as Flying J's businesses cannot operate without the goods and services provided by these vendors. Because the consideration for the initial Transaction is keyed to Flying J's enterprise value, continued provision of goods and services increases the likelihood of a higher purchase price and higher ultimate payout to stakeholders.

27. **Third**, the options available to the Debtors in the absence of postpetition financing could potentially subject the Debtors' businesses to significant risk. Various alternative sources of liquidity at the Flying J level exist, but each such potential alternative source poses significant timing and execution risks. For example, marketing and sale of certain non-core assets, such as the Debtors' Longhorn pipeline, their refinery at Bakersfield, California, the Debtors' 50% interest in their wholesale refinery distributor, Haycock Petroleum Company, and the various parcels of undeveloped real property held by the Debtors, while helpful to the

Debtors' long-term business prospects, are both fraught with risk and likely are unable to address Flying J's immediate short-term cash constraints. Once again, the Debtors' bonds issued by GAIC are set to terminate in a matter of weeks. If that occurs, and the Debtors are left without the ability to provide surety bonds to secure their various fuel tax and workers' compensation obligations, the Debtors will no longer be able to conduct business as usual, resulting in severe disruption and loss of value. Therefore, the DIP Facility is the most effective, and quite simply, the only means of ensuring the continuity of the Debtors' businesses in the long-term and addressing the acute short-term funding shortfall.

28. **Fourth**, without additional funds to address the limitations on the Debtors' operating flexibility described above, the Debtors may find it difficult to continue with business as usual long enough to finalize the Transaction. If this occurs, and the Transaction ultimately does not close, Flying J will have foregone a substantial restructuring opportunity, further prolonging its stay in chapter 11. The Transaction will assist in bringing resolution to these chapter 11 cases expeditiously and efficiently. The DIP Facility is key to achieving that goal.

## Summary of Principal Terms of Postpetition Financing and Letter of Intent

## I. DIP Facility

29. The Debtors have negotiated and reached an agreement on a senior secured revolving credit facility of up to $100 million.

30. Flying J intends to use the proceeds from the DIP Facility to bridge to the Transaction with Pilot, replace certain surety bonds and letters of credit, enter into additional agreements with their trade vendors, enabling the Debtors to obtain further credit concessions and improve liquidity, provide support to the Debtors' subsidiaries (consistent with existing orders of the Court and subject to the Budget) and ensure sufficient cash availability to provide a cushion against unforeseen circumstances.

### A. Key Terms

31. Pursuant to and in accordance with Bankruptcy Rule 4001(b)(1)(B) and Local Bankruptcy Rule 4001-2(a)(ii), the significant terms of the proposed DIP Credit Agreement as currently contained in the DIP Term Sheet[6] are summarized as follows:

| Summary of Material Terms | |
|---|---|
| **Borrower:** | Flying J Inc. |
| **Guarantors** | Flying J Transportation LLC, AFJ and the other direct and indirect subsidiaries of Flying J set forth on Schedule 1 of the DIP Term Sheet. |
| **Amount and Type of Facility:** | • a revolving line of credit ("Line of Credit") in the maximum principal amount of $55 million.<br><br>• letters of credit and/or performance, surety or similar bonds (each, a "LC/Bond") to be procured by the DIP Lender supporting certain fuel tax, workers' and other compensation obligations incurred in the ordinary course of Flying J's business up to a maximum aggregate amount of $45 million (the "LC/Bond Facility"). |
| **Fees:** | Fees in connection with the DIP Facility shall be paid by Flying J as follows:<br><br>• Closing Fee: 1% of the maximum amount of the DIP Facility.<br><br>• Unused Line Fee: 0.5% per annum of the unutilized amount of the DIP Facility.<br><br>• Expenses: All actual, reasonable and documented out-of-pocket fees and expenses of the DIP Lender incurred in connection with the DIP Facility, including reasonable attorney fees and costs. |

---

[6] In the event that the terms described herein differ from the DIP Term Sheet, the DIP Term Sheet shall control. Terms used but not otherwise defined herein shall have the meaning ascribed to them in the DIP Term Sheet.

DB02:8456557.1                                                          067990.1001

| | |
|---|---|
| **DIP Facility Termination Date:** | The earliest to occur (the "Termination Date") of:<br><br>• June 30, 2010 (the "Final Maturity Date");<br><br>• July 31, 2009 if the Court does not enter an order approving the Letter of Intent by that date;<br><br>• September 30, 2010, if the Acquisition Agreement has been executed and delivered, and is thereafter terminated on March 31, 2010 because the waiting period under the HSR Act shall not have expired on or prior to such date;<br><br>• acceleration of the DIP Obligations due to the occurrence and continuation of an Event of Default;<br><br>• the "effective date" of any confirmed plan of reorganization;<br><br>• the date of closing of the Transaction;<br><br>• the date of execution of any agreement for the sale to any third party of any of the Target Assets;<br><br>• the sale, or execution of any agreement for sale, to any third party of any Target Assets comprising travel plazas, fuel stops, card locks and similar business properties; and<br><br>• sale, or execution of any agreement for sale of any Target Assets, other than Target Assets comprising Plazas or certain excess land adjacent to operating travel plazas, to any third party (having a value in excess of $3 million in the aggregate).<br><br>On the Termination Date, the Commitment of the DIP Lender shall be terminated, and the DIP Lender shall have no further obligation to provide financing, pursuant to the DIP Facility or otherwise. |
| **Non-Default Interest Rate/Fees and Payment Terms:** | Flying J shall pay monthly in arrears on the last business day of each month:<br><br>• Line of Credit: 12% per annum.<br><br>• LC/Bond Facility: 5% per annum of the aggregate face amount of all LC/Bonds issued under the LC/Bond Facility.<br><br>Any unreimbursed draws on the LC/Bonds shall constitute an advance under the Line of Credit and shall bear interest at the 12% rate up to the Line of Credit limit of $55 million and shall otherwise constitute an unreimbursed amount due by Flying J and shall bear interest at the rate applicable to Line of Credit advances. |
| **Default Interest Rate:** | Applicable non-default rate plus 200 bps. |
| **Loan Payments:** | All unpaid principal and interest on the DIP Facility shall be due and payable, and all LC/Bonds shall be cash collateralized (on terms and subject to documentation satisfactory to the DIP Lender), in full on the Termination Date.<br><br>Flying J may voluntarily prepay the DIP Facility in whole or in part at any time without penalty.<br><br>The documentation for the DIP Facility shall contain mandatory |

| | prepayments and corresponding permanent commitment reductions which are customary for financings of this type, modified as appropriate to reflect the context of the proposed DIP Facility. |
|---|---|
| | Flying J shall be required to permanently repay the DIP Facility (with a corresponding permanent commitment reduction), with the proceeds of sale of any Plazas, any Adjacent Land, and Collateral or any of the Target Assets (other than Plazas or Adjacent Land) having an aggregate value in excess of $3 million during the term of the DIP Facility. |
| **Use of Proceeds:** | General corporate operating and working capital purposes of Flying J and its non-debtor subsidiaries for the travel center, card and trucking businesses; provided, that up to $5 million of DIP Facility proceeds may be used for administrative and other costs and expenses associated with Flying J's and its non-debtor subsidiaries' other businesses, subject in all cases, to a thirteen-week budget and cash flow forecast (in reasonable line item detail and subject to permitted variances) to be agreed upon by the parties (as periodically updated from time to time in accordance with the terms of the DIP Facility, the "Budget"). |
| **Priority:** [Fed. R. Bankr. P. 4001(c)(B)(i)] | Except as agreed with respect to the Carve Out, all DIP Obligations, including all accrued interest, fees, costs and expenses, shall constitute an allowed superpriority administrative expense claim against Flying J pursuant to section 364(c)(1) of the Bankruptcy Code, having priority over all administrative expenses of the kind specified in or arising under any sections of the Bankruptcy Code (including, without limitation, sections 105, 326, 328, 330, 331, 364(c)(1), 503(b), 506(c), 507, 546(c), 726, 1113 and 1114 thereof). |
| **Liens:** [Fed. R. Bankr. P. 4001(c)(B)(i) & (vii)] | In addition to the superpriority claim described above, the DIP Facility shall be secured by valid, first priority liens on (i) all equity and membership interests in and to (a) Flying J Transportation LLC, (b) AFJ and (c) certain other entities set forth on Schedule 1 of the DIP Term Sheet; (ii) the real property set forth on Schedule 1 of the DIP Term Sheet; (iii) Flying J's and AFJ's leasehold interests in all plazas/truck stops; (iv) Flying J's rights in and to that certain intercompany receivable owed to it by AFJ in the outstanding principal amount of approximately $50 million; and (v) all proceeds of the Transaction, and (vi) all products and proceeds of the foregoing. |
| **Lien Validation and Perfection:** | All liens authorized and granted pursuant to the Financing Order and other Transaction Documents shall be deemed effective and perfected as of the date thereof, and no further notice or act will be required to effect such perfection. |
| | Flying J and Flying J Transportation LLC shall take such actions as may be required by DIP Lender to create and perfect such Liens and security interests in the collateral. |
| **Documentation:** | The DIP Facility shall be subject to the negotiation, execution and delivery of a definitive credit agreement (the "DIP Credit Agreement") and related loan documents, pledges, security documents and other supporting instruments and agreements embodying the terms set forth herein, as well as the Financing Order, which in each case shall be in |

| | |
|---|---|
| | form and substance satisfactory to Flying J and the DIP Lender. |
| | Each of the Transaction Documents shall contain terms and conditions, to the extent acceptable to the DIP Lender, customary in debtor in possession financing agreements, consistent with the Flying J's rights and obligations as a debtor in possession. |
| | The DIP Credit Agreement shall include customary protective provisions for such matters as increased costs, funding losses, illegality and withholding taxes. |
| **Conditions Precedent to Closing:** | As further provided in the DIP Term Sheet, the closing of the DIP Facility, and the initial funding thereunder, shall be subject to conditions precedent customary and appropriate for financings of this type. |
| | Additionally, the closing of the DIP Facility shall be conditioned on the Court's entry of an order by July 31, 2009, of the Financing Order, approving the DIP Facility (including the Transaction Documents) and the Letter of Intent, in form and substance satisfactory to the DIP Lender and with such prior notice to the necessary parties as required by Bankruptcy Rule 4001 or otherwise. |
| **Affirmative and Negative Covenants:**<br>[Fed. R. Bankr. P. 4001(c)(B)(vi)] | As further provided in the DIP Term Sheet, the documentation for the DIP Facility shall contain affirmative and negative covenants customary for financings of this type, modified as appropriate to reflect the context of the proposed DIP Facility. |
| **Representations and Warranties:** | The documentation for the DIP Facility shall contain representations and warranties customary for financings of this type, modified as appropriate to reflect the context of the proposed DIP Facility. |
| **Conditions to Each Extension of Credit Under the DIP Facility:** | The documentation for the DIP Facility shall contain conditions to each extension of credit under the DIP Facility customary for financings of this type, modified as appropriate to reflect the context of the proposed DIP Facility, unless waived by the DIP Lender in its sole discretion, including:<br><br>• Flying J shall provide the DIP Lender with at least five (5) business days written notice prior to the date of any requested advance either financing facility.<br><br>• The Termination Date shall not have occurred and there shall exist no Default or Event of Default under any of the Transaction Documents, and the representations and warranties therein shall be true and correct in all material respects.<br><br>• The DIP Lender shall have received, in form and substance reasonably satisfactory to the DIP Lender, all certificates, orders, authorizations, consents, affidavits, schedules, instruments, security agreements, financing statements and other documents which are provided for under the Financing Order, or which the DIP Lender may at any time reasonably request or as may be required under the terms of the DIP Credit Agreement.<br><br>• Flying J shall have paid all fees and expenses as the DIP Lender shall |

| | reasonably determine are then due and payable (which fees and expenses shall be set forth in the DIP Credit Agreement or the other Transaction Documents). |
| --- | --- |
| | • Flying J and the Sellers (as defined below) shall not have breached any of their respective obligations under the Letter of Intent or, if applicable, the Acquisition Agreement. |
| | • The Financing Order shall be in full force and effect, un-stayed, not subject to any timely filed appeal and (without the prior written consent of the DIP Lender) such order shall not have been amended or modified. |
| | • Compliance with Bankruptcy Rule 4001 and the entry of the Financing Order, together with any other order reasonably requested by the DIP Lender authorizing and approving the DIP Facility in form, substance and amount and providing for the super-priority administrative claims and liens described herein or as may be set forth in the DIP Credit Agreement. |
| **Remedies:** | Upon any Event of Default and/or the Termination Date, the DIP Lender shall have remedies customary for financings of this type, modified as appropriate to reflect the context of the proposed DIP Facility, including, without limitation, relief from the automatic stay, the right to realize on all Collateral, the right to exercise any remedy available under definitive documentation for the DIP Facility and applicable law.<br><br>All proceeds received upon the exercise of such remedies by the DIP Lender shall be applied <u>first</u>, to accrued unpaid interest and costs under the DIP Facility and <u>second,</u> to repay outstanding principal under the DIP Facility and to cash collateralize all LC/Bonds on terms and subject to documentation satisfactory to the DIP Lender. |
| **Additional Covenants and Conditions to Commitment:** | By July 14, 2009, Flying J shall file a motion in form and substance satisfactory to the DIP Lender seeking approval of the DIP Facility and the Letter of Intent and entry of the Financing Order.<br><br>No alternative DIP proposal shall be filed with the Bankruptcy Court unless this commitment to provide the DIP Facility has terminated in accordance with its terms.<br><br>As further provided in the DIP Term Sheet, the DIP Lender shall have the right at any time to cure defaults and/or repay or cause to be refinanced any mortgage on real property pledged to it or owned by any entity whose equity is pledged to it, as part of the Collateral. Flying J shall be obliged to reimburse the DIP Lender for any such amounts so advanced and to pay interest thereon at the Line of Credit rate.<br><br>To the extent the DIP Lender repays a mortgage directly, it shall have and be entitled to a mortgage on such real property pursuant to documentation in form and substance satisfactory to the DIP Lender. |
| **Events of Default:** | The documentation for the DIP Facility shall contain events of default customary for financings of this type, including in respect of non-Debtor entities, modified as appropriate to reflect the context of the proposed DIP Facility, subject to any applicable cure periods ("Events of Default"), |

including, without limitation:

- **Payments.** Failure to timely make any payments required under the DIP Facility when due or failure to repay the DIP Obligations on the Final Maturity Date.

- **Conversion.** The voluntary or involuntary dissolution or liquidation of Flying J, or conversion of the chapter 11 cases to chapter 7, or the filing by Flying J of a motion seeking the above.

- **Reversal of Final Order.** The reversal, vacation or stay by the Bankruptcy Court of the Financing Order.

- **Trustee/Examiner.** Appointment of a trustee under section 1104(ii) or appointment of an examiner with enlarged powers relating to the operation of Flying J's business.

- **Compliance with Financing Order.** The failure of Flying J to comply with any material provision of the Financing Order.

- **Payment of DIP Obligations.** The Court enters an order confirming a plan of reorganization in the chapter 11 cases which does not (i) contain a provision for payment in full of all DIP Obligations and the cash collateralization of all LC/Bonds outstanding on the effective date of such plan and in each case in a manner satisfactory to the DIP Lender on or before the effective date of such plan and (ii) provide for the continuation of the Liens and priorities in favor of the DIP Lender until such effective date.

- **Modification of Financing Order.** The Court enters an order to (i) revoke, reverse, stay for a period in excess of ten (10) days, vacate or rescind any provision of the Financing Order, (ii) modify, supplement or amend any provision of the Financing Order without the consent of the DIP Lender, (iii) permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to Flying J, equal or superior to the priority of the DIP Lender, except in respect of the Carve Out, which shall have a superpriority claim pari passu with the DIP Obligations and which will be paid by Flying J as and when allowed by the Court, (iv) to grant or permit the grant of a Lien on the Collateral other than permitted Liens to be agreed upon or Liens permitted by the DIP Lender in the DIP Lender's sole discretion or (v) dismiss the chapter 11 cases which dismissal does not contain a provision for termination of the DIP Lender's Commitment and payment in full in cash of all DIP Obligations and the cash collateralization or return of all LC/Bonds in a manner satisfactory to the DIP Lender upon such dismissal.

- **Stay Relief.** The Court enters an order granting relief from the automatic stay to the holder or holders of any Liens on Collateral to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any Collateral where the aggregate value of such Collateral subject to such relief is greater than $5 million.

- **Enforceability of Financing Order.** Any provision of the Financing Order, the DIP Credit Agreement or any other Transaction Document ceases to be valid or binding or enforceable against Flying J.

DB02:8456557.1

067990.1001

| | |
|---|---|
| | • **Challenge of Financing Order.** Flying J commences or joins in any legal proceeding to contest in any manner that the Financing Order, the DIP Credit Agreement or any other Transaction Document constitute valid and enforceable agreements or to assert that it has no further obligation or liability under the Financing Order, the DIP Credit Agreement or any other Transaction Document.<br><br>• **Challenge to DIP Obligations.** Flying J seeks to, or supports (whether by way of motion or other pleadings filed with the Court) any other Person's motion to (i) disallow in whole or in part any of the DIP Obligations arising under the DIP Credit Agreement or any other Transaction Document or (ii) challenge the validity and enforceability of the Liens or security interests granted or confirmed in the DIP Credit Agreement or in the Financing Order in favor of the DIP Lender.<br><br>• **Disgorgement.** The Court enters an order avoiding or requiring disgorgement by the DIP Lender of any amounts received in respect of the DIP Obligations.<br><br>• **Breach of Letter of Intent.** Any breach by Flying J or the other sellers party to the Letter of Intent of their respective obligations under (I) section 7 or 14 thereof, (II) Section 8 or the last sentence of Section 12 thereof, in each case after notice and a four (4) business day period to cure such breach (or such longer period as may reasonably be required to cure such breach, provided that breaching party is diligently pursuing such cure), and (III) Section 10 thereof, after notice and a four (4) business day period to cure such breach.<br><br>• **Breach of Acquisition Agreement.** Any material breach by Flying J or the other sellers party to the Acquisition Agreement of their respective obligations thereunder. |
| **Modification of the Automatic Stay:** [Fed. R. Bankr. P. 4001(c)(1)(B)(iv)] | As further provided in the DIP Term Sheet, the automatic stay shall be immediately modified to permit the DIP Lender to exercise the above remedies upon at least 5 business days notice of the exercise of any remedies to the United States Trustee and counsel to the Creditors' Committee. |

## B.    Liens and Claims

32.    As described in the summary above, and as further provided in the DIP Term Sheet, the DIP Obligations will be secured by the Collateral, which constitutes valid, first priority liens on (i) all equity and membership interests in and to (a) Flying J Transportation LLC, (b) AFJ and (c) certain other entities set forth on Schedule 1 of the DIP Term Sheet; (ii) the real property set forth on Schedule 1 of the DIP Term Sheet; (iii) Flying J's and AFJ's leasehold interests in all plazas/truck stops; (iv) Flying J's rights in and to that certain intercompany receivable owed to it by AFJ in the outstanding principal amount of approximately $50 million;

DB02:8456557.1

067990.1001

and (v) all proceeds realized from the transactions contemplated by the Acquisition Agreement or Letter of Intent; and (vi) on all proceeds of the transactions contemplated thereby, and all products and proceeds of the foregoing.

33.     Notably, the DIP Lender is not seeking any "priming" liens.  The DIP Lender shall also receive a superpriority administrative expense claim, subject to the Carve Out, against Flying J to secure payment of the DIP Obligations.

**C.     Provisions To Be Highlighted Pursuant to Local Bankruptcy Rule 4001-2**

34.     Local Rule 4001-2 requires the Debtors to highlight certain provisions included in the DIP Term Sheet.  The only such provision under Rule 4001-2 of the Local Bankruptcy Rules included in the DIP Term Sheet is as follows:

> a.     a carve out for the benefit of professionals retained by the Debtors and the Creditors' Committee, as further described in DIP Term Sheet.

35.     <u>Carve Out</u>.  The inclusion of provisions for the payment of the Carve Out in the DIP Term Sheet and Financing Order does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases.  <u>See</u> <u>In re Ames Dept. Stores, Inc.</u>, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  The proposed DIP Term Sheet makes any administrative expense claims of the DIP Lender pari passu to payment of the Carve Out, as described above.  In <u>Ames</u>, the court found that "carve outs" for professional fees to be not only reasonable, but necessary to ensure that official committees and debtors' estates can retain assistance from counsel.  <u>See</u> <u>id.</u> at 41.

DB02:8456557.1

067990.1001

36.     Local Bankruptcy Rule 4001-2(a)(i)(F) requires a movant to identify provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve out. See Del. Bankr. L.R. 4001-2(a)(i)(F). There are no such provisions in this case.

## II.     Letter of Intent/Acquisition Agreement

37.     As further provided in the DIP Term Sheet, closing of the DIP Facility and Flying J's access to funding thereunder is conditioned upon the Sellers' execution and this Court's approval of the Letter of Intent, which will obligate Flying J to pursue, on an exclusive basis with the DIP Lender through August 31, 2009 (subject to certain extensions upon Pilot's completion of due diligence, delivery of documents and obtaining certain consents), a sale of the assets to be set forth in the Letter of Intent.

38.     The significant and material terms of the proposed Transaction as currently contemplated in the Letter of Intent are summarized as follows:[7]

(a) **Target Assets.**  Flying J's travel center operations (including, without limitation, Flying J's direct or indirect ownership interest in CFJ), trucking operations, corporate headquarters building and operations, certain excess land adjacent to operating travel plazas, and other business operations of Flying J and its subsidiaries (including, without limitation, the assets and certain liabilities of Flying J and its subsidiaries related thereto), other than the Excluded Business Operations, as defined above and as further described below (collectively, the "Target Assets").

(b) **Excluded Assets.**  The Excluded Business Operations are the following business operations and assets of Flying J and its subsidiaries:  their refinery operations, their oil and gas operations, their credit card operations, their banking operations, their pipeline operations, their insurance operations, their airplanes and any and all assets and liabilities associated therewith (including, without, limitation, their airplane hangars and any and all leases and financing arrangements associated with such airplanes) and all real estate which is both not used in the Business and not adjacent to the Business and shall include,

---

[7]     As this summary does not include all terms of the Letter of Intent in their entirety, the summary should be used for reference purposes only and is qualified in all respects by the Letter of Intent.

without limitation, Seller's direct or indirect ownership interests in, or any assets of, TCH LLC, Haycock Petroleum Company, Big West Oil, LLC, Big West of California, LLC, Longhorn Pipeline, Inc., Longhorn Partners Pipeline, L.P., Longhorn Pipeline Holdings LLC, Transportation Alliance Bank, Inc., Flying J Enterprise Solutions, Driveline Accounting Services, LLC, Clarity Inc., Fun Runner LLC or Flying J Oil & Gas Inc.

(c) **Consideration.** The consideration for the acquired assets shall consist of a combination of cash and equity in Pilot (a) based on an enterprise value of Flying J's business operations of not less than $1.189 billion, (b) in any event including a cash portion to be paid to Flying J at the closing of the Transaction of between, at Flying J's option, $300 million and $500 million and (c) for purposes of determining the equity portion of consideration to be issued to Flying J at closing of the Transaction, based on an enterprise value of Pilot of $3.291 billion.

(d) **Working Capital Adjustment.** The respective enterprise values of Flying J, for purposes of determining the total consideration, and Pilot, for purposes of determining the equity portion of the consideration to be paid to Flying J shall be subject to customary net debt and customary working capital adjustments (working capital to be defined in a mutually agreed upon manner, but in any event, determined for each party without regard to the assets and liabilities included in Net Debt, but with regard to assets and liabilities related to the mark-to-market impact on petroleum hedging and derivative instruments) and, in the case of the working capital adjustment, based on differences between the actual working capital at the closing of the Transaction and target net working capital amounts, calculated as provided in Section 1 of the Letter of Intent.

(e) **Exclusivity.** As further described in the Letter of Intent, Flying J may not solicit or engage in negotiations regarding an alternative transaction until the earliest to occur (the "Exclusivity Period") of

- the latest to occur of

  - 5:00 PM EDT on August 31, 2009;

  - 5:00 PM EDT on September 30, 2009 if, on or prior to August 31, 2009, Pilot has notified Flying J that the completion of due diligence is no longer a condition to the Transaction (the "Due Diligence Condition Removal Date"), provided that Flying J reasonable cooperates with Pilot's due diligence requests, as further described in the Letter of Intent;

  - 5:00 PM EDT on October 31, 2009 if, on or prior to August 31, 2009, the Due Diligence Condition Removal Date has

occurred and on or prior to September 30, 2009, Pilot has executed and delivered to Flying J the Acquisition Agreement and other definitive transaction documents in substantial compliance with the terms of the Letter of Intent (the "<u>Transaction Document Delivery Date</u>");

- 5:00 PM EDT on March 31, 2010 if, on or prior to August 31, 2009, the Due Diligence Condition Removal Date has occurred, on or prior to September 30, 2009, the Transaction Document Delivery Date has occurred and on or prior to October 31, 2009, the ConocoPhillips Company and Shell (as defined in the Letter of Intent) have consented to the Transaction.

- the date, if any, that the Court denies Flying J's motion to approve the DIP Facility (subject to Flying J's right to seek reconsideration of such order);

- the closing of the Transaction; and

- the date that Pilot expressly notifies Flying J in writing that it has affirmatively chosen to abandon the Transaction.

(f) **Tolling of Pending Litigation.** [Filed Under Seal].

(g) **Resolution of Pending Litigation.** [Filed Under Seal].

(h) **Pilot's Conditions Precedent to the Transaction.** The obligations of Pilot to effect the Transaction shall be subject to Pilot's obtaining financing and shall also be subject to conditions customary for transactions of its type, all as further described in the Letter of Intent.

(i) **Flying J's Conditions Precedent to the Transaction.** The obligations of Flying J to effect the Transaction shall be subject to conditions customary for transactions of its type.

(j) **Covenants.** The Acquisition Agreement shall contain pre- and post-closing covenants customary for transactions of this type, including obligations of Pilot to replace or indemnify Flying J for credit support obligations of Flying J and its subsidiaries with respect to the Target Assets.

(k) **Indemnification.** The Acquisition Agreement shall provide that the respective parties shall, from and after the closing of the Transaction, indemnify the other for breaches of the representations and warranties (without giving effect to any materiality or material adverse effect qualifiers, except in the case of any representation or warranty as to financial statements or undisclosed liabilities), covenants and agreements contained in the

DB02:8456557.1

067990.1001

Acquisition Agreement, subject (except in the case or representations and warranties regarding ownership, capitalization, title and tax matters and covenants) to, in the case of (a) Flying J's indemnification obligation, a (i) tipping basket equal to $25 million, (ii) cap equal to $75 million and (iii) de minimis per claim threshold of $500,000 and (b) Pilot's indemnification obligation, a (i) tipping basket equal to $12.5 million, (ii) cap equal to $37.5 million and (iii) de minimis per claim threshold of $250,000. The parties shall in good faith negotiate customary monetary thresholds for indemnification limits with respect to certain pre-closing covenants. The indemnification obligations shall, at the indemnifying party's option, be permitted to be satisfied from equity of Pilot. Upon closing of the Transaction, the indemnification provisions in the Acquisition Agreement shall be the sole remedy (other than equitable remedies) of the indemnified parties with respect to the Acquisition Agreement or the transactions contemplated thereby.

(l) **Flying J's Post-Closing Call Option.** Upon the consummation of the Transaction, Flying J and the required equityholders of Pilot shall enter into a customary stockholders agreement. In addition to customary terms such as minority shareholder rights, information rights and preemptive rights, the stockholders agreement will grant Flying J (and related parties) the right, for one (1) year following the consummation of the Transaction, to purchase up to $200 million in additional equity in Pilot with the same economic rights as the original equity based on the value of such equity issued to Flying J at the time of the consummation of the Transaction.

(m) **Flying J's Post-Closing Put Option.** Flying J shall have the option, at its election, to transfer the shares issued to it upon consummation of the Transaction upon the occurrence of certain events.

- Flying J shall be entitled to participate in any transfer of stock to a third party by the majority equityholders of Pilot ratably based on its equity percentage in Pilot relative to such other shareholders.

- Furthermore, a shareholder put mechanism[8] will be available to Flying J to allow for liquidity of their equity securities in Pilot. As part of the put mechanism, Flying J may elect to put up to a total of $15 million of its shares to Pilot at the price per share for the original equity issued upon consummation of the Transaction by giving notice at the closing date of the Transaction, and Pilot shall pay for such shares in cash not later than 90 days after the closing date of the Transaction.

---

[8] As further provided in the Letter of Intent, any exercise by Flying J of any put option will be subject to covenants contained in Pilot's existing debt financing arrangements. Pilot is prohibited from entering into new debt financing arrangements that restrict or prohibit Flying J's put rights.

DB02:8456557.1

067990.1001

- Additionally, subject to a mutually agreed upon methodology for valuing the shares, on an annual basis commencing on the second anniversary of the closing date for the Transaction, subject to six months prior notice to Pilot, Flying J may elect to put up to 20% of its original equity issued upon consummation of the Transaction and other equity securities of Pilot and Pilot shall pay the purchase price in respect of the equity securities so put in cash on or prior to such anniversary date. If such put is for greater than 10% of the original equity issued to Flying J, Pilot shall only be required to accept 10% of the original equity in Pilot issued to Flying J.

- Lastly, from the 6th anniversary of the closing, or if later, the second anniversary of Flying J's prior exercise of the put, Flying J may put to Pilot 15% of the equity in Pilot originally issued to Flying J on each subsequent anniversary. In the event that Flying J exercises such right, Flying J may not again exercise its put right until the 2nd anniversary of the date of its last exercise.[9]

(n) **Last Possible Closing Date.** March 31, 2010, unless all conditions to closing are satisfied on or prior to March 31, 2010 and the expiration of all applicable waiting periods under the HSR Act occurred on or after March 1, 2010 and prior to March 31, 2010, in which case the date shall be thirty (30) days following the expiration of all applicable waiting periods under the HSR Act, but in no event later than April 30, 2010.

39.     The Debtors have determined that ultimate execution of the Acquisition Agreement is in the best interest of all the Debtors' stakeholders. Although there are no guarantees, the Transaction is reasonably expected to provide for payment in full in cash to all Flying J creditors, provide significant value to Flying J shareholders, and will expeditiously resolve the chapter 11 cases. Further, without the DIP Facility, which is contingent upon approval of the Letter of Intent, the Debtors' ability to continue to operate in the ordinary course will be threatened to the detriment of all of the Debtors' creditors. As briefly described above, the Letter of Intent also requires the DIP Lender to meet important hurdles (such as waiver of due diligence, obtaining specified consents, final documentation substantially consistent with the

---

[9] From the 6th anniversary of the closing, Pilot will have a call right on the original equity issued to Flying J upon consummation of the Transaction, which will operate in a manner similar to Flying J's post-6th anniversary put rights.

Letter of Intent) in order to extend the Exclusivity Period for the Transaction, thereby protecting the Debtors' ability to seek alternative transactions if the DIP Lender does not timely meet such conditions, including delivery of the contemplated Acquisition Agreement.

40.    The Debtors believe that entry into the DIP Facility and ultimate consummation of the Acquisition Agreement will best maximize enterprise value and result in the greatest payout to the Debtors' constituencies.

41.    The Debtors have determined in their business judgment that pursuit of this sale is crucial to the DIP Lender's agreement to fund Flying J's operations and that the DIP Lender would not provide funding under the DIP Facility without it. As further described below, postpetition funding from other third parties was simply unavailable, or available only on unworkable or less favorable terms. Therefore, funding on the above terms represents the best and most favorable means of obtaining debtor in possession financing, without which the Debtors would be unable to meet their various surety and operational expense needs. As demonstrated throughout this Motion, the Debtors' failure to obtain postpetition financing pursuant to the DIP Facility will leave the Debtors—whose operations, apart from its surety obligations, are otherwise sound and profitable—without viable postpetition financing options, which could cause severe and irreparable damage to the Debtors' businesses.

## Basis for Relief

**I.    Flying J Should Be Permitted to Obtain Postpetition Financing Pursuant to Section 364(c) of the Bankruptcy Code**

42.    As set forth above, Flying J has an acute need for additional liquidity to provide security and replace the surety bonds and to fund day to day operations. Put simply, the DIP Facility enhances Flying J's flexibility in maximizing the enterprise value of its businesses, avoids the risk of significant and unforeseen future cash outlays restraining liquidity and gives

comfort to the Debtors' significant business and trading partners that further business with the Debtors does not constitute an unjustifiable credit risk.

### A. Flying J Was Unable to Obtain Postpetition Credit on an Unsecured Basis and Could Not Obtain More Favorable Postpetition Credit from Any Other Lender

43.     Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit outside the ordinary course of business and (c) obtaining credit with specialized priority or on a secured basis. For the reasons discussed below, Flying J must be able to access postpetition financing on a secured basis pursuant to sections 364(c) and (d) of the Bankruptcy Code.

44.     Pursuant to section 364(c), if a debtor cannot obtain postpetition credit on an unsecured basis, a court may authorize such debtor to obtain credit or incur debt that is entitled to superpriority administrative expense status, secured by a senior lien on unencumbered property, or secured by a junior lien on encumbered property. See 11 U.S.C. § 364(c); see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp., 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).

45.     A debtor seeking financing under section 364(c) of the Bankruptcy Code must make a reasonable effort to seek other sources of unsecured credit, but is granted deference in acting in accordance with its business judgment and, indeed, is not required to seek credit from every possible source. See, e.g., Ames, 115 B.R. at 40 (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders); see also Bray v. Shenandoah Fed. Sav. & Loan Assoc. (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986)

("The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable.").

46.     Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); see also In re Garland Corp., 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); In re Stanley Hotel, Inc., 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); Ames, 115 B.R. at 37-39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

47.     Over the course of these chapter 11 cases, the Debtors and their advisors have repeatedly attempted to locate consolidated postpetition credit for Flying J to fund ongoing operational costs. Nearly all potential financing sources passed on the opportunity.

48.     The Debtors and their investment banker, Blackstone Advisory Services L.P. ("Blackstone"), contacted 50 different potential lenders concerning a proposed debtor in possession financing arrangement. Thirteen of these potential lenders executed confidentiality agreements with Flying J. Despite the initial interest from several potential lenders, many did not pan out and ultimately the DIP lender offered postpetition financing that the Debtors found most advantageous and could resolve the Debtors' need for immediate financing.

49.     As Flying J itself owns little in the way of "borrowing base" or other traditional hard assets, it is unable to grant any potential lender a more traditional lien in hard assets that are

customary in the debtor in possession financing context. Flying J's sole avenue of granting collateral consists of providing a lender with pledges in the equity interests in Flying J's operating subsidiaries. Most potential lenders contacted by Blackstone, unaccustomed to receiving anything but hard assets to secure their loans, and given the current economic climate, expressed reluctance to enter into financing arrangements under these circumstances. Further, two potential lenders besides the DIP Lender with whom the Debtors engaged in serious negotiations expressed more interest in a private equity investment convertible into controlling interests in the Debtors' retail operations—AFJ and CFJ. While the Debtors themselves were not necessarily opposed to such an arrangement conceptually, any such agreement would have required extensive and complex negotiations with Flying J's joint venture partner in CFJ, ConocoPhillips Company, which negotiations would have been too lengthy and protracted given the Debtors' acute and immediate need for funding.

50.     One additional potential lender proposed debtor in possession financing that would have imposed certain limitations on Flying J's operation and the governance of certain Flying J subsidiaries. The Debtors determined in their business judgment that subjecting their subsidiary operations to such restrictions and the more extensive events of default and indemnification provisions contained in that proposed financing facility made the DIP Facility with Pilot even more desirable. Additionally, the proposed financing arrangements did not provide Flying J a path to expeditiously resolve the chapter 11 cases and emerge as a going concern, in contrast to the DIP Facility.

51.     Lastly, no parties were willing to provide unsecured financing. Thus, the DIP Lender was the only party to date willing to extend credit on terms feasible and desirable in light of existing contractual arrangements. The DIP Lender is willing to provide the DIP Facility

DB02:8456557.1                    067990.1001

only on the terms discussed herein. The terms of the DIP Facility are fair and reasonable. Further, the potential benefits here are substantial and access to the DIP Facility will enable the Debtors to maximize their estates for the benefit of all the parties in interest.

52. As noted above, Flying J has no appreciable secured debt obligations of its own. The DIP Lender's superpriority liens will not prime any existing liens. Therefore, the DIP Facility satisfies the requirements of section 364(d) of the Bankruptcy Code. Additionally, the foregoing reasons satisfy the first prong of section 364(d)(1) of the Bankruptcy Code—the non-availability of credit except on the terms offered by the DIP Lender. Accordingly, Flying J respectfully submits that its efforts to obtain postpetition financing satisfies the standard required under sections 364(c) and (d) of the Bankruptcy Code and that it should be granted authority to enter into the DIP Facility and obtain funds on the secured and administrative superpriority basis described herein.

**B.      The DIP Facility is Necessary to Preserve Estate Assets**

53. In addition to section 364(c), section 364(d)(1) of the Bankruptcy Code provides that the Court may, after notice and a hearing, authorize postpetition financing on a priming lien basis if the debtor is unable to obtain credit otherwise and there is adequate protection of the party whose lien is primed. See 11 U.S.C. § 364(d)(1).

54. Although the DIP Facility does not contemplate priming liens, courts' analyses under section 364(d)(1) are instructive here. Specifically, courts typically advocate using a "holistic approach" to evaluate superpriority postpetition financing agreements under section 364(d)(1), see, e.g., In re Aqua Assocs., 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991), which considers, among other factors, whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtors' business. See, e.g., In re Barbara K. Enters., Inc., Case No. 08-11474 (MG), 2008 WL 2439649,

at *10 (Bankr. S.D.N.Y. June 16, 2008); Ames, 115 B.R. at 37-39; see also 3 COLLIER ON BANKRUPTCY ¶ 364.04[1] (15th ed. rev. 2008).

55.    Here, Flying J clearly meets this standard.  Without access to funding under the DIP Facility, Flying J and the other Debtors' estates will suffer immense harm, as Flying J will be unable to meet certain obligations when due.

56.    Specifically, the laws governing the Debtors' industry require the Debtors to obtain and maintain certain licenses (e.g., fuel tax licenses, motor fuels licenses, and fuel supplier dealer licenses) to legally conduct operations.  Such governmental entities likewise require surety bonds from any entity holding or seeking to hold such licenses.  Additionally, in the ordinary course of business, the Debtors enter into numerous contracts, which require the Debtors to maintain appropriate and adequate bonding.   Entry into and the continued maintenance of these surety bonds is not voluntary, but mandatory.

57.    Following the Court's order approving the GAIC settlement and allowing GAIC to terminate its surety bonds on August 4, 2009, the Debtors focused their efforts upon finding a means for the issuance of replacement bonds.  Finding alternative providers that will issue surety bonds without requiring the Debtors to collateralize them has, however, proved impossible.  As a result, the Debtors have dealt with their surety obligations on a one-off piecemeal basis.  For example, pursuant to the Court's June 22, 2009 order[10] authorizing the Debtors to cause issuance of collateralized letters of credit to secure certain workers' compensation obligations, the Debtors addressed separate demands of two state regulatory agencies to replace bonds that GAIC had advised it would terminate.   In both of these instances, the Debtors were forced to collateralize newly-issued letters of credit.

---

[10]   See Order Authorizing Debtors to Fund and Cause Financial Institution to Issue Fully Collateralized Letters of Credit and to Increase the Amount of Their Existing Security [Docket No. 1404].

58.     The Debtors now face the termination of a majority of their bonds in a matter of weeks. Funding letters of credit to replace surety bonds in this fashion has placed considerable strain on the Debtors' liquidity. It will continue to do so absent approval of the DIP Facility. Obtaining a commitment from the DIP Lender to procure the issuance of the LC/Bonds to secure the Debtors' workers' compensation and fuel tax obligations as provided in the DIP Term Sheet will not only prevent likely financial collapse due to the Debtors' need to collateralize new surety bonds and letters of credit, but will also enable the Debtors' management to refocus their attention on restructuring the Debtors' businesses. The DIP Facility ensures that the Debtors will have sufficient liquidity to bridge to a time where the Debtors, through the already planned divestitures of non-core businesses, will have the liquidity to meet these obligations should the need arise. Additionally, the proceeds from the DIP Facility, as further described above, will promote the Debtors' efforts to transition Flying J's businesses to the Transaction, which, as set forth herein, is in the best interests of the Debtors' estates.

59.     As debtors in possession, the Debtors have a fiduciary duty to protect and maximize their estates' assets. See In re Mushroom Transp. Co., Inc., 382 F.3d 325, 339 (3d Cir. 2004); Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 573 (3d Cir. 2003). Authority to obtain postpetition financing pursuant to the DIP Facility allows the Debtors to do precisely that. Absent new funding, the Debtors will be unable to meet both their surety obligations and operational needs and their businesses will be substantially and irreparably harmed. As noted above, absent these outstanding obligations, which have become increasingly difficult to meet, the Debtors' businesses are sound and profitable. Failure to approve the DIP Facility at this critical juncture in these chapter 11 cases could destroy substantial value for all creditor constituencies.

DB02:8456557.1

067990.1001

## II. The Debtors Should be Authorized to Pay the Facility Fee Pursuant to Section 363 of the Bankruptcy Code

60.     Courts also routinely authorize debtors to pay fees related to debtor in possession financing facilities where the financing is beneficial to the estate in the Debtors' business judgment. See In re Gen. Growth Properties Inc., Case No. 09-11977 (ALG) (Bankr. S.D.N.Y. May 14, 2009) [Docket No. 527] (approving 3.75% exit fee); In re Aleris International Inc., Case No. 09-10478 (BLS) (Bankr. D. Del. Mar. 18, 2009) [Docket No. 299] (approving 3.5% exit fee and 3.5% front-end net adjustment against each lender's initial commitment); In re Tronox Inc., Case No. 09-10156 (ALG) (Bankr. S.D.N.Y. Feb. 6, 2009) [Docket No. 148] (approving an upfront 3% facility fee for $125 million of debtor in possession financing); In re Dura Automotive Systems, Inc., Case No. 06-11202 (KJC) (Bankr. D. Del. Feb. 21, 2008) [Docket No. 2826] (authorizing debtors to pay 2.5% in fees related to refinancing and extending a debtor in possession financing facility); In re DJK Residential, Case No. 08-10375 (JMP) (Bankr. S.D.N.Y. February 29, 2008) [Docket No. 188] (order authorizing debtors to enter into debtor in possession financing and pay a 3.0% fee); In re Delphi Corporation, et al., Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. Nov. 16, 2007) [Docket No. 10960] (authorizing debtor to pay fees in order to extend a debtor in possession facility); see also In re Verasun Energy Corp., Case No. 08-12606 (BLS) (Bankr. D. Del. Dec. 4, 2008) [Docket No. 305] (providing for an exit fee of 5.00% of the principal amount of the funded debtor in possession loans on a $196.54 million facility); In re Lyondell Chemical Co., Case No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 8, 2009) [Docket No. 79] (approving exit fee of 3.00% of a $3.25 billion term loan portion of $8.0 billion in debtor in possession financing).

61.     Pursuant to section 363(b) of the Bankruptcy Code, bankruptcy courts have generally approved the use, sale or lease of estate property, including payment of fees pursuant

to a debtor in possession financing facility, out of the ordinary course of business where a sound business justification for the proposed transaction exists. See, e.g., In re Martin, 91 F.3d 389, 395 (3d Cir. 1996) (noting that under normal circumstances, courts defer to a trustee's judgment concerning use of property under section 363(b) of the Bankruptcy Code when there is a legitimate business justification); In re Lionel Corp., 722 F.2d 1063, 1070 (2d Cir. 1983) (acknowledging the use of the "articulated business justification" for the use of property under section 363 of the Bankruptcy Code).

62.     A debtor has the burden of establishing that a valid business purpose exists for the use of estate property in a manner that is not in the ordinary course of business. See In re Lionel Corp., 722 F.2d at 1071. Once a debtor articulates a valid business justification, however, it is presumed that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). Therefore the business judgment rule shields a debtor's management from judicial second guessing. A court should approve a debtor's business decision unless that decision is a product of bad faith or gross abuse of discretion. See id.; see also Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043, 1047 (4th Cir. 1985), cert. denied, 475 U.S. 1057 (1986).

63.     The Facility Fee of 1% of the DIP Facility and the 0.5% per annum commitment fee, plus all of the DIP Lender's actual out-of-pocket fees and expenses, including reasonable attorney fees and costs incurred by the DIP Lender in conjunction with the DIP Facility (collectively, the "Fees") are justified as a valid exercise of the Debtors' business judgment. As noted above, the Fees are not only well within, but are on the low end of the range entered into in

DB02:8456557.1                                                                                      067990.1001

private lending situations and those approved by bankruptcy courts. Further, the Fees were heavily negotiated between sophisticated parties advised by counsel. Given the current state of the credit markets, the Debtors believe that the Fees are more than reasonable in light of the amounts borrowed and the lending term. As a result, the decision to enter into the DIP Facility and pay the Fees satisfies the business judgment standard. See In re Lionel Corp., 722 F.2d at 1071.

### III.  Modification of the Automatic Stay is Warranted

64.  The DIP Term Sheet provides that, upon five business days notice to the Creditors' Committee and the United States Trustee, the automatic stay provisions of section 362 of the Bankruptcy Code would be vacated and modified to the extent necessary to permit the DIP Lender to exercise, upon the occurrence and during the continuation of any event of default, all rights and remedies provided for under the DIP Facility, and to take various actions without further order of or application to the Court. Any potential trigger that would enable the DIP Lender to exercise its rights and remedies under the DIP Facility will either be known to the parties well in advance or require the DIP Lender to provide advance notice. In addition, the DIP Facility provides the Debtors the ability to cure certain defaults.

65.  Stay modification provisions of this sort are ordinary and usual features of debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances. See, e.g., In re Muzak Holdings LLC, Case No. 09-10422 (KJC) (Bankr. D. Del. Mar. 12, 2009) [Docket No. 133]; In re Flying J., Inc. Case No. 08-13384 (Bankr. D. Del. Mar. 9, 2009) [Docket No. 733]; In re Hines Horticulture, Inc., Case No. 08-11922 (Bankr. D. Del. Sept. 10, 2008) [Docket No. 124]; In re ACG Holdings, Inc., Case No. 08-11467 (Bankr. D. Del. Aug. 13, 2008) [Docket No. 137]; see also In re General Growth Properties, Inc., Case No. 09-11977 (ALG) (Bankr. S.D.N.Y. May 14, 2009) [Docket No. 527];

DB02:8456557.1

067990.1001

In re Tronox Inc., Case No. 09-10156 (ALG) (Bankr. S.D.N.Y. Feb. 6, 2009) [Docket No. 148];

In re Chemtura Corp., Case No. 09-11233 (REG) (Bankr. S.D.N.Y. April 29, 2009) [Docket No. 281]. Accordingly, the Court should modify the automatic stay to the extent contemplated by the DIP Term Sheet.

## IV. The Court Should Approve and Authorize the Debtors to Execute the Letter of Intent

66.     The proposed Transaction described in the Letter of Intent furthers the ultimate resolution of Flying J's chapter 11 cases and could possibly result in a full payout to Flying J's unsecured creditors. Conversely, failure to authorize Flying J to executed the Letter of Intent would leave its reorganization prospects uncertain and would result in withdrawal of the DIP Facility commitment.

### A. The Debtors Should be Authorized to Execute the Letter of Intent Pursuant to Sections 105 and 363 of the Bankruptcy Code

67.     Section 363 of the Bankruptcy Code provides that a debtor-in-possession may "use . . . property of the estate" outside the ordinary course of business after notice and a hearing. 11 U.S.C. § 363(b)(1). Additionally, section 105(a) provides that the "court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

68.     Section 363 does not indicate a standard to be used in determining whether a debtor's use of estate property is appropriate. However, courts routinely authorize a debtor's use of property outside the ordinary course, including in the sale context, if such use is based upon the sound business judgment of the debtor. See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.) 722 F.2d 1063, 1071 (2d Cir. 1983) (explaining that business judgment rule requires that a sound business purpose for the transaction exist); Meyers v. Martin (In re Martin),

DB02:8456557.1

067990.1001

91 F.3d 389, 395 (3d Cir. 1996) (noting that courts usually defer to trustee's judgment as long as there is "legitimate business purpose").

69.     A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders. See, e.g., In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); Lionel, 722 F.2d at 1071. Once a debtor articulates a sound business justification, the business judgment rule creates "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." Integrated Res., 147 B.R. at 650. Accordingly, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). If a debtor satisfies the business judgment rule, then the proposed transaction should be approved. Id. Indeed, courts show great deference to a debtor's business decisions when applying the business judgment rule. See, e.g., In re Aerovox, Inc., 269 B.R. 74, 81 (Bankr. D. Mass. 2001) (explaining that "debtor's business decision 'should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice'" (quoting In re Logical Software, Inc., 66 B.R. 683, 686 (Bankr. D. Mass. 1986)).

70.     In addition to section 363(b), section 105(d) of the Bankruptcy Code is an important tool for bankruptcy courts to manage the plan process. See In re Aspen Limousine Serv., Inc., 187 B.R. 989, 995 (Bankr. D. Colo. 1995) ("Section 105(d)(2) provides, generally,

rather substantial flexibility and latitude for the Court to designate, or adjust, the Chapter 11 plan, disclosure statement, and confirmation time lines and procedure."). Under section 105(d) of the Bankruptcy Code, bankruptcy courts have significant discretion to approve a pre-confirmation process that is otherwise consistent with the Bankruptcy Code. See id. ("[Section 105(d)(2) of the Bankruptcy Code] is an omnibus provision with which the Court can customize Chapter 11 preconfirmation procedures, as long as those procedures are not inconsistent with other provisions of the Code.").

71.     Thus, as long as a debtors' decision to enter into a transaction is in its business judgment and not otherwise inconsistent with the provisions of the Bankruptcy Code, sections 105 and 363(b) give a court authority to enter an order approving and authorizing the transaction.

72.     The Debtors, in their sound business judgment, believe that the Transaction contemplated by the Letter of Intent (a) will promote Flying J's speedy exit from bankruptcy, (b) will facilitate the Debtors' ongoing restructuring efforts and (c) is in the best interest of the Debtors' estates, creditors, and other parties in interest. Further, the Debtors believe that the terms of the Transaction—including, among other things, the Exclusivity Period—are reasonable with respect to the Debtors' business and the chapter 11 cases.

73.     Specifically, the Exclusivity Period is the result of arms' length negotiations conducted in good faith among Flying J and Pilot and is necessary to secure Pilot's entering into the Letter of Intent. Further, the Exclusivity Period is limited, while recognizing the significant effort made by Pilot in the complex negotiations that have characterized the Debtors' restructuring efforts in the chapter 11 cases thus far. The Letter of Intent and the Transaction contemplated thereby represent the culmination of extensive amounts of time and effort devoted

to due diligence and related analysis, negotiating the Transaction, and drafting the Letter of Intent and DIP Term Sheet. Therefore, the Exclusivity Period enables the Debtors to ensure an investment by a contractually committed party on terms the Debtors believe are fair, reasonable, and more beneficial to their business than any other available. Importantly, extension of the Exclusivity Period beyond August 31, 2009 requires Pilot to meet certain due diligence and document delivery requirements. Pilot and Flying J recognize the importance of effectuating the Transaction to reach a speedy consummation and conclusion of these chapter 11 cases. The obligations on Pilot to either meet certain diligence deadlines or lose its exclusive right to purchase the Target Assets reflects this recognition.

74.     Notably, the proceeds from the Transaction may result in a full payout to Flying J creditors. The importance of such an outcome cannot be diminished. Satisfying all or even most Flying J creditor claims in full would constitute a substantial achievement, especially given the Debtors' precipitous and well-documented free fall into chapter 11. The Court should approve the Letter of Intent, in addition to the DIP Facility, in its entirety.

## Request for Final Hearing

75.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a final hearing for July 30, 2009 at 3:00 p.m. ET, and set July 23, 2009 at 4:00 p.m. ET as the deadline for parties to file objections to the Motion.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

76.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

DB02:8456557.1

067990.1001

**Notice**

77.     The Debtors have provided notice of this Motion via electronic mail (when possible) and overnight mail to: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel for the Creditors' Committee; (c) counsel for the agents for the Debtors' prepetition secured and unsecured lenders; and (d) any persons who have filed a request for notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

**No Prior Request**

78.     No prior motion for the relief requested herein has been made to this or any other court.

*[The Remainder of This Page is Intentionally Left Blank.]*

DB02:8456557.1

067990.1001

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court enter an final order, the form of which will be filed and served prior to the final hearing on this Motion, granting the relief requested herein and granting such other and further relief as the Court deems appropriate.

Dated: July 14, 2009
       Wilmington, Delaware

**YOUNG CONAWAY**
**STARGATT & TAYLOR, LLP**


        */s/ Ryan M. Bartley*
Pauline K. Morgan (Bar No. 3650)
Edmon L. Morton (Bar No. 3865)
Donald J. Bowman, Jr. (Bar No. 4383)
Ryan M. Bartley (Bar No. 4985)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone:    (302) 571–6637
Facsimile:    (302) 576–3320

- and -

**KIRKLAND & ELLIS LLP**
David L. Eaton (admitted *pro hac vice*)
Adam C. Paul (admitted *pro hac vice*)
Jeffrey W. Gettleman (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200