**EXHIBIT B**
**Letter of Intent**

## LETTER OF INTENT

July 13, 2009


Flying J Inc.
Flying J Transportation LLC
1104 Country Hills Drive
Ogden, UT 84403

re:  Acquisition of Business


Ladies & Gentlemen:

This letter shall confirm our mutual understandings concerning the proposed acquisition (however structured, the "Transaction") of the Business from Flying J Inc. or Flying J Transportation LLC (collectively, "Seller") or one or more of their respective subsidiaries by Pilot Travel Centers LLC ("Pilot") or a newly formed parent company of Pilot that at the time that it becomes the "Acquirer" for purposes of this letter owns, directly or indirectly, all of the outstanding equity interests of Pilot and all of its subsidiaries and business operations (Pilot or such newly formed company, "Acquirer").  Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Annex A attached hereto.

Our mutual understandings concerning the Transaction are as follows:

1.     Consideration.  The consideration for the Business will be comprised of cash and equity in Acquirer (x) based on an enterprise value of the Business (which value includes, without limitation, the Original Value) of $1,189 million (the "Business Enterprise Value") and (y) in any event including a cash portion to be paid to Seller at the closing of the Transaction of between, at Seller's option, $300 million and $500 million (such amount as elected by Seller, the "Seller Cash Consideration") and (z) for purposes of determining the equity portion of the consideration to be issued to Seller at closing of the Transaction (the "Seller Equity Consideration"), based on an enterprise value of Acquirer of $3,291 million (the "Acquirer Enterprise Value"), with the Business Enterprise Value and the Acquirer Enterprise Value subject to Net Debt and customary working capital (working capital to be defined in a mutually agreed upon manner, but in any event, determined for each party without regard to the assets and liabilities included in Net Debt, but with regard to assets and liabilities related to the mark-to-market impact on petroleum hedging and derivative instruments) adjustments and, in the case of the working capital adjustment, based on differences between the actual working capital at the closing of the Transaction and target net working capital amounts (which (a) target working capital shall be calculated based on the average working capital on the final day of the months of March, April, May and June, 2009, (b) target working capital and closing working capital shall be stated utilizing FIFO inventory in the case of Acquirer and weighted average

inventory in the case of Seller, and (c) closing working capital shall be increased, in the case of Seller, for normalized payment terms with respect to fuel accounts payable of the Business calculated using the value of fuel that is received in the most recent full calendar month prior to closing, as evidenced by bills of lading dated in such month prior to closing and with reference to the applicable fuel supply or purchase contracts, <u>divided</u> by the number of days in such month, <u>multiplied</u> by ten (10), and reducing such result by the amount of actual fuel accounts payable included in such computation of closing working capital for Seller) to be mutually agreed in good faith by the parties (provided that, in the event the parties are unable to agree on the definition of working capital and/or the working capital target amount, such definition of working capital and/or either or both target net working capital amounts, as the case may be, shall be determined by a valuation expert mutually agreed upon by the parties using the criteria described in this <u>Section 1</u>). The parties agree that <u>Annex B</u> attached hereto provides an example of how the value of the Seller Equity Consideration at the closing of the Transaction (the "<u>Seller Rollover Equity Value</u>") is expected to be computed and what percentage of the aggregate equity value of Acquirer or, if applicable, other issuer of the Seller Equity Consideration will be represented by the Seller Rollover Equity Value using examples of how the adjustments to Business Enterprise Value and Acquirer Enterprise Value are expected to work. The definitive transaction agreement will include, without limitation, covenants of the parties to use commercially reasonable efforts to cause the transfer of the plaza mortgage indebtedness of the Business reflected on <u>Annex B</u>, whether by assignment or waiver of change-of-control covenant or otherwise, without requirement for repayment or prepayment at closing of the Transaction. The equity securities in Acquirer to be issued to Seller shall be the same equity securities to be owned, directly or indirectly, by Pilot's private equity shareholder and the Haslam family (the "<u>Current Equityholders</u>") upon closing of the Transaction (with the benefits and burdens of the current equity-percentage shifting arrangements between the Current Equityholders, as described by Acquirer to Seller prior to the date hereof, to be addressed between the Current Equityholders in a side agreement between the Current Equityholders or in another enforceable manner as agreed between the Current Equityholders that does not impact Seller) and Acquirer that issues the Seller Equity Consideration shall be the parent entity of the combined businesses of Pilot and the Business, which parent entity shall also be the sole issuer of all of the equity interests of the Current Equityholders in the combined businesses of Pilot and the Business.

2.     <u>Valuation of Real Estate</u>.  For purposes of determining the Business Enterprise Value, the parties have valued the Adjacent Excess Real Estate and the corporate headquarters building net of its mortgage (collectively, the "<u>Non-Core Real Estate</u>") at $100 million in the aggregate (the "<u>Original Value</u>"). As part of Acquirer's due diligence, Acquirer shall create and deliver to Seller, at or prior to 5:00 PM EDT on August 31, 2009, a schedule allocating the Original Value among the headquarters office building net of its mortgage and each individual parcel of Adjacent Excess Real Property net of each such parcel's mortgage, if any (for each such building and parcel, the "<u>Acquirer Ascribed Value</u>" and the aggregate Acquirer Ascribed Values for all Non-Core Real Estate, the "<u>Aggregate Acquirer Ascribed Value</u>"). To the extent the Aggregate Acquirer Ascribed Value is less than the Original Value (such deficiency, the "<u>Value Deficiency</u>"), then, at the option of Seller, either (i) the Seller Equity Consideration (or, at Seller's option, the Seller Cash Consideration) shall be reduced by an aggregate amount equal to the Value Deficiency  or (ii) Seller shall have the right to withdraw any or all of the Non-Core Real Estate from the Transaction (with all Non-Core Real Estate so withdrawn being Excluded Business Operations for all purposes of this letter) and the Seller

Equity Consideration (or, at Seller's option, the Seller Cash Consideration) shall then be reduced by an aggregate amount equal to the Original Value minus the Acquirer Ascribed Value for the Non-Core Real Estate not elected to be withdrawn by Seller.

3.    <u>Tax</u>. The parties shall endeavor to structure the Transaction in the most tax-efficient manner possible (including a potential tax deferral on any equity consideration paid in the Transaction).

4.    <u>Timing</u>. It is the parties' intention that the negotiations leading to definitive transaction documents shall commence promptly following the execution and delivery of this letter by each party hereto, and we shall instruct our attorneys to expeditiously prepare drafts of the proposed definitive transaction documents for distribution.

5.    <u>Annexes</u>. Attached to this letter as <u>Annex C</u> is an outline of certain of the terms and conditions relating to the proposed Transaction. All of the Annexes attached hereto constitute an integral part of this letter and are incorporated herein by reference.

6.    <u>DIP Facility</u>. In anticipation of the Transaction, Seller has requested that Acquirer provide a Senior Secured Super-priority Debtor-in-Possession Credit Facility (the "<u>DIP Facility</u>"). As material inducement to Seller to execute and deliver this letter, Acquirer agrees to provide to Seller the financing contemplated by the DIP Facility on the terms and subject to the conditions specified in <u>Annex D</u> attached hereto.

7.    <u>Exclusivity</u>. (a) During the period from the date hereof until the Exclusivity Termination Date (such period, the "<u>Exclusivity Period</u>"), neither Seller nor any of its subsidiaries shall, and Seller shall cause its and its subsidiaries' respective affiliates, controlling equityholders, directors, officers, employees, agents, accountants, consultants, financial advisors, counsel, financing sources or representatives (collectively "<u>representatives</u>") not to, take any action to, directly or indirectly, initiate or solicit, or knowingly encourage the submission of, any Acquisition Proposal, or engage in discussions or negotiations with, or provide any information to, any entity or person other than Acquirer (and its representatives) concerning any Acquisition Proposal. If, during the Exclusivity Period, Seller or any of its subsidiaries or any of their respective representatives receives any Acquisition Proposal, then Seller shall, except to the extent it or any of its subsidiaries has any ongoing obligations under binding confidentiality provisions in effect prior to the date hereof that would prohibit or restrict such disclosure, promptly notify Acquirer of its receipt of any such Acquisition Proposal and describe to Acquirer in reasonable detail the substance and material terms of any such Acquisition Proposal. The parties agree that under no circumstances shall the exclusivity rights of Acquirer in this <u>Section 7</u> be adversely affected by Seller's decision to consummate the Transaction pursuant to a Plan of Reorganization or a §363 sale.

(b)    Subject to <u>Section 7(c)</u> hereof, "<u>Exclusivity Termination Date</u>" shall mean the earliest to occur of:

(i)    the latest to occur of (A) 5:00 PM EDT on August 31, 2009, (B) 5:00 PM EDT on September 30, 2009 if, at or prior to 5:00 PM EDT on August 31, 2009, the Due Diligence Condition Removal Date has occurred, (C) 5:00 PM EDT on October 31, 2009 if,

DB02:8456627.1    067990.1001

at or prior to 5:00 PM EDT on August 31, 2009, the Due Diligence Condition Removal Date has occurred and at or prior to 5:00 PM EDT on September 30, 2009, the Transaction Document Delivery Date has occurred and (D) 5:00 PM EDT on March 31, 2010 if, at or prior to 5:00 PM EDT on August 31, 2009, the Due Diligence Condition Removal Date has occurred, at or prior to 5:00 PM EDT on September 30, 2009, the Transaction Document Delivery Date has occurred and at or prior to 5:00 PM EDT on October 31, 2009, the Specified Consents have been obtained;

(ii) the date, if any, that the Bankruptcy Court pursuant to an order denies Seller's motion to approve the DIP Facility (but if Seller seeks reconsideration of such order, the date that Seller's motion for reconsideration is denied);

(iii) the closing of the Transaction; and

(iv) the date that Acquirer expressly notifies Seller in writing that it has affirmatively chosen to abandon the Transaction.

(c) Notwithstanding anything to the contrary contained in <u>Section 7(b)</u> hereof:

(i) the August 31, 2009 deadline referenced in <u>Section 7.1(b)(i)(B)</u> hereof shall be tolled by an aggregate number of business days equal to the number of business days that Seller has failed to substantially comply with its obligations under <u>Section 8</u> hereof beginning on the second business day after having received any notice of such failure from Acquirer specifying the details of such failure at or prior to 5:00 PM EST on August 31, 2009 (or such later tolled date determined in accordance with this clause (i)), but only to the extent that (x) the information or access was requested in writing by Acquirer to Seller at least four (4) business days prior and (y) such information or access was requested at or prior to 5:00 PM EDT on August 24, 2009 (provided that such August 24, 2009 deadline shall also be tolled by an aggregate number of business days equal to the number of business days, if any, that the August 31, 2009 deadline has been tolled in accordance with this <u>Section 7.1(c)(i)</u>);

(ii) the Due Diligence Condition Removal Date shall be deemed to have occurred at or prior to 5:00 PM EST on August 31, 2009 if Seller has continued to fail to substantially comply with its obligations under <u>Section 8</u> hereof for more than seven (7) business days after having received notice of such failure from Acquirer specifying the details of such failure at or prior to 5:00 PM EST on August 31, 2009 (or such later date giving effect to any tolling effected in accordance with <u>Section 7.1(c)(i)</u> hereof);

(iii) the Specified Consents shall be deemed to have been obtained at or prior to 5:00 PM EST on October 31, 2009 if Seller shall fail to substantially comply with its agreement contained in <u>Section 10</u> hereof; and

(iv) in no event shall the Transaction Document Delivery Date be deemed to have occurred to the extent that the transaction documents delivered in connection therewith contain a due diligence condition to closing.

DB02:8456627.1        067990.1001

8. <u>Due Diligence</u>. The parties understand and agree that Acquirer and Seller will be required to complete their business, accounting, legal and other due diligence prior to the execution of definitive transaction documents. For the avoidance of doubt, the executed transaction documents shall not have a due diligence condition to closing. As such, during the Exclusivity Period and subject to applicable antitrust law: (i) Seller shall provide to Acquirer and its representatives reasonable access at reasonable times to all facilities, books and records relating to the Business, the assets and liabilities related thereto, and shall instruct the representatives of the Business to reasonably cooperate with Acquirer and its representatives in connection with Acquirer's due diligence investigation of the Business; and (ii) Acquirer shall provide to Seller and its representatives reasonable access at reasonable times to all facilities, books and records relating to Acquirer and its subsidiaries, the assets and liabilities related thereto, and shall instruct the representatives of Acquirer and such subsidiaries to reasonably cooperate with Seller and its representatives in connection with Seller's due diligence investigation of Acquirer and its subsidiaries. The parties agree that, without breach of this <u>Section 8</u>, each party may, and may instruct its representatives to, withhold access to, and refuse to provide, customer lists, customer terms, pricing lists, specific store financial information, fuel price agreements and information, and other items that such party determines, after receiving advice of outside counsel, should not be provided under applicable antitrust law. The parties acknowledge and agree that all information provided or obtained pursuant to the foregoing shall be subject to that certain Confidentiality Agreement, dated as of June 25, 2009, by and between Pilot and Flying J Inc.

9. <u>Termination of Exclusivity by Seller</u>. Seller shall have the right to terminate the Exclusivity Period if, on or prior to the Transaction Document Delivery Date, a Trigger Event shall have occurred, Seller shall have delivered a written notice to Acquirer specifying the details of such Trigger Event and Acquirer shall have not cured such Trigger Event within ten (10) business days of receipt of such notice.

10. <u>Specified Consents</u>. Seller and Acquirer shall reasonably cooperate in connection with obtaining the Specified Consents; <u>provided</u>, <u>however</u>, that following the Transaction Document Delivery Date, Acquirer shall exclusively conduct the negotiations with ConocoPhillips and Shell with respect to obtaining the Specified Consents. Acquirer shall consult in good faith with Seller with respect to obtaining the Specified Consents; <u>provided</u>, <u>however</u>, that Acquirer shall always have the sole right to determine the terms and conditions of the Specified Consents as long as such terms or conditions do not require, without Seller's prior written consent, any payment, concession or incurrence of any material liability, by Seller or any of its subsidiaries and such Specified Consent does not require material amendment to or waiver of any material rights or obligations of Seller or any of its subsidiaries with respect to ConocoPhillips or Shell (other than payments, concessions, liabilities, amendments or waivers that solely impact Acquirer and the Business after the closing of the Transaction and which shall not be included in the Net Debt or working capital calculations of the parties). Nothing contained in this <u>Section 10</u> shall prohibit Seller or its representatives from communicating with ConocoPhillips or Shell in the ordinary course of its business. Acquirer shall notify Seller in writing promptly, but in any event within two (2) business days, after the Specified Consents have (or either of them has) been obtained and, to the extent obtained from ConocoPhillips and/or Shell prior to execution and delivery of the Acquisition Agreement, there shall be no condition in the Acquisition Agreement or other transaction documents related to consents from

DB02:8456627.1     067990.1001

ConocoPhillips or Shell, as applicable, and to the extent obtained after execution and delivery of the transaction documents or after the occurrence of the Transaction Document Delivery Date, the transaction documents shall provide that any such condition related to obtaining of the consents of ConocoPhillips and/or Shell, as applicable, shall be satisfied upon receipt of such Specified Consents, as applicable.

11.    Bankruptcy Court Approval.  Seller agrees to submit this letter to the Bankruptcy Court having jurisdiction over Seller (the "Bankruptcy Court"), at or prior to 5:00 PM EDT on July 15, 2009 and shall use its best efforts to obtain the approval by such court of this letter, including, without limitation, the exclusivity provisions contained herein, at or prior to 5:00 PM EDT on July 31, 2009.

12.    Credit Card Matters.  Promptly following the execution and delivery of this letter by each party hereto, Pilot and Flying J Inc. shall, and Flying J shall cause its subsidiaries (other than, until receipt of the ConocoPhillips consent referred to in the next sentence, CFJ Properties) to, file a motion with the court with jurisdiction over the Credit Card Litigation to stay the Credit Card Litigation during the Exclusivity Period.  Seller agrees to use commercially reasonable efforts to obtain the consent of ConocoPhillips to such motion to stay the Credit Card Litigation prior to the hearing on such motion.  The parties hereto acknowledge and agree that as a condition to the initial funding pursuant to the DIP Facility: (i) Acquirer and Seller shall have entered into an agreement pursuant to which Seller and all other plaintiffs to the Credit Card Litigation agree to dismiss against Acquirer and all of its related parties with prejudice the Credit Card Litigation (without any further obligation, liability or admission with respect thereto on either party), (ii) Acquirer and Seller shall have entered into an agreement with respect to the transaction specified in Annex E attached hereto on the terms specified therein and (iii) Pilot and its subsidiaries (other than Pilot Corp. Convenience Stores) shall have agreed to accept the Flying J TCH fuel cards at all locations (x) owned by Pilot or its subsidiaries or (y) leased and managed by Pilot or its subsidiaries.  Notwithstanding anything to the contrary contained in the immediately preceding sentence, Seller's obligations thereunder shall be conditioned upon (a) to the extent required under Seller's arrangement with ConocoPhillips, the consent of ConocoPhillips, (b) the approval of the Bankruptcy Court, and (c) to the extent required by law, approval of the court with jurisdiction over the Credit Card Litigation.  Acquirer's obligations contained in the second preceding sentence shall also be conditioned upon all such approvals and consents being obtained.  Seller and Pilot agree to use their commercially reasonable efforts to obtain the consents and approvals referred to in this paragraph.

13.    Debt Financing.  The Acquisition Agreement shall provide that:

(a)    after expiration of the applicable waiting periods under the HSR Act, Seller may request that Acquirer seek to obtain, debt commitment letters ("Debt Commitments") in form and substance customary at such time; and

(b)    Acquirer will use its good faith efforts to obtain such Debt Commitments (and upon obtaining the Debt Commitments, Acquirer shall provide copies thereof to Seller); provided, that Seller may elect whether Acquirer shall execute such letters and provided further that the fees and expenses incurred in connection with obtaining the Debt Commitments (if the

Debt Commitments are executed at the request of Seller) shall be borne as to 75% by Acquirer (on a pro forma post-closing basis) and 25% by Seller.

14. <u>Hart-Scott-Rodino</u>. Seller and Acquirer shall file for approval of the Transaction under the HSR Act based upon this letter within five (5) days following the approval of this letter by the Bankruptcy Court. Seller and Acquirer shall each pay 50% of the fee payable in connection with such filing.

15. <u>Binding Effect</u>. This letter is a letter of intent only and unless and until definitive transaction documents have been executed and delivered, no party will be under any legal obligation of any kind whatsoever with respect to a transaction (except for the agreements in this <u>Section 15</u> and in <u>Sections 6</u>, <u>7</u>, <u>8</u>, <u>9</u>, <u>10</u>, <u>11</u>, <u>12</u>, <u>13</u>, <u>14</u>, <u>16</u>, <u>17</u> and <u>18</u> hereof) by virtue of this or any written or oral expression with respect to such a transaction by any party or any of their representatives. Notwithstanding the parenthetical contained in the immediately preceding sentence, this letter shall not be enforceable against Flying J Inc. or any of its subsidiaries that are currently subject to the jurisdiction of the Bankruptcy Court unless and until such Bankruptcy Court approves this letter and the exclusivity provision, but shall be enforceable against Flying J Transportation LLC and each of Seller's subsidiaries that are not currently subject to the jurisdiction of the Bankruptcy Court. In the event that the Bankruptcy Court shall not approve this letter as against Flying J Inc., this letter and all obligations of the parties hereunder shall terminate (except for the obligations of Flying J Transportation LLC and its non-debtor subsidiaries to reimburse Acquirer, pursuant to the DIP Facility commitment letter, for costs and expenses incurred by Acquirer in connection with providing the DIP Facility, which obligations shall survive indefinitely).

16. <u>Amendment and Modification</u>. This letter shall not be amended or modified except in writing signed by the parties hereto.

17. <u>Governing Law; Jurisdiction</u>. This letter shall be governed by, and construed in accordance with, the laws of the State of Delaware, applicable to agreements made and to be performed within such State. Each party consents to the jurisdiction of the Bankruptcy Court for disputes relating to this letter.

18. <u>Counterparts</u>. This letter may be executed in one (1) or more counterparts, each of which shall be an original, but all such counterparts shall together constitute one and the same instrument.

\* \* \* \* \*

DB02:8456627.1     067990.1001

If the foregoing correctly sets forth our mutual understanding with respect to the proposed transaction please so indicate by signing the enclosed copy of this letter, and returning it to us.

PILOT TRAVEL CENTERS LLC

By_____
   Name:
   Title:

Accepted and Agreed as of this ___ day of July, 2009:

FLYING J INC.

By_____
   Name:
   Title:

FLYING J TRANSPORTATION LLC

By_____
   Name:
   Title:

DB02:8456627.1    067990.1001

## DEFINITIONS

For the purposes of the letter to which this <u>Annex A</u> is attached, the following terms have the respective meanings specified therefor below.

"<u>Acquisition Proposal</u>" means any proposal relating to (a) any stock purchase, merger, consolidation, reorganization, change in organizational form, spin-off, split-off, recapitalization, sale of equity interests or other similar transaction involving Seller or any of its direct or indirect subsidiaries, other than any such subsidiary that does not own any material part of the Business; <u>provided</u>, that such subsidiary promptly takes steps to effect, and effects, the transfer of such part of the Business to another subsidiary that owns a material part of the Business, (b) any sale of all or any significant portion of the Business, other than sales of inventory in the ordinary course of business, (c) any other transaction involving Seller or any of its direct or indirect subsidiaries which results, directly or indirectly, in a change of control of Seller or any subsidiary thereof, other than any such subsidiary that does not own any material part of the Business; <u>provided</u>, that such subsidiary promptly takes steps to effect, and effects, the transfer of such part of the Business to another subsidiary that owns a material part of the Business, or (d) any other transaction or series of transactions which has substantially similar economic effects to those described in clauses (a) - (c) of this sentence.

"<u>Business</u>" means the travel center operations (including, without limitation, Seller's direct or indirect ownership interest in CFJ Properties), trucking operations, corporate headquarters building and operations, certain excess land adjacent to operating travel plazas (the "<u>Adjacent Excess Real Estate</u>"), and other business operations of Seller and its subsidiaries (including, without limitation, the assets and certain liabilities of Seller and its subsidiaries related thereto), other than the Excluded Business Operations. It is intended by the parties that the Business will include the material assets and liabilities of Seller used to generate the most recent financial results prior to the date of this letter which were provided to Acquirer prior to the date hereof, other than such assets otherwise disposed of prior to the date of this letter or, to the extent not in contravention hereof, after the date of this letter in the ordinary course of business; <u>provided</u> that in no event shall this be intended by the parties of a promise of future performance with respect to such business operations.

"<u>Credit Card Litigation</u>" means the case styled Flying J Inc; TCH LLC; Transportation Alliance Bank, Inc.; TON Services Inc.; CFJ Properties; AFJ, LLC.; TFJ; and Louisiana Greenwood LLC vs. Pilot Travel Centers, LLC; Pilot Corporation; and Comdata Network, Inc, d/b/a Comdata Corporation, filed in the United States District Court for the District of Utah, Central Division as Case No: 1:06CV 00030 TC.

"<u>Due Diligence Condition Removal Date</u>" means the date on which Acquirer notifies Seller in writing that the completion of due diligence is no longer a condition to the Transaction.

"<u>Excluded Business Operations</u>" means the following business operations and assets of Seller and its subsidiaries: their refinery operations, their oil and gas operations, their

credit card operations, their banking operations, their pipeline operations, their insurance operations, their airplanes and any and all assets and liabilities associated with such airplanes (including, without, limitation, their airplane hangars and any and all leases and financing arrangements associated with such airplanes) and all real estate which is both not used in the Business and not adjacent to the Business and shall include, without limitation, Seller's direct or indirect ownership interests in, or any assets of, TCH LLC, Haycock Petroleum Company, Big West Oil, LLC, Big West of California, LLC, Longhorn Pipeline, Inc., Longhorn Partners Pipeline, L.P., Transportation Alliance Bank, Inc., Flying J Enterprise Solutions, Driveline Accounting Services, LLC, Clarity Inc., Fun Runner LLC or Flying J Oil & Gas Inc.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Net Debt" of any party means, the amount by which: (a) the sum of such party's (i) indebtedness for borrowed money, (ii) obligations under leases that have been or are required to be, in accordance with U.S. generally accepted accounting principles, recorded as capital leases, (iii) indebtedness evidenced by any note (including seller notes), bond, debenture, mortgage or other debt instrument, debt security or other similar instrument, (iv) letters of credit or surety bonds to the extent drawn upon at or prior to the closing of the Transaction, (v) any amounts becoming due and owing as a result of the consummation of the Transaction (e.g., change of control payments or sale bonuses), (vi) direct or indirect guarantees with respect to any matters described in clauses (i) through (iv) above, and (vii) with respect to any matter described in clause (i) through (v) above, (a) all accrued and unpaid interest, expenses and any other charges that regularly accrue calculated through the closing date for the Transaction and (b) any other costs, such as premiums, penalties, breakage costs and similar items which arise only if such indebtedness is repaid shall constitute Net Debt only to the extent that such indebtedness is repaid in connection with Transaction; exceeds (b) such party's cash and cash equivalents (including restricted cash); provided that, without the prior written consent of Seller with respect to any such liabilities, in no event shall "Net Debt" of the Business be deemed to include any such liabilities to the extent incurred by or at the direction of Acquirer or otherwise relating to Acquirer's or its affiliates' financing (including obtaining any consent or waiver relating thereto) for the transactions contemplated hereby or any other liabilities or obligations incurred or arranged by or on behalf of Acquirer or its affiliates in connection with the Transaction.

"Transaction Document Delivery Date" means the date on which Acquirer has executed and delivered to Seller transaction documents relating to the Transaction (x) reflecting a value to Seller for the Business at closing of the Transaction equal to the Business Enterprise Value and payment to Seller at closing of the Transaction equal to the Seller Cash Consideration and the Seller Rollover Equity Value, subject only to adjustment in accordance with Section 2 of the letter to which this Annex A is attached for any Non-Core Real Estate withdrawn from the Transaction and (y) otherwise on terms and conditions substantially consistent with this letter of intent (including Annex C attached to the letter to which this Annex A is attached).

"Trigger Event" means: (a) Acquirer's failure to deliver to Seller prior to the Transaction Document Delivery Date a term sheet with respect to the financing of the Transaction in the form of either debt and/or equity financing, as the case may be, in which Acquirer shall endeavor to include information on maturity, pricing and conditions to closing (it

being acknowledged and agreed that there shall be no requirement to deliver a commitment letter and no restriction or requirements with respect to the terms of any such financing described in such term sheets); (b) any distribution made after the date hereof by Acquirer to the Current Equityholders other than any tax distributions required to be made pursuant to the Second Amended and Restated Limited Liability Company Agreement of Pilot, dated as of October 8, 2008; or (c) any failure after the date hereof by Acquirer to operate its business in the ordinary course in any material respect.

In addition, the following terms have the respective meanings assigned thereto as indicated below.

| Defined Term | Location of Definition |
| --- | --- |
| Acquirer | Introductory Paragraph |
| Acquirer Ascribed Value | Section 2 |
| Acquirer Enterprise Value | Section 1 |
| Adjacent Excess Real Estate | Annex A – Definition of Business |
| Aggregate Acquirer Ascribed Value | Section 2 |
| Annual Puts | Annex D – Stockholders Agreement |
| Bankruptcy Court | Section 11 |
| Business Enterprise Value | Section 1 |
| Controlling FJ Equityholders | Annex D – Stockholders Agreement |
| Current Equityholders | Section 1 |
| Debt Commitments | Section 13(a) |
| DIP Facility | Section 2 |
| Exclusivity Period | Section 7(a) |
| Exclusivity Termination Date | Section 7(a) |
| Initial Put | Annex D – Stockholders Agreement |
| Non-Core Real Estate | Section 2 |
| Original Equity | Annex D – Stockholders Agreement |
| Original Value | Section 2 |
| Pilot | Introductory Paragraph |
| representatives | Section 7 |
| Seller | Introductory Paragraph |
| Seller Cash Consideration | Section 1 |
| Seller Equity Consideration | Section 1 |
| Seller Rollover Equity Value | Section 1 |
| Transaction | Introductory Paragraph |
| Value Deficiency | Section 2 |

## SAMPLE CALCULATION OF CONSIDERATION

See attached.

## SUMMARY OF TERMS AND CONDITIONS

Set forth below is a summary of the terms and conditions for the proposed acquisition of the Business to be reflected in the Acquisition Agreement or the Stockholders Agreement.

Acquisition Transaction ............. Acquisition of the Business as set forth in the letter to which this Annex C is attached and as more fully set forth in a definitive purchase agreement in connection thereto between Seller and Acquirer (the "Acquisition Agreement"). The parties shall endeavor to structure the Transaction in the most tax-efficient manner possible (including a potential tax deferral on any equity consideration paid in the Transaction).

Representations and
Warranties .................................... The Acquisition Agreement shall contain representations and warranties of the parties customary for transactions of this type, subject to customary materiality, MAE and knowledge qualifiers, regarding due organization, authority, no conflict, title, capitalization, issuance of equity consideration, financial statements, absence of certain changes, no undisclosed liabilities, compliance with laws, material contracts, intellectual property, litigation, environmental, labor, employee benefits, tax and real property.

Covenants .................................... The Acquisition Agreement shall contain pre- and post-closing covenants customary for transactions of this type, including obligations of Acquirer to replace or indemnify Seller for credit support obligations of Seller and its subsidiaries with respect to the Business.

HSR Act ....................................... The parties agree that, to the extent further analysis suggests that the Transaction could result in a lessening of competition, they will negotiate in good faith to reach agreement on the actions the parties would have to take to ensure timely expiration of the waiting period under the HSR Act.

Survival of Representations and
Warranties .................................... The representations and warranties contained in the Acquisition Agreement shall generally survive the closing for a period of six (6) months, except for representations and warranties regarding tax which shall survive until sixty

(60) days after the expiration of the applicable statute of limitations period (after giving effect to any waivers and extensions thereof).

| | |
|---|---|
| Indemnification ............................. | The Acquisition Agreement shall provide that the respective parties shall, from and after the closing of the Transaction, indemnify the other for breaches of the representations and warranties (without giving effect to any materiality or material adverse effect qualifiers, except in the case of any representation or warranty as to financial statements), covenants and agreements contained in the Acquisition Agreement, subject (except in the case of representations and warranties regarding ownership, capitalization, title and tax matters and covenants) to, in the case of (a) Seller's indemnification obligation, a (i) tipping basket equal to $25 million, (ii) cap equal to $75 million and (iii) de minimis per claim threshold of $500,000 and (b) Acquirer's indemnification obligation, a (i) tipping basket equal to $12.5 million, (ii) cap equal to $37.5 million and (iii) de minimis per claim threshold of $250,000. The parties shall in good faith negotiate customary monetary thresholds for indemnification limits with respect to certain pre-closing covenants. The indemnification obligations shall, at the indemnifying party's option, be permitted to be satisfied from equity of Acquirer. Upon closing of the Transaction, the indemnification provisions in the Acquisition Agreement shall be the sole remedy (other than equitable remedies) of the indemnified parties with respect to the Acquisition Agreement or the transactions contemplated thereby. |
| Acquirer's Conditions Precedent.. | The obligations of Acquirer to effect the proposed Transaction pursuant to the Acquisition Agreement shall be subject to Acquirer's receipt of financing and conditions customary for transactions of its type, including, without limitation, the receipt of all necessary governmental approvals, including, without limitation, the expiration of all applicable waiting periods under the HSR Act, no material adverse change (to be customarily defined in the Acquisition Agreement) regarding the Business having occurred since the date of the Acquisition Agreement, and the receipt of all other material third party approvals and consents agreed upon by the parties, including, without limitation, the Specified Consents. |
| Seller's Conditions Precedent....... | The obligations of Seller to effect the proposed Transaction pursuant to the Acquisition Agreement shall be subject to |

conditions customary for transactions of its type, including, without limitation, the receipt of all necessary governmental approvals, including, without limitation, the expiration of all applicable waiting periods under the HSR Act, the receipt of Bankruptcy Court approval therefor, and no material adverse change (to be customarily defined in the Acquisition Agreement) regarding Acquirer having occurred since the date of the Acquisition Agreement; provided that, in the event such material adverse change shall have occurred and Seller notifies Acquirer that Seller wishes to terminate the Transaction as a result of such material adverse change, Acquirer shall have the right prior to such termination (but in no event more than 30 days after receipt of such notice) to purchase the Business from Seller in cash in an amount equal to the sum of (x) the Seller Cash Consideration and (y) the cash equivalent of Seller Equity Consideration.

Closing Date.................................. To occur after a customary period following satisfaction or waiver of all conditions, but, if the expiration of all applicable waiting periods under the HSR Act has not occurred prior to execution and delivery of the Acquisition Agreement by Buyer and Seller, no earlier than thirty (30) days following such expiration.

Outside Drop-Dead Date.............. March 31, 2010, unless all conditions to closing are satisfied on or prior to March 31, 2010 and the expiration of all applicable waiting periods under the HSR Act occurred on or after March 1, 2010 and prior to March 31, 2010, in which case the Outside Drop-Dead Date shall be thirty (30) days following the expiration of all applicable waiting periods under the HSR Act, but in no event later than April 30, 2010.

Stockholders Agreement.............. Upon the consummation of the Transaction, Seller and the required equityholders of Acquirer shall enter into a customary stockholders agreement, which shall contain post-IPO demand and piggyback registration rights and information rights and preemptive rights for Seller customary for minority equityholders of similar-sized equity investments, and covenants against affiliate transactions (other than affiliate arrangements existing as of the date hereof) and amendments (however affected) to governing documents. Seller shall be entitled to two (2) representatives on the board of directors (or similar governing body) of Acquirer, with such board or body having a maximum of twelve (12) representatives; <u>provided</u>, that if Seller (and

related parties) owns at least 25% but less than 50% of the number of original equity interests received as the Seller Equity Consideration for the Transaction (such equity interests, as equitably adjusted for stock splits, reverse stock splits or similar corporate transactions, the "Original Equity"), it shall only be entitled to nominate one (1) representative, and if Seller (and related parties) owns less than 25% of the Original Equity, it shall not be entitled to nominate any representatives, and proportional representation on committees of Acquirer.

Seller (and related parties) shall have the right, for one (1) year following the consummation of the Transaction, to purchase up to $200 million of additional equity in Acquirer with the same economic rights and other rights specified herein as the Original Equity based on the equity value of the Original Equity issued to Seller at the time of the consummation of the Transaction.

A shareholder put mechanism will be available to Seller to allow for liquidity of the Original Equity. As part of such put mechanism, Seller may elect to put up to a total of $15 million of its Original Equity to Acquirer at the price per share for the Original Equity by giving notice on the closing date of the Transaction (the "Initial Put"). Such Initial Put will be paid in cash by the Acquirer not later than 90 days after the closing date of the Transaction. On each anniversary of the closing, Seller may request to put to Acquirer up to 20% of its Original Equity, but if such request is for greater than 10% of the Original Equity, Acquirer shall only be required to accept 10% of the Original Equity (or such greater percentage as Acquirer elects to accept). In the event that Seller exercises such right on any closing anniversary, Seller may not again exercise its right until the 2nd anniversary of the date of its last exercise. The parties will negotiate in good faith the fair market value of the shares being put, but if agreement is not reached regarding such value within 30 days, each party will promptly choose an appraiser to value such shares, which 2 appraisers will mutually choose a 3rd appraiser, and the average price of such 3 appraisers will be the final price ascribed to such shares and such put shall be paid within 30 days after final determination of such price. There will be no minority discount or lack of liquidity discount on such shares. From and after the 6th anniversary of the closing, or if later, the second anniversary of Seller's prior exercise of the put, Seller may put 15% of the Original

Equity to the Company on each subsequent anniversary. In the event that Seller exercises such right, Seller may not again exercise its put right until the 2nd anniversary of the date of its last exercise.

To the extent that Acquirer's third-party debt financing agreements or applicable law prohibit payment by Acquirer on the put, Acquirer will pay the maximum amount permitted without violation of Acquirer's third-party debt financing agreements or applicable law and shall make the remaining purchases as soon as it is able without violating such third-party debt financing arrangements or applicable law. To the extent that at any time there are outstanding put obligations that have not been honored, Acquirer (a) shall not, without Seller's prior written consent, (i) make any distributions or equity repurchases or redemptions (other than, to the extent Acquirer is then a flow-through for tax purposes, tax distributions) or (ii) exercise any of the call rights referenced in the following paragraph and (b) shall, when honoring any put right of CVC (or when the Haslam family honors any put right of CVC), honor any outstanding unhonored put exercises of Seller at the put prices that would have been paid had the puts been honored timely. Acquirer (a) shall not enter into any third-party debt financing arrangement that restricts or prohibits the put rights contemplated hereby, unless all other put or redemption rights against Acquirer are similarly restricted, and (b) shall use commercially reasonable efforts to obtain as much flexibility under its third-party debt financing arrangements as possible so as to maximize the likelihood that the put rights exercised by Seller can be honored. Acquirer agrees that no consent of any Acquirer shareholder shall be required with respect to the exercise or honoring of the put rights.

From the 6th anniversary of the closing, Acquirer will have a call right on the Original Equity, which will operate in a manner similar to the put rights after the 6th anniversary . There will be no tag rights with respect to sales by Acquirer's private equity shareholder to the Haslam family or to Acquirer after January 1, 2015. If the shareholders agreement contains the right of any shareholder to sell to third parties or Acquirer's private equity shareholder or the Haslam family are selling to a third-party, Seller will be granted proportional tag rights to participate in such transfer. Subject to customary minority shareholder protections with respect thereto, Acquirer's

private equity shareholder and the Haslam family can drag Seller on any change-of-control sale of Acquirer to a third party at any time as long as, at the option of Acquirer's private equity shareholder and the Haslam family, either the consideration therefor is cash or, if the consideration therefor is other than cash, Seller's put rights are otherwise the same after giving effect to the sale. If, at any time after the tenth year anniversary of the closing date of the Transaction, more than 30% of the Original Equity is subject to dishonored put exercises of Seller, Seller shall have customary demand registration rights with respect to the Original Equity.

Subject to Bankruptcy Court approval, Seller intends to hold its equity in Acquirer either directly or through a special purpose vehicle (which special purpose vehicle may be distributed to Seller's equityholders as part of Seller's bankruptcy proceeding). Prior to the fifth anniversary of the closing of the Transaction, except as may result by order of the Bankruptcy Court, Crystal Call Maggelett, Thad Call and Tamra Call and other equityholders controlled by them (the "Controlling FJ Equityholders") shall not be permitted to transfer equity interests in such special purpose vehicle that would result in the Controlling FJ Equityholders holding less than a majority of the outstanding equity interests in such special purpose vehicle; provided that if after such fifth anniversary the Controlling FJ Equityholders transfer equity interests in such special purpose vehicle that result in the Controlling FJ Equityholders holding less than a majority of the outstanding equity interests in such special purpose vehicle, then Seller shall be entitled to appoint no more than (1) representative to the board of directors (or similar governing body) of Acquirer. The Controlling FJ Equityholders holding equity in such special purpose entity shall vote their interests together to manage and control the special purpose vehicle. Any such special purposes vehicle shall have the same rights in respect of the equity to be issued to Seller as part of the Transaction as are specified herein for Seller. The provisions is this paragraph shall also apply in the event that the Original Equity continues to be held by Seller.

## DIP FACILITY TERMS AND CONDITIONS

See attached.

**[THE DEBTORS HAVE REQUESTED THAT ANNEX E BE FILED UNDER SEAL]**