IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| FLYING J INC., et al.,[1] | ) Case No. 08-13384 (MFW) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) Hearing Date: October 15, 2009 at 9:30 a.m. (ET) |
| | ) (requested) |
| | ) Objection Deadline: October 8, 2009 at 4:00 p.m. (ET) |
| | ) (requested) |

## MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER APPROVING ENGAGEMENT LETTERS BETWEEN BIG WEST OIL LLC, BANK OF AMERICA, N.A. AND BANC OF AMERICA SECURITIES LLC, IN CONNECTION WITH BIG WEST OIL LLC'S EXIT FINANCING PROCESS

Flying J Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), file this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A**, approving (a) the engagement letter (the "Term Engagement Letter") between Big West Oil, LLC ("Big West") and Banc of America Securities LLC ("BAS") and (b) the engagement letter (the "ABL Engagement Letter," and, collectively with the Term Engagement Letter, the "Engagement Letters") between Big West and Bank of America, N.A. ("BofA," and, collectively with BAS, the "Arrangers"), in connection with Big West's and the Debtors' exploration of exit financing options. Copies of the Engagement Letters are attached to the proposed order, respectively as **Exhibit 1** and **Exhibit 2**. In support of this Motion, the Debtors respectfully state as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Flying J Inc. (3458); Big West of California, LLC (1608), Big West Oil, LLC (6982); Big West Transportation, LLC (6984); Longhorn Partners Pipeline, L.P. (0554); Longhorn Pipeline Holdings, LLC (0226), Longhorn Pipeline Inc. (0654). The location of the Debtors' corporate headquarters and the service address for all Debtors is: 1104 Country Hills Drive, Ogden, UT 84403.

## Jurisdiction and Venue

1. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory bases for the relief requested herein are section 363(b) of title 11 of the United States Code (the "Bankruptcy Code").

## Relief Requested

4. By this Motion, the Debtors request entry of an order approving and authorizing Big West to execute the Engagement Letters.

## Background

5. On December 22, 2008 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of title 11 of the Bankruptcy Code. On January 5, 2009, the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors (the "Creditors' Committee") [Docket No. 85].

6. The Debtors and their wholly owned non-debtor subsidiaries (collectively, the "Flying J Group") are a fully integrated oil company with operations in the field of exploration, production, refining, transportation, wholesaling and retailing of petroleum products. Debtor Flying J Inc. is one of the 20 largest privately held companies in America with 2008 consolidated sales of approximately $18.5 billion and is the direct or indirect parent corporation of each of the other members of the Flying J Group.

7. The Flying J Group operates approximately 250 retail locations, including state-of-the-art travel plazas, convenience stores, restaurants, motels and truck service centers in 43 states and six Canadian provinces. In addition to usual rest stop services (food, fuel, shower facilities), the Flying J Group offers banking, bulk-fuel programs, communications (wireless Internet connections), fuel cost analysis, insurance and truck fleet sales. Furthermore, the Flying J Group explores for, refines and transports petroleum products and is one of the largest retail distributors of diesel fuel in North America. Other operations of the Flying J Group include online banking, card processing, truck and trailer leasing, and payroll services. In these widespread operations, the Flying J Group employs approximately 13,400 people.

8. Each of the Debtors in these chapter 11 cases is involved in or associated with the Flying J Group's core businesses of petroleum refining, supply and distribution. In particular, Debtors Big West Oil LLC and Big West of California LLC own and operate two refineries in North Salt Lake City, Utah and Bakersfield, California, respectively, which have the combined capacity to refine over 100,000 barrels of crude oil per day. These Debtors also are responsible for purchasing and transporting crude oil in parts of California, Utah, Wyoming and Colorado. On the Petition Date and through July 2009, the Debtors owned a 700-mile common carrier pipeline from the Gulf Coast near Houston to El Paso, Texas (the "Longhorn Pipeline"). On July 27, 2009, the Court approved the sale of the Longhorn Pipeline to Magellan Midstream Partners, L.P. [Docket No. 1578].

9. The Debtors have filed these chapter 11 cases to address near-term liquidity and operational challenges brought on in part by the precipitous drop in the price of oil beginning in September of 2008 and continuing through the first quarter of 2009, as well as the recent tightening credit markets. Over the past seven months, the Debtors have implemented a range of

aggressive restructuring actions, including shutting down and selling non-performing businesses and downsizing continuing operations, designed to improve cash flow performance and financial results. The Debtors believe that, after these restructuring actions, their going forward businesses are fundamentally sound and profitable and that these chapter 11 cases will allow them to resolve their liquidity constraints and emerge as stronger, healthier companies.

10. The Debtors have determined that a sale of substantially all of the Debtors' retail operations to Pilot Travel Centers LLC ("Pilot") will maximize creditor recoveries and is in the best interests of the Debtors' estates. On July 30, 2009, the Court granted the Debtors the authority to obtain up to $100,000,000 of secured superpriority postpetition financing (the "DIP Facility") from Pilot and to execute a letter of intent to sell its travel center and trucking operations, corporate headquarters building and certain other assets relating to the Debtors' retail business operations to Pilot.[2] The DIP Facility provides the Debtors with much needed liquidity to continue business operations pending the sale to Pilot. Although there are no guarantees, the Debtors reasonably expect that the transaction currently being negotiated with Pilot would pay all creditors of Flying J Inc. ("Flying J") in full in cash, provide value to Flying J's shareholders, allow Flying J to exit bankruptcy protection expeditiously as a stronger, healthier business and position Flying J to succeed in today's highly competitive market.

**The Exit Facilities**

11. Although the Debtors have not yet decided upon an exit strategy for Big West, one possibility considered by the Debtors and their advisors involves restructuring Big West as a

---

[2] See Final Order Under 11 U.S.C. §§ 105, 362, 363 and 364 and Fed. R. Bankr. P. 2002, 4001 and 9014 Authorizing Flying J Inc. to (A) Obtain Postpetition Financing, (B) Grant Liens and Superpriority Claims, and (C) Execute a Letter of Intent Relating to the Target Assets [Docket No. 1631].

going concern. To that end, the Debtors have explored the option of obtaining exit financing at the Big West entity level.

12. As provided in the *Declaration of Paul P. Huffard in Support of the Motion of the Debtors for Entry of an Order Approving Engagement Letters Between Big West Oil LLC, Bank of America, N.A. and Banc of America Securities LLC, in Connection with Big West Oil LLC's Exit Financing Process*, attached hereto as **Exhibit B**, beginning in July 2009, the Debtors, with the assistance of Blackstone Advisory Services, L.P. ("Blackstone"), the Debtors' financial advisor and investment banker, initiated discussions with, and solicited exit financing proposals from, a variety of potential exit lenders.[3] Ultimately, the Debtors decided to enter into the Engagement Letters with the Arrangers to explore certain exit financing options. The potential benefits offered by the Arrangers' exit financing proposal, coupled with BofA's familiarity with Big West's businesses (as the incumbent agent for Big West's prepetition revolving credit facility),[4] formed the basis for the Debtors' decision, taken in consultation with Blackstone, to explore the possibility of entering into the Exit Facilities (as defined below) with the Arrangers on the basis described herein.

A. **The Exit Facilities**

13. The proposed Exit Facilities for Big West consist of up to approximately $435 million of senior secured bank financing. The proposed Exit Facilities would include: (a) a senior secured revolving credit facility in an amount up to $75 million (the "Revolving

---

[3] On August 27, 2009, the Court entered the *Order Further Amending the Retention Order Authorizing the Debtors to Retain Blackstone Advisory Services, L.P. as Investment Banker and Financial Advisor to Include Additional Necessary Financial Advisory and Investment Banking Services* [Docket No. 1830], which expanded the scope of Blackstone's services to include assisting in arranging, negotiating and structuring secured debt exit financing for Big West and its subsidiaries.

[4] As provided in the *Notice of Appearance and Request for Notices and Papers* [Docket No. 17], filed on December 23, 2008, Wilmington Trust FSB is the successor administrative agent and collateral agent under Big West's prepetition secured term loan facility.

Facility"); (b) a senior secured first-lien term loan facility in the amount of $260 million (the "First Lien Term Facility," and together with the Revolving Facility, the "First Lien Facilities"); and (c) a senior secured second-lien term loan facility in the amount of $100 million (the "Second Lien Facility" and, collectively with the First Lien Facility, the "Term Loan Facilities," and, collectively with the Revolving Facility and the First Lien Term Facility, the "Exit Facilities").

14. BAS will undertake responsibility for syndicating the Term Loan Facilities on a "best efforts" basis in consultation with Big West. By contrast, Big West and the Debtors initially will undertake syndication of the Revolving Facility. If requested by Big West, BofA will arrange and syndicate the Revolving Facility on a best efforts basis. Further, under the ABL Engagement Letter, BofA has proposed holding up to $30 million of the proposed Revolving Facility. One of the closing conditions for the proposed Revolving Facility would be BofA's receipt of firm commitments from lenders totaling at least $45 million.

**B.     The Fee Structure**

15. Pursuant to two separate fee letters, the Debtors will provide certain arrangement and closing fees to the Arrangers, if and when the Exit Facilities close and fund. Contemporaneous herewith, the Debtors have filed the *Motion of the Debtors for Entry of a Protective Order Authorizing the Debtors to File Fee Letters and the Fee Information Contained Therein Under Seal*, pursuant to which the Debtors are requesting authority that this sensitive fee information remain under seal, disclosed only to the United States Trustee, the Court, the Creditors' Committee and certain other parties with the consent of the Debtors and the Arrangers (which consent shall not be unreasonably withheld).

## C. The Debtors' Proposed Use of Proceeds

16. Upon the effective date of a plan of reorganization for Big West, Big West would apply the proceeds from the Exit Facilities to pay down its existing prepetition revolving and term loan facilities and to pay the other claims, costs and expenses contemplated by a plan of reorganization, when filed. Amounts available under the Exit Facilities would further be used to provide funding for Big West's ongoing post-emergence working capital requirements and other general corporate purposes on a going-forward basis.

## D. Summary of Key Terms of the Engagement Letters

17. The Engagement Letters set forth, among other things, the scope of the engagement and the deposit, fees and expenses payable to the Arrangers in connection with the proposed process. The Engagement Letters also provide for certain indemnification by Big West to the Arrangers and certain related parties in connection with the Arrangers' efforts and actions under and relating to the Engagement Letters and the transactions contemplated thereby. Such indemnification, fees and expense reimbursements are necessary to compensate the Arrangers for their time and efforts in soliciting lender interest for the Exit Facilities and are customary for transactions of similar nature.

18. The summary of the principal terms of the Engagement Letters appears as follows below:[5]

| Summary of Material Terms | |
|---|---|
| Borrower: | **First & Second Lien Term Facilities**<br>Big West Oil, LLC |

---

[5] This chart is for illustrative purposes only and to the extent of any inconsistency between the summary set forth herein and the Engagement Letters, the terms and provisions of the Engagement Letters shall govern.

Any terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Engagement Letters.

7
DB02:8779696.2                                                                                              067990.1001

| | |
|---|---|
| | **Revolving Facility**<br>Big West Oil, LLC |
| **Arrangers:** | **First & Second Lien Term Facilities**<br>**Lead Arranger & Book Manager:** Banc of America Securities LLC<br><br>**Administrative Agent:** Bank of America, N.A. or other financial institution reasonably acceptable to Big West.<br><br>**Revolving Facility**<br>**Administrative & Collateral Agent:** Bank of America, N.A.<br><br>**Lead Arranger:** Bank of America, N.A. (BofA is to use its best efforts to arrange and form a syndicate of financial institutions for the Revolving Facility in consultation with Big West). |
| **Facility:** | **First & Second Lien Term Facilities**<br>(i) $260 million senior secured first lien term loan; (ii) $100 million senior secured second lien term loan.<br><br>**Revolving Facility**<br>BofA proposes to arrange on a best efforts basis if requested by Big West a new revolving credit facility of up to $75 million (75% sub-limit for letters of credit (letters of credit would be 100% reserved against borrowing availability under the Revolver)) and to hold up to $30 million.<br><br>• **Revolving Facility Loan Availability:** Limited to the sum of (a) up to 100% of cash in restricted accounts with BofA, (b) up to 85% of eligible accounts receivable, (c) up to 80% of the market value of eligible inventory, minus (d) such reserves as BofA may establish in its discretion (and more clearly defined after due diligence). |
| **Indicative Pricing:** | **First & Second Lien Term Facilities**<br>BAS syndicating on a best efforts basis, but is not providing a commitment under the Term Loan Facilities. Indicative terms for the Term Loan Facilities have been mutually agreed to.<br><br>**Revolving Facility**<br>Although not yet providing firm commitment, BofA to consider pricing of the Revolving Facility on the following terms:<br>**Unused Line Fee:** 75bps if the average monthly usage as a percentage of the Revolving Facility commitment is 80% or less or, if greater than 80%, 50bps.<br><br>**Interest Rates:** initially, LIBOR + 375bps or Base Rate + 225bps, with LIBOR and Base Rate to be defined in accordance with BofA's customary practices.<br><br>• LIBOR loans would be subject to customary provisions, including applicable reserve requirements, limits on the number of outstanding LIBOR loans, and minimum dollar amounts of each LIBOR loan.<br><br>• The Base Rate would be defined as the highest of (a) Bank's |

|  |  |
|---|---|
|  | prime rate, (b) the Federal Funds rate plus .50% and (c) the one month LIBOR Rate plus 1.00%)<br><br>• The LIBOR and Base Rate margins on the Revolving Credit Facility would be subject to performance pricing adjustments, commencing six months after the closing date, based upon a grid to be determined. It is contemplated that such grid would have one step-up and one step-down.<br><br>**LC Fees:** monthly in arrears on all letters of credit equal to the applicable per annum LIBOR margin, and BofA's customary fronting fees and charges in connection with amendments, extensions, draws, etc. |
| **Fees:** | **First & Second Lien Term Facilities**<br>**Work Fee:** $100,000 in connection with the engagement, payable in full within 30 days following acceptance and return of the Term Engagement Letter.<br><br>**Arrangement Fee:** As provided in a separate fee letter.<br><br>**Expenses:** all reasonable documented out-of-pocket fees and expenses (including, but not limited to, the reasonable documented fees, disbursements and other charges of Moore & Van Allen, PLLC, as counsel to BAS and BofA, and of special and local counsel to the Lenders which may be retained by BAS or BofA and due diligence expenses) incurred in connection with the Term Loan Facilities, the syndication thereof, the preparation of the definitive documentation therefor and the other transactions contemplated hereby.<br><br>**Revolving Facility**<br>**Expenses:** (a) all reasonable documented out-of-pocket costs and expenses (including legal fees of BofA's outside counsel) of BofA associated with the Revolving Facility, including costs and expenses of (i) BofA's due diligence, including field examinations and appraisals, and (ii) preparing, administering, syndicating and enforcing all documents executed in connection with the Revolving Facility, plus (b) standard field examiner charges, in addition to all out-of-pocket expenses for field examinations. Big West will remain obligated for all such amounts whether or not the Revolving Facility is consummated.<br><br>**Arrangement Fee:** As provided in a separate fee letter.<br><br>**Deposit:** $75,000 (the "Initial Deposit") in consideration of the ABL Engagement Letter, as well as additional deposits as may be necessary to cover expenses in excess of the Initial Deposit (collectively with the Initial Deposit, the "Deposit"). If the Revolving Facility is consummated, the Deposit less reimbursable expenses, will be applied to closing fees and expenses, with any remaining balance returned to Big West. If the Revolving Facility is not consummated, due to BofA's decision not to approve the Revolving Facility, the Deposit less reimbursable expenses will be returned to Big West. If the Revolving Facility is not consummated for any other reason, BofA will be entitled to retain any unused portions of the Deposit. |
| **Indemnification:** | **First & Second Lien Term Facilities**<br>Big West must indemnity and hold harmless BAS and its affiliates, BofA and BAS' and BofA's respective officers, directors, employees, agents, |

advisors and other representatives (each, an "Indemnified Party") from and against (and will reimburse each Indemnified Party as the same are incurred for) any and all claims, damages, losses, liabilities and expenses (including, without limitation, the reasonable fees, disbursements and other charges of outside counsel referenced above) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) (a) any matters contemplated by the Term Engagement Letter or any related transaction or (b) the Term Loan Facilities or any use made or proposed to be made with the proceeds thereof except to the extent such claim, damage, loss, liability or expense is found in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence, bad faith or willful misconduct. In the case of an investigation, litigation or proceeding to which the indemnity in the Term Engagement Letter applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by Big West, Big West's equity holders or creditors or an Indemnified Party, whether or not an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. Big West also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to Big West or Big West's subsidiaries or affiliates or to Big West's or their respective equity holders or creditors arising out of, related to or in connection with any aspect of the transactions contemplated hereby, except to the extent of direct, as opposed to special, indirect, consequential or punitive, damages determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence, bad faith or willful misconduct. Big West and BAS further agree in the Term Engagement Letter that the Lenders shall only have liability to Big West (as opposed to any other person) solely in respect of their own respective commitment under the Term Loan Facilities on a several, and not joint, basis with any other Lender. Notwithstanding any other provision of the Term Engagement Letter, no Indemnified Party shall be liable for any damages arising from the use by others of information or other materials obtained through electronic telecommunications or other information transmission systems.

**Revolving Facility**
Big West agrees to indemnify and hold harmless BofA and its affiliates, directors, officers, employees, advisors and agents (each, an "Indemnified Party") from and against (and will reimburse each Indemnified Party for) any and all losses, claims, damages, liabilities, and expenses (including, without limitation, the reasonable fees and out-of-pocket expenses of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) any matters contemplated by the ABL Engagement Letter, any related transaction, the proposed Revolving Facility or any use made or proposed to be made with the proceeds thereof, unless and only to the extent that, as to any Indemnified Party, it shall be determined in a final, non-appealable judgment by a court of competent jurisdiction that such losses, claims, damages, liabilities or expenses resulted primarily from the gross negligence, bad faith or willful misconduct of such

10

| | |
|---|---|
| | Indemnified Party. Big West agrees that no Indemnified Party shall have any liability for any indirect or consequential damages in connection with the proposed Revolving Facility. |
| **Conditions Precedent:** | **First & Second Lien Term Facilities**<br>BAS' agreement to syndicate on a best efforts basis is subject to the following conditions:<br><br>• **Accuracy of Information:** accuracy and completeness of all representations made by Big West and its affiliates to BAS.<br><br>• **Competing Offers:** no competing offers, placements or arrangements of any debt securities or bank financing by or on behalf of Big West or any of its subsidiaries may exist prior to and during syndication of the Term Loan Facilities other than: (i) establishment of the Revolving Facility; (ii) preferred stock in exchange for satisfaction of pre-petition claims or for other consideration in an amount determined by the Borrower in its discretion and otherwise on terms acceptable to BAS in its discretion and (iii) if advisable, subordinated debt in an amount not to exceed $50 million and on terms acceptable to BAS in its discretion.<br><br>• **Fees:** Big West's payments of fees and other amounts when due.<br><br>• **Material Adverse Change:** no change, occurrence or development shall have occurred or become known to BAS since January 31, 2009 that could have a material adverse effect on Big West's businesses, assets, liabilities (actual or contingent), operations or financial condition.<br><br>**Revolving Facility**<br>BofA's extension of financing pursuant to the Revolving Facility is subject to fulfillment of a number of conditions precedent customary for transactions of this variety, including:<br><br>• **Diligence:** BofA must complete due diligence of Big West to BofA's satisfaction.<br><br>• **Definitive Documentation:** The parties must negotiate, execute and deliver definitive documentation, including an intercreditor agreement.<br><br>• **Material Adverse Change:** No material adverse change in the opinion of BofA may occur in Big West's assets, liabilities, business, financial condition or results of operation.<br><br>• **Environmental:** BofA must be satisfied with all environmental aspects relating to Big West and its business.<br><br>• **Waivers:** BofA must receive landlord waiver agreements and other third party documents satisfactory to BofA.<br><br>• **Financial Statements:** BofA must receive certain financial |

| | |
|---|---|
| | statements and projections relating to Big West.<br><br>• **Liquidity:** Big West must have sufficient liquidity at closing, as further provided in the ABL Engagement Letter.<br><br>• **Plan of Reorganization:** Big West's plan of reorganization and all proceedings taken in connection with confirmation of the plan shall be satisfactory in form and substance to BofA.<br><br>• **Final Approval:** BofA must give its final approval to the Revolving Facility.<br><br>• **Commitments:** BofA must receive commitments from lenders, totaling at least $45 million. |
| **Syndication:** | <u>First & Second Lien Term Facilities</u><br>BAS will manage and control all aspects of the syndication in consultation with Big West, including decisions as to selection of prospective lenders (which are reasonably acceptable to Big West), when commitments will be accepted and the final allocations of the commitments among the lenders.<br><br><u>Revolving Facility</u><br>BofA will arrange and syndicate on a best efforts basis the Revolving Facility if requested by Big West and will hold up to $30 million. |
| **Warrants and Representations:** | <u>First & Second Lien Term Facilities</u><br>Big West represents, warrants and covenants that:<br><br>• all written information, other than Projections, which has been or is hereafter made available to BAS and our affiliates or to the Lenders by Big West or any of Big West's representatives (or on Big West's or their behalf) in connection with the transactions contemplated hereby (the "<u>Information</u>") is and will be complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading, and<br><br>• all financial projections concerning Big West and its subsidiaries that have been or are hereafter made available to BAS and our affiliates or to the Lenders by Big West or any of Big West's representatives (the "<u>Projections</u>") have been or will be prepared in good faith based upon reasonable assumptions at the time made; it being acknowledged that such Projections are not to be viewed as facts and the actual results during the period or periods covered by any such Projections may differ from the projected results, and no assurance can be given that the projected results will be realized.<br><br><u>Revolving Facility</u><br>The definitive documentation for the Revolving Facility will contain warranties and representations customary for transactions of this variety, including the following: |

| | |
|---|---|
| | - **Financial Covenants.** The documentation for the Revolving Facility will include Maximum Leverage Ratio (defined as Total Funded Debt to adjusted EBITDA) and a Minimum Interest Coverage Ratio (defined as adjusted EBITDA to Interest Expense) and a CAPEX limitation), each to be tested so long as there are any outstanding amounts owing on the Revolving Credit Facility (including any outstanding letters of credit issued thereunder) and prior to any working capital advance or letter of credit issuance, measured monthly on a trailing twelve month basis (and in the case of any working capital advance or letter of credit issuance, measured as of the immediately preceding month), with the CAPEX limitation measured on a fiscal year basis with carry-over amounts to be agreed.<br><br>- **Fixed Charge in Lieu of Covenants:** Big West may choose to have loan documentation include only a fixed charge coverage ratio of not less than 1.10:1 less certain capital expenditures divided by certain cash outflows, to be measured on a trailing twelve month basis and tested only if excess availability falls below a percentage to be determined after BofA's due diligence.<br><br>- **Reporting:** Big West must provide certain financial and collateral reporting, as provided in the ABL Engagement Letter.<br><br>- **Adequate Capitalization:** BofA must be satisfied with Big West's capital structure and financing.<br><br>- **Insurance:** Big West must maintain insurance with carriers acceptable to BofA, as is customary for similar businesses, naming BofA as loss payee.<br><br>- **Restrictions on Distributions:** Documentation must contain restrictions on certain distributions, dividends, acquisitions, investments and other distributions, as further provided in the ABL Engagement Letter.<br><br>- **Cash Reserve:** Big West shall agree to have all proceeds of accounts receivable forwarded to a lockbox or, with BofA's consent, deposited in a blocked account, over which BofA would exercised dominion when excess availability is less than a certain percentage of the Revolving Credit Facility commitment, to be determined after completion of BofA's due diligence.<br><br>- **Field Exams:** BofA shall be allowed to conduct field exams of Big West's operations. |
| **Choice of Law:** | New York |

19. The Debtors have determined in their business judgment that the Exit Facilities, as proposed by the Arrangers, and if ultimately entered into by Big West, likely will provide Big West more favorable rates, pricing, structure and dependability than other potential financing

13

sources that the Debtors considered. Therefore, the Debtors seek authority to enter into the Engagement Letters with the Arrangers to explore the opportunity to restructure Big West as a going concern.

## Basis for Relief

I. **Use of Property of the Estate**.

20. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." In general, the debtor may use property of the estate outside of the ordinary course of its business where the use of such property represents an exercise of the debtor's sound business judgment. See In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (Bankr. D. Del. 1999) ("In evaluating whether a sound business purpose justifies the use, sale or lease of property under Section 363(b), courts consider a variety of factors, which essentially represent a 'business judgment test.'"); In re Schipper, 933 F.2d 513 (7th Cir. 1991); see also Stephens Indus., Inc. v McClung, 789 F.2d 386, 390 (6th Cir. 1986); In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983); In re S.N.A. Nut Co., 186 B.R. 98 (Bankr. N.D. Ill. 1995).

21. "[T]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" In re S.N.A. Nut Company, 186 B.R. 98 (Bankr. N.D. Ill. 1995); see also In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992); In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[A] presumption of reasonableness attaches to a Debtor's management decisions."). Indeed, when applying the "business judgment" rule, courts show great deference to the debtor's decision-making. In re

14

Summit Land Co., 13 B.R. 310, 315 (Bankr. D. Utah 1981). Thus, the Court should grant the relief requested in this Motion if the Debtors demonstrate a sound business justification. See Schipper, 933 F.2d at 515; Lionel, 722 F.2d at 1071.

22. After consultation with their advisors, the Debtors believe that the terms of the Engagement Letters are reasonable and justified under the circumstances, taking into account, among other factors, similar fees in other large chapter 11 cases and current market conditions. Further, the Engagement Letters are the result of good faith, arms-length negotiations between the Debtors and the Arrangers. These negotiations were conducted after the Debtors and their advisors conducted a process of identifying and soliciting proposals from a number of potential financing parties.

23. At this time, the Debtors have not decided upon a particular exit strategy for Big West, whether pursuant to a sale or stand-alone restructuring. However, in order to explore the option of Big West emerging from chapter 11 as a going concern without undertaking an alternative sale or other restructuring process, the Debtors must determine whether they can obtain the requisite exit funding. Without such funding, any proposed plan likely would not be feasible, and the projected recovery for unsecured creditors could be jeopardized. See, e.g., In re Journal Register Co., 407 B.R. 520 (Bankr. S.D.N.Y. 2009) (finding plan feasible where debtors provided exit financing commitment letter); cf. In re Whispering Pines Estate, Inc., 2008 WL 5156429 at *3 (Bankr. D.N.H. Dec. 8, 2008) (finding plan not feasible where debtor lacked exit financing commitment letter). The Debtors believe in their business judgment that the Exit Facilities would provide the most value-maximizing source of exit financing in consideration of both structure and pricing, as well as in consideration of the Arrangers' familiarity with Big West's business operations.

15
DB02:8779696.2                                                                                         067990.1001

24. Entering into the Engagement Letters will allow Big West to further explore the Exit Facilities and, therefore, is a necessary and critical element of any plan confirmation and consummation process that involves Big West emerging from bankruptcy as a going concern. Further, it is customary for debtors in large chapter 11 cases to seek and obtain approval to enter into exit financing commitments, agree to pay an exit financing provider's fees and expenses and grant indemnities such as those described herein prior to the hearing to confirm the debtor's chapter 11 plan. Such relief is routinely granted by courts in this and other Districts. See, e.g., In re Buffets Holdings, Inc., Case No. 08-10141 (MFW) (Bankr. D. Del. Mar. 4, 2009) [Docket No. 2181]; In re Owens Corning, Case No. 00-03837 (JKF) (Bankr. D. Del. Jul. 14, 2006) [Docket No. 18232]; In re Pliant Corp., Case No. 06-10001 (MFW) (Bankr. D. Del. May 9, 2006) [Docket No. 666]; In re Meridian Auto. Sys.-Composites Operations, Inc., Case No. 05-11168 (MFW) (Bankr. D. Del. June 14, 2006) [Docket No. 1155]; see also In re Delta Air Lines, Inc., Case No. 05-17923 (ASH) (Bankr. S.D.N.Y. Apr. 17, 2007) [Docket No. 5764].

25. Therefore, the Debtors respectfully submit that it is in the best interests of the Debtors' estates and all of their creditor constituencies and other stakeholders for the Court to approve the Engagement Letters and Big West's payment of the fees, expense reimbursement and any indemnity obligations on the terms provided therein.

### The Debtors' Reservation of Rights

26. Nothing contained herein is intended or should be construed as an admission of the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract or lease under section 365 of the Bankruptcy Code. The Debtors expressly reserve their rights to contest any objections to the relief sought herein in accordance with applicable non-bankruptcy law.

DB02:8779696.2

067990.1001

## Notice

27. The Debtors have provided notice of this Motion via first class mail to: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel for the Creditors' Committee; (c) counsel for the agents for the Debtors' prepetition and postpetition secured and unsecured lenders; (d) any persons who have filed a request for notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002; and (e) counsel for the Arrangers. In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

## No Prior Request

28. No prior motion for the relief requested herein has been made to this or any other court.

*[The Remainder of This Page Is Intentionally Left Blank]*

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and granting such other and further relief as the Court deems appropriate.

Dated: September 29, 2009
      Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

/s/ Ryan M. Bartley

Pauline K. Morgan (Bar No. 3650)
Edmon L. Morton (Bar No. 3865)
Donald J. Bowman, Jr. (Bar No. 4383)
Ryan M. Bartley (Bar No. 4985)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571–6637
Facsimile: (302) 576–3320

- and -

**KIRKLAND & ELLIS LLP**
David L. Eaton (admitted *pro hac vice*)
Adam C. Paul (admitted *pro hac vice*)
Jeffrey W. Gettleman (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: 312-862-2000
Facsimile: 312-862-2200
Counsel for the Debtors and Debtors in Possession