# EXHIBIT A

# Contribution Agreement

12/30/2009 1:38 PM (2K)
NEWYORK 7321799 v15
[C:\NrPortbl\NEWYORK\GRAHAR\\7321799_15.DOC]
1147969-0003

EXECUTION COPY

# CONTRIBUTION AGREEMENT

## BY AND AMONG

## PILOT TRAVEL CENTERS LLC,

## FLYING J INC.

## AND

## PACIFIC SUNSTONE INC.

## DATED DECEMBER 18, 2009

## Table of Contents

Page

Article I DEFINITIONS ..................................................................................................................2

Section 1.1    Definitions..................................................................................................2
Section 1.2    Additional Defined Terms ........................................................................19
Section 1.3    Construction................................................................................................23
Section 1.4    Exhibits; Disclosure Letters......................................................................24
Section 1.5    Knowledge ..................................................................................................24

Article II CONTRIBUTION OF TARGET HOLDINGS ............................................................25

Section 2.1    Contribution of Target Equity Interests ..................................................25
Section 2.2    Contribution of Target Assets....................................................................25
Section 2.3    Assumption of Liabilities; Excluded Liabilities ......................................29
Section 2.4    Bankruptcy Matters....................................................................................31
Section 2.5    Purchase Price; Delivery of Funds.............................................................32
Section 2.6    Determination of Purchase Price Adjustment and Allocation ..................34
Section 2.7    Closing; Closing Deliverables. ..................................................................38
Section 2.8    Withholding Rights.....................................................................................40

Article III REPRESENTATIONS AND WARRANTIES OF SELLERS .....................................40

Section 3.1    Due Organization, Good Standing and Corporate Power of FJI, PSI and
              the Contributing Affiliates ........................................................................41
Section 3.2    Authorization; Noncontravention ..............................................................41
Section 3.3    Ownership of Target Equity Interests and Target Assets ..........................43
Section 3.4    Target Entities.............................................................................................44
Section 3.5    Capitalization. ............................................................................................44
Section 3.6    Consents and Approvals .............................................................................46
Section 3.7    Financial Statements; Undisclosed Liabilities...........................................47
Section 3.8    Absence of Certain Changes......................................................................48
Section 3.9    Compliance with Laws ...............................................................................48
Section 3.10   Permits .......................................................................................................49
Section 3.11   Litigation.....................................................................................................49
Section 3.12   FJI Employee Benefit Plans.......................................................................50
Section 3.13   Labor Matters.............................................................................................51
Section 3.14   Tax Matters.................................................................................................52
Section 3.15   Intellectual Property...................................................................................55
Section 3.16   Broker's or Finder's Fees...........................................................................57
Section 3.17   Business Material Contracts. .....................................................................57
Section 3.18   Environmental Matters...............................................................................61
Section 3.19   Real Property. ............................................................................................61
Section 3.20   Affiliate Transactions; Interests in Clients, Suppliers, Etc ......................62
Section 3.21   Title to Personal Properties........................................................................62

Section 3.22   Insurance ................................................................................................63
Section 3.23   Sufficiency of Assets ...........................................................................63
Section 3.24   Books and Records ...............................................................................63
Section 3.25   Improper and Other Payments .............................................................64
Section 3.26   No Knowledge of Misrepresentations ..................................................64

Article IV REPRESENTATIONS AND WARRANTIES OF PTC ...............................64

Section 4.1    Due Organization, Good Standing and Corporate Power of PTC ........64
Section 4.2    Authorization; Noncontravention ........................................................65
Section 4.3    PTC Subsidiaries .................................................................................65
Section 4.4    Capitalization. .....................................................................................66
Section 4.5    Consents and Approvals ......................................................................67
Section 4.6    Financial Statements; Undisclosed Liabilities. ...................................67
Section 4.7    Absence of Certain Changes ...............................................................68
Section 4.8    Compliance with Laws ........................................................................68
Section 4.9    Permits ................................................................................................69
Section 4.10   Litigation .............................................................................................69
Section 4.11   PTC Employee Benefit Plans ..............................................................69
Section 4.12   Labor Matters ......................................................................................71
Section 4.13   Tax Matters. ........................................................................................72
Section 4.14   Intellectual Property. ...........................................................................72
Section 4.15   Broker's or Finder's Fees ....................................................................74
Section 4.16   PTC Contracts .....................................................................................75
Section 4.17   Environmental Matters ........................................................................75
Section 4.18   Real Property. .....................................................................................77
Section 4.19   Affiliate Transactions; Interests in Clients, Suppliers, Etc .................78
Section 4.20   Title to Personal Properties .................................................................78
Section 4.21   Insurance .............................................................................................78
Section 4.22   Books and Records ..............................................................................78
Section 4.23   Improper and Other Payments .............................................................79
Section 4.24   No Knowledge of Misrepresentations ..................................................79

Article V COVENANTS ..............................................................................................80

Section 5.1    Access to Information Concerning Properties and Records. ................80
Section 5.2    Confidentiality .....................................................................................82
Section 5.3    Conduct of the Business Pending the Closing Date .............................83
Section 5.4    Conduct of PTC Pending the Closing Date ..........................................87
Section 5.5    Exclusive Dealing ...............................................................................89
Section 5.6    Commercially Reasonable Efforts; Antitrust Filing; Consents. ...........89
Section 5.7    Public Announcements ........................................................................91
Section 5.8    Notification of Certain Matters ...........................................................91
Section 5.9    Non-Competition; Non-Interference ....................................................91
Section 5.10   Non-Solicitation of Employees ...........................................................92
Section 5.11   Resignation or Removal of Officers and Directors ..............................92
Section 5.12   Financing .............................................................................................92
                                                                                         93

Section 5.13 Intercompany Accounts ................................................................................95
Section 5.14 Employee Matters. .........................................................................................96
Section 5.15 Mortgages ...................................................................................................100
Section 5.16 Release of FJI from Certain Obligations .........................................................102
Section 5.17 Insurance Matters. .......................................................................................102
Section 5.18 Bankruptcy Court Filings, Etc ......................................................................103
Section 5.19 Business Letters of Credit and Surety Bonds .................................................104
Section 5.20 Sales of Adjacent Excess Real Estate .............................................................105
Section 5.21 Director and Officer Liability and Indemnification.........................................105
Section 5.22 Bank Accounts and Powers of Attorney .........................................................106
Section 5.23 Transferred Litigation ..................................................................................106
Section 5.24 Texas Tax Controversy .................................................................................106
Section 5.25 Proprietary Software Reversion......................................................................106
Section 5.26 Intellectual Property Licenses. ......................................................................107
Section 5.27 Post-Closing Record Retention and Access.....................................................107
Section 5.28 Certain Provisions Related to Specified Consents............................................108
Section 5.29 BDT Term Sheet...........................................................................................108
Section 5.30 Restriction on Transfer of FJI Equity .............................................................109
Section 5.31 Settlement Agreement....................................................................................109
Section 5.32 Termination of Escrow Arrangement and Release of Funds ............................109
Section 5.33 Cooperation by PSI.......................................................................................109
Section 5.34 Transfer of Title to Certain Real Property .......................................................109
Section 5.35 Consents Regarding TFJ................................................................................110
Section 5.36 Termination of Certain Transactions. .............................................................110

Article VI CONDITIONS PRECEDENT.........................................................................110

Section 6.1 Conditions to the Obligations of Each Party.....................................................110
Section 6.2 Conditions to the Obligations of FJI and PTC..................................................111
Section 6.3 Conditions to the Obligations of PTC..............................................................111
Section 6.4 Conditions to the Obligations of Sellers ..........................................................112
Section 6.5 Conditions to the Obligations of FJI ...............................................................113
Section 6.6 Conditions to the Obligations of PSI ...............................................................113
Section 6.7 Frustration of Closing Conditions...................................................................113

Article VII TAX MATTERS ..........................................................................................114

Section 7.1 Treatment and Reporting ...............................................................................114
Section 7.2 Returns and Payment of Taxes. ......................................................................114
Section 7.3 Controversies. ...............................................................................................116
Section 7.4 Notification. ..................................................................................................117
Section 7.5 Post-Closing Matters......................................................................................117
Section 7.6 Valuation and Allocation ...............................................................................117
Section 7.7 Books and Records ........................................................................................118
Section 7.8 Indemnification for Taxes...............................................................................118
Section 7.9 Refunds and Tax Benefits...............................................................................119

Page

Article VIII TERMINATION AND ABANDONMENT ................................................................119

    Section 8.1    Termination................................................................119
    Section 8.2    Effect of Termination................................................121

Article IX INDEMNIFICATION ..........................................................................................122

    Section 9.1    Survival of Representations and Warranties......................122
    Section 9.2    Indemnification by Sellers ........................................122
    Section 9.3    Indemnification by PTC............................................123
    Section 9.4    Limitation on Indemnification ....................................123
    Section 9.5    Indemnification Procedure; Election and Valuation of Non-Cash
                    Indemnity Payments................................................125
    Section 9.6    Third-Party Claims................................................126
    Section 9.7    Certain Additional Matters ......................................127
    Section 9.8    Exclusive Remedy ................................................130

Article X MISCELLANEOUS ..............................................................................................131

    Section 10.1   Fees and Expenses ..............................................131
    Section 10.2   Extension; Waiver................................................131
    Section 10.3   Notices ..........................................................131
    Section 10.4   Entire Agreement................................................133
    Section 10.5   Binding Effect; Benefit; Assignment............................133
    Section 10.6   Amendment and Modification ....................................134
    Section 10.7   Counterparts....................................................134
    Section 10.8   Applicable Law..................................................134
    Section 10.9   Severability ....................................................135
    Section 10.10 Waiver of Jury Trial............................................135
    Section 10.11 Enforcement....................................................135
    Section 10.12 FJI Disclosure Letter; PSI Disclosure Letter; PTC Disclosure Letter ..............135
    Section 10.13 No Additional Representations; Disclaimer ....................138
    Section 10.14 Rules of Construction ..........................................139
    Section 10.15 Headings ......................................................139
    Section 10.16 Relationship of Parties ........................................140
    Section 10.17 Release ........................................................140

Exhibits

Exhibit I        Form Third Amended and Restated Limited Liability Company Agreement
Exhibit II       Form Amended and Restated Investor Rights Agreement
Exhibit III      BDT Term Sheet
Exhibit IV       Form of Sale Motion
Exhibit V        Form of Sale Order
Exhibit VI       Working Capital Calculation
Exhibit VII      Final Purchase Price Calculation
Exhibit VIII     Form of Target Equity Interest Assignment Agreement
Exhibit IX       Form Bill of Sale and Assignment
Exhibit X        Form Assignment for Intellectual Property
Exhibit XI       Form for Assumption of Liabilities
Exhibit XII      Form Non-Competition Agreement
Exhibit XIII     Form of FJI Guarantee
Exhibit XIV      COP Purchase Agreement
Exhibit XV       Shell Consent Agreement
Exhibit XVI      Form of Fuel Supply Agreement
Exhibit XVII     Form of Transition Services Agreement
Exhibit XVIII    Form of Trademark License Agreement
Exhibit XIX      Form of Transportation Service Agreement
Exhibit XX       Form of Release

## CONTRIBUTION AGREEMENT

This CONTRIBUTION AGREEMENT (this "**Agreement**") is dated December 18, 2009 by and among Pilot Travel Centers LLC ("**PTC**"), a limited liability company organized under the Laws of the State of Delaware, Flying J Inc. ("**FJI**"), a corporation organized under the Laws of the State of Utah and Pacific Sunstone Inc., a corporation organized under the Laws of the State of Utah ("**PSI**" and together with FJI each a "**Seller**" and collectively, the "**Sellers**").

## W I T N E S S E T H:

WHEREAS, FJI and/or one or more Contributing Affiliates own all of the outstanding membership interests (the "**Wholly-Owned LLC Interests**") of the following limited liability companies (collectively, the "**Wholly-Owned LLCs**"): Flying J Transportation LLC; AFJ, LLC; Travel Plaza LLC; Wasatch Global Imports LLC; Mountain View Fulfillment Services, LLC; QSR I LLC; Fleet Sales LLC; FREE II LLC; FREE III LLC; FREE IV LLC; FREE V LLC; FREE VI LLC and FJSD Real Estate LLC;

WHEREAS, FJI and or one or more Contributing Affiliates own all of the interests as a beneficiary (the "**Trust Interests**") of Flying J Plaza I Canadian Trust (the "**Target Trust**");

WHEREAS, FJI owns 49.99% of the outstanding partnership interests of TFJ and PSI owns 50.01% of the outstanding partnership interests of TFJ (the "**PSI TFJ Share**"), and TFJ shall be a Wholly-Owned LLC and its partnership interests shall be Wholly-Owned LLC Interests for purposes of this Agreement;

WHEREAS, FJI and/or one or more Contributing Affiliates own the following percentages of the outstanding membership interests (the "**Partially-Owned LLC Interests**") of the following limited liability companies (collectively, the "**Partially-Owned LLCs**" and, together with the Wholly-Owned LLCs, the "**Target LLCs**"): 49.99% of Flying J Gaming, L.C.; 49.5% of CFJ Plaza Company I LLC; 49.5% of CFJ Plaza Company II LLC; 49.5% of CFJ Plaza Company III LLC; 99% of FJI Plaza Company LLC; 99% of FJI Plaza Company I LLC; 99% of FJI Plaza Company III LLC and 99% of FJI Plaza Company IV LLC;

WHEREAS, FJI and/or one or more Contributing Affiliates own the following percentages of the issued and outstanding shares of capital stock (the "**Partially-Owned Company Interests**" and, collectively with the Wholly-Owned LLC Interests, the Partially-Owned LLC Interests and the Trust Interests, the "**Target Equity Interests**") of the following corporations (collectively, the "**Partially-Owned Companies**" and, collectively with the Target LLCs and the Target Trust, the "**Target Entities**"): 74.53% of Flying J Canada Inc.; 50% of CFJ I Management Inc.; 50% of CFJ II Management Inc. and 50% of CFJ III Management Inc.;

WHEREAS, FJI and/or one or more Contributing Affiliates own the Target Assets (as such term is defined below and, together with the Target Equity Interests, the "**Target Holdings**");

WHEREAS, FJI is a debtor in possession under title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), and has filed a voluntary petition for relief in

the U.S. Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") on December 22, 2008 (the "**Petition Date**");

WHEREAS, FJI desires to contribute and assign to PTC its portion of, and PTC desires to have contributed and assumed, the Target Holdings and Assumed Liabilities pursuant to (a) applicable provisions of the Bankruptcy Code including, as the case may be, sections 363, 365, 1123, 1129 and 1141 and (b) the terms and subject to the conditions set forth in this Agreement and PSI desires to sell and assign to PTC, and PTC desires to have purchased and assumed, the PSI TFJ Share pursuant to the terms and subject to the conditions set forth in this Agreement;

WHEREAS, it is the intention of the parties hereto that, upon consummation of the contribution of the Target Holdings pursuant to this Agreement, subject to the terms and conditions of this Agreement, the Business shall be combined with the business of PTC, and FJI shall be an equity owner of PTC; and

WHEREAS, at the Closing, (a) FJI, PTC and the other equityholders of PTC shall enter into a Third Amended and Restated Limited Liability Company Agreement of PTC in the form of **Exhibit I** attached hereto, as may be amended in accordance with Section 5.29 to reflect the terms and conditions set forth in the BDT Term Sheet (the "**Third Amended and Restated LLC Agreement**"), and (b) FJI and PTC shall enter into an Amended and Restated Investor Rights Agreement relating to the equity interests in PTC and the rights related thereto in the form of **Exhibit II** attached hereto, as may be amended in accordance with Section 5.29 to reflect the terms and conditions set forth in the BDT Term Sheet (the "**Amended and Restated Investor Rights Agreement**").

NOW, THEREFORE, in consideration of the premises and of the mutual covenants, representations, warranties and agreements herein contained, the parties hereto, intending to be legally bound, agree as follows:

Article I

DEFINITIONS

Section 1.1 Definitions. When used in this Agreement, the following terms shall have the respective meanings specified therefor below.

"**Acquisition Proposal**" shall mean any proposal relating to (a) any stock purchase, merger, consolidation, reorganization, change in organizational form, spin-off, split-off, recapitalization, sale of equity interests or other similar transaction involving FJI or any of its Subsidiaries, other than any such Subsidiary that does not own any material part of the Business; provided, that such Subsidiary promptly takes steps to effect, and effects, the transfer of such part of the Business to another Subsidiary of FJI that owns a material part of the Business, (b) any sale of all or any material portion of the Business, other than sales of inventory in the ordinary course of business, (c) any other transaction involving FJI or any of its Subsidiaries which results, directly or indirectly, in any sale or transfer of the equity of FJI or any of its Subsidiaries, other than (i) sales or transfers of the equity of FJI by Persons other than the Call Family Equityholders, (ii) sales or transfers of the equity of any Partially-Owned Company by any Person other than FJI and its Subsidiaries, and (iii) sales or transfers of any

Subsidiary that does not own a material part of the Business; provided, that in the case of clause (iii), such Subsidiary promptly takes steps to effect, and effects, the transfer of such part of the Business to another Subsidiary of FJI that owns a material part of the Business, or (d) any other transaction or series of transactions which has substantially similar economic effects to those described in clauses (a)-(c) above.

"**Action**" shall mean any action, motion, cause of action, inquiry, claim, grievance, counterclaim, complaint, indictment, petition, suit, arbitration, hearing, investigation, assessment, condemnation, expropriation or administrative or other proceeding, whether civil or criminal, at law or in equity, before any Governmental Entity or arbitrator or any other Person.

"**Adjacent Excess Real Estate**" shall mean certain excess land adjacent to operating travel plazas of FJI and its Affiliates, as set forth in Section 1.1(i) of the FJI Disclosure Letter.

"**Affiliate**" of any Person shall mean any other Person directly or indirectly controlling, controlled by, or under common control with, such Person; provided, that, for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise; provided, further, for purposes of the definition of Call Family Equityholders and Sections 3.17(a)(vi), 4.16, 4.19, 5.3, and 5.4, an Affiliate of any Person shall also include (a) any Person that directly or indirectly owns more than 5% of any class of capital stock or other equity interest of such Person, (b) any officer, director, trustee or beneficiary of such Person, (c) any spouse, parent, sibling or descendant of any Person described in clauses (a) or (b) above, and (d) any trust for the benefit of any Person described in clauses (a) through (c) above or for any spouse, issue or lineal descendant of any Person described in clauses (a) through (c) above. For the avoidance of doubt, (x) in no event shall ConocoPhillips Company, Douglas Oil Company of California, Kayo Oil Company or Royal Dutch Shell plc or any of their respective Affiliates (all such Persons, other than the Target Entities and the Target Subsidiaries, collectively referred to as "**Conoco/Shell Entities**") be deemed an Affiliate of FJI, any Contributing Affiliate, any Target Entity, any Target Subsidiary or any other Subsidiary of FJI and (y) in no event shall FJI or any of the Contributing Affiliates be deemed an Affiliate of PTC or any of its present Subsidiaries; provided that, notwithstanding the foregoing clause (x), the Target Entities and Target Subsidiaries shall be deemed Affiliates of FJI for purposes of this Agreement.

"**Antitrust Authorities**" shall mean the Federal Trade Commission, the Antitrust Division of the United States Department of Justice, the attorneys general of the several states of the United States and any other Governmental Entity having jurisdiction with respect to the transactions contemplated hereby pursuant to applicable Antitrust Laws.

"**Antitrust Laws**" shall mean the Sherman Act, as amended; the Clayton Act, as amended; the HSR Act; the Federal Trade Commission Act, as amended; and all other Laws, Orders, administrative and judicial doctrines, and other Laws that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization, restraint of trade, or lessening of competition through merger or acquisition.

"**Assigned Business Intellectual Property**" shall mean all Business Intellectual Property except the Business Intellectual Property specifically licensed to PTC and its Affiliates pursuant to the Trademark License Agreement.

"**Bankruptcy Case**" shall mean FJI's bankruptcy case, No. 08-13384 (MFW), before the Bankruptcy Court.

"**Bankruptcy Rules**" shall mean the Federal Rules of Bankruptcy Procedure, as amended from time to time.

"**BDT Term Sheet**" shall mean that certain summary of terms of an equity investment in PTC by BDT Capital Partners Fund I attached hereto as **Exhibit III**.

"**Business**" shall mean the travel center operations (including FJI's direct or indirect ownership interest in CFJ Properties), terminal fuel locations, trucking operations, corporate headquarters building and operations, Adjacent Excess Real Estate, SFJ Adjacent Excess Real Estate and other business operations of FJI and its Affiliates primarily related thereto (including the assets and certain Liabilities of FJI and its Affiliates (and including for the purposes of this definition all of the operations, assets and Liabilities of TFJ) primarily related thereto), other than the Excluded Business Operations.

"**Business Day**" shall mean any day except a Saturday, a Sunday or any other day on which commercial banks are required or authorized to close in New York, New York.

"**Business Intellectual Property**" shall mean all Intellectual Property owned, licensed, used or held for use by FJI or its Affiliates that is primarily used in the Business, including the Intellectual Property set forth in Sections 2.2(a)(iii) and 3.15 of the FJI Disclosure Letter.

"**Business Material Adverse Effect**" shall mean any event, condition or change which materially and adversely affects, or would reasonably be expected to materially and adversely affect, individually or in the aggregate, the business, assets, liabilities, results of operations or financial condition of the Business, taken as a whole; provided that none of the following, either alone or taken together with other changes or effects or conditions, shall constitute or be taken into account in determining whether there has been a Business Material Adverse Effect:   (i) changes in or effects or conditions arising from or relating to general business or economic conditions affecting any industry in which the Business operates, including changes in fuel prices, commodity prices, customer prices or supply prices, (ii) changes in or effects or conditions arising from or relating to national or international political or social conditions, including the engagement by the United States in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States, (iii) changes in or effects or conditions arising from or relating to financial, banking, or securities markets (including (w) any disruption of any of the foregoing markets, (x) any change in currency exchange rates, (y) any decline in the price of any security or any market index and (z) any increased cost of capital or pricing related to any financing for the transactions contemplated hereby), (iv) changes in, or effects arising from or relating to changes in, GAAP, (v) changes in, or effects arising from or relating to changes in, Laws,

Orders, or other binding directives issued by any Governmental Entity, (vi) changes or effects arising from or relating to the announcement of this Agreement or the announcement of the transactions contemplated hereby, (vii) changes or effects that arise from any seasonal fluctuations in the business, and (viii) any failure, in and of itself, to achieve any projections, forecasts, estimates, performance metrics or operating statistics (whether or not shared with PTC or its Representatives) but the underlying causes of such failure shall not be excluded; provided, however, that if any change or effect described in any of the foregoing clauses (i), (ii), (iii), (iv) and (v) has a disproportionate adverse effect on the Business relative to the business of PTC, then such adverse effect shall be considered in determining whether a "Business Material Adverse Effect" has occurred, but in each such case only to the extent that such effect is disproportionately adverse to the Business relative to the business of PTC.

"**Business Net Debt**" shall mean the amount by which: (a) the sum, without duplication, of the Target Entities' and the Target Subsidiaries' (i) indebtedness for borrowed money, (ii) obligations under leases that have been or are required to be, in accordance with GAAP, recorded as capital leases, (iii) indebtedness evidenced by any note (including seller notes and including the FJI Note Pay-Off Amount with respect to the FJI Subordinated Note), bond, debenture, mortgage or other debt instrument, debt security or other similar instrument, (iv) letters of credit or surety bonds to the extent drawn upon at or prior to the Closing (other than letters of credit and surety bonds issued in connection with, or reimbursement obligations with respect to, the DIP Facility), (v) other than Transfer Taxes, obligations becoming due and owing in connection with the transactions contemplated by this Agreement (including change of control payments or sale bonuses), (vi) the CFJ Applicable Intercompany Payables and other intercompany payables of any kind owing to FJI or any of FJI's Affiliates (excluding current trade accounts payable and any SG&A payables or SG&A accrued liabilities, in all such cases to the extent incurred in the ordinary course of business) not otherwise settled in accordance with this Agreement, (vii) obligations with respect to off-balance sheet financing (but specifically excluding liabilities in respect of sale-leaseback transactions or other transactions recorded as operating leases in accordance with GAAP), (viii) liabilities owing pursuant to interest rate swaps and other derivative contracts (other than derivative contracts relating to petroleum or motor fuels products) ("**Swap Contracts**"), (ix) direct or indirect guarantees with respect to any matters described in clauses (i) through (viii) above with respect to third parties, and (x) with respect to any item described in clauses (i) through (ix) above, (A) all accrued and unpaid interest, fees, expenses and any other charges that accrue through the Closing Date, and (B) except as set forth in Section 5.15 hereof, any other costs, including premiums, penalties, breakage costs and similar items, which arise when such indebtedness is repaid in connection with the transactions contemplated by this Agreement (so long as such indebtedness is repaid within ninety (90) days of the Closing, but in all cases determined after giving effect to any waiver of any such amount approved by the holder thereof); exceeds (b) the Target Entities' and the Target Subsidiaries' Cash and Cash Equivalents plus any amount owing to the Target Entities or the Target Subsidiaries with respect to Swap Contracts; provided, that (A) in no event shall Business Net Debt be deemed to include any assets, or any such liabilities or obligations to the extent owing to any Person, pursuant to or in connection with the Financing, (B) in the case of any Partially-Owned Target Entity or Partially-Owned Target Subsidiary, any component of Business Net Debt (except for the FJI Subordinated Note, where the FJI Note Pay-Off Amount shall be deemed to be Business Net Debt for purposes of this Agreement) owed or, as the case may be, held by such Partially-Owned Target Entity or Partially-Owned Target Subsidiary, only the portion of such Business Net Debt equal to the total amount of such Business Net Debt,

multiplied by the percentage of outstanding equity of such Partially-Owned Target Entity or Partially-Owned Target Subsidiary owned by FJI or any of the Contributing Affiliates, shall be deemed to be Business Net Debt for purposes of this Agreement, (C) in no event shall Business Net Debt be deemed to include any such liabilities or obligations to the extent owing to any Person pursuant to the DIP Facility, (D) subject to the foregoing clause (A) and the following clause (F) and without duplication of any amount otherwise included in the calculation of Business Net Debt, to the extent the Target Assets or Assumed Liabilities include any assets or indebtedness described in clauses (a) or (b) above (including Included Cash), such assets and indebtedness shall be included in the computation of Business Net Debt, (E) in no event shall Business Net Debt include any amount that reduces the calculation of Initial Purchase Price in accordance with clauses (f) or (g) of the definition thereof (including for the purpose of calculating the Final Purchase Price as determined in accordance with Section 2.6(e)), (F) in no event shall Business Net Debt include any Excluded Assets or Excluded Liabilities, any Rejection Liabilities, or any liabilities that PTC has expressly agreed to pay or be responsible for pursuant to Section 5.12 or Section 5.14, (G) in no event shall Business Net Debt include any assets, liabilities or obligations between one Target Entity or Target Subsidiary to another (other than from or to Partially-Owned LLCs or Partially-Owned Companies) and (H) in no event shall Business Net Debt include any asset, obligation or liability with respect to the COP Subordinated Note. With respect to any component of Business Net Debt related to TFJ, to the extent related to TFJ (the "**TFJ Net Debt**"), 49.99% of such component of TFJ Net Debt shall be used to calculate the portion of the Initial Purchase Price and the Final Purchase Price determined in accordance with Section 2.6(e) and 50.01% of the TFJ Net Debt (the "**PSI TFJ Net Debt Share**") shall be used to calculate the PSI Initial Consideration and the PSI Final Consideration.

"**Business Permitted Liens**" shall mean in connection with the Business (a) Liens for Taxes that are being contested in good faith or current Taxes (or municipal assessments as special improvement district assessments) not yet due and payable; (b) statutory Liens or Liens of landlords, carriers, warehousemen, mechanics, suppliers, materialmen or repairmen arising in the ordinary course of business for amounts which are not delinquent and which, individually or in the aggregate, do not materially detract from the value of, or impair the use of, any of the Business's properties or assets, or which are being contested in good faith; (c) Liens consisting of zoning or planning restrictions or regulations, easements, rights-of-way, Permits, restrictive covenants, encroachments and other restrictions or limitations on the use of real property or irregularities in, or exceptions to, title thereto, and which, individually or in the aggregate, do not materially detract from the value of, or impair the use of, such property to or by the Business; (d) rights reserved to or vested in any Governmental Entity by the terms of any right, power, grant, license or Permit, or by any provision of Law, to revoke or terminate any such right, power, grant, license or Permit or to condemn or acquire same by eminent domain which do not constitute security interests or similar interests and, individually or in the aggregate, do not materially detract from the value of, or impair the use of, such property to or by the Business; (e) rights reserved to or vested by Law in any Governmental Entity to, in any manner, control or regulate any of the assets used in the Business or the use thereof or the rights and interests of FJI, any Contributing Affiliate, any Target Entity or any Target Subsidiary therein, in any manner under any and all Laws which do not constitute security interests or similar interests and, individually or in the aggregate, do not materially detract from the value of, or impair the use of, such property to or by the Business; (f) rights reserved to the lessors or licensors of any of the Target Assets or the assets of any Target Entity or Target Subsidiary, and the restrictions, conditions, restrictive covenants and limitations in respect thereof pursuant to the

terms of any Contract, which do not constitute security interests or similar interests and, individually or in the aggregate, do not materially detract from the value of, or impair the use of, such property to or by the Business; (g) Liens on Target Holdings that are released in connection with the Closing by operation of, as the case may be, the Plan, the Confirmation Order, the Sale Order, the Bankruptcy Code or otherwise; (h) Liens for any Liabilities included or to be included in the computation of Closing Business Net Debt or Closing Business Working Capital which (i) to the extent such Liabilities constitute Assumed Liabilities, will be released upon the payment of the amount of the Liabilities so included in either such computation or (ii) will otherwise be released in connection with the Closing by operation of, as the case may be, the Plan, the Confirmation Order, the Sale Order, the Bankruptcy Code or otherwise, (i) all matters showing on the title commitments made available by FJI to PTC on or prior to the date of this Agreement, (j) Liens listed on Section 1.1(ii) of the FJI Disclosure Letter and (k) mortgages or similar instruments securing the CFJ Mortgage Debt or the Non-CFJ Plaza Debt.

"**Business Working Capital**" shall mean the current assets of the Target Entities and the Target Subsidiaries less the current liabilities of the Target Entities and the Target Subsidiaries as determined in accordance with GAAP applied on a basis consistent with the methodologies, practices, estimation techniques, assumptions, policies and principles used in the preparation of the Business Financial Statements except as set forth in Section 1.1(iii) of the FJI Disclosure Letter (including current trade accounts payable and any SG&A payables or SG&A accrued liabilities, in all such cases to the extent incurred in the ordinary course of business), but (a) excluding assets and liabilities included in Business Net Debt and (b) including assets and liabilities related to the mark-to-market impact on petroleum hedging and derivative instruments; provided, that (i) regarding any Business Working Capital held by any Partially-Owned Target Entity or Partially-Owned Target Subsidiary, only the portion of such Business Working Capital equal to the total amount of such Business Working Capital, multiplied by the percentage of outstanding equity of such Target Entity or Target Subsidiary owned by FJI or any of its Affiliates, shall be deemed to be Business Working Capital for purposes of this Agreement, (ii) Closing Business Working Capital shall be (x) stated utilizing weighted average inventory, and (y) increased for normalized payment terms with respect to fuel accounts payable of the Business calculated using the value of fuel that is received in the most recent full calendar month prior to the Closing, as evidenced by bills of lading dated in such month and with reference to the applicable fuel supply or purchase contracts, divided by the number of days in such month, multiplied by ten (10), and minus the amount of actual fuel accounts payable included in such computation, (iii) subject to the following clauses (iv) and (vi) and without duplication of any amount otherwise included in the calculation of Business Working Capital, to the extent the Target Assets or Assumed Liabilities include current assets or current liabilities, such current assets and/or current liabilities shall constitute Business Working Capital, (iv) in no event shall Business Working Capital be deemed to include any such obligations to any Person pursuant to the Financing, (v) in no event shall Business Working Capital be deemed to include any such liabilities or obligations to any Person pursuant to the DIP Facility, (vi) in no event shall Business Working Capital include any Excluded Assets (including the Excluded Current Assets) or Excluded Liabilities (including Liabilities of the Business with respect to the FJI employee stock ownership plan, the "special bonuses" under the Flying J Inc. Bonus Program (also known as the Special Bonus Program), amended and restated effective as of February 1, 2005 (the "**Bonus Program**"), and Liabilities in respect of the FJI 401(k) Plan), any Rejection Liabilities or any liabilities that PTC has expressly agreed to pay or be responsible for pursuant to Section 5.12, Section 5.14 and/or Section 5.15, (vii) in no event shall Business Working Capital include

any asset, obligation or liability with respect to the COP Subordinated Note, (viii) in no event shall Business Working Capital include any amount that reduces the calculation of Initial Purchase Price in accordance with clauses (f) or (g) of the definition thereof (including for the purpose of calculating the Final Purchase Price as determined in accordance with Section 2.6(e)) and (ix) in no event shall Business Working Capital include any assets, liabilities or obligations between one Target Entity or Target Subsidiary to another (other than from or to Partially-Owned LLCs or Partially-Owned Companies). Current liabilities shall include the PTC Cure Cost Obligations. With respect to any component of Business Working Capital related to TFJ, to the extent related to TFJ (the "**TFJ Working Capital**"), 49.99% of such component of TFJ Working Capital shall be used to calculate the portion of the Initial Purchase Price and of the Final Purchase Price determined in accordance with Section 2.6(e) and 50.01% of the TFJ Working Capital (the "**PSI TFJ Working Capital Share**") shall be used to calculate the PSI Initial Consideration and the PSI Final Consideration.

"**Call Family Delivery Parties**" shall mean Crystal Call Maggelet, Thad Call, Tamra Call and each Person of which any of the foregoing is an equityholder or beneficiary that owns capital stock of FJI.

"**Call Family Equityholders**" shall mean Crystal Call Maggelet, Thad Call, Tamra Call and each Affiliate of any of the foregoing.

"**Cash and Cash Equivalents**" shall mean cash and cash equivalents as determined under GAAP.

"**CFJ Applicable Intercompany Payables**" means amounts owing by CFJ Properties, CFJ Plaza Company I LLC, CFJ Plaza Company II LLC, CFJ Plaza Company III LLC, CFJ I Management Inc., CFJ II Management Inc., or CFJ III Management Inc. to FJI or any Contributing Affiliate with respect to the FJI employee stock ownership plan, the "special bonuses" under the Bonus Program, and the FJI 401(k) Plan (including in respect of matching contributions, withholding and loan withholding).

"**CFJ Mortgage Debt**" shall mean all indebtedness arising under: (a) that certain loan agreement, dated March 22, 1999, by and between FFCA Acquisition Corporation and CFJ Plaza Company I LLC, together with the Loan Documents (as defined therein), (b) that certain loan agreement, dated March 22, 1999, by and between FFCA Acquisition Corporation and CFJ Plaza Company II LLC, together with the Loan Documents (as defined therein) and (c) that certain loan agreement, dated March 22, 1999, by and between FFCA Acquisition Corporation and CFJ Plaza Company III LLC, together with the Loan Documents (as defined therein), in each case, as such agreements may be modified, assigned or amended from time to time.

"**Closing Business Net Debt**" shall mean the Business Net Debt as of 11:59 P.M. on the Business Day immediately prior to the Closing Date.

"**Closing Business Working Capital**" shall mean the Business Working Capital as of 11:59 P.M. on the Business Day immediately prior to the Closing Date.

"**Closing PSI TFJ Net Debt Share**" shall mean the PSI TFJ Net Debt Share as of 11:59 P.M. on the Business Day immediately prior to the Closing Date.

"**Closing PSI TFJ Working Capital Share**" shall mean the PSI TFJ Working Capital Share as of 11:59 P.M. on the Business Day immediately prior to the Closing Date.

"**Closing PTC Net Debt**" shall mean the PTC Net Debt as of 11:59 P.M. on the Business Day immediately prior to the Closing Date.

"**Closing PTC Working Capital**" shall mean the PTC Working Capital as of 11:59 P.M. on the Business Day immediately prior to the Closing Date.

"**Code**" shall mean the United States Internal Revenue Code of 1986, as amended, and the regulations promulgated and the rulings issued thereunder.

"**Confirmation Hearing**" shall mean a hearing held or to be held, pursuant to section 1128 of the Bankruptcy Code, on the Plan and which may include, under the circumstances as set forth herein, a hearing to consider approval of the Sale Motion, this Agreement and the transactions contemplated hereby.

"**Confirmation Order**" shall mean an Order of the Bankruptcy Court which (i) confirms the Plan pursuant to section 1129 of the Bankruptcy Code, (ii) contains or incorporates by reference all the provisions of the Sale Order to the extent satisfactory to PTC and (iii) is otherwise in form and substance reasonably satisfactory to PTC.

"**Contract**" shall mean any whether note, bond, mortgage, indenture, guarantee, license, franchise, permit, agreement, understanding, arrangement, contract, commitment, lease, franchise agreement, letter of intent, or other instrument or obligation (whether written or oral and whether or not legally enforceable), and any amendments thereto, other than any purchase order or sale order.

"**Contributing Affiliate**" shall mean each Wholly-Owned Company and each Subsidiary of FJI identified in Section 1.1(iv) of the FJI Disclosure Letter; provided that, for the avoidance of doubt, in no event shall "Contributing Affiliate" include any Target Entity or any Target Subsidiary.

"**Controlled Entities**" shall mean any Target Entity in which FJI directly or indirectly owns as of the date of this Agreement (a) in the case of a corporation, 50% or more of the stock of any class or classes of such corporation having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) and, (b) in the case of a limited liability company, 50% or more in value of the outstanding membership interests of such limited liability company, and (c) in the case of a partnership, 50% or more in value of the outstanding equity interest of such partnership.

"**COP Subordinated Note**" shall mean that certain Unsecured Subordinated Promissory Note dated May 28, 2008, issued by CFJ Properties to ConocoPhillips Company.

"**DIP Facility**" shall mean the credit facility made available to FJI pursuant to that certain Senior Secured Super-Priority Debtor-In-Possession Revolving Credit Agreement, dated as of July 31, 2009, by and between FJI, as borrower, and PTC, as lender, as the same has

9

been and may be amended, modified, supplemented or waived from time to time in accordance with its terms.

"**Environmental Law**" shall mean any Law, Order or other requirement of Law, including common law, relating to public health and safety, worker health and safety, pollution, or protection of the environment, or the manufacture, transport, treatment, storage, disposal, release or threatened release of petroleum products or any substance listed, classified or regulated as hazardous or toxic or any similar term under such Law, Order or other requirement of Law.

"**Excluded Business Operations**" shall mean the following business operations and assets of FJI and its Affiliates: Excluded Real Estate, convenience stores, hotels, inns (including Crystal Inns), refinery operations, oil and gas operations, credit card operations, banking operations, pipeline operations, insurance operations, airplanes and any and all assets and Liabilities primarily associated with such assets (including, in any event, airplane hangars and any and all leases and financing arrangements associated with such airplanes) and shall include (i) FJI's direct or indirect ownership interests in, or any assets of, TCH LLC, Haycock Petroleum Company, Big West Oil, LLC, Big West of California, LLC, Longhorn Pipeline, Inc., Longhorn Partners Pipeline, L.P., Transportation Alliance Bank, Inc., Flying J Enterprise Solutions, Driveline Accounting Services, LLC, Clarity Systems LLC, Clarity Media Systems LLC, Fun Runner LLC, Flying J Oil & Gas Inc., Flying J Insurance Company and each Subsidiary of any of the foregoing and (ii) any Adjacent Excess Real Estate sold pursuant to Section 5.3(a)(J)(3).

"**Excluded Real Estate**" shall mean any real estate not owned by any Target Entity, Target Subsidiary or by CFJ Properties that is not adjacent to the Business and that is not (i) used in the Business, (ii) vertically improved and (iii) separately divided; provided, that such Excluded Real Estate shall not include the SFJ Adjacent Excess Real Estate.

"**Final Equity Consideration Value**" means the amount by which the Final Purchase Price exceeds the Cash Consideration.

"**Final Order**" shall mean an Order of the Bankruptcy Court that is in effect and not stayed, and as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition or certiorari, or other proceeding for reargument or rehearing shall then be pending, or, if pending, no stay pending appeal shall have been granted; provided, however, that no Order shall fail to be a Final Order solely because of the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed with respect to such order.

"**Final PTC Pro Forma Equity Value**" means an aggregate amount equal to the sum of (1) the Final Equity Consideration Value, (2) plus the Final PTC Equity Value, (3) plus the Additional Equity Amount.

"**FJI Disclosure Letter**" shall mean the disclosure letter delivered by FJI to PTC on the date of this Agreement, as amended, modified, or supplemented from time to time in accordance with Section 10.12(a) of this Agreement.

"**FJI Guarantee Conditions**" means each of (i) a portion of the Financing shall be in an amount equal to, and specifically dedicated as one or more separate tranches borrowed solely for the purpose of funding, the Cash Consideration (the "**Cash Consideration Debt**"), (ii) the Cash Consideration Debt shall (w) not be an amendment of, or issued in exchange for, any other indebtedness of PTC, (x) have a term of at least three years, (y) other than solely as a result of an excess cash flow sweep in accordance with the terms of the Financing Letters, require no scheduled principal payments per year during the first two years following the Closing Date in excess of 33% of the initial principal amount, and (z) be drafted as separate tranches of debt from all other tranches of the Financing, (iii) FJI shall have been offered an opportunity to provide a guarantee of collection of the Cash Consideration Debt that provides that such guarantee is expressly subordinate and subject in right and time of payment to payment in full or satisfaction of all claims (as defined in 11 U.S.C. § 101(5)) against FJI incurred or existing on or prior to the effective date of any confirmed plan of reorganization or liquidation in the Bankruptcy Case of FJI and otherwise in a form substantially similar to **Exhibit XIII** or otherwise reasonably acceptable to FJI (the "**FJI Guarantee**"), (iv) the credit agreement(s) providing for the Cash Consideration Debt shall contain as a condition precedent to the funding thereunder the execution of the FJI Guarantee, and (v) no equityholder of PTC or any direct or indirect holder of interests in any such equityholder shall have guaranteed, or agreed to reimburse or indemnify, or pledged collateral or other credit support for the Cash Consideration Debt (within the meaning of Treasury Regulation section 1.752-2(b) or 1.752-2(h)) that would cause any such member or any Person related to such member (within the meaning of Treasury Regulation section 1.752-4(b)), other than FJI, to bear the economic risk of loss (within the meaning of Treasury Regulation section 1.752-2(b)) with respect to the Cash Consideration Debt.

"**FJI Specified Covenant**" shall mean each of subsections (E), (F), (G), (H), (K), (L), (M), (O), (R) and (T) of clause (y) of <u>Section 5.3(a)</u> hereof.

"**FJI Subordinated Note**" shall mean that certain Unsecured Subordinated Promissory Note dated May 28, 2008, issued by CFJ Properties to FJI.

"**GAAP**" shall mean generally accepted accounting principles of the United States of America consistently applied, as in effect from time to time.

"**Governmental Entity**" shall mean any federal, state, local, domestic, provincial or foreign court, arbitral tribunal, administrative agency or commission or other governmental or regulatory agency or authority or any securities exchange.

"**Hazardous Substance**" shall mean any substance, material or waste, including special waste, that is characterized, classified or designated under any Environmental Law as hazardous, toxic, a pollutant, or radioactive or otherwise is subject to imposition of Liability or standards of conduct pursuant to Environmental Laws, and shall include odors, noise, mold, radioactive materials, petroleum, and asbestos.

"**HSR Act**" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"**Income Tax**" shall mean U.S. federal income Taxes and any other Tax imposed on or measured by net or gross income.

"**Income Tax Returns**" shall mean all Returns for Income Taxes.

"**Initial Equity Consideration Value**" means the amount by which the Initial Purchase Price exceeds the Cash Consideration.

"**Initial PTC Equity Value**" means the result equal to (i) $3,291,000,000, (ii) plus the amount, if any, by which PTC's good faith estimate of the Closing PTC Working Capital (the "**Estimated Closing PTC Working Capital**") exceeds Target PTC Working Capital, (iii) minus the amount, if any, by which Target PTC Working Capital exceeds the Estimated Closing PTC Working Capital, (iv) minus the amount of PTC's good faith estimate of the Closing PTC Net Debt (the "**Estimated Closing PTC Net Debt**").

"**Initial PTC Pro Forma Equity Value**" means an aggregate amount equal to the sum of (1) the Initial Equity Consideration Value, (2) plus the Initial PTC Equity Value, (3) plus the Additional Equity Amount.

"**Initial Purchase Price**" shall mean an amount equal to the sum of (a) $1,172,488,431, (b) plus the amount (if any) by which Estimated Business Working Capital exceeds Target Business Working Capital, (c) minus the amount (if any) by which Target Business Working Capital exceeds Estimated Business Working Capital, (d) minus the amount of the Estimated Closing Business Net Debt, (e) minus the Real Estate Sales Amount, (f) minus $550,000 in respect of the CFJ Mortgage Debt as described in Section 5.15(b), (g) minus the Specified Non-CFJ Plaza Debt Reduction Amount, and (h) plus the amount of either: (A) $7,000,000 if the Closing occurs prior to the effective date of any Plan; or (B) if the Closing occurs on or after the effective date of any Plan, the lesser of (x) $7,000,000 and (y) the actual, demonstrable costs and expenses (including resolution of objections) incurred by FJI in connection with obtaining confirmation of the Plan in a proceeding separate from the Sale Hearing.

"**Intellectual Property**" shall mean any and all of the following: (a) inventions (whether or not patentable or reduced to practice), patents, patent applications, and patent disclosures and improvements thereto together with all reissues, continuations, continuations in part, divisions, revisions, extensions or reexaminations thereof; (b) trademarks, service marks, certification marks, trade dress, internet domain names, corporate names, trade names, business names, slogans, logos and all other indicia of origin, whether registered or unregistered, and all registrations and applications for any of the foregoing (including all translations, adaptations, derivations, and combinations of the foregoing), together with all associated goodwill; (c) copyrights and works of authorship, whether registered or unregistered, and all registrations and applications for any of the foregoing and all associated moral rights; (d) Trade Secrets; (e) computer software (including source code and object code), data, databases and documentation thereof; (f) rights of privacy and publicity; (g) all other intellectual property and proprietary rights; (h) rights to sue for past, present and future infringement or misappropriation of the foregoing; and (i) all proceeds of any of the foregoing, including license royalties and other income and damages and other proceeds of suit.

"**IRS**" shall mean the U.S. Internal Revenue Service.

"**Law**" shall mean any statute, law, ordinance, rule or regulation of any Governmental Entity.

"**Liabilities**" shall mean any and all debts, liabilities and obligations, whether accrued or fixed, known or unknown, absolute or contingent, matured or unmatured or determined or determinable.

"**Liens**" shall mean any lien, security interests, claims, easements, mortgages, charges, indentures, deeds of trust, judgments, rights of way, restrictions on the use of real property, encroachments, leases to third parties, security agreements, or any other encumbrances and other restrictions or limitations on use of real or personal property or irregularities in title thereto.

"**Loss**" or "**Losses**" shall mean any and all claims, causes of action, judgments, awards, liabilities, losses, costs or damages, including reasonable attorneys' fees and expenses.

"**Order**" shall mean any judgment, order, injunction, decree, writ, permit or license of any Governmental Entity or any arbitrator.

"**Overlap Period**" shall mean with respect to the Business, the portion of any taxable year or period beginning on or before and ending after the Closing Date.

"**Ownership Ratio**" shall have the meaning set forth in the Third Amended and Restated LLC Agreement.

"**Partially-Owned Target Entity**" shall mean a Partially-Owned LLC or a Partially-Owned Company.

"**Partially-Owned Target Subsidiary**" shall mean a Target Subsidiary in which, indirectly, FJI does not own all of the outstanding membership interests or all of the issued and outstanding shares of capital stock, as the case may be.

"**Partially-Owned Target Subsidiary Interest**" shall mean FJI's indirect percentage ownership interest in any Partially-Owned Target Subsidiary.

"**Patriot Act**" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended, and the rules and regulations promulgated thereunder.

"**Person**" shall mean and include an individual, a partnership, a limited liability partnership, a joint venture, a corporation, a limited liability company, a trust, an unincorporated organization, a group and a Governmental Entity.

"**Plan**" shall mean the Chapter 11 plan of reorganization filed or to be filed, pursuant to section 1121(a) of the Bankruptcy Code, by FJI in the Bankruptcy Case, as modified or amended from time to time, in form and substance consistent with section 1123 of the Bankruptcy Code, which is reasonably acceptable to PTC with respect to provisions relating to this Agreement and the transactions contemplated hereby and is otherwise not inconsistent with the terms of this Agreement, and which otherwise provides, among other things, to the extent not already approved pursuant to a Sale Order (in which case the Plan shall reaffirm and ratify the transactions contemplated by this Agreement) (i) for approval and implementation of, and authorization for FJI (and for FJI to cause its applicable Subsidiaries) to enter into and perform FJI's (or such Subsidiaries') obligations under, this Agreement and all other instruments and

agreements to be executed and delivered by FJI (or such Subsidiaries) as contemplated hereby, and to consummate the transactions contemplated hereby and thereby, (ii) for the contribution, transfer, conveyance and assignment of the FJI-owned Target Holdings or such Subsidiaries free and clear, except as otherwise expressly provided herein, of all claims and interests pursuant to Section 1141(c) of the Bankruptcy Code and, except as otherwise expressly provided herein, an injunction against all relevant claim and interest holders from asserting such claims and interest against PTC or its Affiliates or such contributed, transferred, conveyed or assigned property, (iii) for assignment of all Target Contracts that may be assigned pursuant to Sections 365 and 1123(b)(2) of the Bankruptcy Code, (iv) that all obligations of FJI under this Agreement, including, without limitation, any Purchase Price Adjustment obligation and all claims for indemnification asserted by PTC, shall be entitled to administrative expense priority in the Bankruptcy Case pursuant to Sections 503(b) and 507(a) of the Bankruptcy Code and treatment, subject to FJI's rights in Section 9.5(d)(i) hereof and in accordance with Section 5.18 hereof, and (v) for retention of jurisdiction by the Bankruptcy Court to effectuate and enforce performance of this Agreement, the Plan and all other instruments and agreements to be executed and delivered by FJI as contemplated hereby, the Plan and the Confirmation Order. For the avoidance of doubt, the Plan shall provide for the contingency of a separate (earlier) hearing on the Sale Motion in accordance with the terms hereof.

"**Pre-Closing Period**" shall mean all taxable years or other taxable periods that end on or before the Closing Date and, with respect to any taxable year or other taxable period beginning on or before and ending after the Closing Date, the portion of such taxable year or period ending on and including the Closing Date.

"**PSI Disclosure Letter**" shall mean the disclosure letter delivered by PSI to PTC on the date of this Agreement, as amended, modified, or supplemented from time to time in accordance with Section 10.12(b) of this Agreement.

"**PSI Initial Consideration**" shall mean (i) $6,250,000 (ii) minus the PSI TFJ Net Debt Share (iii) plus the amount (if any) by which Estimated Closing PSI TFJ Working Capital Share exceeds PSI Target TFJ Working Capital, (iv) minus the amount (if any) by which PSI Target TFJ Working Capital exceeds Estimated Closing PSI TFJ Working Capital Share.

"**PSI Target TFJ Working Capital**" shall mean $127,806, as determined pursuant to the calculation set forth on **Exhibit VI**.

"**PTC Disclosure Letter**" shall mean the disclosure letter delivered by PTC to the Sellers on the date of this Agreement, as amended, modified, or supplemented from time to time in accordance with Section 10.12(c) of this Agreement.

"**PTC Intellectual Property**" shall mean all Intellectual Property owned, licensed, used or held for use by PTC or the PTC Subsidiaries, including the Intellectual Property set forth in Section 4.14 of the PTC Disclosure Letter.

"**PTC Material Adverse Effect**" shall mean any event, condition or change which materially and adversely affects, or would reasonably be expected to materially and adversely affect, individually or in the aggregate, the business, assets, liabilities, results of operations or financial condition of the business of PTC and its Subsidiaries, taken as a whole; provided that none of the following, either alone or taken together with other changes or effects,

shall constitute or be taken into account in determining whether there has been a PTC Material Adverse Effect: (i) changes in or effects or conditions arising from or relating to general business or economic conditions affecting any industry in which the business of the PTC and its Subsidiaries operates, including changes in fuel prices, commodity prices or other supply prices, (ii) changes in or effects or conditions arising from or relating to national or international political or social conditions, including the engagement by the United States in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States, (iii) changes in or effects or conditions arising from or relating to financial, banking, or securities markets (including (w) any disruption of any of the foregoing markets, (x) any change in currency exchange rates, (y) any decline in the price of any security or any market index and (z) any increased cost of capital or pricing related to any financing for the transactions contemplated hereby), (iv) changes in, or effects arising from or relating to changes in, GAAP, (v) changes in, or effects arising from or relating to changes in, Laws, Orders, or other binding directives issued by any federal governmental entity, (vi) changes or effects arising from or relating to the announcement of this Agreement or the announcement of the transactions contemplated hereby, (vii) changes or effects that arise from any seasonal fluctuations in the business, and (viii) any failure, in and of itself, to achieve any projections, forecasts, estimates, performance metrics or operating statistics (whether or not shared with FJI or its Representatives) but the underlying causes of such failure shall not be excluded; provided, however, that if any change or effect described in any of the foregoing clauses (i), (ii), (iii), (iv) and (v) has a disproportionate adverse effect on the business of PTC and the PTC Subsidiaries relative to the Business, then such adverse effect shall be considered in determining whether a "PTC Material Adverse Effect" has occurred, but in each such case only to the extent that such effect is disproportionately adverse to the business of PTC and the PTC Subsidiaries relative to the Business.

　　　　"**PTC Net Debt**" shall mean the amount by which: (a) the sum, without duplication, of PTC's and PTC's Subsidiaries' (i) indebtedness for borrowed money (other than indebtedness owed from PTC or any PTC Subsidiary to PTC or another PTC Subsidiary, as applicable), (ii) obligations under leases that have been or are required to be, in accordance with GAAP, recorded as capital leases, (iii) indebtedness evidenced by any note (including FJI notes), bond, debenture, mortgage or other debt instrument, debt security or other similar instrument, (iv) letters of credit or surety bonds to the extent drawn upon at or prior to the Closing (other than letters of credit and surety bonds or reimbursement obligations with respect thereto incurred by, or issued on behalf of, PTC or any of its Subsidiaries in connection with the DIP Facility), (v) other than Transfer Taxes, obligations becoming due and owing in connection with the transactions contemplated by this Agreement (including change of control payments or sale bonuses), (vi) obligations with respect to off-balance sheet financing (but specifically excluding liabilities in respect of sale-leaseback transactions or other transactions recorded as operating leases in accordance with GAAP), (vii) the amount owing pursuant to Swap Contracts, (viii) direct or indirect guarantees with respect to any matters described in clauses (i) through (vii) above, and (ix) with respect to any matter described in clauses (i) through (viii) above, all accrued and unpaid interest, fees, expenses and any other charges that accrue through the Closing Date and all other costs, including premiums, penalties, breakage costs and similar items, which arise when such indebtedness is repaid in connection with the transactions contemplated by this Agreement (so long as such indebtedness is repaid within ninety (90) days of the Closing, but in

15

all cases determined after giving effect to any waiver of any such amount approved by the holders thereof); exceeds (b) the aggregate of (i) PTC's and PTC's Subsidiaries' Cash and Cash Equivalents plus any amount owing to PTC or PTC's Subsidiaries with respect to Swap Contracts, and (ii) the DIP Repayment Amount; provided, however, that, in no event shall PTC Net Debt be deemed to include (A) any such Cash and Cash Equivalents from the Financing or any equity financing after the date hereof (including the equity financing contemplated by the BDT Term Sheet), (B) obligations to the extent owing to any Person pursuant to the Financing but shall include any amounts in respect of existing indebtedness which is refinanced, amended, exchanged or extended in connection with the transactions contemplated by this Agreement, (C) any assets or liabilities of CFJ Properties, CFJ Plaza Company I LLC, CFJ Plaza Company II LLC, CFJ Plaza Company III LLC, CFJ I Management Inc., CFJ II Management Inc., or CFJ III Management Inc., (D) any liability of PTC in connection with its obligations set forth in Section 5.14 of this Agreement or (E) any assets, liabilities or obligations between PTC and any wholly owned PTC Subsidiary or between any wholly owned PTC Subsidiaries, as applicable.

"**PTC Per Unit Value**" shall mean an amount equal to (a) the Initial PTC Pro Forma Equity Value, divided by (b) the PTC Pro Forma Units Outstanding.

"**PTC Permitted Liens**" shall mean (a) Liens for Taxes that are being contested in good faith or current Taxes (or municipal assessments as special improvement district assessments) not yet due and payable; (b) statutory Liens or Liens of landlords, carriers, warehousemen, mechanics, suppliers, materialmen or repairmen arising in the ordinary course of business for amounts which are not delinquent and which, individually or in the aggregate, do not materially detract from the value of, or impair the use of, any of the Business's properties or assets, or which are being contested in good faith; (c) Liens consisting of zoning or planning restrictions or regulations, easements, rights-of-way, Permits, restrictive covenants, encroachments and other restrictions or limitations on the use of real property or irregularities in, or exceptions to, title thereto, and which, individually or in the aggregate, do not materially detract from the value of, or impair the use of, such property by the Business; (d) rights reserved to or vested in any Governmental Entity by the terms of any right, power, grant, license or Permit, or by any provision of Law, to revoke or terminate any such right, power, grant, license or Permit or to condemn or acquire same by eminent domain which do not constitute security interests or similar interests and, individually or in the aggregate, do not materially detract from the value of, or impair the use of, such property to or by PTC or any of the PTC Subsidiaries; (e) rights reserved to or vested by Law in any Governmental Entity to, in any manner, control or regulate any of the assets used in the business or the use thereof or the rights and interests of PTC or any of the PTC Subsidiaries therein, in any manner under any and all Laws which do not constitute security interests or similar interests and, individually or in the aggregate, do not materially detract from the value of, or impair the use of, such property to or by PTC or any of the PTC Subsidiaries; (f) rights reserved to the lessors of any of the assets of PTC or any of the PTC Subsidiaries, and the restrictions, conditions, restrictive covenants and limitations in respect thereof pursuant to the terms of any Contract, which do not constitute security interests or similar interests and, individually or in the aggregate, do not materially detract from the value of, or impair the use of, such property to or by PTC or any of the PTC Subsidiaries, (g) Liens for any Liabilities included or to be included in the computation of Closing PTC Net Debt or Closing PTC Working Capital which will be released upon the payment of the amount of the Liabilities so included in either such computation; (h) all matters showing on the title commitments made

available by PTC to FJI on or prior to the date of this Agreement; and (i) Liens listed on <u>Section 1.1(i)</u> of the PTC Disclosure Letter.

"**PTC Pro Forma Units Outstanding**" shall mean the aggregate number of Common Units issued and outstanding as of immediately after the Closing and which shall include for this purpose all Common Units issued as part of the Initial Equity Consideration and all Common Units issued or issuable in connection with the Additional Equity Amount.

"**PTC Specified Covenant**" shall mean each of subsections (B) and (E) of clause (y) of <u>Section 5.4(a)</u> hereof.

"**PTC Working Capital**" shall mean the consolidated current assets of PTC and the PTC Subsidiaries <u>less</u> the consolidated current liabilities of PTC and the PTC Subsidiaries as determined in accordance with GAAP applied on a consistent basis with the methodologies, practices, estimation techniques, assumptions, policies and principles used in the preparation of the PTC Financial Statements except as set forth in <u>Section 1.1(ii)</u> of the PTC Disclosure Letter, but (a) excluding assets and liabilities included in PTC Net Debt and (b) including assets and liabilities related to the mark-to-market impact on petroleum hedging and derivative instruments; <u>provided</u>, that Closing PTC Working Capital shall be stated utilizing FIFO inventory; <u>provided, however</u>, in no event shall PTC Working Capital be deemed to include (w) any assets, or any such liabilities or obligations to any Person, pursuant to the DIP Facility, the Financing, or any equity financing after the date hereof (including the equity financing contemplated by the BDT Term Sheet), (x) any asset or liability of CFJ Properties, CFJ Plaza Company I LLC, CFJ Plaza Company II LLC, CFJ Plaza Company III LLC, CFJ I Management Inc., CFJ II Management Inc., or CFJ III Management Inc., (y) any liability of PTC in connection with its obligations set forth in <u>Section 5.14</u> of this Agreement or (z) any assets, liabilities or obligations between PTC and any wholly owned PTC Subsidiary or between any wholly owned PTC Subsidiaries, as applicable.

"**Representatives**" of any Person shall mean such Person's Affiliates, and the directors, managers, officers, controlling equityholders, employees, agents, attorneys, accountants, consultants, advisors and other representatives of such Person or such Person's Affiliates.

"**Sale Hearing**" shall mean the hearing held before the Bankruptcy Court to consider approval of the Sale Motion, which hearing may be held with the Confirmation Hearing under the circumstances set forth herein.

"**Sale Motion**" shall mean the motion or motions of FJI for approval of this Agreement and the transactions contemplated hereby (including, for the avoidance of doubt, the assumption and assignment by FJI of the Target Contracts to which it is a party), substantially in the form of **Exhibit IV**.

"**Sale Order**" shall mean the Order of the Bankruptcy Court for approval of this Agreement and the transactions contemplated hereby (including, for the avoidance of doubt, the assumption and assignment by FJI of the Target Contracts to which it is a party), substantially in the form of **Exhibit V**, which Sale Order may be incorporated (whether by reference as an exhibit or otherwise) into the Confirmation Order.

"**Scheduling Motion**" shall mean a motion of FJI, in form and substance reasonably acceptable to PTC with respect to provisions relating to this Agreement and the transactions contemplated hereby (and which shall not be inconsistent herewith or therewith), filed in the Bankruptcy Case, seeking an Order of the Bankruptcy Court that, among other things, approves a disclosure statement respecting the Plan pursuant to section 1125(b) of the Bankruptcy Code, establishes procedures and fixes times for voting on acceptance or rejection of the Plan and tabulating the votes received, and fixes a date for the Confirmation Hearing, together with all requisite exhibits (including the Plan and a proposed disclosure statement), notice and other documents or pleadings required or useful to be filed therewith in order to obtain confirmation of the Plan and approval of this Agreement and the transactions contemplated hereby.

"**Scheduling Order**" shall mean an Order of the Bankruptcy Court, in form and substance reasonably acceptable to FJI and PTC with respect to provisions relating to this Agreement and the transactions contemplated hereby (and which shall not be inconsistent herewith or therewith), granting the relief requested in the Scheduling Motion.

"**SFJ Adjacent Excess Real Estate**" shall mean all undeveloped land owned by SFJ Inc. and adjacent to the operating travel plazas of SFJ Inc. at the locations identified in Section 1.1(v) of the FJI Disclosure Letter.

"**Specified Consents**" shall mean the consents and/or waivers of ConocoPhillips Company and Royal Dutch Shell plc, and certain of their applicable Affiliates, with respect to the transactions contemplated by this Agreement, as more specifically set forth in the COP Purchase Agreement and the Shell Consent Agreement, respectively.

"**Specified Exhibit**" shall mean each of **Exhibit IX, Exhibit X, Exhibit XI** and **Exhibit XII.**

"**Subsidiary**", with respect to any Person, shall mean (a) any corporation 50% or more of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is owned by such Person directly or indirectly through one or more Subsidiaries of such Person and (b) any partnership, association, joint venture, limited liability company or other Person in which such Person directly or indirectly through one or more Subsidiaries of such Person has a 50% or more in value of the outstanding equity interest; provided, that in any event, the following entities shall be considered Subsidiaries of FJI for purposes of this Agreement:  TFJ; Flying J Gaming, L.C.; CFJ Properties; Louisiana Greenwood LLC; Flying J Canada Inc.; SFJ Inc.; Flying J Quebec (2006) Inc.; Lucky J's (2006) Inc.; Country Market Restaurant and Buffet (2006) Inc.; Flying J Canada Transport Inc.; CFJ Plaza Company I LLC; CFJ Plaza Company II LLC; CFJ Plaza Company III LLC; CFJ I Management Inc.; CFJ II Management Inc. and CFJ III Management Inc.

"**Target Business Working Capital**" **shall** mean negative $54,665,401, as determined pursuant to the calculation set forth on **Exhibit VI.**

"**Target PTC Working Capital**" shall mean $99,438,113, as determined pursuant to the calculation set forth on **Exhibit VI.**

"**Tax Benefit**" means, without duplication, the net present value (calculated using a discount rate of 8%) of any refund of Taxes paid or reduction in the amount of Taxes that otherwise would have been paid taken into account at such time or times that such refund or reduction is reasonably expected to be realized, in each case computed at the highest marginal Tax rates in effect at the time of such determination.

"**Taxes**" shall mean all taxes, assessments, charges, duties, fees, levies or other governmental charges including all United States federal, state, local, foreign and other income, franchise, profits, capital gains, capital stock, transfer, sales, use, occupation, property, excise, severance, windfall profits, stamp, license, payroll, withholding, fuels, ad valorem and other taxes, assessments, charges, duties, fees, levies or other governmental charges of any kind whatsoever (whether payable directly or by withholding and whether or not requiring the filing of a Return), all estimated taxes, deficiency assessments, additions to tax, penalties and interest and shall include any Liability for such amounts as a result of (a) being a transferee or successor or member of a combined, consolidated, unitary or affiliated group, or (b) a contractual obligation to indemnify any Person.

"**Trade Secrets**" shall mean any and all trade secrets or other proprietary and confidential information, including ideas, formulas, compositions, unpatented inventions (whether patentable or unpatentable and whether or not reduced to practice), invention disclosures, financial and accounting data, technical data, personal information, customer lists, supplier lists, business plans, know-how, formulae, methods (whether or not patentable), designs, processes, merchandising processes, procedures, source code, object code, and techniques, research and development information, industry analyses, drawings, data collections and related information.

"**Wholly-Owned Companies**" shall mean, collectively, Flying J Franchise Inc.; Windbreak Inc.; Flying J Transportation Canada Inc.; Ton Services Inc.; Flying J Real Estate Enterprises Inc.; PDCA Inc., Professional Driver Carrier Association; PDCA Professional Driver Carrier Canada Inc.; FJI Management Inc.; FJI II Management Inc.; FJI III Management Inc. and FJI IV Management Inc.

"**Wholly-Owned Target Entities**" shall mean, collectively, the Wholly-Owned LLCs and the Target Trust.

Section 1.2  Additional Defined Terms. In addition to the terms defined in Section 1.1, additional defined terms used herein shall have the respective meanings assigned thereto in the Sections indicated below:

<table>
<tr><td>Defined Term</td><td>Section</td></tr>
<tr><td>Accountant</td><td>Section 2.6(d)(ii)(w)</td></tr>
<tr><td>Accrued Vacation</td><td>Section 5.14(i)</td></tr>
<tr><td>Additional Equity Amount</td><td>Section 5.12(a)</td></tr>
<tr><td>Alternative Arrangements</td><td>Section 9.7(b)</td></tr>
<tr><td>Agreed Claims</td><td>Section 9.5(c)</td></tr>
<tr><td>Agreement</td><td>Preamble</td></tr>
<tr><td>Alternative COP Specified Consent</td><td>Section 5.28(a)</td></tr>
<tr><td>Alternative Shell Specified Consent</td><td>Section 5.28(b)</td></tr>
</table>

NEW YORK 7440434 (2K)

Amended and Restated Investor Rights Agreement ............. Recitals
Amendment Notice ....................................................... Section 2.4(c)
Antitrust Filings ........................................................... Section 5.6(b)
Ascribed Value............................................................. Section 5.20
Assigned Proprietary Software Applications................. Section 5.25
Assumed Liabilities ...................................................... Section 2.3
Assumption Determination Date................................ Section 5.15(a)
Assumption Objection ............................................... Section 2.4(b)
Assumption Schedule.................................................. Section 2.4(a)
Balance Sheet Date ..................................................... Section 3.7(a)
Bankruptcy Code ............................................................ Recitals
Bankruptcy Court.............................................................. Recitals
Bonus Program............................................................... Section 1.1
Business Employees................................................... Section 5.14(a)
Business Financial Statements.................................... Section 3.7(a)
Business Labor Actions .............................................. Section 3.13(d)
Business Material Contract......................................... Section 3.17(a)
Business Net Debt Adjustment ................................... Section 2.6(a)
Business Real Property Leases ................................... Section 3.19(b)
Business Working Capital Adjustment........................ Section 2.6(a)
Cash Consideration ..................................................... Section 2.5(b)
Cash Consideration Debt .............................................. Section 1.1
Cash Election .............................................................. Section 8.1(f)
CFJ Properties Partnership Agreement............................ Section 2.3
Claim Certificate......................................................... Section 9.5(a)
Class B Units............................................................... Section 2.5(b)
Closing ....................................................................... Section 2.7(a)
Closing Balance Sheets............................................... Section 2.6(a)
Closing Business Balance Sheet ................................. Section 2.6(a)
Closing Business Statement........................................ Section 2.6(a)
Closing Date................................................................ Section 2.7(a)
Closing PTC Balance Sheet ........................................ Section 2.6(a)
Closing PTC Statement............................................... Section 2.6(a)
COBRA....................................................................... Section 3.12(e)
Commitments.............................................................. Section 5.12(a)
Conduct of Business Deductible................................... Section 9.4(c)
Confidentiality Agreement............................................. Section 5.2
Conoco/Shell Entities..................................................... Section 1.1
COP Purchase Agreement.......................................... Section 5.28(a)
Corrective Transfer Schedule ...................................... Section 5.34
Cure Amounts ............................................................. Section 2.4(a)
DIP Issued Business Bonds .......................................... Section 5.19
DIP Repayment Amount........................................... Section 2.5(b)(i)
Disclosed Rights ............................................................ Section 2.1
Disputed Amounts ...................................................... Section 2.6(d)
Disputed Contract ....................................................... Section 5.1(a)
End Date.................................................................. Section 8.1(b)(ii)
Equity Consideration ................................................... Section 2.5(b)

ERISA ................................................................... Section 3.12(a)
ERISA Affiliate ..................................................... Section 3.12(c)
Estimated Business Closing Statement ....................... Section 2.5(a)
Estimated Business Working Capital........................... Section 2.5(a)
Estimated Closing Business Net Debt ......................... Section 2.5(a)
Estimated Closing PSI TFJ Net Debt Share .............. Section 2.5(a)
Estimated Closing PTC Net Debt .................................... Section 1.1
Estimated Closing PSI TFJ Working Capital Share ... Section 2.5(a)
Estimated Closing PTC Working Capital ....................... Section 1.1
Excluded Assets........................................................... Section 2.2(b)
Excluded Current Assets........................................ Section 2.2(b)(i)
Excluded Liabilities ......................................................... Section 2.3
Final Business Allocation ........................................... Section 2.6(e)
Final PTC Equity Value.............................................. Section 2.6(f)
Final Purchase Price.................................................... Section 2.6(e)
Financing...................................................................... Section 5.12(a)
Financing Deficit Event ............................................. Section 5.12(b)
Financing Letter ......................................................... Section 5.12(b)
FJI ................................................................................. Preamble
FJI 401(k) Plan............................................................ Section 5.14(h)
FJI Covenant Notice ................................................... Section 5.3(b)
FJI Covenant Waiver Date.......................................... Section 5.3(b)
FJI Cure Cost Obligations .......................................... Section 2.4(a)
FJI Employee Benefit Plans........................................ Section 3.12(a)
FJI Guarantee ...................................................................... Section 1.1
FJI Indemnitees.................................................................... Section 9.3
FJI Note Pay-Off Amount...............................................Section 5.13
FJI Obligations............................................................ Section 5.16(a)
FJI's Proposed Calculation ........................................ Section 2.6(a)
Foreign Corrupt Practices Act .......................................Section 3.25
Fuel Supply Agreement ............................................. Section 6.2(a)
Included Cash...................................................... Section 2.2(a)(xiv)
Indemnified Party........................................................ Section 9.5(a)
Indemnifying Party ..................................................... Section 9.5(a)
Initial Equity Consideration ........................................ Section 2.5(b)
Knowledge of FJI........................................................ Section 1.5(a)
Knowledge of PTC ...................................................... Section 1.5(b)
Monthly Business Financial Statements ..................... Section 5.1(b)
Monthly PTC Financial Statements ............................ Section 5.1(b)
Mortgage Costs ........................................................... Section 5.15(c)
Non-Business Evergreen Bonds ................................. Section 2.5(c)
Non-CFJ Plaza Debt ................................................... Section 5.15(a)
Notice of Objection..................................................... Section 2.6(c)
Notification Deductible................................................ Section 9.4(c)
Objection Deadline ..................................................... Section 2.4(a)
Partially-Owned Companies ...............................................Recitals
Partially-Owned Company Interests ..................................Recitals
Partially-Owned LLCs .......................................................Recitals

21

Partially-Owned LLC Interests ............................................Recitals
Permits ..........................................................................Section 3.10
Personal Property ....................................................Section 2.2(a)(ii)
Petition Date.........................................................................Recitals
Proposed Business Allocation.....................................Section 2.6(a)
Proposed Calculations..................................................Section 2.6(a)
PSI ...................................................................................... Preamble
PSI Final Consideration ...............................................Section 2.6(e)
PSI Indemnitees ..............................................................Section 9.3
PSI Net Debt Adjustment ............................................Section 2.6(a)
PSI TFJ Net Debt Share ...................................................Section 1.1
PSI TFJ Share ......................................................................Recitals
PSI TFJ Working Capital Adjustment ........................Section 2.6(a)
PSI TFJ Working Capital Share ......................................Section 1.1
PTC ...................................................................................... Preamble
PTC Covenant Notice ....................................................Section 5.4(b)
PTC Covenant Waiver Date...........................................Section 5.4(b)
PTC Cure Cost Obligations ..........................................Section 2.4(a)
PTC Deductible...............................................................Section 9.4(b)
PTC Employee Benefit Plans.......................................Section 4.11(a)
PTC Financial Statements.............................................Section 4.6(a)
PTC Health Plans........................................................ Section 5.14(c)
PTC Indemnitees..............................................................Section 9.2
PTC Labor Actions ......................................................Section 4.12(d)
PTC Net Debt Adjustment...........................................Section 2.6(a)
PTC Qualifying Loss .....................................................Section 9.4(b)
PTC Real Property Leases .........................................Section 4.18(b)
PTC Subsidiary .............................................................Section 4.3(a)
PTC Units.......................................................................Section 2.5(b)
PTC Working Capital Adjustment...............................Section 2.6(a)
PTC's 401(k) Plan......................................................Section 5.14(h)
PTC's Proposed Calculations ......................................Section 2.6(a)
Purchase Price Adjustment ..........................................Section 2.6(h)
Real Estate Sales Amount...............................................Section 5.20
Real Estate Sales Period.................................................Section 5.20
Rejection Liabilities.....................................................Section 2.3(c)
Remaining Intercompany Payables...............................Section 5.13
Remaining Non-CFJ Plaza Debt................................Section 5.15(c)
Replacement Financing Letter ....................................Section 5.12(b)
Return..............................................................................Section 3.14(a)
Returnable Amount........................................................Section 9.7(b)
Reversion Right ...............................................................Section 5.25
Rights ......................................................................Section 2.2(a)(ix)
Seller ................................................................................ Preamble
Seller Indemnitees............................................................Section 9.3
Sellers Deductible ........................................................ Section 9.4(a)
Sellers Qualifying Loss.....................................................Section 9.4
Shell Consent Agreement ..........................................Section 5.28(b)

NEWYORK 7440434 (2K)

Specified Non-CFJ Plaza Debt ................................ Section 5.15(c)
Specified Non-CFJ Plaza Debt Reduction Amount.. Section 5.15(c)
Swap Contracts ............................................................ Section 1.1
Target Assets ............................................................... Section 2.2(a)
Target Contracts .................................................. Section 2.2(a)(vii)
Target Entities ................................................................... Recitals
Target Equity Interests .......................................................... Recitals
Target Holdings ................................................................... Recitals
Target LLCs .......................................................................... Recitals
Target Permits ..................................................... Section 2.2(a)(viii)
Target Real Property .............................................. Section 2.2(a)(i)
Target Subsidiary ....................................................... Section 3.4(b)
Target Trust ........................................................................ Recitals
Tax Indemnified Party ................................................ Section 7.3(a)
Tax Indemnifying Party ............................................. Section 7.3(a)
Tax Matter ................................................................... Section 7.3(a)
TFJ Net Debt .................................................................. Section 1.1
TFJ Working Capital ....................................................... Section 1.1
Third Amended and Restated LLC Agreement ................... Recitals
Third Party Claim ....................................................... Section 9.6(a)
Trademark License Agreement ................................... Section 6.2(c)
Transfer Taxes ............................................................ Section 7.2(e)
Transferred Employee ................................................ Section 5.14(a)
Transition Services Agreement ................................... Section 6.2(b)
Transportation Service Agreement ............................. Section 6.2(d)
Trust Interests ..................................................................... Recitals
WARN ..................................................................... Section 3.13(f)
Wholly-Owned LLC Interests ............................................. Recitals
Wholly-Owned LLCs ........................................................... Recitals

Section 1.3 <u>Construction</u>. In this Agreement, unless the context otherwise requires:

(a)    references to "writing" or comparable expressions include a reference to facsimile or email transmission or comparable means of communication;

(b)    the phrases "delivered" or "made available" shall mean that the information referred to has been either physically or electronically delivered or physically or electronically made available to the relevant parties hereto;

(c)    words expressed in the singular number shall include the plural and vice versa; words expressed in the masculine shall include the feminine and neuter gender and vice versa;

(d)    references to Articles, Sections, Exhibits, Sections of the FJI Disclosure Letter, Sections of the PSI Disclosure Letter, Sections of the PTC Disclosure Letter, the Preamble and Recitals are references to articles, sections, disclosure letters, the preamble and recitals of this Agreement, and the descriptive headings of the several Articles and Sections of this Agreement are inserted for convenience only, do not constitute a part of

this Agreement and shall not affect in any way the meaning or interpretation of this Agreement;

(e)  references to "day" or "days" are to calendar days;

(f)  references to "the date hereof" shall mean as of the date of this Agreement;

(g)  the words "hereof", "herein", "hereto" and "hereunder", and words of similar import shall refer to this Agreement as a whole and not to any provision of this Agreement;

(h)  this "Agreement" or any other agreement or document shall be construed as a reference to this Agreement or, as the case may be, such other agreement or document as the same may have been, or may from time to time be, amended, varied, novated or supplemented;

(i)  "include", "includes", and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of similar import;

(j)  "primarily" when used in determining which assets are Target Assets shall mean that such asset is used or held for use more in the Business than in the Excluded Business Operations and in determining which Liabilities are Assumed Liabilities means that such Liabilities relate more to the Business than to the Excluded Business Operations;

(k)  the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not simply mean "if";

(l)  references to dollars or "$" are to United States of America dollars; and

(m)  the execution, in and of itself, of this Agreement, and the negotiation of this Agreement by the parties hereto (including the transmission of any drafts of this Agreement between the parties hereto prior to the date hereof) shall not give rise to any right or claim of any kind by any third party (including ConocoPhillips Company and Royal Dutch Shell plc and any of their Affiliates), under any Contract or otherwise.

Section 1.4 Exhibits; Disclosure Letters. The exhibits, the FJI Disclosure Letter, the PSI Disclosure Schedule and the PTC Disclosure Letter are incorporated into and form an integral part of this Agreement.

Section 1.5 Knowledge.

(a)  When any representation, warranty, covenant or agreement contained in this Agreement is expressly qualified by reference to the "**Knowledge of FJI**" or words of similar import, it shall mean the actual knowledge, after reasonable investigation, of the individuals set forth in Section 1.5(a) of the FJI Disclosure Letter.

(b)    When any representation, warranty, covenant or agreement contained in this Agreement is expressly qualified by reference to the "**Knowledge of PTC**" or words of similar import, it shall mean the actual knowledge, after reasonable investigation, of the individuals set forth in Section 1.5(b) of the PTC Disclosure Letter.

(c)    When any representation, warranty, covenant or agreement contained in this Agreement is expressly qualified by reference to the "**Knowledge of PSI**" or words of similar import, it shall mean the actual knowledge, after reasonable investigation, of the individuals set forth in Section 1.5(c) of the PSI Disclosure Letter.

(d)    A Person shall be deemed to have conducted a reasonable investigation if such Person shall have (i) reviewed the relevant representations or warranties contained in this Agreement for purposes of determining the accuracy of such representations or warranties with respect to which such Person would reasonably be expected to have actual knowledge and (ii) to the extent that such Person does not have actual knowledge with respect to any such representation or warranty, inquired of one or more other officers or employees of the Business who would be reasonably likely to have actual knowledge relevant to the accuracy of such representations or warranties.

## Article II

## CONTRIBUTION OF TARGET HOLDINGS

Section 2.1    Contribution of Target Equity Interests. Subject to the terms and conditions set forth in this Agreement, (i) FJI shall contribute, assign, transfer and deliver to PTC on the Closing Date, and PTC shall assume and accept contribution from FJI on the Closing Date of the Target Equity Interests owned by FJI and (ii) PSI shall sell, assign, transfer and deliver to PTC on the Closing Date, and PTC shall purchase from PSI on the Closing Date the PSI TFJ Share, in each case, free and clear of all Liens (other than any rights of first refusal or options granted to any other equityholder in any Target Entity or any Target Subsidiary as disclosed in Section 2.1 of the FJI Disclosure Letter or Section 2.1 of the PSI Disclosure Letter, as applicable (the "**Disclosed Rights**")). Sellers shall take such actions as are reasonably necessary and legally required to reflect the contribution, sale, assignment, transfer and delivery of the Target Equity Interests on the books and records of the Target Entities, free and clear of all Liens (other than the Disclosed Rights) that are released at Closing by operation of, as the case may be, the Plan, the Confirmation Order, the Sale Order, the Bankruptcy Code, or otherwise, and to provide PTC with evidence of the reflection of such contribution, sale, assignment, transfer or delivery as is legally required or reasonably requested by PTC. To the extent that there is any deficiency with respect to any endorsement in connection with the transfer of the Target Equity Interests to PTC hereunder, Sellers agree to cure any deficiencies with respect to the endorsement of any certificates representing the Target Equity Interests or with respect to the stock power accompanying any such certificates.

Section 2.2    Contribution of Target Assets.

(a)    Subject to the terms and conditions set forth in this Agreement, FJI shall, and shall cause the Contributing Affiliates to, contribute, assign, convey and transfer to PTC, and PTC agrees to accept contribution and assume from FJI or such Contributing Affiliate, at the Closing, free and clear of all Liens (other than Business Permitted Liens

(except to the extent that, as the case may be, the Plan, the Confirmation Order, the Sale Order or the Bankruptcy Code operates to release such Business Permitted Liens at Closing)), all of the right, title and interest of FJI or the Contributing Affiliates in, to and under the Target Assets. The term "**Target Assets**" means all of FJI's and the Contributing Affiliates' right, title and interest in, to and under all assets, properties and rights, tangible and intangible, wherever located, that on the Closing Date are, except with respect to Section 2.2(a)(xv) and ownership of any Intellectual Property licensed pursuant to the Trademark License Agreement, primarily used or held for use in the operation or conduct of the Business, including:

(i) the fee-owned real property, leaseholds, subleaseholds and other interests in real property of FJI and the Contributing Affiliates primarily used in the operation or conduct of the Business, including those set forth in Section 2.2(a)(i) of the FJI Disclosure Letter and the Adjacent Excess Real Estate, in each case together with the right, title and interest in all buildings, improvements and fixtures thereon and all other appurtenances thereto and including any prepaid rent, security deposits and options to purchase or renew in connection therewith (the "**Target Real Property**");

(ii) all tangible personal property and interests therein, including machinery, equipment, furnishings and vehicles ("**Personal Property**"), of FJI and the Contributing Affiliates and all other Personal Property that on the Closing Date is located on the Target Real Property or is primarily used or held for use in the operation or conduct of the Business (including all laptops, desktops and associated computer hardware and other work equipment used by the Transferred Employees (but no laptops, desktops, associated computer hardware, or other work equipment for any Business Employee that is not a Transferred Employee or any employee of FJI or any of its Subsidiaries that does not primarily provide services to the Business, all of which shall be Excluded Assets), including any external storage devices and storage media, held by FJI or the Contributing Affiliates that on the Closing Date are primarily used in the operation or conduct of the Business), and all other Personal Property of FJI and the Contributing Affiliates that on the Closing Date is primarily used or held for use in the operation or conduct of the Business;

(iii) the Assigned Business Intellectual Property and the license rights to certain Business Intellectual Property licensed pursuant to the Trademark License Agreement (it being understood that the license rights so licensed are included within the Target Assets);

(iv) all inventory of FJI and the Contributing Affiliates that is primarily used or held for use in, or that primarily arises out of, the operation or conduct of the Business to the extent included or to be included in Closing Business Working Capital;

(v) all accounts receivable of FJI and the Contributing Affiliates, to the extent primarily relating to the Business and included or to be included in Closing Business Working Capital;

(vi) all credits, prepaid expenses, deferred charges and prepaid items of FJI and the Contributing Affiliates that are primarily used in, or that primarily arise out

of, the operation or conduct of the Business and included or to be included in Closing Business Working Capital;

(vii) all Contracts to which FJI or any of the Contributing Affiliates is a party or by which any Target Asset is bound that are primarily used in, or that primarily relate to, the operation or conduct of the Business, (i) including the Contracts set forth in Section 2.2(a)(vii)(A) of the FJI Disclosure Letter, but only if they are primarily used in, or primarily relate to, the operation or conduct of the Business, but (ii) excluding the Contracts set forth in Section 2.2(a)(vii)(B) of the FJI Disclosure Letter (the "**Target Contracts**");

(viii) to the extent transferable, all Permits (as defined below) of FJI and the Contributing Affiliates that are primarily related to the operation or conduct of the Business (the "**Target Permits**");

(ix) all rights, claims, counter-claims, defenses and credits, including and in respect of all guarantees, warranties, indemnities and similar rights ("**Rights**"), in favor of FJI and the Contributing Affiliates, to the extent primarily relating to the Business or to any Assumed Liability;

(x) originals of all books of account, ledgers, general, financial and accounting records, stock record books of or related to the Business, files, invoices, customers' and suppliers' lists, other distribution lists, billing records, sales and promotional literature, manuals and customer and supplier correspondence and all other historical records and data to the extent relating to the Business (in all cases, in any form or medium) of FJI and the Contributing Affiliates that are primarily used in, or that primarily arise out of, the operation or conduct of the Business; provided, however, (i) to the extent that the originals of any such documents contain material relating to businesses other than the Business, then copies of such documents, with information related to other businesses of FJI and its Subsidiaries redacted, may be delivered instead of originals and (ii) in no event shall Target Assets include stock record books of FJI or any Subsidiary (other than Target Entities or Target Subsidiaries);

(xi) all goodwill to the extent incident to or associated with the Business, the Target Assets, the Target Entities or the Target Subsidiaries;

(xii) all causes of action (whether or not asserted as of the Closing Date) to the extent primarily relating to the Business, the Target Assets, the Target Entities or the Target Subsidiaries (including against vendors, suppliers or customers) or FJI's operations relating thereto, arising under Chapter 5 of the Bankruptcy Code, or under similar state or foreign Law;

(xiii) to the fullest extent permitted by applicable Law, all personnel records (or copies of personnel records) of the Transferred Employees;

(xiv) cash at the Target Real Property which is transferred to PTC at the Closing and is included in the calculation of Closing Business Net Debt (the "**Included Cash**");

(xv) without duplication, all other assets, properties and rights, tangible and intangible, wherever located, of the Wholly-Owned Companies, whether or not such assets, properties and rights are primarily used or held for use in the operation or conduct of the Business; and

(xv) without duplication, all other assets included or to be included in the calculation of Business Working Capital.

(b)    Notwithstanding anything to the contrary contained in this Agreement, the Target Assets shall not include any of the following assets (such assets, the "**Excluded Assets**"):

(i) all Cash and Cash Equivalents of FJI and the Contributing Affiliates, other than Included Cash, and other current assets listed in Section 2.2(b)(i) of the FJI Disclosure Letter not included or to be included in the computation of Closing Business Working Capital (the "**Excluded Current Assets**");

(ii) all cash and other assets of or relating to any FJI Employee Benefit Plans;

(iii) all Rights of FJI and the Contributing Affiliates to the extent relating to any Excluded Asset or any Excluded Liability, including any such Rights arising under insurance policies in favor of FJI and the Contributing Affiliates in respect of any other Excluded Asset or any Excluded Liability;

(iv) any refund or credit of Taxes;

(v) all rights of FJI and the Contributing Affiliates under this Agreement and the other agreements and instruments executed and delivered in connection with this Agreement;

(vi) (x) all Contracts of FJI and the Contributing Affiliates for the employment of any officer, individual employee or other Person on a full-time or consulting basis and all severance agreements of FJI and the Contributing Affiliates and (y) all Contracts set forth in Section 2.2(b)(vi)(y) of the FJI Disclosure Letter;

(vii) all causes of action of FJI's estate under Chapter 5 of the Bankruptcy Code, but only to the extent such causes of action do not constitute Target Assets;

(viii) any records of FJI and the Contributing Affiliates to the extent relating to any Excluded Asset or Excluded Liability;

(ix) all insurance policies of FJI and the Contributing Affiliates;

(x) the Excluded Business Operations; and

(xi)  the assets listed in Section 2.2(b)(xi) of the FJI Disclosure Letter.

(c)    If at any time after the Closing, FJI or any of its Subsidiaries is in possession of any Target Asset, receives any payment, refund or reimbursement from any

28

Person in respect of any Target Asset and such payment, refund or reimbursement is not otherwise an Excluded Asset, or otherwise acquires or possesses any rights, entitlements or assets in respect of the Target Assets and such rights, entitlements or assets are not Excluded Assets, such payments, refunds, rights, entitlements or assets, as applicable, shall be held by FJI or such Subsidiary, as applicable, in trust for the benefit of PTC and, promptly following the receipt thereof, FJI or such Subsidiary, as applicable, shall pay over any such amounts to PTC without set off or deduction of any kind and/or shall, at PTC's cost and expense, execute and deliver any instruments of transfer or assignment that are necessary to transfer and assign to PTC or its designee, or otherwise vest PTC or such designee with title to, such rights, entitlements or assets.  If at any time after the Closing, PTC, any PTC Subsidiary, any Target Entity or any Target Subsidiary is in possession of any Excluded Asset or receives any payment, refund or reimbursement from any Person in respect of any Excluded Asset and such payment, refund or reimbursement is not otherwise a Target Asset, or otherwise acquires or possesses any rights, entitlements or assets in respect of the Excluded Assets and such rights, entitlements or assets are not Target Assets, such payments, refunds or reimbursements, as applicable, shall be held by PTC or such PTC Subsidiary, Target Entity or Target Subsidiary, as applicable, in trust for the benefit of FJI and, promptly following the receipt thereof, PTC or such PTC Subsidiary, Target Entity or Target Subsidiary, as applicable, shall pay over any such amounts to FJI without set-off or deduction of any kind and/or shall, at FJI's cost, execute and deliver any instruments of transfer or assignment that are necessary to transfer and assign to FJI or its designee, or otherwise vest FJI or its designee with title to, such payments, refunds or reimbursements.

<div align="center">Section 2.3  Assumption of Liabilities; Excluded Liabilities.</div>

Subject to the terms and conditions set forth in this Agreement, without limiting the Liabilities of the Target Entities and Target Subsidiaries (which will remain Liabilities of the Target Entities and the Target Subsidiaries but subject to the rights of the PTC Indemnitees to indemnification under Article IX), PTC shall assume, effective as of the Closing, and from and after the Closing, shall pay, perform and discharge, or cause to be paid, performed and discharged when due, the following Liabilities of FJI and the Contributing Affiliates (collectively, the "**Assumed Liabilities**"):

(a)    all Liabilities under the Target Contracts relating to performance of such Target Contracts to the extent performance is due on or after the Closing Date;

(b)    PTC Cure Cost Obligations;

(c)    all Liabilities relating to or arising from the rejection by FJI or any Contributing Affiliate of (i) any Contract listed in Section 2.2(a)(vii)(B) of the FJI Disclosure Letter, but only if they are primarily used in, or primarily relate to, the operation or conduct of the Business, and (ii) subject to Section 5.1(a), any Target Contract removed from the Assumption Schedule pursuant to Section 2.4(b) (such Liabilities, "**Rejection Liabilities**");

(d)    all Liabilities in respect of any Action pending as of the Closing Date arising primarily out of the operation or conduct of the Business, including any Action under appeal and including all Actions listed in Section 2.3(d) of the FJI Disclosure Letter;

<div align="center">29</div>

(e)    all Liabilities in respect of the ownership or operation of any of the Target Real Property;

(f)    all Liabilities included or to be included in the calculation of Closing Business Net Debt;

(g)    all Liabilities arising under Environmental Laws or relating to Hazardous Substances and relating to the Target Real Property or arising primarily out of the operation or conduct of the Business, whether prior to or after the Closing;

(h)    all Liabilities arising out of the operation or conduct of the Business on and after the Petition Date;

(i)    all Liabilities from personal injuries or property damage claims arising primarily out of the operation of the Business that have been incurred but not reported on or prior to the Closing Date;

(j)    all accounts payable (including trade and SG&A payables to FJI and its Affiliates (other than the Target Entities or the Target Subsidiaries)) arising primarily out of the operation or conduct of the Business on and after the Petition Date to the extent such accounts payable are included or to be included in Business Working Capital;

(k)    all Taxes arising from the operation of the Business, excluding Income Taxes (for the avoidance of doubt, such Income Taxes shall include all Liabilities for Income Taxes as a result of (x) being a transferee or successor or, member of a combined, consolidated, unitary or affiliated group, or (y) a contractual obligation to indemnify any Person);

(l)    all Liabilities of FJI and the Contributing Affiliates that PTC has expressly agreed to assume pursuant to this Agreement, including the employee-related Liabilities referred to in Section 5.14;

(m)    without duplication, all other Liabilities (other than Liabilities for Income Taxes excluded pursuant to Section 2.3(k) hereof) of the Wholly-Owned Companies, whether or not such Liabilities relate primarily to the Business; and

(n)    all other Liabilities included or to be included in Closing Business Working Capital.

Notwithstanding anything to the contrary contained in this Agreement, the parties hereto expressly acknowledge and agree that PTC shall not assume or agree to pay, perform or otherwise discharge, or be liable or responsible for any Liabilities of FJI or any of its Contributing Affiliates (other than the Target Entities and the Target Subsidiaries), including any expenses payable by FJI pursuant to Section 10.1, related to the Target Assets, other than the Assumed Liabilities (such Liabilities, the "**Excluded Liabilities**"). The parties acknowledge and agree that none of the Liabilities of FJI to ConocoPhillips Company, Douglas Oil Company of California, or Big West Oil Company pursuant to that certain Partnership Agreement of CFJ Properties (the "**CFJ Properties Partnership Agreement**"), dated February 1, 1991, by and among Douglas Oil Company of California, Big West Oil Company and FJI (as operator), as

amended, related to or arising out of FJI's actions (or failure to act) as an Operator (as such term is defined in the CFJ Properties Partnership Agreement) shall be assumed under this Agreement and all such Liabilities shall be Excluded Liabilities for purposes of this Agreement.

Section 2.4 <u>Bankruptcy Matters</u>.

(a)    In the Plan and the Confirmation Hearing, or in the Sale Motion and at the Sale Hearing (subject to the Bankruptcy Code, applicable Law and Bankruptcy Court approval), as the case may be, FJI shall seek authorization to assume the Target Contracts of FJI and assign them to PTC or its designated assignee in accordance with section 365 of the Bankruptcy Code. The amounts, if any, required to cure any defaults under any Target Contracts of FJI (the "**Cure Amounts**"), shall be paid (i) by FJI at the Closing (except to the extent later payment is otherwise agreed by the other party to each such Target Contract) to the extent that such Cure Amount relates to amounts due and owing under any such Target Contract prior to the Petition Date (the "**FJI Cure Cost Obligations**"), and PTC shall have no obligations or Liabilities for FJI Cure Cost Obligations and (ii) by PTC at the Closing (except to the extent later payment is otherwise agreed by the other party to each such Target Contract) to the extent that such Cure Amount relates to amounts due and owing under any such Target Contract on or after the Petition Date (the "**PTC Cure Cost Obligations**"), and, except as included or to be included in the computation of Closing Business Working Capital, FJI shall have no obligation or Liabilities for PTC Cure Cost Obligations.  FJI shall provide notice to all counterparties to such Target Contracts of, as the case may be, the Plan and the Confirmation Hearing pursuant to the Scheduling Order and of the Sale Motion and Sale Hearing.  The Plan and the Sale Motion, as the case may be, shall include an exhibit of all Target Contracts of FJI (the "**Assumption Schedule**") which shall set forth the proposed Cure Amounts (which proposed Cure Amounts shall be submitted to PTC for review and comment prior to filing thereof and shall provide PTC with such information in FJI's possession as may be reasonably requested by PTC so that it may verify such Cure Amounts) and an objection deadline (the "**Objection Deadline**") for any counterparty to object to such proposed amounts which deadline shall be at least five (5) days prior to the Sale Hearing. FJI's estimates of the Cure Amounts described in this <u>Section 2.4(a)</u> as of December 15, 2009, together with the portion thereof that are as of such date FJI Cure Cost Obligations and PTC Cure Cost Obligations, are set forth in <u>Section 2.4(a)</u> of the FJI Disclosure Letter. FJI shall cooperate with and provide additional information in its possession to PTC in order to identify and provide to PTC as promptly as practicable all Target Contracts listed on the Assumption Schedule in addition to any estimated Cure Amounts related thereto.  FJI shall deliver to PTC an estimate as of the Closing Date of the Cure Amounts described in this <u>Section 2.4(a)</u> (other than the portion thereof to be included in Closing Business Working Capital) no later than twenty (20) days in advance of the Closing Date.

(b)    PTC shall have the right to amend the Assumption Schedule at any time up to five (5) Business Days before the Closing to remove Contracts therefrom.  All non-FJI parties to the Target Contracts shall have until the Objection Deadline to file an objection (an "**Assumption Objection**") to the assumption and assignment of the Target Contracts listed on the Assumption Schedule to which they are parties, or to the Cure Amounts listed for those Target Contracts.

(c)    PTC shall have the right to amend the Assumption Schedule at any time prior to five (5) Business Days before the Closing to add additional Target Contracts thereto.  FJI

shall promptly file and serve notice of any such amendment (an **"Amendment Notice"**) on all non-FJI parties to the Target Contracts added to the Assumption Schedule by such amendment. All non-FJI parties to the Target Contracts added to the Assumption Schedule pursuant to this paragraph shall have until ten (10) days after the date of service of the applicable Amendment Notice to file an Assumption Objection.

        (d)    If an Assumption Objection is timely filed, the Bankruptcy Court may hold a hearing with respect to such Assumption Objection either at (i) the Confirmation Hearing or the Sale Hearing, as the case may be, or (ii) at such other date as the Bankruptcy Court shall designate prior to the Closing if the Assumption Objection relates to an Amendment Notice. Subject to Section 2.4(b) of this Agreement, if the Assumption Objection relates only to the Cure Amount of a Target Contract, such Target Contract may be assumed by FJI and assigned to PTC; provided, however, that, if not resolved prior to Closing, the amount asserted by the objecting party as the proper Cure Amount, or a different amount set by the Bankruptcy Court, shall be held in escrow pending further order of the Bankruptcy Court or mutual agreement of the parties hereto as to the proper Cure Amount for such Target Contract.

        (e)    To the extent necessary to obtain the approval of the Bankruptcy Court to the assumption of any Target Contract on the Assumption Schedule, PTC shall provide adequate assurance of the future performance of such Target Contract by PTC or one of its Subsidiaries.

        (f)    Any motions filed by FJI with, and any proposed orders submitted by FJI to, the Bankruptcy Court seeking authorization after the date hereof to assume or reject any Target Contracts shall be submitted to PTC for a reasonable opportunity for review and comment prior to filing and shall be in form and substance satisfactory to the parties.

<div align="center">Section 2.5  Purchase Price; Delivery of Funds.</div>

        (a)    At least five (5) Business Days, but not more than seven (7) Business Days prior to the Closing Date, FJI shall prepare and deliver to PTC (x) an unaudited pro forma balance sheet of the Business as of the Closing Date and (y) a statement (the **"Estimated Business Closing Statement"**) setting forth (A) FJI's good faith estimate of the amount of the Closing Business Net Debt (the **"Estimated Closing Business Net Debt"**), and FJI's good faith estimate of the amount of the Closing PSI TFJ Net Debt Share (the **"Estimated Closing PSI TFJ Net Debt Share"**), (B) FJI's good faith estimate of the Closing Business Working Capital (the **"Estimated Business Working Capital"**) and FJI's good faith estimate of the amount of the Closing PSI TFJ Working Capital Share (the **"Estimated Closing PSI TFJ Working Capital Share"**), and (C) the calculation of the Initial Purchase Price and the PSI Initial Consideration, in each case as of the Closing Date, which shall quantify in reasonable detail the items constituting such Estimated Closing Business Net Debt, such Estimated Closing PSI TFJ Net Debt Share, such Estimated Business Working Capital, such Estimated Closing PSI TFJ Working Capital Share and the Initial Purchase Price or PSI Initial Consideration, if any, and shall be prepared in accordance with GAAP applied on a basis consistent with the methodologies, practices, estimation techniques, assumptions, policies and principles used in the preparation of the Business Financial Statements except as set forth in Section 1.1(iii) of the FJI Disclosure Letter. Within three (3) Business Days after the delivery by FJI to PTC of the items set forth in the immediately preceding sentence, PTC shall, using the Initial Purchase Price delivered by FJI, prepare and deliver to FJI a statement setting forth PTC's good faith estimate of the PTC Per

<div align="center">32</div>

Unit Value (including a calculation of the individual components set forth in clauses (ii), (iii) and (iv) of the definition of "Initial PTC Equity Value" and the number of PTC Pro Forma Units Outstanding) as of the Closing Date (and such statement prepared in accordance with GAAP applied on a consistent basis with the methodologies, practices, estimation techniques, assumptions, policies and principles used in the preparation of the PTC Financial Statements except as set forth in Section 1.1(ii) of the PTC Disclosure Letter).

(b)    At the Closing, PTC shall pay to PSI in cash, in full consideration for the sale by PSI of the PSI TFJ Share (subject to the adjustment set forth in Section 2.6), the PSI Initial Consideration. At the Closing, subject to Section 2.5(c), PTC shall pay to FJI, in full consideration for the contribution by FJI and its Contributing Affiliates of the Target Holdings (subject to the adjustments set forth in Section 2.6), the Initial Purchase Price, which shall be paid in the form of: (i) $515,000,000 (the "**Cash Consideration**"), and (ii) the remainder in a number of membership units of PTC ("**PTC Units**") determined in accordance with the following sentence (the consideration issued pursuant to this clause (ii), the "**Initial Equity Consideration**"). At Closing, as the Initial Equity Consideration, PTC shall issue to FJI a number of Class B Units having the rights specified in the Third Amended and Restated LLC Agreement and in the Amended and Restated Investor Rights Agreement (the "**Class B Units**") such that upon such issuance, FJI's Ownership Ratio (assuming for the purpose of determining the Initial Equity Consideration hereunder, the issuance of all PTC Units issuable upon the conversion of any options, warrants or other rights issued pursuant to clause (x) of Section 5.12(a)) shall equal the percentage obtained by multiplying 100 by a fraction (y) the numerator of which is the Initial Equity Consideration Value and (x) the denominator of which is the Initial PTC Pro Forma Equity Value.  PTC acknowledges and agrees that immediately after the Closing, all of the issued and outstanding PTC Units (which shall be deemed to include, for this purpose, the PTC Units issued or to be issued or issuable in accordance with Section 5.12 hereof) shall be Common Units (as such term is defined in the Amended and Restated LLC Agreement)).  The Cash Consideration and the PSI Initial Consideration shall be paid by wire transfer of immediately available funds to the accounts designated in writing by Sellers to PTC, such accounts to be designated no later than two (2) Business Days prior to the Closing Date; provided, that the parties hereto acknowledge and agree that PTC shall, and FJI hereby directs PTC to, pay a portion of the Cash Consideration required to be paid by PTC pursuant to this Section 2.5(b) directly to PTC as Lender under the DIP Facility in accordance with clauses (i) and (ii) below of this Section 2.5(b) and in accordance with Section 2.5(c) as follows (and upon such payments PTC acknowledges and agrees that the DIP Facility is terminated in full and, at the Closing, shall deliver a pay-off and lien release letter in customary form reasonably acceptable to FJI with respect thereto):

(i)    an amount equal to the sum of: (x) the principal of all then outstanding Loans (as defined in the DIP Facility), together with all accrued interest thereon; and (y) all other costs, expenses, fees and other amounts then due and payable by FJI under the DIP Facility, including all amounts owing with respect to any Letters of Credit (as defined in the DIP Facility) which have been drawn upon, or surety or similar bonds issued pursuant to the DIP Facility and which have been drawn upon (the "**DIP Repayment Amount**"), and in the case of each of clauses (i)(x) and (i)(y) above, such funds shall be deposited by PTC in the account(s) notified by the Lender under the DIP Facility for this purpose; and

(ii)      with respect to any outstanding Letter of Credit (as defined in the DIP Facility) not issued in connection with the Business (x) as set forth in Section 2.5(b) of the FJI Disclosure Letter or (y) issued after the date hereof, in each case that may be terminated in accordance with its terms on its original expiry date, an amount equal to 105% of the aggregate Stated Amount (as defined in the DIP Facility) of each such outstanding Letter of Credit as Cash Collateral (as defined in the DIP Facility) in accordance with the terms of the DIP Facility, with such funds to be deposited in the Letter of Credit Cash Collateral Account (as defined in the DIP Facility) in accordance with the terms of the DIP Facility; provided that, promptly, but in any event within five (5) Business Days, after such Letter of Credit is returned for cancellation, the Cash Collateral, together with all interest and earnings thereon, shall be paid by PTC to FJI;

and any such payments to PTC as Lender under the DIP Facility shall be considered part of the Initial Purchase Price for all purposes of this Agreement.

(c)      In addition to any payments to be made pursuant to Section 2.5(b), in relation to any surety or similar bond not issued in connection with the Business which has been issued pursuant to the DIP Facility on an "evergreen basis" (x) as set forth in Section 2.5(c) of the FJI Disclosure Letter or (y) issued after the date hereof, and in each case which shall be outstanding on the Closing Date (the "**Non-Business Evergreen Bonds**"), the parties hereto hereby acknowledge and agree that, effective as of the Closing, (i) PTC shall, and FJI hereby directs PTC to, pay a portion of the Cash Consideration directly to PTC as Lender under the DIP Facility in an amount equal to 105% of the aggregate Stated Amount (as defined in the DIP Facility) of each outstanding Non-Business Evergreen Bond, with such funds to be deposited in the Letter of Credit Cash Collateral Account (as defined in the DIP Facility) and any such payments to PTC as Lender under the DIP Facility shall be considered part of the Initial Purchase Price for all purposes of this Agreement, and (ii) for each day following the Closing until all such Non-Business Evergreen Bonds have been cancelled and terminated as required under this Section 2.5(c), FJI shall pay to PTC on a monthly basis in arrears an amount equal to 5% per annum of the Stated Amount (as defined in the DIP Facility) of the Non-Business Evergreen Bonds (calculated on a daily basis on such Stated Amount in respect of the Non-Business Evergreen Bonds still outstanding on each such day and on the basis of a year of 360 days); provided that, promptly, but in any event within five (5) Business Days, after such Non-Business Evergreen Bond is returned for cancellation, the amounts paid pursuant to clause (i) of this Section 2.5(c), together with all interest and earnings thereon, shall be paid by PTC to FJI.

Section 2.6    Determination of Purchase Price Adjustment and Allocation.

(a)      Promptly after the Closing Date, but in no event later than ninety (90) days following the Closing Date, (i) FJI shall prepare and deliver to PTC (A) an unaudited pro forma balance sheet of the Business (the "**Closing Business Balance Sheet**"), (B) a statement (the "**Closing Business Statement**") setting forth FJI's calculations ("**FJI's Proposed Calculation**") of (w) the amount of the Closing Business Net Debt and the amount of the Closing PSI TFJ Net Debt Share, (x) the amount, if any, by which the Estimated Closing Business Net Debt (or the Estimated Closing PSI TFJ Ned Debt Share, as applicable) differs from the Closing Business Net Debt (or the Closing PSI TFJ Ned Debt Share, as applicable) (the "**Business Net Debt Adjustment**" and the "**PSI Net Debt Adjustment**", as applicable), (y) the amount of the Closing Business Working Capital and the amount of the

Closing PSI TFJ Working Capital Share and (z) the amount, if any, by which the Target Business Working Capital (or the PSI Target TFJ Working Capital, as applicable) differs from the Closing Business Working Capital (or the Closing PSI TFJ Working Capital Share, as applicable) (the "**Business Working Capital Adjustment**" and the "**PSI TFJ Working Capital Adjustment**", as applicable), (C) a recalculation of the PSI Initial Consideration based on the PSI Net Debt Adjustment and the PSI TFJ Working Capital Adjustment and a recalculation of the Initial Purchase Price based on the Business Net Debt Adjustment and the Business Working Capital Adjustment and (D) an allocation of such recalculated Initial Purchase Price among the Target Entities and Target Assets in accordance with the respective fair market values (the "**Proposed Business Allocation**") and (ii) PTC shall prepare and deliver to FJI (A) an unaudited consolidated balance sheet of PTC and the PTC Subsidiaries (the "**Closing PTC Balance Sheet**" and, together with the Closing Business Balance Sheet, the "**Closing Balance Sheets**"), (B) a statement (the "**Closing PTC Statement**") setting forth PTC's calculation ("**PTC's Proposed Calculation**" and, together with FJI's Proposed Calculation, the "**Proposed Calculations**") of (u) the amount of Closing PTC Net Debt, (v) the amount, if any, by which the Estimated Closing PTC Net Debt differs from the Closing PTC Net Debt (the "**PTC Net Debt Adjustment**"), (w) the amount of the Closing PTC Working Capital, (x) the amount, if any, by which the Target PTC Working Capital differs from the Closing PTC Working Capital (the "**PTC Working Capital Adjustment**"), (y) the number of PTC Units outstanding as of immediately after giving effect to the Closing (which shall include the PTC Units issued or to be issued in accordance with the BDT Term Sheet and any PTC Units issued or issuable in connection with any equity kicker as contemplated hereby) and (z) a calculation of the Mortgage Costs pursuant to Section 5.15(c) hereof and (C) a recalculation of the Initial PTC Equity Value based on the PTC Net Debt Adjustment and PTC Working Capital Adjustment.    FJI's Proposed Calculation shall be made in accordance with GAAP applied on a basis consistent with the methodologies, practices, estimation techniques, assumptions, policies and principles used in the preparation of the Business Financial Statements except as set forth in Section 1.1(iii) of the FJI Disclosure Letter.   PTC's Proposed Calculation shall be made in accordance with GAAP applied on a consistent basis with the methodologies, practices, estimation techniques, assumptions, policies and principles used in the preparation of the PTC Financial Statements except as set forth in Section 1.1(ii) of the PTC Disclosure Letter. Upon delivery of the Closing PTC Balance Sheet and the Closing PTC Statement by PTC, PTC shall provide FJI and its Representatives with reasonable access to PTC's accounting and other personnel and to the books and records of PTC during normal business hours, in order to allow FJI and its Representatives to verify the accuracy of PTC's determination of the items set forth in the Closing PTC Balance Sheet and Closing PTC Statement.   Upon delivery of the Closing Business Balance Sheet, Closing Business Statement and Proposed Business Allocation by FJI, FJI shall provide PTC and its Representatives with reasonable access to FJI's accounting and other personnel and to the books and records of FJI, the Target Entities and the Target Subsidiaries relating to the Business during normal business hours, in order to allow PTC and its Representatives to verify the accuracy of FJI's determination of the items set forth in the Closing Business Balance Sheet, Closing Business Statement and Proposed Business Allocation.

(b)    In the event that PTC does not object to the Closing Business Balance Sheet, the Closing Business Statement, FJI's Proposed Calculation or the Proposed Business Allocation within thirty (30) days after PTC's receipt of such items by delivery of a written

notice of objection to FJI, the recalculation of the Initial Purchase Price and the Proposed Business Allocation pursuant to FJI's proposed calculations shall be deemed final and binding. In the event that FJI does not object to the Closing PTC Balance Sheet, the Closing PTC Statement, or the PTC's Proposed Calculation within thirty (30) days after FJI's receipt of such items by delivery of a written notice of objection to FJI, the recalculation of the Initial PTC Equity Value shall be deemed final and binding.

(c)    A notice of objection delivered pursuant to <u>Section 2.6(b)</u> (each, a "**Notice of Objection**") shall (i) in the case of a Notice of Objection delivered by FJI, set forth in reasonable detail (A) FJI's alternative calculation of the amount of the Closing PTC Net Debt, and/or Closing PTC Working Capital, as the case may be, (B) FJI's recalculation of the Initial PTC Equity Value, and (C) FJI's alternative calculation of the Mortgage Costs or (ii) in the case of a Notice of Objection delivered by PTC, set forth in reasonable detail (A) PTC's alternative calculation of the Closing Business Net Debt, Closing PSI TFJ Net Debt Share, Closing Business Working Capital, Closing PSI TFJ Working Capital Share and/or Proposed Business Allocation, as the case may be and (B) PTC's recalculation of the Initial Purchase Price and/or the PSI Initial Consideration, as the case may be.

(d)    In the event that FJI and/or PTC delivers a Notice of Objection to the other party within the thirty (30) day period referred to in <u>Section 2.6(b)</u>, then (i) any amount of the adjustment to the Initial Purchase Price, PSI Initial Consideration, Proposed Business Allocation, Initial PTC Equity Value, and/or the Mortgage Costs, as the case may be, that is not in dispute on the date such Notice of Objection is given shall be treated as final and binding and (ii) any dispute (all such disputed amounts, the "**Disputed Amounts**") shall be resolved as follows:

(w)    FJI and PTC shall promptly endeavor in good faith to resolve the Disputed Amounts listed in any Notice of Objection. In the event that a written agreement determining the Disputed Amounts has not been reached within ten (10) Business Days (or such longer period as may be agreed to by FJI and PTC) after the date of receipt by PTC from FJI of the Notice of Objection, the resolution of such Disputed Amounts shall be submitted to Deloitte & Touche LLP or, to the extent Deloitte & Touche LLP is not then independent of the parties or as otherwise agreed by the parties, any other independent firm agreed to by the parties (the "**Accountant**");

(x)    FJI and PTC shall use their commercially reasonable efforts to cause the Accountant to render a decision in accordance with this <u>Section 2.6(d)</u> along with a statement of reasons therefor within thirty (30) days of the submission of the Disputed Amounts, or a reasonable time thereafter, to the Accountant. The decision of the Accountant shall be final and binding upon each party hereto and the decision of the Accountant shall constitute an arbitral award that is final, binding and non-appealable and upon which a judgment may be entered by a court having jurisdiction thereover;

(y)    in the event FJI and PTC submit any Disputed Amounts to the Accountant for resolution, FJI and PTC shall each pay their own costs and expenses incurred under this <u>Section 2.6(d)</u>. Each of FJI and PTC shall be responsible for one-half of the fees and costs of the Accountant; and

(z) the Accountant shall act as an arbitrator to determine, based upon the provisions of this Section 2.6(d) and the other provisions of this Agreement, only the Disputed Amounts and the determination of each amount of the Disputed Amounts shall be made in accordance with the procedures set forth in Section 2.6(a) and, in any event shall be no less than the lesser of the amount claimed by either FJI or PTC, and shall be no greater than the greater of the amount claimed by either FJI or PTC.

(e)     Upon the determination, in accordance with Sections 2.6(b) or 2.6(d), of the final calculations of the amounts of the Closing Business Net Debt, the Closing PSI TFJ Net Debt Share, the Closing Business Working Capital, Closing PSI TFJ Working Capital Share and the Mortgage Costs, the Initial Purchase Price and/or the PSI Initial Consideration, as paid in accordance with Section 2.5(b), and the Proposed Business Allocation shall be adjusted using such finally determined amounts. The term "**Final Purchase Price**" means the result of such adjustment to the Initial Purchase Price. The term "**PSI Final Consideration**" means the result of such adjustment to the PSI Initial Consideration. The term "**Final Business Allocation**" means the result of such adjustment to the Proposed Business Allocation.

(f)     Upon the determination, in accordance with Sections 2.6(b) or 2.6(d), of the final calculations of the amounts of the Closing PTC Net Debt, the Closing PTC Working Capital and the Initial PTC Equity Value shall be adjusted using such finally determined amounts (for the avoidance of doubt, the Initial Purchase Price shall be reduced by the full amount of the Mortgage Costs, as finally determined in accordance with Sections 2.6(b) or 2.6(d)). The term "**Final PTC Equity Value**" means the result of such adjustment to the Initial PTC Equity Value.

(g)     The parties agree that, from and after the Closing, the provisions of this Section 2.6 and the dispute resolution provisions contemplated hereby shall be the exclusive remedy and exclusive forum of the parties with respect to the determination of Closing Business Working Capital, Closing PSI TFJ Working Capital Share, Closing Business Net Debt, Closing PSI TFJ Net Debt Share, Proposed Business Allocation, Closing PTC Working Capital, Closing PTC Net Debt and Mortgage Costs.

(h)     Subject to Section 8.1(f), if the Final Purchase Price is greater than the Initial Purchase Price and/or the Final PTC Equity Value is less than the Initial PTC Equity Value, then, within three (3) Business Days of the determination of the Final Purchase Price and the Final PTC Equity Value PTC shall issue and deliver to FJI a number of Class B Units such that upon such issuance and delivery, FJI's Ownership Ratio (assuming for the purpose of determining FJI's Ownership Ratio pursuant to this Section 2.6(h), the issuance of all PTC Units issuable upon the conversion of any options, warrants or other rights issued pursuant to clause (x) of Section 5.12(a)) shall equal the percentage obtained by multiplying 100 by a fraction (y) the numerator of which is the Final Equity Consideration Value and (x) the denominator of which is the Final PTC Pro Forma Equity Value. If the Final Purchase Price is less than the Initial Purchase Price and/or the Final PTC Equity Value is greater than the Initial PTC Equity Value, then, within three (3) Business Days of the determination of the Final Purchase Price and the Final PTC Equity Value, FJI shall (i) deliver to PTC a number of Class B Units such that upon such delivery, FJI's Ownership Ratio (assuming for the purpose of determining FJI's Ownership Ratio pursuant to this Section 2.6(h), the issuance of all PTC Units issuable upon the conversion of any options, warrants or other rights issued

pursuant to clause (x) of Section 5.12(a)) shall equal the percentage obtained by multiplying 100 by a fraction (y) the numerator of which is the Final Equity Consideration Value and (x) the denominator of which is the Final PTC Pro Forma Equity Value or (ii) at FJI's election, deliver to PTC cash in an amount equal to the aggregate amount of such difference; provided, that (x) at its election, FJI may deliver to PTC a combination of Class B Units and cash in satisfaction of the foregoing and (y) if the aggregate value of all of the Class B Units held by FJI (valued using the PTC Per Unit Value) is not sufficient to allow FJI to pay PTC the full amount of such deficiency, FJI shall pay the remaining amount of such deficiency to PTC in cash. The amount payable by FJI, PSI or PTC, as applicable pursuant to this Section 2.6(h) or Section 2.6(i) hereof is referred to herein as the **"Purchase Price Adjustment"** and shall be treated as such for federal, state, local and foreign income tax purposes. For the avoidance of doubt, set forth on **Exhibit VII** is an example of the method for calculating the Final Purchase Price, the Final PTC Equity Value and the amounts, if any, due under this Section 2.6(h), assuming that the Closing Date was October 31, 2009.

(i)     If the PSI Final Consideration is greater than the PSI Initial Consideration, then PTC shall be obligated to pay to PSI an amount that equals the aggregate amount of such difference within three (3) Business Days of the determination of the PSI Final Consideration by wire transfer of immediately available funds to the account designated in writing by PSI to PTC no later than two (2) Business Days prior to the date of such payment. If the PSI Final Consideration is less than the PSI Initial Consideration, then PSI shall be obligated to pay to PTC an amount that equals the aggregate amount of such difference within three (3) Business Days of the determination of the PSI Final Consideration by wire transfer of immediately available funds to the account designated in writing by PTC to PSI no later than two (2) Business Days prior to the date of such payment. To the extent practicable, the PSI Final Consideration shall be calculated using the method set forth in **Exhibit VII.**

Section 2.7    Closing; Closing Deliverables.

(a)     Unless this Agreement shall have been terminated pursuant to Article VIII, and subject to the satisfaction or waiver of all of the conditions set forth in Article VI, the closing of the transactions referred to in Section 2.1, Section 2.2 and Section 2.3 (the "**Closing**") shall take place at 10:00 A.M. at the offices of White & Case LLP, 1155 Avenue of the Americas, New York, New York, 10036-2787, on the third (3rd) Business Day after the last of the conditions set forth in Article VI is satisfied or waived (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the fulfillment or waiver of those conditions), or at such other time, date or place as the parties hereto shall agree in writing; provided, that, at PTC's option, the date of the Closing may be delayed for up to thirty (30) days following the expiration of all applicable waiting periods in connection with the Antitrust Filings, but, without the consent of FJI, not later than April 30, 2010. The date on which the Closing occurs is referred to as the **"Closing Date."**

(b)     At the Closing, FJI shall deliver or cause to be delivered to PTC:

(i)     (x) regarding Target Equity Interests that are certificated, certificates representing such Target Equity Interests, duly endorsed in blank, or accompanied by either stock powers duly executed in blank by FJI or such other

instruments of transfer as are reasonably acceptable to PTC, and (y) regarding Target Equity Interests that are not certificated, such Target Equity Interests pursuant to an assignment agreement substantially in the form of **Exhibit VIII** attached hereto;

(ii)    a duly executed bill of sale and assignment to transfer the Target Assets substantially in the form of **Exhibit IX** attached hereto;

(iii)    short form assignments, substantially in the form of **Exhibit X** attached hereto, of registered or applied for patents, trademarks, copyrights, and internet domain names included within the Assigned Business Intellectual Property;

(iv)    counterparts of the Third Amended and Restated LLC Agreement, the Amended and Restated Investor Rights Agreement, the Fuel Supply Agreement, the Transition Services Agreement, the Trademark License Agreement and the Transportation Service Agreement, duly executed by FJI (or, in the case of the Fuel Supply Agreement and the Transportation Service Agreement, Big West Oil, LLC);

(v)    a certificate signed by an authorized officer of FJI, dated as of the Closing Date, to the effect that the conditions set forth in Section 6.3(a), Section 6.3(b) and Section 6.3(e) have been satisfied by and with respect to FJI;

(vi)    duly executed letters of resignation from each of the individuals appointed by FJI resigning from their positions pursuant to Section 5.11;

(vii)    non-foreign person affidavits from FJI and the Contributing Affiliates dated as of the Closing Date as required by Section 1445 of the Code; and

(viii)    a copy of all consents, waivers and approvals set forth in Section 6.3(c) of the FJI Disclosure Letter that FJI has obtained.

(c)    At the Closing, PSI shall deliver or cause to be delivered to PTC:

(i)    TFJ's partnership interests pursuant to an assignment agreement substantially in the form of **Exhibit VIII** attached hereto;

(ii)    a certificate signed by an authorized officer of PSI, dated as of the Closing Date, to the effect that the conditions set forth in Section 6.3(a) and Section 6.3(b) have been satisfied by and with respect to PSI;

(iii)    duly executed letters of resignation from each of the individuals appointed by PSI resigning from their positions pursuant to Section 5.11;

(iv)    non-foreign person affidavits from PSI, dated as of the Closing Date as required by Section 1445 of the Code; and

(v)    a copy of all (if any) consents, waivers and approvals set forth in Section 6.3(c) of the PSI Disclosure Letter that PSI has obtained.

(d)    At the Closing, PTC shall deliver or cause to be delivered to FJI:

NEWYORK 7440434 (2K)

(i)    the Initial Purchase Price, including certificates representing the Equity Consideration duly executed and issued in the name of FJI;

(ii)    a duly executed instrument of assumption of Liabilities with respect to the Assumed Liabilities, substantially in the form of **Exhibit XI** attached hereto;

(iii)    counterparts of the Third Amended and Restated LLC Agreement, the Amended and Restated Investor Rights Agreement, the Fuel Supply Agreement, the Transition Services Agreement, the Trademark License Agreement and the Transportation Service Agreement, duly executed by the requisite parties; and

(iv)    a certificate signed by an authorized officer of PTC, dated as of the Closing Date, to the effect that the conditions set forth in Section 6.4(a), Section 6.4(b) and Section 6.5(b) have been satisfied.

(e)    At the Closing, PTC shall deliver or cause to be delivered to PSI:

(i)    the PSI Initial Consideration; and

(ii)    a certificate signed by an authorized officer of PTC, dated as of the Closing Date, to the effect that the conditions set forth in Section 6.4(a) and Section 6.4(b) have been satisfied.

Section 2.8 Withholding Rights.    PTC, the Target Entities and the Target Subsidiaries shall be entitled to deduct and withhold from the consideration otherwise payable to any Person pursuant to this Article II, such amounts as they are required to deduct and withhold with respect to the making of such payment under any provision of federal, state, local or foreign Tax Law; provided that no such withholding shall be allowed unless PTC gives written notice to FJI of any withholding at least ten (10) Business Days prior to the Closing. If PTC, the Target Entities or the Target Subsidiaries, as the case may be, so withhold amounts, such amounts shall be treated for all purposes of this Agreement as having been paid to the holder of the equity interests of the Target Entities in respect of which PTC, the Target Entities or the Target Subsidiaries, as the case may be, made such deduction and withholding.

Article III

## REPRESENTATIONS AND WARRANTIES OF SELLERS

As a material inducement to PTC to enter into this Agreement and to consummate the transactions contemplated hereby each Seller hereby severally and not jointly represents and warrants to PTC as follows, except as set forth in the FJI Disclosure Letter or the PSI Disclosure Letter, as applicable, each arranged as provided in Section 10.12(a) or Section 10.12(b) of this Agreement, as applicable; provided, that (i) each Seller makes the representations and warranties set forth in Sections 3.1, 3.2, 3.3, 3.5, 3.6 and 3.16 only with respect to itself (except with respect to such representations and warranties made with respect to the Target Entities, Target Subsidiaries, Contributing Affiliates or Target Holdings) and (ii) PSI makes the representations and warranties set forth in this Article III only with respect to TFJ, including its equity interests in TFJ where applicable:

Section 3.1 <u>Due Organization, Good Standing and Corporate Power of</u>
<u>FJI, PSI and the Contributing Affiliates.</u>

(a)    FJI and the Contributing Affiliates are corporations, limited liability
companies or trusts, as applicable, duly organized, validly existing and in good standing (or
the equivalent thereof) under the Laws of the states or provinces of their incorporation or
organization, as applicable, and have all requisite corporate, company or trust power, as
applicable, and authority to own, lease and operate their properties and to carry on the
Business as now being conducted, except where the failure to have such power or authority
would not result, and would not reasonably be expected to result, in a Business Material
Adverse Effect. FJI and the Contributing Affiliates are duly qualified or licensed to do
business and are in good standing (or the equivalent thereof) in each jurisdiction in which the
character or location of the properties owned, leased or operated by FJI and the Contributing
Affiliates or the nature of the Business makes such qualification necessary, except as would
not have, or would not reasonably be expected to have, individually or in the aggregate, a
Business Material Adverse Effect. The copies of the governing documents of FJI, the
Contributing Affiliates, the Target Entities, and the Target Subsidiaries have been made
available to PTC, reflect all amendments made thereto and are true and complete copies of
such governing documents.

(b)    PSI is a corporation, duly organized, validly existing and in good
standing (or the equivalent thereof) under the Laws of the state of Utah, and has all requisite
corporate power and authority to own, lease and operate its properties and to carry on its
business as now being conducted, except as would not have, or would not reasonably be
expected to have, individually or in the aggregate, a material adverse effect on PSI. PSI is
duly qualified or licensed to do business and is in good standing (or the equivalent thereof) in
each jurisdiction in which the character or location of the properties owned, leased or
operated by PSI or the nature of its business makes such qualification necessary, except as
would not have, or would not reasonably be expected to have, individually or in the
aggregate, a material adverse effect on PSI. The copies of the governing documents of PSI
have been made available to PTC, reflect all amendments made thereto and are true and
complete copies of such governing documents.

Section 3.2 <u>Authorization; Noncontravention.</u>

(a)    Except for such authorization as is required by the Bankruptcy Court
(as herein provided for), FJI has the requisite corporate power and authority and has taken all
corporate action necessary to execute and deliver this Agreement and all other instruments
and agreements to be executed and delivered by FJI as contemplated hereby, to perform its
obligations hereunder and thereunder and to consummate the transactions contemplated
hereby and thereby. The execution, delivery and performance of this Agreement and all other
instruments and agreements to be executed and delivered by FJI as contemplated hereby, and
the consummation by it of the transactions contemplated hereby and thereby, have been duly
authorized and approved by the Board of Directors of FJI. Assuming entry of the
Confirmation Order or the Sale Order, as the case may be, and receipt of other necessary
authorization of the Bankruptcy Court, no other corporate or stockholder action on the part of
FJI is necessary to authorize the execution, delivery and performance of this Agreement and
all other instruments and agreements to be executed and delivered by FJI as contemplated

hereby by FJI and the consummation of the transactions contemplated hereby and thereby. Assuming entry of the Confirmation Order or the Sale Order, as the case may be, and receipt of other necessary authorization of the Bankruptcy Court, this Agreement and all other instruments and agreements to be executed and delivered by FJI as contemplated hereby have been or shall be duly executed and delivered by FJI and, assuming that (a) this Agreement and such other instruments and agreements constitute valid and binding obligations of the other party or parties thereto and (b) the Confirmation Order or the Sale Order, as the case may be, has been entered and is a Final Order, constitute valid and binding obligations of FJI enforceable against FJI in accordance with their terms, except to the extent that their enforceability may be subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general equitable principles. Assuming entry of the Confirmation Order or the Sale Order, as the case may be, and receipt (or giving, as applicable) of the consents, approvals, authorizations, declarations, filings and notices referred to in Section 3.6(a) of the FJI Disclosure Letter, and after giving effect to the applicable provisions of the Plan (if authorization for the transactions contemplated hereby from the Bankruptcy Court is obtained by the Confirmation Order) and the Bankruptcy Code, the execution and delivery of this Agreement and such other instruments and agreements do not, and the consummation of the transactions contemplated by this Agreement and such other instruments and agreements shall not result in a violation or breach of, conflict with, constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of first offer, first refusal, termination, cancellation, payment or acceleration) under, or result in the creation of any Lien on any of the properties or assets of FJI, the Contributing Affiliates or the Business under: (a) any of the provisions of the certificate of incorporation or by-laws or other equivalent charter documents, as applicable, of FJI, the Contributing Affiliates, the Target Entities or the Target Subsidiaries, in each case as amended to the date of this Agreement; (b) any Business Material Contract to which FJI, the Contributing Affiliates, the Target Entities or the Target Subsidiaries is a party, or by which they or any of their respective properties or assets is bound; or (c) any Law or Order applicable to FJI, the Contributing Affiliates or the Business or by which any of their respective properties or assets may be bound, other than, in the case of clauses (b) and (c) above, would not have, or would not reasonably be expected to have, individually or in the aggregate, a Business Material Adverse Effect.

(b)    PSI has the requisite corporate power and authority and has taken all corporate action necessary to execute and deliver this Agreement and all other instruments and agreements to be executed and delivered by PSI as contemplated hereby, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement and all other instruments and agreements to be executed and delivered by PSI as contemplated hereby, and the consummation by it of the transactions contemplated hereby and thereby, have been duly authorized and approved by the Board of Directors of PSI. No corporate or stockholder action on the part of PSI is necessary to authorize the execution, delivery and performance of this Agreement and all other instruments and agreements to be executed and delivered by PSI as contemplated hereby by PSI and the consummation of the transactions contemplated hereby and thereby.  This Agreement and all other instruments and agreements to be executed and delivered by PSI as contemplated hereby have been or shall be duly executed and delivered by PSI and, assuming that (a) this Agreement and such other instruments and agreements constitute valid and binding obligations of the other party or parties thereto,

42

except to the extent that their enforceability may be subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general equitable principles. Assuming receipt (or giving, as applicable) of the consents, approvals, authorizations, declarations, filings and notices referred to in Section 3.6(b) of the PSI Disclosure Letter, the execution and delivery of this Agreement and such other instruments and agreements do not, and the consummation of the transactions contemplated by this Agreement and such other instruments and agreements shall not result in a violation or breach of, conflict with, constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of first offer, first refusal, termination, cancellation, payment or acceleration) under, or result in the creation of any Lien on any of the properties or assets of PSI under: (a) any of the provisions of the certificate of incorporation or by-laws or other equivalent charter documents, as applicable, of PSI, as amended to the date of this Agreement; (b) any Contract to which PSI is a party, or by which it or any of its respective properties or assets is bound; or (c) any Law or Order applicable to PSI, or by which any of its properties or assets may be bound, other than, in the case of clauses (b) and (c) above, would not have, or would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on PSI.

Section 3.3  Ownership of Target Equity Interests and Target Assets.

(a)    All of the Target Equity Interests and Target Assets (for the purpose of this Section 3.3(a), the term Target Equity Interests shall not include the PSI TFJ Share) are owned by FJI or a Contributing Affiliate, as applicable, free and clear of all Liens (other than, in the case of the Target Equity Interests, the Disclosed Rights and, in the case of the Target Assets, Business Permitted Liens), and the Target Equity Interests have been issued in compliance with all applicable securities Laws. Assuming entry of the Confirmation Order or the Sale Order, as the case may be, receipt of all other necessary authorizations of the Bankruptcy Court, upon payment of the Initial Purchase Price to FJI at the Closing, FJI and/or one or more Contributing Affiliates shall convey all of their rights, title and interest in and to the Target Equity Interests, free and clear of all Liens (other than the Disclosed Rights). FJI and/or one or more of the Contributing Affiliates shall convey all of their right, title and interests in and to the Target Assets, free and clear of all Liens (other than Business Permitted Liens (except to the extent that the Confirmation Order and the Plan or the Sale Order, as the case may be, and any provision(s) of the Bankruptcy Code operate to release such Business Permitted Liens at Closing)). Assuming entry of the Sale Order, the assignments, endorsements, stock powers and other instruments of transfer delivered by FJI and the Contributing Affiliates to PTC at the Closing shall be sufficient to transfer FJI's or the Contributing Affiliates' entire interest, legal and beneficial, in the Target Equity Interests and the Target Assets purported to be transferred thereby, as applicable, to PTC. Except as set forth in Section 3.3(a) of the FJI Disclosure Letter, none of the Target Assets or the assets of any Target Entity or Target Subsidiary is subject to any Lien, other than Business Permitted Liens and Disclosed Rights, that secures the obligations of FJI or any of the Contributing Affiliates (other than the Target Entities or any of the Target Subsidiaries) within the meaning of clauses (a)(i), (iii), (iv), (vii), (viii), or (ix) of the definition of Business Net Debt.

(b)    All partnership interests included in the PSI TFJ Share are owned by PSI, free and clear of all Liens (other than the Disclosed Rights) and have been issued in compliance with all applicable securities Laws. Upon payment of the PSI Initial

Consideration at the Closing, PSI shall convey all of its rights, title and interest in and to the partnership interests of TFJ included in the PSI TFJ Share, free and clear of all Liens (other than the Disclosed Rights). The assignments, endorsements, stock powers and other instruments of transfer delivered by PSI to PTC at the Closing shall be sufficient to transfer PSI's entire interest, legal and beneficial, in the partnership interests of TFJ purported to be transferred thereby, as applicable, to PTC. Except as set forth in Section 3.3(b) of the PSI Disclosure Letter, none of the partnership interests in TFJ held by PSI is subject to any Lien, other than Disclosed Rights.

Section 3.4  Target Entities.

(a)     The Target Entities are corporations, limited liability companies or trusts, as applicable, duly organized, validly existing and in good standing (or the equivalent thereof) under the Laws of the states or provinces of their incorporation or organization, as applicable, and have all requisite corporate, company or trust power, as applicable, and authority to own, lease and operate their properties and to carry on the Business as now being conducted. The Target Entities are duly qualified or licensed to do business and are in good standing (or the equivalent thereof) in each jurisdiction in which the character or location of the properties owned, leased or operated by the Target Entities or the nature of the Business makes such qualification necessary, except as would not have, or would not reasonably be expected to have, individually or in the aggregate, a Business Material Adverse Effect.

(b)     Section 3.4(b) of the FJI Disclosure Letter lists each Subsidiary of the Target Entities (each, a "**Target Subsidiary**"). Each Target Subsidiary is a legal entity duly organized, validly existing and in good standing (or the equivalent thereof) under the Laws of the jurisdiction of incorporation or organization and each Target Subsidiary has all requisite power and authority to own, lease and operate its properties and to carry on its business as now being conducted. Each Target Subsidiary is duly qualified or licensed to do business and is in good standing (or the equivalent thereof) in each jurisdiction in which the character or location of the properties owned, leased or operated by such Target Subsidiary or the nature of the business conducted by such Target Subsidiary makes such qualification necessary, except as would not have, or would not reasonably be expected to have, individually or in the aggregate, a Business Material Adverse Effect.

(c)     None of the Target Entities or Target Subsidiaries owns, directly or indirectly, any capital stock or other equity, ownership, proprietary or voting interest in any Person other than the Target Subsidiaries.

Section 3.5  Capitalization.

(a)     PSI owns the number and type of issued and outstanding partnership interests of TFJ set forth in Section 3.5(a) of the PSI Disclosure Letter.

(b)     Each of the Call Family Delivery Parties owns the number and type of issued and outstanding capital stock of FJI set forth in Section 3.5(b) of the FJI Disclosure Letter. Also set forth in Section 3.5(b) of the FJI Disclosure Letter is an accurate and complete list of all Persons, other than the Call Family Delivery Parties, owning capital stock of FJI, including the number and type of issued and outstanding capital stock of FJI held by each such Person. Except as set forth in Section 3.5(b) of the FJI Disclosure Letter, no shares

of capital stock or other equity interests of FJI are issued, reserved for issuance or outstanding. Each Target Entity has the issued and outstanding equity interests set forth in Section 3.5(a) of the FJI Disclosure Letter. The Partially-Owned Company Interests constitute all of the issued and outstanding equity interests of the Partially-Owned Companies owned by FJI. The Wholly-Owned LLC Interests constitute all of the issued and outstanding equity interests of the Wholly-Owned LLCs. The Partially-Owned LLC Interests constitute all of the issued and outstanding equity interests of the Partially-Owned LLCs owned by FJI. The Trust Interests constitute all of the issued and outstanding interests of a beneficiary of the Target Trust. The Partially-Owned Company Interests, the Wholly-Owned LLC Interests, the Partially-Owned LLC Interests and the Trust Interests have been duly authorized and validly issued and, to the extent such concepts are applicable thereto, are fully paid and nonassessable, and were not issued in violation of any preemptive rights. Except for the Partially-Owned Company Interests, and the following interests outstanding: (i) Flying J Real Estate Enterprises Inc.'s 29.19% interest and Flying J Plaza I Canadian Trust's 25.48% interest in Flying J Canada Inc., (ii) Kayo Oil Company's 50% interest in CFJ I Management Inc., (iii) Kayo Oil Company's 50% interest in CFJ II Management Inc., and (iv) Kayo Oil Company's 50% interest in CFJ III Management Inc., no shares of capital stock or other equity interests of the Partially-Owned Companies are issued, reserved for issuance or outstanding. Except for the Wholly-Owned LLC Interests, no membership interests or other equity interests of the Wholly-Owned LLCs are issued, reserved for issuance or outstanding. Except for the Partially-Owned LLC Interests, and the following outstanding interests: (i) Pacific Sunstone Inc.'s 50.01% interest in TFJ, (ii) Nitro Gaming Inc.'s 50.01% interest in Flying J Gaming, L.C., (iii) Kayo Oil Company's 49.5% interest and CFJ I Management Inc.'s 1% interest in CFJ Plaza Company I LLC, (iv) Kayo Oil Company's 49.5% interest and CFJ II Management Inc.'s 1% interest in CFJ Plaza Company II LLC, (v) Kayo Oil Company's 49.5% interest and CFJ III Management Inc.'s 1% interest in CFJ Plaza Company III LLC, (vi) FJI Management Inc.'s 1% interest in FJI Plaza Company LLC, (vii) FJI II Management Inc.'s 1% interest in FJI Plaza Company II LLC, (viii) FJI III Management Inc.'s 1% interest in FJI Plaza Company III LLC, and (ix) FJI IV Management Inc.'s 1% interest in FJI Plaza Company IV LLC, no membership interests or other equity interests of the Partially-Owned LLCs are issued, reserved for issuance or outstanding. Except for the Trust Interests, no interests of a beneficiary or other equity interests of the Target Trust are issued, reserved for issuance or outstanding. Except as set forth in Section 3.5(b) of the FJI Disclosure Letter, the Target Entities are not parties to any outstanding or authorized option, warrant, right (including any preemptive right), subscription, agreement, obligation, convertible or exchangeable securities, or other commitments contingent or otherwise, relating to the capital stock, membership interests, interests of a beneficiary of a trust or other equity interest, as applicable, in the Target Entities pursuant to which any Target Entity is or may become obligated to issue, deliver or sell or cause to be issued, delivered or sold, shares of capital stock, membership interests or trust interests of, or other equity or voting interests in, such Target Entity or any securities convertible into, exchangeable for, or evidencing the right to subscribe for or acquire, any shares of the capital stock, membership interests or trust interests of, or other equity or voting interests in such Target Entity. Except as set forth in Section 3.5(b) of the FJI Disclosure Letter, there are no outstanding or authorized equity appreciation, phantom equity, profit participation or similar rights with respect to the capital stock, membership interests or trust interests of, or other equity or voting interests in, the Target Entities. The Target Entities do not have any authorized or outstanding bonds, debentures, notes or other indebtedness the holders of

45

which have the right to vote (or convertible into, exchangeable for, or evidencing the right to subscribe for or acquire securities having the right to vote) with the equityholders of such entities on any matter. Except as set forth in <u>Section 3.5(b)</u> of the FJI Disclosure Letter, there are no irrevocable proxies and no voting agreements with respect to any capital stock, membership interests or trust interests of, or other equity or voting interests in, the Target Entities.

(c)     Each Target Subsidiary has the capitalization set forth in <u>Section 3.5(c)</u> of the FJI Disclosure Letter. All issued and outstanding shares of capital stock or other equity interests of each Target Subsidiary have been duly authorized and validly issued and, to the extent such concepts are applicable thereto, are fully paid and nonassessable, and are not subject to any preemptive rights. Except as set forth in <u>Section 3.5(c)</u> of the FJI Disclosure Letter, no shares of capital stock or other equity interests of any Target Subsidiary are issued, reserved for issuance or outstanding. Except as set forth in <u>Section 3.5(c)</u> of the FJI Disclosure Letter, the Target Subsidiaries are not party to any outstanding option, warrant, call, subscription, or other right (including any preemptive right), agreement or commitment relating to the capital stock, or other equity interests in, the Target Entities or any Target Subsidiary, pursuant to which such Target Subsidiary is or may become obligated to issue, deliver or sell or cause to be issued, delivered or sold, shares of capital stock of or other equity or voting interests in, such Target Subsidiary or any securities convertible into, exchangeable for, or evidencing the right to subscribe for or acquire, any shares of the capital stock of or other equity or voting interests in, such Target Subsidiary. There are no outstanding or authorized stock appreciation, phantom stock, profit participation or similar rights with respect to the capital stock of, or other equity or voting interests in, any Target Subsidiary. No Target Subsidiary has any authorized or outstanding bonds, debentures, notes or other indebtedness the holders of which have the right to vote (or convertible into, exchangeable for, or evidencing the right to subscribe for or acquire securities having the right to vote) with the equityholders of any Target Subsidiary on any matter. Except as set forth in <u>Section 3.5(c)</u> of the FJI Disclosure Letter, there are no irrevocable proxies and no voting agreements with respect to any capital stock of, or other equity or voting interests in, any Target Subsidiary.

Section 3.6  <u>Consents and Approvals.</u>

(a)     Except as set forth in <u>Section 3.6</u> of the FJI Disclosure Letter and excluding Permits (which are the subject of <u>Section 3.10</u>), assuming all required Antitrust Filings are made and any waiting periods thereunder have been terminated or expired and assuming that the Sale Order has been entered and after giving effect to the provisions of the Plan (if authorization for the transactions contemplated hereby from the Bankruptcy Court is obtained by the Confirmation Order) and the applicable provisions of the Bankruptcy Code, no consent of or filing with any Governmental Entity or any other third party, which has not been received or made, is necessary or required under (a) any of the terms, conditions or provisions of any Law or Order (except for the Sale Order) applicable to FJI, any of the Contributing Affiliates, any of the Target Entities or any of the Target Subsidiaries or the Business or by which any of their respective properties or assets may be bound, or (b) any Business Material Contract to which FJI, any of the Contributing Affiliates, any of the Target Entities or any of the Target Subsidiaries is a party or by which any of them or any of their respective assets or properties may be bound, for the execution and delivery of this Agreement and all other instruments and agreements to be executed and delivered by FJI or

46

any of its Subsidiaries as contemplated hereby or the consummation by FJI or any of its Subsidiaries of the transactions contemplated hereby or thereby, where the failure of which to be received or made would not, individually or in the aggregate, reasonably be expected to have a Business Material Adverse Effect.

(b)     Except as set forth in Section 3.6(b) of the PSI Disclosure Letter and excluding Permits (which are the subject of Section 3.10), assuming all required Antitrust Filings are made and any waiting periods thereunder have been terminated or expired, no consent of or filing with any Governmental Entity or any other third party, which has not been received or made, is necessary or required under (a) any of the terms, conditions or provisions of any Law or Order applicable to PSI, or by which any of its properties or assets may be bound, or (b) any Contract to which PSI is a party or by which any of its assets or properties may be bound, for the execution and delivery of this Agreement and all other instruments and agreements to be executed and delivered by PSI as contemplated hereby or the consummation by PSI of the transactions contemplated hereby or thereby, where the failure of which to be received or made would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on PSI.

Section 3.7  Financial Statements; Undisclosed Liabilities.

(a)     Set forth in Section 3.7 of the FJI Disclosure Letter are the (i) (x) unaudited pro forma balance sheets of the Business as at March 31, 2009, April 30, 2009, May 31, 2009, June 30, 2009 and October 31, 2009 (such latest date, the "**Balance Sheet Date**"), and (y) unaudited pro forma statement of operations for fiscal years ended January 31, 2007, January 31, 2008, January 31, 2009 and the nine (9) months ended on the Balance Sheet Date, (ii) (x) audited consolidated balance sheet of CFJ Properties and its Subsidiaries as at January 31, 2007, January 31, 2008 and January 31, 2009, the related audited consolidated statements of operations, partners' capital, and cash flows for the fiscal years ended January 31, 2007, January 31, 2008 and January 31, 2009 and (y) unaudited consolidated balance sheet of CFJ Properties and its Subsidiaries as at the Balance Sheet Date, and the related unaudited consolidated statements of operations, partners' capital and cash flows for the nine (9) months ended on the Balance Sheet Date, and (iii) (x) audited balance sheet of SFJ Inc. as at January 31, 2007, January 31, 2008 and January 31, 2009, the related audited statements of operations, accumulated deficit and cash flows for the fiscal years ended January 31, 2007, January 31, 2008 and January 31, 2009 and (y) unaudited balance sheet of SFJ Inc. as at Balance Sheet Date, and the related unaudited statements of operations, accumulated deficit and cash flows for the nine (9) months ended on the Balance Sheet Date. The financial statements referred to above, including any footnotes thereto (the "**Business Financial Statements**") have been prepared (A) in accordance with GAAP consistently followed throughout the periods indicated and (B) from, and consistent with, the books and records of FJI and its Subsidiaries, as applicable, except (v) that the Business Financial Statements that are not audited or are not annual financial statements are subject to normal year-end adjustments and lack footnotes and other presentation items, (w) that the allocation (if any) of corporate support, general and administrative and other corporate support liabilities and expenses included in any of the Business Financial Statements may differ from what would be included for the Target Entities, the Target Subsidiaries and/or the Business on a stand-alone basis, (x) as described therein, (y) as set forth in Section 3.7(a) of the FJI Disclosure Letter and (z) that the financial statements referred to in clause (iii) of this

47

Section 3.7(a) have been prepared in accordance with Canadian generally accepted accounting principles.

(b) Except (i) that the Business Financial Statements that are not audited or are not annual financial statements are subject to normal year-end adjustments and lack footnotes and other presentation items, (ii) that the allocation (if any) of corporate support, general and administrative and other corporate support liabilities and expenses included in any of the Business Financial Statements may differ from what would be included for the Target Entities, the Target Subsidiaries and/or the Business on a stand-alone basis and (iii) as otherwise set forth in Section 3.7 of the FJI Disclosure Letter, the balance sheets referred to in Section 3.7(a) fairly present, in all material respects, in conformity with GAAP (or, with respect to the balance sheets referred to in clause (iii) of Section 3.7(a), Canadian generally accepted accounting principles) the financial condition of the Business or the relevant entities, as applicable, as at the relevant dates, respectively, and the related statements of operations referred to in Section 3.7(a) fairly present, in all material respects, in conformity with GAAP (or, with respect to the statements of operations referred to in clause (iii) of Section 3.7(a), Canadian generally accepted accounting principles) the results of operations of the Business or the relevant entities, as applicable, for the periods set forth therein.

(c) Neither the Target Entities nor any of the Target Subsidiaries has any Liabilities that would be required to be reflected on a balance sheet prepared in accordance with GAAP, except for (i) Liabilities set forth in the most recent Business Financial Statements, (ii) current Liabilities incurred subsequent to the Balance Sheet Date in the ordinary course of business, (iii) Liabilities included or to be included in the computation of Closing Business Net Debt, Closing PSI TFJ Net Debt Share, Closing Business Working Capital or Closing PSI TFJ Working Capital Share, (iv) Liabilities disclosed in Section 3.7(c) of the FJI Disclosure Letter, and (v) other Liabilities that do not exceed in the aggregate $1,000,000 (provided, that solely for the purpose of Section 6.3(b) and Section 9.2(a), such other Liabilities referred to in this clause (v) of this Section 3.7 shall not exceed in the aggregate $2,500,000). Other than sale-leaseback and other arrangements that are recorded as operating leases in accordance with GAAP and except as set forth in Section 3.7(c) of the FJI Disclosure Letter, neither the Target Entities nor any of the Target Subsidiaries maintains any "off balance sheet arrangements".

Section 3.8 Absence of Certain Changes. Since the Balance Sheet Date, there has not been, individually or in the aggregate, a Business Material Adverse Effect. Since the Balance Sheet Date, neither FJI, the Contributing Affiliates, the Target Entities nor any of the Target Subsidiaries has undertaken any action that, if they had been taken subsequent to the execution of this Agreement and on or prior to the Closing Date, would, without the consent of PTC, constitute a breach of the covenants set forth in Section 5.3.

Section 3.9 Compliance with Laws. Except as set forth in Section 3.9 of the FJI Disclosure Letter and except with respect to matters covered by any of Sections 3.12, 3.13, 3.14 or 3.18, the Business during the last three (3) years has been, and is being, conducted in compliance with all Laws and Orders applicable to the Business, except as would not have, or would not reasonably be expected to have, individually or in the aggregate, a Business Material Adverse Effect. Except as set forth in Section 3.9 of the FJI Disclosure Letter, neither the Target Entities nor any of the Target Subsidiaries has, since the Balance Sheet Date, received any written notice that any violation of the foregoing is being alleged, except as would not have, or

48

would not reasonably be expected to have, individually or in the aggregate, a Business Material Adverse Effect. Except as set forth in <u>Section 3.9</u> of the FJI Disclosure Letter, none of FJI, the Contributing Affiliates, the Target Entities or the Target Subsidiaries is aware of or has been advised in writing of any facts or circumstances that exist which would cause it to be deemed to be operating in violation of the Patriot Act or any other applicable anti-money laundering Law, except as would not have, or would not reasonably be expected to have, individually or in the aggregate, a Business Material Adverse Effect.

Section 3.10    <u>Permits</u>. Except as set forth in <u>Section 3.10</u> of the FJI Disclosure Letter, FJI, the Contributing Affiliates, the Target Entities and the Target Subsidiaries have obtained and possess all federal, state, local and foreign permits, approvals, licenses, authorizations, certificates, rights, exemptions and Orders from Governmental Entities (collectively, the **"Permits"**) that are necessary for the operation of the Business as presently conducted, or that are necessary for the lawful ownership of their respective properties and assets, except where any failure to obtain or possess a Permit would not have, or would not reasonably be expected to have, a Business Material Adverse Effect. FJI has delivered or made available to PTC for inspection a true and complete copy, including all amendments thereto, of each material Permit obtained or possessed by FJI, the Contributing Affiliates, the Target Entities and the Target Subsidiaries relating to the Business. Except as set forth in <u>Section 3.10</u> of the FJI Disclosure Letter, all such Permits are in full force and effect, except as would not have, or would not reasonably be expect to have, individually or in the aggregate, a Business Material Adverse Effect. Each such Permit can be renewed in the ordinary course of business by FJI, the Contributing Affiliates, the Target Entities or any Target Subsidiary, as the case may be, and after giving effect to the transactions contemplated by this Agreement, all such Permits shall, in the case of Permits held by the Target Entities and the Target Subsidiaries, continue to be in effect and shall remain in full force and effect in accordance with their terms in all such cases, except to the extent that all such failures would not have, and would not reasonably be expected to have, individually or in the aggregate, a Business Material Adverse Effect. Except as set forth in <u>Section 3.10</u> of the FJI Disclosure Letter, FJI, the Contributing Affiliates, the Target Entities and each of the Target Subsidiaries are in compliance with all such Permits, except as would not have, or would not reasonably be expected to have, individually or in the aggregate, a Business Material Adverse Effect. Except as set forth in <u>Section 3.10</u> of the FJI Disclosure Letter, or except as would not have, or would not reasonably be expected to have, individually or in the aggregate, a Business Material Adverse Effect, no Action by any Governmental Entity or other proceeding to modify, suspend, revoke, withdraw, terminate or otherwise limit any such Permit is pending or, to the Knowledge of FJI, threatened.

Section 3.11    <u>Litigation</u>. Except as set forth in <u>Section 3.11</u> of the FJI Disclosure Letter, (a) there is no Action by, before or against any Governmental Entity or any other Person pending or, to the Knowledge of FJI, threatened, against or affecting the Target Entities or any of the Target Subsidiaries or the Business, or any of their respective properties, assets or rights, except as would not have, or would not reasonably be expected to have, individually or in the aggregate, a Business Material Adverse Effect, and (b) neither the Target Entities nor any of the Target Subsidiaries nor the Business is subject to any Order, except as would not have, or would not reasonably be expected to have, individually or in the aggregate, a Business Material Adverse Effect.

NEW YORK 7440434 (2K)

Section 3.12    FJI Employee Benefit Plans.

(a)    Set forth in Section 3.12(a) of the FJI Disclosure Letter is a true and complete list of each employee benefit plan (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**")) and material fringe benefit plan maintained or contributed to or required to be contributed to by FJI, any Contributing Affiliate, any Target Entity, any Target Subsidiary or any of their respective Affiliates, with respect to any present or former employee of any Target Entity, Target Subsidiary and/or the Business ("**FJI Employee Benefit Plans**").

(b)    Except as set forth in Section 3.12(b) of the FJI Disclosure Letter, no FJI Employee Benefit Plan is sponsored or maintained by any Target Entity or Target Subsidiary.

(c)    Except as set forth in Section 3.12(c) of the FJI Disclosure Letter, none of FJI, the Contributing Affiliates, the Target Entities, the Target Subsidiaries or any of their Affiliates (nor any employer (whether or not incorporated)) that would be treated together with FJI, the Contributing Affiliates, any Target Entity, any Target Subsidiary or any such Affiliate as a single employer within the meaning of Section 414 of the Code (an "**ERISA Affiliate**"), has ever maintained or contributed to, or had any obligation to contribute to (or borne any Liability with respect to) any "employee pension benefit plan," within the meaning of Section 3(2) of ERISA, that is a "multiemployer plan," within the meaning of Section 3(37) of ERISA, or subject to Section 412 of the Code, or Section 302 or Title IV of ERISA. With respect to any plan set forth in Section 3.12(c) of the FJI Disclosure Letter, no Liability under Title IV of ERISA has been incurred by any Target Entity or Target Subsidiary.

(d)    Each FJI Employee Benefit Plan intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the IRS covering all Tax Law changes, including the Economic Growth and Tax Relief Reconciliation Act of 2001, or is comprised of a master or prototype plan that has received a favorable opinion letter from the IRS and, since the date of such determination, no event has occurred that resulted or would reasonably be expected to result in the revocation of any such determination letter or opinion letter.

(e)    FJI, each Contributing Affiliate, each Target Entity and each Target Subsidiary have complied in all material respects with the applicable requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Code ("**COBRA**"), except to the extent that any such noncompliance would not reasonably be expected to result in material Liability, and none of the Target Entities or Target Subsidiaries is subject to any material Liability as a result of any failure to administer or operate any "group health plan" (as defined in COBRA and/or as defined in 45 Code of Federal Regulations Section 160.103) in compliance with COBRA and/or the applicable requirements of the Health Insurance Portability and Accountability Act of 1996 and the regulations promulgated thereunder.

(f)    Full payment has been made of all amounts which FJI, the Contributing Affiliates, any Target Entity or any Target Subsidiary is required under applicable Law or under any FJI Employee Benefit Plan or any agreement relating to any FJI Employee Benefit Plan to have paid as contributions or premiums thereunder as of the last day of the most recent fiscal year of such FJI Employee Benefit Plan ended prior to the date

50

hereof or have been timely reflected on the most recent consolidated balance sheet filed prior to the date hereof or accrued in the account records of FJI, the Contributing Affiliates, any Target Entity or any Target Subsidiary.

(g)     No litigation or administrative or other proceeding, audit, examination or investigation is pending or asserted, or, to the Knowledge of FJI, threatened anticipated or expected to be asserted with respect to any FJI Employee Benefit Plan or the assets of any such plan (other than routine claims for benefits arising in the ordinary course). None of FJI, the Contributing Affiliates, nor any Target Entity or Target Subsidiary has filed, or is considering filing, an application under the IRS Employee Plans Compliance Resolution System or the Department of Labor's Voluntary Fiduciary Correction Program with respect to any FJI Employee Benefit Plan.

(h)     The Target Entities and the Target Subsidiaries have, for purposes of each FJI Employee Benefit Plan, correctly classified those individuals performing services for such Target Entity or Target Subsidiary as common law employees, leased employees, independent contractors or agents of such Target Entity or Target Subsidiary. Except to the extent that the amount and payee or beneficiary of any such payment, benefit or other obligations is set forth in Section 3.12(h) of the FJI Disclosure Letter, the execution of this Agreement and the consummation of the transactions contemplated hereby do not constitute a triggering event under any FJI Employee Benefit Plan, policy, arrangement, statement, commitment or agreement, whether or not legally enforceable, which (either alone or upon the occurrence of any additional or subsequent event) shall or may result in any payment (whether of severance pay or otherwise), "parachute payment" (as such term is defined in Section 280G of the Code), acceleration, vesting or increase in benefits to any present or former employee or director of FJI, the Contributing Affiliates, any Target Entity or any Target Subsidiary.

(i)     No Target Entity or Target Subsidiary has any obligation under any FJI Employee Benefit Plan or otherwise to provide post-employment or retiree welfare benefits to any former employee or any other Person, except as required by applicable Laws or for death benefits or retirement benefits under any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA).

(j)     This Section 3.12 contains the sole and exclusive representations and warranties of FJI with respect to any employee benefits matters.

Section 3.13    Labor Matters.

(a)     Except as set forth in Section 3.13 of the FJI Disclosure Letter, the Business during the last three (3) years has been, and is being, conducted in compliance with all applicable Laws, agreements, policies, plans and programs relating to labor or employment relations or practices (including terms and conditions of employment, management-labor relations, wage and hour issues, immigration and occupational safety and health) and is not engaged in and, since the Balance Sheet Date, has not engaged in, any unfair labor practice, except in each case as would not have, or would not reasonably be expected to have, individually or in the aggregate, a Business Material Adverse Effect.

(b)     Except as set forth in <u>Section 3.13</u> of the FJI Disclosure Letter, no employee of the Business is represented by any union or covered by any collective bargaining agreement, nor is any such agreement currently being negotiated with FJI or any Target Entity or Target Subsidiary. Except as set forth in <u>Section 3.13</u> of the FJI Disclosure Letter, none of FJI, the Contributing Affiliates, the Target Entities or the Target Subsidiaries nor the Business is subject to a pending or, to FJI's Knowledge, threatened demand by a labor organization for recognition or certification, and there are no representation or certification proceedings or petitions presently pending or, to the Knowledge of FJI, threatened to be brought or filed with the National Labor Relations Board or any other labor relations tribunal or authority.

(c)     There are no pending or, to the Knowledge of FJI, threatened strikes, lockouts, union organization activities (including union organization campaigns or requests for representation), pickets, slowdowns, stoppages, material grievances or material labor disputes relating to the Business.

(d)     Except as set forth in <u>Section 3.13(d)</u> of the FJI Disclosure Letter or except as would not have, and would not reasonably be expected to have, individually or in the aggregate, a Business Material Adverse Effect, there are no pending or, to the Knowledge of FJI, threatened Actions, investigations, inspections, audits or notices of violations or possible violations brought by or on behalf of, or otherwise involving, any current or former employee, any Person alleged to be a current or former employee, any applicant for employment, or any class of the foregoing, or any Governmental Entity, that involve the labor or employment relations and practices of the Business (collectively, "**Business Labor Actions**").

(e)     Except as set forth in <u>Section 3.13(e)</u> of the FJI Disclosure Letter, the Business does not employ any Person who cannot be dismissed immediately without notice and without further material Liability, subject to the requirements of applicable Law.

(f)     Except as set forth in <u>Section 3.13(f)</u> of FJI Disclosure Letter, the Business has not engaged in layoffs or employment terminations sufficient in number to trigger application of the federal Worker Adjustment and Retraining Notification Act or any similar Law (including any state Laws relating to plant closings or mass layoffs) (collectively, "**WARN**") during the last three (3) years. Each of (i) FJI and the Contributing Affiliates with respect to the Business, and (ii) the Target Entities and the Target Subsidiaries, is and has been in compliance with WARN, and has not incurred any Liability under WARN which remains unsatisfied. On or before the Closing Date, FJI on behalf of each of itself, the Contributing Affiliates, the Target Entities and each of the Target Subsidiaries shall provide a list of all employees of the Business who have experienced "employment losses" (as defined under WARN) within ninety (90) days prior to the Closing Date and FJI on behalf of itself, the Contributing Affiliates, the Target Entities and the Target Subsidiaries shall update this list up to and including the Closing Date.

(g)     This <u>Section 3.13</u> contains the sole and exclusive representations and warranties of FJI with respect to any labor or employment matters.

Section 3.14    <u>Tax Matters</u>.

52

Except as set forth in <u>Section 3.14</u> of the FJI Disclosure Letter:

(a)     <u>Tax Returns</u>.  FJI, the Contributing Affiliates, each of the Target Entities and each of the Target Subsidiaries has filed or caused to be filed, or shall file or cause to be filed, all returns, statements, forms and reports for Taxes (each, a "**Return**") that are required to be filed by, or with respect to, FJI, the Contributing Affiliates, the Target Entities, the Target Subsidiaries, the Target Assets or the Business on or prior to the Closing Date (taking into account any applicable extension of time within which to file).  FJI has made available to PTC all material Returns filed with respect to FJI, the Contributing Affiliates, the Target Entities, the Target Subsidiaries, the Target Assets or the Business for taxable periods ended on or after January 31, 2006, all of which are true, correct and complete in all material respects.  FJI has made available to PTC all examination reports and statements of material deficiencies assessed against, or agreed to by, FJI, the Contributing Affiliates, the Target Entities and the Target Subsidiaries that are relevant to Tax Liabilities of or with respect to the Target Entities, the Target Subsidiaries, the Target Assets or the Business since January 31, 2006.

(b)     <u>Payment of Taxes</u>.  All material Taxes and material Tax Liabilities of or with respect to FJI, the Contributing Affiliates, the Target Entities, the Target Subsidiaries, the Target Assets or the Business that are due and payable on or prior to the Closing Date have been (or shall be) paid on or prior to the Closing Date or accrued on the books and records of FJI, the Contributing Affiliates, the Target Entities and the Target Subsidiaries in accordance with GAAP.

(c)     <u>Other Tax Matters</u>.

(i)     None of FJI, the Contributing Affiliates, any of the Target Entities or any of the Target Subsidiaries is currently the subject of an audit or other examination relating to the payment of a material amount of Taxes of or with respect to the Target Entities, the Target Subsidiaries, the Target Assets or the Business by the taxing authorities of any Governmental Entity nor has FJI, the Contributing Affiliates, the Target Entities or the Target Subsidiaries received any written notices from any taxing authority that such an audit or examination is pending.

(ii)     None of FJI, the Contributing Affiliates, any of the Target Entities or any of the Target Subsidiaries (x) has entered into a written agreement or waiver extending any statute of limitations relating to the payment or collection of a material amount of Taxes of or with respect to the Target Entities, the Target Subsidiaries or the Target Assets that have not expired or (y) is presently contesting any Tax Liability of or with respect to the Target Entities, the Target Subsidiaries or the Target Assets before any Governmental Entity.

(iii)     The Target Entities and the Target Subsidiaries have never been included in any "consolidated," "unitary" or "combined" Return provided for under the Law of any Governmental Entity.

(iv)     All Taxes that FJI, the Contributing Affiliates, the Target Entities or the Target Subsidiaries are (or were) required by Law to withhold or collect in connection with amounts paid or owing in connection with the Business to any employee,

independent contractor, creditor, stockholder, member or other third party have been duly withheld or collected, and have been timely paid over to the proper authorities to the extent due and payable.

(v)     No written claim has ever been made by any taxing authority in a jurisdiction where any of FJI, the Contributing Affiliates, the Target Entities or Target Subsidiaries does not file Returns that any of the Target Entities, the Target Subsidiaries or the Target Assets is or may be subject to taxation by that jurisdiction.

(vi)     Neither FJI nor the Contributing Affiliates is a "foreign person" within the meaning of Section 1445 of the Code.

(vii)     There are no Tax-sharing, allocation, indemnification or similar agreements in effect as between FJI or the Contributing Affiliates or any of the Target Entities or any of the Target Subsidiaries or any predecessor or Affiliate thereof and any other party under which PTC, any of PTC's Affiliates, any Target Entity or any Target Subsidiary could be liable for any Taxes or other claims of any party.

(viii)     Each Target Entity and each Target Subsidiary has delivered or made available to PTC true and complete copies, including all amendments thereto, of each of the Returns for income taxes filed by or on behalf of each Target Entity and Target Subsidiary since December 31, 2005.

(ix)     No Target Entity or Target Subsidiary shall be required to include any material item of income in, or exclude any material item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any of the following that occurred or exists on or prior to the Closing Date: (v) a "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local or non-U.S. income tax Law), (w) an installment sale or open transaction, (x) a prepaid amount, (y) a change in the accounting method of FJI, the Contributing Affiliates, any Target Entity or any Target Subsidiary pursuant to Section 481 of the Code or any similar provision of the Code or the corresponding Tax Laws of any nation, state or locality.

(x)     None of FJI, the Contributing Affiliates, the Target Entities or the Target Subsidiaries has engaged in a "reportable transaction" within the meaning of Treasury Regulations Section 1.6011-4(b).

(xi)     There are no transactions or facts existing with respect to FJI, the Contributing Affiliates, the Target Entities or the Target Subsidiaries which by reason of the consummation of the transactions contemplated by this Agreement shall result in (1) PTC or any of PTC's Affiliates recognizing income, or (2) the Target Entities or Target Subsidiaries recognizing income for which any resulting Income Tax would not be the responsibility of FJI under Article VII.

(xii)     There are no Liens on the Business, the Target Equity Interests or any of the Target Assets or assets of the Target Entities or Target Subsidiaries that arose in connection with any failure (or alleged failure) to pay any Taxes, that will not be

released at Closing pursuant to the Plan and the Confirmation Order, or the Sale Order, as the case may be;

(xiii)    Except as set forth in Section 3.14(c)(xiii) of the FJI Disclosure Letter, none of the Target Entities or the Target Subsidiaries has applied for, been granted, or agreed to any accounting method change for which it shall be required to take into account any adjustment under Section 481 of the Code or any similar provision of the Code or the corresponding Tax Laws of any Governmental Entity, (x) neither the IRS nor any other taxing authority has proposed or purported to require any such adjustment or change in accounting method, and (y) no such adjustment under Section 481 of the Code or the corresponding Tax Laws of any Governmental Entity shall be required of the Target Entities or the Target Subsidiaries upon the completion of, or by reason of, the transactions contemplated by this Agreement.

(xiv)    No Target Entity or Target Subsidiary is a party to any agreement that would require any Target Entity or any Target Subsidiary to make any payment that would constitute an "excess parachute payment" for purposes of Section 280G and 4999 of the Code.

(xv)    The Target Entities and the Target Subsidiaries are and have always been, treated as corporations, partnerships or disregarded entities for U.S. federal income tax purposes as set forth in Section 3.14(c)(xv) of the FJI Disclosure Letter.

(xvi)    All non-qualified deferred compensation plans (within the meaning of Section 409A of the Code) of the Target Entities and the Target Subsidiaries are in compliance in all material respects with Section 409A of the Code.

(xvii)    None of the Target Entities or the Target Subsidiaries has distributed equity of another Person, or has had its own equity distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Section 355 or Section 361 of the Code.

(xviii)    Except as set forth in Section 3.14(c)(xvii) of the FJI Disclosure Letter, no Taxes shall be due and payable by or in respect of the Target Entities or Target Subsidiaries after the Closing Date as a result of any of the Target Entities or Target Subsidiaries being a "personal holding company" within the meaning of Section 542 of the Code.

(d)    No Other Tax Representation and Warranties. This Section 3.14 contains the sole and exclusive representations and warranties of FJI with respect to any Tax matters.

Section 3.15    Intellectual Property.

(a)    Copies of all material Contracts concerning the use of any of the Business Intellectual Property which have been made available to PTC reflect all amendments made thereto and are true and complete copies of such Contracts.

(b)     Section 3.15(b) of the FJI Disclosure Letter sets forth a list of all of the following that are primarily related to the Business and are owned, used or held for use by the Target Entities and/or, the Target Subsidiaries and/or, to the extent used in the Business, owned, used, or held for use, by  FJI or the Contributing Affiliates (all of which shall be deemed included within the meaning of "Business Intellectual Property"): (i) issued patents, registered trademarks and registered copyrights; (ii) pending patent applications, trademark applications and copyright applications; (iii) all computer software (other than commercially available, off the shelf software licensed for less than a total cost of $100,000), and all computer software owned or developed by the Target Entities, the Target Subsidiaries and/or, to the extent used in the Business, owned, used, or held for use by FJI or the Contributing Affiliates; (iv) internet domain names; and (v) unregistered trademarks and unregistered service marks currently used in connection with any material products or material services of FJI, the Contributing Affiliates, the Target Entities and/or Target Subsidiaries.  To the extent indicated in Sections 3.15(b)(i), 3.15(b)(ii) and 3.15(b)(iv) of the FJI Disclosure Letter, such Intellectual Property has been duly registered in, filed in or issued by the United States Patent and Trademark Office, United States Copyright Office, a duly accredited and appropriate internet domain name registrar or the appropriate offices in the various states of the United States and the appropriate offices of other jurisdictions (foreign and domestic), and each such registration, filing and issuance remains valid as of the Closing Date.  Except as set forth in Section 3.15(b) of the FJI Disclosure Letter, with regard to Business Intellectual Property, there are no actions that must be taken or payments that must be made within 180 days following the Closing Date that, if not taken, shall cause a Business Material Adverse Effect.

(c)     Except as set forth in Section 3.15(c) of the FJI Disclosure Letter, FJI, the Contributing Affiliates, the Target Entities and/or the Target Subsidiaries own and possess, free and clear of Liens (other than Business Permitted Liens), all right title and interest in and to, or has the right to use pursuant to a valid and enforceable written license, all material Intellectual Property necessary to conduct the Business as presently conducted. There is no material Intellectual Property, other than (i) the Business Intellectual Property (whether included in the Target Assets or being transferred with the Target Entities and Target Subsidiaries), (ii) any Intellectual Property in connection with the services provided by FJI to PTC pursuant to the Transition Services Agreement, (iii) Intellectual Property licensed pursuant to the Trademark License Agreement, (iv) the Intellectual Property licensed herein pursuant to Section 5.26(a) and (v) patents that are outside the Knowledge of FJI (that are owned by Persons other than FJI, FJI's Subsidiaries or FJI's Affiliates), that is necessary to conduct the Business as presently conducted.

(d)     Except as set forth in Section 3.15(d) of the FJI Disclosure Letter and subject to any third party consents for any licensed Intellectual Property, the transactions contemplated by this Agreement shall not impair the right, title, or interest of FJI, the Contributing Affiliates, the Target Entities and/or the Target Subsidiaries in and to the Business Intellectual Property and all of the Business Intellectual Property shall be owned or available for use by PTC, the Target Entities and/or the Target Subsidiaries immediately after the Closing on terms and conditions equivalent (taking into account any restructuring or partial assignments of licensed Intellectual Property based upon the Plan and the Confirmation Order, or the Sale Order, as the case may be) to those under which FJI, the Contributing Affiliates, the Target Entities and/or the Target Subsidiaries owned or used the Business Intellectual Property immediately prior to the Closing.

56

(e)    FJI, the Contributing Affiliates, the Target Entities and the Target Subsidiaries have used commercially reasonable efforts to protect and preserve the confidentiality of all Trade Secrets held by or for the Business.

(f)    Except as would not have, or would not reasonably be expected to have, individually or in the aggregate, a Business Material Adverse Effect, FJI, the Contributing Affiliates, the Target Entities and the Target Subsidiaries have in place a privacy policy regarding the collection and use of customer information in accordance with applicable Law and industry standards and practice. Except as would not have, or would not reasonably be expected to have, individually or in the aggregate, a Business Material Adverse Effect, FJI, the Contributing Affiliates, the Target Entities and the Target Subsidiaries are in compliance with such privacy policy and FJI, the Contributing Affiliates, the Target Entities and the Target Subsidiaries do not use customer information in an unlawful manner or in a manner that violates the privacy rights of their customers.

(g)    Except as set forth in Section 3.15(g) of the FJI Disclosure Letter, FJI, the Contributing Affiliates, the Target Entities and/or the Target Subsidiaries have not received, within the past three (3) years, any written notice or written claim from any third party challenging their right to use any Intellectual Property, or their ownership of, or license to, any of the Business Intellectual Property, or the validity of such Intellectual Property. The conduct of the Business as currently conducted does not violate, infringe, misappropriate, misuse or otherwise conflict with the Intellectual Property (except for patents that are outside the Knowledge of FJI) of any third party. To the Knowledge of FJI, no third party is currently violating, infringing, misusing, misappropriating, or otherwise conflicting with any of the Business Intellectual Property and there is no claim pending against any third party regarding any such violation, infringement, misuse, misappropriation, or conflict.

(h)    Except as set forth in Section 3.15(h) of the FJI Disclosure Letter and other than Assigned Business Intellectual Property licensed from PTC as contemplated by Section 5.26(b) of this Agreement, no Affiliate of FJI, other than a Contributing Affiliate, a Target Entity or a Target Subsidiary, owns or holds a license to any Business Intellectual Property.

(i)    To the Knowledge of FJI, there is no registered or applied for Intellectual Property, or any readily identifiable trade secret, software or database, in each case, that is subject to the license to FJI pursuant to Section 5.26(b) and that is material to the Business, other than the Intellectual Property set forth on Section 3.15(i) of the FJI Disclosure Letter.

Section 3.16    Broker's or Finder's Fees. No agent, broker, Person or firm acting on behalf of FJI, PSI, any of their respective Affiliates or the Target Entities or Target Subsidiaries is, or shall be, entitled to any broker's fees, finder's fees or commissions from the Target Entities, Target Subsidiaries or any of the other parties hereto, or from any of their Affiliates, in connection with this Agreement or any of the transactions contemplated hereby.

Section 3.17    Business Material Contracts.

57

(a)    Section 3.17 of the FJI Disclosure Letter sets forth an accurate and complete list of the following material Contracts (each, a "**Business Material Contract**") to which the Target Entities or any of the Target Subsidiaries is a party or by which any of them are bound or which constitute Target Assets and which relate primarily to the Business:

(i)    each Contract that contains restrictions with respect to (x) payment of dividends or any other distribution in respect of the capital stock or other equity interests of the Target Entities or any such Target Subsidiaries or (y) actions that may be undertaken by any Affiliate of FJI that materially restrict the operation of the Business by such Affiliate;

(ii)    each Contract relating to capital expenditures or other purchases of material, supplies, equipment or other assets or properties (other than purchase orders for inventory or supplies in the ordinary course of business) for which there are remaining required payment obligations in excess of $1,000,000 and which is not terminable upon notice of sixty (60) days or less or for a cost of less than $1,000,000;

(iii)    each Contract involving an outstanding loan (other than accounts receivable from trade debtors in the ordinary course of business) or an outstanding advance (other than travel and entertainment allowances to a Business Employee extended in the ordinary course of business) by any Target Entity or Target Subsidiary to, or an existing investment by any Target Entity or Target Subsidiary in, any Person, in each case of more than $1,000,000 (other than in each case an investment by a Wholly-Owned Target Entity in another Wholly-Owned Target Entity);

(iv)    each exclusive management service, consulting, financial advisory or any other similar type Contract and all contracts with investment or commercial banks, for which there are remaining required payment obligations in excess of $1,000,000 and which is not terminable upon notice of sixty (60) days or less or for a cost of less than $1,000,000, but, for the avoidance of doubt, in each case only to the extent that a Target Entity or Target Subsidiary is party thereto or such Contract is a Target Contract;

(v)    each Contract (x) limiting the ability of the Target Entities or any of the Target Subsidiaries, or the Business, after the Closing, to engage in any line of business or to compete with any Person or in any geographical area or (y) with respect to any Partially-Owned Company that contains any preemptive rights, "most favored nation" rights, "drag-along" or "tag-along" rights, rights of first refusal or first offer or exclusivity provisions with respect to the equity interests of any Partially-Owned Company;

(vi)    each Contract (other than this Agreement and any agreement or instrument entered into pursuant to this Agreement) to which any Target Entity or Target Subsidiary is party or which is a Target Contract with (x) assuming that the Closing shall have occurred and (in the case of a Target Contract) that such Target Contract was assigned at the Closing by FJI or a Contributing Affiliate, any Call Family Equityholder, FJI, the Contributing Affiliates, or any Affiliate of FJI (or, with respect to Contracts of TFJ, PSI) as a counterparty thereto, for which there are remaining required payment obligations in excess of $1,000,000 and which is not terminable upon notice of sixty (60) days or less or for a cost of less than $1,000,000; or (y) any current or former officer or

58

director of FJI, the Contributing Affiliates, the Target Entities or any of the Target Subsidiaries as the counterparty for which there are remaining required payment obligations in excess of $250,000 and which is not terminable upon notice of sixty (60) days or less or for a cost of less than $250,000;

(vii)    each Contract (including letters of intent, but specifically excluding any confidentiality agreements) with respect to the Business that sets forth the terms of any disposition or acquisition of material assets or properties after the date hereof outside of the ordinary course of business, or that involves any merger, consolidation or similar acquisition of a business after the date hereof whether or not enforceable after the date hereof;

(viii)    each Contract involving any joint venture, partnership, strategic alliance, franchise agreement, dealer agreement, shareholders' agreement, co-marketing, co-promotion, joint development or similar arrangement for which there are remaining annual payment obligations in excess of $1,000,000 and which is not terminable upon notice of sixty (60) days or less or for a cost of less than $1,000,000;

(ix)    each collective bargaining Contract or other Contract with any labor union that is currently in effect;

(x)    each Contract for the employment of any officer, individual employee or other Person on a full-time or consulting basis or any severance agreements, programs, policies or arrangements for which there are remaining required payment obligations in excess of $350,000 and which is not terminable upon notice of sixty (60) days or less or for a cost of less than $350,000, and each Contract to which a Target Entity or Target Subsidiary is party involving pensions, profit sharing, equity options, employee equity purchases or other plans or arrangements providing for deferred or other compensation for employees;

(xi)    each Contract that involves the performance of services for or by, or delivery of goods or materials (other than fuel, which is covered by clause (xix) below) to or by, the Business during the twelve (12) month period immediately prior to the date hereof of an amount or value in excess of $1,000,000 and which is not terminable upon notice of sixty (60) days or less or for a cost of less than $1,000,000;

(xii)    all Contracts (other than Contracts for commercially available, off-the-shelf software license fees of less than a total cost of $100,000) containing (y) a grant by FJI, any Affiliate of FJI, the Target Entities or any of the Target Subsidiaries to a third party of any Business Intellectual Property, or (z) a grant of any licensed Business Intellectual Property to FJI, any Affiliate of FJI, the Target Entities or any of the Target Subsidiaries;

(xiii)    each Contract not otherwise contemplated by any of the other subsections to this Section 3.17(a) for which there are remaining required payment obligations by a Target Entity or a Target Subsidiary or by FJI or a Contributing Affiliate with respect to the Business in excess of $1,000,000 and which is not terminable upon notice of sixty (60) days or less or for a cost of less than $1,000,000;

NEWYORK 7440434 (2K)

(xiv) each Contract with any Conoco/Shell Entity;

(xv)   each sale-leaseback Contract involving an annual base rental payment in excess of $500,000 and each other Contract involving leases or subleases of personal property (including trucks) (whether as lessee, sublessee, lessor or sublessor) and involving an annual base rental payment in excess of $1,000,000;

(xvi) each Contract with or involving any Governmental Entity;

(xvii) each Contract involving any resolution or settlement of any actual or threatened Action which imposes ongoing obligations on any Target Entity, any Target Subsidiary or FJI or any of the Contributing Affiliates with respect to the Business;

(xviii) each Contract involving Business Net Debt or TFJ Net Debt;

(xix) each Contract (or group of related Contracts) for the purchase or sale of raw materials, commodities, supplies, products or other personal property, or for the furnishing or receipt of related services which has not been fully performed, and the performance of which shall involve consideration in excess of $1,000,000 annually and which is not terminable upon notice of sixty (60) days or less or for a cost of less than $1,000,000, except for hedging contracts entered into in the ordinary course of business consistent with past practice; provided, that with respect to the purchase or sale of fuel, the foregoing shall only apply to the twenty (20) largest Contracts (or group of related Contracts), by aggregate annual consideration, for the purchase of fuel, and the twenty (20) largest Contracts (or group of related Contracts), by aggregate annual consideration, for the sale of fuel; and

(xx) any Contracts (or group of related Contracts) which involve consideration in excess of $1,000,000 annually and are not otherwise contemplated pursuant to any of the foregoing which has not been fully performed, which, for the avoidance of doubt, means, for example, that any Contracts (or group of related Contracts) described in clause (xix) above that is not among the twenty (20) largest Contracts (or group of related Contracts) shall not nor be deemed to fall within the requirements of this clause (xx).

(b)     Except (i) for events of default arising as a result of FJI filing a voluntary petition for relief under the Bankruptcy Code, (ii) for defaults relating to non-payment or late payment that will, assuming entry of the Confirmation Order or the Sale Order, as the case may be, and payment of the Cure Amounts, be cured upon effective assignment to PTC at Closing or (iii) as set forth in Section 3.17(b) of the FJI Disclosure Letter, each Contract set forth in Section 3.17 of the FJI Disclosure Letter (or required to be set forth in Section 3.17 of the FJI Disclosure Letter) is in full force and effect and there exists no default or event of default or event, occurrence, condition or act (including the contribution of the Target Holdings hereunder) which, with the giving of notice, the lapse of time or the happening of any other event or condition, would become a default or event of default thereunder with respect to any material term or provision of any such Contract. None of FJI, any of the Contributing Affiliates, any of the Target Entities nor any of the Target Subsidiaries has violated any of the material terms or conditions of any Contract required to be set forth in Section 3.17 of the FJI Disclosure Letter and all of the covenants to be

performed by any other party thereto have been fully performed in all material respects. FJI has delivered or made available to PTC true and complete copies, including all amendments thereto, of each Contract set forth in <u>Section 3.17</u> of the FJI Disclosure Letter. Subject to compliance with the Bankruptcy Code and entry of the Confirmation Order or the Sale Order, as the case may be, by the Bankruptcy Court and receipt of any consents specified in <u>Section 3.6,</u> after giving effect to applicable provisions of the Bankruptcy Code, including Sections 363 and 365, each of FJI and the Contributing Affiliates have the right to assign to PTC each of the Business Material Contracts to which it is a party on the Closing Date.

Section 3.18    <u>Environmental Matters</u>. Except as set forth in <u>Section 3.18</u> of the FJI Disclosure Letter, and except as would not have, or would not reasonably be expected to have, individually or in the aggregate, a Business Material Adverse Effect: (a) each of the Target Entities and each of the Target Subsidiaries and the Business has been, for the last three (3) years, and is in compliance with all applicable Environmental Laws, and has obtained, and is in compliance with, all Permits required of it under applicable Environmental Law; (b) there are no investigations or Actions by any Governmental Entity or other Person pending or, to the Knowledge of FJI, threatened, against the Business or any of the Target Entities or Target Subsidiaries under any Environmental Law; (c) none of the Business, the Target Entities nor any of the Target Subsidiaries has assumed contractually or, by operation of Law, the Liabilities of any other Person under any Environmental Law; (d) there are no facts, circumstances or conditions relating to the past or present business or operations of any of the Business, the Target Entities or any of the Target Subsidiaries or any of their respective predecessors (including the treatment, storage, transportation, handling, release or disposal of any Hazardous Substances or other materials at any location), or any real property or facility at any time owned, leased, or operated by the Business, the Target Entities or any of the Target Subsidiaries or any of their respective predecessors that would reasonably be expected to give rise to any claim or Action, or to any fines, penalties, corrective action, remedial costs, personal injury, property damage, or natural resource damage under any Environmental Law; and (e) the consummation of the transactions contemplated by this Agreement will not result in any obligations for site investigation or cleanup, or notification to or consent of any Governmental Entity or other Person with respect to any Target Real Property pursuant to any so-called "transaction-triggered" or "responsible property transfer" Environmental Laws. FJI has made available to PTC all material environmental audits, reports and other environmental documents relating to the Business, the Target Entities or any of the Target Subsidiaries or any of their respective predecessors, to the extent such documents are in the possession, custody or control of FJI or any of its predecessors. This <u>Section 3.18</u> contains the sole and exclusive representations and warranties of FJI with respect to any environmental, health or safety matters, including arising under any Environmental Laws or relating to Hazardous Substances.

Section 3.19    <u>Real Property</u>.

(a)    <u>Section 3.19(a)</u> of the FJI Disclosure Letter contains an accurate and complete list of all material real property owned in whole or in part by any of the Target Entities, Target Subsidiaries, Contributing Affiliates or by FJI that constitute part of the Business or the Target Assets. Each of the Target Entities and the Target Subsidiaries or FJI or a Contributing Affiliate has good title in fee simple to all the real property owned by it, free and clear of all Liens, except for Business Permitted Liens. No condemnation proceeding is pending in which a material portion of such real property is expected to be taken.

NEWYORK 7440434 (2K)

(b)    Section 3.19(b) of the FJI Disclosure Letter contains an accurate and complete list of all material leases of real property (collectively, the "**Business Real Property Leases**") to which any of the Target Entities, Target Subsidiaries, Contributing Affiliates or FJI is a party that constitute part of the Business or that constitute Target Assets (as lessee, sublessee, lessor or sublessor). The Target Entities or one of the Target Subsidiaries or FJI or a Contributing Affiliate has valid leasehold interests in all leased real property described in each Business Real Property Lease, free and clear of any and all Liens, except for Business Permitted Liens. Except (i) for those defaults that will be cured in accordance with the Plan and Confirmation Order, or the Sale Order, as the case may be (or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of the Business Real Property Leases), or (ii) as otherwise set forth in Section 3.19(b) of the FJI Disclosure Letter, each Business Real Property Lease is in full force and effect; all rents and additional rents due and payable under each such Business Real Property Lease have been paid; the lessee is not in default thereunder and no waiver or postponement of the lessee's obligations thereunder has been granted by the lessor. Except as set forth in Section 3.19(b) of the FJI Disclosure Letter, with respect to each Business Real Property Lease: (i) the counterparty to such Business Real Property Lease is not FJI or an Affiliate of FJI; and (ii) FJI has not subleased, licensed or otherwise granted any Person the right to use or occupy such real property or any material portion thereof.

Section 3.20    Affiliate Transactions; Interests in Clients, Suppliers, Etc. Except (a) for trade payables and SG&A payables and liabilities, (b) as will be settled on or prior to Closing in accordance with this Agreement, or (c) as otherwise set forth in Section 3.20 of the FJI Disclosure Letter, (i) there are no Liabilities owing by, or to, the Target Entities or any of the Target Subsidiaries, on the one hand, to, or by, FJI or any Affiliate of FJI, or any officer, director or Subsidiary of FJI or any such Affiliate (other than the Wholly-Owned Target Entities and any Target Subsidiaries that are wholly-owned by a Wholly-Owned Target Entity), on the other hand and (ii) for purposes of this representation, assuming that the Closing shall have occurred and (in the case of a Target Contract) that such Target Contract was assigned at the Closing by FJI or a Contributing Affiliate, there shall be no Target Contracts or Contracts to which any Target Entity or Target Subsidiary is a party which will have as a counterparty thereto FJI, any Affiliate of FJI (other than another Target Entity or Target Subsidiary) or any Call Family Delivery Party (or, with respect to Contracts of TFJ, PSI).  Section 3.20 of the FJI Disclosure Letter lists (x) the type of SG&A services provided by FJI and its Subsidiaries (other than the Target Entities and the Target Subsidiaries) to the Target Entities and the Target Subsidiaries or otherwise with respect to the Business during the six-month period ended on the Balance Sheet Date and (y) each type of service or product purchased, sold, provided or received by FJI and/or one or more Subsidiaries (or any stockholder, officer or director of FJI, or any Person controlled by such stockholder, officer or director) that accounted for more than 1% of the consolidated revenues or expenses of the Business for the six-month period ended July 31, 2009, other than, in the case of this clause (y), the SG&A services provided by FJI and or its Subsidiaries (other than the Target Entities and the Target Subsidiaries) to the Target Entities and/or the Target Subsidiaries or otherwise with respect to the Business during the six-month period ended on the Balance Sheet Date.

Section 3.21    Title to Personal Properties. The Target Entities, one of the Target Subsidiaries, a Contributing Affiliate or FJI has valid right, title or interest in or to or, in the case of leased assets, a valid leasehold interest, free and clear of all Liens, except for

Business Permitted Liens, to all of the tangible and intangible personal property and assets reflected in the Business Financial Statements or thereafter acquired, except for properties and assets disposed of in the ordinary course of business since the Balance Sheet Date. The representations and warranties in this <u>Section 3.21</u> shall not apply to the Business Intellectual Property, which is instead addressed in <u>Section 3.15</u>.

Section 3.22    <u>Insurance</u>. Set forth in <u>Section 3.22</u> of the FJI Disclosure Letter is an accurate and complete list of insurance policies (other than title insurance policies) which, subject to self-insured retentions, deductibles, coverage limits, policy exclusions and other policy terms, cover the Business, the Target Entities and the Target Subsidiaries or their business, properties, assets or employees (including self-insurance) for the policy year that includes the date of this Agreement. Except as set forth in <u>Section 3.22</u> of the FJI Disclosure Letter, all premiums required to have been paid thereon have been paid, the insured parties are otherwise in compliance in all material respects with the terms and provisions of such policies and such policies are in full force and effect. Neither the Target Entities nor any of the Target Subsidiaries nor the Business is in default under any of the insurance policies set forth in <u>Section 3.22</u> of the FJI Disclosure Letter (or required to be set forth in <u>Section 3.22</u> of the FJI Disclosure Letter). Except as set forth in <u>Section 3.22</u> of the FJI Disclosure Letter, neither the Target Entities or any of the Target Subsidiaries, nor FJI or any Contributing Affiliate has received any written notice from or on behalf of any insurance carrier issuing policies or binders relating to or covering the Business, the Target Entities or any of the Target Subsidiaries that there shall be a cancellation or non-renewal of any such policy or arrangement, or that alteration of any equipment or any improvements to real estate occupied by or leased to or by the Business, the Target Entities or any of the Target Subsidiaries, purchase of additional equipment, or material modification of any of the methods of doing business, shall be required, nor has the termination of any such policies or arrangements been threatened in writing. There exists no event, occurrence, condition or act (including the contribution of the Target Equity Interests hereunder) which, with the giving of notice, the lapse of time or the happening of any other event or condition, would entitle any insurer to terminate or cancel any such policies. <u>Section 3.22</u> of the FJI Disclosure Letter sets forth a list of all pending claims and the claims history (including any denied claims) of the Target Entities and each Target Subsidiaries during the past three (3) years (including with respect to insurance obtained but not currently maintained). Flying J Insurance Company has sufficient assets and liquidity under applicable Law to fulfill its obligations under its existing insurance policies.

Section 3.23    <u>Sufficiency of Assets</u>. Except for (a) (i) the Excluded Assets, (ii) assets acquired and/or disposed of since the Balance Sheet Date in the ordinary course of business and, with respect to assets acquired or disposed of after the date of this Agreement, in accordance with this Agreement, (iii) SG&A assets and services provided by to the Business or at the direction of FJI and the Contributing Affiliates, and (iv) other assets and services listed in <u>Section 3.23</u> of the FJI Disclosure Letter, (b) the assets and services to be provided pursuant to the agreements contemplated hereby and (c) other services and assets the failure of which would not result in a Business Material Adverse Effect, as of the Closing, the Target Assets and the assets of the Target Entities and the Target Subsidiaries will consist of all of the material assets used in the operation of the Business by FJI, the Contributing Affiliates, the Target Entities and the Target Subsidiaries as of the Balance Sheet Date.

Section 3.24    <u>Books and Records</u>. The respective minute books of FJI, the Target Entities and the Target Subsidiaries, as previously made available to PTC and its

63

Representatives, are complete and correct and contain accurate records of all meetings of, and corporate action taken by (including action taken by written consent) the respective equityholders and Boards of Directors (or similar governing body) of FJI, the Target Entities and each Target Subsidiary. Neither FJI, the Target Entities nor any Target Subsidiary has any of its records, systems, controls, data or information recorded, stored, maintained, operated or otherwise wholly or partly dependent on or held by any means (including any electronic, mechanical or photographic process, whether computerized or not) which (including all means of access thereto and therefrom) are not under the exclusive ownership and direct control of FJI, the Target Entities or a Target Subsidiary.

Section 3.25  Improper and Other Payments. Except as set forth in Section 3.25 of the FJI Disclosure Letter, (a) none of FJI, the Contributing Affiliates, the Target Entities, the Target Subsidiaries nor any Representative of FJI, the Contributing Affiliates, the Target Entities, the Target Subsidiaries nor any Person acting on behalf of any of them, has made, paid or received any unlawful bribes, kickbacks or other similar payments to or from any Person (including any customer or supplier) or Governmental Entity, (b) no contributions have been made by FJI, the Contributing Affiliates, the Target Entities, or the Target Subsidiaries, directly or indirectly, to a domestic or foreign political party or candidate, (c) no improper foreign payment (as defined in the Foreign Corrupt Practices Act of 1977 (the "**Foreign Corrupt Practices Act**") has been made by FJI, the Contributing Affiliates, the Target Entities, or the Target Subsidiaries, and (d) the internal accounting controls of FJI, the Contributing Affiliates, the Target Entities and the Target Subsidiaries are believed by FJI's, the Contributing Affiliates', the Target Entities' or the Target Subsidiaries' management to be adequate to detect any of the foregoing under current circumstances.

Section 3.26  No Knowledge of Misrepresentations. To the Knowledge of each Seller, PTC is not in breach of any of the representations and warranties made by PTC to such Seller in Article IV of this Agreement; provided that, to the extent PTC shall allege any breach by any Seller of this Section 3.26, PTC shall have the burden of proving FJI's Knowledge or PSI's Knowledge, as applicable, of PTC's breach of the applicable representations and warranties made by PTC in Article IV of this Agreement.

Article IV

REPRESENTATIONS AND WARRANTIES OF PTC

As a material inducement to each Seller to enter into this Agreement and to consummate the transactions contemplated hereby, PTC hereby represents and warrants as follows, except as set forth in the PTC Disclosure Letter arranged as provided in Section 10.12(c) of this Agreement; provided, that the only representations and warranties PTC makes to PSI are set forth in Section 4.1, 4.2, 4.5 and 4.15:

Section 4.1  Due Organization, Good Standing and Corporate Power of PTC. PTC is a limited liability company, duly organized, validly existing and in good standing (or the equivalent thereof) under the Laws of the State of Delaware and has all requisite company power and authority to own, lease and operate its properties and to carry on its business as now being conducted, except where the failure to have such power or authority would not result, and would not reasonably be expected to result, in a PTC Material Adverse Effect. PTC is duly qualified or licensed to do business and is in good standing (or the equivalent thereof) in each

jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification or licensing necessary, except as would not have, or would not reasonably be expected to have, individually or in the aggregate, a PTC Material Adverse Effect. The copies of the governing documents of PTC and its Subsidiaries have been made available to the Sellers, reflect all amendments made thereto and are true and complete copies of such governing documents.

Section 4.2 <u>Authorization; Noncontravention</u>. PTC has the requisite company power and authority and has taken all company action necessary to execute and deliver this Agreement and all other instruments and agreements to be executed and delivered by PTC as contemplated hereby, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement and all other instruments and agreements to be executed and delivered by PTC as contemplated hereby, and the consummation by it of the transactions contemplated hereby and thereby, have been duly authorized and approved by the Board of Managers of PTC. No other company or member action on the part of PTC is necessary to authorize the execution, delivery and performance of this Agreement and all other instruments and agreements to be executed and delivered by PTC as contemplated hereby by PTC and the consummation of the transactions contemplated hereby and thereby. This Agreement and all other instruments and agreements to be executed and delivered by PTC as contemplated hereby have been or shall be duly executed and delivered by PTC and, assuming that this Agreement and such other instruments and agreements constitute valid and binding obligations of the Sellers, constitute valid and binding obligations of PTC enforceable against PTC in accordance with their terms, except to the extent that their enforceability may be subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general equitable principles. Assuming receipt (or giving, as applicable) of the consents, approvals, authorizations, declarations, filings and notices referred to in <u>Section 4.5</u> of the PTC Disclosure Letter, execution and delivery of this Agreement and such other instruments and agreements do not, and the consummation of the transactions contemplated by this Agreement and such other instruments and agreements shall not result in a violation or breach of, conflict with, constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of first offer, first refusal, termination, cancellation, payment or acceleration) under, or result in the creation of any Lien on any of the properties or assets of PTC: (a) any of the provisions of the certificate of incorporation or by-laws or other equivalent charter documents, as applicable, of PTC or any of the PTC Subsidiaries, in each case as amended to the date of this Agreement; (b) any Contract to which PTC or any of the PTC Subsidiaries is a party, or by which they or any of their respective properties or assets is bound; or (c) any Law or Order applicable to PTC or any of the PTC Subsidiaries or by which any of their respective properties or assets may be bound, other than, in the case of clauses (b) and (c) above, would not have, or would not reasonably be expected to have, individually or in the aggregate, a PTC Material Adverse Effect.

Section 4.3 <u>PTC Subsidiaries</u>.

(a)    <u>Section 4.3(a)</u> of the PTC Disclosure Letter lists each Subsidiary of PTC (each, a "**PTC Subsidiary**"). Each PTC Subsidiary is a legal entity duly organized, validly existing and in good standing (or the equivalent thereof) under the Laws of the jurisdiction of incorporation or organization and each PTC Subsidiary has all requisite power and authority to own, lease and operate its properties and to carry on its business as

now being conducted. Each PTC Subsidiary is duly qualified or licensed to do business and is in good standing (or the equivalent thereof) in each jurisdiction in which the character or location of the properties owned, leased or operated by such PTC Subsidiary or the nature of the business conducted by such PTC Subsidiary makes such qualification necessary, except as would not have, or would not reasonably be expected to have, individually or in the aggregate, a PTC Material Adverse Effect.

(b)    PTC does not own, directly or indirectly, any capital stock or other equity, ownership, proprietary or voting interest in any Person other than the PTC Subsidiaries.

(c)    Except as set forth in <u>Section 4.3(c)</u> of the PTC Disclosure Letter, there are no restrictions of any kind that prevent or restrict the payment of dividends or other distributions by any of PTC or the PTC Subsidiaries, other than those imposed by the Laws of general applicability of their respective jurisdictions of organization.

(d)    Except as set forth in <u>Section 4.3(d)</u> of the PTC Disclosure Letter, none of the assets of PTC or the PTC Subsidiaries is subject to any Lien that secures the obligations of PTC or its Affiliates within the meaning of clauses (a)(i), (iii), (iv), (vi) or (vii) of the definition of PTC Net Debt.

Section 4.4  <u>Capitalization</u>.

(a)    Effective as of the Closing, the equity capitalization of PTC, without giving effect to the transactions contemplated by the BDT Term Sheet, will be as set forth in <u>Section 4.4(a)</u> of the PTC Disclosure Letter.  Except as set forth in <u>Section 4.4(a)</u> of the PTC Disclosure Letter and except as set forth in the BDT Term Sheet, the PTC Units constitute all of the issued and outstanding equity interests of PTC. The PTC Units have been duly authorized and validly issued and, to the extent such concepts are applicable, are fully paid and nonassessable, and were not issued in violation of any preemptive rights. Except as set forth in the BDT Term Sheet, PTC is not a party to any outstanding or authorized option, warrant, right (including any preemptive right), subscription, claim of any character, agreement, obligation, convertible or exchangeable securities, or other commitments contingent or otherwise, relating to the capital stock or other equity interest in PTC or any PTC Subsidiary, pursuant to which PTC is or may become obligated to issue, deliver or sell or cause to be issued, delivered or sold, shares of capital stock of or other equity or voting interests in, PTC or any securities convertible into, exchangeable for, or evidencing the right to subscribe for or acquire, any shares of the capital stock of or other equity or voting interests in PTC. Except as set forth in <u>Section  4.4(a)</u> of the PTC Disclosure Letter, there are no outstanding or authorized stock appreciation, phantom stock, profit participation or similar rights with respect to the capital stock of, or other equity or voting interests in, PTC. Except as set forth in the BDT Term Sheet, PTC does not have any authorized or outstanding bonds, debentures, notes or other indebtedness the holders of which have the right to vote (or convertible into, exchangeable for, or evidencing the right to subscribe for or acquire securities having the right to vote) with the equityholders of PTC on any matter. There are no irrevocable proxies and no voting agreements with respect to any of the PTC Units.

(b)    Each PTC Subsidiary has the equity capitalization set forth in Section 4.4(b) of the PTC Disclosure Letter. Except as set forth in Section 4.4(b) of the PTC Disclosure Letter, all issued and outstanding shares of capital stock or other equity interests of each PTC Subsidiary have been duly authorized and validly issued and, to the extent such concepts are applicable, and are fully paid and nonassessable, and are not subject to any preemptive rights. No shares of capital stock or other equity interests of any PTC Subsidiary are issued, reserved for issuance or outstanding. The PTC Subsidiaries are not party to any outstanding option, warrant, call, subscription, or other right (including any preemptive right), agreement or commitment relating to the capital stock, or other equity interests in, PTC or PTC Subsidiaries, pursuant to which such PTC Subsidiary is or may become obligated to issue, deliver or sell or cause to be issued, delivered or sold, shares of capital stock of or other equity or voting interests in, such PTC Subsidiary or any securities convertible into, exchangeable for, or evidencing the right to subscribe for or acquire, any shares of the capital stock of or other equity or voting interests in, such PTC Subsidiary. Except as set forth in Section 4.4(b) of the PTC Disclosure Letter, there are no outstanding or authorized stock appreciation, phantom stock, profit participation or similar rights with respect to the capital stock of, or other equity or voting interests in, any PTC Subsidiary. No PTC Subsidiary has any authorized or outstanding bonds, debentures, notes or other indebtedness the holders of which have the right to vote (or convertible into, exchangeable for, or evidencing the right to subscribe for or acquire securities having the right to vote) with the equityholders of any PTC Subsidiary on any matter. There are no irrevocable proxies and no voting agreements with respect to any capital stock of, or other equity or voting interests in, any PTC Subsidiary.

Section 4.5    Consents and Approvals. Except as set forth in Section 4.5 of the PTC Disclosure Letter and excluding Permits (which are the subject of Section 4.9), assuming all required Antitrust Filings are made and any waiting periods thereunder have been terminated or expired and no consent of or filing with any Governmental Entity or any other third party, which has not been received or made, is necessary or required under (a) any of the terms, conditions or provisions of any Law or Order applicable to PTC or any of the PTC Subsidiaries or by which any of their respective properties or assets may be bound, or (b) any Contract to which PTC or any of the PTC Subsidiaries is a party or by which any of them or any of their respective assets or properties may be bound, for the execution and delivery of this Agreement and all other instruments and agreements to be executed and delivered by PTC or any of its Affiliates as contemplated hereby or the consummation by PTC or any of its Affiliates of the transactions contemplated hereby or thereby, where the failure of which to be received or made would not have and would not reasonably be expected to have, individually or in the aggregate, a PTC Material Adverse Effect.

Section 4.6    Financial Statements; Undisclosed Liabilities.

(a)    PTC has furnished FJI with the (i) audited consolidated balance sheets of PTC and the PTC Subsidiaries as at December 31, 2008, December 31, 2007 and December 31, 2006, and the related audited consolidated statements of operations, members' capital and cash flows for the fiscal years ended December 31, 2008, December 31, 2007 and December 31, 2006, and (ii) unaudited consolidated balance sheet of PTC and the PTC Subsidiaries as at March 31, 2009, April 30, 2009, May 31, 2009, June 30, 2009, and as at the Balance Sheet Date, and the related unaudited consolidated statements of operations, members' capital and cash flows for the ten (10) months ended on the Balance

Sheet Date. The financial statements referred to above, including any footnotes thereto (the "**PTC Financial Statements**"), except as described therein, have been prepared from, and consistent with, the books and records of PTC and the PTC Subsidiaries.

(b)    The audited balance sheets of PTC referred to in Section 4.6(a) fairly present, in all material respects, in conformity with GAAP the financial condition of PTC and the PTC Subsidiaries as at December 31, 2008, December 31, 2007 and December 31, 2006, respectively, and the related statements of operations, members' capital and cash flows fairly present, in all material respects, in conformity with GAAP the results of operations, members' capital and cash flows of PTC and the PTC Subsidiaries for the fiscal years then ended. The unaudited balance sheets of PTC referred to in Section 4.6(a) fairly present, in all material respects, in conformity with GAAP the financial condition of PTC and the PTC Subsidiaries as at the relevant dates, respectively, and the related statement of operations, members' capital and cash flows referred to in Section 4.6(a) fairly presents, in all material respects, in conformity with GAAP the results of operations, members' capital and cash flows of PTC and the PTC Subsidiaries for the ten (10) months then ended.

(c)    Neither PTC nor any of the PTC Subsidiaries has any Liabilities that would be required to be reflected on a balance sheet prepared in accordance with GAAP, except for (i) Liabilities set forth in the most recent PTC Financial Statements, (ii) current Liabilities incurred subsequent to the Balance Sheet Date in the ordinary course of business, (iii) Liabilities included or to be included in the computation of Closing PTC Net Debt or Closing PTC Working Capital, (iv) Liabilities disclosed in Section 4.6(c) of the PTC Disclosure Letter, and (v) other Liabilities that do not exceed in the aggregate $3,000,000. Other than sale-leaseback and other arrangements that are recorded as operating leases in accordance with GAAP and except as set forth in Section 4.6(c) of the PTC Disclosure Letter, none of PTC nor any of the PTC Subsidiaries maintains any "off balance sheet arrangements".

Section 4.7 Absence of Certain Changes. Since the Balance Sheet Date, there has not been, individually or in the aggregate, a PTC Material Adverse Effect. Since the Balance Sheet Date, neither PTC nor any of its Subsidiaries has undertaken any action that, if they had been taken subsequent to the execution of this Agreement and on or prior to the Closing Date, would, without the consent of PTC, constitute a breach of the covenants set forth in Section 5.4 (assuming for this purpose that the necessary consents had not been obtained).

Section 4.8 Compliance with Laws. Except as set forth in Section 4.8 of the PTC Disclosure Letter, PTC and each of the PTC Subsidiaries during the last three (3) years has, and is, conducting their operations in compliance with all Laws and Orders applicable to PTC or the PTC Subsidiaries, except as would not have, or would not reasonably be expected to have, individually or in the aggregate, a PTC Material Adverse Effect. Except as set forth in Section 4.8 of the PTC Disclosure Letter, neither PTC nor any of the PTC Subsidiaries has, since the Balance Sheet Date, received any notice that any violation of the foregoing is being alleged, except as would not have, or would not reasonably be expected to have, individually or in the aggregate, a PTC Material Adverse Effect. Except as set forth in Section 4.8 of the PTC Disclosure Letter, none of PTC or the PTC Subsidiaries is aware of or has been advised in writing of any facts or circumstances that exist which would cause it to be deemed to be operating in violation of the Patriot Act or any other applicable anti-money laundering Law,

except as would not have, or would not reasonably be expected to have, individually or in the aggregate, a PTC Material Adverse Effect.

Section 4.9 <u>Permits</u>. Except as set forth in <u>Section 4.9</u> of the PTC Disclosure Letter, PTC and its Subsidiaries have obtained and possess all Permits that are necessary for the operation of the business of PTC or the PTC Subsidiaries as presently conducted, or that are necessary for the lawful ownership of their respective properties and assets, except where any failure to obtain or possess a Permit would not have, or would not reasonably be expected to have, individually or in the aggregate, a PTC Material Adverse Effect. PTC has delivered to FJI for inspection a true and complete copy, including all amendments thereto, of each Permit obtained or possessed by PTC or its Subsidiaries. Except as set forth in <u>Section 4.9</u> of the PTC Disclosure Letter, all such Permits are in full force and effect, except as would not have, or would not reasonably be expect to have, individually or in the aggregate, a PTC Material Adverse Effect. Each such Permit can be renewed or transferred in the ordinary course of business by PTC or its Subsidiaries. Except as set forth in <u>Section 4.9</u> of the PTC Disclosure Letter, PTC, and its Subsidiaries are in compliance with all such Permits, except as would not have, or would not reasonably be expected to have, individually or in the aggregate, a PTC Material Adverse Effect. Except as set forth in <u>Section 4.9</u> of the PTC Disclosure Letter, or except as would not have, or would not reasonably be expected to have, individually or in the aggregate, a PTC Material Adverse Effect, no Action by any Governmental Entity or other proceeding to modify, suspend, revoke, withdraw, terminate or otherwise limit any such Permit is pending or, to the Knowledge of PTC, threatened.

Section 4.10 <u>Litigation</u>. Except as set forth in <u>Section 4.10</u> of the PTC Disclosure Letter, (a) there is no Action by, before or against any Governmental Entity or any other Person pending or, to the Knowledge of PTC, threatened, against or affecting PTC or any of the PTC Subsidiaries, or any of their respective properties, assets or rights, except as would not have, or would not reasonably be expected to have, individually or in the aggregate, a PTC Material Adverse Effect, (b) neither PTC nor any of the PTC Subsidiaries is subject to any Order, except as would not have, or would not reasonably be expected to have, individually or in the aggregate, a PTC Material Adverse Effect.

Section 4.11 <u>PTC Employee Benefit Plans</u>.

(a)    Set forth in <u>Section 4.11</u> of the PTC Disclosure Letter is a true and complete list of each employee benefit plan (as defined in Section 3(3) of ERISA) and material fringe benefit plan maintained or contributed to or required to be contributed to by PTC or any of its Affiliates, with respect to any present or former employee of PTC or such Affiliate ("**PTC Employee Benefit Plans**").

(b)    Except as set forth in <u>Section 4.11(b)</u> of the PTC Disclosure Letter, neither PTC nor any PTC Subsidiary nor any of their Affiliates, (nor any employer (whether or not incorporated)) that would be treated together with PTC, any PTC Subsidiary or any such Affiliate as a single employer within the meaning of Section 414 of the Code, has ever maintained or contributed to, or had any obligation to contribute to (or borne any Liability with respect to) any "employee pension benefit plan," within the meaning of Section 3(2) of ERISA, that is a "multiemployer plan," within the meaning of Section 3(37) of ERISA, or subject to Section 412 of the Code, or Section 302 or Title IV of ERISA.

(c)    Each PTC Employee Benefit Plan intended to be qualified under Section 401(a) of the Code, has received a favorable determination letter from the IRS covering all Tax Law changes including the Economic Growth and Tax Relief Reconciliation Act of 2001 or is comprised of a master or prototype plan that has received a favorable opinion letter from the IRS, and since the date of such determination, no event has occurred that resulted or would reasonably be expected to result in the revocation of any such determination letter or opinion letter.

(d)    PTC and each PTC Subsidiary have complied in all material respects with the applicable requirements of COBRA, except to the extent that any such noncompliance would not reasonably be expected to result in material Liability, and neither PTC nor any PTC Subsidiary is subject to any material Liability as a result of any failure to administer or operate any "group health plan" (as defined in COBRA and/or as defined in 45 Code of Federal Regulations Section 160.103) in compliance with COBRA and/or the applicable requirements of the Health Insurance Portability and Accountability Act of 1996 and the regulations promulgated thereunder.

(e)    Full payment has been made of all amounts which PTC or any PTC Subsidiary is required under applicable Law or under any PTC Employee Benefit Plan or any agreement relating to any PTC Employee Benefit Plan to have paid as contributions or premiums thereunder as of the last day of the most recent fiscal year of such PTC Employee Benefit Plan ended prior to the date hereof or have been timely reflected on the most recent consolidated balance sheet filed prior to the date hereof or accrued in the account records of PTC or any PTC Subsidiary.

(f)    No litigation or administrative or other proceeding, audit, examination or investigation is pending or asserted, or, to the Knowledge of PTC, threatened, anticipated or expected to be asserted with respect to any PTC Employee Benefit Plan or the assets of any such plan (other than routine claims for benefits arising in the ordinary course).  None of PTC or any PTC Subsidiary has filed, or is considering filing, an application under the IRS Employee Plans Compliance Resolution System or the Department of Labor's Voluntary Fiduciary Correction Program with respect to any PTC Employee Benefit Plan.

(g)    PTC and the PTC Subsidiaries have, for purposes of each PTC Employee Benefit Plan, correctly classified those individuals performing services for PTC and the PTC Subsidiaries as common law employees, leased employees, independent contractors or agents of PTC and the PTC Subsidiaries. The execution of this Agreement and the consummation of the transactions contemplated hereby, do not constitute a triggering event under any PTC Employee Benefit Plan, policy, arrangement, statement, commitment or agreement, whether or not legally enforceable, which (either alone or upon the occurrence of any additional or subsequent event) shall or may result in any payment (whether of severance pay or otherwise), "parachute payment" (as such term is defined in Section 280G of the Code), acceleration, vesting or increase in benefits to any present or former employee or director of PTC or any PTC Subsidiary.

(h)    Except as set forth in <u>Section 4.11(h)</u> of the PTC Disclosure Letter, neither PTC nor any PTC Subsidiary has any obligation under any PTC Employee Benefit Plan or otherwise to provide post-employment or retiree welfare benefits to any former

NEWYORK 7440434 (2K)

employee or any other Person, except as required by applicable Laws or for death benefits or retirement benefits under any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA).

(i)    This Section 4.11 contains the sole and exclusive representations and warranties of PTC with respect to any employee benefits matters.

Section 4.12    Labor Matters

(a)    PTC has made available to FJI a true and complete list of all employees of PTC or the PTC Subsidiaries that were paid in excess of $350,000 during the fiscal year ended December 31, 2008, indicating their position, date of hire, base pay, bonus structure and additional compensation incentives. Except as set forth in Section 4.12(a) of the PTC Disclosure Letter, PTC and each of the PTC Subsidiaries is and has been in compliance with all applicable Laws, agreements, policies, plans and programs relating to labor or employment relations or practices (including terms and conditions of employment, management-labor relations, wage and hour issues, immigration and occupational safety and health) and is not engaged in and, since the Balance Sheet Date, has not engaged in any unfair labor practice, except in each case as would not have, or would not reasonably be expected to have, individually or in the aggregate, a PTC Material Adverse Effect.

(b)    No employee of PTC or any of the PTC Subsidiaries is represented by any union or covered by any collective bargaining agreement, nor is any such labor union or collective bargaining agreement currently being negotiated with PTC or any PTC Subsidiaries. Neither PTC nor any of the PTC Subsidiaries is subject to a pending, or, to PTC's Knowledge, threatened or anticipated demand by a labor organization for recognition or certification, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or, to the Knowledge of PTC, threatened to be brought or filed with the National Labor Relations Board or any other labor relations tribunal or authority.

(c)    There are no pending or, to the Knowledge of PTC, threatened strikes, lockouts, union organization activities (including union organization campaigns or requests for representation), pickets, slowdowns, stoppages, material grievances or material labor disputes relating to the business of PTC.

(d)    Except as set forth in Section 4.12(d) of the PTC Disclosure Letter, or except as would not have, or would not reasonably be expected to have, individually or in the aggregate, a PTC Material Adverse Effect, there are no pending or, to the Knowledge of PTC, threatened Actions, investigations, inspections, audits or notices of violations or possible violations brought by or on behalf of, or otherwise involving, any current or former employee, any Person alleged to be a current or former employee, any applicant for employment, or any class of the foregoing, or any Governmental Entity, that involve the labor or employment relations and practices of PTC or any of the PTC Subsidiaries (collectively, "**PTC Labor Actions**").

(e)    Except as set forth in Section 4.12(e) of the PTC Disclosure Letter, neither PTC nor any of the PTC Subsidiaries employs any Person who cannot be dismissed

71

immediately without notice and without further material Liability, subject to the requirements of Law.

(f)    Neither PTC nor any of the PTC Subsidiaries has engaged in layoffs or employment terminations sufficient in number to trigger application of WARN during the last three (3) years. Each of PTC and the PTC Subsidiaries is and has been in compliance with WARN, and PTC and the PTC Subsidiaries have not incurred any Liability under WARN which remains unsatisfied.

Section 4.13    Tax Matters.

Except as set forth in Section 4.13 of the PTC Disclosure Letter:

(a)    Tax Returns.    PTC and each of the PTC Subsidiaries has filed or caused to be filed, or shall file or cause to be filed, all Returns that are required to be filed by, or with respect to, PTC and the PTC Subsidiaries on or prior to the Closing Date (taking into account any applicable extension of time within which to file). Such Returns are and shall be true, correct and complete in all material respects.

(b)    Payment of Taxes.    All material Taxes and material Tax Liabilities of or with respect to PTC and the PTC Subsidiaries that are due and payable on or prior to the Closing Date have been (or shall be) paid on or prior to the Closing Date or accrued on the books and records of PTC and the PTC Subsidiaries in accordance with GAAP.

(c)    Other Tax Matters.

(i)    Neither PTC nor any of the PTC Subsidiaries is currently the subject of an audit or other examination relating to the payment of a material amount of Taxes of PTC or the PTC Subsidiaries by the taxing authorities of any Governmental Entity nor have PTC or the PTC Subsidiaries received any written notices from any taxing authority that such an audit or examination is pending.

(ii)    Neither PTC nor any of the PTC Subsidiaries (x) has entered into a written agreement or waiver extending any statute of limitations relating to the payment or collection of a material amount of Taxes of or with respect to PTC and the PTC Subsidiaries that have not expired or (y) are presently contesting any Tax Liability of PTC or the PTC Subsidiaries before any Governmental Entity.

(iii)    All Taxes that PTC or the PTC Subsidiaries are (or were) required by Law to withhold or collect in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, member or other third party have been duly withheld or collected, and have been timely paid over to the proper authorities to the extent due and payable.

(iv)    Except as set forth in Section 4.13(c)(iv) of the PTC Disclosure Letter, no written claim has ever been made by any taxing authority in a jurisdiction where PTC or any of the PTC Subsidiaries does not file Returns that any of PTC or PTC Subsidiaries is or may be subject to taxation by that jurisdiction.