(v)    PTC and each PTC Subsidiary has delivered or made available to FJI true and complete copies, including all amendments thereto, of each of the Returns for income taxes filed on behalf of PTC and each PTC Subsidiary since December 31, 2005.

(vi)    Except set forth in Section 4.13(c)(vi) of the PTC Disclosure Letter, neither PTC nor any of the PTC Subsidiaries shall be required to include any material item of income in, or exclude any material item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any of the following that occurred or exists on or prior to the Closing Date: (v) a "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local or non-U.S. income tax Law), (w) an installment sale or open transaction, (x) a prepaid amount, (y) an intercompany item under Treasury Regulation Section 1.1502-13 or an excess loss account under Treasury Regulation 1.1502-19, or (z) a change in the accounting method of PTC or any of the PTC Subsidiaries pursuant to Section 481 of the Code or any similar provision of the Code or the corresponding Tax Laws of any Governmental Entity.

(vii)    Neither PTC nor any of the PTC Subsidiaries has engaged in a "reportable transaction" within the meaning of Treasury Regulations Section 1.6011-4(b).

(viii)    There are no Liens on the PTC Units or any of the assets of PTC that arose in connection with any failure (or alleged failure) to pay any Taxes.

(ix)    Except as set forth in Section 4.13(c)(ix) of the PTC Disclosure Letter, neither PTC nor any of the PTC Subsidiaries has applied for, been granted, or agreed to any accounting method change for which it shall be required to take into account any adjustment under Section 481 of the Code or any similar provision of the Code or the corresponding Tax Laws of any Governmental Entity, (x) neither the IRS nor any other taxing authority has proposed or purported to require any such adjustment or change in accounting method, (y) no such adjustment under Section 481 of the Code or the corresponding Tax Laws of any Governmental Entity shall be required of PTC upon the completion of, or by reason of, the transactions contemplated by this Agreement.

(x)    Neither PTC nor any PTC Subsidiary is a party to any agreement that would require PTC or any PTC Subsidiary or any Affiliate thereof to make any payment that would constitute an "excess parachute payment" for purposes of Section 280G and 4999 of the Code.

(xi)    Except as set forth in Section 4.13(c)(xi) of the PTC Disclosure Letter, PTC and the PTC Subsidiaries are and have always been treated as corporations, partnerships or disregarded entities for U.S. federal income tax purposes as set forth in Section 4.13(c)(xi) of the PTC Disclosure Letter.

(d)    No Other Tax Representation and Warranties. This Section 4.13 contains the sole and exclusive representations and warranties of PTC with respect to any Tax matters.

Section 4.14    Intellectual Property.

(a)    To the Knowledge of PTC, copies of all material Contracts concerning the use of any of the PTC Intellectual Property which have been made available to FJI reflect all amendments made thereto and are true and complete copies of such Contracts.

(b)    Section 4.14(b) of the PTC Disclosure Letter sets forth a list of all of the following that are owned, used or held for use by PTC and/or the PTC Subsidiaries (all of which shall be deemed included within the meaning of "PTC Intellectual Property"): (i) issued patents, registered trademarks and registered copyrights; (ii) pending patent applications, trademark applications and copyright applications; (iii) all computer software (other than commercially available, off the shelf software licensed for less than a total cost of $100,000), and all computer software owned or developed by PTC and/or the PTC Subsidiaries; (iv) internet domain names; and (v) unregistered trademarks and unregistered service marks currently used in connection with any material products or material services of PTC and/or the PTC Subsidiaries.  To the extent that any registered or applied for PTC Intellectual Property is owned by any Affiliate of PTC, such ownership status is indicated on Schedule 4.14(b).  To the extent indicated in Sections 4.14(b)(i), 4.14(b)(ii) and 4.14(b)(iv) of the PTC Disclosure Letter, such Intellectual Property has been duly registered in, filed in or issued by the United States Patent and Trademark Office, United States Copyright Office, a duly accredited and appropriate internet domain name registrar or the appropriate offices in the various states of the United States and the appropriate offices of other jurisdictions (foreign and domestic), and each such registration, filing and issuance remains valid as of the Closing Date.  Except as set forth in Section 4.14(b) of the PTC Disclosure Letter, with regard to the PTC Intellectual Property, there are no actions that must be taken or payments that must be made within 180 days following the Closing Date that, if not taken, shall cause a PTC Material Adverse Effect.

(c)    Except as set forth in Section 4.14(c) of the PTC Disclosure Letter, to the Knowledge of PTC, PTC and/or the PTC Subsidiaries own and possess, free and clear of Liens (other than PTC Permitted Liens), all right title and interest in and to, or has the right to use pursuant to a valid and enforceable written license, all Intellectual Property necessary to conduct the respective businesses of PTC and the PTC Subsidiaries as presently conducted.    There is no material Intellectual Property, other than the PTC Intellectual Property and patents that are outside the Knowledge of PTC (that are owned by Persons other than PTC, PTC's Subsidiaries, or PTC's Affiliates), that is necessary to conduct the respective business of PTC and the PTC Subsidiaries as presently conducted.

(d)    Except as set forth in Section 4.14(d) of the PTC Disclosure Letter and subject to any third party consents for any licensed Intellectual Property, the transactions contemplated by this Agreement shall not impair the right, title, or interest of PTC and/or the PTC Subsidiaries in and to the PTC Intellectual Property and all of the PTC Intellectual Property shall be owned or available for use by PTC and/or the PTC Subsidiaries immediately after the Closing on terms and conditions equivalent to those under which PTC, and/or the PTC Subsidiaries owned or used the PTC Intellectual Property immediately prior to the Closing.

74

(e)    PTC and/or the PTC Subsidiaries have used commercially reasonable efforts to protect and preserve the confidentiality of all material Trade Secrets held by or for the respective businesses of PTC and/or the PTC Subsidiaries.

(f)    Except as would not have, or would not reasonably be expected to have, individually or in the aggregate, a PTC Material Adverse Effect, PTC and the PTC Subsidiaries have in place a privacy policy regarding the collection and use of customer information in accordance with applicable Law and industry standards and practice. Except as would not have, or would not reasonably be expected to have, individually or in the aggregate, a PTC Material Adverse Effect, PTC and the PTC Subsidiaries are in compliance with such privacy policy and PTC and/or the PTC Subsidiaries do not use customer information in an unlawful manner or in a manner that violates the privacy rights of their customers.

(g)    Except as set forth in <u>Section 4.14(g)</u> of the PTC Disclosure Letter, PTC and/or the PTC Subsidiaries have not received, within the past three (3) years, any written notice or written claim from any third party challenging their right to use any material Intellectual Property, or their ownership of, or license to, any of the PTC Intellectual Property, or the validity of such Intellectual Property. The conduct of the respective businesses of PTC and the PTC Subsidiaries as currently conducted does not violate, infringe, misappropriate, misuse or otherwise conflict with the Intellectual Property (except for patents that are outside the Knowledge of PTC) of any third party. To the Knowledge of PTC, no third party is currently violating, infringing, misusing, misappropriating, or otherwise conflicting with any of the PTC Intellectual Property and there is no claim pending against any third party regarding any such violation, infringement, misuse, misappropriation, or conflict.

Section 4.15    <u>Broker's or Finder's Fees</u>. No agent, broker, Person or firm acting on behalf of PTC or any Affiliate of PTC is, or shall be, entitled to any broker's fees, finder's fees or commissions from PTC or any of the other parties hereto, or from any of their Affiliates, in connection with this Agreement or any of the transactions contemplated hereby.

Section 4.16    <u>PTC Contracts</u>.

(a)    <u>Section 4.16</u> of the PTC Disclosure Letter sets forth an accurate and complete list of the following material Contracts to which PTC, the PTC Subsidiaries and/or Pilot Corporation is a party or by which any of them are bound:

(i)    all Contracts involving pensions, profit sharing, equity options, employee equity purchases or other plans or arrangements providing for deferred or other compensation to employees;

(ii)    all collective bargaining Contracts or any other Contract with any labor union, or severance Contracts, programs, policies or arrangements currently in effect;

(iii)    all Contracts with or involving any Governmental Entity;

75

(iv)    all Contracts relating to the ownership of, investments in or loans and advances to any Person, including investments in joint ventures, partnerships and minority equity investments;

(v)    all Contracts (other than Contracts for commercially available, off-the-shelf software license fees of less than a total cost of $100,000) containing (y) a grant by PTC, Pilot Corporation or any of the PTC Subsidiaries to a third party of any PTC Intellectual Property, or (z) a grant of any licensed PTC Intellectual Property to PTC, Pilot Corporation or any of the PTC Subsidiaries;

(vi)    all Contracts (or group of related Contracts) for the purchase or sale of raw materials, commodities, supplies, products or other personal property, or for the furnishing or receipt of related services, the performance of which shall involve consideration in excess of $1,000,000 annually, except for hedging contracts entered into in the ordinary course of business consistent with past practice; provided, that with respect to the purchase or sale of fuel, the foregoing shall only apply to the twenty (20) largest Contracts (or group of related Contracts), by aggregate annual consideration, for the purchase of fuel, and the twenty (20) largest Contracts (or group of related Contracts), by aggregate annual consideration, for the sale of fuel;

(vii)    all Contracts which granted any Person registration rights, preemptive rights, "most favored nation" rights, "drag-along" or "tag-along" rights, rights of first refusal or first offer or exclusivity provisions with respect to the equity interests of PTC or any PTC Subsidiary;

(viii)    all Contracts (or group of related Contracts) which involve consideration in excess of $1,000,000 annually and are not otherwise contemplated pursuant to any of the foregoing, which, for the avoidance of doubt, means, for example, that any Contracts (or group of related Contracts) described in clause (viii) above that is not among the twenty (20) largest Contracts (or group of related Contracts) shall not nor be deemed to fall within the requirements of this clause (x);

(x)    all Contracts involving any resolution or settlement of any actual or threatened Action which has current effectiveness;

(xi)    all Contracts (other than this Agreement and any agreement or instrument entered into pursuant to this Agreement) to which PTC or any PTC Subsidiary is party with (x) any Affiliate of PTC or any PTC Subsidiary for which there are remaining required payment obligations in excess of $1,000,000 and which is not terminable upon notice of sixty (60) days or less or for a cost of less than $1,000,000 or (y) any current or former officer or director of PTC or any PTC Subsidiary for which there are remaining required payment obligations in excess of $250,000 and which is not terminable upon notice of sixty (60) days or less or for a cost of less than $250,000;

(xii)    all Contracts (including letters of intent, but specifically excluding any confidentiality agreements) with respect to the business of PTC or any of the PTC Subsidiaries that sets forth the terms of any disposition or acquisition of material assets or properties after the date hereof outside of the ordinary course of business, or that involves

76

any merger, consolidation or similar acquisition of a business after the date hereof whether or not enforceable after the date hereof;

(xiii)    all Contracts involving any joint venture, partnership, strategic alliance, franchise agreement, dealer agreement, shareholders' agreement, co-marketing, co-promotion, joint development or similar arrangement for which there are remaining annual payment obligations in excess of $1,000,000 and which is not terminable upon notice of sixty (60) days or less or for a cost of less than $1,000,000; and

(xiv)    all Contracts involving PTC Net Debt.

(b)    Each Contract required to be set forth in Section 4.16 of the PTC Disclosure Letter is in full force and effect and there exists no default or event of default or event, occurrence, condition or act which, with the giving of notice, the lapse of time or the happening of any other event or condition, would become a default or event of default thereunder with respect to any material term or provision of any such Contract. Neither PTC nor any PTC Subsidiary has violated any of the material terms or conditions of any Contract set forth in Section 4.16 of the PTC Disclosure Letter (or required to be set forth in Section 4.16 of the PTC Disclosure Letter) and all of the covenants to be performed by any other party thereto have been fully performed in all material respects. PTC has delivered or made available to FJI true and complete copies, including all amendments thereto, of each Contract set forth in Section 4.16 of the PTC Disclosure Letter.

Section 4.17    Environmental Matters. Except as set forth in Section 4.17 of the PTC Disclosure Letter, and except as would not have, or would not reasonably be expected to have, individually or in the aggregate, a Business Material Adverse Effect: (a) each of PTC and each of the PTC Subsidiaries has been, for the last three (3) years, and is in compliance with all applicable Environmental Laws, and has obtained, and is in compliance with, all Permits required of it under applicable Environmental Law; (b) there are no investigations or Actions by any Governmental Entity or other Person pending or, to the Knowledge of PTC, threatened, against PTC or any of the PTC Subsidiaries under any Environmental Law; (c) neither PTC nor any of the PTC Subsidiaries has assumed contractually or by operation of Law, the Liabilities of any other Person under any Environmental Law; and (d) there are no facts, circumstances or conditions relating to the past or present business or operations of PTC or any of the PTC Subsidiaries or any of their respective predecessors (including the treatment, storage, transportation, handling, release or disposal of any Hazardous Substances or other materials at any location), or any real property or facility at any time owned, leased, or operated by PTC or any of the PTC Subsidiaries or any of their respective predecessors that would reasonably be expected to give rise to any claim or Action, or to any fines, penalties, correction action, remedial costs, personal injury, property damage, or natural resource damage, under any Environmental Law. PTC has made available to FJI all material environmental audits, reports and other environmental documents relating to PTC or any of the PTC Subsidiaries or any of their respective predecessors, to the extent such documents are in the possession, custody or control of PTC, any of the PTC Subsidiaries or any of their respective predecessors. This Section 4.17 contains the sole and exclusive representations and warranties of PTC with respect to any environmental, health or safety matters, including any arising under any Environmental Laws or relating to Hazardous Substances.

Section 4.18    Real Property.

(a)    Section 4.18(a) of the PTC Disclosure Letter contains an accurate and complete list of all material real property owned in whole or in part by PTC or any of the PTC Subsidiaries. PTC and each of the PTC Subsidiaries has good title in fee simple to all the real property owned by it, free and clear of all Liens, except for PTC Permitted Liens. No condemnation proceeding is pending in which a material portion of such real property is expected to be taken.

(b)    Section 4.18(b) of the PTC Disclosure Letter contains an accurate and complete list of all material leases of material real property (collectively, the "**PTC Real Property Leases**") to which PTC or any of the PTC Subsidiaries is a party (as lessee, sublessee, lessor or sublessor). PTC or one of the PTC Subsidiaries has valid leasehold interests in all leased real property described in each PTC Real Property Lease, free and clear of any and all Liens, except for PTC Permitted Liens. Each PTC Real Property Lease is in full force and effect; all rents and additional rents due and payable under each such PTC Real Property Lease have been paid; the lessee is not in default thereunder and no waiver or postponement of the lessee's obligations thereunder has been granted by the lessor. Except as set forth in Section 4.18(b) of the PTC Disclosure Letter, with respect to each PTC Real Property Lease, PTC has not subleased, licensed or otherwise granted any Person the right to use or occupy such real property or any material portion thereof.

Section 4.19    Affiliate Transactions; Interests in Clients, Suppliers, Etc. Except as set forth in Section 4.19 of the PTC Disclosure Letter, (a) there are no Liabilities owing by, or to, PTC or any of the PTC Subsidiaries, on the one hand, to, or by, PTC or any officer, director or Affiliate of PTC (other than PTC or any of the PTC Subsidiaries), on the other hand and (b) there are no Contracts or arrangements between PTC or any PTC Subsidiary, on the one hand, and any Affiliate of PTC or any PTC Subsidiary, on the other hand. Section 4.19 of the PTC Disclosure Letter lists (a) the type of SG&A services provided by any Affiliate of PTC (other than the Subsidiaries of PTC) to PTC and the PTC Subsidiaries during the six-month period ended on the Balance Sheet Date and (b) each type of service or product purchased, sold, provided or received by PTC and/or one or more Subsidiaries (or any stockholder, officer or director of PTC, or any Person controlled by such stockholder, officer or director) that accounted for more than 1% of the revenues or expenses of PTC for the six-month period ended July 31, 2009, other than, in the case of this clause (b), the SG&A services any Affiliate of PTC (other than the Subsidiaries of PTC) to PTC and/or its Subsidiaries or otherwise with respect to the PTC during the six-month period ended on the Balance Sheet Date.

Section 4.20    Title to Personal Properties. Except as set forth in Section 4.20 of the PTC Disclosure Letter, PTC or one of the PTC Subsidiaries has valid right, title or interest, in the case of leased assets, a valid leasehold interest, free and clear of all Liens, except for PTC Permitted Liens, to all of the tangible and intangible personal property and assets reflected in the PTC Financial Statements or thereafter acquired, except for properties and assets disposed of in the ordinary course of business, consistent with past practice, since the Balance Sheet Date. The representations and warranties in this Section 4.20 shall not apply to the PTC Intellectual Property, which is instead addressed in Section 4.14.

Section 4.21    Insurance. Set forth in Section 4.21 of the PTC Disclosure Letter is an accurate and complete list of insurance policies other than title insurance policies) which, subject to self-insured retentions, deductibles, coverage limits, policy exclusions, and other policy terms, cover PTC and the PTC Subsidiaries or their businesses,

properties, assets or employees (including self-insurance) for the policy year that includes the date of this Agreement. Except as set forth in <u>Section 4.21</u> of the PTC Disclosure Letter, all premiums thereon have been paid and the insured parties are otherwise in compliance in all material respects with the terms and provisions of such policies and such policies are in full force and effect. Neither PTC nor any of the PTC Subsidiaries is in default under any of the insurance policies set forth in <u>Section 4.21</u> of the PTC Disclosure Letter (or required to be set forth in <u>Section 4.21</u> of the PTC Disclosure Letter). Except as set forth in <u>Section 4.21</u> of the PTC Disclosure Letter, neither PTC nor any of the PTC Subsidiaries has received any written notice from or on behalf of any insurance carrier issuing policies or binders relating to or covering PTC or any of the PTC Subsidiaries that there shall be a cancellation or non-renewal of any such policy or arrangement, or that alteration of any equipment or any improvements to real estate occupied by or leased to or by PTC or any of the PTC Subsidiaries, purchase of additional equipment, or material modification of any of the methods of doing business, shall be required, nor has the termination of any such policies or arrangements been threatened in writing. There exists no event, occurrence, condition or act which, with the giving of notice, the lapse of time or the happening of any other event or condition, would entitle any insurer to terminate or cancel any such policies. <u>Section 4.21</u> of the PTC Disclosure Letter sets forth a list of all pending claims and the claims history of PTC and each PTC Subsidiary during the past three (3) years (including with respect to insurance obtained but not currently maintained).

Section 4.22    <u>Books and Records</u>. The respective minute books of PTC and the PTC Subsidiaries, as previously made available to FJI and its Representatives, are complete and correct and contain accurate records of all meetings of, and corporate action taken by (including action taken by written consent) the respective equityholders and Boards of Directors (or similar governing body) of PTC and each PTC Subsidiary. Neither PTC nor any PTC Subsidiary has any of its records, systems, controls, data or information recorded, stored, maintained, operated or otherwise wholly or partly dependent on or held by any means (including any electronic, mechanical or photographic process, whether computerized or not) which (including all means of access thereto and therefrom) are not under the exclusive ownership and direct control of PTC or a PTC Subsidiary.

Section 4.23    <u>Improper and Other Payments</u>. Except as set forth in <u>Section 4.23</u> of the PTC Disclosure Letter, (a) none of PTC nor any of the PTC Subsidiaries nor any Representative of PTC or any of the PTC Subsidiaries nor any Person acting on behalf of any of them, has made, paid or received any unlawful bribes, kickbacks or other similar payments to or from any Person (including any customer or supplier) or Governmental Entity, (b) no contributions have been made by PTC or any of the PTC Subsidiaries, directly or indirectly, to a domestic or foreign political party or candidate, (c) no improper foreign payment (as defined in the Foreign Corrupt Practices Act) has been made by PTC or any of the PTC Subsidiaries, and (d) the internal accounting controls of PTC and the PTC Subsidiaries are believed by management of PTC and the PTC Subsidiaries to be adequate to detect any of the foregoing under current circumstances.

Section 4.24    <u>No Knowledge of Misrepresentations</u>. To the Knowledge of PTC, neither Seller is in breach of any of the representations and warranties made by such Seller in <u>Article III</u> of this Agreement; <u>provided</u> that, to the extent that either Seller shall allege any breach by PTC of this <u>Section 4.24</u>, such Seller shall have the burden of proving PTC's Knowledge of such Seller's breach of the applicable representations and warranties made by such Seller in <u>Article III</u> of this Agreement.

NEWYORK 7440434 (2K)

Article V

## COVENANTS

Section 5.1   Access to Information Concerning Properties and Records.

(a)      During the period commencing on the date hereof and ending on the earlier of (i) the Closing Date and (ii) the date on which this Agreement is terminated pursuant to Section 8.1, (x) FJI shall, and shall cause the Target Entities and the Target Subsidiaries to, upon reasonable notice, afford PTC and its Representatives and its financing sources full access during normal business hours to the Representatives, properties, facilities, books and records relating to the Business, to the extent PTC reasonably believes necessary or advisable to familiarize itself with such properties and other matters and, during such period, FJI shall furnish promptly to PTC all financial and operating data and other information concerning the Business (including information concerning the assets and Liabilities of the Business) as PTC may reasonably request and shall instruct its Representatives to reasonably cooperate with PTC and its Representatives and its financing sources regarding such matters; provided, that (A) such access shall not unreasonably disrupt the operations of FJI or any of its Affiliates (including the Target Entities and the Target Subsidiaries) and (B) prior to receipt of all approvals of Antitrust Authorities required for consummation of the transactions contemplated hereby, FJI may, and may cause the Target Entities, Target Subsidiaries and their respective Representatives to, not transition the Business or any of its systems or data to PTC and the PTC Subsidiaries and otherwise withhold access to Representatives, properties, facilities, books, records, data and information to the extent FJI reasonably determines access thereto would materially impair operation of the Business or, if the transactions contemplated hereby were not consummated, would materially impair the competitive position of the Business relative to PTC and the PTC Subsidiaries, and (y) PTC shall, and shall cause the PTC Subsidiaries to, upon reasonable notice, afford FJI and its Representatives full access during normal business hours to the Representatives, properties, books and records of PTC and the PTC Subsidiaries to the extent FJI reasonably believes necessary or advisable to familiarize itself with such properties and other matters and, during such period, PTC shall furnish promptly to FJI all financial and operating data and other information concerning PTC's and the PTC Subsidiaries' businesses, properties and personnel (including information concerning the assets and Liabilities of PTC and the PTC Subsidiaries) as FJI may reasonably request and shall instruct its Representatives to reasonably cooperate with FJI and its Representatives regarding such matters; provided, that (A) such access shall not unreasonably disrupt the operations of PTC or the PTC Subsidiaries and (B) prior to receipt of all approvals of Antitrust Authorities required for consummation of the transactions contemplated hereby, PTC may, and may cause the PTC Subsidiaries and their respective Representatives to, withhold access to Representatives, properties, facilities, books, records, data and information to the extent PTC reasonably determines access would materially impair operation of the business of PTC and the PTC Subsidiaries or, if the transactions contemplated hereby were not consummated, would materially impair the competitive position of the business of PTC and the PTC Subsidiaries relative to the Business. FJI shall, and shall use commercially reasonable efforts to cause its Representatives to, provide access to and assist PTC in its review, in each case consistent with this Section 5.1(a), of the Contracts set forth in (i) Section 2.2(a)(vii)(A) of the FJI Disclosure Letter and (ii) the

Assumption Schedule, so as to allow PTC to determine and confirm (x) with respect to Contracts set forth in the Assumption Schedule, not later than three (3) Business Days prior to the scheduled date for filing the Sale Motion, whether or not such Contracts are Contracts of FJI that are primarily used in, or primarily relate to, the operation or conduct of the Business and (y) with respect to Contracts set forth in Section 2.2(a)(vii)(A) of the FJI Disclosure Letter, which are not also set forth in the Assumption Schedule, not later than five (5) Business Days prior to the Closing Date, whether or not such Contracts are primarily used in, or primarily relate to, the operation or conduct of the Business. PTC shall be entitled to notify FJI in writing prior to the expiration of the relevant period whether it proposes to remove one or more of the Contracts referred to in the immediately preceding sentence from Section 2.2(a)(vii)(A) of the FJI Disclosure Letter and/or the Assumption Schedule, as applicable, which notice shall identify the Contracts requested to be removed and whether such Contracts are requested to be removed from Section 2.2(a)(vii)(A) of the FJI Disclosure Letter and/or the Assumption Schedule and such Contract identified in PTC's notice shall be deemed to have been removed from Section 2.2(a)(vii)(A) of the FJI Disclosure Letter and/or the Assumption Schedule, as applicable, at the end of the second (2nd) Business Day after FJI's receipt of such notice, unless FJI has first notified PTC in writing that it objects to the removal of one or more such Contracts; provided, that in no event shall any Contract be subject to removal if such Contract is primarily used in, or primarily relates to, the operation or conduct of the Business. If (x) PTC has proposed to remove a Contract from the Assumption Schedule (each such Contract, a "**Disputed Contract**") and (y) FJI has objected to the removal of such Disputed Contract from the Assumption Schedule and included such Disputed Contract on the Assumption Schedule, and (z) PTC has subsequently exercised its right set forth in Section 2.4(b) hereof to amend the Assumption Schedule and remove such Disputed Contract therefrom, then PTC shall assume the Rejection Liabilities with respect to such Disputed Contracts in accordance with Section 2.3(c) hereof; provided, that if it is determined in connection with the resolution of any dispute with respect to any Disputed Contact in accordance with this Section 5.1(a) that such Disputed Contract is not primarily used in, or primarily relate to, the operation or conduct of the Business, then FJI shall promptly indemnify PTC for any Losses incurred in connection with the assumption of the Rejection Liabilities with respect to such Disputed Contract. If FJI notifies PTC in writing that it objects to the removal of any such Contract, then any Contract with respect to which such objection has not been made shall be deemed to have been removed from Section 2.2(a)(vii)(A) of the FJI Disclosure Letter and/or the Assumption Schedule, as applicable and FJI and PTC shall promptly endeavor in good faith to resolve any dispute with respect to any Contract listed in FJI's notice of objection. If a written agreement determining the Contracts to be so removed has not been reached within ten (10) Business Days (or such longer period as may be agreed to by FJI and PTC) after the date of receipt by PTC from FJI of the notice of objection referred to in this Section 5.1(a), FJI and PTC shall submit any dispute to a resolution in accordance with Section 10.8 hereof; provided that the only issue for such dispute resolution panel is whether each such Contract is primarily used in, or primarily relates to, the operation or conduct of the Business. Upon any removal of one or more Contracts from Section 2.2(a)(vii)(A) of the FJI Disclosure Letter and/or the Assumption Schedule as a result of (I) an agreement between PTC and FJI, (II) an agreement by FJI to remove any or all of the Contracts identified in PTC's notice submitted pursuant to this Section 5.1(a) (including as a result of FJI's failure to object to the removal of such Contract during the relevant period) or (III) upon a resolution of any dispute with respect to the removal of any such Contract in accordance with Section 10.8 hereof, as applicable, PTC and

NEW YORK 7440434 (2K)

FJI shall cooperate in good faith to amend as promptly as reasonably practicable Section 2.2(a)(vii)(A) of the FJI Disclosure Letter and/or the Assumption Schedule, as applicable, to reflect such removal. Notwithstanding anything to the contrary contained in this Section 5.1(a), Section 5.3 or Section 5.4, each party hereto may, and may instruct its Representatives to, withhold access to, and refuse to confer with the other party about or provide the other party hereto with, customer lists, customer terms, pricing lists, specific store financial information, fuel price agreements and information, and other items that such party determines, after receiving advice of outside counsel should not be provided under applicable Antitrust Laws.

(b)    For each month, beginning November, 2009, FJI shall provide PTC with an unaudited pro forma balance sheet of the Business and the related unaudited pro forma statement of operations for the month then ended (the "**Monthly Business Financial Statements**"). The Monthly Business Financial Statements, except as indicated therein, shall be prepared (i) in accordance with GAAP applied on a basis consistent with the Business Financial Statements and the other financial statements referred to in Section 3.7, except that they need not contain footnotes and shall be subject to year-end audit adjustments and except that they may otherwise deviate from GAAP in the same manner as the Business Financial Statements, or (ii) as mutually agreed upon by FJI and PTC. For each month, beginning November, 2009, PTC shall provide FJI with an unaudited consolidated balance sheet of PTC and the PTC Subsidiaries and the related unaudited consolidated statement of operations for the month then ended (the "**Monthly PTC Financial Statements**"). The Monthly PTC Financial Statements, except as indicated therein, shall be prepared (i) in accordance with GAAP applied on a basis consistent with the PTC Financial Statements, except that they need not contain footnotes and shall be subject to year-end audit adjustments, or (ii) as mutually agreed upon by FJI and PTC.

(c)    For the avoidance of doubt, but subject in all respects to the representations and warranties made in Section 3.26 and Section 4.24 hereof and the rights and remedies herein provided for any breach thereof, no review by (i) PTC shall affect the representations and warranties made by Sellers pursuant to this Agreement or the remedies of PTC for breaches of such representations and warranties, and (ii) Sellers shall affect the representations and warranties made by PTC pursuant to this Agreement or the remedies of Sellers for breaches of such representations and warranties.

Section 5.2 Confidentiality. Sellers acknowledge that they are in possession of Evaluation Material concerning the Business. Sellers agree that after the Closing they shall, and shall cause their respective Representatives to, keep all such Evaluation Material strictly confidential and shall be responsible for any breach of these confidentiality provisions by such Representatives; provided, that Sellers may disclose such information to enforce their respective rights under this Agreement or to defend against any claim related to the transactions contemplated hereby. If Sellers or any of their respective Representatives are legally required to disclose (after Sellers have used their commercially reasonable efforts to avoid such disclosure and after promptly advising and consulting with PTC about their intention to make, and the proposed contents of such, disclosure) any of the Evaluation Material (whether by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process), Sellers shall, or shall cause such Representative, to provide PTC with prompt written notice of such request so that PTC may, at its own cost and expense, seek an appropriate protective order or other appropriate remedy. If such protective order or remedy is not obtained, Sellers or such

Representative may disclose that portion of the Evaluation Material which such Person is legally required to disclose. Sellers shall have the right to retain copies of any documents, or other tangible embodiments, constituting Information or Evaluation Material.  For purposes of this Section 5.2 the terms "Evaluation Material", "Information" and "Representatives" shall have the meanings ascribed to such terms in that certain Confidentiality Agreement, by and between FJI and PTC, dated June 25, 2009 (as the same has been and may be amended, modified, supplemented or waived from time to time, the "**Confidentiality Agreement**"), a copy of which has been provided to PSI prior to the date hereof.  Notwithstanding the foregoing, FJI may, without breach of this Agreement or the Confidentiality Agreement, disclose certain Evaluation Material to ConocoPhillips Company, Douglas Oil Company of California and Kayo Oil Company pursuant to the terms of that certain agreement, dated as of the date hereof, by and among FJI, ConocoPhillips Company, Douglas Oil Company of California and Kayo Oil Company, subject to ConocoPhillips Company, Douglas Oil Company of California and/or Kayo Oil Company's acknowledgment to continue to be bound by their respective obligations under that certain Confidentiality Agreement, dated as of July 13, 2009, by and among ConocoPhillips Company, FJI and PTC with respect to the information provided to any or all of them pursuant to such agreement.

Section 5.3 <u>Conduct of the Business Pending the Closing Date</u>. (a)  FJI agrees that during the period commencing on the date hereof and ending on the earlier of (i) the Closing and (ii) the termination of this Agreement pursuant to <u>Article VIII</u>, except as set forth in <u>Section 5.3</u> of the FJI Disclosure Letter, (x) FJI shall, and shall cause each of the Target Entities and the Target Subsidiaries to, conduct their respective operations in all material respects only in the ordinary course of business consistent with past practice and to use their commercially reasonable efforts, recognizing that FJI is undergoing a reorganization in bankruptcy, to preserve intact their respective business organizations, keep available the services of their officers and employees and maintain satisfactory relationships with lenders, licensors, suppliers, distributors, clients and others having business relationships with them, and (y) FJI shall not, and shall not permit any Contributing Affiliate or any Target Entity or Target Subsidiary to, do any of the following to the extent relating to the Business or the Target Entities or Target Subsidiaries without the prior written consent of PTC (which consent shall not be unreasonably withheld, delayed or conditioned):

(A) amend or restate the certificate of incorporation or by-laws or other equivalent charter documents of any Target Entity or Target Subsidiary;

(B) authorize for issuance, issue, sell or deliver (1) any capital stock of, or other equity or voting interest in, the Target Entities and the Target Subsidiaries or (2) any securities convertible into, exchangeable for, or evidencing the right to subscribe for or acquire either (i) any shares of capital stock of, or other equity or voting interest in, the Target Entities and the Target Subsidiaries, (ii) any securities convertible into, exchangeable for, or evidencing the right to subscribe for or acquire, any shares of the capital stock of, or other equity or voting interest in, the Target Entities and the Target Subsidiaries including rights, warrants or options, or (iii) any phantom stock or similar equity-based payment option; <u>provided</u>, that the foregoing shall not prevent any Partially-Owned Target Entity from recognizing a transfer of the portion of the equity interests owned by a Person other than FJI or one of its Subsidiaries and taking any action reasonably in furtherance thereof or FJI from recognizing the transfer of capital stock by any non-Call Family Delivery Party;

(C) split, combine, redeem, reclassify, purchase or otherwise acquire directly, or indirectly, any shares of capital stock of, or other equity or voting interest in, the Target Entities and the Target Subsidiaries, or make any other change in the capital structure of the Target Entities and the Target Subsidiaries;

(D) change the form of organization (including a conversion from a limited liability company to a corporation or from a corporation to a limited liability company) of the Target Entities, the Target Subsidiaries or the Wholly-Owned Companies;

(E) increase, by more than 3% in the aggregate, the compensation payable (including wages, salaries, bonuses or any other remuneration) or to become payable to the Business Employees as a group, except for (1) amounts paid fully in cash prior to 11:59 p.m. on the Business Day immediately preceding the Closing Date and (2) such other increases that are required in accordance with the terms of any FJI Employee Benefit Plan set forth in Section 3.12 of the FJI Disclosure Letter;

(F) make any bonus, profit sharing, pension, retirement or insurance payment, distribution or arrangement to or with any Business Employee except for (1) amounts paid fully in cash prior to 11:59 p.m. on the Business Day immediately preceding the Closing Date, (2) payments that were already accrued prior to the date hereof or (3) payments required by the terms of any FJI Employee Benefit Plan set forth in Section 3.12 of the FJI Disclosure Letter;

(G) establish, adopt, enter into, amend or terminate any FJI Employee Benefit Plan in which Business Employees participate or under which PTC will have any liability pursuant to the terms of this Agreement or any collective bargaining, thrift, compensation or other plan, agreement, trust, fund, policy or arrangement for the benefit of any Business Employees;

(H) other than Contracts for matters permitted pursuant to clause (J), (L), (R), (S) or (U) without consent of the counterparty thereto, enter into, materially amend, become subject to or terminate any Contract that is (or, had it been entered into prior to the date hereof, would have been) required to be set forth in Section 3.17 of the FJI Disclosure Letter, any Business Real Property Lease or any insurance Contract, including any Contracts to which any Target Entity or Target Subsidiary (or, with respect to the Business, FJI or any of the Contributing Affiliates) is a party with Flying J Insurance Company;

(I) consensually grant any Lien on any Target Assets or any assets of any Target Entity or Target Subsidiary, other than Business Permitted Liens and Liens already disclosed in the FJI Disclosure Letter;

(J) sell, transfer, lease, sublease, assign, license or otherwise dispose of any assets or properties of the Business (including any truck leases), except for (1) sales of inventory in the ordinary course of business consistent with past practice, (2) leases or non-exclusive licenses entered into in the ordinary course of business consistent with past practice with annual lease or royalty payments that are not reasonably expected to exceed $5,000,000, (3) sales of any Adjacent Excess Real Estate that would not cause any

default under any Business Net Debt, (4) sales of worn or obsolete equipment consistent with past practice, (5) non-exclusive licenses of Intellectual Property made in the ordinary course of business consistent with past practice, and (6) other sales of assets in an aggregate amount not to exceed $500,000;

(K) acquire any business or Person by merger or consolidation, purchase of substantial assets or equity interests, or by any other manner, in a single transaction or a series of related transactions or acquire any material amount of assets (including any real estate);

(L) make a commitment for capital expenditures or requiring payment by PTC or one of its Subsidiaries after the Closing (including the Target Entities and the Target Subsidiaries) or enter into any operating lease requiring payment by PTC or one of its Subsidiaries after the Closing, other than maintenance commitments and payments to maintain FJI's network in good operating condition in an aggregate amount (x) for any travel center not to exceed $3,000,000 in the aggregate and (y) for all such travel centers not to exceed $25,000,000 and; provided, that the foregoing shall not prevent a renewal or extension of a travel center operating lease on terms not substantially less favorable than those in existence or the making of any commitment for capital expenditures specifically set forth in Section 5.3 of the FJI Disclosure Letter;

(M) form any Subsidiary of any Target Entity or Target Subsidiary or enter into, materially amend or become subject to any joint venture, partnership, strategic alliance, stockholders' agreement, co-marketing, co-promotion, joint development or similar arrangement affecting the Business that is not already disclosed in Section 3.17 of the FJI Disclosure Letter;

(N) write off as uncollectible any notes or accounts receivable of the Business, except write-offs in the ordinary course of business consistent with past practice charged to applicable reserves;

(O) cancel or waive any claims or rights having value to the Business (including the Target Entities or the Target Subsidiaries, as applicable) of more than $500,000 in the aggregate;

(P) except as required by GAAP or Law, make any change in any method of accounting or auditing practice with respect to the Business;

(Q) make any Tax election, settle and/or compromise any material Tax Liability of the Business or prepare any Returns of or with respect to the Target Entities or Target Subsidiaries in a manner which is inconsistent with the past practices of any of the Target Entities or any Target Subsidiary, as applicable, with respect to the treatment of items on such Returns;

(R) other than Actions with respect to Taxes (which are addressed in clause (P) foregoing), initiate, pay, discharge, settle or satisfy any Actions with respect to the Business to the extent that such settlement requires a payment of $500,000 or more or in the case of initiating Actions, requires a payment of $500,000 or more or is likely to materially impair the operation of the Business after the Closing; provided, however, that

85

the foregoing shall not restrict the ability of FJI or any of its Subsidiaries to initiate Actions relating to stolen or damaged property or to enforce any rights under this Agreement;

(S) incur, assume, guarantee or modify any Business Net Debt or TFJ Net Debt, except incurring Business Net Debt or TFJ Net Debt in the ordinary course of business pursuant to existing credit agreements disclosed in Section 3.17 of the FJI Disclosure Letter or make any loans, advances or capital contributions other than those required by a Contract to which FJI or one of its Subsidiaries is a party;

(T) plan, announce, implement or effect any reduction in force, lay-off, early retirement program, severance program or other program or effort concerning the termination of employment of Business Employees (other than routine employee terminations that would not, or would not reasonably be expected to, individually or in the aggregate, be materially adverse to the Business);

(U) except for transactions referred to in Section 3.20, enter into any transaction with any Affiliate for which there are, after the Closing, remaining required payment obligations in excess of $250,000 and which is not terminable upon notice of sixty (60) days or less or for a cost of less than $250,000;

(V) permit any of CFJ Properties, CFJ Plaza Company I LLC, CFJ Plaza Company II LLC, CFJ Plaza Company III LLC, CFJ I Management Inc., CFJ II Management Inc., CFJ III Management Inc. or any of their Subsidiaries to declare, pay or set aside or make any distribution or any dividend of any proceeds of the sale of any Adjacent Excess Real Estate owned by any such entity;or

(W) enter into any Contract to do any of the foregoing.

Notwithstanding anything in this Agreement to the contrary, in no event shall FJI be deemed in breach of the covenant contained in clause (x) of this Section 5.3(a) in the event that FJI has requested the consent of PTC for any of the matters referred to in clause (y) of this Section 5.3(a) and PTC has not provided such consent.

(b)    Notwithstanding anything in this Agreement to the contrary, during the period from the date of this Agreement to the date on which the condition set forth in Section 6.4(c) hereof is satisfied or, to the extent permitted by Law, waived with respect to all Antitrust Authorities, in the event that FJI desires to undertake any action that would, without the consent of PTC, constitute a breach of any FJI Specified Covenant, then FJI shall promptly deliver notice to PTC of such desired action. If within five (5) Business Days after PTC's receipt of such notice, PTC shall not have consented to such action (such consent not to be unreasonably withheld, delayed or conditioned), then FJI may undertake such action, and the undertaking of such action shall not be deemed to constitute a breach of such FJI Specified Covenant for purposes of Article VIII or Article IX hereof or for purposes of the DIP Facility; provided that, until the FJI Covenant Waiver Date with respect to such action, the undertaking of such action shall be deemed to constitute a breach of such FJI Specified Covenant solely for purposes of Section 6.3(a) hereof. In the event that FJI elects to undertake any such action referred to in this Section 5.3(b) for which it has not received the required consent of PTC, it shall provide written notice of the taking of such action to PTC (each, a **"FJI Covenant Notice"**). Unless

PTC elects to terminate this Agreement in accordance with <u>Section 8.1(g)</u> of this Agreement on or prior to the fifth (5th) Business Day after delivery of a FJI Covenant Notice (such 5th Business Day, the "**FJI Covenant Waiver Date**"), then from and after the FJI Covenant Waiver Date with respect to such action, the undertaking of such action shall no longer be deemed a breach of such FJI Specified Covenant for purposes of <u>Section 6.3(a)</u> hereof.

(c)    Subject in all cases to the last sentence of <u>Section 5.1(a)</u>, during the period from the date of this Agreement to the Closing Date, FJI shall, and shall cause the Target Entities and the Target Subsidiaries to, confer on a regular basis with one or more designated Representatives of PTC to report material operational matters and to report the general status of ongoing operations; <u>provided</u>, that prior to receipt of all approvals of Antitrust Authorities required for consummation of the transactions contemplated hereby, FJI may, and may cause the Target Entities, Target Subsidiaries and their respective Representatives not to confer with Representatives of PTC and/or not to report such operational matters or the status of ongoing operations to the extent FJI reasonably determines such actions would materially impair operation of the Business or, if the transactions contemplated hereby were not consummated, would materially impair the competitive position of the Business relative to PTC and the PTC Subsidiaries.

(d)    FJI shall keep, or cause the Target Entities and the Target Subsidiaries to keep, all insurance policies currently maintained with respect to the Target Entities and the Target Subsidiaries and their respective assets and properties, or suitable replacements or renewals, in full force and effect through the close of business on the Closing Date.

Section 5.4  <u>Conduct of PTC Pending the Closing Date</u>. (a) PTC agrees that during the period commencing on the date hereof and ending on the earlier of (i) the Closing and (ii) the termination of this Agreement pursuant to <u>Article VIII</u>, except as set forth in <u>Section 5.4</u> of the PTC Disclosure Letter, (x) PTC shall, and shall cause each of the PTC Subsidiaries to, conduct their respective operations in all material respects only in the ordinary course of business consistent with past practice and to use their commercially reasonable efforts to preserve intact their respective business organizations, keep available the services of their officers and employees and maintain satisfactory relationships with lenders, licensors, suppliers, distributors, clients and others having business relationships with them and (y) PTC shall not, and shall not permit any PTC Subsidiary to, do any of the following without the prior written consent of FJI (which consent shall not be unreasonably withheld, delayed or conditioned):

(A)    sell, transfer, lease, sublease, assign, license or otherwise dispose of any assets or properties (including equity securities of any PTC Subsidiary), except for (1) sales of inventory in the ordinary course of business consistent with past practice, (2) leases or non-exclusive licenses entered into in the ordinary course of business consistent with past practice with annual lease or royalty payments that are not reasonably expected to exceed $5,000,000, (3) sales of worn or obsolete equipment consistent with past practice, (4) non-exclusive licenses of Intellectual Property made in the ordinary course of business consistent with past practice, and (5) other sales of assets in aggregate amount not to exceed $2,500,000;

(B)    cancel or waive any claims or rights of value to PTC and the PTC Subsidiaries of more than $1,000,000 in the aggregate;

(C) except as required by GAAP or Law, make any change in any method of accounting or auditing practice;

(D) make any Tax election;

(E) initiate any Actions to the extent that such Action seeks a payment of $1,000,000 or more or is likely to materially impair the operation of PTC's business after the Closing; provided, however, that the foregoing shall not restrict the ability of PTC or any of its Subsidiaries to initiate Actions relating to stolen or damaged property or to enforce any rights under this Agreement;

(F) except for transactions of the type referred to in Section 4.19, enter into any transaction with any Affiliate; or

(G) enter into any Contract to do any of the foregoing.

Notwithstanding anything in this Agreement to the contrary, in no event shall PTC be deemed in breach of the covenant contained in clause (x) of this Section 5.4(a) in the event that PTC has requested the consent of FJI for any of the matters referred to in clause (y) of this Section 5.4(a) and FJI has not provided such consent.

(b) Notwithstanding anything in this Agreement to the contrary, during the period from the date of this Agreement to the date on which the condition set forth in Section 6.3(c) hereof is satisfied or, to the extent permitted by Law, waived with respect to all Antitrust Authorities, in the event that PTC desires to undertake any action that would, without the consent of FJI, constitute a breach of any PTC Specified Covenant, then PTC shall promptly deliver notice to FJI of such desired action. If within five (5) Business Days after FJI's receipt of such notice, FJI shall not have consented to such action, then PTC may undertake such action, and the undertaking of such action shall not be deemed to constitute a breach of such PTC Specified Covenant for purposes of Article VIII or Article IX hereof; provided that the undertaking of such action shall be deemed to constitute a breach of such PTC Specified Covenant for purposes of Section 6.4(a) hereof. In the event that PTC elects to undertake any such action referred to in this Section 5.4(b) for which it has not received the required consent of FJI, it shall provide written notice of the taking of such action to FJI (each, a "**PTC Covenant Notice**"). Unless FJI elects to terminate this Agreement in accordance with Section 8.1(h) of this Agreement on or prior to the fifth (5th) Business Day after delivery of a PTC Covenant Notice (such 5th Business Day, the "**PTC Covenant Waiver Date**"), then from and after the PTC Covenant Waiver Date with respect to such action, the undertaking of such action shall no longer be deemed a breach of such PTC Specified Covenant for purposes of Section 6.4(a) hereof.

(c)     Subject in all cases to the last sentence of Section 5.1(a), during the period from the date of this Agreement to the Closing Date, PTC shall, and shall cause the PTC Subsidiaries to, confer on a regular basis with one or more designated Representatives of FJI to report material operational matters and to report the general status of ongoing operations; provided, that prior to receipt of all approvals of Antitrust Authorities required for consummation of the transactions contemplated hereby, PTC may, and may cause its Subsidiaries and their respective Representatives not to confer with Representatives of FJI and/or not to report such operational matters or the status of ongoing operations to the extent

PTC reasonably determines such actions would materially impair operations of the business of PTC or the PTC Subsidiaries or, if the transactions contemplated hereby were not consummated, would materially impair the competitive position of the business of PTC or the PTC Subsidiaries relative to the Business.

Section 5.5 Exclusive Dealing. During the period from the date of this Agreement to the earlier of (a) the Closing Date or (b) the date this Agreement is terminated in accordance with its terms, Sellers shall not, and FJI shall cause the Target Entities and the Target Subsidiaries and the respective Affiliates, Representatives and other agents of the Target Entities, the Target Subsidiaries and FJI to refrain from taking any action to, directly or indirectly, initiate or solicit, or knowingly encourage the submission of, any Acquisition Proposal, or engage in discussions or negotiations with, or provide any information to, any Person, other than PTC (and its Affiliates and Representatives), concerning any Acquisition Proposal. Sellers shall not, and FJI shall cause the Target Entities not to, vote their capital stock of the Target Entities and the Target Subsidiaries in favor of any such Acquisition Proposal. If Sellers or any of their respective Subsidiaries or any of their respective Representatives receives any Acquisition Proposal then Sellers shall, except to the extent it or any of its Subsidiaries has any ongoing obligations under binding confidentiality provisions in effect prior to the July 14, 2009 that would prohibit or restrict such disclosure, promptly notify PTC of its receipt of any such Acquisition Proposal and describe to PTC in reasonable detail the substance and material terms of any such Acquisition Proposal. Nothing contained herein shall purport to bind any Conoco/Shell Entity or CFJ Properties or the respective directors, officers, employees, agents, accountants, consultants, financial advisors, counsel, financing sources or representatives of the foregoing Persons who are not also directors, officers, employees, agents, accountants, consultants, financial advisors, counsel, financing sources or representatives of Sellers or their respective Subsidiaries (other than CFJ Properties and TCH LLC); provided, that the provisions of this Section 5.5 shall apply to FJI and its Representatives with respect to CFJ Properties and TCH LLC.

Section 5.6 Commercially Reasonable Efforts; Antitrust Filing; Consents.

(a)     Subject to the terms and conditions contained in this Section 5.6 (i) FJI and PTC shall, FJI shall cause the Contributing Affiliates, Target Entities and each of the Target Subsidiaries to, and PTC shall cause each of the PTC Subsidiaries to, cooperate and use their respective commercially reasonable efforts to take, or cause to be taken, all appropriate action, and to make, or cause to be made, all filings necessary, proper or advisable under applicable Laws and regulations and to consummate and make effective the transactions contemplated by this Agreement, including their respective commercially reasonable efforts to obtain, transfer, or have reissued, as applicable, on or after the Closing Date, all registered or applied for Intellectual Property (including internet domain names), Permits (including Permits required by Environmental Laws), consents, approvals, authorizations, qualifications and Orders of Governmental Entities and parties to Contracts with FJI, any Contributing Affiliate, the Target Entities or any of the Target Subsidiaries (including landlords) or any party as are necessary for consummation of the transactions contemplated by this Agreement (determined in each case after giving effect to the provisions of the Bankruptcy Code, the terms of the Plan and the Confirmation Order, or the Sale Order, as the case may be, and of any other Order of the Bankruptcy Court entered in connection with the transactions contemplated hereby) and to fulfill

89

the conditions to consummation of the transactions contemplated hereby set forth in Section 6.2(e), Section 6.3, Section 6.4, Section 6.5 and Section 6.6 of this Agreement and (ii) PSI shall, and shall cooperate with FJI to cause TFJ to, cooperate and use its commercially reasonable efforts to take, or cause to be taken, all appropriate action, and to make, or cause to be made, all filings necessary, proper or advisable under applicable Laws and regulations and to consummate and make effective the transactions contemplated by this Agreement and to fulfill the conditions to consummation of the transactions contemplated hereby set forth in Section 6.3, Section 6.4, Section 6.5 and Section 6.6 of this Agreement; provided, that no Business Material Contract shall be amended to increase the amount payable thereunder or otherwise to be materially more burdensome to the Business, the Target Entities or any of the Target Subsidiaries to obtain any such consent, approval or authorization, without first obtaining the written approval of PTC; provided, that, with respect to each of clause (i) and clause (ii) of this Section 5.6(a), that no Business Material Contract shall be amended to increase the amount payable thereunder or otherwise to be materially more burdensome to the Business, the Target Entities or any of the Target Subsidiaries to obtain any such consent, approval or authorization, without first obtaining the written approval of PTC

(b)     FJI and PTC (i) made all required filings under the HSR Act on August 17, 2009, and (ii) shall use their respective commercially reasonable efforts to promptly file or cause to be filed (including by their respective Affiliates), but in any event no later than ten (10) Business Days from the date hereof, all required filings under other applicable Antitrust Laws that the parties reasonably determine in good faith to be necessary or appropriate to consummate the transactions contemplated by this Agreement (the filings set forth in (i) and (ii) collectively, the **"Antitrust Filings"**), shall consult and cooperate with each other in the preparation of such filings, and shall promptly inform the other party hereto of any material communication received by such party from any Antitrust Authority regarding the transactions contemplated by this Agreement. Each party hereto shall review and discuss in advance, and consider in good faith the views of the other in connection with any proposed written or material oral communication with any Antitrust Authority (which, at the reasonable request of the other party hereto, shall be limited to such party's outside counsel). No party hereto shall, and each party hereto shall cause its Affiliates not to, participate in any meeting with any Governmental Entity regarding any Antirust Filing with respect to the transactions contemplated hereby unless such party hereto first consults with the other in advance, and to the extent permitted by the Governmental Entity, gives the other the opportunity to be present thereat. No party hereto shall agree to any voluntary extension of any statutory deadline or waiting period or to any voluntary delay of the consummation of the transactions contemplated by this Agreement at the behest of any Antitrust Authority without the written consent of the other. FJI and PTC shall each be responsible for 50% of the filing fees required to be paid in connection with any Antitrust Filing. FJI and PTC shall use their commercially reasonable efforts to avoid or eliminate any impediment under any Antitrust Law that may be asserted by any Governmental Entity.

(c)     Notwithstanding anything to the contrary contained in this Agreement, if any third party or governmental consent regarding any Business Material Contract or Permit has not been obtained prior to Closing, (x) this Agreement shall not constitute an agreement to transfer or assign any Business Material Contract or Permit included in the Business if an attempted transfer or assignment thereof without the consent of such third party thereto (determined after giving effect to the Confirmation Order or the Sale Order, as the case may be,

and operation of the Bankruptcy Code (including Section 365 thereof) or unless otherwise ordered by the Bankruptcy Court) would constitute a breach thereof or create in any party thereto the right or power to cancel or terminate such right or agreement, (y) after the Closing, each party hereto shall have a continuing obligation to use its commercially reasonable efforts to obtain all such consents and to otherwise properly consummate such transfer or assignment, and upon obtaining such consent, such transfer or assignment shall be consummated, and (z) until such consents are obtained and such transfer or assignment is consummated, each party hereto shall cooperate with the other in any reasonable arrangement requested by such other party designed to provide PTC the benefits and burdens, monetary or otherwise, of FJI's, each Contributing Affiliate's, each Target Entity's and each Target Subsidiary's rights and obligations under such Business Material Contract and Permit, including enforcement (at PTC's expense) of any and all rights of FJI, the Contributing Affiliates, the Target Entities or the Target Subsidiaries against the other party thereto under the Bankruptcy Code or arising out of the breach or cancellation thereof by such other party. So long as PTC is receiving all the benefits, monetary or otherwise, of any Business Material Contract or Permit that is not assigned to PTC as of the Closing, to the extent that FJI bears any economic burden or suffers any Loss with respect to such Business Material Contract or Permit, PTC shall reimburse FJI promptly, but in any event within ten (10) Business Days, after the request therefor by FJI or any of the Contributing Affiliates.

           Section 5.7 <u>Public Announcements</u>. No party shall issue any press release or other public statement with respect to the transactions contemplated hereby, except as may be required by applicable Law or as the parties shall mutually determine; <u>provided</u>, that if such press release or other public statement is required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement, FJI and PTC shall consult with each other before issuing, and provide each other the opportunity to review and comment upon, such press release or other public statement.

           Section 5.8 <u>Notification of Certain Matters</u>. Each of the parties hereto shall promptly notify the other parties hereto of (a) any material Actions in connection with the transactions contemplated by this Agreement commenced or, to the Knowledge of FJI, the Knowledge of PSI or the Knowledge of PTC, as applicable, threatened, against PSI, FJI, the Target Entities, any of the Target Subsidiaries or PTC or any of the PTC Subsidiaries, as the case may be, (b) the occurrence or non-occurrence of any fact or event which, to the Knowledge of FJI, the Knowledge of PSI or the Knowledge of PTC, as applicable, would be reasonably likely to cause any condition set forth in <u>Article VI</u> not to be satisfied, (c) any written notice of, or other written communication received by such party relating to, a default or event that, with notice or lapse of time or both, would become a default under any Contract disclosed (or required to be disclosed) in <u>Section 3.17</u> of the FJI Disclosure Letter or <u>Section 4.16</u> of the PTC Disclosure Letter, as applicable; (d) the occurrence or existence of any fact, circumstance or event which, to the Knowledge of such party, would, or would reasonably be expected to, result in any representation or warranty made by any Seller or PTC, as applicable, in this Agreement to be untrue or inaccurate such as to be reasonably likely to cause any condition set forth in <u>Sections 6.3(b)</u> or <u>6.4(b)</u>, as applicable, not to be satisfied; or (e) any written notice or other written communication from any third party alleging that the consent of such third party is or may be required in connection with the transactions contemplated by this Agreement; <u>provided</u>, that, without limiting the rights of the parties pursuant to <u>Section 10.12</u> to amend or supplement the FJI Disclosure Letter, the PSI Disclosure Letter or the PTC Disclosure Letter, no such

NEWYORK 7440434 (2K)

notification, nor the obligation to make such notification, shall be deemed to amend or supplement the FJI Disclosure Letter, the PSI Disclosure Letter or the PTC Disclosure Letter, or limit or otherwise affect the representations, warranties or covenants, or the conditions to the obligations of, FJI, PSI or PTC, as applicable.

Section 5.9 <u>Non-Competition; Non-Interference</u>. In consideration of the acceptance by PTC of FJI's contribution of the Business to PTC, at the Closing, FJI, FJI's Subsidiaries (other than the Target Entities and Target Subsidiaries) and each of the Call Family Delivery Parties, shall each enter into non-competition agreements in the form of **Exhibit XII** attached hereto.

Section 5.10 <u>Non-Solicitation of Employees</u>. If this Agreement is terminated, without limiting its obligations under the Confidentiality Agreement, PTC shall not and shall cause its Affiliates not to, for a period of one (1) year from the date of such termination, knowingly solicit for employment any Business Employee or any other employee of PSI, FJI or any of their respective Subsidiaries; <u>provided,</u> that this paragraph shall not preclude PTC from soliciting for employment or hiring any such individual who (a) responds to a general solicitation through a public medium or general or mass mailing by or on behalf of PTC that is not targeted at employees of PSI, FJI or any of their respective Subsidiaries or (b) contacts PTC or its Affiliates directly on such individual's own initiative. PSI and FJI shall not, and shall cause their respective Affiliates not to, (x) until one (1) year after the Closing Date, knowingly solicit for employment any Transferred Employee or (y) if the Closing Date does not occur and this Agreement is terminated, until one (1) year from the date of such termination, knowingly solicit for employment any employee of PTC or any of its Subsidiaries; <u>provided,</u> that this paragraph shall not preclude PSI, FJI or their respective Affiliates from soliciting for employment or hiring any such employee who (a) responds to a general solicitation through a public medium or general or mass mailing by or on behalf of PSI, FJI or any of their respective Affiliates that is not targeted at employees of the Target Entities or any of the Target Subsidiaries or (b) contacts PSI, FJI or their respective Affiliates directly on such individual's own initiative. Notwithstanding anything to the contrary contained in this Agreement, from and after the date hereof, PSI and FJI shall not, and shall cause their respective Affiliates not to, for a period of one (1) year after the Closing Date or one (1) year after the termination of this Agreement, directly or indirectly solicit, employ or retain in any capacity, or directly or indirectly offer to employ or retain in any capacity, any of the Persons set forth in <u>Section 5.10</u> of the PTC Disclosure Letter.

Section 5.11 <u>Resignation or Removal of Officers and Directors</u>. At the written request of PTC (which request shall be delivered at least three (3) Business Days prior to the Closing), (a) PSI, FJI or the Wholly-Owned Target Entities shall cause any so requested officer and member of the Boards of Directors (or similar governing body) of the Wholly-Owned Target Entities and any Target Subsidiaries that are wholly-owned by a Wholly-Owned Target Entity to resign from such position or to be removed from such position (at the election of PSI or FJI, as applicable) effective as of immediately prior to the Closing Date, and (b) FJI shall cause any of its representatives on the Boards of Directors (or similar governing body) of the Partially-Owned Target Entities and any Target Subsidiaries that are not wholly-owned by a Target Entity to be removed from such position or to resign from such position (at the election of FJI) effective immediately prior to the Closing. Notwithstanding anything to the contrary set forth in this <u>Section 5.11</u>, with respect to TFJ, PSI shall cause the requested officers and members of the Board of Directors appointed by it to resign or be removed from their positions (at the election of PSI) and FJI shall cause the requested officers and members of the Board of Directors appointed

NEWYORK 7440434 (2K)

by it to resign or be removed from their positions (at the election of FJI), in each case effective as of immediately prior to the Closing Date.

                        Section 5.12    Financing. (a) After expiration of the applicable waiting periods under the HSR Act that are required to consummate the transactions contemplated hereby, FJI may request that PTC seek to obtain commitment letters ("**Commitments**"), in form and substance customary at such time, in connection with any financings required in order to provide PTC with all funds necessary to consummate the transactions contemplated by this Agreement (the "**Financing**"); provided, that other than (x) upon the occurrence of a Financing Deficit Event, in which case PTC shall be entitled to issue at the Closing to one or more issuers of Replacement Financing Letters, equity in the form of PTC Units that shall be Common Units (as such term is defined in the Amended and Restated LLC Agreement) (or options, warrants or other rights to obtain PTC Units which shall be Common Units (as such term is defined in the Amended and Restated LLC Agreement)) in an aggregate amount that shall not exceed 5% of the PTC Units on a fully diluted basis after giving effect to such issuance (including upon exercise of all options, warrants and other rights referenced in clause (x) and including for purposes of calculating the Additional Equity Amount the exercise price to acquire each PTC Unit issuable upon the exercise of each such option, warrant or other right (but in no event more than the PTC Per Unit Value for each such PTC Unit); (y) in connection with equity investments in PTC by current and/or future directors in an amount that shall not exceed $5,000,000 in the aggregate; or (z) the $75,000,000 equity financing contemplated by the BDT Term Sheet, which equity financing shall be issued at the PTC Per Unit Value and, to the extent in excess of $75,000,000, shall be used only to provide funds to PTC to repurchase PTC Units at the PTC Per Unit Value (the equity contemplated to be issued by clauses (x), (y) and (z) (with respect to clause (z), other than equity in excess of $75,000,000 contemplated by the BDT Term Sheet), collectively, the "**Additional Equity Amount**"), without the prior written consent of FJI, in no event shall the "Financing" include, and in no event shall PTC accept or agree to accept after the date hereof and prior to Closing, any equity financing. If requested by FJI, PTC shall use its good faith efforts to obtain such Commitments (and, if PTC obtains such Commitments, PTC shall provide copies thereof to FJI). If PTC obtains such Commitments, upon FJI's request, PTC shall accept such Commitments; provided, that the fees and expenses incurred in connection with obtaining the Commitments (if the Commitments are executed at the request of FJI) shall be borne 75% by PTC and 25% by FJI, calculated as if PTC were required to pay for such fees and expenses only after the Closing and the issuance of the Equity Consideration to FJI pursuant to this Agreement.

                        (b)    PTC represents and warrants to FJI that it has delivered to FJI true and complete copies of the letters related to the Financing listed in Section 5.12(b) of the PTC Disclosure Letter, together with (other than fee letters entered into in connection therewith) all exhibits, term sheets and other agreements and arrangements entered into in connection therewith and, notwithstanding the immediately preceding parenthetical, all "market flex" terms applicable thereto (all such letters, exhibits, term sheets, agreements, arrangements, and terms, collectively, "**Financing Letters**"). PTC hereby confirms that the terms (assuming exercise in full of all "market flex" terms) of the Financing Letters are satisfactory to PTC and that, including the up to $75,000,000 of equity financing contemplated by the BDT Term Sheet, the financing contemplated by the Financing Letters is sufficient to provide PTC with all funds necessary to consummate the transactions contemplated by this Agreement and the COP Purchase Agreement. PTC shall promptly (but in any event within two (2) Business Days after obtaining such information) provide FJI with written notice in the event that (i) PTC has received

a written notice that the counterparty to any Financing Letter will not provide or seek to arrange the portion of the Financing contemplated by such Financing Letter, (ii) the obligations, if any, of any counterparty to any Financing Letter has terminated in accordance with the terms of such Financing Letter and the term of such Financing Letter has not been extended, or (iii) PTC obtains actual knowledge that any condition to any of the Financing Letters will not be satisfied prior to the End Date (any such event, a "**Financing Deficit Event**"). Upon the occurrence of a Financing Deficit Event, PTC shall be entitled, in its sole discretion, to deliver to FJI prior to Closing one or more replacement or alternative Financing Letters from the same counterparty which was the subject of the Financing Deficit Event or from any other Person (each, a "**Replacement Financing Letter**") and confirm that the terms (assuming exercise in full of all "market flex" terms) of the Replacement Financing Letters are satisfactory to PTC and that the amount of the Financing contemplated by such Replacement Financing Letter, together with all other Financing Letters with respect to which there is not then a Financing Deficit Event and the up to $75,000,000 of equity financing contemplated by the BDT Term Sheet is in the aggregate sufficient to provide PTC with all funds necessary to consummate the transactions contemplated by this Agreement and the COP Purchase Agreement.

(c)     PTC shall use its commercially reasonable efforts to (i) cause the Cash Consideration Debt to (y) have a term of at least five years, and (z) other than solely as a result of an excess cash flow sweep in accordance with the terms of the Financing Letters, require no scheduled principal payments during the first two years following the Closing Date in excess of 1% of the initial principal amount per year, (ii) refrain from and cause its Affiliates to refrain from taking any action that would cause all or part of the Cash Consideration Debt that is guaranteed by FJI to cease to be recourse to FJI for purposes of Section 752 of the Code, and (iii) cause the FJI Guarantee to be in a form substantially similar to that attached as **Exhibit XIII**. To the extent that the Cash Consideration Debt is issued by substantially identical lenders as, or is otherwise "stapled" to or connected with, other debt, PTC shall use its commercially reasonable efforts to cause the proceeds of such other debt to be used solely to repay existing PTC debt and shall reasonably cooperate with FJI over the flow of funds at Closing in furtherance of the Tax considerations provided herein. If the FJI Guarantee Conditions shall have been satisfied at Closing, FJI shall execute and deliver the FJI Guarantee at Closing.

(d)     FJI shall use its commercially reasonable efforts to assist, and shall cause the Wholly-Owned Target Entities to use their commercially reasonable efforts to assist, in connection with the arrangement of the Financing as may be reasonably requested by PTC, including by (subject to such lenders having executed confidentiality agreements in favor of and for the benefit of FJI) (i) participating in meetings (including lender meetings), presentations, road shows, due diligence and drafting sessions and sessions with rating agencies and investors, in each case, as required to consummate the Financing; (ii) assisting with the preparation of materials for rating agency presentations, offering documents, private placement memoranda, bank information memoranda, prospectuses and similar documents required in connection with the Financing; (iii) subject to Section 5.1 of this Agreement, furnishing PTC and its financing sources financial and other pertinent information with respect to the Business, the Target Entities and the Target Subsidiaries as may be reasonably requested by PTC to consummate the Financing; (iv) requesting from the appropriate Person, and using its commercially reasonable efforts to obtain, such consents, "local counsel" legal opinions, surveys and title insurance commitments as reasonably requested by PTC, in each case, (A) as required to consummate the Financing and (B) to the extent requested at least 45 days prior to the Closing; (v) subject to

Section 5.1 of this Agreement, cooperate with prospective lenders involved in the Financing to provide access to the Business' and the Wholly-Owned LLCs' respective properties and assets, provide information regarding the cash management and accounting systems of the Business (including cooperating in and facilitating the completion of field examinations, collateral audits, asset appraisals, surveys, and engineering/property condition reports); (vi) cause the officers and directors of the Target Entities or Target Subsidiaries to resign or be removed immediately prior to the Closing to facilitate any direct borrowing or debt incurrence by the Target Entities or Target Subsidiaries at the Closing, and the lending of all or part of the proceeds thereof to PTC at the Closing; and (vii) otherwise requesting of the appropriate Persons, and using its commercially reasonable efforts to obtain, such other documents and instruments as may reasonably be requested by PTC, facilitating the pledge of, and granting of security interests in, the Target Assets and the stock and assets of the Target Entities or Target Subsidiaries, establishing bank accounts, blocked account agreements and lock box arrangements, executing and delivering deeds and other conveyance instruments to one or more designees of PTC, in each case effective as of the Closing; provided, that (A) FJI shall not be required to provide, or cause any of the Target Entities or Target Subsidiaries to provide, cooperation under this Section 5.12 that: (w) would require the delivery of any officers' certificate (including solvency certificate), cold comfort letter, solvency opinion, legal opinion (other than any "local counsel" opinion) or carve-out audited financial statements for the Business or any portion thereof, (x) unreasonably interferes with the ongoing business of the Target Entities, the Target Subsidiaries or the Business; (y) causes any representation, warranty or covenant in this Agreement to be breached or causes it to be in breach or default of any other Contract to which it is party or to violate any Order of the Bankruptcy Code or Law; or (z) causes any closing condition set forth in Article VI to fail to be satisfied or otherwise causes the breach of this Agreement and (B) PTC shall promptly, but in any event within thirty (30) days after request therefor, reimburse FJI for any out-of-pocket costs and expenses paid by FJI in connection with the fulfillment of its obligations under this Section 5.12(d).

Section 5.13    Intercompany Accounts. FJI and PTC agree that, to the extent permitted by the Bankruptcy Court, they shall use commercially reasonable efforts to cause all intercompany payables and liabilities (which shall (i) include the FJI Subordinated Note, but (ii) exclude (a) current trade accounts payable and liabilities for SG&A payables and accrued current liabilities, (b) CFJ Applicable Intercompany Payables, and (c) the COP Subordinated Note) from a Target Entity or Target Subsidiary to FJI or an Affiliate of FJI (other than any of the Target Entities or any of the Target Subsidiaries) to be settled at or prior to the Closing (such intercompany payables and liabilities not referred to in clause (ii) of the second immediately preceding parenthetical, the "**Remaining Intercompany Payables**"); provided, that (i) without duplication to amounts otherwise included therein, any Remaining Intercompany Payable (which, in the case of the FJI Subordinated Note, shall be the FJI Note Pay-Off Amount), that will not be settled on or prior to 11:59 p.m. on the Business Day before the Closing Date shall be included in the computation of Closing Business Net Debt or Closing PSI TFJ Net Debt Share, as applicable and PTC shall pay such Remaining Intercompany Payable and the CFJ Applicable Intercompany Payables upon demand by FJI and (ii) to the extent that FJI determines that the Remaining Intercompany Payables are reasonably likely to exceed $5,000,000 in the aggregate, FJI shall deliver a written notice to PTC no later than ten (10) Business Days prior to the Closing Date in respect of such Remaining Intercompany Payables. With respect to the FJI Subordinated Note, FJI shall deliver at the Closing a pay-off letter and release in customary form specifying the remaining liability on the FJI Subordinated Note to be

95

repaid at Closing (the "**FJI Note Pay-Off Amount**") and confirming that upon payment of the FJI Note Pay-Off Amount at Closing, CFJ Properties and its Affiliates shall have no further liability in respect of the FJI Subordinated Note (it being understood and agreed that FJI may effect, and such pay-off letter may reflect, a contribution of all or a portion of such FJI Subordinated Note to equity capital or other settlement or conversion of such FJI Subordinated Note immediately prior to the Closing and thus a remaining balance, if any, of less than the amount owing as of immediately prior to such contribution, settlement or conversion). Notwithstanding the foregoing, to the extent that any Target Entity or any Target Subsidiary has any account or other receivable from FJI or any of its Affiliates (other than any of the Target Entities or any of the Target Subsidiaries), FJI may, subject to the approval of the Bankruptcy Court, cause such account or other receivable to be paid, canceled, forgiven, or otherwise discharged.

Section 5.14    Employee Matters.

(a)    At least twenty (20) Business Days prior to the Closing, FJI shall provide PTC with a list of all employees of the Business (the "**Business Employees**"), including all employees of the Target Entities and the Target Subsidiaries (for the avoidance of doubt, any employee of FJI assigned to work at individual travel plaza locations owned by CFJ Properties, CFJ Plaza Company I LLC, CFJ Plaza Company II LLC, CFJ Plaza Company III LLC, CFJ I Management Inc., CFJ II Management Inc. or CFJ III Management Inc. shall be deemed for all purposes, including for the purpose of any FJI Severance Policy and any FJI Employee Benefit Plan, an employee of FJI), excluding the FJI employees that will be retained by FJI as noted on such list, and, to the extent permitted by Law, such Business Employee's position, date of hire, base pay, bonus structure, severance requirements and additional compensation incentives.  At least ten (10) Business Days prior to the Closing, PTC shall provide FJI with a list of those Business Employees that shall be employed by PTC or its Affiliates after the Closing (each, a "**Transferred Employee**"). At least two (2) days prior to the Closing, to the extent permitted by Law, FJI shall provide all pertinent records of Transferred Employees in sufficient electronic form in order to insert records in PTC's human resources information system.  FJI shall take all actions necessary, and PTC shall pay all costs and expenses related thereto, so that immediately following the Closing, all Transferred Employees that have accepted employment with PTC shall be employed by PTC or one of the PTC Subsidiaries.  Regarding any Business Employee that is not a Transferred Employee, PTC shall reimburse FJI for the payment of any severance pay (or similar pay under Canadian Law) and other costs, including any unpaid vacation and COBRA continuation coverage costs in excess of premiums collected, owed to such Business Employee arising due to an involuntary termination of employment resulting from or in connection with the consummation of the transactions contemplated hereby (it being understood that, subject to the following proviso, if any Business Employee is terminated, except in cases of termination where such Business Employee is not entitled to severance in accordance with the FJI Severance Policy, at any time at Closing or within eighteen (18) months after the Closing (or, if later, within three months after FJI ceases to provide to PTC or any of its Affiliates the transition service for which such employee was, in whole or in part, responsible) and such Business Employee is entitled to severance in accordance with FJI's Severance Policy as set forth in Section 5.14(a) of the FJI Disclosure Letter, such person's termination shall be deemed to arise due to an involuntary termination of employment resulting from or in connection with the consummation of the transactions contemplated hereby thereby triggering PTC's obligations hereunder, and that any Business Employee's termination outside of the above-referenced dates shall not be

considered to arise due to an involuntary termination of employment directly resulting from or directly in connection with the consummation of the transactions contemplated hereby), in an amount of severance and other payment obligations of FJI arising in connection with such termination determined under FJI's Severance Policy as set forth in Section 5.14(a) of the FJI Disclosure Letter or as otherwise determined in accordance with applicable Law and, with respect to any particular Business Employees agreed to between FJI and PTC, such additional retention amount as agreed to between FJI and PTC; provided, that PTC shall not be required to pay or reimburse FJI in the case where FJI pays the severance or other costs for any such severance payments or other termination liabilities arising out of or in connection with any store, restaurant or travel center closures effected by FJI prior to the Closing. With respect to any Transferred Employee, PTC shall be responsible for the payment of any severance pay (or similar pay under Canadian Law) and other costs of termination arising out of or in connection with any actions undertaken by PTC at or after the Closing. The parties hereto acknowledge that the transactions provided for in this Agreement may result in obligations on the part of FJI or its Subsidiaries and one or more of the FJI Employee Benefit Plans that is an employee welfare benefit plan (within the meaning of Section 3(1) of ERISA) to comply with the health care continuation requirements of COBRA or state Law, as applicable. The parties hereto expressly agree that, except as otherwise expressly agreed in this Section 5.14(a), PTC and the PTC Employee Benefit Plans shall have no responsibility for compliance with such COBRA health care continuation requirements (i) for qualified beneficiaries who previously elected to receive COBRA continuation coverage under the FJI Employee Benefit Plans or who between the date of this Agreement and the Closing Date elect to receive COBRA continuation coverage, or (ii) with respect to those employees or former employees of FJI, the Contributing Affiliates, the Target Entities or the Target Subsidiaries who may become eligible to receive such continuation coverage on or prior to the Closing or in connection with the transactions provided for in this Agreement.

(b)     With respect to the Transferred Employees, for the six (6) month period following the Closing, PTC shall not reduce any Transferred Employee's base salary or wages and aggregate employee benefits in existence immediately prior to the date hereof. PTC shall recognize for purposes of eligibility, vesting and the determination of any vacation availability, sick pay or severance benefits (but not for purposes of any other benefit accrual) under its policies and employee benefit plans, the service of any Transferred Employee with FJI or any of its Affiliates prior to the Closing Date. Notwithstanding the forgoing, PTC shall pay to each Transferred Employee whose employment is involuntarily terminated by PTC or one of its Affiliates (i) within six (6) months of the Closing Date, severance or termination benefits that are no less than the severance or termination benefits to which such Transferred Employee would have been entitled to under FJI's Severance Policy set forth in Section 5.14(a) of the FJI Disclosure Letter and, with respect to any particular Transferred Employees agreed to between FJI and PTC, such additional retention amount as agreed to between FJI and PTC or (ii) after the six (6) month anniversary of the Closing Date and prior to the eighteen (18) month anniversary of the Closing Date, severance or termination benefits that are no less than the maximum severance or termination benefits to which such Transferred Employee would have been entitled to under the Order of the Bankruptcy Court governing severance for employees of FJI and, with respect to any particular Transferred Employees agreed to between FJI and PTC, such additional retention amount as agreed to between FJI and PTC.

97

(c) Effective as of the Closing Date, FJI shall take all actions necessary to ensure that each Transferred Employee shall cease to participate in all FJI Employee Benefit Plans, except to the extent continuation coverage is required pursuant to COBRA or any similar state Law. PTC shall offer, with coverage effective as of the Closing Date, employee welfare benefit plans which shall provide the Transferred Employees and eligible dependents, with the opportunity to participate in the health, medical, dental, vision, life insurance and disability coverage and related welfare benefit plans of PTC and its Subsidiaries (the "**PTC Health Plans**"). PTC shall use commercially reasonable efforts to (a) waive pre-existing condition requirements (except with respect to any pre-existing condition for which coverage was denied under any welfare benefit plan of FJI), evidence of insurability provisions, unless any Transferred Employee requests a coverage level that requires such evidence pursuant to the provisions of any available life insurance plan, waiting period requirements (to the extent satisfied under any similar welfare benefit plan of FJI) or any similar provisions under any PTC Health Plans and (b) apply toward any deductible requirements and out-of-pocket maximum limits under its PTC Health Plan any amounts paid (or accrued) by each Transferred Employee under FJI's welfare benefit plans during the applicable plan year in which the Closing Date occurs.

(d) Provided that on or before the Closing Date FJI provides PTC with an accurate list, by date and location, of employee layoffs implemented by FJI in the 90-day period preceding the Closing Date, PTC shall indemnify and hold FJI harmless from all Losses arising under WARN to the extent arising out of PTC's actions or omissions occurring on or after the Closing (including as the same may result from the termination of any Business Employee that results from PTC's determination not to make a Business Employee a Transferred Employee or otherwise because a Transferred Employee is terminated by PTC after the Closing). FJI shall indemnify and hold PTC harmless from all Losses arising under the WARN prior to the Closing to the extent arising out of FJI's actions or omissions (with it being understood that any termination in connection with the transactions contemplated hereby shall not be deemed an FJI action or omission).

(e) Except as specifically set forth in this Section 5.14, (i) PTC shall not be obligated to assume or maintain any of the FJI Employee Benefit Plans; (ii) no assets or Liabilities of the FJI Employee Benefit Plans shall be transferred to, or assumed by, PTC or the PTC Employee Benefit Plans; and (iii) FJI and its Subsidiaries (other than the Target Entities) shall be solely responsible for funding and/or paying any benefits under all of the FJI Employee Benefit Plans, including employee entitlements accrued under such plans by or attributable to employees of FJI, any Contributing Affiliate, any of the Target Entities and the Target Subsidiaries. FJI shall be responsible for paying any annual bonus or incentive payments that become due and payable prior to the Closing that FJI has committed to provide to any Business Employee pursuant to any FJI Employee Benefit Plan, subject to the terms thereof; provided that, notwithstanding anything herein to the contrary, PTC shall promptly, but in any event within ten (10) Business Days after demand therefor, reimburse FJI for any such payment made in accordance with this sentence (whether made in respect of Transferred Employees or other Business Employees) and each other payment made by FJI in accordance with this Section 5.14(e), other than payments made in respect of the first installment of such annual bonus and other incentive payments due and owing to Transferred Employees and other Business Employees on December 15, 2009 (which first installment shall be paid by FJI without a right of reimbursement). In the event that the Closing occurs prior to the due date for payment of the

second installment (i.e., the installment due on the earlier of March 15, 2010 and FJI's emergence from bankruptcy) or third installment (i.e., the installment due only on FJI's emergence from bankruptcy) of such annual bonus or incentive payments (i.e., the payment due at emergence of FJI from bankruptcy), then (x) FJI shall, subject to its right to reimbursement from PTC in accordance with the immediately foregoing sentence, pay to Business Employees that are not Transferred Employees installments of such annual bonus or incentive payments due after the Closing Date, and (y) PTC shall pay to Transferred Employees installments of such annual bonus or incentive payments due after the Closing Date. Notwithstanding anything herein to the contrary, the only portion of the liability with respect to such annual bonus or incentive payments that shall be included in the computation of Closing Business Net Debt, Closing PSI TFJ Net Debt Share, Closing Business Working Capital or Closing PSI TFJ Working Capital Share shall be (A) in the case that the Closing occurs prior to the payment of the second installment of such annual bonus or incentive payment, the portion of the liability related to the second installment for the period prior to 11:59 p.m. on the Business Day prior to the Closing Date (which shall be included in the computation of Closing Business Working Capital or Closing PSI TFJ Working Capital Share, as applicable, in accordance with the terms hereof) and (B) in the case that the Closing occurs after the payment of the second installment of such annual bonus or incentive payment, the liability for such annual bonus or incentive payment (which shall be included in the computation of Closing Business Working Capital or Closing PSI TFJ Working Capital Share, as applicable, in accordance with the terms hereof). For the avoidance of doubt, without limiting PTC's obligations in respect of any CFJ Applicable Intercompany Payable included in the computation of Closing Business Net Debt, FJI shall be solely responsible for paying any "special bonus" to any Business Employee and Transferred Employee under the Bonus Program.

(f)    Nothing in this Agreement, express or implied, shall: (i) confer upon any employee of FJI, any Contributing Affiliate, any Target Entity or the Target Subsidiaries, or any representative of any such employee, any rights or remedies, including any right to employment or continued employment for any period or terms of employment, for any nature whatsoever, or (ii) be interpreted to prevent or restrict PTC or its Affiliates from modifying or terminating the employment or terms of employment of any Transferred Employee, including the amendment or termination of any employee benefit or compensation plan, program or arrangement, after the Closing Date.

(g)    FJI shall permit, and cause its Subsidiaries to permit, PTC to contact and make arrangements with the Transferred Employees regarding employment or prospective employment by PTC or its Affiliates after the Closing and for the purpose of ensuring the continuity of the Business, and FJI agrees not to discourage, and to cause its Subsidiaries not to discourage, any such Transferred Employees from consulting with PTC. FJI shall, and shall cause its Subsidiaries to, make available to PTC such personnel and similar information as PTC may request with respect to any Transferred Employee, including compensation and employment records to the extent allowed under applicable Law.

(h)    FJI shall take such action as is necessary and required to provide that all Transferred Employees who are participants in the Flying J Inc. Retirement Savings Plan (the "**FJI 401(k) Plan**") have a fully vested and nonforfeitable interest in their entire respective account balances under such plan as of the Closing Date (regardless of their years of vesting credit under the FJI 401(k) Plan). As soon as practicable following the Closing Date, with respect to all of the Transferred Employees, FJI shall contribute all contributions to the FJI

401(k) Plan (i) which are required to be made on or before the Closing Date under the FJI 401(k) Plan, and (ii) which relate to service or employee salary deferral contributions on or prior to the Closing Date, whether or not required to be made on or prior to the Closing Date under the FJI 401(k) Plan. PTC shall take commercially reasonable steps to effect, as promptly as practicable after the Closing Date, to the extent elected by Transferred Employees who are participants in the FJI 401(k) Plan, the direct rollover pursuant to Sections 401(a) and 401(k) of the Code to a tax-qualified defined contribution plan sponsored or maintained by PTC or its Affiliates under which the Transferred Employees shall be eligible to participate following the Closing Date (the "**PTC's 401(k) Plan**") of each Transferred Employee's full account balance (including the promissory notes representing outstanding loans) in the FJI 401(k) Plan. To the extent permitted by the Code and ERISA, until such transfer is accomplished, FJI shall cause, or FJI shall use commercially reasonable efforts to cause, the trustee of the FJI 401(k) Plan to suspend any default on any loan from the FJI 401(k) Plan to any Transferred Employee resulting from the transactions contemplated herein. If a Transferred Employee elects to participate in PTC's 401(k) Plan, such Transferred Employee will only be entitled to the level of company match that PTC provides under PTC's 401(k) Plan.

(i)     To the extent allowed under applicable Law, with respect to the vacation entitlements that Transferred Employees have under the applicable policies of FJI or the Target Entity or the Target Subsidiaries accrued but not used through Closing ("**Accrued Vacation**"), PTC shall permit Transferred Employees to carry over, and to use after Closing, for a period of one (1) calendar year beginning on the Closing Date, all Accrued Vacation in accordance with the applicable policies of FJI and its Affiliates as in effect as of the Closing Date, but only to the extent such Accrued Vacation amounts are included or to be included in the computation of Closing Business Working Capital or Closing PSI TFJ Working Capital Share, as applicable (including as the same may be accrued as wages).

Section 5.15    Mortgages.

(a)     No later than ninety (90) days after the Closing (the "**Assumption Determination Date**"), at PTC's option (i) the Business Net Debt related to plaza mortgages set forth in Section 5.15(a) of the FJI Disclosure Letter (the "**Non-CFJ Plaza Debt**") shall be paid in full or (ii) PTC, directly or through a Target Entity or Target Subsidiary, shall assume such Non-CFJ Plaza Debt.

(b)     At Closing, at PTC's option (i) the CFJ Mortgage Debt shall be paid in full, or (ii) PTC shall assume the CFJ Mortgage Debt. The liability of FJI with respect to any costs, including premiums, penalties, breakage costs and similar items, which arise when the CFJ Mortgage Debt is assumed or paid in full, shall be (as provided in the definitions thereof) a reduction in the calculation of, as applicable, Initial Purchase Price and Final Purchase Price (as determined in accordance with Section 2.6(e)) of $550,000. PTC shall pay any remaining costs, including premiums, penalties, breakage costs and similar items, which arise when the CFJ Mortgage Debt is assumed or paid in full and none of such costs shall be included in the calculation of Closing Business Net Debt or Closing Business Working Capital.

(c)     The liability of FJI with respect to any costs, including premiums, penalties, breakage costs and similar items, which arise when the Non-CFJ Plaza Debt is assumed or paid in full, shall be a reduction in the calculation of, as applicable, the definition

of the Initial Purchase Price and/or the determination of the Final Purchase Price in accordance with Section 2.6(e) as follows: (i) with respect to Non-CFJ Plaza Debt set forth on Section 5.15(a) of the FJI Disclosure Letter for which there is an amount set forth opposite such Non-CFJ Plaza Debt (the "**Specified Non-CFJ Plaza Debt**"), the amount set forth opposite such Specified Non-CFJ Plaza Debt on Section 5.15(a) of the FJI Disclosure Letter (the "**Specified Non-CFJ Plaza Debt Reduction Amount**") shall be deducted from the Initial Purchase Price and (ii) for each Non-CFJ Plaza Debt other than the Specified Non-CFJ Plaza Debt (the "**Remaining Non-CFJ Plaza Debt**"), an amount determined as follows (such amount, the "**Mortgage Costs**"): (x) with respect to each item of Remaining Non-CFJ Plaza Debt that PTC has elected to assume or continue after the Assumption Determination Date directly or through one of its Subsidiaries (including a Target Entity or Target Subsidiary), for which the consent of the lender is required for such assumption or continuation, but such consent is not provided on or prior to the Assumption Determination Date, the lesser of (A) the premiums, penalties, breakage costs and similar items required in connection with pay-off thereof as determined as of 11:59 p.m. on the Business Day immediately preceding the Assumption Determination Date in accordance with the instruments governing such Remaining Non-CFJ Plaza Debt, which premiums, penalties, breakage costs and similar items shall be calculated in accordance with Section 5.15(c) of the FJI Disclosure Letter and (B) any fee or similar payment in lieu of the amount determined pursuant to clause (x)(A) agreed to by such lender, (y) with respect to each item of Remaining Non-CFJ Plaza Debt that PTC has elected to assume or continue after the Assumption Determination Date directly or through one of its Subsidiaries (including a Target Entity or Target Subsidiary), for which the consent of the lender is required for such assumption or continuation, and the lender has agreed to provide such consent on or prior to the Assumption Determination Date, the lesser of (A) the assumption fee determined as of 11:59 p.m. on the Business Day immediately preceding the earlier of (I) the date of the consummation of such assumption and (II) the Assumption Determination Date in accordance with the instruments governing such Remaining Non-CFJ Plaza Debt, which assumption fee shall be calculated in accordance with Section 5.15(c) of the FJI Disclosure Letter and (B) any fee or similar payment agreed to by such lender in lieu of the amount described in clause (y)(A), and (z) with respect to each item of Remaining Non-CFJ Plaza Debt that PTC has elected to pay at or prior to the Assumption Determination Date (whether consent of the lender thereto is required and obtained or not required), the least of (A) the premiums, penalties, breakage costs and similar items required in connection with pay-off thereof as determined as of 11:59 p.m. on the Business Day immediately preceding the date of such pay-off in accordance with the instruments governing such Remaining Non-CFJ Plaza Debt, which premiums, penalties, breakage costs and similar items shall be calculated in accordance with Section 5.15(c) of the FJI Disclosure Letter (B) the assumption fee determined as of 11:59 p.m. on the Business Day immediately preceding the date of such pay-off in accordance with the instruments governing such Remaining Non-CFJ Plaza Debt, which assumption fee shall be calculated in accordance with Section 5.15(c) of the FJI Disclosure Letter and (C) any fee or similar payment agreed to by such lender in lieu of the amount described in clause (z)(A) and (z)(B). PTC shall pay any remaining costs, including premiums, penalties, breakage costs and similar items, which arise when the Non-CFJ Plaza Debt is assumed or paid in full and none of such costs shall be included in the calculation of Closing Business Net Debt or Closing Business Working Capital. The parties shall cooperate in good faith in working with the lenders in an effort to reduce the overall costs related to the assumption or prepayment thereof.

NEWYORK 7440434 (2K)

Section 5.16    Release of FJI from Certain Obligations.

(a)    Other than in the case of the DIP Issued Business Bonds, PTC agrees to use its commercially reasonable efforts (i) to obtain the release of FJI or any of its Affiliates (other than the Target Entities or any Target Subsidiary) from each guaranty, indemnity or other obligation relating to the Business set forth in <u>Section 5.16(a)(i)</u> of the FJI Disclosure Letter or replace any such guaranty, indemnity or other obligation with a guaranty, indemnity or other obligation of PTC or an Affiliate of PTC, and (ii) to replace any performance bond, surety bond, letter of credit or other security provided by FJI or its Affiliates (other than the Target Entities or any Target Subsidiary) on behalf of the Target Entities or any Target Subsidiary relating to the Business set forth in <u>Section 5.16(a)(ii)</u> of the FJI Disclosure Letter with a performance bond, surety bond, letter of credit or other security provided by PTC or an Affiliate of the PTC (any of the instruments or obligations referred to in clauses (i) and (ii), collectively, the "**FJI Obligations**").

(b)    In the event that PTC is unable to so release or replace any of the FJI Obligations, PTC shall, with effect as of the Closing, indemnify and hold harmless FJI, its Affiliates and their respective Representatives from and against all Losses suffered, incurred or paid directly or indirectly, as a result of, in connection with or arising out of any of the FJI Obligations.

Section 5.17    Insurance Matters.

(a)    In the event that, after the Closing, PTC or any of its Subsidiaries suffers any Loss with respect to the Business, the Target Assets, the Target Entities or the Target Subsidiaries, or any current or former directors, officers, employees or agents of any of the Target Entities, Target Subsidiaries or any Transferred Employees, in each case to the extent relating to events, facts or circumstances existing or occurring prior to the Closing and such Loss is, subject to the coverage limits, deductibles, self-insured retentions and other limitations thereof, covered by the terms of any insurance policy of FJI or any of its Subsidiaries (other than the Target Entities and the Target Subsidiaries), FJI shall, and shall cause its Subsidiaries to, at the expense of PTC, use their respective commercially reasonable efforts to pursue all Actions or other rights (and, at the request of PTC, to the extent allowed without the consent of any other Person, cause PTC to be subrogated in respect of any such Actions or rights) that FJI or any of its Subsidiaries may have with respect to such Loss under any past or present insurance policies of FJI or any of its Subsidiaries covering such Loss (including any such insurance policies provided by Flying J Insurance Company). Notwithstanding anything contained in this Agreement to the contrary, FJI shall take all steps necessary or required to allow and enable PTC and/or any of PTC's Subsidiaries to directly make claims on behalf of FJI and/or any of FJI's applicable Subsidiaries under the insurance policies with Flying J Insurance Company and PTC shall provide reasonable cooperation in connection therewith. Subject to the requirements of Law, FJI shall cause any such Action or such rights that FJI or any of its Subsidiaries may have with respect to such Losses under any current or former insurance policies provided by Flying J Insurance Company to be treated on parity with any other Action or other rights that any other Person may have under such policies. All proceeds (net of any deductible, self-insured retention, costs of recovery, and other costs paid or incurred, by PSI, FJI or any of its Subsidiaries with respect thereto, including any increased premiums) received by PSI, FJI or any of its Subsidiaries pursuant to such insurance policies in respect of any such Loss shall be remitted by FJI to PTC promptly,

but in any event within five (5) Business Days, after FJI's or such Subsidiary's receipt thereof; provided that in no event shall PSI or FJI be required to turn over an amount more than the Loss suffered by PTC or its Subsidiaries. PTC or one of its Subsidiaries, as applicable, shall be solely responsible for the payment of any deductible, self-insured retention and Loss in excess of coverage limitations to the extent FJI has no indemnification obligation with respect to such amounts pursuant to this Agreement.

(b)     During the period from the date of this Agreement to the Closing Date, FJI shall, as promptly as practicable but in no event later than two (2) Business Days prior to the Closing Date, deliver or cause to be delivered to PTC the following documents, certificates and other information, in each case to the extent prepared or obtained by, or is otherwise in the possession of, FJI or any of its Affiliates, as PTC may reasonably request for the purposes of obtaining pollution legal liability insurance and underground tank storage insurance in respect of each Target Real Property:

(i)     a completed "Form 13 Storage Tank & Location Schedule" for each Target Real Property, in form and substance reasonably acceptable to PTC;

(ii)     a copy of the completed registration form for each underground storage tank located at any Target Real Property, as applicable, where registration of storage tank facilities in respect of such Target Real Property is required under any federal, state or local Law; and

(iii)     all records, reports, data and other information prepared in connection with tank tightness testing conducted in respect of each underground storage tank located at any Target Real Property on and from October 1, 2008 through November 1, 2009.

Section 5.18     Bankruptcy Court Filings, Etc.  FJI shall file the Sale Motion as soon as practicable and no later than December 30, 2009, and thereafter shall diligently seek entry of the Sale Order. FJI shall cause the Bankruptcy Court to schedule the Sale Hearing on a date which is not later than January 29, 2010. Once scheduled by the Bankruptcy Court, FJI shall not adjourn (or seek or agree to an adjournment of) the Sale Hearing unless: (a) PTC consents (which consent shall not be unreasonably withheld, conditioned or delayed); (b) FJI has not received from PTC, by 5:00 p.m. (New York time) on January 21, 2010, evidence reasonably satisfactory to it that the condition to Closing set forth in Section 6.3(c) hereof in respect of Antitrust Filings has been satisfied; or (c) at or prior to the commencement of the originally scheduled Sale Hearing, a Financing Deficit Event has occurred which has not been cured by a Replacement Financing Letter. If any of the conditions set forth in (a) through (c) of the preceding sentence occur, then FJI may (but is not obligated to) adjourn the Sale Hearing to a date to be mutually agreed (which may be the same date as, but no later than, the Confirmation Hearing) and, if no agreement is reached, to a date reasonably determined by FJI's counsel after consultation with PTC's counsel, taking into consideration the cause of the adjournment, but which shall not be later than the date of the Confirmation Hearing. PTC agrees that it shall promptly take such actions as are reasonably requested by FJI to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by PTC, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes of, among other things, providing necessary assurances of performance by PTC under this Agreement and demonstrating that PTC is a "good faith" purchaser under Section

363(m) of the Bankruptcy Code and affidavits and other documents and information demonstrating PTC's ability to pay and perform or otherwise satisfy the Assumed Liabilities. Without limiting the foregoing, each of FJI and PTC shall use its commercially reasonable efforts to cooperate, assist and consult with each other to procure the entry of the Sale Order and, if applicable, the Scheduling Order and the Confirmation Order, as promptly as is practicable. In the event that the entry of the Sale Order or Confirmation Order, as the case may be, is appealed, each of FJI and PTC shall use its respective commercially reasonable efforts to defend against such appeal. In the event that an appeal is taken, or a stay pending appeal is requested from the Sale Order or Confirmation Order, as the case may be, FJI shall promptly notify PTC of such appeal or stay request and shall promptly provide PTC with a copy of the relevant notice of appeal or motion for (and order of) stay. FJI shall also provide PTC with written notice of any motion or application filed in connection with any appeal from either of such orders. Notice of the Sale Motion and the transactions contemplated hereby shall be in a form reasonably acceptable to PTC and be served in accordance with applicable Law (including, to the extent applicable, Bankruptcy Rules 2002, 6004 and 6006 and any local rules or orders of the Bankruptcy Court) on all Persons required to receive notice in order to be bound by the Bankruptcy Court's disposition of such Sale Motion under applicable Law (it being understood and agreed that FJI and PTC shall cooperate in good faith to determine the Persons to be served such notice). All obligations of FJI under this Agreement, including, without limitation, any Purchase Price Adjustment obligation and any and all claims for indemnification asserted by PTC, shall be entitled to administrative expense priority in the Bankruptcy Case pursuant to Sections 503(b) and 507(a) of the Bankruptcy Code , subject to FJI's rights pursuant to <u>Section 9.5(d)(i)</u> of this Agreement.  To the extent FJI's Liabilities regarding such claims (a) shall be fixed prior to confirmation of a chapter 11 plan for FJI, such claims shall be paid in full and in cash or as otherwise provided by this Agreement on or prior to the effective date of such plan, or (b) remain contingent at the confirmation of a chapter 11 plan for FJI in the Bankruptcy Case and have not previously been assumed by a successor in interest to FJI pursuant to a sale approved by the Bankruptcy Court pursuant to Section 363 of the Bankruptcy Code, such plan shall provide for (i) the assumption and affirmation of such claims by the reorganized debtor(s) in the Bankruptcy Case on the effective date of such plan, (ii) the assumption and affirmation of such claims by any successor(s) in interest to FJI in the Bankruptcy Case on the effective date of such plan, or (iii) if there is no reorganized debtor in the Bankruptcy Case or successor that has assumed such Liabilities, establishment on the effective date of such plan of a cash reserve, letter of credit or similar financial instrument or arrangements pursuant to and consistent with <u>Section 9.5(d)(i)</u> hereof, that is available to fully satisfy such claims in an amount and on terms to be agreed to among FJI and PTC or, if no such agreement is reached, as determined by the Bankruptcy Court.

Section 5.19    <u>Business Letters of Credit and Surety Bonds</u>.    FJI shall use its commercially reasonable efforts to cancel and terminate at or after the Closing, or cause to be cancelled and terminated, any outstanding Letter of Credit (as defined in the DIP Facility), surety or similar bond issued in connection with the Business which has been issued pursuant to the DIP Facility (the **"DIP Issued Business Bonds"**).  If such cancellation and termination does not occur at or prior to the Closing, then from and after the Closing until the date all such DIP Issued Business Bonds have been cancelled or terminated, FJI shall (a) promptly inform PTC of any communication received by FJI from any Governmental Entity regarding such DIP Issued Business Bonds, (b) review and consult with PTC in connection with any proposed written or oral communication with any Governmental Entity regarding such DIP Issued

Business Bonds, (c) not participate in any meeting with any Governmental Entity regarding such DIP Issued Business Bonds unless it first consults with PTC in advance and gives PTC the opportunity to be present thereat, and (d) not agree to any amendment or waiver in connection with such DIP Issued Business Bonds without the written consent of PTC. If such cancellation and termination does not occur at or prior to the date that is ninety (90) days after the Closing, then following such date until all such DIP Issued Business Bonds have been cancelled and terminated, FJI shall pay to PTC, on a monthly basis in arrears, an amount equal to 5% per annum of the Stated Amount (as defined in the DIP Facility) of the DIP Issued Business Bonds (calculated on a daily basis on such Stated Amount in respect of the DIP Issued Business Bonds still outstanding on each such day and a year of 360 days).

Section 5.20    Sales of Adjacent Excess Real Estate.    Set forth on Section 1.1(i) of the FJI Disclosure Letter is the value of each parcel of Adjacent Excess Real Estate (each such value, an "**Ascribed Value**"). FJI and PTC acknowledge and agree that it is a material term of this Agreement that FJI has the right to sell parcels of Adjacent Excess Real Estate during the period from and after the date of this Agreement until the date which is eight (8) Business Days prior to the Closing (the "**Real Estate Sales Period**"); provided, however, that FJI shall not sell any parcel of Adjacent Excess Real Estate to the extent such sale would cause any default under any Business Net Debt. At least five (5) Business Days but no more than seven (7) Business Days prior to the Closing Date, FJI shall deliver to PTC a notice identifying each parcel of Adjacent Excess Real Estate sold during the Real Estate Sales Period and setting forth the aggregate amount of the Ascribed Values of such sold parcels (such aggregate amount, less any portion thereof that is paid to a Target Entity or Target Subsidiary, the "**Real Estate Sales Amount**"). FJI acknowledges and agrees that the Real Estate Sales Amount, if any, shall be deducted in the computation of the Initial Purchase Price and Final Purchase Price determined in accordance with Section 2.6(e) of this Agreement; provided that the foregoing shall not be construed or interpreted to mean that the Real Estate Sales Amount or any portion thereof may not, to the extent otherwise qualifying as such, be included in the computation of Closing Business Net Debt or Closing Business Working Capital.

Section 5.21    Director and Officer Liability and Indemnification. During the period commencing as of the Closing Date and for a period of six (6) years thereafter, PTC shall not, and shall not permit any Target Entity or any Target Subsidiary to, amend, repeal or modify any provision in any constituent document of such Target Entity or such Target Subsidiary relating to the exculpation of directors and officers and former officers and directors of the Target Entities and Target Subsidiaries as in effect immediately prior to the Closing, it being the intent of the parties hereto that the officers and directors of the Target Entities and the Target Subsidiaries prior to the Closing shall continue to be entitled to such exculpation to the fullest extent permitted under applicable Law; provided that in no event shall this Section 5.21 be deemed to limit or modify PTC's rights with respect to any such claim arising under Section 5.17(a) of this Agreement. Notwithstanding anything contained in this Agreement to the contrary, this Section 5.21 shall survive the consummation of the Closing. In the event that any Target Entity or Target Subsidiary or any of their respective successors or assigns (a) consolidates with or merges into any other Person, or (b) transfers all or substantially all of its properties or assets to any Person, then, and in each case, PTC shall use commercially reasonable efforts to cause the successors and assigns of such Target Entities or Target Subsidiaries, as the case may be, to expressly assume and be bound by the obligations set forth in this Section 5.21. The obligations of PTC under this Section 5.21 shall not be terminated or modified in such a

manner as to adversely affect any Person to whom this <u>Section 5.21</u> applies without the consent of such affected Person.

        Section 5.22    <u>Bank Accounts and Powers of Attorney</u>. At or prior to Closing, FJI shall deliver to PTC a list showing (a) the name and address of each bank in which the Target Entities or any of the Target Subsidiaries has an account or safe deposit box, the number of any such account or any such box and the names of all Persons authorized to draw thereon or to have access thereto, and (b) the names of all Persons, if any, holding powers of attorney relating to the Business and a summary statement of the terms thereof.

        Section 5.23    <u>Transferred Litigation</u>. From and after the Closing, PTC and FJI shall cooperate to attempt to have FJI and the Contributing Affiliates dismissed from and/or PTC substituted as a party in place of FJI and such Contributing Affiliates with respect to each Action that is, in accordance with <u>Section 2.3</u> of this Agreement, an Assumed Liability. Such substitution, or the failure to cause such a substitution, will have no effect on the fact that each such Action is an Assumed Liability of PTC for purposes of this Agreement. Except to the extent that FJI has, in accordance with <u>Section 9.6</u> hereof, the right to direct the prosecution, defense and/or settlement of any such Action, PTC shall, subject to the other provisions of this Agreement, be entitled to direct the prosecution, defense and/or settlement and all other aspects of the administration of all Actions that are Assumed Liabilities. FJI and the Contributing Affiliates shall, at PTC's cost and expense, cooperate in connection with such prosecution, defense and or settlement, which cooperation shall include, but not be limited to (a) affording PTC and its Representatives reasonable access, upon reasonable notice during normal business hours, to all relevant personnel, properties, books, contracts, commitments and relevant records that are not subject to privilege, (b) furnishing promptly to PTC and its Representatives any non-privileged information in its possession reasonably requested by PTC or such Representatives in connection therewith, (c) authorizing and permitting relevant personnel to provide interviews, sworn statements, deposition testimony and trial testimony and (d) providing any other assistance to PTC or such Representatives, reasonably requested by PTC or such Representatives in connection therewith.

        Section 5.24    <u>Texas Tax Controversy</u>. FJI shall provide PTC with all material non-privileged documentation and timely status updates in connection with FJI's fuel Tax dispute with the State of Texas.

        Section 5.25    <u>Proprietary Software Reversion</u>.    Following the effective date of the Plan and FJI's emergence from bankruptcy proceedings, FJI shall have the right to obtain a reversion (the "**Reversion Right**") of the ownership rights to the software applications that were proprietary to FJI prior to the Closing Date and which are included within the list of proprietary software applications set forth on <u>Section 2.2(a)(iii)</u> of the FJI Disclosure Letter (the "**Assigned Proprietary Software Applications**").    In order for FJI to exercise the Reversion Right, FJI must give written notice to PTC on or after the effective date of the Plan and FJI's emergence from bankruptcy proceedings indicating that FJI is exercising the Reversion Right.    Upon receipt of such written notice, PTC shall, within a reasonable amount of time thereafter, (i) assign all right, title, and interest (subject to the license granted below) in and to the Assigned Proprietary Software Applications (including all Intellectual Property rights therein) back to FJI and (ii) provide to FJI, at FJI's expense, copies of the Assigned Proprietary Software Applications (excluding any improvements or modifications made by PTC) in a form substantially similar to the form of Assigned Proprietary Software Applications as of the Closing

Date. For each such Assigned Proprietary Software Application that is assigned back to FJI, FJI hereby grants to PTC and PTC's Affiliates a perpetual, irrevocable, assignable, sublicensable, worldwide, fully-paid, non-exclusive license to, in an unlimited manner, use, improve, and make derivative works from such Assigned Proprietary Software Application (including Intellectual Property rights therein) in connection with the Business. PTC shall have no obligation to provide any maintenance or support to FJI in connection with any such Assigned Proprietary Software Applications. If PTC subsequently sells the Business or the assets related to the Business, including any Assigned Proprietary Software Applications, to a third party prior to the exercising of the Reversion Right, this Section 5.25 shall no longer apply with respect to such Assigned Proprietary Software Applications.

Section 5.26    Intellectual Property Licenses.

(a)    License to PTC. FJI hereby grants to PTC, the Target Entities, and the PTC Subsidiaries a perpetual, irrevocable, worldwide, fully-paid, non-exclusive license to use or have used, solely in connection with the Business, any Intellectual Property owned, licensed (provided it can be sublicensed), used or held for use by FJI or its Affiliates that is used in the Business, but is not primarily used in the Business, except for the Business Intellectual Property specifically licensed to PTC and its Affiliates pursuant to the Trademark License Agreement.

(b)    License Back to FJI. PTC hereby grants to FJI, FJI Subsidiaries and FJI Affiliates a perpetual, irrevocable, worldwide, fully-paid, non-exclusive license to use and have used, solely in connection with the Excluded Business Operations, any of the Assigned Business Intellectual Property (provided it can be sublicensed) that is used in the Excluded Business Operations, but is primarily used in the Business. No license is granted by this Section 5.26(b) to any trademarks, service marks or domain names included in the Assigned Business Intellectual Property.

Section 5.27    Post-Closing Record Retention and Access. Each of FJI, PSI and PTC shall keep and preserve in an organized and retrievable manner, at the headquarters for the Business or any other location at which a portion of the Business is conducted and any such books or records are stored (in the case of PTC) and at the headquarters of FJI or PSI, as applicable (in the case of FJI and PSI) the books and records in its possession related to the Business (and with respect to PSI, solely to TFJ) for the lesser of (i) seven (7) years from the Closing Date or (ii) the retention period for such records under the longer of PTC's, FJI's or PSI's records retention schedules applicable to such records. Upon expiration of such period for any specific books and records pertaining to the Business (and with respect to PSI, solely to TFJ), each party shall notify the other parties that it intends to destroy such records unless any other party takes possession of them within sixty (60) days following such notice and, upon expiration of such period, such notifying party may promptly destroy any such record not taken by any other party. While such books and records relating to the Business (and with respect to PSI, solely to TFJ) remain in existence, each party shall allow the other parties and their respective Representatives, at the requesting party's expense, access to the books and records with respect to the Business (and with respect to PSI, solely with respect to TFJ) upon reasonable request and advance notice and during normal business hours. Without limiting the generality of the foregoing, from and after the Closing, each party shall provide the other parties and their respective Representatives with reasonable access (for the purpose of examining and copying), during normal business hours, to any books and records and other materials relating to

107

the Business (and with respect to PSI, solely to TFJ) for periods prior to the Closing Date in connection with general business purposes, whether or not relating to or arising out of this Agreement or the transactions contemplated hereby (including the preparation of Returns, amended Returns or claim for refund (and any materials necessary for the preparation of any of the foregoing), and financial statements for periods ending on or prior to the Closing Date, the management and handling of any audit, investigation, litigation or other proceeding, whether such audit, investigation, litigation or other proceeding is a matter with respect to which indemnification may be sought hereunder), to comply with the rules and regulations of the IRS or any other Governmental Entity.

Section 5.28    Certain Provisions Related to Specified Consents.

(a)    Conoco. PTC represents and warrants to FJI that, on the date hereof, it and each other party thereto is executing and delivering that certain Purchase Agreement, dated as of the date hereof, by and among PTC, ConocoPhillips Company, Douglas Oil Company of California and Kayo Oil Company (the "**COP Purchase Agreement**"), attached hereto as **Exhibit XIV** which contains, subject to the conditions specified therein, the Specified Consents of ConocoPhillips Company and its Affiliates for the transactions contemplated hereby. PTC shall not, without the prior written consent of FJI, consent to any amendment to, or provide any waiver to, the COP Purchase Agreement which would be reasonably expected to delay or make more burdensome the satisfaction of all of the conditions to the consummation of the transactions under the COP Purchase Agreement and, prior to the termination of this Agreement, shall not consent to termination of the COP Purchase Agreement unless an alternative Specified Consent from ConocoPhillips Company and its Affiliates ("**Alternative COP Specified Consent**") has been obtained. PTC and FJI each represent and warrant to the other that it is not aware of any material conditions to receipt of the Specified Consent of ConocoPhillips Company and its Affiliates to the transactions contemplated by this Agreement, other than as specified in the COP Purchase Agreement. PTC shall give FJI written notice promptly, but in any event within one (1) Business Day, after any termination of the COP Purchase Agreement.

(b)    Shell. PTC represents and warrants to FJI that it and Royal Dutch Shell plc have executed and delivered that certain SFJ, Inc. Side Letter Agreement, dated as of November 10, 2009, by and between PTC and Shell Canada Projects (the "**Shell Consent Agreement**"), attached hereto as **Exhibit XV** which contains, subject to the conditions specified therein, the Specified Consents of Royal Dutch Shell plc and its Affiliates for the transactions contemplated hereby. PTC shall not, without the prior written consent of FJI, consent to any amendment to, or provide any waiver to, the Shell Consent Agreement and, prior to the termination of this Agreement, shall not consent to termination of the Shell Consent Agreement unless an alternative Specified Consent from Royal Dutch Shell plc and its Affiliates ("**Alternative Shell Specified Consent**") has been obtained. PTC and FJI each represent and warrant to the other that it is not aware of any material conditions to receipt of the Specified Consent of Royal Dutch Shell plc and its Affiliates to the transactions contemplated by this Agreement, other than as specified in the Shell Consent Agreement. PTC shall give FJI written notice promptly, but in any event within one (1) Business Day, after any termination of the Shell Consent Agreement.

Section 5.29    BDT Term Sheet. PTC and FJI shall cooperate in good faith to amend as promptly as reasonably practicable and in no event later than the Closing Date,

108

the form of the Third Amended and Restated LLC Agreement attached hereto as **Exhibit I** and the form of the Amended and Restated Investor Rights Agreement attached hereto as **Exhibit II** to reflect the terms and conditions set forth in the BDT Term Sheet; provided that, except as otherwise consented to by FJI, the PTC Units to be issued to BDT Capital Partners Fund I or any of its Affiliates as contemplated thereunder shall have, except with respect to the rights in the BDT Term Sheet and except with respect to rights of FJI to distributions in respect of sales of certain real estate, the same economic rights as the PTC Units to be issued to FJI (as adjusted for different ownership percentages).

Section 5.30    Restriction on Transfer of FJI Equity.  FJI shall cause the Flying J Inc. Voting Agreement and Agreement Prohibiting Transfer, made effective as of September 28, 2007, by and among FJI, Thad J. Call, Trustee of The O. Jay Call Accumulation Trust FBO Thad J. Call, Crystal Accumulation, LLC, Barre G. Burgon, Trustee of The Tamra C. Call Marital Trust, Crystal Call Maggelet, Trustee of The O. Jay Call Trust FBO Crystal Call Maggelet, Thad J. Call, Trustee of the O. Jay Call Trust FBO Thad J. Call, Calls Investment Company, Ltd., Thad J. Call, Crystal Call Maggelet and Tamra C. Call and Thad J. Call, Crystal Call Maggelet and Tamra C. Call as Shareholders Representatives (as defined therein), to be amended, effective as of the Closing Date, to prohibit, during the five (5)-year period commencing on the Closing Date, any transfer of FJI equity securities by its shareholders that would result in the Call Family Delivery Parties holding, directly or indirectly, less than a majority of the outstanding equity securities of FJI.

Section 5.31    Settlement Agreement.  FJI acknowledges that after the Closing, PTC shall cause CFJ Properties, Louisiana Greenwood LLC and TCH LLC to execute that certain Settlement Agreement and Release by and among FJI, TCH LLC, TON Services Inc., Transportation Alliance Bank Inc., CFJ Properties, AFJ LLC, TFJ, Louisiana Greenwood LLC, PTC and Pilot Corporation.

Section 5.32    Termination of Escrow Arrangement and Release of Funds.  At the Closing, FJI shall cause the escrow arrangement to be entered into by FJI and ConocoPhillips Company after the date hereof and prior to the Closing Date for the purpose of establishing an escrow fund for the deposit of the proceeds from the sale of a certain real property located in Brunswick, Georgia, whether or not such escrow arrangement is established pursuant to that certain letter agreement by and among PTC, FJI and ConocoPhillips Company titled "Pilot/CFJ Transaction; Sale of Surplus Property in Brunswick, GA", to be terminated, and all amounts deposited in such escrow fund shall be released and transferred to a bank account owned by CFJ Properties.

Section 5.33    Cooperation by PSI.  During the period commencing on the date hereof and ending on the earlier of (x) the Closing Date and (y) the date on which this Agreement is terminated pursuant to its terms, PSI shall, and shall cause its Affiliates to, and shall use its commercially reasonable efforts to cause TFJ to, cooperate and use commercially reasonable efforts to allow FJI to effect and comply with its obligations under this Agreement with respect to TFJ.

Section 5.34    Transfer of Title to Certain Real Property.  FJI shall and shall cause its Affiliates to, use commercially reasonable efforts to consummate the transactions set forth in Section 5.34(a) of the FJI Disclosure Letter (the "**Corrective Transfer Schedule**") and transfer at the Closing to PTC or another Person designated by PTC at least fifteen (15) days

109

prior to the Closing Date, good and valid title in fee simple, free and clear of any Liens other than Business Permitted Liens, to all real property assets listed on the Corrective Transfer Schedule. FJI shall not, and shall cause its Affiliates not to, unless this Agreement is terminated pursuant to its terms, transfer the title (whether held by FJI or by any of its Affiliates) to any of the real property assets set forth in Section 5.34(b) of the FJI Disclosure Letter. If FJI is unable to so consummate any of the transactions set forth in the Corrective Transfer Schedule at the Closing, FJI shall, and shall cause its Affiliates to, use commercially reasonable efforts and cooperate with PTC and, to the extent applicable, any other Person designated by PTC as the transferee of such real property assets and with PTC's and/or such other Person's Affiliates to consummate such transactions as soon as practicable after the Closing Date and to take any action reasonably necessary to put PTC and/or such other Person in the same position as if PTC or such other Person had at the Closing valid title in fee simple, free and clear of any Liens, other than Business Permitted Liens, to such real property assets. FJI shall promptly, and not later than ten (10) Business Days following its receipt of a written notice from PTC, reimburse PTC for its portion of such Transfer Taxes and shall indemnify and hold harmless PTC, its Affiliates (including, following the Closing, the Target Entities and Target Subsidiaries) from and against all Losses suffered, incurred or paid as a result of, in connection with or arising out of the failure of FJI to perform any of its obligations pursuant to this Section 5.34.

Section 5.35   Consents Regarding TFJ. By its execution and delivery of this Agreement, each Seller hereby consents to, and hereby waives any rights of first refusal, consent rights, or other rights or remedies, whether arising pursuant to the governing documents of TFJ or otherwise, with respect to the transfer by the other Seller of its membership interest in TFJ.

Section 5.36   Termination of Certain Transactions. PSI and PTC shall, and shall cause their respective Affiliates to, terminate at Closing by execution of one or more written instruments, all Contracts for the management of TFJ to which TFJ on the one hand and PSI or any of its Affiliates on the other hand, are parties.

Article VI

CONDITIONS PRECEDENT

Section 6.1   Conditions to the Obligations of Each Party. The respective obligations of FJI, PTC and PSI to consummate the transactions contemplated hereby are subject to the satisfaction or waiver by FJI, PTC and PSI at or before the Closing Date, of each of the following conditions:

(a)   Injunctions; Illegality. No court or other Governmental Entity shall have issued, enacted, entered, promulgated or enforced any Law or Order (that is final and non-appealable and that has not been vacated, withdrawn or overturned) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement.

(b)   Bankruptcy Court Approval. The Bankruptcy Court shall have entered the Sale Order, and the Sale Order shall have become a Final Order. If the Sale Hearing is held with the Confirmation Hearing, this condition shall be satisfied if the terms of the Sale Order are incorporated into the Confirmation Order and the Plan, and the Confirmation Order

110

shall have become a Final Order and the Plan shall have become effective according to its terms.

Section 6.2 <u>Conditions to the Obligations of FJI and PTC</u>. The respective obligations of FJI and PTC to consummate the transactions contemplated hereby are subject to the satisfaction or waiver by FJI or PTC at or before the Closing Date, of each of the following conditions:

(a)    <u>Fuel Supply Agreement</u>.  PTC and Big West Oil LLC shall have entered into a fuel supply agreement for FJI's North Salt Lake refinery in the form of **Exhibit XVI** attached hereto (the "**Fuel Supply Agreement**").

(b)    <u>Transition Services Agreement</u>.  The parties hereto shall have entered into a transition services agreement in the form of **Exhibit XVII** attached hereto (the "**Transition Services Agreement**").

(c)    <u>Trademark License Agreement</u>.  The parties hereto shall have entered into a trademark license agreement pursuant to which PTC shall license the perpetual use of the "Flying J" trademark and certain other related trademarks that are not Assigned Business Intellectual Property, from FJI after the Closing, in the form of **Exhibit XVIII** attached hereto (the "**Trademark License Agreement**").

(d)    <u>Transportation Agreement</u>.  PTC and Big West Oil LLC shall have entered into a transportation service agreement for FJI's North Salt Lake refinery in the form of **Exhibit XIX** attached hereto (the "**Transportation Service Agreement**").

(e)    <u>COP Purchase Agreement</u>.   The closing of the transactions contemplated by the COP Purchase Agreement shall have been consummated simultaneously with the Closing.

Section 6.3 <u>Conditions to the Obligations of PTC</u>. The obligations of PTC to consummate the transactions contemplated hereby are subject to the satisfaction or waiver by PTC on or prior to the Closing Date of the following further conditions:

(a)    <u>Performance</u>. All of the agreements and covenants of FJI and PSI to be performed prior to the Closing pursuant to this Agreement shall have been duly performed in all material respects.

(b)    <u>Representations and Warranties</u>.   Except as set forth in the immediately succeeding sentence, the representations and warranties of FJI and/or PSI contained in this Agreement or in any schedule, exhibit or certificate delivered pursuant to this Agreement shall be true and correct both when made and as of the Closing Date, except where the failure to be so true and correct (disregarding for this purpose (other than in the case of <u>Section 3.7</u> and the first sentence of <u>Section 3.8</u>) any "material," "materially," "materiality," "Business Material Adverse Effect," or "material adverse change" qualification set forth in any such representation or warranty) would not have, or would not reasonably be expected to have, individually or in the aggregate, a Business Material Adverse Effect.   The representations and warranties of FJI and/or PSI, as applicable, contained in <u>Sections 3.1</u>, <u>3.2</u>, <u>3.3</u>, <u>3.4</u> and <u>3.5</u> shall be true and correct (disregarding for this

NEWYORK 7440434 (2K)

purpose any "material," "materially," "materiality," "Business Material Adverse Effect," or "material adverse change" qualification set forth in any such representation or warranty) both when made and as of the Closing Date in all material respects.

(c)    <u>Antitrust Filings; Governmental Approvals; Consents</u>. Any waiting periods in connection with the Antitrust Filings and all other consents (including the Specified Consents), waivers and approvals from the Bankruptcy Court and any other Governmental Entities or third parties, if any, set forth in <u>Section 6.3(c)</u> of the FJI Disclosure Letter and <u>Section 6.3(c)</u> of the PSI Disclosure Letter shall have expired, been terminated, been made or been obtained.

(d)    <u>Closing Deliverables</u>. FJI shall have delivered or caused to be delivered to PTC the items set forth in <u>Section 2.7(b)</u> and PSI shall have delivered or caused to be delivered to PTC the items set forth in <u>Section 2.7(c)</u>.

(e)    <u>No Business Material Adverse Effect</u>. Since the date hereof, there shall not have occurred, individually or in the aggregate, a Business Material Adverse Effect.

(f)    <u>Financing</u>. PTC shall have received the proceeds of the Financing.

(g)    <u>Pay-Off Letters and Lien Releases</u>. PTC shall have received duly executed pay-off and lien release letters in customary form from each of the holders of indebtedness under clauses (a)(i) and (iii) of the definition of Business Net Debt that are being paid at the Closing, stating that such indebtedness owing to such holder shall have been fully paid, and, all liens securing such indebtedness shall be released, upon the receipt by such holder of all funds owing to such holder under such indebtedness.

Section 6.4  <u>Conditions to the Obligations of Sellers</u>. The obligations of each Seller to consummate the transactions contemplated hereby are subject to the satisfaction or waiver by such Seller, on or prior to the Closing Date, of the following further conditions:

(a)    <u>Performance</u>. All of the agreements and covenants of PTC with or related to such Seller (for the avoidance of doubt, for purposes of this <u>Section 6.4(a)</u>, only the covenants contained in <u>Sections 5.6</u>, <u>5.7</u>, <u>5.8</u>, <u>5.10</u>, <u>5.12(a)</u>, <u>5.12(b)</u>, <u>5.14</u>, <u>5.17</u>, <u>5.21</u> and <u>5.27</u> in each case, as they relate to PSI, TFJ, its assets, liabilities, employees, and/or equity interests as applicable shall be deemed agreements and/or covenants with or related to PSI) to be performed prior to the Closing pursuant to this Agreement shall have been duly performed in all material respects.

(b)    <u>Representations and Warranties</u>. The representations and warranties of PTC contained in this Agreement or in any schedule, exhibit or certificate delivered pursuant to this Agreement and made to such Seller shall be true and correct in all material respects both when made and as of the Closing Date, except where the failure to be so true and correct (disregarding for this purpose (other than in the case of <u>Section 4.6</u> and the first sentence of <u>Section 4.7</u>) any "material," "materially," "materiality," "PTC Material Adverse Effect," or "material adverse change" qualification set forth in any such representation or warranty) would not, or would not reasonably be expected to, individually or in the aggregate, prevent or materially delay the consummation by PTC of the transactions contemplated by this Agreement.  The representations and warranties of PTC contained in <u>Sections 4.1</u>, <u>4.2</u>, <u>4.3</u>

and <u>4.4</u> shall be true and correct (disregarding for this purpose any "material," "materially," "materiality," "Business Material Adverse Effect," or "material adverse change" qualification set forth in any such representation or warranty) both when made and as of the Closing Date in all material respects.

(c)    <u>Antitrust Filings; Governmental Approvals; Specified Consents</u>. Any waiting periods in connection with the Antitrust Filings and all other consents, waivers and approvals from the Bankruptcy Court and any other Governmental Entities, if any, set forth in <u>Section 6.4(c)</u> of the PTC Disclosure Letter, and the Specified Consents and other third-party consents set forth in <u>Section 6.4(c)</u>, shall have expired, been terminated, been made or been obtained.

Section 6.5    <u>Conditions to the Obligations of FJI</u>.   The obligations of FJI to consummate the transactions contemplated hereby are subject to the satisfaction or waiver by FJI, on or prior to the Closing Date, of the following further conditions:

(a)    <u>Closing Deliverables</u>. PTC shall have delivered or caused to be delivered to FJI the items set forth in <u>Section 2.7(d)</u>.

(b)    <u>No PTC Material Adverse Effect</u>. Since the date hereof there shall not have occurred, individually or in the aggregate, a PTC Material Adverse Effect; <u>provided</u>, that, in the event that FJI reasonably believes that, individually or in the aggregate, such PTC Material Adverse Effect has occurred prior to the Closing, it shall promptly so notify PTC in writing, and if FJI provides such notice, the condition set forth in this <u>Section 6.5(b)</u> shall be deemed to have been fulfilled if within thirty (30) days after the receipt of such notice, PTC notifies FJI that it elects the Cash Election (defined below) pursuant to the provisions of <u>Section 8.1(f)</u>; <u>provided</u>, that such notice by FJI shall not be conclusive evidence that the condition set forth in this <u>Section 6.5(b)</u> has not been satisfied.

(c)    The FJI Guarantee Conditions shall have been satisfied.

Section 6.6    <u>Conditions to the Obligations of PSI</u>.   The obligations of PSI to consummate the transactions contemplated hereby are subject to the satisfaction or waiver by PSI, on or prior to the Closing Date, of the following further conditions:

(a)    PTC shall have delivered or caused to be delivered to PSI the items set forth in <u>Section 2.7(e)</u>.

(b)    The transactions contemplated by this Agreement between FJI and PTC shall have been consummated.

Section 6.7    <u>Frustration of Closing Conditions</u>. No party to this Agreement may rely on the failure of any condition set forth in this <u>Article VI</u> to be satisfied if such failure was caused by such party's failure to act in good faith or such party's failure to use its commercially reasonable efforts to cause the Closing to occur, as required by <u>Section 5.6</u>. Notwithstanding anything herein to the contrary, in the event that PTC asserts a failure of the conditions specified in <u>Section 6.3(a)</u> or <u>Section 6.3(b)</u> as a result of a breach by PSI of any of its covenants, agreements, representations or warranties in this Agreement, such failure shall excuse only its obligation to consummate the transactions contemplated hereby with respect to the PSI

TFJ Share, but shall not excuse any of its obligations to consummate the purchase and sale of the Target Holdings (including FJI's 49.99% ownership interest in TFJ) and the other transactions contemplated hereby to occur at the Closing.

## Article VII

## TAX MATTERS

Section 7.1 <u>Treatment and Reporting</u>. FJI and PTC agree to treat the contribution of the Target Holdings (other than PSI TFJ Share) to PTC contemplated by this Agreement for all Tax purposes as a contribution under Section 721 of the Code, and to file any and all Tax Returns accordingly.

Section 7.2 <u>Returns and Payment of Taxes</u>.

(a)     FJI shall have the authority and obligation to accurately prepare, or cause to be accurately prepared, all Income Tax Returns of or with respect to the Target Entities, the Target Subsidiaries and the Target Assets that are due with respect to any taxable year or other taxable period ending on or before the Closing Date. Such Income Tax Returns shall be prepared by treating items on such Income Tax Returns in a manner consistent with the past practices of FJI, the Target Entities and the Target Subsidiaries with respect to such items. FJI shall permit PTC to review and comment on each such unfiled Income Tax Return due after the Closing. If PTC consents to such Income Tax Returns (which consent shall not be unreasonably withheld or delayed), then FJI, the Target Entities and the Target Subsidiaries as the case may be shall execute and timely file such Income Tax Returns as prepared by FJI, the Target Entities or the Target Subsidiaries, as the case may be. In addition, FJI shall pay on or prior to the due date, any amount due and payable on such Income Tax Returns (except to the extent such amount was taken into account in calculating Closing Business Working Capital); <u>provided</u>, that with respect to TFJ, PSI shall pay 50.01% of such amounts and FJI shall pay 49.99% of such amounts. In respect of the Target Entities and Target Subsidiaries that are not Controlled Entities, FJI shall use commercially reasonable efforts to comply with its obligations under this <u>Section 7.2(a)</u>.

(b)     PTC shall have the authority and obligation to accurately prepare, or cause to be accurately prepared, all Income Tax Returns of or with respect to the Target Entities and the Target Subsidiaries that are due with respect to any Overlap Period. Such Income Tax Returns shall be prepared by treating items on such Income Tax Returns in a manner consistent with the past practices of the Target Entities and the Target Subsidiaries with respect to such items. PTC shall permit FJI to review and comment on each such Income Tax Return. If FJI consents to such Income Tax Returns (which consent shall not be unreasonably withheld or delayed) then the Target Entities and the Target Subsidiaries shall execute and timely file such Income Tax Returns as prepared by PTC, the Target Entities or the Target Subsidiaries as the case may be. In respect of the Target Entities and Target Subsidiaries that are not Controlled Entities, PTC shall use commercially reasonable efforts to comply with its obligations under this <u>Section 7.2(b)</u>.

(c)     Except as provided in <u>Sections 7.2(a)</u> and <u>(b)</u>, (i) PTC shall have the exclusive authority and obligation to prepare and timely file, or cause to be prepared and timely filed, all Returns of or with respect to the Target Entities, the Target Subsidiaries and

the Target Assets; <u>provided, however,</u> that in respect of the Target Entities and Target Subsidiaries that are not Controlled Entities, PTC shall use commercially reasonable efforts to comply with its obligations under this <u>Section 7.2(c)</u>.

(d)      All Income Taxes with respect to the income, property or operations of any of the Target Entities, Target Subsidiaries and Target Assets or the Business that relate to any taxable period that includes (but does not end on) the Closing Date (an "**Overlap Period**") shall be apportioned between Sellers on the one hand and PTC on the other hand based on an interim closing of the books as of the close of business on the Closing Date (and for such purpose, the taxable period of any of the partnership or other pass-through entity shall be deemed to terminate as of such time). Sellers shall be liable for Income Taxes on or with respect to the income, property or operations of the Target Entities and the Target Subsidiaries that are attributable to the portion of the Overlap Period ending on and including the Closing Date, and shall pay such amounts to PTC on or before five (5) days prior to the due date of such Taxes (except to the extent such amount was taken into account in calculating Closing Business Working Capital); <u>provided,</u> however, that (x) with respect to Income Taxes of TFJ or any of the Partially-Owned Target Entities or Partially-Owned Target Subsidiaries, FJI shall have obligations under this <u>Section 7.2(d)</u> in an amount equal to such Income Taxes <u>multiplied</u> by the percentage of outstanding equity of such Partially-Owned Target Entity or Partially-Owned Target Subsidiary owned by FJI directly or indirectly and (y) PSI shall have obligations under this <u>Section 7.2(d)</u> only with respect to the Income Taxes on or with respect to the income, property or operations of TFJ in an amount equal to such Income Taxes <u>multiplied</u> by the PSI TFJ Share.

(e)      <u>Transfer Taxes</u>. All transfer, sales and use, registration, stamp and similar Taxes ("**Transfer Taxes**") imposed in connection with the sale of the Business or any other transaction that occurs pursuant to this Agreement shall be borne one-half by FJI and one-half by PTC. All Transfer Taxes imposed in connection with the dissolution of any of CFJ Properties, CFJ Plaza Company I LLC, CFJ Plaza Company II LLC, CFJ Plaza Company III LLC, CFJ I Management Inc., CFJ II Management Inc. and CFJ III Management Inc. by PTC after the Closing Date shall be borne one-quarter by FJI and one-half by PTC (it being acknowledged that the remainder one-quarter of such Taxes shall be borne by ConocoPhillips Company pursuant to the COP Purchase Agreement). All such Transfer Taxes shall be paid, and all Tax returns for such Transfer Taxes shall be filed, by the party responsible for paying such Taxes and filing such Tax returns under applicable Law. Promptly after payment of such Transfer Taxes or invoice from the applicable taxing authority, PTC shall notify FJI in writing of the amount owed by FJI to PTC pursuant to this <u>Section 7.2(e)</u>, together with a copy of proof of payment or invoice, and, absent manifest error, FJI shall, within five (5) Business Days of its receipt of PTC's notice, either (i) pay the amount set forth in such notice in full by wire transfer of immediately available funds to a bank account designated by PTC in such notice or by any other means agreed to by PTC and FJI or (ii) deliver to PTC a number of PTC Units which, when multiplied by the PTC Per Unit Value, is equal to the amount owed by FJI to PTC pursuant to this <u>Section 7.2(e)</u>, as set forth in PTC's notice. Promptly after payment of such Transfer Taxes or invoice from the applicable taxing authority, FJI shall notify PTC in writing of the amount owed by PTC pursuant to this <u>Section 7.2(e)</u>, together with a copy of proof of payment or invoice, and, absent manifest error, PTC shall, within five (5) Business Days of its receipt of FJI's notice pay the amount set forth in such notice in full by wire transfer of immediately available funds to a bank account designated by FJI in such notice or by any other means agreed

to by PTC and FJI. FJI and PTC will cooperate to determine where, if at all, an exemption under section 1146(b) of the Bankruptcy Code should apply. In such cases, the instruments transferring the relevant Target Holdings shall contain the following endorsement:

"Because this instrument has been authorized pursuant to Order of the United States Bankruptcy Court for the District of Delaware under a plan of reorganization of the Grantor, it is exempt from transfer taxes, stamp taxes or similar taxes pursuant to Section 1146 of the Bankruptcy Code."

(f)   *Prior Tax Agreements*. Each Seller shall terminate or cause to be terminated any and all of the Tax sharing, allocation, indemnification or similar agreements, arrangements or undertakings in effect, written or unwritten, on the Closing Date as between such Seller or any predecessor or Affiliate thereof, on the one hand, and the Target Entities and any of the Target Subsidiaries, on the other hand, for all Taxes imposed by any Governmental Entity or taxing authority, regardless of the period in which such Taxes are imposed, and there shall be no continuing obligation to make any payments under any such agreements, arrangements or undertakings.

Section 7.3  Controversies.

(a)   Each Person entitled to indemnification pursuant to Section 7.8 hereof (the "**Tax Indemnified Party**") shall promptly notify the party from which indemnification is sought (the "**Tax Indemnifying Party**") upon receipt by such Tax Indemnified Party or any Affiliate thereof (including, in the case of PTC, the Target Entities and the Target Subsidiaries) of written notice of any inquiries, claims, assessments, audits or similar events with respect to Taxes for which the Tax Indemnifying Party has an indemnification obligation pursuant to Section 7.8 (any such inquiry, claim, assessment, audit or similar event, a "**Tax Matter**"). The Tax Indemnifying Party, or a Representative thereof, at its sole expense, shall have the authority to represent the relevant interests with respect to any Tax Matter before the IRS, any other taxing authority, or any other Governmental Entity and shall have the right to control the defense, compromise or other resolution of any Tax Matter, including responding to inquiries, filing Income Tax Returns and contesting, defending against and resolving any assessment for additional Income Taxes or notice of Income Tax deficiency or other adjustment of Income Taxes of, or relating to, a Tax Matter; provided, however, that no Tax Indemnifying Party shall, and each Tax Indemnifying Party shall cause its Affiliates not to, enter into any settlement of or otherwise compromise any Tax Matter that adversely affects or may adversely affect the Tax Indemnified Party or any Affiliate thereof (including in the case of PTC the Target Entities and the Target Subsidiaries) without the prior written consent of the Tax Indemnified Party, which consent shall not be unreasonably withheld or delayed. The Tax Indemnifying Party or its Representative shall keep the Tax Indemnified Party fully and timely informed with respect to the commencement, status and nature of any Tax Matter. The Tax Indemnifying Party shall, in good faith, allow the Tax Indemnified Party to make comments to the Tax Indemnifying Party or its Representative, regarding the conduct of or positions taken in any such proceeding. In respect of any Person that is not a Controlled Entity, the Tax Indemnifying Party shall use commercially reasonable efforts to comply with its obligations under this Section 7.3(a).

116

(b)     Except as otherwise provided in <u>Section 7.3(a)</u>, or if the Tax Indemnifying Party does not elect to control a proceeding pursuant to <u>Section 7.3(a)</u>, the Tax Indemnified Party shall have the sole right to control any audit or examination by any taxing authority, initiate any claim for refund, amend any Return, and contest, resolve and defend against any assessment for additional Taxes, notice of Tax deficiency or other adjustment of Taxes of or relating to, the income, assets or operations of the party in question for all taxable periods.

Section 7.4  <u>Notification.</u>

Each Tax Indemnified Party shall use its commercially reasonable efforts to forward to the relevant Tax Indemnifying Party all written notifications and other communications from any taxing authority received by such Tax Indemnified Party relating to any Tax Matters relating to the federal and consolidated Income Tax Liabilities of a Person with respect to a Pre-Closing Period.

Section 7.5  <u>Post-Closing Matters.</u>

(a)     After the Closing Date, PTC, the Target Entities and the Target Subsidiaries, on the one hand, and FJI and/or PSI, on the other hand, shall furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance (including access to books, records, work papers and Returns for Pre-Closing Periods) relating to the Target Entities, Target Subsidiaries and Target Assets as is reasonably necessary for the preparation of any Return, claim for refund or audit, and the prosecution or defense of any claim, suit or proceeding relating to any proposed Tax adjustment. Upon reasonable notice, each of FJI, PSI and PTC shall make its, or shall cause the Target Entities or the Target Subsidiaries, as applicable, to make their, employees and facilities available on a mutually convenient basis to provide reasonable explanation of any documents or information provided hereunder. In respect of the Target Entities and Target Subsidiaries that are not Controlled Entities, the parties hereto shall use commercially reasonable efforts to comply with their obligations under this <u>Section 7.5(a)</u>. PSI shall have obligations under this <u>Section 7.5(a)</u> only with respect to TFJ.

(b)     Any request for information or documents pursuant to this <u>Section 7.5</u> shall be made by the requesting party in writing. The other party hereto shall promptly (and in no event later than thirty (30) days after receipt of the request) provide the requested information; <u>provided</u>, <u>however</u>, that in respect of the Target Entities and Target Subsidiaries that are not Controlled Entities, the party shall use commercially reasonable efforts to provide such requested information. The requesting party shall indemnify the other party for any out-of-pocket expenses incurred by such party in connection with providing any information or documentation pursuant to this <u>Section 7.5</u>. Any information obtained under this <u>Section 7.5</u> shall be kept confidential, except as otherwise reasonably may be necessary in connection with the filing of Returns or claims for refund or in conducting any Tax audit, dispute or contest.

Section 7.6     <u>Valuation and Allocation.</u>     The parties agree to allocate the aggregate Final Purchase Price to be paid for the Target Entities and Target Assets in accordance with the Final Business Allocation. No party to this Agreement shall file any Tax Return or other document or otherwise take any position which is inconsistent with the Final Business

117

Allocation except as may be adjusted by subsequent agreement following an audit by the IRS or by court decision.

Section 7.7    Books and Records.   Until the seventh (7th) anniversary of the Closing Date, each party hereto shall, to the extent necessary in connection with any Taxes (including the tax basis of any of the Target Assets, Target Entities, Target Subsidiaries or any Target Asset) or other matter relating for which such party has indemnification obligations pursuant to this Agreement for any period ending at or prior to the Closing, and without charge to the other parties, (i) retain and, as the other party may reasonably request, permit the other parties and their Representatives to inspect and copy all original books, records and other documents and all electronically archived data of such party and its Affiliates and (ii) make reasonably available to the other parties the officers, directors, employees and agents of such party and its Affiliates.

Section 7.8    Indemnification for Taxes.

(a)    From and after the Closing, FJI and PSI shall severally and not jointly indemnify and defend the PTC Indemnitees and save and hold each of them harmless from and against: (i) all Taxes and Losses resulting from, arising out of, or incurred with respect to, any claims that may be asserted by any party based on, attributable to, or resulting from the failure of any representation or warranty made pursuant to Section 3.14 to be true and correct as of the date of this Agreement and as of the Closing Date (disregarding for this purpose any "material," "materially," "materiality," "Business Material Adverse Effect," or "material adverse change" qualification contained in such representation or warranty); (ii) all Income Taxes imposed on, asserted against or attributable to the properties, income or operations of the Target Entities, Target Subsidiaries and Target Assets or the Business or any Income Taxes for which FJI, PSI, the Target Entities or the Target Subsidiaries or the Business are otherwise liable, for all Pre-Closing Periods; (iii) all Income Taxes for Pre-Closing Periods imposed on the Target Entities and the Target Subsidiaries as a result of the provisions of Treasury Regulations Section 1.1502-6 or the analogous provisions of any Law; and (iv) all Income Taxes imposed on or with respect to the Target Entities and the Target Subsidiaries or the Business, or for which the Target Entities and the Target Subsidiaries or the Business may be liable, as a result of any transactions contemplated by this Agreement; provided, however, that, (A) with respect to Income Taxes of TFJ or any of the Partially-Owned Target Entities or Partially-Owned Target Subsidiaries, FJI shall have obligations under this Section 7.8(a) in an amount equal to such Income Taxes multiplied by the percentage of outstanding equity of such Partially-Owned Target Entity or Partially-Owned Target Subsidiary owned by FJI directly or indirectly, (B) PSI shall have obligations under this Section 7.8(a) only with respect to the Income Taxes on or with respect to the income, property or operations of TFJ in an amount equal to such Income Taxes multiplied by the PSI TFJ Share and (C) the provisions of subsections (ii), (iii) and (iv) shall not apply to the extent such Income Taxes are included or to be included in the calculation of Closing Business Working Capital or the Closing PSI TFJ Working Capital Share.

(b)    From and after the Closing, PTC shall indemnify and defend the FJI Indemnitees and save and hold each of them harmless from and against: (i) all Taxes and Losses resulting from, arising out of, or incurred with respect to, any claims that may be asserted by any party based on, attributable to, or resulting from the failure of any representation or warranty made pursuant to Section 4.13 to be true and correct as of the date

118

of this Agreement and as of the Closing Date (disregarding for this purpose any "material," "materially," "materiality," "Business Material Adverse Effect," or "material adverse change" qualification contained in such representation or warranty); and (ii) all Income Taxes imposed on, asserted against or attributable to the properties, income or operations of PTC and the PTC Subsidiaries or any Income Taxes for which PTC and the PTC Subsidiaries are otherwise liable, for all Pre-Closing Periods; provided, however, that with respect to subsection (ii) of this Section 7.8(b), such provision shall not apply to the extent such Income Taxes are included in the calculation of PTC Working Capital.

(c)    All amounts paid pursuant to this Section 7.8 shall, to the extent permitted by applicable Law, be treated as adjustments to the Initial Purchase Price or the Final Purchase Price, as the case may be.

Section 7.9 Refunds and Tax Benefits. If a Tax Indemnified Party receives from a Tax Indemnifying Party an amount pursuant to a claim for indemnification under Section 7.8, then any Income Tax refunds that are received by the Tax Indemnified Party (or, in the case of PTC, the Target Entities or the Target Subsidiaries) and any amounts credited against Income Tax of the Tax Indemnified Party (or, in the case of PTC, the Target Entities or the Target Subsidiaries) in connection therewith shall be for the account of the Tax Indemnifying Party and the Tax Indemnified Party shall pay over to the Tax Indemnifying Party any such refund within thirty (30) days after receipt or the amount of any such credit within thirty (30) days of entitlement thereto. In addition, to the extent that a claim for refund or a proceeding results in a payment or credit against Income Tax by a taxing authority to the Tax Indemnified Party (or, in the case of PTC, the Target Entities or the Target Subsidiaries) of any amount included or to be included in the calculation of Closing Business Working Capital or the Closing PSI TFJ Working Capital Share in the case of PTC being the Indemnified Party or Closing PTC Working Capital in the case of FJI being the Indemnified Party, the Indemnified Party shall pay such amount over to the Tax Indemnifying Party any such refund within thirty (30) days after receipt or the amount of any such credit within thirty (30) days of entitlement thereto; provided, however, that (i) the Tax Indemnified Party shall not be obligated to file amended tax returns for the purpose of obtaining a refund or credit; (ii) any Taxes that are imposed on the Tax Indemnified Party (or, in the case of PTC, the Target Entities or the Target Subsidiaries) as a result of a disallowance or reduction of the refund or credit with respect to which the Tax Indemnified Party has made a payment to the Tax Indemnifying Party pursuant to this Section 7.9 shall be treated as a Tax for which the Tax Indemnifying Party is obligated to indemnify the Tax Indemnified Party pursuant to Section 7.8 hereof; and (iii) the amount of any refund or credit shall be determined by the Tax Indemnified Party in its sole discretion.

Article VIII

TERMINATION AND ABANDONMENT

Section 8.1 Termination. This Agreement may be terminated and the transactions contemplated hereby may be abandoned, at any time prior to the Closing:

(a)    by mutual written consent of FJI and PTC;

(b)    by FJI or PTC, if:

(i)     any court or other Governmental Entity shall have issued, enacted, entered, promulgated or enforced any Law or Order (that is final and non-appealable and that has not been vacated, withdrawn or overturned) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement; provided, that the party seeking to terminate pursuant to this Section 8.1(b)(i) shall have complied with its obligations, if any, under Section 5.6; or

(ii)     the Closing Date shall not have occurred on or prior to March 31, 2010 (the "**End Date**"); provided, that neither FJI nor PTC may terminate this Agreement pursuant to this Section 8.1(b)(ii) if such party is in material breach of this Agreement; and provided, further, that if all of the conditions set forth in Article VI are satisfied or waived on or prior to March 31, 2010, and the expiration of all applicable waiting periods in connection with the Antitrust Filings occurred on or after March 1, 2010 and prior to March 31, 2010, the End Date shall be thirty (30) days following the expiration of all such waiting periods, but in no event later than April 30, 2010.

(c)     by FJI, if: (i) any of the representations and warranties of PTC contained in Article IV and made to Sellers shall fail to be true and correct, or (ii) there shall be a breach by PTC of any covenant or agreement of PTC in this Agreement that, in either case, (x) would result in the failure of a condition set forth in Section 6.4(a) or Section 6.4(b) and (y) which is not curable or, if curable, is not cured upon the occurrence of the earlier of (1) the thirtieth (30th) day after written notice thereof is given by FJI to PTC and (2) the day that is five (5) Business Days prior to the End Date; provided, that FJI may not terminate this Agreement pursuant to this Section 8.1(c) if FJI is then in material breach of this Agreement;

(d)     by PTC, if: (i) any of the representations and warranties of FJI and/or PSI contained in Article III shall fail to be true and correct, or (ii) there shall be a breach by FJI or PSI of any covenant or agreement of FJI or PSI contained in this Agreement that, in either case, (x) would result in the failure of a condition set forth in Section 6.3(a) or Section 6.3(b) and (y) which is not curable or, if curable, is not cured upon the occurrence of the earlier of (A) the thirtieth (30th) day after written notice thereof is given by PTC to FJI and/or PSI, as applicable, and (B) the day that is five (5) Business Days prior to the End Date; provided, that PTC may not terminate this Agreement pursuant to this Section 8.1(d) if PTC is then in material breach of this Agreement;

(e)     by PTC if there has been, or would reasonably be expected to have been, individually or in the aggregate, a Business Material Adverse Effect;

(f)     by FJI if there has been, or would reasonably be expected to have been, individually or in the aggregate, a PTC Material Adverse Effect; provided, that, in the event that FJI reasonably believes that, individually or in the aggregate, such PTC Material Adverse Effect has occurred prior to the Closing, it shall promptly so notify PTC in writing, and PTC shall have thirty (30) days after receipt of such notice to notify FJI that it elects to pay the Initial Purchase Price entirely in cash (the "**Cash Election**"). If PTC so notifies FJI, FJI shall no longer have the right to terminate this Agreement pursuant to this Section 8.1(f), and subject to the terms and conditions set forth in this Agreement, at the Closing, PTC shall pay the Initial Purchase Price entirely in cash, and the payments made pursuant to Section 2.6(e), if any, shall be made by PTC or FJI, as applicable, entirely in cash; provided, that

such notice by FJI shall not be conclusive evidence that a PTC Material Adverse Effect has occurred;

      (g)     by PTC, on or prior to the FJI Covenant Waiver Date;

      (h)     by FJI, on or prior to the PTC Covenant Waiver Date;

      (i)     by FJI, on or after the fifth (5th) Business Day after (i) the COP Purchase Agreement has been terminated, unless prior to such time an Alternative COP Specified Consent has been delivered to FJI or (ii) the Shell Agreement has been terminated, unless prior to such time an Alternative Shell Specified Consent has been delivered to FJI;

      (j)     by FJI, on or after the twentieth (20th) Business Day after the date on which a Financing Deficit Event has occurred unless prior to such time (i) PTC has delivered (x) one or more Replacement Financing Letters with respect to Financing in an aggregate amount that is at least equal to the Financing set forth in all Financing Letter(s) that have given rise to the Financing Deficit Event prior to such 20th Business Day, and (y) a written confirmation that the terms (assuming exercise in full of all "market flex" terms) of the Replacement Financing Letters are satisfactory to PTC and (ii) the conditions to obtaining the Financing contained in such Replacement Financing Letters do not materially increase the risk that the funds covered by such Replacement Financing Letters will not be available at the Closing;

      (k)     By PTC, if the Bankruptcy Case is converted to a case under Chapter 7 of the Bankruptcy Code or a trustee is appointed under section 1104 of the Bankruptcy Code; or

      (l)     by PTC or FJI, on or after the tenth (10th) Business Day after the Sale Hearing or Confirmation Hearing, as applicable, if the Sale Order or Confirmation Order is not entered by the Bankruptcy Court at the Sale Hearing or Confirmation Hearing, as applicable; provided that, prior to any such termination pursuant to this Section 8.1(l), the parties shall consult in good faith whether to seek reconsideration or appeal of the determination of the Bankruptcy Court with respect to denial of the Sale Order or the Confirmation Order, as applicable.

The time periods for termination of this Agreement set forth in this Section 8.1 may be extended upon written agreement of the parties hereto without further consent of the Bankruptcy Court.

      Section 8.2 Effect of Termination. In the event of the termination of this Agreement pursuant to Section 8.1 by PTC, on the one hand, or FJI, on the other hand, written notice thereof shall forthwith be given to the other parties hereto specifying the provision hereof pursuant to which such termination is made, and this Agreement shall be terminated and become void and have no effect and there shall be no Liability hereunder on the part of the parties hereto, the Target Entities or the Target Subsidiaries, except that Section 5.3(b), Section 5.4(b), Section 5.10, clause (B) of the proviso in Section 5.12(d), Section 8.1, this Section 8.2 and Article X shall survive any termination of this Agreement. Nothing in this Section 8.2 shall relieve any party hereto of Liability for any willful breach of this Agreement.

Article IX

## INDEMNIFICATION

Section 9.1  Survival of Representations and Warranties.

(a)     The respective representations and warranties of FJI, PSI and PTC contained in this Agreement, the FJI Disclosure Letter, the PSI Disclosure Letter, the PTC Disclosure Letter or in any schedule, Specified Exhibit or certificate attached hereto or delivered pursuant to this Agreement, the respective covenants and agreements of the parties hereto contained in this Agreement requiring or calling for performance prior to the Closing, and the respective rights of the PTC Indemnitees, the FJI Indemnitees and the PSI Indemnitees to indemnification pursuant to Section 9.2(e) and Section 9.3(e) shall survive the Closing pursuant to this Agreement until the date that is six (6) months from the Closing Date, except that the representations and warranties contained in Sections 3.14 and 4.13 shall survive until sixty (60) days after the expiration of the applicable statute of limitations (after giving effect to any waivers and extension thereof).   The respective covenants and agreements of the parties hereto contained in this Agreement requiring or calling for performance after the Closing shall survive the Closing in accordance with their respective terms.

(b)     Notwithstanding anything herein to the contrary, including Article VII hereof and this Article IX, no party hereto shall have any Liability whatsoever with respect to (i) any representation or warranty of such party (whether pursuant to Section 9.2(a), Section 9.2(b), Section 9.3(a), Section 9.3(b) or otherwise), (ii) any covenant or agreement of such party that requires or calls for performance by such party prior to the Closing (whether pursuant to Section 9.2(c), Section 9.3(c) or otherwise) or (iii) any claim for indemnification pursuant to Section 9.2(e) or Section 9.3(e), unless a claim is made in accordance with the terms hereof prior to the expiration of the applicable survival period for such representation and warranty, covenant or agreement, in which case such representation, warranty, covenant or agreement shall survive as to such claim until such claim has been finally resolved.

Section 9.2  Indemnification by Sellers. Subject to the other provisions of this Article IX, from and after the Closing, each Seller shall severally and not jointly indemnify PTC, the Target Entities, the Target Subsidiaries and each of their respective officers, directors, employees, agents, successors and assigns (the "**PTC Indemnitees**") and save and hold each of them harmless from and against any Losses suffered, incurred or paid after the Closing directly, or indirectly through application of the Target Entities', Target Subsidiaries' or PTC's assets or otherwise, as a result of, in connection with or arising out of: (a) any failure of any representation or warranty made by such Seller in this Agreement, any Specified Exhibit or any certificate delivered pursuant to this Agreement (whether or not contained in Article III of this Agreement), other than the representations and warranties of Sellers in Section 3.14 and the representations and warranties referred to in the immediately following clause (b), to be true and correct as of the date of this Agreement and as of the Closing Date (disregarding for this purpose any "material," "materially," "materiality," "Business Material Adverse Effect," or "material adverse change" qualification contained in any such representation or warranty, except the term "material" in Section 3.23 shall not be disregarded (but the term "Business Material Adverse Effect" shall be)); (b) any failure of any representation or warranty made by Sellers in Section 3.7 or the first sentence of Section 3.8 hereof to be true and correct as of the date of this

Agreement and as of the Closing Date; (c) any breach of any covenant or agreement by such Seller contained in this Agreement, (d) with respect to FJI only, the Excluded Liabilities, (e) the existence of any Closing Business Net Debt or Closing PSI TFJ Net Debt Share not taken into account in determining the Final Purchase Price or the PSI Final Consideration, as applicable, and (f) with respect to FJI only, the matter referred on Section 9.2(f) of the FJI Disclosure Letter. For the avoidance of doubt, FJI's obligations to indemnify and hold harmless PTC Indemnitees pursuant to clauses (d) and (f) of the immediately preceding sentence shall survive the Closing indefinitely. For the avoidance of doubt, (x) the several and not joint liability of the Sellers pursuant to this Section 9.2 shall mean that (A) FJI shall have no obligation under this Section 9.2 or otherwise under this Agreement with respect to any failure or breach by PSI or the existence of any Closing PSI TFJ Net Debt Share not taken into account in determining the PSI Final Consideration and (B) PSI shall have no obligation under this Section 9.2 or otherwise under this Agreement with respect to (i) any failure or breach by FJI or the existence of any Closing Business Net Debt not taken into account in determining the Final Purchase Price or (ii) any matter, which in accordance with this Section 9.2, is specified as an obligation of FJI only and (y) in no event shall PSI be deemed to make any representation, warranty, covenant or agreement hereunder other than with respect to PSI, TFJ and PSI's ownership interest in TFJ.

Section 9.3    Indemnification by PTC. Subject to the other provisions of this Article IX, from and after the Closing, PTC shall indemnify FJI and its officers, directors, employees, agents, successors and assigns (the "**FJI Indemnitees**") and PSI and its officers, directors, employees, agents, successors and assigns (the "**PSI Indemnitees**" and collectively with the FJI Indemnitees, the "**Seller Indemnitees**") and save and hold each of them harmless against any Losses suffered, incurred or paid after the Closing directly or indirectly through application of Seller's assets or otherwise, as a result of, in connection with or arising out of: (a) any failure of any representation or warranty made by PTC to such Seller in this Agreement, any Specified Exhibit or any certificate delivered pursuant to this Agreement (whether or not contained in Article IV of this Agreement), other than the representations and warranties of PTC in Section 4.13 and the representations and warranties referred to in the immediately following clause (b), to be true and correct as of the date of this Agreement and as of the Closing Date (disregarding for this purpose any "material," "materially," "materiality," "PTC Material Adverse Effect," or "material adverse change" qualification contained in any such representation or warranty); (b) with respect to FJI Indemnitees only, any failure of any representation or warranty made by PTC in Section 4.6 or the first sentence of Section 4.7 hereof to be true and correct as of the date of this Agreement and as of the Closing Date; (c) any breach of any covenant or agreement by PTC contained in this Agreement; (d) with respect to FJI Indemnitees only, the Assumed Liabilities; and (e) with respect to FJI Indemnitees only, the existence of any Closing PTC Net Debt not taken into account in determining the Final Purchase Price. For the avoidance of doubt, PTC's obligations to indemnify and hold harmless FJI Indemnitees pursuant to clause (d) of the immediately preceding sentence shall survive the Closing indefinitely.

Section 9.4    Limitation on Indemnification.

(a)    Notwithstanding anything to the contrary contained in this Agreement, neither Seller shall be liable for any claim for indemnification pursuant to Section 9.2(a) or Section 9.2(b) unless and until the aggregate amount of Sellers Qualifying Losses (defined below) resulting from claims for indemnification pursuant to Section 9.2(a) or Section 9.2(b) which may be recovered from Sellers equals or exceeds $25,000,000 (the "**Sellers Deductible**"), in which case PTC shall be entitled to recover the Sellers Deductible, in

addition to any Losses in excess of the Sellers Deductible; provided, that (i) with respect to any claim for indemnification by any PTC Indemnitee pursuant to Section 9.2(a), Section 9.2(b) or, with respect to covenants that require or call for performance prior to Closing, Section 9.2(c), Sellers shall only be liable for any individual Loss suffered by any PTC Indemnitee (that is not related to any other Loss) in excess of $500,000 (such Loss, a "**Sellers Qualifying Loss**") and (ii) the maximum aggregate amount of indemnifiable Losses which may be recovered for indemnification by the PTC Indemnitees pursuant to Section 9.2(a), Section 9.2(b) and, with respect to covenants that require or call for performance prior to Closing, Section 9.2(c) shall be an amount equal to $75,000,000. Notwithstanding anything to the contrary contained in this Agreement, the limitations set forth in this Section 9.4(a) shall not apply to Losses incurred by the PTC Indemnitees in connection with or arising from any breach of any representation or warranty of any Seller in Section 3.3 and Section 3.5.

(b)     Notwithstanding anything to the contrary contained in this Agreement, PTC shall not be liable for any claim for indemnification pursuant to Section 9.3(a) or Section 9.3(b) unless and until the aggregate amount of PTC Qualifying Losses (defined below) resulting from claims for indemnification pursuant to Section 9.3(a) or Section 9.3(b) which may be recovered from PTC equals or exceeds $12,500,000 (the "**PTC Deductible**"), in which case Sellers shall be entitled to recover the PTC Deductible, in addition to any Losses in excess of the PTC Deductible; provided, that (i) with respect to any claim for indemnification by any Seller Indemnitee pursuant to Section 9.3(a), Section 9.3(b) or, with respect to covenants that require or call for performance prior to Closing, Section 9.3(c), PTC shall only be liable for any individual Loss suffered by any Seller Indemnitee (that is not related to any other Loss) in excess of $250,000 (such Loss, a "**PTC Qualifying Loss**") and (ii) the maximum aggregate amount of indemnifiable Losses suffered by the Seller Indemnitees which may be recovered for indemnification pursuant to Section 9.3(a), Section 9.3(b) and, with respect to covenants that require or call for performance prior to Closing, Section 9.3(c) shall be an amount equal to $37,500,000. Notwithstanding anything to the contrary contained in this Agreement, the limitations set forth in this Section 9.4(b) shall not apply to Losses incurred by any Seller Indemnitee in connection with or arising from any breach of any representation or warranty of PTC in Section 4.3(d) and Section 4.4.

(c)     Notwithstanding anything to the contrary contained in this Agreement, FJI shall not be liable for any claim for indemnification pursuant to Section 9.2(c) in connection with or arising from any breach of any covenant or agreement contained in Section 5.3 unless and until the aggregate amount of Sellers Qualifying Losses which may be recovered in connection therewith equals or exceeds $10,000,000 (the "**Conduct of Business Deductible**"), in which case (subject to the other limitations on indemnification set forth in this Article IX) the PTC Indemnitees shall be entitled to recover the Conduct of Business Deductible, in addition to any Sellers Qualifying Losses in excess of the Conduct of Business Deductible. Notwithstanding anything to the contrary contained in this Agreement, (i) Sellers shall not be liable for any claim for indemnification pursuant to Section 9.2(c) and (ii) PTC shall not be liable for any claim for indemnification pursuant to Section 9.3(c), in connection with or arising from any breach of any covenant or agreement contained in Section 5.8, unless and until the aggregate amount of Sellers Qualifying Losses or PTC Qualifying Losses which may be recovered in connection therewith equals or exceeds $10,000,00 (the "**Notification Deductible**"), in which case (subject to the other limitations on indemnification set forth in this Article IX) the PTC Indemnitees or Seller Indemnitees, as

applicable, shall be entitled to recover the Notification Deductible, in addition to any Sellers Qualifying Losses in excess of the Notification Deductible.

Section 9.5  Indemnification Procedure; Election and Valuation of Non-Cash Indemnity Payments.

(a)     Promptly after the incurrence of any Losses by any Person entitled to indemnification pursuant to Section 9.2 or Section 9.3 hereof (an "**Indemnified Party**"), including, any claim by a third party described in Section 9.6, which might give rise to indemnification hereunder, the Indemnified Party shall deliver to the party from which indemnification is sought (the "**Indemnifying Party**") a certificate (a "**Claim Certificate**"), which Claim Certificate shall:

(i)     state that the Indemnified Party is entitled to indemnification pursuant to this Agreement; and

(ii)    specify in reasonable detail each individual item of Loss for which Indemnified Party is entitled to indemnification, the date such item was paid, the basis for any anticipated Liability and the nature of the misrepresentation, breach of warranty, breach of covenant or claim to which each such item is related and the computation of the amount to which such Indemnified Party claims to be entitled hereunder.

(b)     In the event that the Indemnifying Party shall object to the indemnification of an Indemnified Party in respect of any claim or claims specified in any Claim Certificate, the Indemnifying Party shall, within forty-five (45) days after receipt by the Indemnifying Party of such Claim Certificate, deliver to the Indemnified Party (and, for all purposes of this Agreement, notice to FJI shall be deemed notice to all FJI Indemnitees, notice to PSI shall be deemed notice to all PSI Indemnitees and notice to PTC shall be deemed notice to all PTC Indemnitees) a notice to such effect, specifying in reasonable detail the basis for such objection, and the Indemnifying Party and the Indemnified Party shall, within the thirty (30) day period beginning on the date of receipt by the Indemnified Party of such objection, attempt in good faith to agree upon the rights of the respective parties with respect to each of such claims to which the Indemnifying Party shall have so objected. If the Indemnified Party and the Indemnifying Party shall succeed in reaching agreement on their respective rights with respect to any of such claims, the Indemnified Party and the Indemnifying Party shall promptly prepare and sign a memorandum setting forth such agreement. Should the Indemnified Party and the Indemnifying Party be unable to agree as to any particular item or items or amount or amounts within such time period, then the Indemnified Party shall be permitted to submit such dispute to a court of competent jurisdiction as set forth in Section 10.8.

(c)     Claims for Losses specified in any Claim Certificate to which an Indemnifying Party shall not object in writing within forty-five (45) days of receipt of such Claim Certificate, claims for Losses covered by a memorandum of agreement of the nature described in Section 9.5(b), and claims for Losses the validity and amount of which have been the subject of judicial determination as described in Section 9.5(b) or shall have been settled with the consent of the Indemnifying Party, as described in Section 9.6, are hereinafter referred to, collectively, as "**Agreed Claims**". Subject to the rights of the Indemnifying Party in Section 9.5(d) below, within ten (10) Business Days after the

determination of the amount of any Agreed Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to the Agreed Claim by wire transfer in immediately available funds to the bank account or accounts designated by the Indemnified Party in a notice to the Indemnifying Party not less than two (2) Business Days prior to such payment; provided, that the Indemnifying Party may set-off the amount of any unpaid Agreed Claim owed to it by the Indemnified Party under this Article IX against the amount of any Agreed Claim that the Indemnifying Party is obligated to pay pursuant to this Section 9.5(c).

(d)     The parties hereto acknowledge and agree that, except as set forth in the last sentence of this Section 9.5(d), any indemnification payment required to be made pursuant to Article VII or this Article IX (excluding any payment where PSI is the party required to make such indemnification payment or such payment is required to be made to a PSI Indemnitee) may, at the option of the party required to make such indemnification payment, be satisfied by (i) in the case where FJI is the party required to make such indemnification payment, the relinquishment of PTC Units to PTC (which amount shall be deemed delivered to all PTC Indemnitees), and (ii) in the case where PTC is the party required to make such indemnification payment, the issuance of new PTC Units to FJI (which amount shall be deemed delivered to all FJI Indemnitees), in each case based upon the PTC Per Unit Value at the Closing, instead of cash; provided, that if the party required to make such indemnification payment does not elect, within twenty (20) Business Days after such indemnification payment is agreed to by the parties hereto or finally judicially determined, that it will satisfy such payment on the basis of PTC Units instead of cash, then the party that is owed such indemnification payment shall be deemed to have elected to make such payment in PTC Units.    Notwithstanding the foregoing, PTC's indemnification obligations pursuant to Section 5.16(b), pursuant to Section 9.3(c) (but solely to the extent relating to covenants requiring or calling for performance after the Closing) and pursuant to Section 9.3(d) shall be satisfied solely in cash.

Section 9.6  Third-Party Claims.

(a)     If a claim by a third party (a **"Third Party Claim"**) is made against any Indemnified Party, and if such Indemnified Party intends to seek indemnity with respect thereto under this Article IX, such Indemnified Party shall promptly notify the Indemnifying Party of such Third Party Claim; provided, that the failure to so notify shall not relieve the Indemnifying Party of its obligations hereunder, except to the extent that the Indemnifying Party is actually and materially prejudiced thereby. The Indemnifying Party shall have thirty (30) days after receipt of such notice to assume the conduct and control, through counsel reasonably acceptable to the Indemnified Party at the expense of the Indemnifying Party, of the settlement or defense of such Third Party Claim and the Indemnified Party shall cooperate with it in connection therewith; provided, that the Indemnifying Party shall permit the Indemnified Party to participate in such settlement or defense through counsel chosen by such Indemnified Party; provided, that the fees and expenses of such counsel shall be borne by such Indemnified Party; provided, further, that, the Indemnifying Party shall not be entitled to assume control of such defense and, to the extent that such Indemnifying Party is ultimately determined to be required to provide indemnification with respect to the matter for which indemnification is sought in accordance with this Agreement, shall pay the reasonable fees and expenses of counsel retained by the Indemnified Party as part of any Losses for which Indemnified Party is making an indemnification payment if (i) such Third Party Claim would give rise to Losses which are more than twice the amount indemnifiable by such

126

Indemnifying Party pursuant to this Article IX; (ii) the claim for indemnification relates to or arises in connection with any criminal Action, indictment, allegation or investigation; (iii) the claim seeks an injunction or equitable relief against the Indemnified Party; (iv) the Indemnified Party has been advised in writing by counsel that a reasonable likelihood exists of a conflict of interest between the Indemnifying Party and the Indemnified Party; (v) upon petition by the Indemnified Party, the appropriate court rules that the Indemnifying Party failed or is failing to vigorously prosecute or defend such Third Party Claim; or (vi) the Indemnified Party reasonably believes an adverse determination with respect to the Action, investigation, proceeding or other claim giving rise to such claim for indemnification would be materially detrimental to or materially injure the Indemnified Party's reputation or future business prospects.

(b)    Any Indemnified Party shall have the right to employ separate counsel in any such Action or claim and to participate in the defense of such Third Party Claim, but the fees and expenses of such counsel shall be at the expense of the Indemnified Party. So long as the Indemnifying Party is reasonably contesting any such Third Party Claim in good faith, no Indemnified Party shall pay or settle any such Third Party Claim. Notwithstanding the foregoing, the Indemnified Party shall have the right to pay or settle any such Third Party Claim, provided, that in such event it and all other Indemnified Parties shall waive all rights to indemnity therefor by the Indemnifying Party for such Third Party Claim unless the Indemnifying Party shall have consented in writing to such payment or settlement.

(c)    If the Indemnifying Party does not notify an Indemnified Party within thirty (30) days after the receipt of the Indemnified Party's notice of a Third Party Claim of indemnity hereunder that it elects to undertake the defense thereof, the Indemnified Party shall have the right to contest, settle or compromise the Third Party Claim but shall not thereby waive any right to indemnity therefor pursuant to this Agreement.

(d)    The Indemnifying Party shall not, except with the consent of the Indemnified Party, enter into any settlement that is not entirely indemnifiable by the Indemnifying Party pursuant to this Article IX and does not include as an unconditional term thereof the giving by the Person or Persons asserting such Third Party Claim to all Indemnified Parties of an unconditional release from all Liability with respect to such Third Party Claim or consent to entry of any judgment.

(e)    The Indemnifying Party and the Indemnified Party shall cooperate with each other in all reasonable respects in connection with the defense of any Third Party Claim, including making available records relating to such Third Party Claim and furnishing such employees of the Indemnified Party as may be reasonably necessary for the preparation of the defense of any such Third Party Claim or for testimony as witnesses in any proceeding relating to such Third Party Claim; provided, that nothing in this Section 9.6(e) shall require any Indemnifying Party to provide any cooperation, information or testimony that is subject to, or would compromise, attorney-client or other applicable Law, would cause the violation of applicable Law or would reasonably be expected to adversely affect the defense that such Indemnifying Party may have against such Indemnified Party.

Section 9.7  Certain Additional Matters.

NEWYORK 7440434 (2K)

(a)     The amount of any and all Losses for which an Indemnified Party shall be entitled to indemnification pursuant to this Agreement shall be determined net of any Tax Benefits to any Indemnified Party seeking indemnification hereunder or any of such Indemnified Party's Affiliates arising in connection with such Losses.

(b)     The amount of any and all Losses for which an Indemnified Party shall be entitled to indemnification pursuant to this Agreement shall be determined net of any amounts actually recovered (net of expenses incurred in connection with such recovery and net of increasing premiums) by an Indemnified Party or any of such an Indemnified Party's Affiliates under or pursuant to any insurance policy, title insurance policy, indemnity, reimbursement arrangement or contract pursuant to which or under which such an Indemnified Party or such Indemnified Party's Affiliates is a party or has rights (collectively, "**Alternative Arrangements**"). If, after a claim by an Indemnified Party for indemnification is paid hereunder, (x) an Indemnified Party or an Affiliate thereof recovers amounts under such Alternative Arrangement with respect to the subject matter of such claim and (y) the amount so recovered would have reduced the aggregate amount for which the Indemnified Party would have been indemnified hereunder had such recovery occurred before such claim for indemnification was paid hereunder, the parties hereby agree (on behalf of their respective Indemnified Parties) to promptly remit to FJI, PSI or PTC, as the case may be, an amount (the "**Returnable Amount**") equal to the least of (I) the amount of such reduction that would have occurred, (II) the amount of the proceeds received for such claim under the Alternative Arrangement and (III) the amount for such claim previously paid to the Indemnified Party pursuant to this Article IX. At the written request and at the sole cost of FJI, PSI or PTC, as the case may be, the other party shall (or shall cause one of its Subsidiaries (including, in the case of FJI, a Target Entity or Target Subsidiary to)) pursue, or cause the Indemnified Party or any of such an Indemnified Party's Affiliates to pursue recovery under the Alternative Arrangements on behalf of FJI, PSI or PTC, as the case may be, to the extent that (x) the Persons from whom recovery are sought are not material customers of PTC, PSI or FJI, as the case may be, and its Subsidiaries, the Target Entities and the Target Subsidiaries, as applicable, and (y) the pursuit thereof does not unreasonably interfere with the conduct by PTC, PSI or FJI, as the case may be, and its Subsidiaries, the Target Entities and the Target Subsidiaries, as applicable, of their business. Subject to the limitations set forth in clauses (x) and (y) of the foregoing sentence, PTC, PSI and FJI shall cooperate as reasonably requested in connection with pursuing such recovery and each of FJI, PSI or PTC, as the case may be, and its Subsidiaries, the Target Entities and the Target Subsidiaries, as applicable, shall be entitled to direct and control the manner in which such recovery is pursued and any negotiations or litigation (or other proceedings) in connection therewith. Each of PTC, PSI or FJI, as the case may be, and its Subsidiaries, the Target Entities and the Target Subsidiaries, as applicable, shall employ counsel selected by the other in connection therewith (which counsel shall be subject to the approval of the other, not to be unreasonably withheld, delayed or conditioned).

(c)     In no event shall any Indemnified Party be entitled to recover or make a claim for any amounts in respect of, and in no event shall "Losses" for purposes of this Agreement be deemed to include, (i) punitive damages not owed to a third party, (ii) to the extent such Indemnified Party is a PTC Indemnitee, any Loss to the extent included as a liability, contra-asset or expense on the Business Financial Statements or to the extent included or to be included (including as a contra-asset) in the calculation of Closing Business

Net Debt, Closing PSI TFJ Net Debt Share, Closing Business Working Capital or Closing PSI TFJ Working Capital Share, or (iii) to the extent such Indemnified Party is a Seller Indemnitee, any Loss to the extent included as a liability, contra-asset or expense on the PTC Financial Statements or to the extent included or to be included (including as a contra-asset) in the calculation of Closing PTC Net Debt or Closing PTC Working Capital.

(d)    In no event shall any PTC Indemnitee or Seller Indemnitee, as the case may be, be entitled to recover twice for the same Losses or to the extent another PTC Indemnitee or Seller Indemnitee has already recovered for such Losses.

(e)    Notwithstanding anything to the contrary contained in this Agreement, the obligation of an Indemnifying Party to indemnify an Indemnified Party for any Losses arising out of the representations and warranties set forth in <u>Section 3.18</u> or <u>Section 4.17</u>, as applicable, shall be limited to Losses resulting from a claim by a Governmental Entity or other Third Party Claim, but only to the extent that a PTC Indemnitee or FJI Indemnitee, as applicable, or anyone acting on behalf of any such PTC Indemnitee or FJI Indemnitee, as applicable, has not approached a Governmental Entity or other third party to request or suggest that a claim be made or an investigation ordered.  No Indemnifying Party shall have any obligation to indemnify any Indemnified Party with respect to the representations and warranties set forth in <u>Section 3.18</u> or <u>Section 4.17</u>, as applicable, arising from any Hazardous Substances or conditions of contamination identified through any environmental sampling or analysis conducted after the date of this Agreement, which is not affirmatively required by Environmental Laws.  Each Indemnifying Party's obligation to indemnify an Indemnified Party with respect to any environmental corrective, remedial or cleanup action shall be limited to the extent such actions are required by Environmental Laws based on continued non-residential use of the subject property, and making use of cost-effective options permitted by Environmental Laws, including deed restrictions, institutional controls, risk assessments, monitored natural attenuation, and site-specific cleanup criteria. Except with respect to such information, as applicable, for which FJI would not be entitled to update the FJI Disclosure Letter in accordance with clause (ii) to the proviso to the penultimate sentence of <u>Section 10.12(a)</u> or for which PTC would not be entitled to update the PTC Disclosure Letter in accordance with clause (ii) to the proviso to the penultimate sentence of <u>Section 10.12(c)</u>, the parties hereto agree that any information obtained by or on behalf of any Person as a result of or as a part of any Phase I environmental site assessments or environmental sampling or analysis conducted on behalf of such Person with respect to any real property of FJI or PTC or any of their respective Subsidiaries, as applicable, after the date of this Agreement shall be deemed to have been disclosed as of the date hereof and as of the Closing Date on the FJI Disclosure Letter or the PTC Disclosure Letter, as applicable.

(f)    Any indemnity payment under this Agreement shall be treated as an adjustment to the Final Purchase Price for Tax purposes.

(g)    Each Indemnified Party agrees that such Indemnified Party shall take and shall cause its Affiliates to take, or cooperate with the Indemnifying Party if so requested, in order to take, all reasonable measures to mitigate the consequences of the related breach (including taking steps to prevent any contingent liability from becoming an actual liability).

129

(h)     Each Indemnified Party hereby waives any subrogation rights that its insurer may have with respect to any indemnifiable Losses. After any indemnification payment is made to any Indemnified Party pursuant to this Agreement, the Indemnifying Party shall, to the extent of such payment, be subrogated to all rights (if any) of the Indemnified Party against any third party in connection with the Losses to which such payment relates. Without limiting the generality of the preceding sentence, any Indemnified Party receiving an indemnification payment pursuant to the preceding sentence shall execute, upon the written request of the Indemnifying Party, any instrument reasonably necessary to evidence such subrogation rights.

(i)     In the event that any claim for indemnification is asserted by an Indemnified Party with respect to a Loss in respect of a Person that is not, directly or indirectly, 100% owned by an Indemnifying Party as of immediately prior to the Closing, the amount indemnifiable hereunder shall be determined after reduction for the portion not owned by the Indemnifying Party as of immediately prior to the Closing. By way of example, if a Loss is, after giving effect to the provisions hereof, indemnifiable hereunder because of a breach of a representation and warranty by an Indemnifying Party made in respect of a liability of a Person that is 60% owned by an Indemnifying Party as of immediately prior to the Closing, the obligations of the Indemnifying Party to indemnify in respect of such Loss shall be 60% of such liability. For clarification purposes, for any claims asserted with respect to any Loss in respect of TFJ, the amount indemnifiable hereunder shall be allocated between FJI and PSI so that FJI shall be responsible for 49.99% of such amount and PSI shall be responsible for 50.01% of such amount.

(j)     Notwithstanding anything else herein to the contrary, in no event shall any PTC Indemnitee be entitled to indemnification under this Agreement for any Losses arising in connection with, arising out of or related to the sufficiency or insufficiency of the accounting reserves set forth on the Business Financial Statements (including as such sufficiency or insufficiency of reserves may have affected the results of operations or cash flows for the Business for the related periods as reflected on the related statements of operations or cash flows included in the Business Financial Statements (it being understood that PTC's due diligence investigation included significant investigation of FJI's estimation methodologies and other accounting policies and principles and took account of such reserves as a basis for determining the consideration payable hereunder)).

Section 9.8 <u>Exclusive Remedy</u>. Following the Closing, except for claims pursuant to <u>Section 2.6</u> (which shall be handled and addressed in accordance with the terms thereof), the sole and exclusive remedy of the PTC Indemnitees and the Seller Indemnitees, as applicable, against any Indemnifying Party or any Representative thereof with respect to any and all claims arising out of, in connection with or relating to the subject matter of this Agreement and the transactions contemplated hereby shall be remedies against the respective Indemnifying Parties pursuant to the indemnification provisions set forth in this Agreement; <u>provided</u>, that the limitations of the foregoing sentence shall not relieve any Indemnifying Party from liability or responsibility for actual fraud. Nothing in this <u>Section 9.8</u> shall prohibit claims for equitable relief made by an Indemnified Party. In furtherance of the foregoing, but without limiting the rights of indemnification expressly provided for under this Agreement, each Indemnified Party hereby waives or is deemed to waive, from and after the Closing, to the fullest extent permitted under applicable Law, any and all rights, claims and causes of action (including any right, whether arising at Law or in equity, to seek indemnification, contribution, cost

recovery, damages, or any other recourse or remedy, including as may arise under common law) it may have against any Indemnifying Party or any of its Representatives relating to the operation of the Business, the Target Entities or the Target Subsidiaries prior to the Closing or the operation of the PTC and the PTC Subsidiaries, as applicable, whether arising under or based upon Law or otherwise.   The parties hereto acknowledge and agree that, to the extent FJI elects or, as the case may be, is required, to make an indemnification payment pursuant to Section 9.5(d) by relinquishing PTC Units, any indemnification payment required to be made pursuant to Section 5.16(b), Article VII or this Article IX shall be binding on all "Permitted Transferees" (as such term is defined in the Amended and Restated Investor Rights Agreement) of the party required to make such indemnification payment, in accordance with the terms of the Amended and Restated Investor Rights Agreement.

Article X

MISCELLANEOUS

Section 10.1   Fees and Expenses.  Except as set forth herein, all costs and expenses incurred in connection with this Agreement and the consummation of the transactions contemplated hereby shall be paid by the party hereto incurring such costs and expenses; provided, that for the avoidance of doubt, except as otherwise expressly provided in this Agreement, FJI shall be responsible to pay all costs and expenses incurred by FJI, any Contributing Affiliate, any Target Entity or any Target Subsidiary in connection with this Agreement and the consummation of the transactions contemplated hereby, and no Target Entity or Target Subsidiary after the Closing shall be responsible to pay any costs or expenses incurred by FJI, any Contributing Affiliate, any Target Entity or any Target Subsidiary in connection with this Agreement or the consummation of the transactions contemplated hereby and, notwithstanding anything herein to the contrary, in no event shall Closing Business Net Debt or Closing Business Working Capital include any liability for, or be reduced by, any liability for which FJI is, in accordance with this Section 10.1, responsible.  PTC agrees that, except as expressly excluded from the definition of PTC Net Debt or PTC Working Capital, any of its unpaid obligations under this Section 10.1 shall be included in the calculation of Closing PTC Net Debt or Closing PTC Working Capital.

Section 10.2   Extension; Waiver.  Subject to the express limitations herein, at any time prior to the Closing, the parties hereto may (a) extend the time for the performance of any of the obligations or other acts of the other parties hereto, (b) waive any inaccuracies in the representations and warranties contained herein by the other parties hereto or in any document, certificate or writing delivered pursuant hereto by such other parties or (c) waive compliance with any of the agreements or conditions contained herein. Any agreement on the part of any party hereto to any such extension or waiver shall be valid only if set forth in an instrument in writing signed by or on behalf of such party. The extensions and waivers set forth in this Section 10.2 may be made without further consent of the Bankruptcy Court. No failure or delay on the part of any party hereto in the exercise of any right hereunder shall impair such right or be construed as a waiver of, or acquiescence in, any breach of any representation, warranty, covenant or agreement herein, nor shall any single or partial exercise of any such right preclude other or further exercise thereof or of any other right.

Section 10.3   Notices.  All notices, consents, requests, demands, waivers and other communications required or permitted to be given under this Agreement shall

131

be in writing and shall be deemed to have been duly given if delivered in person or mailed, certified or registered mail with postage prepaid, or sent by facsimile or email (upon confirmation of receipt), as follows:

(a) if to FJI and all FJI Indemnitees, to:

Flying J Inc.
1104 Country Hills Drive, 7th Floor
Ogden, Utah  84403
Attention:  Crystal C. Maggelet
Facsimile:  (801) 624-1705
Email: crystal.maggelet@flyingj.com

with a copy (which shall not constitute notice) to:

Kirkland & Ellis LLP
300 N. La Salle St.
Chicago, Illinois 60654
Attention:  David Eaton and Richard J. Campbell, P.C.
Facsimile:  (312) 862-2200
Email: deaton@kirkland.com
        rcampbell@kirkland.com

(b) if to PSI and all PSI Indemnitees, to:

Pacific Sunstone Inc.
c/o Flying J Inc.
1104 Country Hills Drive, 7th Floor
Ogden, Utah  84403
Attention:  Thad Call
Facsimile:  (801) 624-1705

with a copy (which shall not constitute notice) to:

Kirkland & Ellis LLP
300 N. La Salle St.
Chicago, Illinois 60654
Attention:  David Eaton and Richard J. Campbell, P.C.
Facsimile:  (312) 862-2200
Email: deaton@kirkland.com
        rcampbell@kirkland.com

(c) if to PTC and all PTC Indemnitees, to:

132

Pilot Travel Centers LLC

5508 Lonas Drive
Knoxville, Tennessee 37909
Attention: Mitchell D. Steenrod and Kristin K. Seabrook
Facsimile: (865) 297-1548
Email: mitch.steenrod@pilottravelcenters.com
kristin.seabrook@pilottravelcenters.com

with a copy (which shall not constitute notice) to:

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036
Attention: John M. Reiss and Oliver C. Brahmst
Facsimile: (212) 354-8113
Email: jreiss@whitecase.com
obrahmst@whitecase.com;

or to such other Person or address as any party hereto shall specify by notice in writing in accordance with this <u>Section 10.3</u> to the other parties hereto. All such notices, requests, demands, waivers and communications shall be deemed to have been received on the date of delivery unless if mailed, in which case on the third (3rd) Business Day after the mailing thereof, except for a notice of a change of address, which shall be effective only upon receipt thereof.

Section 10.4    <u>Entire Agreement</u>. This Agreement, together with the FJI Disclosure Letter, PSI Disclosure Letter and the PTC Disclosure Letter, contains the entire understanding of the parties hereto with respect to the subject matter contained herein and supersedes all prior agreements and understandings, oral and written, with respect thereto, other than the Confidentiality Agreement. No such prior agreements, including any earlier drafts of this Agreement, shall affect in any way the meaning or interpretation of this Agreement.

Section 10.5    <u>Binding Effect; Benefit; Assignment</u>. This Agreement shall inure to the sole benefit of and be binding upon the parties hereto (but in the case of FJI, assuming entry of the Confirmation Order or the Sale Order, as the case may be, and receipt of other necessary authorization of the Bankruptcy Court) and nothing herein express or implied shall give or be construed to give any other Person any benefit or legal or equitable rights hereunder; <u>provided</u>, that <u>Article IX</u> of this Agreement is intended to be for the benefit of the Indemnified Parties and as such, may be enforced by such Indemnified Party. Without limiting the generality of the foregoing, no Person other than the parties hereto may rely upon the representations and warranties in this Agreement as characterizations of actual facts or circumstances as of the date of this Agreement or as of any other date. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without the prior written consent of the other parties hereto; <u>provided</u>, that, after the Closing, PTC may assign its rights, interests and obligations hereunder (a) in connection with the transfer by PTC of all or substantially all of the Business and (b) as collateral security for the purpose of securing any debt financing of the transactions contemplated hereby; <u>provided</u>, further that, unless otherwise consented to in writing by FJI, after giving effect to such

assignment, PTC shall remain responsible for its obligations under this Agreement. Any attempted assignment in violation of this <u>Section 10.5</u> shall be void.

Section 10.6    <u>Amendment and Modification</u>. This Agreement may not be amended except by a written instrument executed by all parties hereto.

Section 10.7    <u>Counterparts</u>.    This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same instrument. Signed counterparts of this Agreement may be delivered by facsimile and by scanned .pdf image, each of which shall have the same force and effect as an original signed counterpart; <u>provided</u>, that, after a request by any party hereto for such original signed counterpart, each party hereto uses commercially reasonable efforts to deliver to each other party hereto original signed counterparts as soon as possible thereafter.

Section 10.8    <u>Applicable Law</u>. THIS AGREEMENT AND THE LEGAL RELATIONS BETWEEN THE PARTIES HERETO SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO THE CONFLICT OF LAWS RULES THEREOF. WITHOUT LIMITING THE RIGHT OF ANY PARTY HERETO TO APPEAL ANY ORDER OF THE BANKRUPTCY COURT, (A) THE BANKRUPTCY COURT SHALL RETAIN EXCLUSIVE JURISDICTION TO ENFORCE THE TERMS OF THIS AGREEMENT AND TO DECIDE ANY CLAIMS OR DISPUTES WHICH MAY ARISE OR RESULT FROM, OR BE CONNECTED WITH, THIS AGREEMENT, ANY BREACH OF DEFAULT HEREUNDER, OR THE TRANSACTIONS CONTEMPLATED HEREBY, AND (B) ANY AND ALL PROCEEDINGS RELATED TO THE FOREGOING SHALL BE FILED AND MAINTAINED ONLY IN THE BANKRUPTCY COURT, AND THE PARTIES HERETO HEREBY CONSENT TO AND SUBMIT TO THE JURISDICTION AND VENUE OF THE BANKRUPTCY COURT. NOTWITHSTANDING THE FOREGOING, IF THE BANKRUPTCY COURT NO LONGER HAS JURISDICTION OVER THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY, THE PARTIES HERETO AGREE THAT THE STATE OR FEDERAL COURTS LOCATED IN THE STATE OF DELAWARE SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN THE PARTIES HERETO, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE AGREEMENTS, INSTRUMENTS AND DOCUMENTS CONTEMPLATED HEREBY AND THE PARTIES CONSENT TO AND AGREE TO SUBMIT TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS. EACH OF THE PARTIES HEREBY WAIVES AND AGREES NOT TO ASSERT IN ANY SUCH DISPUTE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY CLAIM THAT (A) SUCH PARTY IS NOT PERSONALLY SUBJECT TO THE JURISDICTION OF SUCH COURTS, (B) SUCH PARTY AND SUCH PARTY'S PROPERTY IS IMMUNE FROM ANY LEGAL PROCESS ISSUED BY SUCH COURTS OR (C) ANY LITIGATION OR OTHER PROCEEDING COMMENCED IN SUCH COURTS IS BROUGHT IN AN INCONVENIENT FORUM. THE PARTIES HEREBY AGREE THAT MAILING OF PROCESS OR OTHER PAPERS IN CONNECTION WITH ANY SUCH ACTION OR PROCEEDING IN THE MANNER PROVIDED IN <u>SECTION 10.3</u>, OR IN SUCH OTHER MANNER AS MAY BE PERMITTED BY LAW, SHALL BE VALID AND SUFFICIENT SERVICE THEREOF AND HEREBY WAIVE ANY OBJECTIONS TO SERVICE ACCOMPLISHED IN THE MANNER HEREIN PROVIDED.

NEWYORK 7440434 (2K)

Section 10.9  <u>Severability</u>. Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable Law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or portion of any provision in such jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision or portion of any provision had never been contained herein. Upon such a determination, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties hereto as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby may be consummated as originally contemplated to the fullest extent possible.

Section 10.10  <u>Waiver of Jury Trial</u>. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW WHICH CANNOT BE WAIVED, EACH PARTY HERETO HEREBY WAIVES AND COVENANTS THAT IT SHALL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE) ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE OR ACTION (IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE SUBJECT MATTER HEREOF OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE TRANSACTIONS CONTEMPLATED HEREBY, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING. EACH PARTY HERETO ACKNOWLEDGES THAT IT HAS BEEN INFORMED BY THE OTHER PARTIES HERETO THAT THIS <u>SECTION 10.10</u> CONSTITUTES A MATERIAL INDUCEMENT UPON WHICH IT IS RELYING AND SHALL RELY IN ENTERING INTO THIS AGREEMENT. ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS <u>SECTION 10.10</u> WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE OTHER PARTIES TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

Section 10.11  <u>Enforcement</u>. The parties hereto acknowledge and agree that if any of the provisions of this Agreement were not performed by any party hereto or its Affiliates in accordance with the terms hereof, the other parties shall not have an adequate remedy at law for any such breach and that such other parties shall be entitled to specific performance of the terms hereof (without any requirement for the securing or posting of any bond in connection therewith), in addition to any other remedy at law or in equity. In the event that any action shall be brought by a party hereto in equity to enforce the provisions of this Agreement, no party hereto shall (and each party hereto shall cause each of its Affiliates not to) allege, and each party hereto hereby waives (and shall cause each of its Affiliates to waive) the defense, that there is an adequate remedy at law available to such party. Notwithstanding anything herein to the contrary, in no event shall this <u>Section 10.11</u> be used, alone or together with any other provision of this Agreement, to require any party to remedy any breach of any representation or warranty of such party made herein.

Section 10.12  <u>FJI Disclosure Letter; PSI Disclosure Letter; PTC Disclosure Letter</u>.

(a)  The disclosures in the FJI Disclosure Letter are to be taken as relating to the representations and warranties of FJI as a whole, notwithstanding the fact that the FJI Disclosure Letter is arranged by sections corresponding to the sections in this Agreement or

that a particular section of this Agreement makes reference to a specific section of the FJI Disclosure Letter and notwithstanding that a particular representation and warranty may not make a reference to the FJI Disclosure Letter, but in each case where a disclosure is made corresponding to a particular section of the FJI Disclosure Letter, such disclosure shall only be deemed to apply to other portions of the FJI Disclosure Letter only to the extent the relevance of such disclosure to such other representation and warranty is reasonably apparent on its face. The inclusion of information in the FJI Disclosure Letter shall not be construed as or constitute an admission or agreement that a violation, right of termination, default, liability or other obligation of any kind exists with respect to any item, nor shall it be construed as or constitute an admission or agreement that such information is material to any of FJI or its Subsidiaries. In addition, matters reflected in the FJI Disclosure Letter are not necessarily limited to matters required by this Agreement to be reflected in the FJI Disclosure Letter. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. Neither the specifications of any dollar amount in any representation, warranty or covenant contained in this Agreement nor the inclusion of any specific item in the FJI Disclosure Letter is intended to imply that such amount, or higher or lower amounts, or the item so included or other items, are or are not material, and no Person shall use the fact of the setting forth of any such amount or the inclusion of any such item in any dispute or controversy between the parties as to whether any obligation, item or matter not described herein or included in the FJI Disclosure Letter is or is not material for purposes of this Agreement. Further, neither the specification of any item or matter in any representation, warranty or covenant contained in this Agreement nor the inclusion of any specific item in the FJI Disclosure Letter is intended to imply that such item or matter, or other items or matters, are or are not in the ordinary course of business, and no Person shall use the fact of setting forth or the inclusion of any such items or matter in any dispute or controversy between the parties as to whether any obligation, item or matter not described herein or included in the FJI Disclosure Letter is or is not in the ordinary course of business for purposes of this Agreement. FJI shall have the right, from time to time until the date that is five (5) Business Days prior to the Closing, to supplement, modify or update the FJI Disclosure Letter with respect to any disclosure made pursuant to <u>Article III</u>, including for events occurring prior to or after the date hereof; <u>provided,</u> that (i) any such supplements, modifications and updates shall not be taken into account in determining whether the condition set forth in <u>Section 6.3(b)</u> is satisfied, but such supplements, modifications and updates shall be given full force and effect for all other purposes of this Agreement (including, for the avoidance of doubt, for purposes of Article VIII and Article IX, for determining whether a representation or warranty is true and correct as of the date of this Agreement) and (ii) FJI shall not be entitled to supplement, modify or update the FJI Disclosure Letter with respect to any information with respect to any Hazardous Substances or conditions of contamination identified through any environmental sampling or analysis conducted by or on behalf of FJI or any of its Affiliates after the date of this Agreement which is not affirmatively required by Environmental Laws. From and after the Closing, references to the "FJI Disclosure Letter" as referred to in this Agreement shall be references to the FJI Disclosure Letter as so supplemented, modified and/or updated.

      (b)     The disclosures in the PSI Disclosure Letter are to be taken as relating to the representations and warranties of PSI as a whole, notwithstanding the fact that the PSI Disclosure Letter is arranged by sections corresponding to the sections in this Agreement or that a particular section of this Agreement makes reference to a specific section of the PSI

Disclosure Letter and notwithstanding that a particular representation and warranty may not make a reference to the PSI Disclosure Letter, but in each case where a disclosure is made corresponding to a particular section of the PSI Disclosure Letter, such disclosure shall only be deemed to apply to other portions of the PSI Disclosure Letter only to the extent the relevance of such disclosure to such other representation and warranty is reasonably apparent on its face. The inclusion of information in the PSI Disclosure Letter shall not be construed as or constitute an admission or agreement that a violation, right of termination, default, liability or other obligation of any kind exists with respect to any item, nor shall it be construed as or constitute an admission or agreement that such information is material to any of PSI or its Subsidiaries. In addition, matters reflected in the PSI Disclosure Letter are not necessarily limited to matters required by this Agreement to be reflected in the PSI Disclosure Letter. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. Neither the specifications of any dollar amount in any representation, warranty or covenant contained in this Agreement nor the inclusion of any specific item in the PSI Disclosure Letter is intended to imply that such amount, or higher or lower amounts, or the item so included or other items, are or are not material, and no Person shall use the fact of the setting forth of any such amount or the inclusion of any such item in any dispute or controversy between the parties as to whether any obligation, item or matter not described herein or included in the PSI Disclosure Letter is or is not material for purposes of this Agreement. Further, neither the specification of any item or matter in any representation, warranty or covenant contained in this Agreement nor the inclusion of any specific item in the PSI Disclosure Letter is intended to imply that such item or matter, or other items or matters, are or are not in the ordinary course of business, and no Person shall use the fact of setting forth or the inclusion of any such items or matter in any dispute or controversy between the parties as to whether any obligation, item or matter not described herein or included in the PSI Disclosure Letter is or is not in the ordinary course of business for purposes of this Agreement. PSI shall have the right, from time to time until the date that is five (5) Business Days prior to the Closing, to supplement, modify or update the PSI Disclosure Letter with respect to any disclosure made pursuant to Article III, including for events occurring prior to or after the date hereof; provided, that (i) any such supplements, modifications and updates shall not be taken into account in determining whether the condition set forth in Section 6.3(b) is satisfied, but such supplements, modifications and updates shall be given full force and effect for all other purposes of this Agreement (including, for the avoidance of doubt, for purposes of Article VIII and Article IX, for determining whether a representation or warranty is true and correct as of the date of this Agreement) and (ii) PSI shall not be entitled to supplement, modify or update the PSI Disclosure Letter with respect to any information with respect to any Hazardous Substances or conditions of contamination identified through any environmental sampling or analysis conducted by or on behalf of PSI or any of its Affiliates after the date of this Agreement which is not affirmatively required by Environmental Laws. From and after the Closing, references to the "PSI Disclosure Letter" as referred to in this Agreement shall be references to the PSI Disclosure Letter as so supplemented, modified and/or updated.

(c)    The disclosures in the PTC Disclosure Letter are to be taken as relating to the representations and warranties of PTC as a whole, notwithstanding the fact that the PTC Disclosure Letter is arranged by sections corresponding to the sections in this Agreement or that a particular section of this Agreement makes reference to a specific section of the PTC Disclosure Letter and notwithstanding that a particular representation and

137

warranty may not make a reference to the PTC Disclosure Letter, but in each case where a disclosure is made corresponding to a particular section of the PTC Disclosure Letter, such disclosure shall only be deemed to apply to other portions of the PTC Disclosure Letter only to the extent the relevance of such disclosure to such other representation and warranty is reasonably apparent on its face.  The inclusion of information in the PTC Disclosure Letter shall not be construed as or constitute an admission or agreement that a violation, right of termination, default, liability or other obligation of any kind exists with respect to any item, nor shall it be construed as or constitute an admission or agreement that such information is material to any of PTC or its Subsidiaries.  In addition, matters reflected in the PTC Disclosure Letter are not necessarily limited to matters required by this Agreement to be reflected in the PTC Disclosure Letter.    Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. Neither the specifications of any dollar amount in any representation, warranty or covenant contained in this Agreement nor the inclusion of any specific item in the PTC Disclosure Letter is intended to imply that such amount, or higher or lower amounts, or the item so included or other items, are or are not material, and no Person shall use the fact of the setting forth of any such amount or the inclusion of any such item in any dispute or controversy between the parties as to whether any obligation, item or matter not described herein or included in the PTC Disclosure Letter is or is not material for purposes of this Agreement. Further, neither the specification of any item or matter in any representation, warranty or covenant contained in this Agreement nor the inclusion of any specific item in the PTC Disclosure Letter is intended to imply that such item or matter, or other items or matters, are or are not in the ordinary course of business, and no Person shall use the fact of setting forth or the inclusion of any such items or matter in any dispute or controversy between the parties as to whether any obligation, item or matter not described herein or included in the PTC Disclosure Letter is or is not in the ordinary course of business for purposes of this Agreement.  PTC shall have the right, from time to time until the date that is five (5) Business Days prior to the Closing, to supplement, modify or update the PTC Disclosure Letter with respect to any disclosure made pursuant to Article IV, including for events occurring prior to or after the date hereof; provided that (i) any such supplements, modifications and updates shall not be taken into account in determining whether the condition set forth in Section 6.4(b) is satisfied, but such supplements, modifications and updates shall be given full force and effect for all other purposes of this Agreement (including, for the avoidance of doubt, for purposes of Article VIII and Article IX, for determining whether a representation or warranty is true and correct as of the date of this Agreement) and (ii) PTC shall not be entitled to supplement, modify or update the PTC Disclosure Letter with respect to any information with respect to any Hazardous Substances or conditions of contamination identified through any environmental sampling or analysis conducted by or on behalf of PTC or any of its Affiliates after the date of this Agreement which is not affirmatively required by Environmental Laws.  From and after the Closing, references to the "PTC Disclosure Letter" as referred to in this Agreement shall be references to the PTC Disclosure Letter as so supplemented, modified and/or updated.

Section 10.13        No Additional Representations; Disclaimer

(a)        Each party hereto acknowledges and agrees that the other parties hereto nor any of their respective Representatives, nor any other Person acting on behalf of the other parties hereto or any of their Representatives has made any representation or

138

warranty, express or implied, as to the accuracy or completeness of any information regarding such other parties and their Affiliates or their respective businesses, assets or liabilities, except as expressly set forth in this Agreement or as and to the extent required by this Agreement to be set forth in the FJI Disclosure Letter, PSI Disclosure Letter or the PTC Disclosure Letter, as applicable. Each party hereto further agrees that neither the other parties hereto nor any of such respective other party's Representatives will have or be subject to any liability to such party or any other Person resulting from the distribution to such party, or such party's use of, any information, document or material made available to such party or its Representatives in certain "data rooms" and online "data sites," management presentations or any other form in expectation of the transactions contemplated by this Agreement.

(b)    Each party acknowledges and agrees that, except for the representations and warranties of the parties expressly set forth in this Agreement, the transactions contemplated by this Agreement are being effected AS IS WITHOUT ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR INTENDED USE OR OTHER EXPRESSED OR IMPLIED WARRANTY and without any representation or warranty, express or implied (with it being understood and agreed that the representations and warranties of the parties in this Agreement are the exclusive representations and warranties of the parties in connection with the transactions contemplated by this Agreement).

(c)    In connection with each party's investigation of the others and the Business and PTC's business, as applicable, such party may have received from or on behalf of such other parties certain projections, including projected statements of operating revenues and income from operations of the Business or PTC's business, as applicable, and certain business plan information related to the Business or PTC's business, as applicable. Each party acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that such party is familiar with such uncertainties, that such party is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the assumptions underlying such estimates, projections and forecasts), and that no party shall have a claim against the other parties or any of such respective other party's Representatives with respect thereto. Accordingly, none of the parties make any representations or warranties whatsoever with respect to such estimates, projections and other forecasts and plans (including the reasonableness of the assumptions underlying such estimates, projections and forecasts).

Section 10.14    <u>Rules of Construction</u>. The parties hereto agree that they have been represented by counsel during the negotiation and execution of this Agreement and have participated jointly in the drafting of this Agreement and, therefore, waive the application of any Law, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the parties hereto drafting such agreement or document.

Section 10.15    <u>Headings</u>. The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

139

Section 10.16 <u>Relationship of Parties</u>. Except as specifically provided herein, none of the parties shall (and shall cause their respective Representatives not to) act or represent or hold itself out as having authority to act as an agent or partner of the other parties or any of their respective Affiliates or in any way bind or commit the other parties or any of their respective Affiliates to any obligations or agreement. Nothing contained in this Agreement will be construed as creating a partnership, joint venture, agency, trust, fiduciary relationship or other association of any kind, each party being individually responsible only for its obligations as set forth in this Agreement. The parties' respective rights and obligations hereunder are limited to the contractual rights and obligations expressly set forth herein on the terms and conditions set forth herein.

Section 10.17      <u>Release</u>. In consideration of the acceptance of the contribution of the Business by PTC, at the Closing, PSI, FJI, FJI's Subsidiaries (other than the Target Entities and Target Subsidiaries), and the Call Family Delivery Parties, shall each have entered into a release in the form of **Exhibit XX** attached hereto.

140

IN WITNESS WHEREOF, FJI, PSI and PTC have caused this Agreement to be duly executed by their respective officers thereunto duly authorized, all as of the date first above written.

FLYING J INC.

By:_____
    Name:
    Title:

PACIFIC SUNSTONE INC.

By:_____
    Name:
    Title:

PILOT TRAVEL CENTERS LLC

By:_____
    Name:
    Title:

[Contribution Agreement Signature Page]

IN WITNESS WHEREOF, FJI, PSI and PTC have caused this Agreement to be duly executed by their respective officers thereunto duly authorized, all as of the date first above written.

FLYING J INC.

By:_____
    Name:
    Title:


PACIFIC SUNSTONE INC.

By:_____
    Name:
    Title:


PILOT TRAVEL CENTERS LLC

By:_____
    Name:
    Title:

[Contribution Agreement Signature Page]

IN WITNESS WHEREOF, FJI, PSI and PTC have caused this Agreement to be duly executed by their respective officers thereunto duly authorized, all as of the date first above written.

FLYING J INC.

By:_____
    Name:
    Title:

PACIFIC SUNSTONE INC.

By:_____
    Name:
    Title:

PILOT TRAVEL CENTERS LLC

By:_____
    Name: *James A. Haslam III*
    Title: *President + CEO*

[Contribution Agreement Signature Page]