# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| FLYING J INC., et al.,[1] | ) | Case No. 08-13384 (MFW) |
| Debtors. | ) | Jointly Administered |
| | ) | **Bidding Procedures Hearing Date: February 23, 2010 at 2:00 p.m. (ET)** |
| | ) | **Bidding Procedure Objection Deadline: February 16, 2010 at 4:00 p.m. (ET)** |
| | ) | **Sale Hearing Date: March 23, 2010 at 11:30 a.m. (ET)** |
| | ) | **Sale Objection Deadline: March 16, 2010 at 4:00 p.m. (ET)** |

## MOTION TO APPROVE BIDDING PROCEDURES, BREAK-UP FEE AND SALE OF SUBSTANTIALLY ALL ASSETS OF BIG WEST OF CALIFORNIA, LLC

Flying J Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), file this motion (the "Motion") for entry of (a) an order substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order") establishing bidding and notice procedures (the "Bidding Procedures") and approving certain bid protections in connection with the sale (the "Sale") of substantially all of the assets (the "Acquired Assets") of Big West of California, LLC ("BWOC") and (b) an order, substantially in the form attached hereto as **Exhibit B** (the "Sale Order"), (i) approving an agreement substantially in the form attached hereto as **Exhibit C** (the "Purchase Agreement") for the sale of the Acquired Assets to Paramount Petroleum Corporation as buyer (collectively with its

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Flying J Inc. (3458); Big West of California, LLC (1608), Big West Oil, LLC (6982); Big West Transportation, LLC (6984); Longhorn Partners Pipeline, L.P. (0554); Longhorn Pipeline Holdings, LLC (0226), Longhorn Pipeline Inc. (0654). The location of the Debtors' corporate headquarters and the service address for all Debtors is: 1104 Country Hills Drive, Ogden, UT 84403.

designated affiliate or affiliates,[2] the "Buyer") and Alon USA Energy, Inc. ("Alon") as guarantor (the "Guarantor") or the Successful Bidder (as defined herein) to be identified pursuant to the Bidding Procedures,[3] (ii) authorizing the sale of substantially all of BWOC's assets free and clear of all liens, claims, encumbrances and other interests (collectively, the "Encumbrances"), (iii) authorizing the assumption and assignment to Buyer or the Successful Bidder of the executory contracts and unexpired leases identified on Exhibit 1 to **Exhibit E** attached hereto (collectively, the "Assigned Contracts") and (iv) granting certain related relief. In support of this Motion, the Debtors respectfully state as follows:

## Jurisdiction

1. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory bases for the relief requested herein are sections 105(a), 363(b), 363(f) and (m), 365, 503 and 507 of title 11 of the United States Code (the "Bankruptcy Code") and rules 2002(a)(2), 6004(a), (b), (c), (e), (f) and (h), 6006(a), (c) and (d), 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules").

---

[2] As further provided in the Purchase Agreement, Paramount Petroleum Corporation, as the Buyer, and its affiliate, Alon Energy USA, Inc., may at any time prior to closing of the Sale, substitute one or more entities affiliated with Alon and Paramount as the purchaser of the Acquired Assets in the Sale.

[3] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Purchase Agreement (as defined herein).

## Relief Requested

4. By this Motion, the Debtors request the entry of (a) an order approving the Bidding Procedures and Break-Up Fee (as defined herein) and (b) an order (i) approving the Purchase Agreement for the sale of the Acquired Assets to Buyer or the Successful Bidder, (ii) authorizing the sale of the Acquired Assets free and clear of Encumbrances, (iii) authorizing the assumption and assignment of the Assigned Contracts to Buyer or the Successful Bidder and (iv) granting certain related relief.

## Background

5. On December 22, 2008 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of title 11 of the Bankruptcy Code. On January 5, 2009, the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors (the "Creditors' Committee") [Docket No. 85].

6. The Debtors and their wholly-owned non-debtor subsidiaries (collectively, the "Flying J Group") are a fully integrated oil company with operations in the field of exploration, production, refining, transportation, wholesaling and retailing of petroleum products. Debtor Flying J Inc. ("Flying J") is one of the 20 largest privately held companies in America with fiscal year 2009 consolidated sales of approximately $18.5 billion and is the direct or indirect parent corporation of each of the other members of the Flying J Group.

7. The Flying J Group operates approximately 250 retail locations, including state-of-the-art travel plazas, convenience stores, restaurants, motels and truck service centers in 43 states and six Canadian provinces. In addition to usual rest stop services (food, fuel, shower facilities), the Flying J Group offers banking, bulk-fuel programs, communications (wireless

Internet connections), fuel cost analysis, insurance and truck fleet sales. Furthermore, the Flying J Group explores for, refines and transports petroleum products and is one of the largest retail distributors of diesel fuel in North America. Other operations of the Flying J Group include online banking, card processing, truck and trailer leasing, and payroll services. In these widespread operations, the Flying J Group employs approximately 12,330 people.

8. Each of the Debtors in these chapter 11 cases is involved in or associated with the Flying J Group's core businesses of petroleum refining, supply and distribution. In particular, Debtors Big West Oil LLC and Big West of California LLC own and operate two refineries in North Salt Lake City, Utah and Bakersfield, California, respectively, which have the combined capacity to refine over 100,000 barrels of crude oil per day. These Debtors also are responsible for purchasing and transporting crude oil in parts of California, Utah, Wyoming and Colorado. On the Petition Date and through July 2009, the Debtors owned a 700-mile common carrier pipeline from the Gulf Coast near Houston to El Paso, Texas (the "Longhorn Pipeline"). On July 27, 2009, the Court approved the sale of the Longhorn Pipeline to Magellan Midstream Partners, L.P. [Docket No. 1578] (the "Longhorn Sale").

9. The Debtors have filed these chapter 11 cases to address near-term liquidity and operational challenges brought on in part by the precipitous drop in the price of oil beginning in September of 2008 and continuing through the first quarter of 2009, as well as the recent tightening credit markets. Over the past year, the Debtors have implemented a range of aggressive restructuring actions, including shutting down non-performing businesses and downsizing continuing operations, designed to improve cash flow performance and financial results. Moreover, the Debtors have aggressively marketed both core and non-core assets for sale, including and in addition to the Longhorn Pipeline, in an attempt to maximize liquidity in

preparation for the Debtors' eventual exit from bankruptcy. Such assets include: (a) the Debtors' 50% equity interest in Haycock Petroleum Company; and (b) substantially all the assets of Flying J Oil & Gas Inc. and its subsidiaries, each of which are wholly -owned, directly or indirectly, by Flying J (collectively, the "Sales"). The Debtors believe that, after these restructuring actions, in particular the Sales, their businesses will be fundamentally sound and profitable and that these chapter 11 cases will allow them to resolve their liquidity constraints and emerge as stronger, healthier companies.

10. The Debtors have determined that a sale of substantially all of the Debtors' retail operations to Pilot Travel Centers LLC ("Pilot") will maximize creditor recoveries and is in the best interests of the Debtors' estates. On July 30, 2009, the Court granted the Debtors the authority to obtain up to $100,000,000 of secured superpriority postpetition financing (the "DIP Facility") from Pilot and to execute a letter of intent to sell its travel center and trucking operations, corporate headquarters building and certain other assets relating to the Debtors' retail business operations to Pilot (the "Pilot Transaction"). The DIP Facility provides the Debtors with much needed liquidity to continue business operations pending the sale to Pilot. On January 27, 2010, the Court granted the Debtors' motion to execute the Pilot Transaction.[4] The transaction currently being negotiated with Pilot would pay all creditors of Flying J in full, provide value to Flying J's shareholders, allow Flying J to exit bankruptcy protection expeditiously as a stronger, healthier business and position Flying J to succeed in today's highly competitive market.

---

4 See *Order (I) Authorizing Sale of Target Holdings Free and Clear of Liens, Claims, Encumbrances and Other Interests, (II) Approving Assumption and Assignment of Certain Agreements., (III) Approving Contribution Agreement and Transactions Contemplated Therein, (IV) Approving the ConocoPhillips Agreement and (V) Granting Related Relief* [Docket No. 2637].

11. As part of the Debtors' efforts to maximize the recovery for creditors at all estates, this Motion addresses the disposition of the assets of BWOC.

**Marketing Efforts**

12. Throughout the pendency of these chapter 11 cases, the Debtors and their advisors have explored, and continue to explore, multiple restructuring alternatives, including the sale of specific portions of the Debtors' operations, a new debt or equity capital infusion and a restructuring of the Debtors' balance sheet. On April 3, 2009, the Debtors retained special financial advisor Deutsche Bank Securities Inc. ("Deutsche Bank") in part to assist the board of directors of Flying J in its evaluation of strategic alternatives with respect to asset dispositions, including BWOC.[5] The Debtors, Deutsche Bank and the Debtors' other advisors ultimately determined a divestiture of the assets held by BWOC, a wholly owned subsidiary of the Flying J Group, would allow the Debtors to maximize recovery to creditors of both BWOC and the Debtors' other estates.

13. On or around March 16, 2009, Deutsche Bank began soliciting potential third-party buyers in connection with the sale of the Acquired Assets. Deutsche Bank, with the assistance of the Debtors, identified approximately 180 parties, which included private-equity investors, energy and exploration companies, midstream companies and master limited partnerships, commodities trading firms and fuel refiners and marketers, to receive preliminary informational memoranda. Fifty-six of these parties executed confidentiality agreements and received additional information, including a confidential information memorandum. From this pool of parties, the Debtors ultimately received fifteen first round (non-binding) expressions of

---

[5] See *Order Authorizing the Debtors to Retain Deutsche Bank Securities Inc. as Their Special Financial Advisor Nunc Pro Tunc to March 13, 2009, entered on April 3, 2009* [Docket No. 922].

interest. After careful review of these expressions of interest and related diligence, the Debtors held a second round of bidding, where six parties, one of which was the Buyer, submitted binding bids to purchase the Acquired Assets. Notably, while five of these second-round bidders identified mere bid levels at which such bidders would contemplate making a definitive bid for BWOC's assets, at the time, only the Buyer submitted a definitive bid. Thus, working closely with Deutsche Bank, the Debtors ultimately determined that the Buyer offered the best combination of price, proven financing and ability to efficiently close the transaction. All told, the Debtors, Deutsche Bank and the Debtors' other professional advisors devoted approximately ten months of diligent analysis and negotiation to this extensive marketing and sale process.

**The Purchase Agreement**

14. Since selecting the Buyer's bid as the most qualified among those received during the marketing process, the Debtors and the Buyer have conducted extensive negotiations regarding the terms of the Purchase Agreement. These negotiations culminated in the execution of the Purchase Agreement with the Buyer on February 2, 2010. The Purchase Agreement[6] outlines the terms and conditions of a proposed acquisition of substantially all of the assets of BWOC in a sale pursuant to section 363 of the Bankruptcy Code in which the Buyer would be the "stalking horse" bidder. Subject to adjustment in accordance with the Purchase Agreement, the purchase price for the Acquired Assets is equal to: (a) a Base Purchase Price of $40 million; plus (b) an amount equal to 90% of the value of certain Hydrocarbon Inventories owned by BWOC, consisting of, *inter alia*, crude oil, other petroleum products, refined and intermediate

---

[6] The summary of the Purchase Agreement contained in this Motion is qualified in its entirety by reference to the specific terms contained therein. In the event of any inconsistency between the Purchase Agreement and the summary herein, the terms of the Purchase Agreement shall govern.

petroleum products and additives located at or in transit to the Refinery, which value BWOC shall estimate in good faith five Business Days prior to the Closing Date; plus (c) assumption of certain Assumed Liabilities (the "Purchase Price").

15. Subject to the receipt of higher and better proposals through the Bidding Procedures, the Purchase Agreement represents the best alternative currently available to the Debtors. Thus, in an effort to expeditiously move these chapter 11 cases forward, to realize value from the sale of BWOC's assets and to continue the process commenced in February 2009 of divesting certain non-core assets, the Debtors are filing the Motion seeking approval of the Purchase Agreement.

16. The Debtors intend to sell the Acquired Assets to the Buyer or the highest or best bidder at the Auction (as defined herein), if conducted, free and clear of any Encumbrances, with any valid liens on the assets sold to attach to the Sale proceeds. The price to be paid by the ultimate purchaser for the Acquired Assets and terms and conditions for the sale of such assets will be established at the Auction (if conducted).

17. The proposed Bidding Procedures and Auction should provide a fair opportunity for open and spirited bidding, taking into account the already robust and lengthy marketing process that has occurred, and generate the highest or best bid for the Acquired Assets. ***The Debtors reserve the right not to proceed to Auction or at Auction not to declare a successful bidder***.[7]

---

[7] Per Local Bankruptcy Rule 6004-1(b)(iv) and (c)(i), the Debtors are required to highlight certain provisions of this Motion. The Debtors have formatted (using bold and italics) every such required instance.

**The Break-Up Fee**

18. ***The Purchase Agreement provides for a Break-Up Fee of $1 million (i.e., 2.5% of the Base Purchase Price) (the "Break-Up Fee") in the event that a party other than the Buyer is determined at Auction to be the Successful Bidder for the Acquired Assets***.[8]

19. As set forth in the Purchase Agreement, the Break-Up Fee is payable only in narrow circumstances. Specifically, all as further described in the Purchase Agreement, the Buyer is entitled to the Break-Up Fee only if: (a) a party other than the Buyer is the Successful Bidder; (b) the Buyer terminates the Purchase Agreement due to any unwaived material violation or breach by BWOC or any covenant, representation or warranty in the Purchase Agreement that prevents satisfaction of any condition to closing and such violation or breach is not capable of being cured, or, if capable of being cured, is not cured within thirty days after written notice thereof by the Buyer; or (c) BWOC willfully breaches the Purchase Agreement and such breach gives rise to the Buyer's termination rights as set forth in the Purchase Agreement.

20. The Buyer's willingness to enter into and execute the Purchase Agreement is expressly conditioned on the Court's approval of the Break-Up Fee. As discussed in greater detail below, the Debtors submit that the potential benefits of the Sale more than justify the Break-Up Fee and submit that agreeing to the Break-Up Fee is a prudent exercise of the Debtors' business judgment.

---

8 See Local Bankruptcy Rule 6004-1(c)(i)(C)(2).

## Marketing Process

21. The Debtors have taken the following steps to ensure a well-advertised Sale and Auction:

(a) Contact Parties: The Debtors, in consultation with Deutsche Bank, have developed a list of parties who the Debtors believe may be interested in and who the Debtors reasonably believe would have the financial resources to consummate a competing transaction to that of the Buyer (a "Competing Transaction"), which list includes both potential strategic investors and potential financial investors (each, individually, a "Contact Party," and collectively, the "Contact Parties"). As the Court is aware, and as further described above, the Debtors have already conducted an extensive marketing process over the last ten months, engaging over 180 potential strategic investors and potential financial investors, thereby ensuring that the Contact Parties are comprised of viable potential bidders and have been provided sufficient time to participate in the Auction undertaken to date. The Debtors will continue to discuss and may supplement the list of Contact Parties throughout the marketing process, as appropriate.

(b) Information Package: The Debtors will distribute to each Contact Party an "Information Package" comprising a cover letter, a copy of the Bidding Procedures; and a copy of the Confidentiality Agreement (as defined herein).

(c) Data Room and Access to Information: Upon execution of a Confidentiality Agreement, in form and substance satisfactory to the Debtors, any party that wishes to conduct due diligence on the Acquired Assets may be granted access to material and confidential information in the Debtors' sole discretion; *provided*, *however*, that the Debtors have no obligation to provide information after the Bid Deadline (as defined herein). The Debtors may, in their sole discretion, schedule management presentations and make management otherwise available to selected bidders prior to the Bid Deadline.

## **The Bidding Procedures**[9]

22. To ensure the highest or best price is received for the Acquired Assets, the Debtors have developed the following proposed Bidding Procedures (substantially in the form attached hereto as **Exhibit D**) for the contemplated Auction and Sale:

(a) **Confidentiality Agreements (Bidding Procedures § 2):** ***Any prospective bidder that wishes to receive information regarding the Acquired Assets must execute a confidentiality agreement, in form and substance satisfactory to the Debtors (a "Confidentiality Agreement")***.[10] Upon execution and delivery of a Confidentiality Agreement, the Debtors may, in their discretion, provide information to any such prospective bidder, schedule management presentations and make management otherwise available to selected bidders, in each case prior to the Bid Deadline.

(b) **Qualified Bidders (Bidding Procedures § 3):** In order to be a Qualified Bidder (as defined herein) for the Acquired Assets, a bidder must deliver the Qualified Bid Required Documents (as defined herein) **so as to be received by the parties specified in Section 5 of the Bidding Procedures by not later than 4:00 p.m. (prevailing Eastern Time) on March 16, 2010 (the "Bid Deadline")**.[11]

When used herein, "Qualified Bid Required Documents" means:

(i) a letter, executed by such bidder, (A) setting forth the cash purchase price proposed to be paid by such bidder for the Acquired Assets proposed to be acquired by such bidder, (B) ***stating that the bid submitted by such bidder is binding and irrevocable until the conclusion of the Sale Hearing***, (C) ***stating that such bid and the agreements, exhibits and schedules referred to in Section 3(b) of the Bidding Procedures have been duly authorized, executed and delivered by such bidder and***

9 The summary of the Bidding Procedures contained in this Motion is qualified in its entirety by reference to the Bidding Procedures. Any conflict between the terms described in this Motion and the Bidding Procedures shall be resolved in favor of the Bidding Procedures. Capitalized terms used but not otherwise defined in this section shall have the meanings set forth in the Bidding Procedures.

10 See Local Bankruptcy Rule 6004-1(c)(i)(A)(3).

11 See Local Bankruptcy Rule 6004-1(c)(i)(B)(1).

***that no further internal or equityholder approvals are required with respect to any such matter***,[12] (D) setting forth each regulatory and third-party approval required by such bidder for the consummation of the purchase and sale of the Acquired Assets and the time period within which such bidder expects to receive such regulatory and third-party approvals (and, in the case that any such regulatory or third-party approval is expected to take more than 30 days after execution and delivery of a purchase and sale agreement, what actions such bidder is prepared to take to ensure prompt receipt of such approval(s)) and (E) confirming that the bid submitted by such bidder is not conditioned on receipt of financing or the outcome of any due diligence investigation regarding the Acquired Assets;

(ii) a clean asset purchase agreement, duly authorized, executed and delivered by such bidder, for the Acquired Assets consistent in all material respects with section 3(a) of the Bidding Procedures, together with all exhibits and schedules to each of the foregoing (the "Modified Purchase Agreement") and ***a marked Modified Purchase Agreement reflecting the variations from the Purchase Agreement and each exhibit and schedule thereto***[13] (with it being understood that the Modified Purchase Agreement for each bidder shall show with precision any changes to the assets, contracts, leases and liabilities to be assumed or purchased by such bidder relative to the Buyer);

(iii) a proposed purchase price greater than the aggregate consideration offered by the Buyer pursuant to the Purchase Agreement by at least $1,250,000 (which amount equals the sum of the Break-Up Fee and $250,000);

(iv) to the extent that the bidder is proposing to pay for the Acquired Assets, in whole or in part, from cash on its balance sheet, ***recent financial information and confirmation that such bidder's cash position has not materially decreased, nor is expected to materially decrease, from that reflected in such recent financial information***,[14] and to the extent that such bidder is

---

[12] See Local Bankruptcy Rule 6004-1(c)(i)(A)(4).

[13] See Local Bankruptcy Rule 6004-1(c)(i)(B)(2).

[14] See Local Bankruptcy Rule 6004-1(c)(i)(A)(2).

proposing to pay for the Acquired Assets with funds from any third-party financing source (whether debt or equity), includes copies of written firm commitments for such financing (including, without limitation, any existing credit facility) executed by all parties thereto;

(v) does not request or entitle the bidder to any transaction or break-up fee, expense reimbursement, or similar type of payment; and

(vi) ***includes a cash deposit in the amount of $10% of the bidder's cash purchase price set forth in the Modified Purchase Agreement***.[15]

Subject to other bids being deemed Qualified Bids in accordance with Section 3 of the Bidding Procedures, any bid meeting the above requirements shall constitute a "Qualified Bid" and the bidder submitting such Qualified Bid referred to herein as a "Qualified Bidder." For all purposes of the bidding process, the Buyer shall be deemed a Qualified Bidder and the Purchase Agreement shall be deemed a Qualified Bid.

Upon submission of a bid prior to the Bid Deadline (and whether or not such bid is ultimately determined to be a Qualified Bid), the bidder shall, at the request of the Debtors, include information that, in the discretion of the Debtors after consultation with the counsel and financial advisors for the Creditors' Committee and the lenders (the "Secured Lenders") party to that certain Credit Agreement dated as of March 15, 2005, among Big West Oil, LLC and Big West of California, LLC, as Borrowers, Certain Subsidiaries of the Borrowers, as Guarantors, the Lenders Party Thereto, Bank of American, N.A. as Administrative Agent, Wells Fargo Bank, National Association and ING Capital LLC as Co-Syndication Agents, UFJ Bank Limited as Documentation Agent and Banc of America Securities LLC as Sole Lead Arranger and Book Manager (as amended, the "Revolving Credit Agreement") and that certain Term Loan Credit Agreement dated as of May 15, 2007 among Big West Oil, LLC, as Borrower, Certain Subsidiaries of the Borrowers as Guarantors, the Lenders Party Thereto, and Bank of America, N.A., as Administrative Agent and Collateral Agent, (as amended, the "Term Loan Agreement") evidences the bidder's financial wherewithal and operational ability to consummate the transaction proposed by its bid, including, without limitation, such financial and other information setting forth adequate

[15] See Local Bankruptcy Rule 6004-1(c)(i)(B)(3).

assurance of future performance under section 365 of the Bankruptcy Code in a form requested by the Debtors to allow the Debtors to serve within one business day after such receipt of such information on counter-parties to any contracts or leases being assigned in connection with the proposed sale that have requested, in writing, such information.

The Debtors reserve the right to (a) solicit bids for the Acquired Assets, (b) subject to execution and delivery by a bidder of a Confidentiality Agreement, provide information regarding the Acquired Assets and liabilities related thereto, (c) discuss the terms of any bid submitted, and (d) request clarifications or resubmission of any bid, and upon receipt of any such clarification or resubmission, to deem a bid as a Qualified Bid even if it was not such a Qualified Bid prior to such clarification or resubmission.

The Debtors, in consultation with the Creditors' Committee, shall make a determination regarding whether a bid is a Qualified Bid and shall notify bidders whether their bids have been determined to be Qualified Bids by no later than 4:00 p.m. on March 17, 2010 (the "Qualified Bidder Notification Deadline"). The Qualified Bidder Notification Deadline may be extended by the Debtors, in their sole discretion, at any time and from time to time; provided that, if the Qualified Bidder Notification Deadline is extended, the Debtors will promptly notify each bidder that has submitted a Qualified Bid prior to the pre-extension deadline time of such extension. The Debtors will consult with the Secured Lenders to the same extent that they are required to consult with the Creditors' Committee under these Bidding Procedures (including, for the avoidance of doubt, pursuant to Sections 6, 8 and 9 of the Bidding Procedures) but only to the extent that the Secured Lenders are not active bidders at the applicable time.

(c) **Aggregate Bids (Bidding Procedures § 4):** Persons who collectively are referred to as a "Qualified Bidder" need not be Affiliates and need not act in concert with one another, and the Debtors may aggregate separate bids from unaffiliated persons to create one "Qualified Bid" from one or more "Qualified Bidders"; provided, however, that all bidders shall remain subject to the provisions of 11 U.S.C. § 363(n) regarding collusive bidding.

(d) **Deadline for Submission (Bidding Procedures § 5):** All bids (including any credit bid submitted by the Secured Lenders) must be submitted to the following so as to be received **by the Bid Deadline**:

(i) Flying J Inc., 1104 Country Hills Drive, Ogden, UT 84403; Attn.: Brett Bailey;

(ii) Investment Banker and Financial Advisor to the Debtors: Deutsche Bank Securities Inc., 60 Wall Street, 45th Floor, New York, NY 10005; Attn: Peter Bennett;

(iii) Co-Counsel to the Debtors: Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654; Attn.: Adam C. Paul;

(iv) Co-Counsel to the Debtors: Young Conaway Stargatt & Taylor, LLP, The Brandywine Building 1000 West Street, Wilmington, Delaware 19801; Attn.: Pauline K. Morgan;

(v) Counsel to the Official Committee of Unsecured Creditors: Pachulski Stang Ziehl & Jones LLP, 150 California Street San Francisco, California 94111; Attn.: Debra Grassgreen;

(vi) Counsel to the Secured Lenders: (A) Brown Rudnick LLP, City Place 1, 185 Asylum Street, Hartford, Connecticut 06103; Attn: Howard L. Siegel; and (B) Moore & Van Allen, Suite 4700, 100 North Tryon Street, Charlotte, North Carolina 28201-4003; Attn: Alan W. Pope.

(e) **Evaluation of Qualified Bids (Bidding Procedures § 6):** Prior to the Auction, the Debtors shall determine, in their reasonable business judgment after consultation with the Debtors' financial and legal advisors and the financial and legal advisors for the Creditors' Committee, which of the Qualified Bids is likely to result in the highest or otherwise best offer for the Acquired Assets (the bid so selected, being referred to herein as the "Starting Bid"). Subject in all respects to the requirements of the Bankruptcy Code, and all rules and regulations (including, without limitation, local rules) promulgated pursuant thereto, and the Bidding Procedures Order, in evaluating whether a Qualified Bid for the Acquired Assets is the highest or otherwise best offer, such bid will be valued by the Debtors, in consultation with its financial and legal advisors and the legal and financial advisors for the Creditors' Committee, based on numerous factors, including, without limitation, the net value and recovery to the Debtors and their stakeholders (including, without limitation, after giving effect to any purchase price adjustments provided for in such bid), the amount and availability of distributions to the Debtors and their creditors as a result of the proposed transaction, the assets and liabilities included or excluded from the bid (and the resulting effect on value and distributions), the number, type and nature of any changes to the Purchase Agreement requested by each bidder (and whether any such changes are favorable or not to the Debtors) and the certainty and timing of closing the transactions contemplated by such Qualified Bid.

(f) **No Qualified Bids (Bidding Procedures § 7):** If no Qualified Bids other than the Purchase Agreement are submitted by the Bid Deadline, the Debtors shall cancel the Auction, shall deem the Purchase Agreement to be the Successful Bid, and shall seek the Court's authority to consummate the Sale contemplated in the Purchase Agreement with the Buyer.

(g) **Auction (Bidding Procedures § 8):** In the event that the Debtors receive at least one Qualified Bid from a bidder other than the Buyer by the Bid Deadline, the Debtors shall conduct an auction (the "Auction") with respect to the Acquired Assets. The Auction will take place starting at **9:00 a.m. (prevailing Eastern Time) on March 19, 2010** at Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022,[16] or at such other place, date and time as may be designated in writing by the Debtors.

Other than the Debtors, only (i) the Buyer and its advisors, (ii) parties and their advisors that have been advised that they have submitted a Qualified Bid, (iii) counsel and financial advisors to the Creditors' Committee, (iv) counsel and financial advisors for the Secured Lenders, and (v) other parties specified in the Bidding Procedures Order will be permitted to participate in and make any statements on the record at the Auction.

Subject to Section 13 of the Bidding Procedures, the Auction shall be governed by the following procedures:

(i) Only Qualified Bidders shall be entitled to make any subsequent bids at the Auction;

(ii) ***Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale***;[17]

(iii) The Qualified Bidders shall appear in person at the Auction, or through a duly authorized representative;

(iv) Prior to the Auction, the Debtors shall provide copies of the Starting Bid to all Qualified Bidders which have informed the Debtors of their intent to participate in the Auction;

(v) All bids will be made and received in one room, on an open basis, and all other Qualified Bidders will be entitled to be

---

16 See Local Bankruptcy Rule 6004-1(c)(ii)(A).

17 See Local Bankruptcy Rule 6004-1(c)(ii)(B).

present for all bidding, and all material terms of each bid will be fully disclosed to all other Qualified Bidders; provided that the Debtors shall have the right, once a Qualified Bidder has fully disclosed its bid, to meet with such Qualified Bidder privately in a separate break-out room;

(vi) Qualified Bidders may then submit successive bids with the value to the Debtors, as determined by the Debtors in their reasonable business judgment after consultation with the legal and financial advisors for the Creditors' Committee, ***of at least $250,000 more than the bid at which the Auction commenced and then continue in minimum increments of at least $250,000 higher than the previous bid***;[18]

(vii) The Auction will be conducted in a manner as reasonably determined by the Debtors;

(viii) All Qualified Bidders shall have the right to submit additional bids and make additional modifications to their respective Modified Purchase Agreements at the Auction, provided that any such modifications to the Modified Purchase Agreements, on an aggregate basis and viewed in whole, shall not be less favorable to the Debtors than any prior bid by such party or the preceding bid;

(ix) Debtors will, from time to time, in an open forum, advise Qualified Bidders participating in the Auction of their determination as to the terms of the then highest or otherwise best bid;

(x) The Debtors shall have the right to request any additional financial information that will allow the Debtors to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by one or more of the Modified Purchase Agreements as further amended during the Auction process and any further information that Debtors believe that they reasonably need to better understand the terms of a Qualified Bidder's bid; and

---

18 See Local Bankruptcy Rule 6004-1(c)(i)(C)(3).

(xi) ***Any bid submitted by the Buyer at the Auction will include a credit equal to $1,000,000, which equals the amount of the Break-Up Fee***.[19]

(h) **Selection of Successful Bidder (Bidding Procedures § 9):** The concluding date and time of the Auction shall be stated on the record. At the conclusion of the foregoing steps in the Auction, or as soon thereafter as practicable, the Debtors, in consultation with counsel and financial advisors for the Creditors' Committee, will: (i) review each Qualified Bid, and consider each Qualified Bid, in each case as updated through the conclusion of the Auction, on the basis of, among other considerations, the same considerations used by the Debtors in determining the Starting Bid, and (ii) identify the highest or otherwise best offer(s) for the Acquired Assets received at the Auction (each, a "Successful Bid" and each party making such a bid, a "Successful Bidder"), as well as identifying the Back-up Bidder (as defined herein). The Successful Bidder(s) shall have such rights and responsibilities as set forth in the applicable purchase and sale agreement for such Successful Bidder as agreed at the Auction.

Within one calendar day after conclusion of the Auction, the Successful Bidder shall complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made. The results at the close of the Auction shall be final and no additional bids will be accepted after the close of the Auction.

(i) **Sale Hearing (Bidding Procedures § 10):** The Successful Bid will be subject to approval by the Court. The Debtors' presentation of a particular bid to the Court for approval does not constitute the Debtors' acceptance of the bid. The Debtors will be deemed to have accepted a bid only when the bid has been approved by the Court at the Sale Hearing (as defined herein) to approve the sale of the Acquired Assets. The sale hearing (the "Sale Hearing") to approve the sale of the Acquired Assets to the Successful Bidder in accordance with the Bidding Procedures will take place before the **Honorable Mary F. Walrath in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 5th Floor, Courtroom 4, Wilmington, Delaware 19801 at 11:30 a.m. (prevailing Eastern Time) on March 23, 2010**, or at such time thereafter as counsel may be heard. The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other by announcement of the adjournment in open court on the

[19] See Local Bankruptcy Rule 6004-1(c)(i)(C)(4).

date scheduled for the Sale Hearing. The Successful Bidder and Backup Bidder, if any, should be represented by counsel at the Sale Hearing.

(j) **Failure to Consummate Purchase (Bidding Procedures § 11):** If an Auction is conducted, ***the party with the next highest or otherwise best Qualified Bid, as determined by the Debtors in the exercise of their business judgment, at the Auction shall be required to serve as a back-up bidder (the "Back-up Bidder"). If the Back-up Bidder is the Buyer, the bid of the Buyer shall remain open and irrevocable in accordance with the terms of the Purchase Agreement. All other Back-up Bidders shall keep their bids open and irrevocable until the earlier of 5:00 p.m. prevailing Eastern time on the date (the "Outside Back-up Date") that is 180 days after the Sale Hearing or the closing of the sale transaction with the buyer approved at the Sale Hearing***.[20] Following the Sale Hearing, if such buyer fails to consummate an approved Sale because of a breach or failure to perform on the part of such buyer, the Back-up Bidder will be deemed to have the new Successful Bid, and the Debtors will be authorized, but not required, to consummate the Sale with the Back-up Bidder without further order of the Court. In such case, the defaulting buyer's deposit, if any, shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available damages from the defaulting buyer.

(k) **Return of Deposits (Bidding Procedures § 12):** Notwithstanding anything to the contrary in the Bidding Procedures, the Deposit (as defined in the Purchase Agreement) made by the Buyer shall be returned to the Buyer in accordance with the terms of the Purchase Agreement. Except as otherwise provided in the Bidding Procedures, all deposits shall be returned to each bidder not selected by the Debtors as the buyer or the Back-up Bidder by no later than the fifth business day following the conclusion of the Auction; provided, however, that the interest on such deposit may not be returned until the second business day of the month following such termination. The deposit of the Back-up Bidder shall be held by the Debtors until the earlier of 24 hours after (i) the closing of the sale transaction with the Successful Bidder and (ii) the Outside Back-up Date.

(l) **Reservation of Rights (Bidding Procedures § 13):** The Debtors reserve the right, as they may reasonably determine to be in the interests of their estates, to: (i) determine which bidders are Qualified Bidders; (ii) determine which bids are Qualified Bids; (iii) determine which Qualified Bid is the highest or otherwise best proposal and which is the

---

[20] See Local Bankruptcy Rule 6004-1(c)(i)(E).

next highest or otherwise best proposal; (iv) reject any bid that is inadequate or insufficient or for any other reason; (v) refuse to execute a Confidentiality Agreement with, or provide information or access to, any prospective bidder; (vi) ***impose additional terms and conditions with respect to any or all potential bidders (other than the Buyer)***;[21] or (vii) adjourn or cancel the Auction or Sale Hearing in open court without further notice. Notwithstanding the foregoing, the Debtors may not impair or modify the rights and obligations of the Buyer under the Purchase Agreement or the right of the Buyer to credit the Break-Up Fee as part of any subsequent bid for the Acquired Assets.

## Basis for Relief

## I. THE COURT SHOULD APPROVE THE BIDDING PROCEDURES.

### A. The Proposed Notice of Bidding Procedures and Auction Is Appropriate

23. The Debtors seek to sell the Acquired Assets through a well-advertised Sale and Auction. The Debtors have already taken steps to canvass the market and identify the universe of parties that are capable of taking interest in the Acquired Assets and maximizing the value received for such assets. The process by which the Buyer emerged as the stalking horse involved an extensive solicitation process over a period of ten months that initially generated approximately 180 potential buyers. The Debtors hope that the Auction, subject to this Court's approval, should elicit bids from one or more parties and potentially lead to a robust auction of the Acquired Assets, maximizing the value for the Debtors' estates and their creditors.

24. Under Bankruptcy Rule 2002, the Debtors are required to notify creditors of the proposed sale of the Acquired Assets, including a disclosure of the time and place of an auction, the terms and conditions of a sale, and the deadline for filing any objections. The Debtors request notice of the Sale, the Auction, the Sale Hearing, the Cure Amounts and the Bidding

[21] See Local Bankruptcy Rule 6004-1(c)(i)(D).

Procedures, (the "Sale Notice"), substantially in the form attached hereto as **Exhibit E**,[22] be deemed adequate and sufficient if, within five business days of the entry of the Bidding Procedures Order, the Debtors (or their agents) serve by first class mail, postage prepaid, copies of the Sale Notice upon the following entities (collectively, the "Notice Parties"):

(a) all parties entitled to receive notice as of the date hereof pursuant to Bankruptcy Rule 2002(a)(2);

(b) all parties known to the Debtors who have an interest in or rights to the Acquired Assets;

(c) all entities who have recorded in the public record any lien, interest or encumbrance in or upon the Acquired Assets;

(d) all parties to the Debtors' executory contracts, unexpired leases and real property easements (as and when identified) that will be assumed and assigned in connection with the Sale;

(e) the Office of the United States Trustee for the District of Delaware;

(f) applicable federal, state and local governmental authorities or units thereof, including the California Regional Water Quality Control Board;

(g) all taxing authorities having jurisdiction over any of the Acquired Assets, including the Internal Revenue Service;

(h) counsel for the Creditors' Committee;

(i) counsel for the agents for the Debtors' prepetition secured and unsecured lenders;

(j) all persons known or reasonably believed to have expressed an interest in acquiring the Acquired Assets;

(k) counsel for the Buyer; and

[22] The Sale Notice and Publication Notice will direct parties to contact Kirkland & Ellis LLP, counsel to the Debtors, or Deutsche Bank, financial advisors to the Debtors, for more information and will provide that any party that wishes to obtain a copy of any related document (subject to any necessary confidentiality agreement) may make such a request in writing to: (a) Deutsche Bank Securities Inc., 60 Wall Street, 45th Floor, New York, NY 10005, Attn: Peter Bennett (Peter.Bennett@db.com) or (b) Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attn.: Jeffrey W. Gettleman, Esq., Facsimile: (312) 862-2200 (jeffrey.gettleman@kirkland.com).

(l) counsel for the Guarantor.

25. Within five business days of the entry of the Bidding Procedures Order, the Debtors will publish a notice, substantially in the form attached hereto as **Exhibit F** (the "Publication Notice"), in the National Edition of *The Wall Street Journal*, the *Bakersfield Californian* and such other publication(s) as the Debtors and their advisors determine will promote the marketing and sale of the Acquired Assets to other interested parties whose identities are unknown to the Debtors.

26. The Debtors submit that the notice procedures herein comply fully with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Sale, the Bidding Procedures, the Auction, the Cure Amounts and the Sale Hearing to the Debtors' creditors and other parties in interest that are entitled to notice of the Sale, as well as to those parties who have expressed an interest, or may express an interest, in bidding on the Acquired Assets. This is especially true given the extensive pre-filing marketing that occurred over the past year with respect to the Acquired Assets. Based upon the foregoing, the Debtors respectfully request that this Court approve the notice procedures proposed above.

### B. The Bidding Procedures Are Appropriate and Will Maximize the Value Received for the Acquired Assets

27. Bidding procedures should be approved when they provide a benefit to the estate by maximizing the value of the assets. See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 535-537 (3rd Cir. 1999) (detailing situations where bidding incentives are appropriate in bankruptcy because they provide a benefit to the estate); In re Edwards, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate.").

28. The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. See In re Mushroom Transp. Co., Inc., 382 F.3d 325, 339 (3rd Cir. 2004) (debtor-in-possession "had a fiduciary duty to protect and maximize the estate's assets"); Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 573 (3rd Cir. 2003) (same); Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand").

29. To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy sales. See In re O'Brien Envtl. Energy, 181 F.3d at 537; Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets").

30. The proposed Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially-capable bidders who demonstrate the ability to close a transaction. Such a process will increase the likelihood that the Debtors receive the best possible consideration for the Acquired Assets by helping ensure a competitive and fair bidding process. They also allow the Debtors to undertake the auction process in as expeditious a manner as possible, which is essential to maintaining and potentially maximizing value for the estates.

31. The Auction and the proposed Bidding Procedures should promote active bidding from interested parties and thus dispel any doubts as to the highest or best offer reasonably available for the Acquired Assets. The Bidding Procedures are consistent with other procedures

previously approved by this Court and other courts, and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings. See, e.g. In re O'Brien Envtl. Energy, 181 F.3d at 537. See also In re Flying J Inc., Case No. 08-13384 (MFW) (Bankr. D. Del. July 7, 2009) [Docket No. 1460]; In re Nortel Networks Inc., Case No. 09-10138 (KG) (Bankr. D. Del. Feb. 27, 2009) [Docket No. 386]; In re VeraSun Energy Corporation, Case No. 08-12606 (BLS) (Bankr. D. Del. Feb. 19, 2009) [Docket No. 699]; In re PPI Holdings, Inc., Case No. 08-13289 (KG) (Bankr. D. Del. Jan. 15, 2009) [Docket No. 156)]; In re Hines Horticulture, Inc., Case No. 08-11922 (KJC) (Bankr. D. Del. Dec. 9, 2008) [Docket No. 355].

32. Thus, the proposed Bidding Procedures are reasonable, appropriate and within the Debtors' sound business judgment under the circumstances.

**C. The Overbid Increment Is Appropriate**

33. An important component of the Bidding Procedures is the "overbid" provision. Once the Debtors receive bids that they determine to be Qualified Bids (as that term is defined in the Bidding Procedures), and hold the Auction, ***Qualified Bidders must bid in increments of at least $250,000 higher than the previous bid.*** Such an overbid increment is reasonable under the circumstances, and will enable the Debtors to maximize the value for their assets while limiting any chilling effect on the Sale process. The overbid increment is also consistent with such increments previously approved by this Court and in other courts. See In re Flying J Inc., Case No. 08-13384 (MFW) (Bankr. D. Del. July 7, 2009) [Docket No. 1460] (approving $1 million increment); In re Nortel Networks Inc., Case No. 09-10138 (KG) (Bankr. D. Del. Feb. 27, 2009) [Docket No. 386] (approving $500,000 increment); In re Hines Horticulture, Inc., Case No. 08-11922 (KJC) (Bankr. D. Del. Dec. 9, 2008) [Docket No. 355] (approving $500,000 increment); In re Uni-Marts, LLC, Case No. 08-11037 (MFW) (Bankr. D. Del. July 10, 2008) [Docket No.

207] (approving $100,000 increment); Dura Automotive Systems, Inc., No. 06-11202 (KJC) (Bankr. D. Del. July 24, 2007) [Docket No. 1486] (approving $750,000 increment).

### D. The Break-Up Fee is Reasonable and Appropriate

34. Bankruptcy courts have approved bidding incentives, including traditional Break-Up Fees, under the business judgment rule, which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. See, e.g., In re Integrated Res., 147 B.R. at 662 (approving termination fee plus reimbursement of expenses); In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may be "legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking").

35. Further, courts, including the Third Circuit, have emphasized that bidding incentives in general, and break-up fees in particular, are appropriate where necessary to "induc[e] a bid that otherwise would not have been made and without which bidding would have been limited." In re O'Brien Envtl. Energy, 181 F.3d at 537. In O'Brien, the Third Circuit identified nine factors used by lower courts when deciding whether to award a break-up fee:

(a) the presence of self-dealing or manipulation in negotiating the breakup fee;

(b) whether the fee harms, rather than encourages, bidding;

(c) the reasonableness of the break-up fee relative to the purchase price;

(d) whether the unsuccessful bidder placed the estate property in a "sales configuration, mode" to attract other bidders to the auction;

(e) the ability of the request for a break-up fee "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders";

(f) the correlation of the fee to a maximization of value of the debtor's estate;

(g) the support of the principal secured creditors and creditors' committee of the break-up fee;

(h) the benefits of the safeguards to the debtor's estate; and

(i) the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

See id.

36. The Debtors submit that the 2.5% Break-Up Fee is reasonable and necessary under the circumstances. Specifically, the Buyer's expectation of the Break-Up Fee was necessary to induce the Buyer's initial bid and continued willingness to proceed with the Sale. In addition, break-up fees similar to the Break-Up Fee negotiated here have consistently been authorized by courts in this and other districts. See, e.g., In re VeraSun Energy Corp., Case No. 08-12606 (BLS) (Bankr. D. Del. Feb. 19, 2009) [Docket No. 699] (2.8% break-up fee approved); In re Hines Horticulture, Inc., No. 08-11922 (KJC) (Bankr. D. Del. Dec. 16, 2008) [Docket No. 410] (2.5% break-up fee approved); In re Trim Trender Co., LLC, No. 05-56108 (Bankr. E.D. Mich. Oct. 31, 2005) [Docket No. 337] (3% breakup fee); In re Financial News Network, Inc., 931 F.2d 217 (2d Cir. 1991) (2.8% break-up fee allowed); In re Montgomery Ward Holding Co., No. 97-01409 (Bankr. D. Del. Feb. 17, 1998) [Docket No. 1745] (4% breakup fee approved). To induce the Buyer's initial offer and willingness to consummate the Sale, the Debtors, in their business judgment, determined that the Break-Up Fee was necessary and appropriate.

37. Further, the Break-Up Fee was negotiated at arm's length and in good faith. It reflects the Debtors' judgment that an inducement was necessary to secure an adequate floor for the Acquired Assets by insisting that competing bids be materially higher or otherwise better than the Purchase Agreement. This provides undoubted benefits to the Debtors' estates. Moreover, the Buyer would not have agreed to act as a stalking horse without the Break-Up Fee. Given the option between the Buyer and the negotiated Break-Up Fee, and no break-up fee and

no interested buyer, the Debtors determined that the former option clearly would provide the most benefit to their estates.

38. Importantly, and as noted above, the Break-Up Fee is not triggered unless or until the Debtors breach or terminate material terms of the Purchase Agreement or unless a higher and better bid is received and accepted. The Debtors to not intend to terminate the Purchase Agreement, especially if such termination would trigger an obligation to pay the Break-Up Fee. And if the Break-Up Fee is triggered due to receipt and acceptance of a higher and better bid, that merely proves that the Break-Up Fee performed its intended function of both attracting a stalking horse and inducing further interest for and bids on the Acquired Assets.

### E. The Proposed Notice Procedures for the Assigned Contracts and Real Property Easements and the Identification of Related Cure Amounts are Appropriate

39. As part of the Motion, the Debtors also seek authority under Bankruptcy Code sections 105(a) and 365 to assume and assign the Assigned Contracts and the Real Property Easements to the Buyer. The Sale Notice identifies the Assigned Contracts and the Real Property Easements to be assumed and assigned to the Buyer, as well as any related defaults required to be cured in accordance with the Purchase Agreement (the "Cure Amounts"). A copy of the Sale Notice will be served on each of the counterparties to the Assigned Contracts and the Real Property Easements consistent with the notice procedures requested herein, as approved by this Court.

40. The Debtors request that any counterparty to an Assigned Contract that wishes to obtain adequate assurance information regarding any of the bidders that will or may participate at the Auction must notify the Debtors in writing at: (a) Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn: Jeffrey W. Gettleman, e-mail: jeffrey.gettleman@kirkland.com; and Flying J Inc., 1104 Country Hills Drive, Ogden, Utah 84403, Attn: Brett Bailey, e-mail:

brett.bailey@flyingj.com on or before March 9, 2010 at 4:00 p.m. (prevailing Eastern Time) (the "Request for Adequate Assurance"). The Request for Adequate Assurance must include an e-mail address or postal address for overnight courier delivery to which a response to such information request can be sent.

41. If a counterparty to an Assigned Contract timely submits a Request for Adequate Assurance, the Debtors shall serve such party with any non-confidential information relating to adequate assurance received by the Debtors as provided in the Bidding Procedures by e-mail or overnight delivery on or before March 12, 2010. A counterparty to an Assigned Contract that timely submits a Request for Adequate Assurance shall have until **March 16, 2010 at 4:00 p.m. (prevailing Eastern Time)** by which to file an objection to adequate assurance of future performance by any of the bidders. If a counterparty to an Assigned Contract does not timely submit a Request for Adequate Assurance and does not timely object to adequate assurance of future performance by any of the bidders **on or before March 16, 2010 at 4:00 p.m. (prevailing Eastern Time)**, this Court may enter an order forever barring such counterparty to an Assigned Contract from objecting to adequate assurance of future performance.

42. Except as may otherwise be agreed to by the parties to an Assigned Contract, at or prior to the closing of the Sale, the Buyer and the Debtors shall each pay their share, as set forth in the Purchase Agreement, in curing those defaults under the Assigned Contracts that need to be cured in accordance with section 365(b) of the Bankruptcy Code, by (a) payment of the undisputed Cure Amounts or (b) reserving amounts with respect to the disputed Cure Amounts.

## II. APPROVAL OF THE PROPOSED SALE TRANSACTION IS APPROPRIATE AND IN THE BEST INTEREST OF THE ESTATES

43. In accordance with Bankruptcy Rule 6004, sales of property rights outside the ordinary course of business may be by private sale or public auction. The Debtors have determined that the sale of the Acquired Assets, pursuant to the Bidding Procedures and by public auction, should enable them to obtain the highest or best offer for these assets (thereby maximizing the value of their estates) and is in the best interests of their estates and creditors.

44. Despite the fact the Debtors have already conducted an extensive marketing process for the Acquired Assets, an auction process will further test the market for the assets. The Debtors seek to establish a process that will provide the greatest possible recovery for the Debtors' estates as compared to any other available existing alternative. The bases for the relief requested in this Motion are found in a number of provisions of the Bankruptcy Code and Bankruptcy Rules. These bases are discussed in detail below.

### A. The Sale of the Acquired Assets Pursuant to the Purchase Agreements Is Authorized by Section 363 as a Sound Exercise of the Debtors' Business Judgment

45. Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 105(a) of the Bankruptcy Code provides in pertinent part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

46. Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor. See, e.g., Meyers v. Martin (In re Martin), 91 F.3d

389, 395 (3d Cir. 1996); In re Trans World Airlines, Inc., No. 01-00056, 2001 Bankr. LEXIS 980, at *29 (Bankr. D. Del. Apr. 2, 2001); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991).

47. Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was given to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith. See In re Delaware & Hudson Ry., 124 B.R. at 176; In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987); In re United Healthcare Sys., Inc., No. 97-1159, 1997 U.S. Dist. LEXIS 5090, at * 13-14 and n.2 (D.N.J. March 26, 1997). The Delaware & Hudson court further held that:

> [o]nce a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale, the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the purchaser [or proposed purchaser] is proceeding in good faith.

In re Delaware & Hudson Ry., 124 B.R. at 176.

48. A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders. See, e.g., In re Abbotts Dairies of Pa., Inc., 788 F.2d 143 (3rd Cir. 1986); In re Lionel Corp., 722 F.2d 1063 (2nd Cir. 1983). In fact, the paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. See Food Barn, 107 F.3d at 564-65 (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); In re Integrated Res., 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the [Debtor's] duty with

respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting In re Atlanta Packaging Prods., Inc., 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

49. This Court and others uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy sales. See In re Montgomery Ward Holding Corp., Case No. 97-1409 (PJW) (Bankr. D. Del. Aug. 6, 1997); In re Fruehauf Trailer Corp., Case No. 96-01563 (PJW) (Bankr. D. Del. Jan. 31, 1997). See also In re Integrated Res., 147 B.R. at 659 (such procedures "encourage bidding and to maximize the value of the debtor's assets").

50. Furthermore, once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." Creditors' Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." In re Integrated Res., 147 B.R. at 656 (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1). Indeed, when applying the "business judgment" standard, courts show great deference to a debtor's business decisions. See Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.), Case No. 89C593, 1989 WL 106838, at *3 (N.D. Ill. Sept. 8, 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless

shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion").

51. The Debtors submit that the proposed Auction and Sale satisfies the "sound business reason test." The prompt sale of the Acquired Assets and assumption of the Assumed Liabilities presents the best opportunity to maximize the value for the estates in light of the need to preserve the value of the assets and to manage and transition the Acquired Assets to a purchaser. Further, a prompt sale of the Acquired Assets and assumption of the Assumed Liabilities will allow the Debtors to finalize their plan of reorganization, and coupled with the Pilot transaction, will allow the Debtors to exit bankruptcy expeditiously.

52. In addition, the Debtors believe that the Bidding Procedures and Sale Notice are the best method by which they can obtain the best price for the Acquired Assets and provide interested persons with accurate and reasonable notice of the Sale. The Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction, thereby increasing the likelihood that the Debtors will receive the best possible consideration for the Acquired Assets by helping ensure a competitive and fair bidding process. The Bidding Procedures also allow the Debtors to undertake the Auction process in as expeditious a manner as possible, which is essential to maintaining and maximizing the value of their estates.

53. Accordingly, the Debtors request that this Court make a finding at the Sale Hearing that the proposed Sale is a proper exercise of its business judgment and is authorized.

**B. The Sale of the Acquired Assets Free and Clear of Encumbrances and Other <u>Interests Is Authorized By Section 363(f) of the Bankruptcy Code</u>**

54. The Debtors further submit that it is appropriate to sell the Acquired Assets free and clear of Encumbrances (other than Assumed Liabilities and Permitted Encumbrances (as each is defined in the respective Purchase Agreement)) pursuant to section 363(f) of the Bankruptcy Code, with any such Encumbrances attaching to the net proceeds of the Sale, as and to the extent applicable. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

> (a) applicable nonbankruptcy law permits sale of such property free and clear of such interests;
>
> (b) such entity consents;
>
> (c) such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;
>
> (d) such interest is in bona fide dispute; or
>
> (e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

55. This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

56. Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Acquired Assets "free and clear" of liens and interests. <u>In re Dundee Equity Corp.</u>, Case No. 89B10233, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the

conditions of § 363(f) have been met"); Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (same); see also Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

57. One or more of the tests of section 363(f) will be satisfied with respect to the Sale of the Acquired Assets. In particular, at least section 363(f)(2) will be met in connection with the transactions proposed because each of the parties holding liens on the Acquired Assets, if any, will consent, or absent any objection to this Motion, will be deemed to have consented to, the Sale. Any lienholder also will be adequately protected by having their Encumbrances, if any, in each instance against the Debtors or their estates, attach to the cash proceeds of the Sale ultimately attributable to the Acquired Assets in which such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor had prior to the Sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto. Accordingly, section 363(f) authorizes the transfer and conveyance of the Acquired Assets free and clear any such Encumbrances.

### C. The Acquired Assets Should Be Sold Free and Clear of Successor Liability

58. Under the terms of the proposed Purchase Agreement, the Debtors have included a provision whereby the Buyer will assume and agree to pay, perform and discharge as and when they become due and payable, or will be required to perform, all liabilities on or after consummation of the Purchase Agreement. Therefore, except for certain Assumed Liabilities expressly assumed by the Buyer in the Purchase Agreement, ***the Buyer should not be liable for any of the Debtors' liabilities in connection with the sale of the Acquired Assets as a successor***

***to the Debtors' business or otherwise***.[23] Extensive case law exists providing that claims against the winning bidder are directed to the proceeds of a free and clear sale of property and may not be subsequently asserted against a buyer.

59. Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free from successor liability resulting from pre-existing claims. See Trans World Airlines, Inc., 322 F.3d 283, 292-93 (3d Cir. 2003) (affirming bankruptcy court's order approving sale "free and clear" of successor liability claims); MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under section 363(f) of the Bankruptcy Code); Ninth Ave. Remedial Group v. Allis-Chalmers Corp., 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); WBQ P'ship v. Virginia Dept. of Med. Assistance Servs. (In re WBQ P'ship), 189 B.R. 97, 104-05 (Bankr. E.D. Va. 1995); In re Hoffman, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any interest permissible even though the estate had unpaid taxes).

60. Indeed, particularly in recent years, courts have been explicit in taking the position that parties may rely on section 363(f) to transfer assets free and clear of successor liability or transferee liability claims. See In re Chrysler LLC, Case No. 09-50002 (AJG), slip op. at 42-43, (Bankr. S.D.N.Y. May 31, 2009) [Docket No. 3073] (granting sale motion and stating that "claim, including any potential state successor or transferee liability claims against [the debtors] . . . are encompassed by section 363(f) and are therefore extinguished by the Sale

[23] Local Bankruptcy Rule 6004-1(b)(iv)(L).

Transaction”), aff’d, 576 F.3d 108, 127 (2d Cir. 2009); In re General Motors Corp., Case No. 50026 (REG), slip op. at  (Bankr. S.D.N.Y. July 5, 2009) (“[Section] 363(f) may appropriately be invoked to sell free and clear of successor liability claims.”).[24]

61. The purpose of an order purporting to authorize the transfer of assets free and clear of all “interests” would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against the Buyer arising from the Debtors’ pre-sale conduct. Under section 363(f) of the Bankruptcy Code, the Buyer is entitled to know that the Acquired Assets are not infected with latent claims that will be asserted against the Buyer after the proposed transaction is completed.

62. Accordingly, consistent with the above-cited case law, the order approving the sale of the Acquired Assets should state that, except for the Assumed Liabilities expressly assumed by the Buyer, the Buyer is not liable as a successor under any theory of successor liability, for claims that encumber or relate to the Acquired Assets, including, without limitation, any Encumbrances arising under a theory of successor liability.

### D. The Buyer is a Good Faith Purchaser and is Entitled to the Full Protection of Section 363(m) of the Bankruptcy Code, and the Transfer of the Acquired Assets Does Not Violate Section 363(n)

63. Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in

[24] Even courts concluding that Bankruptcy Code section 363(f) does not empower them to convey assets free and clear of claims have nevertheless found that section 105(a) of the Bankruptcy Code provides such authority. See Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (stating that the absence of specific authority to sell assets free and clear of claims poses no impediment to such a sale, as such authority is implicit in the court’s equitable powers when necessary to carry out the provisions of title 11).

> good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). While the Bankruptcy Code does not define "good faith," the Third Circuit in In re Abbotts Dairies of Pa., Inc., held that:

> [t]he requirement that a [buyer] act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [Proposed Buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted).

64. Upon execution, the Purchase Agreement will have been negotiated at arm's length and in good faith. Thus, the Buyer should be entitled to the full protections of section 363(m) of the Bankruptcy Code. A party would have to show fraud or collusion between a purchaser and a debtor in possession or trustee or other bidders in order to demonstrate a lack of good faith. See id.; see also Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269, 276 (2d Cir. 1997) ("Typically, the misconduct that would destroy a [purchaser]'s good faith status at a judicial sale involves fraud, collusion between the [purchaser] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders"); see also In re Angelika Films, 57th, Inc., Case No. 97 Civ. 2239, 1997 WL 283412, at *7 (S.D.N.Y. May 29, 1997); In re Bakalis, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998).

65. The Debtors and the Buyer have engaged in thorough and lengthy arm's-length negotiations over the terms of the Purchase Agreement, and there has been no fraud or collusion in those negotiations. Upon execution of the Purchase Agreement, and under the terms of the Purchase Agreement, the Buyer recognized that the Debtors were free to deal with any other

party interested in acquiring the Acquired Assets. Upon execution of the Purchase Agreement, the Buyer also complied with the provisions in the Bidding Procedures Order and agreed to subject its bid to the competitive bidding procedures set forth in the Bidding Procedures Order. Additionally, all payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sale have been disclosed.

66. In this case, there is no indication of fraud or improper insider dealing of any kind. The Purchase Agreement does not constitute an avoidable transaction pursuant to section 363(n) and the Buyer should receive the protections afforded good faith purchasers by section 363(m). Accordingly, the Debtors request that this Court make a finding at the Sale Hearing that the Purchase Agreement reached with the Buyer was at arm's length and is entitled to the full protections of section 363(m) of Bankruptcy Code.

### E. Assumption and Assignment of the Assigned Contracts Is Authorized by Section 365 of the Bankruptcy Code

(i) *Assumption and Assignment Based on Debtors' Business Judgment*

67. Section 365(a) and (b) of the Bankruptcy Code authorizes debtors in possession to assume executory contracts or unexpired leases subject to the court's approval, and requires such debtors in possession to satisfy certain requirements at the time of assumption. Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing in relevant part that:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default …;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

68. The standard that is applied by the Third Circuit in determining whether an executory contract or unexpired lease should be assumed is the debtor's "business judgment" that the assumption is in its economic best interests. See Sharon Steel Corp. v. National Fuel Gas Distrib. Corp., 872 F.2d 36, 40 (3rd Cir. 1989). See also NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984) (superseded in part by 11 U.S.C. § 1113) (describing business judgment test as "traditional"); In re III Enter., Inc. V, 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) (citations omitted), aff'd, 169 B.R. 551 (E.D. Pa. 1994).

69. It is well-established that a court should approve a debtor's motion to assume or reject an executory contract if the debtor's decision is based on its sound "business judgment." See In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard"); In re Network Access Solutions, 330 B.R. at 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule"); In re Decora Industries, Inc., No. 00-4459(JJF), 2002 WL 32332749, at *8 (D. Del. May 20, 2002); Phar Mor, Inc. v.

Strouss Bldg. Assocs., 204 B.R. 948, 952 (N.D. Ohio 1997) ("Courts should generally defer to a debtor's decision whether to reject an executory contract.") (citation omitted).[25]

70. To determine if the business judgment test is met, the court "is required to examine whether a reasonable business person would make a similar decision under similar circumstances." In re Exide Techs., 340 B.R. at 239 ("This is not a difficult standard to satisfy and requires only a showing that rejection will benefit the estate"). Specifically, a court should find that the Debtor acted prudently, "on an informed basis, in good faith, and with the honest belief that the assumption" is in the best interests of the debtor and the estate. Network Access Solutions, 330 B.R. at 75. Under this standard, a court should approve a debtor's business decision unless that decision is the product of bad faith or a gross abuse of discretion. See Computer Sales Int'l, Inc. v. Federal Mogul (In re Federal Mogul Global, Inc.), 293 B.R. 124, 126 (D. Del. 2003); Lubrizol Enters. v. Richmond Metal Finishers, 756 F.2d 1043, 1047 (4th Cir. 1985).

71. In the present case, the Debtors' assumption and assignment of the Assigned Contracts to the Buyer meets the business judgment standard and satisfies the requirements of section 365 of the Bankruptcy Code. As discussed above, the transactions contemplated by the Purchase Agreement will provide significant benefits to the Debtors' estates. The Assigned Contracts are necessary for the Buyer to conduct the business, and, since the Buyer would not purchase the Acquired Assets without them, the assumption and assignment of the Assigned Contracts is essential to inducing the highest or best offer for the Acquired Assets. Further,

---

[25] Further, "[n]othing in the Code suggests that the debtor may not modify its contracts when all parties to the contract consent." In re Network Access Solutions, Corp., 330 B.R. at 74 (citation omitted). While "[s]ection 363 of the Bankruptcy Code allows a debtor to … modify contracts … [t]o the extent they are outside the ordinary course of business, court approval is necessary." Id. Regardless, "[t]here is … no discernable difference in the notice requirements or standard for approval under section 363 and 365." Id.

pursuant to the terms of the proposed Purchase Agreement, the Buyer will pay all cure costs up to a limit of the sum of $500,000 and all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code. Because the Debtors cannot otherwise obtain the benefits of the Purchase Agreement, and such cure payments are expected to be borne by the Buyer in accordance with the terms of the Purchase Agreement, the assumption of the Assigned Contracts is a sound exercise of the Debtors' business judgment. Finally, upon consummation of the Sale, the Debtors will no longer continue to operate the business and will have no use for any contracts and leases utilized in that business. Indeed, the Debtors already have ceased operations at the Bakersfield Refinery for all intents and purposes. Accordingly, to the extent that the Debtors can sell any related executory contracts and unexpired leases to a third party in connection with the sale of the Acquired Assets, they will generate cash to satisfy claims against the Debtors' estates.

(ii) *Adequate Assurance of Future Performance Provided Under the Purchase Agreement*

72. It is necessary to establish an orderly and fair process by which the Debtors and the counterparties to the Assigned Contracts can establish the cure obligations, if any, necessary to be paid under section 365 of the Bankruptcy Code, and by which contract counterparties can request additional information regarding adequate assurance of future payment.

73. A debtor in possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a), and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement. See 11 U.S.C. § 365(f)(2). Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., In re Bygaph, Inc., 596, 605-606 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when

the prospective assignee of lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

74. The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." EBG Midtown South Corp. v. McLaren/Hart Envtl. Engineering Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), aff'd, 993 F.2d 300 (2d Cir. 1993); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

75. Pursuant to the Bidding Procedures, the Debtors will require potential bidders to provide evidence constituting adequate assurance of future performance to be provided to counterparties to Assigned Contracts upon their request. Specifically, Section 3 of the Bidding Procedures requires each Potential Bidder to provide documentation that:

> evidences the bidder's financial wherewithal and operational ability to consummate the transaction proposed by its bid, including, without limitation, such financial and other information setting forth adequate assurance of future performance under section 365 of the Bankruptcy Code in a form requested by the Debtors to allow the Debtors to serve within one business day after such receipt of such information on counter-parties to any contracts or leases being assigned in connection with the proposed sale that have requested, in writing, such information.

See Bidding Procedures § 3.

(iii) *Assignment Permitted, Notwithstanding Anti-Assignment Provisions*

76. To assist in the assumption, assignment and sale of the Assigned Contracts and the Acquired Assets, the Debtors also request that the Court enter an order providing that anti-assignment provisions therein under applicable law shall not restrict, limit or prohibit the assumption, assignment and sale of the Assigned Contracts or other Assigned Assets and are

deemed and found to be unenforceable anti-assignment provisions under sections 105(a) or 365(f) of the Bankruptcy Code.

77. Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign unexpired leases and contracts free from such anti-assignment restrictions:

> [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

11 U.S.C. § 365(f)(l).

78. Section 365(f)(l), by operation of law, invalidates provisions or applicable law that prohibit, restrict, or condition assignment of an executory contract or unexpired lease. See, e.g., Coleman Oil Co., Inc. v. Circle K Corp. (In re Circle K Corp.), 127 F.3d 904, 910-11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365"), cert. denied, 522 U.S. 1148 (1998). Section 365(f)(3) goes beyond the scope of section 365(f)(1) by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof. See, e.g., In re Jamesway Corp., 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (section 365(f)(3) prohibits enforcement of any lease clause creating a right to terminate a lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

79. Other courts have recognized that provisions that have the effect of restricting assignments cannot be enforced. See In re Rickel Home Centers, Inc., 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 356(f) [sic], courts and commentators alike have construed

the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions."). Similarly, in In re Mr. Grocer, Inc., the court noted that:

> [the] case law interpreting § 365(f)(l) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves ipso facto anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

77 B.R. 349, 354 (Bankr. D.N.H. 1987).

80. Thus, the Debtors request that any anti-assignment provisions or applicable law be deemed not to restrict, limit or prohibit the assumption, assignment and sale of the Assigned Contracts and Real Property Easements and other Acquired Assets and be deemed and found to be unenforceable anti-assignment provisions under the Bankruptcy Code pursuant to sections 105(a) and 365(f) of the Bankruptcy Code.

### F. The Debtors Will Retain or Have Reasonable Access to Their Business Records to Administer Their Chapter 11 Cases.

81. Pursuant to section 7.6 of the Purchase Agreement:

> After the Closing Date, Buyer shall provide to Seller, its Affiliates and its and their Related Persons (after reasonable notice and during normal business hours at the expense of Seller, its Affiliates and its and their Related Persons) access to all Business Records of the Business or the Acquired Assets and Assumed Liabilities for periods prior to the Closing and shall preserve, subject to the terms of the Confidentiality Agreement, such Business Records until the later of (a) six (6) years after the Closing Date and (b) the required retention period for all Government contact information, records or documents. Such access includes access to any information in electronic or digital form to the extent reasonably available. Buyer acknowledges that Seller has the right to retain originals or copies of Business Records for periods prior to the Closing. With respect to any litigation and claims that are Excluded Liabilities, Buyer shall render all reasonable assistance that Seller may request in

> defending such litigation or claim at Seller's expense, including making available to Seller, its counsel and its agents, advisors or representatives, Buyer's personnel most knowledgeable about the matter in question. If, after the Closing, Buyer (or any Affiliate or creditor of Buyer) receives any payment or revenue that belongs to Seller pursuant to this Agreement or any Ancillary Agreement, Buyer shall promptly remit or cause to be remitted the same to Seller without set-off or deduction of any kind or nature.

See Purchase Agreement § 7.6.

***82. As such, the Debtors will have adequate access to their books and records for purposes of administering their estates, and the estates of BWOC in particular.***[26]

## III. RELIEF UNDER BANKRUPTCY RULES 6004(H) AND 6006(D) IS APPROPRIATE.

83. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d). ***The Debtors request that any order approving the Purchase Agreement and the assumption and assignment of the Assigned Contracts be effective immediately by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived***.[27]

84. The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory

---

[26] See Local Bankruptcy Rule 6004-1(b)(iv)(J).

[27] See Local Bankruptcy Rule 6004-1(b)(iv)(O).

Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, the leading treatise on bankruptcy suggests that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy ¶ 6004.10 (15th rev. ed. 2006). Furthermore, Collier's suggests that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

85. To maximize the value received for the Acquired Assets, the Debtors seek to close the Sale as soon as possible after the Sale Hearing. Absent an expedient hearing on, approval and closing of the Sale, the Debtors will continue to incur extensive costs associated with preserving the refinery. Indeed, the Debtors estimate they spend approximately $3 million every month merely to maintain the refinery's "cold idle" status, a clear negative impact on the overall liquidity of the Debtors' estates. Accordingly, the Debtors hereby request that the Court waive the 14-day stay period under Bankruptcy Rules 6004(h) and 6006(d) or, in the alternative, if an objection to the sale is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal.

**The Debtors' Reservation of Rights**

86. Nothing contained herein is intended or should be construed as an admission of the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract or lease under section 365 of the Bankruptcy Code (other than as specified herein). The Debtors expressly reserve their rights to contest any assertion, objection or pleading adverse to this Motion or the relief requested herein in accordance with applicable non-bankruptcy law.

## Notice

87. The Debtors have provided notice of this Motion by electronic mail, facsimile or overnight mail to: (a) all parties entitled to receive notice as of the date hereof pursuant to Bankruptcy Rule 2002(a)(2); (b) all persons known or reasonably believed to have expressed an interest in acquiring the Acquired Assets; (c) the Office of the United States Trustee for the District of Delaware; (d) counsel for the Creditors' Committee; (e) counsel for the agents for the Debtors' prepetition and postpetition secured and unsecured lenders; (f) counsel for the Buyer; (g) counsel for the Guarantor; (h) the California Regional Water Quality Control Board; (i) the United States Environmental Protection Agency; (j) Equilon Enterprises LLC (d/b/a Shell Oil Products US) and Motiva Enterprises LLC; (k) California Environmental Protection Agency; (l) California State Treasury Department; (m) United States Internal Revenue Service; (n) the San Joaquin Valley Air Pollution Control District; (o) California State Board of Equalization; and (p) all persons known or reasonably believed to have expressed an interest in acquiring the Acquired Assets. In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

## No Prior Request

88. No prior motion for the relief requested herein has been made to this or any other court.

*[The Remainder of This Page Is Intentionally Left Blank]*

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that this Court enter orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, granting the relief requested herein and granting such other and further relief as the Court deems appropriate.

Dated: February 2, 2010
Wilmington, Delaware

**YOUNG CONAWAY**
**STARGATT & TAYLOR, LLP**

*/s/ Donald J. Bowman Jr.*
Pauline K. Morgan (Bar No. 3650)
Edmon L. Morton (Bar No. 3865)
Donald J. Bowman, Jr. (Bar No. 4383)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6637
Facsimile: (302) 576-3320

- and -

**KIRKLAND & ELLIS LLP**
David L. Eaton (admitted *pro hac vice*)
Adam C. Paul (admitted *pro hac vice*)
Jeffrey W. Gettleman (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 861-2000
Facsimile: (312) 861-2200
Counsel for the Debtors and Debtors in Possession