# <u>EXHIBIT C</u>

## Asset Purchase Agreement

# ASSET PURCHASE AGREEMENT

By and Between

BIG WEST OF CALIFORNIA, LLC,

AS SELLER,

PARAMOUNT PETROLEUM CORPORATION,

AS BUYER,

And

ALON USA ENERGY, INC.,

AS GUARANTOR

Dated as of February 2, 2010

## TABLE OF CONTENTS


Page

ARTICLE 1 PURCHASE AND SALE OF THE ACQUIRED ASSETS .......... 2
1.1. Transfer of Acquired Assets .......... 2
1.2. Excluded Assets .......... 2
1.3. Assumption of Liabilities .......... 2
1.4. Excluded Liabilities .......... 3
1.5. Delayed Conveyance of Certain Property .......... 4

ARTICLE 2 CONSIDERATION .......... 6
2.1. Consideration .......... 6
2.2. Deposit .......... 6

ARTICLE 3 CLOSING AND DELIVERIES .......... 6
3.1. Closing .......... 6
3.2. Seller's Deliveries .......... 6
3.3. Buyer's Deliveries .......... 9
3.4. Hydrocarbon Inventory .......... 10

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF SELLER .......... 12
4.1. Corporate Organization .......... 12
4.2. Authorization and Validity .......... 12
4.3. No Conflict or Violation .......... 13
4.4. Consents and Approvals .......... 13
4.5. Compliance with Law .......... 13
4.6. Litigation .......... 13
4.7. Material Contracts .......... 14
4.8. Permits .......... 15
4.9. Environmental Matters .......... 16
4.10. [Intentionally Omitted.] .......... 17
4.11. Owned Real Property .......... 17
4.12. Real Property Leases and Licenses .......... 17
4.13. Real Property Easements .......... 17
4.14. Mineral Rights .......... 17
4.15. Pipelines .......... 17

4.16. Title to Assets; Sufficiency ..... 18
4.17. Business Records ..... 18
4.18. Intellectual Property ..... 18
4.19. Employees ..... 18
4.20. Taxes ..... 19
4.21. Liens ..... 19

**ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF BUYER ..... 19**

5.1. Corporate Organization ..... 19
5.2. Authorization and Validity ..... 19
5.3. No Conflict or Violation ..... 20
5.4. Consents, Approvals and Notifications ..... 20
5.5. Litigation ..... 20

**ARTICLE 6 COVENANTS OF SELLER ..... 20**

6.1. Conduct of Business Before the Closing Date ..... 20
6.2. Obligations of Seller after Entry of Sale Order ..... 21
6.3. Access to Properties and Records; Confidentiality ..... 21
6.4. Rejection of Assigned Contracts ..... 22
6.5. Provision of Data; Transfer of Software ..... 22
6.6. Further Assurances ..... 23
6.7. Seller's Obligation to Perform ..... 23
6.8. Title Insurance and Surveys ..... 23
6.9. Casualty/Condemnation or Taking ..... 23
6.10. Certain Outstanding Purchase Orders ..... 24
6.11. Cure of Defaults ..... 24
6.12. Removal of Assigned Contracts ..... 24

**ARTICLE 7 COVENANTS OF BUYER ..... 25**

7.1. Actions Before Closing Date ..... 25
7.2. Consents; Shell Agreements ..... 25
7.3. Adequate Assurances ..... 26
7.4. Cure of Defaults ..... 26
7.5. [Intentionally Omitted.] ..... 27
7.6. Availability of Business Records ..... 27
7.7. Flying J Marks ..... 28

7.8. Buyer Obligation to Perform; Cooperation with Seller Enforcement of Rights. 28
7.9. Third Party Real Property 28
7.10. Buyer's Assumption of Environmental Obligations 29
7.11. Further Assurances 29

**ARTICLE 8 BANKRUPTCY PROCEDURES** 29
8.1. Bankruptcy Actions 29
8.2. Bidding Procedures 29
8.3. Approval 30

**ARTICLE 9 EMPLOYEE AND BENEFITS MATTERS** 30
9.1. Offers of Employment 30
9.2. Transferred Employees 30
9.3. 401(k) Plan Rollover 31
9.4. Employee Benefit Plans 31
9.5. WARN Act Obligations 31
9.6. Welfare Benefits Claims 31
9.7. COBRA Obligations 32
9.8. No Assumption of Certain Liabilities 32
9.9. No Third Party Beneficiaries 32

**ARTICLE 10 REGULATORY MATTERS** 32
10.1. Antitrust And Other Filings and Notices 32
10.2. Cooperation; Confidentiality Agreement 33
10.3. Objections or Other Challenges 33
10.4. Environmental Authorizations 34

**ARTICLE 11 TAXES AND FEES** 34
11.1. Taxes Related to Purchase of Assets 34
11.2. Cooperation on Tax Matters 35
11.3. Allocation of Purchase Price and Purchase Price Allocation Forms 35
11.4. Prorations 35
11.5. Unbilled Transactional Taxes 37

**ARTICLE 12 CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES** 37
12.1. Conditions Precedent to Performance by Seller and Buyer 37
12.2. Conditions Precedent to Performance by Seller 37

12.3. Conditions Precedent to the Performance by Buyer ..... 38
12.4. Frustration of Conditions ..... 39

**ARTICLE 13 TERMINATION AND EFFECT OF TERMINATION** ..... 39

13.1. Right of Termination ..... 39
13.2. Termination Without Default ..... 39
13.3. Effect of Failure of Seller's Conditions to Closing ..... 41
13.4. Effect of Failure of Buyer's Conditions to Closing ..... 42
13.5. Termination on Alternative Transaction ..... 42

**ARTICLE 14 INDEMNIFICATION** ..... 44

14.1. Indemnification ..... 44
14.2. Limitations ..... 44
14.3. Expiration of Claims ..... 44
14.4. Procedures Relating to Indemnification ..... 45
14.5. Determination of Loss Amount ..... 46
14.6. Release of Indemnity Escrow Funds ..... 47
14.7. Exclusive Remedy ..... 48

**ARTICLE 15 ADDITIONAL AGREEMENTS** ..... 48

15.1. Litigation Support ..... 48
15.2. Cancellation of Accounts from Seller ..... 48
15.3. Insurance Matters ..... 49

**ARTICLE 16 MISCELLANEOUS** ..... 49

16.1. Successors and Assigns ..... 49
16.2. GOVERNING LAW; JURISDICTION ..... 50
16.3. Mutual Disclosures ..... 50
16.4. Disclosure Schedules; Disclosure Schedule Supplements ..... 50
16.5. Warranties Exclusive ..... 51
16.6. Survival of Representations and Warranties ..... 52
16.7. No Recourse Against Affiliates or Related Persons ..... 52
16.8. Mutual Drafting ..... 53
16.9. Expenses ..... 53
16.10. Severability ..... 54
16.11. Notices ..... 54
16.12. Amendments; Waivers ..... 55

16.13. Public Announcements .................... 55
16.14. Entire Agreement .................... 55
16.15. Parties in Interest .................... 55
16.16. Guarantor .................... 56
16.17. DAMAGES .................... 57
16.18. WAIVER OF JURY TRIAL .................... 57
16.19. Specific Performance; Limitations on Liability .................... 57
16.20. Headings .................... 58
16.21. Construction .................... 58
16.22. Currency .................... 58
16.23. Time of Essence .................... 58
16.24. Counterparts .................... 58

**ARTICLE 17 DEFINITIONS** .................... 58

17.1. Certain Terms Defined .................... 58
17.2. Cross-Referenced .................... 73

## EXHIBITS


Exhibit A-1 .......... Form of Access Agreement
Exhibit A-2 .......... Form of License Transfer Agreement
Exhibit A-3 .......... Form of Shell Purchase Agreement and Shell Environmental Agreement Assignment and Assumption Agreement
Exhibit B-1 .......... Form of Bill of Sale
Exhibit B-2 .......... Form of Assigned Contract/Assumed Liability Assignment and Assumption Agreement
Exhibit B-3 .......... Form of Real Property Easement Assignment and Assumption Agreement
Exhibit B-4 .......... Form of Real Property Lease Assignment and Assumption Agreement
Exhibit B-5 .......... Form of Real Property License Assignment and Assumption Agreement
Exhibit B-6 .......... Form of Easement Grant
Exhibit B-7 .......... Form of Deed
Exhibit B-8 .......... Form of Seller's Secretary's Certificate
Exhibit B-9 .......... Form of Non-Foreign Status Certificate
Exhibit B-10 .......... Form of Buyer's Secretary's Certificate
Exhibit B-11 .......... Form of Buyer's Bring Down Certificate
Exhibit B-12 .......... Form of Seller's Bring Down Certificate
Exhibit C-1 .......... Hydrocarbon Inventory Measurement Procedures
Exhibit C-2 .......... Hydrocarbon Inventory Valuation Procedures
Exhibit D .......... Form of Bidding Procedures Order
Exhibit E .......... Form of Sale Order
Exhibit F .......... Indemnity Escrow Agreement

## DISCLOSURE SCHEDULES


| | |
|---|---|
| Schedule 1.3 | Consignment Liabilities and Obligations |
| Schedule 1.4 | Other Excluded Liabilities |
| Schedule 4.4 | Consents and Approvals |
| Schedule 4.5 | Compliance with Law |
| Schedule 4.6 | Litigation |
| Schedule 4.7 | Material Contracts |
| Schedule 4.8 | Permits; Permit Exceptions |
| Schedule 4.9 | Environmental Matters |
| Schedule 4.11 | Owned Real Property |
| Schedule 4.11(I) | Exceptions to Title to Owned Real Property |
| Schedule 4.12 | Real Property Leases and Licenses |
| Schedule 4.13 | Real Property Easements |
| Schedule 4.14 | Mineral Rights Contracts |
| Schedule 4.15 | Pipeline Rights |
| Schedule 4.16 | Exceptions to Title to Assets and Sufficiency |
| Schedule 4.18 | Intellectual Property |
| Schedule 4.19 | Employment Matters |
| Schedule 4.20 | Taxes |
| Schedule 6.1 | Other Permitted Conduct |
| Schedule 7.4(b) | Outstanding Purchase Orders |
| Schedule 7.9 | Third Party Tangible Personal Property |
| Schedule 10.4 | Environmental Authorizations |
| Schedule 17.1A | Other Assigned Contracts |
| Schedule 17.1B | Big West Marks |
| Schedule 17.1C | Customer Contracts |
| Schedule 17.1E1 | Equipment |
| Schedule 17.1E2 | Excluded Mineral Rights |
| Schedule 17.1E3 | Other Excluded Rights |
| Schedule 17.1E4 | Other Excluded Assets |
| Schedule 17.1E5 | Excluded ERCs |
| Schedule 17.1E6 | Excluded Real Property |
| Schedule 17.1E7 | ERCs |
| Schedule 17.1F | Flying J Marks |

| | |
|---|---|
| Schedule 17.1R1 | Retained Equipment |
| Schedule 17.1R2 | Retained Litigation |
| Schedule 17.1S | Supplier Contracts |
| Schedule 17.1T1 | Terminal Assets |
| Schedule 17.1T2 | Transferred Permits |

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "***Agreement***"), dated as of February 2, 2010, is made by and between Big West of California, LLC, a Utah limited liability company ("***Seller***"), Paramount Petroleum Corporation, a Delaware corporation ("***Buyer***"), and, solely with respect to Section 16.16, Alon USA Energy, Inc., a Delaware corporation ("***Guarantor***"). Buyer and Seller are sometimes referred to in this Agreement, individually as a "***Party***" and collectively as the "***Parties***". Capitalized terms used in this Agreement are defined or cross-referenced in Article 17.

## BACKGROUND INFORMATION

WHEREAS, Seller is a Subsidiary of Flying J Inc., a Utah corporation ("***Flying J***");

WHEREAS, on December 22, 2008, Flying J and certain of its Affiliates, including Seller, filed voluntary petitions for relief under the Bankruptcy Code in the Bankruptcy Court;

WHEREAS, on the terms and subject to the conditions set forth in this Agreement, Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, all of Seller's right, title and interest in and to the Acquired Assets, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, Sections 105, 363, and 365 of the Bankruptcy Code;

WHEREAS, on the terms and subject to the conditions set forth in this Agreement, Buyer also desires to assume, and Seller desires to assign and transfer to Buyer, the Assumed Liabilities;

WHEREAS, Seller's sole member has approved this Agreement and the transactions contemplated hereby (including the purchase and sale of the Acquired Assets and the assumption by Buyer of the Assumed Liabilities) upon the terms and conditions set forth in this Agreement and in accordance with the Utah Revised Limited Liability Company Act;

WHEREAS, the board of directors of Buyer has approved this Agreement and the transactions contemplated hereby (including the purchase and sale of the Acquired Assets and the assumption by Buyer of the Assumed Liabilities) upon the terms and conditions set forth in this Agreement and in accordance with the Delaware General Corporation Law; and

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and undertakings herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, Seller and Buyer hereby agree as follows:

## ARTICLE 1
## PURCHASE AND SALE OF THE ACQUIRED ASSETS

1.1. Transfer of Acquired Assets. At, and effective as of, the Closing, and upon the terms and conditions set forth in this Agreement, Seller shall sell, assign, transfer and convey to Buyer, and Buyer shall purchase and accept from Seller, all of Seller's right, title and interest in, to and under all the Acquired Assets.

1.2. Excluded Assets.

(a) Notwithstanding anything to the contrary in this Agreement (including Section 1.1), the Acquired Assets do not include any right, property or interest in, the Excluded Assets, except as provided in the Ancillary Agreements.

(b) If any Excluded Assets remain located on the Real Property after the Closing Date, Buyer and Seller will enter into an access agreement substantially in the form of Exhibit A-1 hereto (the "***Access Agreement***") at or prior to the Closing to permit Seller, its Affiliates and their representatives reasonable access to such Excluded Assets or make any other appropriate arrangements with respect thereto.

1.3. Assumption of Liabilities. At, and effective as of, the Closing, Seller shall assign, transfer, and convey to Buyer, and Buyer shall irrevocably assume and agree to faithfully pay, perform, discharge and fulfill, and if applicable, comply with, the Assumed Liabilities in accordance with their respective terms. For purposes of this Agreement, "***Assumed Liabilities***" shall not include the Excluded Liabilities and mean only the following obligations of Seller and no other:

(a) all liabilities and obligations related to events or conditions arising after the Closing Date under the Transferred Permits and the Assigned Contracts (in each case, to the extent such Transferred Permit or Assigned Contract is transferred or assigned to Buyer pursuant to the Sale Order) and all Buyer Cure Cost Obligations required to be paid pursuant to Section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts, subject to the cap on such obligations set forth in the definition of Buyer Cure Cost Obligations;

(b) all liabilities and obligations related to events or conditions arising after the Closing Date to the extent related to or arising from the Acquired Assets or the Business with respect to any environmental, health or safety matter, including any liability or obligation arising under any Environmental Law;

(c) all liabilities and obligations, with respect to (i) any environmental investigation or Remedial Action related to or arising from the existence of Hazardous Materials in or on structures, soil, sediments, surface water or groundwater at, on, under, or directly emanating from the Acquired Assets, (ii) the Cleanup and Abatement Order, (iii) the Shell/Motiva EPA Consent Decrees, (iv) the site conditions identified in the RMT Environmental Report, and (v) the Shell Purchase Agreement and Shell Environmental Agreement (it being understood that the Assumed Liabilities shall not include any obligations for (y) third party (including employee) claims (other than claims

by any Government requiring or relating to Remedial Actions, subject to subclause (z) below) or (z) fines or penalties relating to Hazardous Materials or Environmental Laws (including with respect to the Cleanup and Abatement Order and the Shell/Motiva EPA Consent Decrees), related to any conditions, actions or omissions occurring or arising prior to the Closing Date, each of which shall constitute Excluded Liabilities);

(d) all liabilities and obligations for (i) Transaction Taxes payable in connection with the transactions contemplated by this Agreement (ii) real estate Taxes and assessments that are not yet due and payable, and (ii) Taxes relating to the Acquired Assets for periods on and after the Closing Date, in each case in accordance with and only to the extent set forth in Article 11;

(e) all liabilities and obligations to be assumed by Buyer pursuant to Article 9;

(f) all liabilities and obligations for consignment of materials or goods of third parties set forth on Schedule 1.3(f);

(g) all liabilities and obligations assumed by or agreed to be performed by Buyer or any of its Affiliates pursuant to this Agreement or any Ancillary Agreement; and

(h) all liabilities and obligations arising after the Closing Date to the extent relating to or arising from the operation of the Business or the ownership of the Acquired Assets after the Closing Date.

Other than the Assumed Liabilities, the sale of the Acquired Assets shall be free and clear of any and all Liens to the extent provided by the Bankruptcy Code (including Section 105 and 363(f) thereof) or by order of the Bankruptcy Court.

1.4. Excluded Liabilities. Notwithstanding anything to the contrary contained in this Agreement, the Ancillary Agreements or any other agreement, other than the Assumed Liabilities, Buyer shall not assume or be liable with respect to any other Obligation of Seller or any Related Person, whether presently in existence or arising hereafter, including, without limitation, priority and administrative claims or expenses allowed in the Chapter 11 Case or any professional fees (such other liabilities and obligations, the "***Excluded Liabilities***"). Seller and its Related Persons, as applicable, shall retain and shall remain solely responsible and liable for all Excluded Liabilities, including: (a) all liabilities and obligations of Seller with respect to intercompany accounts payable, notes or other liabilities or obligations owing from Seller to any Affiliates of Seller; (b) all liabilities and obligations arising in connection with Excluded Assets; (c) all liabilities and obligations that Seller has agreed to pay or perform pursuant to this Agreement or any Ancillary Agreement; (d) all liabilities and obligations of Seller in respect of indebtedness for borrowed money; (e) all Taxes, including penalties and interest thereon related to or imposed upon the Business, the Acquired Assets or the Excluded Assets prior to the Closing Date; (f) all payables and liabilities arising prior to the Closing Date, including Seller's portion of any prorated Taxes, fees and expenses in accordance with Article 11; (g) the Retained Litigation; (h) all liabilities and obligations arising prior to the Closing Date to the extent relating to or arising from the operation of the Business or the ownership of the Acquired Assets prior to

the Closing, including all liabilities and obligations with respect to Environmental Laws other than those environmental obligations assumed by Buyer in Section 1.3(c); (i) all liabilities and obligations arising under or relating to any Employee Benefit Plan; (j) the Seller Cure Cost Obligations and (k) those liabilities and obligations of Seller listed on Schedule 1.4.

1.5. Delayed Conveyance of Certain Property.

(a) Notwithstanding anything in this Agreement to the contrary, Seller shall not be obligated to assign, transfer, or convey (or cause to be assigned, transferred, or conveyed) to Buyer any Delayed Acquired Asset or Delayed Assumed Liability until such time as all Legal Impediments are removed and/or all Consents necessary for the legal transfer and/or assumption thereof are obtained or delivered in respect of such Delayed Acquired Asset or Delayed Assumed Liability, as applicable. Each of the Parties agrees that the Delayed Acquired Assets shall be assigned, transferred, and conveyed, and any Delayed Acquired Liabilities shall be assumed, in accordance with the provisions of this Section 1.5; provided that, for all purposes of this Section 1.5, if the Bankruptcy Code (including Section 365 thereof) permits the assignment, transfer or conveyance without any other removal of any Legal Impediment or the obtaining or delivering of any such Consent, then the Parties shall take whatever action is necessary under the Bankruptcy Code to cause the assignment, transfer and conveyance of such Delayed Acquired Asset or Delayed Assumed Liability as of the Closing Date without such separate removal of any such Legal Impediment or such separate obtaining or delivering of any such Consent, and such asset or liability, as the case may be, shall be transferred on the Closing Date and without regard to the other provisions of this Section 1.5. Following such assignment, transfer, and conveyance of any Delayed Acquired Asset, or the assumption of any Delayed Assumed Liability, the applicable Delayed Acquired Asset or Delayed Assumed Liability shall be treated for all purposes of this Agreement as an "Acquired Asset" or as an "Assumed Liability," as the case may be, and for all purposes hereof, unless otherwise waived in writing by Seller, "Acquired Assets" shall not include any Delayed Acquired Asset and "Assumed Liabilities" shall not include any "Delayed Assumed Liability" until the Legal Impediments are removed and/or all Consents necessary for the legal transfer and/or assumption thereof are obtained or delivered in respect of such Delayed Acquired Asset or Delayed Assumed Liability.

(b) To the extent permitted by Law and to the extent otherwise permissible in light of any Legal Impediment or required Consent, if the transfer, assignment or conveyance or assumption of any Delayed Acquired Asset or any Delayed Assumed Liability intended to be transferred, assigned or assumed hereunder is not consummated prior to or on the Closing Date, then Seller shall thereafter hold such Delayed Acquired Asset or such Delayed Assumed Liability for the use and benefit, to the extent it may lawfully do so, of Buyer (at the expense of Buyer). In addition, to the extent permitted by Law and to the extent otherwise permissible in light of any Legal Impediment or required Consent, Seller shall take such other actions in order to place Buyer, to the extent it may lawfully do so, in the same position as if such Delayed Acquired Asset or such Delayed Assumed Liability had been transferred, assigned or conveyed or assumed as contemplated hereby and so that all the benefits and burdens relating to such Delayed

Acquired Asset or such Delayed Assumed Liability, including possession, use, risk of loss, potential for gain, and dominion, control and command over such asset, are to inure from, and after the Closing Date to Buyer. To the extent permitted by law and to the extent otherwise permissible in light of any Legal Impediment or required Consent, Buyer shall be entitled to, and shall be responsible for, the management and the benefits and burdens of any Delayed Acquired Asset or any Delayed Assumed Liability not yet transferred to or assumed by it as a result of this Section 1.5, and, subject to the other provisions of this Agreement, the Parties agree to use commercially reasonable best efforts to cooperate and coordinate with respect to obtaining any Consent or removing any Legal Impediment, including by providing any financial information and pro forma financial information of the relevant Party and its Affiliates reasonably required by the Party from whom a Consent is sought to be obtained or from whom a Legal Impediment is sought to be removed. Each of the Parties agrees that, until a Delayed Assumed Liability is assumed by Buyer, Buyer shall indemnify and hold harmless Seller from such Delayed Assumed Liability. Nothing herein shall require Seller or its Related Persons to expend any money or commence any litigation to obtain the removal of any Legal Impediment or obtain any required Consent.

(c) If and when the Legal Impediments and the Consents, the failure to remove or the absence of which caused the deferral of the transfer or assumption of any Acquired Asset or Assumed Liability pursuant to Section 1.5(a), are removed or obtained, as the case may be, the transfer and assumption of the applicable Acquired Asset or Assumed Liability shall be promptly effected in accordance with the terms of this Agreement and/or any other applicable Ancillary Agreements, without the payment of additional consideration.

(d) In connection with Seller's retention of an Acquired Asset or Assumed Liability due to the deferral of the transfer or assumption of such Acquired Asset or Assumed Liability pursuant to this Section 1.5, none of Seller or its Related Persons shall be obligated to expend any money, unless the necessary funds are advanced by Buyer.

(e) In the event that at any time or from time to time, any Person shall receive or otherwise possess any asset that is acquired by, or retained by, any other Person pursuant to this Agreement, such Party shall promptly transfer, or cause to be transferred, such asset to the Person so entitled thereto. Prior to any such transfer, the Person receiving or possessing such asset shall hold such asset in trust for any such other Person.

## ARTICLE 2
## CONSIDERATION

2.1. Consideration. The aggregate consideration for the sale and transfer of the Acquired Assets is (i) the Base Purchase Price, which is payable and deliverable at the Closing in accordance with Section 3.3 plus (ii) the Hydrocarbon Inventory Deposit, which is payable and deliverable at the Closing in accordance with Section 3.3 and is subject to adjustment in accordance with Section 3.4 plus (iii) the assumption by Buyer at the Closing of the Assumed Liabilities.

2.2. Deposit. On the date hereof, Buyer and Seller have executed and delivered a purchase notice pursuant to the Master Escrow Agreement, and within two Business Days of the date hereof, Buyer will deposit with the Escrow Agent an amount equal to $2,000,000.00 in immediately available funds (the "***Initial Deposit***"). Buyer shall deposit with the Escrow Agent an additional amount equal to $8,000,000 (the "***Additional Deposit***") on the later of (a) the day after the Bid Deadline (as defined in Exhibit D) or (b) March 17, 2010; provided that, if the Auction is to occur and is later than March 17, 2010, the Additional Deposit shall be made one (1) Business Day before the Auction. The Additional Deposit (if and when deposited), together with the Initial Deposit, is referred to herein as the "***Deposit***". The Deposit shall be held in the escrow account established pursuant to the Master Escrow Agreement and disbursed pursuant to the terms of the Master Escrow Agreement and this Agreement.

## ARTICLE 3
## CLOSING AND DELIVERIES

3.1. Closing. The sale, transfer, assignment and delivery by Seller of the Acquired Assets to Buyer and the assumption by Buyer of the Assumed Liabilities, on terms and subject to the conditions set forth in this Agreement, will be effected on the Closing Date (the "***Closing***") and will take place at the offices of Kirkland & Ellis LLP, 153 East 53rd Street, New York, New York at 10:00 a.m. eastern prevailing time on the second Business Day following, or at the election of either party, on the first Business Day of the calendar month immediately following the satisfaction or waiver by the appropriate Party of all the conditions contained in Article 12 (other than conditions which by their terms or their nature are to be performed or measured as of the Closing Date (provided such conditions are satisfied at Closing or waived by the applicable Party)), or on such other date or at such other place and time as may be agreed to by the Parties (the "***Closing Date***"). The Closing will be deemed to be effective at the Effective Time. On the Business Day immediately prior to the Closing Date, Buyer and Seller shall conduct a pre-Closing at the same location as the Closing, commencing at 9:00 a.m. local time, at which each Party shall present for review by the other Parties copies in execution form of all documents required to be delivered by such Party at or in connection with the Closing. Each Party will, and will cause its Affiliates to, at the Closing execute and deliver the agreements, documents, certificates and other deliveries (including the Ancillary Agreements) required to be executed and/or delivered at the Closing by such Party and/or such Affiliates of such Party or for which such execution and/or delivery is a condition to another Party's obligations to consummate the Closing.

3.2. Seller's Deliveries.

(a) At the Closing, Seller shall, or shall cause one of its Affiliates to, deliver the following documents consistent with the terms of this Agreement:

(i) an access agreement, duly executed by an Affiliate of Seller and substantially in the form of Exhibit A-1 hereto;

(ii) a license transfer agreement, duly executed by an Affiliate of Seller and substantially in the form of Exhibit A-2 hereto;

(iii) an assignment and assumption agreement with regard to the Shell Environmental Agreement and Shell Purchase Agreement, duly executed by Seller and substantially in the form of Exhibit A-3 hereto (the "Shell Agreement Assignment"); provided that the foregoing shall not prevent Buyer from agreeing to amendments of the Shell Environmental Agreement or the Shell Purchase Agreement that will become effective upon the Closing;

(iv) a bill of sale with respect to the Acquired Assets (other than the Assigned Contracts and Real Property), duly executed by Seller and substantially in the form of Exhibit B-1 hereto;

(v) an assignment and assumption agreement with respect to the Assigned Contracts (other than the Shell Purchase Agreement, the Shell Environmental Agreement, the Real Property Leases and the Real Property Licenses) and Assumed Liabilities, duly executed by Seller and substantially in the form of Exhibit B-2 hereto;

(vi) a copy of the Business Records in Seller's possession or control (it being understood that any Business Records located at the Bakersfield office site need not be physically delivered, but will be deemed delivered at the Closing); provided that, for any Business Records not located at the Bakersfield office site, Seller may deliver such Business Records to Buyer promptly after the Closing Date, but in no event later than forty-five (45) days after the Closing Date;

(vii) one or more assignment and assumption agreements with regard to the Real Property Easements and Pipeline Rights, duly executed by Seller and substantially in the form of Exhibit B-3 hereto, as modified as necessary to meet the filing requirements for each recording jurisdiction;

(viii) an assignment and assumption agreement with regard to the Real Property Leases, duly executed by Seller and substantially in the form of Exhibit B-4 hereto, as modified as necessary to meet the filing requirements for each recording jurisdiction;

(ix) an assignment and assumption agreement with regard to the Real Property Licenses duly executed by Seller and substantially in the form of Exhibit B-5 hereto, as modified as necessary to meet the filing requirements for each recording jurisdiction;

(x) an easement grant with regard to pipelines located upon the buffer zone real property (as further described on Schedule 17.1E6), duly executed by Seller and substantially in the form of Exhibit B-6 hereto, as modified as necessary to meet the filing requirements for each recording jurisdiction;

(xi) one or more grant deeds with regard to each parcel of the Owned Real Property, duly executed by Seller and substantially in the form of Exhibit B-7 hereto, as modified as necessary to meet the filing requirements for each recording jurisdiction;

(xii) an officer's certificate certifying as to the resolutions of the sole member of Seller approving and authorizing this Agreement and the transactions contemplated by this Agreement and substantially in the form of Exhibit B-8 hereto;

(xiii) certificates of title, assignments of contracts and other instruments of transfer, conveyance and assignment as and to the extent agreed by Buyer and Seller to be necessary to evidence the transfer, conveyance and assignment of Seller's right, title and interest in and to the Acquired Assets to Buyer (collectively, the "***Additional Asset Conveyance Documents***");

(xiv) such assignments of contracts and other instruments of assumption as and to the extent necessary to evidence the valid and effective assumption by Buyer of the Assumed Liabilities (collectively, the "***Additional Liabilities Assumption Documents***");

(xv) an affidavit of non-foreign status that complies with Section 1445 of the Code, duly executed by Seller or Seller's Affiliate, as applicable, and substantially in the form of Exhibit B-9 hereto; and

(xvi) the Indemnity Escrow Agreement, duly executed by Seller and the Escrow Agent.

(b) Notwithstanding anything in this Agreement or any Ancillary Agreement to the contrary, Seller's obligation to convey to Buyer all rights of Seller under the Transferred Permits consists solely of providing: (i) if required by Law, notices of intent to transfer the Transferred Permit to Buyer in accordance with the Government regulations governing such Transferred Permit transfer and (ii) information as required by the Government regulations governing such Transferred Permit transfer. Except as provided in Section 6.8 with respect to Seller, Seller, any of its Related Persons, or any of their Related Persons shall not be required to deliver any Additional Asset Conveyance Document or Additional Liabilities Assumption Document that (x) requires Seller, any of its Related Persons or any of their Related Persons to make any additional representations, warranties or covenants, express or implied, not contained in this Agreement or (y) otherwise expands the liabilities or obligations of Seller, any of its

Affiliates or any of their respective Related Persons related to the transactions contemplated hereby.

3.3. Buyer's Deliveries.

(a) At Closing, the Escrow Agent shall cause (i) $6,000,000.00 (the "***Indemnity Escrow Amount***") to be transferred in accordance with the terms of the Indemnity Escrow Agreement and the Master Escrow Agreement to an escrow account established pursuant to the Indemnity Escrow Agreement (the "***Indemnity Escrow Account***"), and (ii) the remainder of the funds held by the Escrow Agent to be transferred to Seller in accordance with the Master Escrow Agreement, and each of Buyer and Seller shall take all action required to cause such deliveries of such portions of the Deposit to the Indemnity Escrow Account and Seller to occur, and the Indemnity Escrow Funds shall continue to be held by the Escrow Agent and released in accordance with the provisions of Article 14 of this Agreement and the Indemnity Escrow Agreement;

(b) At Closing, subject to adjustment in accordance with Section 11.4, Buyer shall pay to Seller by wire transfer of immediately available funds to a bank account designated by Seller in writing an amount equal to the sum of the Base Purchase Price plus the Hydrocarbon Inventory Deposit, reduced by the amount of (i) the Deposit, (ii) the Buyer Credit Amount, (iii) the Segregated Funds and (iv) any any unpaid Seller Cure Cost Obligations (but excluding any Segregated Funds); and

(c) At or prior to Closing, Buyer shall deliver the following documents consistent with the terms of this Agreement:

(i) an access agreement, duly executed by an Affiliate of Seller and substantially in the form of Exhibit A-1 hereto;

(ii) a license transfer agreement, duly executed by an Affiliate of Seller and substantially in the form of Exhibit A-2 hereto;

(iii) an assignment and assumption agreement with regard to the Shell Environmental Agreement and Shell Purchase Agreement, duly executed by Buyer and substantially in the form of Exhibit A-3 hereto;

(iv) an assignment and assumption agreement with respect to the Assigned Contracts (other than the Shell Purchase Agreement, the Shell Environmental Agreement, the Real Property Leases and the Real Property Licenses) and Assumed Liabilities, duly executed by Buyer, substantially in the form of Exhibit B-2 hereto;

(v) one or more assignment and assumption agreements with regard to the Real Property Easements, duly executed by Buyer and substantially in the form of Exhibit B-3 hereto, as modified as necessary to meet the filing requirements for each recording jurisdiction;

(vi) an assignment and assumption agreement with regard to the Real Property Leases, duly executed by Buyer and substantially in the form of Exhibit B-4 hereto, as modified as necessary to meet the filing requirements for each recording jurisdiction;

(vii) an assignment and assumption agreement with regard to the Real Property Licenses duly executed by Buyer and substantially in the form of Exhibit B-5 hereto, as modified as necessary to meet the filing requirements for each recording jurisdiction;

(viii) a secretary's certificate certifying as to the resolutions of Buyer approving and authorizing this Agreement and the transactions contemplated by this Agreement and substantially in the form of Exhibit B-10 hereto;

(ix) the Indemnity Escrow Agreement, duly executed by Buyer; and

(x) each of the Additional Asset Conveyance Documents and Additional Liabilities Assumption Documents.

(d) Except as provided in Section 6.8 herein with respect to Buyer, Buyer, any of its Related Persons, or any of their Related Persons shall not be required to deliver any Additional Asset Conveyance Document or Additional Liabilities Assumption Document that (x) requires Buyer, any of its Related Persons or any of their Related Persons to make any additional representations, warranties or covenants, express or implied, not contained in this Agreement or (y) otherwise expands the liabilities or obligations of Buyer, any of its Affiliates or any of their respective Related Persons related to the transactions contemplated hereby.

3.4. Hydrocarbon Inventory.

(a) Seller shall make a good faith estimate five (5) Business Days prior to the Closing Date of the estimated value of the Hydrocarbon Inventory as of such date (the "***Estimated Hydrocarbon Inventory Value***") and provide a copy thereof to Buyer setting forth the ownership, types, characteristics and volumes, on a tank, trunk, pipeline or other location basis, of all Hydrocarbon Inventory. Seller shall value the Hydrocarbon Inventory in accordance with the measurement procedures set forth in Exhibit C-1 and in accordance with the valuation procedures set forth in Exhibit C-2. Buyer shall be permitted to have representatives present to observe any measurements taken in accordance with Exhibit C-1. At the Closing, Buyer shall pay Seller an amount (the "***Hydrocarbon Inventory Deposit***") equal to 90% of the Estimated Hydrocarbon Inventory Value.

(b) An independent inspector (the "***Field Inspector***") shall be engaged by agreement of Seller and Buyer. The Field Inspector shall measure the Hydrocarbon Inventory as of the Effective Time at the respective locations of the Hydrocarbon Inventory on the Closing Date. The Hydrocarbon Inventory shall be measured by the

Field Inspector in accordance with the procedures set forth on Exhibit C-2. The Field Inspector shall issue a written report (the "***Field Inspector Report***") within ten (10) Business Days after the Closing Date setting forth the volumes and quantities of the Hydrocarbon Inventory as of the Effective Time. The fees and expenses of the Field Inspector shall be borne fifty percent (50%) by Seller and fifty percent (50%) by Buyer.

(c) As promptly as practicable, but in any event no later than ten (10) days following receipt of the Field Inspector Report, Seller shall cause to be prepared and delivered to Buyer a statement, together with supporting calculations and information (the "***Hydrocarbon Inventory Statement***") setting forth the volume of the Hydrocarbon Inventory as measured by the Field Inspector as of the Effective Time and the value of the Hydrocarbon Inventory (the "***Hydrocarbon Inventory Value***"), which Hydrocarbon Inventory Value shall be determined in accordance with the procedures set forth on Exhibit C-2. Buyer shall give Seller notice of its acceptance of or objection to the computations in the Hydrocarbon Inventory Statement no later than twenty (20) days following its receipt of the Hydrocarbon Inventory Statement (the date of Seller's receipt of such acceptance or rejection, or the expiration of such twenty (20) day period with no notice having been given, shall be the "***Hydrocarbon Inventory Notice Date***"). If Buyer fails to give such notice before the end of such twenty (20) day period, then the Hydrocarbon Inventory Statement will be deemed final and binding upon the Parties. If Buyer gives such notice to Seller of Buyer's objection within such twenty (20) days, and Buyer and Seller are unable to resolve the issues in dispute within seven (7) days after delivery of such notice of objection, each of Buyer's and Seller's positions with respect to the computation of the Hydrocarbon Inventory Value will be submitted to an independent and qualified party mutually selected by the Parties (the "***Inspector***") such as an accounting firm or independent inspector, for final resolution. If the computation of the Hydrocarbon Inventory Value is submitted to the Inspector for resolution, (x) each Party will furnish to the Inspector such workpapers and other documents and information relating to the disputed issues as the Inspector may request and are available to that Party, and will be afforded the opportunity to present to the Inspector any material relating to such issues and to discuss the same with the Inspector; (y) the Inspector's determination or computation of the Hydrocarbon Inventory Value shall be binding and conclusive on the Parties and will be deemed to be the final Hydrocarbon Inventory Value (and judgment thereupon may be entered in any court having jurisdiction over the Party against which the same is sought to be enforced); and (z) the fees and expenses of the Inspector for such determination will be borne fifty percent (50%) by Seller and fifty percent (50%) by Buyer.

(d) If the Hydrocarbon Inventory Value exceeds the Hydrocarbon Inventory Deposit (such excess, the "***Hydrocarbon Inventory Balance***"), then Buyer shall pay to Seller, without offset or deduction, an amount equal to the Hydrocarbon Inventory Balance by wire transfer of immediately available funds to such account or accounts of Seller, as may be designated by Seller. If the Hydrocarbon Inventory Value is less than the Hydrocarbon Inventory Deposit (such deficit, the "***Hydrocarbon Inventory Deficit***"), then Seller shall pay to Buyer as a post-petition administrative expense, without offset or deduction, an amount equal to the Hydrocarbon Inventory Deficit by wire transfer of immediately available funds to such account or accounts of Buyer, as may be designated

by Buyer. All such undisputed amounts shall be paid by the relevant Party to the other Party within five (5) Business Days of the Hydrocarbon Inventory Notice Date. All disputed amounts shall be paid by the relevant Party to the other Party within five (5) Business Days of the resolution of such disputed amounts. Any payment pursuant to this Section 3.4(d) shall be made together with interest thereon at a rate per annum equal to the rate of interest published by the *Wall Street Journal* as the "prime rate" at large U.S. money center banks on the Closing Date, calculated on the basis of the number of days elapsed from the Closing Date to the date of payment.

(e) Each Party agrees that, following the Closing, it shall not take any actions with respect to the accounting books, records, policies and procedures of itself or its Affiliates that would obstruct or prevent the preparation of the Hydrocarbon Inventory Statement as provided in this Section 3.4. From the Closing through the final determination of the Hydrocarbon Inventory Value in accordance with this Section 3.4 and subject to the Access Agreement, (i) Seller shall provide Buyer with access at all reasonable times to the personnel and working papers utilized in determining the Hydrocarbon Inventory Statement for purposes of confirming Seller's calculation of same and (ii) Seller and Buyer shall provide one another access at all reasonable times to the personnel, properties, and books and records of the Refinery and the Terminal Assets for purposes of determining the Hydrocarbon Inventory Value, including permitting the Parties and their respective advisors to participate in the taking of the physical inventory. The Parties shall cooperate with each other in the preparation of the Hydrocarbon Inventory Statement, if requested by another Party.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer on the date hereof as follows, except in all cases as disclosed in the Disclosure Schedules:

4.1. Corporate Organization. Seller is duly organized and validly existing under the Laws of the State of Utah. Seller is duly qualified or authorized to do business as a foreign limited liability company, and is in good standing, under the laws of each other jurisdiction where the failure to be so qualified or authorized would have a Material Adverse Effect. Subject to any necessary authority from the Bankruptcy Court, Seller has all requisite limited liability company power and authority to own its properties and assets and to conduct its business as now conducted.

4.2. Authorization and Validity. Subject to the Bankruptcy Court's entry of the Sale Order and the receipt of the Consents set forth on Schedule 4.4, Seller has all requisite limited liability company power and authority to enter into this Agreement and the Ancillary Agreements to which it is or will be a party and to carry out its obligations hereunder and thereunder. Subject to the Bankruptcy Court's entry of the Sale Order, the execution and delivery of this Agreement and the Ancillary Agreements by Seller and the performance by Seller of its obligations hereunder and thereunder have been duly authorized by all necessary action by the sole member of Seller, and no other organizational proceedings on the part of Seller are necessary to authorize such execution, delivery and performance. This Agreement has been,

and the Ancillary Agreements when delivered will be, duly executed by Seller and, subject to the Bankruptcy Court's entry of the Sale Order, constitute or will constitute its valid and binding obligation, enforceable against it in accordance with the terms herein and therein, except that such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar Laws affecting or relating to the enforcement of creditors' rights generally, and is subject to general principles of equity.

4.3. No Conflict or Violation. Subject to (a) the receipt of all Consents set forth on Schedule 4.4, (b) the Bankruptcy Court's entry of the Sale Order, and (c) the receipt of the Antitrust Approvals, the execution, delivery and performance by Seller of this Agreement and by Seller of the Ancillary Agreements do not and will not in each case, except as has been obtained or contemplated in this Agreement or the Ancillary Agreements (x) violate or conflict with any provision of the limited liability company agreement (or equivalent organizational documents) (collectively, the "***Organizational Documents***") of Seller, (y) violate any Law or Order applicable to Seller, or (z) violate, result in a breach of or constitute (with due notice or lapse of time, or both) a default under any Assigned Contract, which violation, conflict, breach or default in the case of clauses (y) and (z) that would reasonably be expected to have a Material Adverse Effect.

4.4. Consents and Approvals. Other than Consents relating to and as may result from the Chapter 11 Case, Schedule 4.4 sets forth a true and correct list of each Consent and each declaration to, or filing or registration with, any Government that is required in connection with the execution and delivery of this Agreement by Seller and the Ancillary Agreements by Seller or the performance by Seller of its obligations hereunder by Seller or under the Ancillary Agreements, in any such case the failure of which to obtain would reasonably be expected to have a Material Adverse Effect.

4.5. Compliance with Law. Except as set forth on Schedule 4.5, Seller is in compliance in all material respects with all statutes, laws, ordinances, rules, orders and regulations of any Government applicable to the Business. Except as set forth on Schedule 4.5 and as may result from the Chapter 11 Case, Seller has not received written notice of any violation of any Law. Notwithstanding the foregoing, no representation is being made by Seller under this Section 4.5 with respect to Taxes or Environmental Laws (as to which the only representations and warranties made by Seller are those contained in Section 4.20 or Section 4.9, respectively). Seller is not in material default with respect to any Order to which Seller is subject applicable to the Refinery or the operation of the Business.

4.6. Litigation. Except (x) as a result of the Chapter 11 Case, (y) Claims made against Seller or any of its Related Persons as a part of the Chapter 11 Case or (z) as otherwise set forth on Schedules 4.6 or 4.9, there are no Claims, suits or proceedings pending or, to Seller's Knowledge, threatened in writing, before any Government, brought by or against Seller or related to the Business or the Acquired Assets.

4.7. Material Contracts.

(a) Schedule 4.7(a)(I) sets forth a complete and correct list of each of the contracts to which Seller is a party, which have not expired or been cancelled or terminated, that:

(i) relates to the acquisition of goods (other than Inventory in the Ordinary Course of Business) or Equipment, the lease of Equipment or other personal property, or the provision of any services, in each case which requires any future payment in excess of $250,000 in the aggregate during any twelve (12) month period and is not terminable by Seller without cause upon notice of thirty (30) days or less for a cost of less than $250,000;

(ii) the purchase, sale or lease of Real Property or that otherwise relate to the Real Property, including the Real Property Leases, Real Property Licenses, Real Property Easements, Pipeline Rights and Mineral Rights Contracts;

(iii) relates to any material Intellectual Property (other than "off the shelf" commercially available software);

(iv) relates to any employment agreement with any Business Employee that has future required scheduled payments (absent a material breach thereof) in excess of $100,000 per annum and is not terminable by Seller upon notice of sixty (60) days or less for a cost of less than $100,000;

(v) relates to any other agreement, contract, lease, license or instrument, in each case not included in clauses (i) through (iii) above or set forth on any of the other sections of the Disclosure Schedules, which Seller is a party or by or to which any of their assets are bound or subject, in each case which has future required scheduled payments (absent a material breach thereof) to or by Seller in excess of $500,000 per annum and is not terminable by Seller without cause upon notice of thirty (30) days or less for a cost of less than $500,000;

(vi) contains a covenant not to compete granted in favor of a third party; or

(vii) the consequences of a default under or termination of such Contract would reasonably be expected to have a Material Adverse Effect (the agreements described in clauses (i) through (vi) collectively, the "***Seller Contracts***").

Schedule 4.7(a)(II) sets forth those Seller Contracts which are Assigned Contracts (the "***Material Contracts***").

(b) Other than as set forth on Schedule 4.7(b) or in motions, other pleadings or similar items filed with the Bankruptcy Court, neither Seller nor, to Seller's

Knowledge, any other party to any of the Material Contracts is in breach or default under or has commenced any action against any of the parties to such Material Contracts or given or received any written notice of any material default or violation under any Material Contract that was not withdrawn or dismissed, except only for those defaults that will be cured in accordance with the Sale Order (or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of the Assigned Contracts). Set forth on Schedule 4.7(b) is a list of Seller's reasonable estimate of the cure costs that are required as of the date hereof to cure any default on the part of Seller under each Assigned Contract. To Seller's Knowledge, each of the Material Contracts is, or will be at the Closing, valid, binding and in full force and effect against Seller, except as otherwise set forth on Schedule 4.7(b). Seller has provided Buyer, in an electronic data room or otherwise, with access to the Material Contracts referred to on Schedule 4.7(a), together will all material amendments, waivers or other changes thereto.

(c) Except as set forth on Schedule 4.7(c), after giving effect to Section 365 of the Bankruptcy Code or otherwise as a result of the entry of the Sale Order, no Consent or waiver under any of the Assigned Contracts (including the Real Property Leases, the Real Property Licenses and the Mineral Rights Contracts), Pipeline Rights or Real Property Easements is required to be obtained by Seller in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

(d) Except as set forth on Schedule 4.7(d), none of the other parties under any of the Material Contracts has provided Seller with any written notice that it currently plans or intends to terminate any such Contract, or otherwise cease their performance thereunder related to such Contracts or the Business.

(e) At the Closing, (i) the Terminal Lease shall not have been terminated and the lessor thereunder shall have no right to terminate the Terminal Lease and (ii) if the Terminal Lease has not yet been executed, subject to the completion of the subdivision set forth in Section 3.03 of the Shell Purchase Agreement, Seller shall have the right to enter into the Terminal Lease effective as of the Closing; provided that to the extent that Buyer has entered into an agreement with Shell regarding the subject of the Terminal Lease, Seller's representations and warranties contained in this Section 4.7(e) shall be of no further force and effect.

4.8. Permits. Schedule 4.8 sets forth a complete and correct list of all material Permits that are necessary to the operation of the Refinery and the Acquired Assets, other than the Environmental Permits (as to which the only representations and warranties are those contained in Section 4.9). Seller is in compliance with its Permits, and Seller has made available to Buyer copies of all such material Permits. To Seller's Knowledge, other than those Permits set forth on Schedule 4.8, no other Permits (other than Environmental Permits) are necessary for the operation of the Refinery and the Acquired Assets. As of the date of this Agreement, except as set forth on Schedule 4.8 or as a result of the Chapter 11 Case or as would not reasonably be expected to result in a material liability of the Business or materially impair the operation of the Business, the Refinery or the Acquired Assets after the Closing, each Transferred Permit is valid and in full force and effect, and is not subject to any pending or, to Seller's Knowledge,

threatened administrative or judicial proceeding to revoke, cancel, suspend or declare such Permit invalid in any respect.

4.9. Environmental Matters. Except as set forth on Schedule 4.9 or in the Environmental Reports, with respect to the Acquired Assets or the operation of the Refinery:

(a) Seller has obtained all material Permits required by Environmental Laws ("***Environmental Permits***") for the operation of the Refinery as it was being operated until its recent shutdown and for the operation of the Acquired Assets; a list of such Environmental Permits is set forth on Schedule 4.9. Seller has obtained all Environmental Permits necessary for the operation of the Business, including the Refinery, as it was being operated until its recent shutdown and for the operation of all Acquired Assets. All such Environmental Permits are in full force and effect. No appeal or any other action is pending, or to Seller's Knowledge, is threatened, to revoke any such Environmental Permit. Seller is in material compliance with its Environmental Permits, and Seller has made available to Buyer copies of all such Environmental Permits. To the extent required by applicable Environmental Law, Seller has timely filed all applications necessary to renew or obtain any necessary Environmental Permit so as to allow Seller to operate the Refinery and for the operation of all Acquired Assets in compliance with applicable Environmental Laws.

(b) Seller's operation of the Refinery and the Acquired Assets is not subject to any Order issued pursuant to any Environmental Law or any settlement agreement with any third parties with respect to liability under Environmental Law.

(c) Since March 15, 2005, and as of the date hereof, Seller has not received a written complaint, Order, directive, Claim, citation or notice of violation, suit or proceeding from any Government or any other Person with respect to any violation of Environmental Laws, including any release, spill, leak, discharge or emission of any Hazardous Materials that remains unresolved or, to Seller's Knowledge, that has a resolution that restricts the operation of the Refinery or the Acquired Assets in a manner more stringent than required under existing Environmental Laws.

(d) Seller is in material compliance with and, since September 1, 2006, has complied with all applicable Environmental Laws.

(e) Seller has made available to Buyer copies of all Environmental Reports that are in the possession of or within the reasonable control of Seller, and as of the date hereof there are no partially complete, pending or other Environmental Reports commissioned by Seller that have not been made available to Buyer.

(f) To Seller's Knowledge, no Hazardous Material has been released at the Real Property during Seller's ownership of the Real Property that would result in material liability under the Environmental Laws.

(g) To Seller's Knowledge, Seller has not disposed of, or arranged to dispose of, any Hazardous Materials on any third party property that has resulted in any material liability under the Environmental Laws.

(h) Seller has not received any notices, demand letters, complaints, claims or requests for information from any Government indicating that Seller may be in material violation of, or materially liable under, any Environmental Law;

(i) None of the properties currently owned or operated by Seller are subject to any Liens imposed pursuant to Environmental Law by any Government in connection with the presence on or off such property of any Hazardous Materials.

(j) The representations and warranties contained in this Section 4.9 are the only representations and warranties made by Seller with respect to environmental, health and safety matters including any arising under Environmental Laws or relating to Hazardous Materials.

4.10. [Intentionally Omitted.]

4.11. Owned Real Property. Except for the Excluded Real Property, Schedule 4.11 sets forth a complete and correct list of all real property owned in whole or in part (and states the ownership percentage of all partially owned real property, if applicable) by Seller. Except as set forth on Schedule 4.11(I), (a) Seller has good and marketable title to all Owned Real Property free and clear of all Liens, except Permitted Liens, Assumed Liabilities and Liens that would be released by operation of the Sale Order or otherwise at Closing, (b) other than the right of Buyer pursuant to this Agreement, there are no outstanding options, rights of first offer or rights of first refusal to purchase such Owned Real Property or any portion thereof or interest therein, and (c) Seller has not leased or otherwise granted to any Person the right to use or occupy such Owned Real Property or any portion thereof.

4.12. Real Property Leases and Licenses. Schedule 4.12 sets forth a complete and correct list of all Real Property Leases and Real Property Licenses. Seller has made available to Buyer a complete and correct copy of each Real Property Lease and Real Property License, and, except as set forth on Schedule 4.12, Seller has not subleased or otherwise granted to any Person the right to use or occupy such Leased Real Property or any portion thereof.

4.13. Real Property Easements. Schedule 4.13 sets forth a complete and correct list of all material Real Property Easements. Seller has made available to Buyer a complete and correct copy of each Real Property Easement in its possession or control.

4.14. Mineral Rights. To Seller's Knowledge, Schedule 4.14 sets forth a complete and correct list of all material Mineral Rights Contracts and identifies the nature of Seller's interest in such Mineral Rights Contracts, whether as lessor, lessee, grantor or grantee.

4.15. Pipelines. To Seller's Knowledge, Schedule 4.15 sets forth a complete and correct list of all Pipeline Rights. Seller has made available a true and complete copy of each Pipeline Right in its possession or control. To Seller's Knowledge, except as would not reasonably be expected to have a Material Adverse Effect, (a) Seller owns all of the Pipeline Assets and/or has the right to use the Pipeline Assets pursuant to the Pipeline Rights, (b) there are no gaps in either the chain of title to the Pipelines or in the Pipeline Rights, (c) Seller has maintained the Pipeline Assets in good condition, reasonable wear and tear excepted, so as to be

adequate for normal operations of the Pipeline Assets in accordance with industry standard and applicable Laws, including, without limitation, conducting regular testing to ensure such performance of the Pipeline Assets, and (d) each of the Pipelines is capable, in accordance with all applicable Laws and Permits, of transporting product at the volumes set forth in Schedule 4.15.

4.16. Title to Assets; Sufficiency. Other than as set forth on Schedule 4.16, Seller has good and valid title to the personal property, other than the leased property, constituting the Acquired Assets. Except for (a) assets and services set forth on Schedule 4.16, (b) the Excluded Assets, (c) assets transferred or sold in the Ordinary Course of Business and (d) Delayed Acquired Assets, as of the Closing, the assets transferred to Buyer hereunder (without regard to any action taken by or at the direction of Buyer or any business plan of Buyer and assuming the due execution and delivery at the Closing of each of the Ancillary Agreements) will consist of all of the material physical assets (i) used or held for use in the operation of the Business and the Refinery as conducted by Seller and (ii) necessary for the operation of the Business and the Refinery as conducted by Seller and contemplated to be conducted prior to its recent shutdown, in each case other than the Retained Equipment. At the Closing, Seller will convey good and marketable title to the Acquired Assets, free and clear of any and all Liens, except for Permitted Liens and Assumed Liabilities.

4.17. Business Records. Seller has made, or will make, available to Buyer copies of those Business Records that are in Seller's possession or control.

4.18. Intellectual Property. Schedule 4.18 sets forth (a) each material license of Intellectual Property to a third party in effect as of the date of this Agreement, (b) each material third party license agreement of Intellectual Property Rights to Seller and (c) all other material Intellectual Property used in the operation of the Business. Seller owns or possesses licenses or other valid rights to use the intellectual property used in connection with the operation of the Business, except where the failure to possess such licenses or rights would not, individually or in the aggregate, materially impair the operation of the Business. No material claims are pending or, to Seller's Knowledge, threatened against Seller as of the date of this Agreement with respect to the ownership, use or validity of any Intellectual Property. Except as set forth on Schedule 4.18, any and all renewal and maintenance fees, annuities or other similar fees due and payable in respect of the Intellectual Property have been paid and are not overdue. To Seller's Knowledge, no other Person is infringing, misappropriating or violating any of the Intellectual Property used in the operation of the Business. Except as set forth on Schedule 4.18, Seller has not been sued or charged as a defendant in any claim, suit, action, or proceeding which involves a claim of infringement of any Intellectual Property Rights of any third party and which has not been finally terminated prior to the date hereof.

4.19. Employees. Except as set forth on Schedule 4.19(a) and except as a result of the Chapter 11 Case, Seller is in compliance in all material respects with all currently applicable Laws and collective bargaining agreements respecting employment and employment practices, terms and conditions of employment and wage-hour practices, including but not limited to minimum wage, bonus, overtime, meal and rest break, deductions, wage statement and method of payment practices, and are not engaged in any unfair labor practice. As of the date hereof, except as set forth on Schedule 4.19(b), there is no written unfair labor practice complaint

pending or, to Seller's Knowledge, threatened in writing against Seller, before the National Labor Relations Board or any similar state Government. Set forth on Schedule 4.19(c) is a true, correct and complete list setting forth the name and address of each officer, Business Employee and employee on furlough, suspension, leave of absence or layoff status as of the date hereof, together with their date of employment, current job title or relationship to Seller, and Seller has delivered to Buyer a schedule of each such employee's compensation. Schedule 4.19(d) sets forth all employees of Seller who are actively employed by Seller as of the date hereof.

4.20. Taxes. Except as would not constitute an Assumed Liability or otherwise result in any liability to Buyer after the Closing (after giving effect to the Sale Order and the provisions of the Bankruptcy Code and other orders of the Bankruptcy Court) or as set forth on Schedule 4.20, Seller has (i) properly completed and filed or caused to be filed, or shall properly complete and file or cause to be filed, within the time prescribed by Law, subject to the filings or requests for extensions, all Tax Returns with respect to the Acquired Assets that are or were required to be filed under applicable Laws prior to the Closing Date, (ii) paid or caused to be paid, within the time and in the manner prescribed by Law (and until the Closing Date shall, within the time, subject to the filings or requests for extensions, and in the manner prescribed by Law, pay or cause to be paid) all Taxes that are shown to be due and payable on all material Tax Returns filed prior to the Closing Date, and (iii) filed, reported and paid all applicable sales, use, franchise, excise and similar Taxes in compliance in all material respects with all applicable Laws related to such Taxes.

4.21. Liens. Subject to the entry and effectiveness of the Sale Order, at the Closing, Seller will transfer to Buyer the Acquired Assets, free and clear of all Liens and Claims, other than Permitted Liens and Assumed Liabilities.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows, except in all cases as disclosed in the Disclosure Schedules.

5.1. Corporate Organization. Buyer is a corporation, duly organized, validly existing and in good standing under the Laws of the jurisdiction of its Delaware, and has all requisite power and authority to own its properties and assets and to conduct its business as now conducted.

5.2. Authorization and Validity. Buyer has all requisite power and authority to enter into this Agreement and to execute and deliver any Ancillary Agreement to which it is or will be a party and to carry out its obligations hereunder and thereunder. The execution and delivery of this Agreement and the Ancillary Agreements and the performance of Buyer's obligations hereunder and thereunder have been duly authorized by all necessary action by the board of directors of Buyer, and no other proceedings on the part of Buyer are necessary to authorize such execution, delivery and performance. This Agreement has been, and the Ancillary Agreements when delivered will be, duly executed by Buyer and do and will constitute its valid and binding obligation, enforceable against it in accordance with the terms herein and therein, except that such enforceability (a) may be limited by applicable bankruptcy, insolvency,

reorganization, fraudulent conveyance, moratorium or other similar Laws affecting or relating to the enforcement of creditors' rights generally and (b) is subject to general principles of equity.

5.3. No Conflict or Violation. The execution, delivery and performance by Buyer of this Agreement and the Ancillary Agreements do not and will not (a) violate or conflict with any provision of the Organizational Documents of Buyer and (b) violate any provision of Law, or any Order applicable to Buyer, nor will they result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contract to which Buyer is a party, by which it is bound or to which any of its properties or assets is subject.

5.4. Consents, Approvals and Notifications. The execution, delivery and performance by Buyer of this Agreement and the Ancillary Agreements do not require the Consent of, or filing with or notification of, any Government or any other Person except as required: (a) under any Antitrust Law; (b) for entry of the Sale Order by the Bankruptcy Court; or (c) for such Consents and filings, the failure to obtain or make would not reasonably be expected to have a material adverse effect on the ability of Buyer to consummate the transactions contemplated hereby.

5.5. Litigation. As of the date hereof, there are no Claims, suits, orders or proceedings pending or, to Buyer's knowledge, threatened, against Buyer at law or in equity, or before any Government that would reasonably be expected to have a material adverse effect on the ability of Buyer to consummate the transactions contemplated hereby.

## ARTICLE 6
## COVENANTS OF SELLER

Seller hereby covenants to Buyer as follows:

6.1. Conduct of Business Before the Closing Date. Without the prior written consent of Buyer or the direction of the Bankruptcy Court without any request from Seller or its Related Persons and after notice and a hearing, between the date hereof through the earlier of the Closing Date or the date this Agreement is terminated in accordance with its terms, Seller shall not, except as required or expressly permitted pursuant to the terms hereof or of any Ancillary Agreement or as set forth on Schedule 6.1, (i) transfer, sell, dispose of, or make any material change to, any Acquired Asset, (ii) enter into any material transaction with respect to any Acquired Asset, other than an Alternative Transaction, (iii) enter into any new Contract, side letter or memorandum of understanding with any employee or employee representative or any material amendment to any Contract or other agreement, or otherwise increase in any manner the compensation of, or enter into any new bonus, incentive, employee benefits, severance or termination agreement or arrangement with, any of the Business Employees or amend any Employee Benefit Plan except as required by applicable Law, (iv) enter into, amend or terminate any Material Contracts; provided that Seller may enter into or amend such agreements in the Ordinary Course of Business if the term of such agreement or amendment is less than sixty (60) days; or (v) purchase substantially all the assets of or otherwise acquire any business or any corporation, partnership, association or other business organization or division thereof. Without limiting the generality of the foregoing, except as may be required by the Bankruptcy Court, from the date hereof until the earlier to occur of the Closing and the date this Agreement is

terminated in accordance with its terms, Seller shall use commercially reasonable efforts to conduct the Business in substantially the same manner as conducted by Seller on the date of this Agreement, taking into account business exigencies arising as a result of Seller's and its Affiliates' financial condition and status as filers under Chapter 11 of the Bankruptcy Code, and shall comply in all material respects with all applicable laws, permits, consents and orders (other than as set forth on Schedule 6.1 with respect to the Cleanup and Abatement Order) that relate to or affect the ownership and/or use or operation of the Acquired Assets or the Business. Seller shall not be obligated to (a) make any capital expenditures related to any expansion of the capacity of the Refinery or (b) refine any petroleum product.

6.2. Obligations of Seller after Entry of Sale Order. From and after the date that the Sale Order is entered, Seller shall use reasonable best efforts to (a) perform and satisfy all conditions to each of Buyer's and Seller's obligations to consummate the transactions contemplated by this Agreement that are to be performed or satisfied by Seller under this Agreement, (b) cause the Closing to occur as promptly as practicable, and (c) obtain all Consents necessary to assign the Assigned Contracts and Transferred Permits to Buyer, and Seller shall not, and shall not permit any of its Affiliates to, intentionally take any action that is reasonably likely to prevent or delay the consummation of the transactions contemplated hereby unless otherwise required by the Bankruptcy Court or Law. The "reasonable best efforts" of Seller shall not require Seller or any of its Related Persons to expend any money to remedy any breach of any representation or warranty hereunder, to commence any litigation or arbitration proceeding, to offer or grant any accommodation (financial or otherwise) to any third party, to obtain any Consent required for the consummation of the transactions contemplated hereby or to provide financing to Buyer for the consummation of the transactions contemplated hereby; provided that, if Seller or any of its Affiliates elects to remedy such breach, Seller shall not be deemed to be in breach of such representation or warranty to the extent remedied in a manner reasonably acceptable to Buyer, or in violation of any covenant, for solely purposes of determining Buyer's obligations to consummate the transactions contemplated by this Agreement.

6.3. Access to Properties and Records; Confidentiality. Prior to the earlier to occur of the Closing Date or the date on which this Agreement is terminated in accordance with its terms, unless and until an Alternative Transaction is approved in accordance with the Bidding Procedures, Seller shall afford to Buyer and to the accountants, counsel and representatives of Buyer, reasonable access during normal business hours and upon reasonable notice to all Books and Records of Seller relating to the Business for purposes of assisting in the transition of the Acquired Assets and Assumed Liabilities to Buyer at the Closing if (a) permitted under Law, (b) such Books and Records are not subject to confidentiality agreements, (c) disclosing such Books and Records would not adversely affect any attorney client privilege, work product or similar privilege and (d) such Books and Records do not relate to any confidential proprietary models or other information of Seller or any of its Affiliates pertaining to project evaluation, price curves or projections or other economic or other predictive models. Upon reasonable prior notice, Seller shall also afford Buyer reasonable access, during normal business hours, to the Business, to all operations of the Business and to all Acquired Assets throughout the period prior to the Closing Date for purposes of assisting in the transition of the Acquired Assets and the Assumed Liabilities to Buyer at the Closing. Upon the reasonable request by Buyer, Seller shall furnish to Buyer updates on the amounts of the cure costs required to be paid pursuant to Section 365 of the Bankruptcy Code in connection with the assignment and assumption of the Assigned

Contracts or any other Material Contracts. The rights of access contained in this Section 6.3 are granted subject to, and on, the following terms and conditions: (t) nothing herein shall require Seller to provide access to or disclose any information to any other party if such access or disclosure would be in violation of applicable Laws or regulations of any Government (including the HSR Act and other Antitrust Laws or Laws regarding employee rights of privacy) or the provisions of any agreement to which such Party is a party; (u) all requests for access shall be directed to Fred Greener and Brett Bailey (the "***Seller Designated Contacts***"); (v) any such investigation shall not include physical testing or samplings and such access shall be exercised in such a manner as not to interfere unreasonably with the operation of the Business; (w) all information provided to Buyer or its agents or representatives by or on behalf of Seller or their agents or representatives (whether pursuant to this Section 6.3 or otherwise) is governed by and subject to the Confidentiality Agreement, dated as of March 25, 2009, by and between Flying J and Buyer or an Affiliate of Buyer (the "***Confidentiality Agreement***"), and such access shall occur in such a manner as Seller reasonably determines to be appropriate to protect the confidentiality of such information sought; (x) all such rights of access are at Buyer's sole cost, expense and risk; and Buyer shall indemnify Seller for any property damage or personal injury that Seller or its Affiliates and their Related Persons or any third party suffer to the extent directly resulting from Buyer's exercise of its access rights under this Section 6.3; and (y) Seller shall not provide access or disclose any information if such access or disclosure would cause significant competitive harm to Seller or Affiliates if the transactions contemplated by this Agreement are not consummated. Notwithstanding anything to the contrary contained in the Confidentiality Agreement, the obligations of Buyer and its Affiliates and its and their Related Persons (excluding, for the avoidance of doubt Seller and its Affiliates and its and their Related Persons), financing sources, agents and representatives under the Confidentiality Agreement shall continue with respect to the information of Flying J, Seller and its Affiliates and its or their Related Persons with respect to Flying J's businesses and any other information which is not included in the Acquired Assets and Assumed Liabilities. Other than the Seller Designated Contacts or as expressly provided in the preceding sentence, Buyer is not authorized to and shall not (and shall cause its Affiliates, employees, agents, representatives and Related Persons not to) contact any officer, director, employee, supplier, lessee, lessor, licensee, licensor, distributor, lender, advertiser, customer or other material business relation of Seller prior to the Closing without the prior written consent of Seller. In no event shall any Phase II Environmental Site Assessment or invasive soil testing be permitted without the prior written consent of Seller. Buyer shall, and shall cause its representatives to, abide by the terms of the Confidentiality Agreement with respect to such access and any information furnished to it or its representatives pursuant to this Section 6.3.

6.4. Rejection of Assigned Contracts. Other than Assigned Contracts for which Buyer has not provided adequate assurances, Seller shall not reject any Assigned Contracts pursuant to the Chapter 11 Case without the prior written consent of Buyer.

6.5. Provision of Data; Transfer of Software. Seller agrees to cooperate with such reasonable requests during normal business hours as Buyer may make prior to and following the Closing (which requests shall not interfere in any material respect with the responsibilities of the Business Employees), so as to assist Buyer, at Buyer's sole cost and expense, with the integration, from and after the Closing, of the existing operational data, software and systems relating to the operating of the Refinery into Buyer's software and systems. Notwithstanding the

foregoing, the Parties acknowledge and agree that Buyer is not acquiring any software or any computer or other electronic equipment transferred to Buyer as part of the Acquired Assets, unless and only to the extent that Buyer or Seller have obtained prior to the Closing any necessary licenses or rights to use such software from and after the Closing. Seller also agrees to cooperate with such reasonable requests during normal business hours as Buyer may make in order to facilitate Buyer's acquisition of such licenses or rights, at no cost to Seller, but neither Seller nor any Affiliate of Seller shall have any obligation to assist Buyer to retain the services of any other Person, or to obtain any services provided by any such Person to support software or systems at any particular cost.

6.6. Further Assurances. Upon the request and at the sole expense of Buyer at any time after the Closing Date (but without additional consideration), Seller shall execute and deliver such documents as Buyer or its counsel may reasonably request to effectuate the transactions contemplated by this Agreement. In the event that any Affiliate or Related Person of Seller has as of the Closing, or receives after the Closing, any right, title or interest in any of the Acquired Assets, Seller shall, or shall cause such Affiliate to, convey all such right, title and interest to Buyer.

6.7. Seller's Obligation to Perform. Seller shall pay, perform and discharge all Excluded Liabilities in accordance with Seller's plan of reorganization or liquidation and as permitted by the Bankruptcy Court, as applicable, and will indemnify and hold Buyer, each of its Affiliates and each of their Related Persons harmless as provided in Article 14 for any and all Losses suffered by any of them from any breach of the covenants and agreements of Seller in this Section 6.7.

6.8. Title Insurance and Surveys. At or prior to Closing, Buyer may obtain, at its sole cost and expense, surveys or aerial photographs of the Real Property and extended coverage ALTA owner's policies of title insurance or other title insurance policy insuring title in Buyer to the Owned Real Property. Upon Buyer's request, Seller shall cooperate with Buyer in obtaining such surveys, aerial photographs and title policies, at Buyer's sole cost and expense. Seller shall execute and deliver any affidavits, documents or gap indemnities reasonably required by the title company and necessary to issue the title policies in a form reasonably acceptable to Buyer.

6.9. Casualty/Condemnation or Taking. Notwithstanding any provision in this Agreement to the contrary, if, from the date hereof until the Closing, (a) all or any portion of the Acquired Assets is condemned or taken by eminent domain, or (b) all or any portion of the Acquired Assets is damaged or destroyed by fire or other casualty, Seller shall notify Buyer promptly in writing of such fact. In the case of condemnation or taking, Seller shall assign or pay, as the case may be, any proceeds thereof to Buyer at the Closing, and in the case of fire or other casualty, Seller shall either restore such damage or assign the insurance proceeds therefrom to Buyer at Closing. If Seller chooses to assign the insurance proceeds to Buyer, Seller agrees that the Base Purchase Price shall be reduced by the amount of the deductible for the insurance policy paying proceeds to Seller for such loss (with Buyer being responsible for payment of such deductible). Notwithstanding the foregoing, the provisions of this Section 6.9 do not in any way modify Buyer's other rights under this Agreement, including any applicable right to terminate this Agreement if any condemnation or taking, damage or other destruction results in a Material Adverse Effect.

6.10. Certain Outstanding Purchase Orders.

(a) Prior to Closing, Seller will have caused Alliance Process Partners LLC (d/b/a International Alliance Group) ("***IAG***") to transfer to Seller for transfer to Buyer at Closing all right, title and interest of Seller in the equipment subject to each outstanding purchase order listed on Schedule 7.4(b) and all other equipment set forth on Schedule 17.1E1 (other than, in each case, the purchase order and underlying equipment with regard to Hy-Bon), free and clear of all Liens, other than obligations to pay amounts remaining to be paid thereunder or in respect thereof, of which payments Buyer shall have no obligation in excess of $379,995.

(b) Seller will use its reasonable best efforts to (i) obtain an acknowledgement from Hy-Bon and IAG that Hy-Bon will deliver, conditioned only upon payment of the amount specified in such acknowledgement (for which Buyer shall not be responsible in excess of $637,306 and Seller shall be responsible for the remainder) in respect of such purchase order, such right, title and interest of Seller in the equipment subject to the outstanding purchase order to Buyer in accordance with this Section 6.10 or (ii) obtain a letter from Hy-Bon which sets forth that the payment obligation (for which Buyer shall not be responsible in excess of $637,306 and Seller shall be responsible for the remainder). Seller shall cooperate with Buyer and Hy-Bon to effect any arrangement between Buyer and Hy-Bon which obligates Hy-Bon to transfer the equipment to Buyer, free and clear of all Liens, other than obligations to pay amounts remaining to be paid thereunder or in respect thereof, and releases Seller and IAG from any and all claims and obligations related thereto (including, without limitation, with respect to the purchase order and any obligation of Seller to deliver any such acknowledgement set forth in this Agreement).

6.11. Cure of Defaults. On or before the Closing, Seller shall pay all Seller Cure Cost Obligations; or if the Buyer, at its option, elects to pay the Buyer Credit Amount, then, pursuant to Section 3.3(b), the amount otherwise payable to Seller in accordance with Section 3.3(b) shall be reduced by the Buyer Credit Amount.

6.12. Removal of Assigned Contracts. From and after the date hereof until five (5) Business Days prior to the Closing, Buyer may request that Seller remove certain of the Assigned Contracts from Schedule 17.1A and move to reject any such Contracts pursuant to the Bankruptcy Code; provided that Seller may withhold its consent to the removal of any such Assigned Contracts from Schedule 17.1A if the removal of an Assigned Contract from Schedule 17.1A or any rejection thereof that Seller may obtain will (i) give rise to certain rejection damages based on Seller's subsequent rejection of such Contract pursuant to the Bankruptcy Code or (ii) otherwise impede, delay or affect Seller's or any of its Affiliates' plan of reorganization.

## ARTICLE 7
## COVENANTS OF BUYER

Buyer hereby covenants to Seller as follows:

7.1. Actions Before Closing Date. Buyer shall use reasonable best efforts (a) to perform and satisfy all conditions to each of Buyer's and Seller's obligations to consummate the transactions contemplated by this Agreement that are to be performed or satisfied by Buyer under this Agreement and (b) to cause the Closing to occur as promptly as practicable and Buyer shall not, and shall not permit any of its Affiliates to, intentionally take any action that is reasonably likely to prevent or delay the consummation of the transactions contemplated hereby and the performance of its obligations hereunder. At all times from and after the date of this Agreement, Buyer shall maintain cash on hand or capacity under its revolving credit facility or other sources of funds, together in an amount not less than that needed to consummate the transactions contemplated by this Agreement to be consummated at Closing and satisfy its obligations upon any termination of this Agreement pursuant to Article 13 hereof. The "reasonable best efforts" of Buyer shall not require Buyer to expend any money to remedy any breach of representation or warranty hereunder, to commence any litigation or arbitration proceeding, to offer or grant any accommodation (financial or otherwise) to any third party, to obtain any Consent required for the consummation of the transactions contemplated hereby or to sell or agree to sell any Acquired Assets or any assets owned by Buyer or any of its Affiliates.

7.2. Consents; Shell Agreements.

(a) Buyer acknowledges that certain Consents to the transactions contemplated by this Agreement may be required from parties to Contracts to which Seller and/or its Affiliates are party and that such Consents have not been obtained and may not be obtained. Except as otherwise set forth in this Agreement, Buyer agrees that neither Seller nor any of its Affiliates nor any of its or their Related Persons shall have any liability whatsoever to Buyer (and Buyer shall not be entitled to assert any claims) arising out of or relating to the failure to obtain any Consents that may have been, or may be, required in connection with the transactions contemplated by this Agreement, or because of the default, acceleration or termination of or loss of right under any such Contract as a result of such failure. Subject to Section 6.2, Buyer further agrees that no representation, warranty or covenant of Seller contained herein shall be breached or deemed breached, as a result of any default, acceleration or termination or loss of right resulting from such failure, or as a result of any lawsuit, action, claim, proceeding or investigation commenced or threatened by or on behalf of any Person arising out of or relating to the failure to obtain any Consent or any default, acceleration or termination or loss of right resulting from such failure. Subject to the foregoing, at Buyer's written request, if such Consent is required notwithstanding the provisions of Section 365 of the Bankruptcy Code, or (at Buyer's expense) if such Consent is otherwise reasonably requested by Buyer, Seller shall cooperate with Buyer in any reasonable manner in connection with Buyer's obtaining any such Consents or otherwise in connection with the transfer of Assigned Contracts or Transferred Permits or issuance of equivalent Permits; provided that such cooperation shall not include any requirement of Seller or any of its

Affiliates to expend money, commence any litigation or arbitration proceeding or offer or grant any accommodation (financial or otherwise) to any third party.

(b) Without limiting the generality of Section 7.2(a), Buyer acknowledges and agrees that, notwithstanding any other provision of this Agreement, Seller shall have no obligation to obtain the Consent of Equilon Enterprises LLC (d/b/a Shell Oil Products US) or any of its Affiliates, successors or assigns in connection with the transfer of the Shell Purchase Agreement and Shell Environmental Agreement pursuant to this Agreement and the Shell Assignment Agreement or any amendment or modification of the terms and conditions of the Shell Purchase Agreement or Shell Environmental Agreement. Buyer further agrees that no representation, warranty or covenant of Seller contained herein shall be breached or deemed breached, as a result of the failure to obtain such Consent, modification or amendment thereto.

7.3. Adequate Assurances. Buyer covenants and agrees that it shall, unless otherwise agreed with Seller, use good faith efforts to provide, as required by Section 365(f)(2)(B) of the Bankruptcy Code, adequate assurance of the future performance of the Assigned Contracts by Buyer. Buyer will promptly take all actions reasonably requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Sale Order, such as furnishing affidavits, non-confidential financial information or other documents or information for filing with the Bankruptcy Court and making Buyer's employees and representatives available to testify before the Bankruptcy Court, all for the purpose of demonstrating adequate assurance of future performance of the Assigned Contracts by Buyer.

7.4. Cure of Defaults.

(a) Buyer shall, on or prior to the Closing, and subject to the cap contained in the definition of Buyer Cure Cost Obligations, cure any and all monetary defaults under the Assigned Contracts that are required to be cured under the Bankruptcy Code or shall have made adequate provision for payment of such cure amounts at the Closing. In the event that the Base Purchase Price is, in accordance with Section 3.3 hereof, reduced by the Segregated Funds, from and after the Closing, the parties shall cooperate in good faith to promptly resolve any objection to the cure cost amount and, upon resolution, Buyer shall be entitled to use the Segregated Funds applicable to the Cure Cost Contract being resolved in payment thereof; provided that Buyer may not consent to any resolution or settlement that would require application of any Segregated Funds without the prior written consent of Seller.

(b) Buyer shall assume all responsibility for payments in the aggregate amount of $1,017,301 with respect to the purchase orders set forth on Schedule 7.4(b). Subject to the terms of Section 6.10,

(i) the equipment subject to the purchase orders set forth on Schedule 7.4(b) (other than, in each case, the purchase order and underlying equipment with regard to Hy-Bon) will be transferred to Buyer at Closing, upon payment by Seller of an amount equal to $379,995 to IAG, free and clear

of all Liens. To the extent that the remaining payment obligations at Closing related to such purchase orders (as in effect on the Closing Date) (other than the purchase order with regard to Hy-Bon) (x) exceed $379,995, Seller shall be solely responsible for such payment or (y) are less than $379,995 (solely as a result of payment of amounts due and owing thereunder by Seller or any of its Related Persons prior to Closing), Buyer shall at Closing pay to Seller the excess of $379,995 over such remaining payment obligations;

(ii) Buyer (A) shall receive an acknowledgement or letter from Hy-Bon and IAG or (B) have entered into other arrangements with Hy-Bon and IAG (which releases Seller pursuant to the terms of Section 6.10). To the extent that the remaining payment obligations at Closing related to such Hy-Bon purchase orders (as in effect on the Closing Date) (x) exceed $637,306, Seller shall be solely responsible for such payment or (y) are less than $637,306 (solely as a result of payment of amounts due and owing thereunder by Seller or any of its Related Persons prior to Closing), Buyer shall at Closing pay to Seller the excess of $637,306 over such remaining payment obligations.

If any amount is due and owing by Seller in accordance with the immediately foregoing subclauses and Seller has agreed to pay such amounts, Buyer may reduce the amount payable by Buyer at Closing pursuant to Section 3.3(b) by such undisputed amount and such reduction shall be in full satisfaction of Seller's obligations under this Section 7.4(b). Buyer agrees to promptly, but in any event within ten (10) Business Days, after receipt or withholding of any amount owed by Seller pursuant to this Section 7.4(b), remit such payment or withheld amount to IAG. Buyer acknowledges and agrees that it shall be solely responsible for transportation and storage expenses set forth on Schedule 7.4(b) related to Seller's clean fuels project equipment being transferred to Buyer that is currently owned by or subject to the Lien of IAG.

7.5. [Intentionally Omitted.]

7.6. Availability of Business Records. After the Closing Date, Buyer shall provide to Seller, its Affiliates and its and their Related Persons (after reasonable notice and during normal business hours at the expense of Seller, its Affiliates and its and their Related Persons) access to all Business Records of the Business or the Acquired Assets and Assumed Liabilities for periods prior to the Closing and shall preserve, subject to the terms of the Confidentiality Agreement, such Business Records until the later of (a) six (6) years after the Closing Date and (b) the required retention period for all Government contact information, records or documents. Such access includes access to any information in electronic or digital form to the extent reasonably available. Buyer acknowledges that Seller has the right to retain originals or copies of Business Records for periods prior to the Closing. With respect to any litigation and claims that are Excluded Liabilities, Buyer shall render all reasonable assistance that Seller may request in defending such litigation or claim at Seller's expense, including making available to Seller, its counsel and its agents, advisors or representatives, Buyer's personnel most knowledgeable about the matter in question. If, after the Closing, Buyer (or any Affiliate or creditor of Buyer) receives any payment or revenue that belongs to Seller pursuant to this Agreement or any

Ancillary Agreement, Buyer shall promptly remit or cause to be remitted the same to Seller without set-off or deduction of any kind or nature.

7.7. Flying J Marks. Buyer agrees that, within ninety (90) days after the Closing Date, Buyer shall (a) remove, obliterate, cover or replace, as appropriate, all signs, billboards, containers, drums, advertisements or other media containing any Excluded Asset or other service marks, trade names, trade dress or other indicia of origin of Flying J or Seller or any of Flying J's or Seller's Affiliates and (b) return to Seller or, at Seller's option, destroy (and certify such destruction to Seller) all items and materials, including stationery, letterhead and purchase orders, located at the Refinery containing the above described marks.

7.8. Buyer Obligation to Perform; Cooperation with Seller Enforcement of Rights.

(a) From and after the Closing, Buyer shall pay, perform and discharge all Assumed Liabilities when due or obligated and will indemnify and hold Seller, each of its Affiliates and each of their Related Persons harmless as provided in Article 14 for any and all Losses suffered by any of them form any breach of the covenants and agreements of Buyer in this Section 7.8(a).

(b) Notwithstanding the assignment, transfer and conveyance as part of the Acquired Assets of any Contract containing non-competition, non-solicitation, confidentiality and/or work product assignment provisions or similar provisions applicable to a third party (the "***Protective Provisions***") for the benefit of Seller and/or its Subsidiaries, Seller hereby retains the right to enforce each and every Protective Provision of each such Contract against such third party. In furtherance of the foregoing, Buyer shall, at the written request of Seller and at Seller's cost and expense, reasonably cooperate with Seller in its pursuit and prosecution of any claim to enforce any such Protective Provision or any other rights or remedies available under such Contract against such third party (including specific performance and/or immediate injunctive or other equitable relief).

(c) Buyer acknowledges and agrees that the Retained Litigation and Retained Claims are being retained by Seller. Buyer shall, at the written request of Seller and, at Seller's cost and expense, reasonably cooperate with Seller in its pursuit, prosecution, and defense of any Claim related to the Retained Litigation, the Retained Claims or other litigation that may be instituted by or against Seller or its Related Persons related to the Acquired Assets, the operation of the Business or the transactions contemplated hereby, including by making individuals available to provide testimony or information in connection therewith and to make Books and Records available for review, inspection and, as necessary, production.

7.9. Third Party Real Property. Buyer shall grant or continue to grant those rights-of-way, easements, or other right of ingress or egress that are necessary to allow any third party that owns any improvements, equipment, inventory or other tangible personal property located on the Real Property, as set forth on Schedule 7.9, as of the Closing Date for the purposes or repairing, maintaining or otherwise utilizing such tangible personal property.

7.10. Buyer's Assumption of Environmental Obligations. Subject to Section 1.3(c), Buyer agrees to (a) become a party named on the Cleanup and Abatement Order and the Shell/Motiva EPA Consent Decrees and assume all obligations of Seller thereunder on and after the Closing Date, and Buyer shall execute an amendment to the Cleanup and Abatement Order and Shell/Motiva EPA Consent Decrees or other such documents that may be necessary in order to effectuate the same as soon as reasonably practical following the Closing Date and (b) be substituted for Seller as the party in interest with respect to the AIR Litigation.

7.11. Further Assurances. Upon the request and at the sole expense of Seller at any time after the Closing Date (but without additional consideration), Buyer shall execute and deliver such documents as Seller or its counsel may reasonably request to effectuate the transactions contemplated by this Agreement. Without limiting the foregoing, if at any time on or after the Closing Buyer, its Affiliates or any of its or their Related Persons comes into possession or control of any Excluded Assets, Buyer shall promptly but in no event later than ten (10) Business Days after coming into possession or control, return (or cause to be returned) such Excluded Assets to Seller for no additional consideration.

## ARTICLE 8
## BANKRUPTCY PROCEDURES

8.1. Bankruptcy Actions. Seller shall use reasonable best efforts to obtain entry by the Bankruptcy Court of (a) an Order approving the procedures relating to the public auction of the Acquired Assets substantially in the form of Exhibit D attached hereto, with changes thereto reasonably acceptable to Buyer (the "***Bidding Procedures Order***"), and (b) upon completion of the Auction and subject to an Alternative Transaction not being approved in accordance with the Bidding Procedures, an Order approving the sale of the Acquired Assets to Buyer substantially in the form of Exhibit E attached hereto, with changes thereto reasonably acceptable to Buyer (the "***Sale Order***"). Seller shall (x) file all pleadings with the Bankruptcy Court as are necessary or appropriate to secure entry of the Bidding Procedures Order and, upon completion of the Auction and subject to an Alternative Transaction not being approved in accordance with the Bidding Procedures, the Sale Order, and (y) serve such pleadings on all parties known to Seller to be entitled to notice of such pleadings under applicable provisions of the Bankruptcy Code and Rules, including all parties to the Assigned Contracts, all parties that are known to claim interests or liens in or upon the Acquired Assets and all Governments having or asserting jurisdiction over Seller or the Acquired Assets, and shall diligently pursue the obtaining of such orders. Buyer shall promptly take all actions as are reasonably requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Bidding Procedures Order and, as applicable, the Sale Order or any other Order reasonably necessary in connection with the transactions contemplated by this Agreement and the Ancillary Agreements, including furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court and making Buyer's employees and representatives available to testify before the Bankruptcy Court. Furthermore, Buyer covenants and agrees that it shall cooperate with Seller in connection with furnishing information or documents to Seller to satisfy the requirements of adequate assurance of future performance under Section 365(f)(2)(B) of the Bankruptcy Code.

8.2. Bidding Procedures. The bidding procedures (the "***Bidding Procedures***") to be employed with respect to this Agreement are those reflected in the Bidding Procedures Order.

8.3. Approval. Notwithstanding anything in this Agreement to the contrary, Buyer acknowledges and agrees that Seller's obligations under this Agreement and under the Ancillary Agreements are subject to the orders of the Bankruptcy Court in the Chapter 11 Case, including entry of the Bidding Procedures Order and the Sale Order.

## ARTICLE 9
## EMPLOYEE AND BENEFITS MATTERS

This Article 9 sets forth Buyer's and Seller's acknowledgements, covenants and undertakings with respect to certain matters related to employees of the Business.

9.1. Offers of Employment. Prior to the Closing Date Buyer shall offer employment, effective as of the Closing Date, to all employees of Seller listed on Schedule 4.19(d) that are active as of the Closing Date, other than any such employees in respect of whom a notice of termination of employment has been given by Seller (collectively, the "***Business Employees***") at substantially similar salary, wage level, benefits, work rules, and bonus opportunity (and on substantially similar terms and conditions) applicable to employees in comparable positions with Buyer or its Affiliates. Buyer and Seller shall reasonably cooperate with respect to Buyer's potential employment offers to Business Employees, and Seller shall provide Buyer with reasonable access to Business Employees and applicable records prior to the Closing Date to facilitate Buyer's offers of employment. To the extent that Buyer does not offer employment to all Business Employees effective as of the Closing Date, Buyer shall reimburse Seller for the cost of severance as set forth on Schedule 9.1 for each such Business Employee who does not receive an offer of employment, and, if Buyer does not provide offers of employment to Business Employees as described in this Section 9.1, notwithstanding Section 9.5, Buyer shall bear the full and sole responsibility for obligations or liabilities under the WARN Act with respect to such Business Employees.

Nothing in this Agreement is intended to create any Claim or right on the part of any employee of the Business or employee representative thereof and no such employee or employee representative shall be entitled to assert any such Claim or right hereunder. Buyer understands that some of the Business Employees are currently represented at Seller by the Paper, Allied-Industrial, Chemical and Energy Workers International Union, AFL-CIO (Local No. 8-219), and Buyer understands its rights and obligations under the National Labor Relations Act arising from this transaction in regard to those employees and Local No. 8-219.

9.2. Transferred Employees. Those Business Employees who accept such offer of employment and become employees of Buyer pursuant to this Agreement are referred to herein as the "***Transferred Employees***". For the 12-month period following the Closing Date, Buyer shall provide the Transferred Employees and their covered dependents with employee benefits (including health and welfare and retirement benefits) that are substantially similar in the aggregate to the employee benefits (including health and welfare and retirement benefits) provided to employees in comparable positions with Buyer or its Affiliates. Buyer agrees to comply with all applicable Laws in its interactions, discussions and dealings with Business Employees and shall bear the full and sole responsibility for any terminations of Transferred Employees after the Closing.

9.3. 401(k) Plan Rollover. As soon as reasonably practicable following the Closing Date but effective as of the Closing Date, Buyer or one of its Affiliates shall extend coverage under tax-qualified defined contribution pension plan pursuant to Sections 401(a) and 401(k) of the Code (the "***Buyer Savings Plan***") to the Transferred Employees. Buyer shall take the commercially reasonable steps that are necessary to effect, as promptly as practicable after the Closing Date, to the extent elected by Transferred Employees who are participants in the Seller Savings Plan, the direct rollover to Buyer Savings Plan of each Transferred Employee's full account balance (including the promissory notes representing outstanding loans) in the Flying J Inc. Retirement Savings Plan and Big West of California, LLC Contracted Employees 401(k) Plan (collectively, the "***Seller Savings Plan***"). To the extent permitted by the Code and ERISA, until such transfer is accomplished, Seller shall cause, or Seller shall use commercially reasonable efforts to cause, the trustee of the Seller Savings Plan to suspend any default on any loan from the Seller Savings Plan to any Transferred Employee resulting from the transactions contemplated herein.

9.4. Employee Benefit Plans. Buyer will not adopt or assume any Employee Benefit Plans that Seller maintains, and Seller shall be solely responsible for any liabilities which have arisen or accrued from the employment, compensation or benefits of any current or former employee, officer, director, independent contractor or consultant of the Business. Buyer shall recognize solely for purposes of eligibility and vesting (but not for benefit determination) under its policies and employee benefit plans, including pension or retirement plans, the service of any Transferred Employee with Seller prior to the Closing Date.

9.5. WARN Act Obligations. Except as otherwise provided in Section 9.1, Seller shall bear the full and sole responsibility and liability for providing any notice to employees of Seller which may be required pursuant to the WARN Act or any similar applicable law for any employment loss which occurs in connection with this transaction. Seller agrees and acknowledges that Buyer and its Affiliates will not incur any liability under the WARN Act that may occur by the actions of Seller or by Buyer's decision not to hire any of Seller's employees and agrees to hold Buyer harmless from and against, any and all Losses arising or resulting, or alleged to arise or result from liabilities arising under the WARN Act with respect thereto.

9.6. Welfare Benefits Claims. Buyer shall offer, effective as of the Closing Date (or as of such later date on which a Business Employee becomes a Transferred Employee), employee welfare benefit plans which shall provide the Transferred Employees and eligible dependents, with the opportunity for health, medical, dental, vision, life insurance and disability coverage (the "***Buyer Welfare Benefit Plans***"). Claims of Transferred Employees and their eligible beneficiaries and dependents for medical, dental, prescription drug, life insurance, worker's compensation and/or other welfare benefits ("***Welfare Benefits***") (other than disability benefits as described below) that are incurred before the Closing Date are the sole responsibility of Seller and Seller's welfare benefit plans. Claims of Transferred Employees and their eligible beneficiaries and dependents for Welfare Benefits (other than disability benefits for disabilities that arise prior to the Closing Date) that are incurred on or after the Closing Date are the sole responsibility of Buyer and the Buyer Welfare Benefit Plans. For purposes of the preceding provisions of this paragraph, a medical/dental claim is considered incurred on the date when the medical/dental services are rendered or medical/dental supplies are provided, and not when the condition arose or when the course of treatment began; provided, however, that if a Transferred

Employee is hospitalized on the Closing Date, medical/dental services rendered and medical/dental supplies provided during such hospitalizations shall be deemed to be claims incurred prior to the Closing Date and shall be the responsibility of Seller and Seller's welfare benefit plans. Claims of individuals receiving worker's compensation and short-term or long-term disability benefits under a disability plan of Seller prior to the Closing Date are the sole responsibility of Seller and such plan. Claims of Transferred Employees and their eligible beneficiaries and dependents for short-term or long-term disability benefits with respect to disabilities that arise on or after the Closing Date are the sole responsibility of Buyer.

9.7. COBRA Obligations. Seller shall be responsible for satisfying all COBRA obligations to provide continuation coverage with respect to any of the qualified beneficiaries and their covered dependents in accordance with law and with respect to any "qualifying event" which occurs prior to or in connection with the sale. After the Closing Date, Buyer shall provide Transferred Employees and their covered beneficiaries with continuation coverage required by COBRA as a result of "qualifying events" (as defined in COBRA) occurring after the Closing Date.

9.8. No Assumption of Certain Liabilities. Buyer shall assume no liabilities and obligations to any Transferred Employees incurred prior to the Closing Date, including for accrued and unpaid wages relating to the period prior to the Closing Date (including those wages or payments accrued for holiday and vacation pay, sick pay and payroll-related Taxes); provided that Buyer will credit prior service for vacation and leave eligibility with respect to Transferred Employees.

9.9. No Third Party Beneficiaries. Nothing in this Article 9 or any other provision of this Agreement shall be construed to modify, amend, or establish any benefit plan, program or arrangement or in any way affect the ability of the Parties hereto or any other person to modify, amend or terminate any of its benefit plans, programs or arrangements. This Article 9 is not intended to, and shall not be construed to, (i) confer upon any person other than the parties to this Agreement any rights or remedies hereunder or (ii) limit Buyer's right to not hire employees other than the Business Employees or to terminate employees at will.

## ARTICLE 10
## REGULATORY MATTERS

Buyer hereby covenants to Seller, and Seller hereby covenants to Buyer, as follows:

10.1. Antitrust And Other Filings and Notices. Subject to the terms and conditions of this Agreement and to the extent required by applicable Law, each Party shall use its reasonable best efforts to (a) file a Notification and Report Form pursuant to the HSR Act with respect to the transactions contemplated hereby within fifteen (15) Business Days after the date hereof; (b) supply as promptly as practicable any information and documentary material that may be requested or required pursuant to any Antitrust Law, including the HSR Act, and (c) cause the expiration or termination of the applicable waiting periods under the HSR Act or any other Antitrust Law as soon as practicable.

10.2. Cooperation; Confidentiality Agreement. In connection with the efforts referenced in Section 10.1 to obtain all such requisite approvals and authorizations for the transactions contemplated by this Agreement under the HSR Act, any other Antitrust Law, or any state law, each of the Parties shall use reasonable best efforts to (i) cooperate with each other in connection with any filing or submission and in connection with any investigation or other inquiry, including any proceeding initiated by a private party; (ii) keep the other Parties informed in all material respects of any material communication received by such Party or its Affiliates from, or given by such Party or its Affiliates to, any Government and of any material communication received or given in connection with any proceeding by a private party, in each case regarding any of the transactions contemplated hereby; and (iii) permit the other Party to review any material communication given to it by, and consult with each other in advance of any meeting or conference with, any Government, including in connection with any proceeding by a private party. The foregoing obligations in this Section 10.2 shall be subject to the Confidentiality Agreement and any attorney-client, work product or other privilege, and each of the Parties hereto shall coordinate and cooperate fully with the other Parties hereto (and its Affiliates) in exchanging such information and providing such assistance as such other parties may reasonably request in connection with the foregoing and in seeking early termination of any applicable waiting periods under Antitrust Law. No Party shall take any action that will have the effect of delaying, impairing or impeding the receipt of any required Consents or Orders. "***Antitrust Law***" means the Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, and all other Laws and Orders that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition. "***Antitrust Approval***" means any Consent of any Government required under any applicable Antitrust Law or the expiration or termination of any applicable waiting period under any applicable Antitrust Law.

10.3. Objections or Other Challenges. If any objections are asserted with respect to the transactions contemplated hereby under any Antitrust Law or if any suit is instituted by any Government or any private party challenging any of the transactions contemplated hereby as violating any Antitrust Law, each Party shall use reasonable best efforts to resolve such objections or challenge as such Government or private party may have to such transactions, including to vacate, lift, reverse or overturn any Order, whether temporary, preliminary or permanent, so as to permit consummation of the transactions contemplated by this Agreement. Without limiting the generality of the foregoing, Buyer shall promptly take and diligently pursue any or all of the following actions to the extent necessary to eliminate any concerns on the part of, or to satisfy any conditions imposed by, any Government with jurisdiction over the enforcement of any applicable Law, including any Antitrust Law and applicable state Law, regarding the legality of Buyer's acquisition of the Business or any portion thereof, the Acquired Assets or the Assumed Liabilities: (a) entering into negotiations, making proposals and providing information requested by any Government or Person as promptly as possible by (i) if such response is acceptable to the requesting Government or Person, providing information that addresses individual or specific questions at the time obtained or generated and prior to obtaining or generating a complete set of information that addresses all outstanding information requests, (ii) providing a complete set of information that addresses fully the Government's or Person's request as soon as possible after receipt of an oral or written request for such information, and (iii) if required, promptly and continuously providing updated information to the requesting Government or Person as such information is generated or obtained; (b) using its reasonable best

efforts to prevent the entry in a judicial or administrative proceeding brought under any Law, including any Antitrust Law or applicable state Law, by any Government or any other Person of any permanent, temporary or preliminary injunction or other Order that would make consummation of the acquisition of the Business or any portion thereof, the Acquired Assets or the Assumed Liabilities in accordance with the terms of this Agreement unlawful or that would prevent or delay such consummation; (c) taking promptly and diligently pursuing, in the event that an injunction or Order has been issued as referred to in this Section 10.3, any and all steps, including the appeal thereof, the posting of a bond and/or the steps contemplated by this Section 10.3, necessary to vacate, modify or suspend such injunction or Order so as to permit such consummation as promptly as possible and (d) taking promptly and diligently pursuing all other actions and doing all other things necessary and proper consistent with Buyer's obligations under this Article 10 to avoid or eliminate each and every impediment under any Law, including any Antitrust Law, that may be asserted by any Government or any other Person to the consummation of the acquisition of the Business or any portion thereof, the Acquired Assets or the Assumed Liabilities by Buyer in accordance with the terms of this Agreement. Notwithstanding anything to the contrary in this Agreement or any of the Ancillary Agreements, in no event shall Buyer be required to enter into or perform any agreements or submit to any Orders requiring it to sell or otherwise dispose of, or hold separate (through establishment of a trust or otherwise), particular assets or categories of assets (including, after the Closing, any Acquired Assets), or operations (including, after the Closing, the Business, the Refinery, or any portion thereof), of Buyer or any of its Affiliates.

10.4. Environmental Authorizations. In order to obtain all requisite approvals and authorizations under Environmental Laws for the transactions contemplated by this Agreement, including the transfer to or assumption by Buyer of the Environmental Permits, the Cleanup and Abatement Order, the Shell/Motiva Consent Decrees and any other Orders or authorizations of Seller under Environmental Laws with respect to the Refinery which are set forth on Schedule 10.4, each of the Parties shall use reasonable best efforts to cooperate with each other in connection with any required filing or submission, keep the other Party reasonably apprised of the status of any action or communication with the Government, and supply as promptly as practicable any information and documentary material that may be requested or required pursuant to any Environmental Law or assumed written obligation in connection therewith.

## ARTICLE 11
## TAXES AND FEES

11.1. Taxes Related to Purchase of Assets. All state and local sales, use, gross-receipts, transfer, excise, value-added or other similar Taxes incurred in connection with the transfer of the Acquired Assets and the assumption of the Assumed Liabilities, and all recording and filing fees that may be imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets (collectively, "***Transaction Taxes***"), shall be paid by Buyer on or prior to their due date, in all cases to the extent not discharged by operation of the Bankruptcy Code upon entry of the Sale Order. Notwithstanding anything herein to the contrary, Buyer will not pay, and shall not be liable for, Taxes related to any period prior to the Closing Date.

11.2. Cooperation on Tax Matters. Seller and Buyer shall (and shall cause their respective Affiliates to) cooperate fully with each other and make available or cause to be made available to each other for consultation, inspection and copying (at such other Party's expense), in a timely fashion, such personnel, Tax data, relevant Tax Returns or portions thereof and filings, files, books, records, documents, financial, technical and operating data, computer records and other information as may be reasonably required (a) for the preparation by such other Party or its Affiliates of any Tax Returns or (b) in connection with any Tax audit or proceeding including one Party (or an Affiliate thereof) to the extent such Tax audit or proceeding relates to or arises from the transactions contemplated by this Agreement; provided that in no event will Seller contact any taxing authority with respect to any Tax matter that relates to any period on or after Closing without the prior written consent of Buyer, except as required by applicable Law. Any notice received by Seller from any federal, state or local taxing authority shall be promptly forwarded to Buyer.

11.3. Allocation of Purchase Price and Purchase Price Allocation Forms. The Purchase Price, the Assumed Liabilities and other relevant items shall be allocated among the Acquired Assets in accordance with Section 1060 of the Code. Seller shall prepare and deliver to Buyer an allocation schedule setting forth Seller's determination of the allocation (the "***Allocation Schedule***") within sixty (60) days after the date hereof, which Allocation Schedule shall be subject to the reasonable approval of Buyer. The Allocation Schedule shall identify the transferor and transferee thereof and shall be prepared in accordance with Treas. Reg. Section 1.1060-1 (or any comparable provision of state or local Tax Law) or any successor provision. The Parties on behalf of themselves and their respective Affiliates agree that they will report the federal, state, local and other Tax consequences of the purchase and sale hereunder (including in filings on IRS Form 8594) in a manner consistent with such allocation and that they will not take any position inconsistent therewith in connection with any Tax Return, refund claim, litigation or otherwise, unless and to the extent required to do so pursuant to applicable Law. Seller and Buyer shall, and shall cause their Affiliates to, cooperate in the filing of any forms (including IRS Form 8594) with respect to such allocation.

11.4. Prorations. The items of revenue and expense set forth in this Section 11.4 shall be prorated between the Parties (the "***Prorations***") as of the Closing Date, or such other time expressly provided in this Section 11.4, so that the Closing Date is a day of income and expense for Seller.

(a) Ad valorem Taxes. Seller shall be responsible to pay all real and personal property taxes, including penalties and interest thereon, applicable to the Acquired Assets for any fiscal year prior to the fiscal year in which the Closing occurs. Buyer shall be responsible to pay all real and personal property taxes applicable to the Acquired Assets for fiscal years subsequent to the fiscal year in which the Closing occurs. All real and personal property Taxes applicable to the Acquired Assets for the fiscal year in which Closing occurs will be prorated between the Parties as of the Closing Date. Seller's allocated share of the real and personal property Taxes shall be deducted from the Base Purchase Price and Buyer shall assume the responsibility for payment unless the Seller has already paid such Taxes, in which case Buyer's allocated share of such real and personal property Taxes shall be added to the Base Purchase Price and paid to Seller at Closing. If the Closing occurs before the Tax rate is fixed for such fiscal year, the

apportionment of real and personal property Taxes shall be based on the most recently ascertainable Tax statement provided that the Parties shall recalculate and re-prorate the Taxes and make the necessary cash adjustment promptly upon the issuance of the actual tax statements for the fiscal year in which Closing occurs. This Section 11.4(a) shall survive the Closing.

(b) Real Property Leases, Licenses and Easements, Pipeline Rights, Mineral Rights Contracts, Permits and Utilities. Any rents, fees, charges, deposits and other amounts prepaid, accrued or due and payable or to become due and payable for the calendar year or portion thereof in which the Closing occurs under the (i) Real Property Leases, (ii) Real Property Licenses, (iii) Real Property Easements, (iv) Pipeline Rights, (v) Mineral Rights Contracts, (vi) Transferred Permits, and (vii) utility services shall be prorated as of the Closing Date between Seller and Buyer. Buyer hereby agrees and acknowledges that Seller may prepay certain real property taxes to Kern County for the tax years 2010 and 2011 in furtherance of the subdivision of real property contemplated by the Shell Purchase Agreement and on of the Closing Date Buyer shall reimburse Seller for the amount of such prepayment for the periods occurring after the Closing Date.

(c) Other Adjustments and Prorations. All rents, revenues, fees, charges, deposits, prepaid amount and other expenses accrued or due and payable or to become due and payable for the calendar year or portion thereof in which the Closing occurs related to, occurring under or arising from or in connection with the Acquired Assets (and not addressed in Sections 11.4(a) and 11.4(b)) shall be prorated as of the Closing Date between Seller and Buyer.

(d) Estimated Prorations. On or prior to the Business Day immediately preceding the Closing Date, Seller shall deliver to Buyer its good faith estimate of the prorated amount with respect to the matters referred to in this Section 11.4 (the "***Estimated Proration Amount***"), together with reasonable back-up therefor. Whenever possible, such prorations shall be based on actual, current payments by Seller and to the extent such actual amounts are not available, such prorations shall be estimated as of the Closing Date based on actual amounts for the most recent comparable billing period. If, after determination of the Estimated Proration Amount in accordance with this Section 11.4(d), (i) the Estimated Proration Amount is owed by Buyer to Seller, the Base Purchase Price required to be delivered by Buyer shall be increased accordingly or (ii) the Estimated Proration Amount is owed by Seller to Buyer, the Base Purchase Price required to be delivered by Buyer shall be decreased accordingly. Upon the earlier of (x) the date on which the Parties mutually agree that the actual amount of the Prorations has become known or (y) ten (10) Business Days following the end of the calendar year (or portion thereof applicable to all Prorations) in which the Closing occurs, the Prorations shall be re-prorated by the Parties, and to the extent any such re-proration was not taken into account in the calculation of the Estimated Proration Amount, such amount shall be refunded or paid to Buyer or Seller in accordance with this Section 11.4(d) promptly, but in any event within ten (10) Business Days after delivery of notice of payment due. Buyer and Seller shall cooperate in good faith to resolve any dispute with respect to the Prorations. All disputed amounts shall be paid by the relevant Party to the other Party within five (5) Business Days of the resolution of such disputed amounts.

Any payment pursuant to this Section 11.4(d) shall be made together with interest thereon at a rate per annum equal to the rate of interest published by the *Wall Street Journal* as the "prime rate" at large U.S. money center banks on the Closing Date, calculated on the basis of the number of days elapsed from the Closing Date to the date of payment.

11.5. Unbilled Transactional Taxes. If a Tax assessment is levied upon Seller or its Affiliates (or its or their Related Persons) by an authorized Tax jurisdiction for unbilled Transaction Taxes related to the period on or after the Closing Date, then Buyer shall promptly reimburse Seller the amount of such Transaction Taxes including any interest and penalty upon receipt of notification of the same from Seller.

## ARTICLE 12
## CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES

12.1. Conditions Precedent to Performance by Seller and Buyer. The respective obligations of Seller and Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver by Buyer and Seller (other than the condition contained in Section 12.1(a), the satisfaction of which cannot be waived), on or prior to the Closing Date, of the following conditions:

(a) Sale Order. The Bankruptcy Court shall have entered the Sale Order, and no Order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date.

(b) Antitrust Approvals. The applicable waiting periods for the transactions contemplated under this Agreement under the HSR Act applicable to the transactions contemplated hereby shall have expired or been terminated.

(c) No Violation of Orders. No preliminary or permanent injunction or other Order that declares this Agreement, the Master Escrow Agreement or the Indemnity Escrow Agreement invalid or unenforceable in any material respect or that prevents the consummation of the transactions contemplated hereby or thereby shall be in effect on the Closing Date.

(d) No Termination of Agreement. This Agreement shall not have been terminated in accordance with Article 13.

Any condition specified in this Section 12.1 may be waived only by written instrument executed by Buyer and Seller.

12.2. Conditions Precedent to Performance by Seller. The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or before the Closing Date, of the following conditions, any one or more of which may be waived by Seller in its sole discretion in a written instrument executed and delivered by Seller:

(a) Representations and Warranties of Buyer. Each of the representations and warranties made by Buyer in this Agreement shall be true and correct on and as of the Closing Date as if made anew as of such date (except to the extent any such

representation and warranty expressly relates to an earlier date (in which case as of such earlier date)), except to the extent of changes or developments contemplated by the terms of this Agreement or the Ancillary Agreements or caused by the transactions contemplated hereby or thereby and except for any failure of any such representation and warranty to be true and correct as does not have a material adverse effect, and Seller shall have received on the Closing Date a certificate substantially in the form attached hereto as Exhibit B-11 dated as of the Closing Date and signed by a duly authorized signatory of Buyer to that effect.

(b) Performance of the Obligations of Buyer. Buyer shall have performed in all material respects all obligations required under this Agreement to be performed by it on or before the Closing Date (except with respect to the obligation to pay the Purchase Price in accordance with the terms of this Agreement, which obligation shall be performed in all respects as required under this Agreement), and Seller shall have received on the Closing Date a certificate substantially in the form attached hereto as Exhibit B-11 dated the Closing Date and signed by a duly authorized signatory of Buyer to that effect.

(c) Cure of Defaults. Subject to the cap contained in the definition of Buyer Cure Cost Obligations, Buyer shall have cured, at or prior to the Closing, any and all monetary defaults under the Assigned Contracts that are required to be cured under the Bankruptcy Code or shall have made adequate provision for payment of such cure amounts at the Closing.

(d) Buyer's Deliveries. Buyer shall have delivered to Seller all of the items set forth in Section 3.3(c) of this Agreement.

12.3. Conditions Precedent to the Performance by Buyer. The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or before the Closing Date, of the following conditions, any one or more of which may be waived by Buyer in its sole discretion in a written instrument executed and delivered by Buyer:

(a) Representations and Warranties of Seller. Each of the representations and warranties made by Seller in this Agreement (disregarding any material adverse effect or other materiality qualifier therein) shall be true and correct on and as of the Closing Date as if made anew as of such date (except to the extent any such representation and warranty expressly relates to an earlier date (in which case as of such earlier date)), except to the extent such failures to be true and correct do not, individually or in the aggregate, constitute a Material Adverse Effect, and Buyer shall have received on the Closing Date a certificate substantially in the form attached hereto as Exhibit B-12 dated as of the Closing Date and signed by a duly authorized signatory of Seller to that effect.

(b) Performance of the Obligations of Seller. Seller shall have performed in all material respects all obligations required under this Agreement to be performed by it on or before the Closing Date, and Buyer shall have received on the Closing Date a certificate substantially in the form attached hereto as Exhibit B-12 dated as of the Closing Date and signed by a duly authorized signatory of Seller to that effect.

(c) Material Adverse Effect. Since the date of this Agreement, no Material Adverse Effect shall have occurred and be continuing.

(d) Seller's Deliveries. Seller shall have delivered to Buyer all of the items set forth in Section 3.2(a) of this Agreement.

(e) Seller Cure Cost Obligations. On or before the Closing, Seller shall have paid all Seller Cure Cost Obligations, or if Buyer, at its option, elected to pay the Buyer Credit Amount, then, pursuant to Section 3.3(b), the amount otherwise payable by Buyer to Seller in accordance with Section 3.3(b) shall be subject to reduction by the Buyer Credit Amount.

(f) IAG. Seller has complied with its obligations under Section 6.10 and has provided to Buyer any documents required thereunder; provided that to the extent that Seller is unable to comply with this condition in Section 12.3(f) with regard to Hy-Bon, this condition and the condition set forth in Section 12.3(b) (only with respect to compliance with Sections 6.10 and 7.4(b) hereof) shall be deemed to be satisfied if Seller agrees to a reduction in the Base Purchase Price in an amount equal to the cost in excess of $637,306 to replace the Hy-Bon related equipment set forth in Schedule 7.4(B).

12.4. Frustration of Conditions. Neither Buyer nor Seller may rely on the failure of any condition set forth in this Article 12, as applicable, to be satisfied if such failure was caused by such Party's failure to use, as required by this Agreement, its reasonable best efforts to consummate the transactions contemplated hereby.

## ARTICLE 13
## TERMINATION AND EFFECT OF TERMINATION

13.1. Right of Termination. Notwithstanding anything to the contrary contained herein, this Agreement may be terminated only as provided in this Article 13. In the case of any such termination, the terminating Party shall give notice to the other Party specifying the provision pursuant to which the Agreement is being terminated.

13.2. Termination Without Default.

(a) This Agreement may be terminated at any time before Closing:

(i) by mutual written consent of Seller and Buyer;

(ii) by Buyer, on or after May 1, 2010 (the "***Initial Closing Date***"), if any condition contained in Section 12.1 has not been satisfied or waived as of such time; provided that Buyer may extend the Initial Closing Date to June 1, 2010 (the "***Termination Date***") if it pays to Seller, on a weekly basis by wire transfer of immediately available funds to an account designated by Seller, an amount equal to $150,000 per day for the period beginning on the Initial Closing Date and ending on the earlier of the Termination Date and the Closing Date; provided further that Buyer shall have no right to terminate this

Agreement under this Section 13.2(a)(ii) if Buyer's failure to fulfill any of its obligations under this Agreement is the reason that the Closing has not occurred on or before said date;

(iii) by Seller (x) on or after the Initial Closing Date, if Buyer is in breach of its payment obligations under Section 13.2(a)(ii) or (y) on or after the Termination Date, if any condition contained in Section 12.1 has not been satisfied or waived as of such time; provided, however, that Seller shall have no right to terminate this Agreement under this Section 13.2(a)(iii)(y) if Seller's failure to fulfill any of its obligations under this Agreement is the reason that the Closing has not occurred on or before said date;

(iv) by either Buyer or Seller, at any time after an Order becoming final and non-appealable that declares this Agreement invalid or unenforceable in any material respect or that prevents the consummation of the transactions contemplated hereby or thereby (a "***Termination Order***"); provided, however, that neither Seller nor Buyer shall have the right to terminate this Agreement pursuant to this Section 13.2(a)(iv) if such Party or any of its Affiliates has sought entry of, or has failed to use its reasonable best efforts to oppose entry of, such Termination Order;

(v) by Buyer or, if the motion for entry of the Bidding Procedures Order has been timely filed and the Seller has used reasonable best efforts to obtain entry of the Bidding Procedures within forty-five (45) days after the date hereof, by Seller if the Bidding Procedures Order has not been entered on or before the 45th day after the date of this Agreement;

(vi) by Buyer, if, after entry thereof, any provision of the Bidding Procedures Order has been stayed or revoked or any provision of the Bidding Procedures Order or the Sale Order has been amended or otherwise changed in a manner inconsistent with Section 8.1; provided that the right to terminate pursuant to this Section 8.1(a)(vi) shall not be available to Buyer if such stay or revocation, amendment or change is sought by or on behalf of Buyer or any of its Affiliates or Buyer has failed to use its reasonable best efforts to oppose entry of such stay, amendment or change.

(b) If this Agreement is terminated pursuant to Section 13.2(a), (i) the Deposit, together with any interest accrued thereon less fees and expenses of the Escrow Agent, shall be returned to Buyer and each of Buyer and Seller shall take all actions necessary to cause such return as promptly as practicable after the date of such termination (including delivery of joint written instructions to such effect), (ii) this Agreement shall be null and void and have no further legal effect (other than this Article 13, Article 16 and Article 17, each of which shall survive termination), and (iii) except as provided in this Section 13.2, none of Seller, Buyer or any of their respective Affiliates or any of their Related Persons or their Affiliates' Related Persons shall have any liability or obligation arising under or in connection with this Agreement or the transactions contemplated hereby.

13.3. Effect of Failure of Seller's Conditions to Closing.

(a) Seller may terminate this Agreement if there has been (x) a breach by Buyer of Buyer's obligations to deliver the Base Purchase Price (reduced by the amounts contemplated to reduce the Base Purchase Price pursuant to Section 3.3(b)) and the Hydrocarbon Inventory Deposit after satisfaction or waiver of all of the conditions specified herein (determined after giving effect to the provisions of Section 12.4) which has not been cured within fifteen (15) days after written notice thereof from Seller or (y) a material violation or breach by Buyer of (i) any other covenant contained in this Agreement or (ii) any representation or warranty contained in this Agreement, in each case for this clause (y) which has prevented the satisfaction of any condition to the obligations of Seller at the Closing and such violation or breach has not been waived by Seller and in the case of this clause (y) such violation or breach is not capable of being cured or, if capable of being cured, has not been cured prior to the earlier of (A) thirty (30) days after written notice thereof from Seller, or (B) the Termination Date; provided that the right of termination pursuant to this Section 13.3(a) shall not be available to Seller at any time that Seller has violated or is in breach of any covenant, representation or warranty hereunder if such breach has prevented satisfaction of Buyer's conditions to Closing hereunder and has not been waived by Buyer or, if capable of cure, has not been cured by Seller.

(b) If this Agreement is terminated pursuant to Section 13.3(a), (i) Seller shall receive the Initial Deposit from the escrow account established pursuant to the Master Escrow Agreement, together with any interest accrued thereon but less fees and expenses of the Escrow Agent, and each of Buyer and Seller shall take all actions reasonably required to cause such amounts to be released to Seller, provided that, if at such time of termination the Additional Deposit has been deposited pursuant to Section 2.2, subject to Section 13.3(b)(ii), the Additional Deposit, together with any interest accrued thereon, shall be returned to Buyer and each of Buyer and Seller shall take all actions necessary to cause such return as promptly as practicable after the date of such termination (including delivery of joint written instructions to such effect); and (ii) notwithstanding Section 13.3(b)(i), in the event that such termination arises either pursuant to clause (x) of Section 13.3(a) or pursuant to clause (y) of Section 13.3(a) and in the case of such a termination pursuant to clause (y) of Section 13.3(a), such termination arose after a willful material breach of this Agreement by Buyer which has prevented the satisfaction of any condition to the obligations of Seller at the Closing and such breach has not been waived or cured in accordance with this Agreement, then in either case Seller shall receive the Initial Deposit and the Additional Deposit from the escrow account established pursuant to the Master Escrow Agreement, together with any interest accrued thereon but less fees and expenses of the Escrow Agent, and each of Buyer and Seller shall take all actions reasonably required to cause such amounts to be released to Seller, provided that, if the Additional Deposit has not yet been deposited pursuant to Section 2.2, then Buyer shall pay directly to Seller in immediately available funds an amount equal to the Additional Deposit ($8,000,000); (iii) this Agreement shall be null and void and have no further effect (other than this Article 13, Article 16 and Article 17, each of which shall survive termination); and (iv) except as provided in this Section 13.3, none of Seller, Buyer or any of their respective Affiliates or any of their Related Persons

or their Affiliates' Related Persons shall have any liability or obligation arising under or in connection with this Agreement or the transactions contemplated hereby.

13.4. Effect of Failure of Buyer's Conditions to Closing. Buyer may terminate this Agreement if there has been a material violation or breach by Seller of any covenant, representation or warranty contained in this Agreement which has prevented the satisfaction of any condition to the obligation of Buyer at the Closing and such violation or breach has not been waived by Buyer and such violation or breach is not capable of being cured or, if capable of being cured, shall not have been cured prior to the earlier of (x) thirty (30) days after written notice thereof from Buyer, or (y) the Termination Date; provided that the right of termination pursuant to this Section 13.4 shall not be available to Buyer at any time that Buyer has violated or is in breach of any covenant, representation or warranty hereunder if such breach has prevented satisfaction of Seller's conditions to Closing hereunder and has not been waived by Seller or, if capable of cure, has not been cured by Buyer. If this Agreement is terminated pursuant to this Section 13.4: (i) the Deposit, together with any interest accrued thereon but less any fees and expenses of the Escrow Agent, shall be returned to Buyer and each of Buyer and Seller shall take all actions necessary to cause such return as promptly as practicable after the date of such termination (including delivery of joint written instructions to such effect), (ii) notwithstanding Section 13.4(i), to the extent that such termination arises out of Seller's breach of this Agreement and such breach gives rise to Buyer's termination pursuant to this Section 13.4, Seller shall pay Buyer the Break-Up Fee in accordance with Section 13.5(c), (iii) this Agreement shall be null and void and have no further legal effect (other than this Article 13, Article 16 and Article 17, each of which shall survive termination), and (iv) except as provided in this Section 13.4, none of Seller, Buyer or any of their respective Affiliates or any of their Related Persons or their Affiliates' Related Persons shall have any liability or obligation arising under or in connection with this Agreement or the transactions contemplated hereby.

13.5. Termination on Alternative Transaction.

(a) This Agreement may be terminated at any time before Closing by either Buyer or Seller (i) upon or after the entry of an order by the Bankruptcy Court approving any Alternative Transaction if Buyer is not designated as the Back-up Bidder at the Auction or (ii) at the closing of any Alternative Transaction if Buyer is designated as the Back-up Bidder at the Auction.

(b) If this Agreement is terminated pursuant to Section 13.5(a): (i) the Deposit, together with any interest accrued thereon, less any fees and expenses of the Escrow Agent, shall be returned to Buyer within five (5) Business Days after such termination and each of Buyer and Seller shall take all actions necessary to cause such return as promptly as practicable after the date of such termination (including delivery of joint written instructions to such effect) (provided that, to the extent required by the terms of the Master Escrow Agreement, interest may not be returned until the second day of the month following such termination), (ii) Seller shall pay Buyer the Break-Up Fee in accordance with Section 13.5(c), (iii) subject to the delivery of the amounts set forth in Section 13.5(b)(i) and Section 13.3(b)(ii), this Agreement shall be null and void and have

no further legal effect (except for this Article 13, Article 16 and Article 17, each of which shall survive termination), and (iv) except as provided in this Section 13.5(b) and in Section 13.5(c), none of Buyer, Seller, or any of their respective Affiliates or any of their Related Persons or their Affiliates' Related Persons shall have any liability or obligation arising under or in connection with this Agreement.

(c) Break-Up Fee.

(i) If this Agreement is terminated pursuant to Section 13.4 or Section 13.5(a), Seller shall pay to Buyer in immediately available funds a cash fee equal to the Break-Up Fee, such fee to be paid upon the earlier of (A) the termination of this Agreement or (B) the closing of the Alternative Transaction.

(ii) Seller's obligation to pay the Break-Up Fee pursuant to this Section 13.5(c) shall survive termination of this Agreement pursuant to this Section 13.5 and shall constitute a post-petition administrative expense of Seller in the Chapter 11 Case.

(iii) The Break-Up Fee, payable under the circumstances provided in Section 13.5(c)(i) constitutes liquidated damages and not a penalty and is the exclusive remedy of Buyer and its Affiliates for any termination of this Agreement pursuant to this Section 13.5. Buyer shall not, and shall cause each of its Related Persons not to bring any cause of action against or otherwise seek remedies from, Seller or any of its Affiliates or any of its or their Related Persons or any counterparty to an Alternative Transaction or any of such counterparty's Affiliates or its or their Related Persons (other than for payment of the applicable Break-Up Fee when payable hereunder and return of the Deposit together with interest accrued thereon), whether at equity or in law, for breach of contract, in tort or otherwise, in the event that this Agreement is terminated in accordance with Section 13.5(a), and, in such event, any claim, right or cause of action by Buyer or any other Person against Seller, its Affiliates or its or their Related Persons in excess of the applicable Break-Up Fee (and return of the Deposit together with interest accrued thereon) is hereby fully waived, released and forever discharged.

(d) If Seller enters into an Alternative Transaction and Buyer is chosen as the Back-up Bidder, each Party's obligations and rights to consummate the transactions contemplated by this Agreement are tolled until either (i) Seller closes the Alternative Transaction or (ii) Seller informs Buyer that the Alternative Transaction will not be consummated. Upon notification by Seller that the Alternative Transaction will not close and Buyer, as Back-up Bidder, must close the transaction, both Parties shall proceed to the closing of this transaction in accordance with the terms of this Agreement and the obligations of the parties under this Agreement shall automatically, and without further action on the part on any Party, be restored in full.

## ARTICLE 14
## INDEMNIFICATION

14.1. Indemnification.

(a) From and after the Closing (but subject to the provisions of this Article 14), the Seller shall indemnify the Buyer, its Affiliates, and their Related Persons (the "***Buyer Indemnitees***") against and hold them harmless from any loss, liability, damage or expense (hereinafter individually a "***Loss***" and collectively "***Losses***") suffered or incurred by any such Buyer Indemnitee to the extent arising from or related to (i) a breach of any representation or warranty of Seller contained in this Agreement or in any Ancillary Agreement, (ii) any breach by Seller of any covenant requiring performance by Seller pursuant to this Agreement or any Ancillary Agreement, or (iii) any Excluded Assets or Excluded Liabilities.

(b) From and after the Closing (but subject to the provisions of this Article 14), the Buyer shall indemnify the Seller, its Affiliates and their Related Persons (the "***Seller Indemnitees***") against and hold them harmless from any Losses suffered or incurred by any such Seller Indemnitee to the extent arising from or related to (i) any breach of any representation or warranty of Buyer contained in this Agreement or in any Ancillary Agreement, (ii) any breach by Buyer of any covenant requiring performance by Buyer pursuant to this Agreement or any Ancillary Agreement, or (iii) any Assumed Liabilities.

(c) With respect to any claim for indemnification under Sections 14.1(a)(i) or 14.1(b)(i) relating to a breach, inaccuracy or default of a representation or warranty that contains a materiality qualifier, such materiality qualifier shall be disregarded and not given any effect or consideration in any representation or warranty for purposes of the indemnification obligations pursuant to Section 14.1.

14.2. Limitations. No indemnifying party (the "***Indemnifying Party***") shall be entitled to any indemnification pursuant to Sections 14.1(a)(i) or 14.1(b)(i) until the Buyer Indemnitees or Seller Indemnitees (the "***Indemnified Party***"), as applicable, have suffered Losses subject to this provision to which they are entitled to indemnification pursuant to Sections 14.1(a)(i) or 14.1(b)(i), respectively, in excess of an aggregate amount equal to $500,000 (the "***Deductible***"), and then only to the extent such Losses exceed the Deductible; provided, however, that the Deductible shall not apply to Losses relating to or resulting from (i) fraud or (ii) a breach of any of the representations and warranties set forth in Sections 4.1, 4.2, 4.9, 4.11, 4.16, 4.20, 4.21, 5.1 and 5.2. Additionally, no Indemnified Party shall be entitled to any indemnification pursuant to Sections 14.1(a)(i), or 14.1(b)(i) in excess of, in the aggregate, an amount equal to that of $6,000,000 (the "***Cap***"). Notwithstanding anything to the contrary set forth in this Agreement or any Ancillary Agreement, neither the Cap nor any other limitation shall apply to Losses relating to or resulting from (i) fraud, (ii) a breach of any covenant set forth in this Agreement or any Ancillary Agreement, (iii) the Excluded Assets or Excluded Liabilities, (iv) the Assumed Liabilities, or (v) willful misconduct.

14.3. Expiration of Claims. The ability of any Indemnified Party to receive indemnification under 14.1(a)(i), 14.1(a)(ii) (solely with respect to covenants requiring

performance prior to Closing), 14.1(b)(i) or 14.1(b)(ii) (solely with respect to covenants requiring performance prior to Closing) shall terminate on the applicable survival termination date as set forth in Section 16.6 unless such Indemnified Party shall have incurred a Loss prior to the applicable survival termination date and made a claim in writing for indemnification pursuant to this Article 14 prior to such survival termination date (it being understood that if an Indemnified Party has made a claim for indemnification pursuant to this Article 14 prior to such termination date, then such claim for such Loss suffered or incurred, if then unresolved, shall not be extinguished by the passage of the applicable survival period set forth in Section 16.6). The ability of any Indemnified Party to receive in indemnification under Sections 14.1(a)(ii) (with respect to covenants requiring performance at or after Closing), 14.1(a)(iii), 14.1(b)(ii) (with respect to covenants requiring performance at or after Closing) and 14.1(b)(iii) shall not terminate.

14.4. Procedures Relating to Indemnification..

(a) In order for an Indemnified Party to be entitled to receive from the applicable Party from which indemnification is sought pursuant to Section 14.1(a) or 14.1(b) (the "***Indemnifying Party***") any indemnification provided for under this Agreement against such Indemnifying Party, such Indemnified Party must as promptly as reasonably practicable notify in writing the Indemnifying Party after receiving written notice of any action, lawsuit, proceeding, investigation or other claim against by any Person not a party hereto (a "***Third Party Claim***") or discovering the liability, obligation or facts giving rise to such claim for indemnification, describing the claim, the amount thereof and the basis of indemnification therefor; provided that copies of all notices and documents (including court papers) received by the Indemnified Party relating to the Third Party Claim shall be provided within 5 Business Days of receipt of notice of a Third Party Claim; provided, further, that failure to give such notification on a timely basis shall not affect the entitlement to indemnification provided hereunder (so long as given prior to the applicable survival termination date) except to the extent the Defending Party shall have been materially prejudiced as a result of such failure.

(b) If the Indemnifying Party disputes its liability with respect to any such claim, the Indemnifying Party shall give written notice to the Indemnified Party after receipt of full written notice set forth in Section 14.4(a). Upon the Indemnified Party's receipt of a notice of dispute, the Indemnifying Party and the Indemnified Party shall proceed to negotiate a resolution of such dispute and, if not resolved through negotiations within ninety (90) days of the original notice of such claim, such dispute shall be resolved in accordance with Section 16.2.

(c) If a Third Party Claim is made against an Indemnified Party (the "***Claiming Party***"), the Indemnifying Party (the "***Defending Party***") shall, at its own expense, be entitled to participate in the defense thereof and, if it so chooses, to assume the defense thereof (subject to a reservation of rights) with counsel selected by the Defending Party and reasonably satisfactory to the Claiming Party. If the Defending Party elects to assume the defense of a Third Party Claim, the Defending Party shall within thirty (30) days of the Claiming Party's written notice of the assertion of such Third Party Claim notify the Claiming Party of its intent to do so; provided, that the

Defending Party must conduct the defense of the Third Party Claim actively and diligently thereafter. Should a Defending Party so elect to assume the defense of a Third Party Claim, the Defending Party shall not be liable to the Claiming Party for legal expenses subsequently incurred by the Claiming Party in connection with the defense thereof. If the Defending Party assumes such defense, the Claiming Party shall, at its own expense, have the right to participate in the defense thereof and to employ counsel separate from the counsel employed by the Defending Party, it being understood, however, that the Defending Party shall control such defense; provided, however, that the Claiming Party shall be entitled to participate in any such defense with separate counsel at the expense of the Defending Party if so requested in writing by the Defending Party to participate. The Defending Party shall be liable for the reasonable fees and expenses of counsel employed by the Claiming Party for any period during which the Defending Party has not assumed the defense thereof. If the Defending Party chooses to defend any Third Party Claim, then all the parties hereto shall cooperate in the defense or prosecution of such Third Party Claim, including by retaining and (upon the Defending Party's reasonable request) providing to the Defending Party all records and information which are reasonably relevant to such Third Party Claim, and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. Neither the Claiming Party nor the Defending Party shall, without the prior written consent of the other Party, admit any liability with respect to, or settle, compromise or discharge, any Third Party Claim if such admission, settlement, compromise or discharge does not expressly unconditionally release the other Party from all liabilities and obligations with respect to such claim.

(d) After any final decision, judgment or award shall have been rendered by a Government of competent jurisdiction and the expiration of the time in which to appeal therefrom, or a settlement shall have been consummated, or the Defending Party and the Claiming Party shall have reached an agreement, in each case with respect to any indemnification matter, the Claiming Party shall forward to the Defending Party (and the Escrow Agent, if applicable) notice of any sums due and owing by the Defending Party pursuant to this Agreement with respect to such indemnification matter and the Defending Party or the Escrow Agent shall pay, as the case may be, all of such remaining sums so due and owing to the Claiming Party in full within ten (10) days after the date of such notice or in accordance with the Indemnity Escrow Agreement, as applicable, by wire transfer of immediately available funds to the account or accounts designated in writing by the Claiming Party.

(e) For the avoidance of doubt, none of the Losses indemnifiable under this Article 14 shall include any type of damages of the type that Section 16.17 provides is not recoverable by any party from and after the Closing.

14.5. Determination of Loss Amount. The amount of any and all Losses under this Article 14 shall be determined net of any amounts recovered by any Indemnified Party under or pursuant to any insurance policy or title insurance policy pursuant to which or under which such Indemnified Party is a party or has rights (collectively, "***Alternative Arrangements***").

14.6. Release of Indemnity Escrow Funds.

(a) Not later than the nine (9) month anniversary of the Closing Date (the "***First Release Date***"), Buyer and Seller shall cause the Escrow Agent (including by delivering joint written instructions to the Escrow Agent) to disburse to Seller from the Indemnity Escrow Funds, an amount equal to the excess of (i) $4,000,000, minus (ii) the sum (without duplication) of (A) the aggregate amount for which claims for indemnification of the Buyer Indemnitees that were asserted pursuant to this Agreement prior to the First Release Date and are still pending (or, to the extent finally resolved in favor of the Buyer Indemnitees, have not been paid from the Indemnity Escrow Funds) as of the First Release Date (such aggregate amount, the "***Interim Claim Amount***") and (B) the aggregate amount of all distributions from the Indemnity Escrow Funds to any Buyer Indemnitee or any designee thereof prior to the First Release Date. In the event that, after the First Release Date but prior to the Second Release Date, it is finally determined in accordance with this Agreement that the Buyer Indemnitees are not entitled to some portion of the Interim Claim Amount pursuant to this Agreement, Buyer and Seller shall, within five (5) Business Days after such final determination, cause the Escrow Agent (including by delivering joint written instructions to the Escrow Agent) to disburse to Seller from the Indemnity Escrow Funds, that portion of the Interim Claim Amount which, when taken together with the amounts previously disbursed or released from the Indemnity Escrow Funds pursuant to this Section 14.6, would not be in excess of (i) $4,000,000, minus (ii) the sum (without duplication) of (A) the aggregate amount of all claims for indemnification of the Buyer Indemnitees that were asserted pursuant to this Agreement prior to the First Release Date and are still pending (or, to the extent finally resolved in favor of the Buyer Indemnitees, have not been paid from the Indemnity Escrow Funds) as of the date of final determination of such Interim Claim Amount, and (B) the aggregate amount of all distributions from the Indemnity Funds to any Buyer Indemnitee or a designee thereof prior to the First Release Date.

(b) Not later than the twelve (12) month anniversary of the Closing Date (the "***Second Release Date***"), the Escrow Agent shall disburse to Seller from the Indemnity Escrow Funds, an amount equal to the excess of (i) all of such then-remaining Indemnity Escrow Funds minus (ii) the aggregate amount for which claims for indemnification (including Interim Claim Amounts) of the Buyer Indemnitees were asserted in accordance with Section 14.4 pursuant to this Agreement prior to the Second Release Date and are still pending (or, to the extent finally resolved in favor of the Buyer Indemnitees, have not been paid from the Indemnity Escrow Funds) as of the Second Release Date (the "***Final Claim Amount***"). Furthermore, after the Second Release Date, within five (5) Business Days after it is finally determined in accordance with this Agreement that all or any portion of the Final Claim Amount is not owed to any Buyer Indemnitee hereunder, the Escrow Agent shall disburse to Seller from the Indemnity Escrow Funds, all or such portion of the Final Claim Amount; provided that the remaining Indemnity Escrow Funds, after giving effect to such disbursement, are at least equal to the aggregate amount for which claims for indemnification of the Buyer Indemnitees were asserted in accordance with Section 14.4 pursuant to this Agreement prior to the Second Release Date and are still pending (or, to the extent finally resolved in

favor of the Buyer Indemnitees, have not been paid from the Indemnity Escrow Funds) as of the date of such disbursement of such Final Claim Amount (or portion thereof).

14.7. Exclusive Remedy. NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, IF THE CLOSING OCCURS, EXCEPT (I) FOR CLAIMS FOR INJUNCTIVE OR OTHER EQUITABLE RELIEF, OR (II) IN THE CASE OF FRAUD OR WILLFUL MISCONDUCT, NO PARTY SHALL HAVE ANY LIABILITY, AND NO PARTY SHALL MAKE ANY CLAIM, FOR ANY LOSS OR OTHER MATTER (AND THE PARTIES HEREBY WAIVE ANY RIGHT OF CONTRIBUTION AGAINST EACH OTHER AND THEIR RESPECTIVE AFFILIATES), UNDER, ARISING OUT OF OR RELATING TO THIS AGREEMENT (INCLUDING ANY CERTIFICATE DELIVERED PURSUANT HERETO), ANY ANCILLARY AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, WHETHER BASED ON CONTRACT, TORT, STRICT LIABILITY, OTHER LAWS OR OTHERWISE. THE INDEMNITY ESCROW FUNDS SHALL BE THE SOLE AND EXCLUSIVE SOURCE OF RECOVERY WITH RESPECT TO SECTION 14.1(A)(I). THE INDEMNITY ESCROW FUNDS SHALL BE A NON-EXCLUSIVE SOURCE OF RECOVERY WITH RESPECT TO SECTION 14.1(A)(II) AND SECTION 14.1(A)(III).

## ARTICLE 15
## ADDITIONAL AGREEMENTS

15.1. Litigation Support. In the event and for so long as any Party or any of its Affiliates or any of its or their Related Persons actively is contesting or defending against any action, suit, audit, proceeding, hearing, investigation, charge, complaint, claim, or demand in connection with (a) any transaction contemplated by this Agreement or the Ancillary Agreements or (b) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction on or prior to the Closing Date involving Seller or the Business, the other Party will reasonably cooperate with the contesting or defending Person and its counsel (at the expense of the contesting or defending Person) in the contest or defense, make available its personnel, and provide such testimony and access to its books and records as shall be necessary in connection with the contest or defense, all at the sole cost and expense of the contesting or defending Person (unless the contesting or defending Person is entitled to indemnification therefor pursuant to this Agreement).

15.2. Cancellation of Accounts from Seller. Buyer acknowledges and agrees that, at or prior to the Closing, Seller and its Affiliates may (but shall not be obligated to) cancel or forgive any note or other liability or obligation (including intercompany debt) owing from Seller or any of its Affiliates to the Business (other than accounts receivable and accounts payable arising in the Ordinary Course of Business), that such cancellation or forgiveness shall be without liability to Seller or any such Affiliate and that all representations and warranties made hereunder shall be made as though such receivable, note, or other liability or obligation was never outstanding. Furthermore, for the avoidance of doubt, nothing in this Agreement shall prevent, or be construed to prevent, Seller or any of its Affiliates from (x) using cash and/or cash equivalents of any of Seller or its Affiliates and/or of the Business as Seller deems fit (including by causing the distribution by any of the foregoing Persons of its cash and/or cash equivalents to Seller or any other Person or the repayment of indebtedness or obligations of Seller and/or any of

its Affiliates) and/or (y) transferring and/or otherwise distributing to Seller and/or any of its post Closing Affiliates any Excluded Assets, subject in all cases to any required approval of the Bankruptcy Court.

15.3. Insurance Matters. As of the Closing Date, the coverage under all insurance policies maintained by Seller or any of its Affiliates related to the Business shall continue in force only for the benefit of Seller and its Affiliates and not for the benefit of Buyer or its Affiliates (including, after the Closing, the Business) other than as set forth in this Section 15.3. Buyer agrees to arrange for its own insurance policies with respect to the Business covering all periods beginning on the Closing Date and agrees not to seek, other than as set forth in this Agreement, to benefit from any of the insurance policies maintained by Seller or its Affiliates which may provide coverage for claims relating in any way to the Business prior to the Closing. With respect to any loss, liability or damage relating to, resulting from or arising out of the conduct of the Business on or prior to the Closing Date and that constitutes an Assumed Liability and as to which Seller or any of its Affiliates or Related Persons would be entitled to assert a claim for recovery under any policy of insurance maintained by or for the benefit of Seller or any of its Affiliates or Related Persons thereof in respect of the Acquired Assets, at the request of Buyer, Seller will, and will cause its Affiliates and Related Persons to, use their respective commercially reasonable efforts to assert, or to assist Buyer in asserting, one or more claims under such insurance covering such loss, liability or damage to the extent Seller or any of its Affiliates or Related Persons is entitled to assert such claim(s). Any recovery received by Seller as a result of any such assertion shall be promptly paid to Buyer. Buyer agrees to pay or assume all costs paid or incurred by Seller in connection with any such assertion of any such claim (including deductibles, self-insured retentions and other retained amounts). Buyer agrees to cooperate with Seller in connection with any assertion of claims for the benefit of Buyer as contemplated in this Section 15.3.

## ARTICLE 16
## MISCELLANEOUS

16.1. Successors and Assigns. Except as otherwise provided in this Agreement, no Party may assign this Agreement or any rights or obligations hereunder without the prior written consent of the other Party and any such attempted assignment without such prior written consent shall be void and of no legal force or effect. This Agreement inures to the benefit of and is binding upon the successors and permitted assigns of the Parties. For all purposes hereof, a transfer, sale or disposition of a majority of the voting capital stock or other voting interests of a Party (whether by contract or otherwise) shall be deemed an assignment hereunder. Notwithstanding anything herein to the contrary, without amending, modifying or terminating any of Buyer's obligations under this Agreement, Buyer may, not less than five (5) Business Days prior to Closing, designate one or more of its Subsidiaries or Affiliates to purchase all or any portion of the Acquired Assets and execution and delivery by such Person(s) of any agreement or document contemplated by Section 3.3(c) of this Agreement shall be in full satisfaction of Buyer's obligations under Section 3.3(c) to deliver any such agreement or document; provided that, if such designation or purchase of any Acquired Assets by such Affiliate or Subsidiary would cause the Closing Date to be delayed, such designation or purchase may only be made or occur with the prior written consent of Seller.

16.2. GOVERNING LAW; JURISDICTION. THIS AGREEMENT SHALL BE CONSTRUED, PERFORMED AND ENFORCED IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS OF THE STATE OF DELAWARE (WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICTS OF LAWS THEREOF), EXCEPT TO THE EXTENT THAT THE LAWS OF SUCH STATE ARE SUPERSEDED BY THE BANKRUPTCY CODE; PROVIDED THAT THE VALIDITY AND ENFORCEABILITY OF ALL CONVEYANCE DOCUMENTS OR INSTRUMENTS EXECUTED AND DELIVERED PURSUANT TO THIS AGREEMENT INSOFAR AS THEY AFFECT TITLE TO REAL PROPERTY ARE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA. FOR SO LONG AS SELLER IS SUBJECT TO THE JURISDICTION OF THE BANKRUPTCY COURT, THE PARTIES HERETO AND THE GUARANTOR IRREVOCABLY ELECT AS THE SOLE JUDICIAL FORUM FOR THE ADJUDICATION OF ANY MATTERS ARISING UNDER OR IN CONNECTION WITH THE AGREEMENT, AND CONSENT TO THE EXCLUSIVE JURISDICTION OF, THE BANKRUPTCY COURT. AFTER SELLER IS NO LONGER SUBJECT TO THE JURISDICTION OF THE BANKRUPTCY COURT, ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY MAY BE BROUGHT IN THE COURTS OF THE STATE OF DELAWARE SITTING IN WILMINGTON OR OF THE UNITED STATES FOR THE DISTRICT OF DELAWARE, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES AND THE GUARANTOR CONSENTS TO THE NON-EXCLUSIVE JURISDICTION OF THOSE COURTS. THE GUARANTOR AND EACH OF THE PARTIES IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF *FORUM NON CONVENIENS*, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN ANY SUCH JURISDICTION IN RESPECT OF THIS AGREEMENT, THE ANCILLARY AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

16.3. Mutual Disclosures. Prior to the Closing, each of Buyer and Seller shall promptly notify the other Parties hereto if such Party obtains knowledge that any of the representations and warranties in this Agreement or the Disclosure Schedules are not true and correct in all material respects, or if such Party obtains actual knowledge of any material errors in or omissions from the Disclosure Schedules; provided that such knowledge shall not limit any right set forth in Article 12 or Article 14.

16.4. Disclosure Schedules; Disclosure Schedule Supplements.

(a) From time to time prior to the Closing, Seller shall supplement or amend the Disclosure Schedules to this Agreement with respect to any matter that, if existing, occurring or known at the date of this Agreement, would have been required to be set forth or described in the Disclosure Schedules. No such update shall be deemed to have amended any Disclosure Schedule for purposes of Article 12 or Article 14.

(b) The inclusion of information by Seller in the Disclosure Schedules shall not be construed as or constitute an admission or agreement that such information is material to the Business, the Refinery, the Acquired Assets or the Assumed Liabilities, or

to Seller. In addition, matters reflected in the Disclosure Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Disclosure Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. Neither the specifications of any dollar amount in any representation, warranty or covenant contained in this Agreement nor the inclusion of any specific item in the Disclosure Schedules is intended to imply that such amount, or higher or lower amounts, or the item so included or other items, are or are not material or would or would not cause, or be expected to cause, a Material Adverse Effect, and no Party (or their respective Related Persons) shall use the fact of the setting forth of any such amount or the inclusion of any such item in any dispute or controversy between the Parties as to whether any obligation, item or matter not described herein or included in the Disclosure Schedules is or is not material or would cause, or be expected to cause, a Material Adverse Effect, in each case, for purposes of this Agreement. Further, neither the specification of any item or matter in any representation, warranty or covenant contained in this Agreement nor the inclusion of any specific item in the Disclosure Schedules is intended to imply that such item or matter, or other items or matters, are or are not in the Ordinary Course of Business, and no Party (or their respective Related Persons) shall use the fact of the inclusion of any such items or matters in any dispute or controversy between the Parties as to whether any obligation, item or matter not described herein or included in the Disclosure Schedules is or is not in the Ordinary Course of Business for purposes of this Agreement.

16.5. Warranties Exclusive.

(a) The representations, warranties, covenants and agreements contained in this Agreement and the Ancillary Agreements are the only representations, warranties, covenants or agreements given by either Party and all other express or implied warranties are disclaimed. Each of Buyer and Seller acknowledges that (i) neither Buyer nor Seller is making any representations or warranties, in this Agreement or in any Ancillary Agreement, regarding or relating to any Affiliate, (ii) neither Buyer nor Seller shall have any obligations or liabilities under this Agreement or any Ancillary Agreements with respect to any of their respective Affiliates, and (iii) neither Buyer nor Seller has relied on any representation, warranty, covenant or agreement of the other Party or their respective Affiliates or Related Persons, other than the express representations, warranties, covenants and agreements made in this Agreement and the Ancillary Agreements. Furthermore, Buyer acknowledges and agrees that, except as expressly provided in this Agreement and the Ancillary Agreements, (i) the Acquired Assets are conveyed "AS IS," "WHERE IS" and "WITH ALL FAULTS" and that ALL WARRANTIES OF MERCHANTABILITY, USAGE OR SUITABILITY, FITNESS FOR A PARTICULAR PURPOSE OR CONFORMITY TO MODELS, SAMPLES OF MATERIALS OR MANUFACTURER DESIGN ARE DISCLAIMED, (ii) Buyer has made its own investigation of the Acquired Assets and Assumed Liabilities and, based on such investigation and its own conclusions derived from such investigation, has elected to proceed with the transactions contemplated hereby and (iii) no material or information provided by or communications made by (or on behalf of) Seller or its Affiliates or its or their Related Persons will create any representation or warranty of any kind, whether express or implied, with respect to the Acquired Assets and the title thereto, the operation

of the Acquired Assets, the Assumed Liabilities, the Business, the Refinery or the prospects (financial and otherwise), risks and other incidents of the Business.

(b) Without limiting the generality of the foregoing, Buyer acknowledges and agrees that none of Seller or its Affiliates or its or their Related Persons has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Business, except as expressly set forth in this Agreement or as and to the extent required by this Agreement to be set forth in the Disclosure Schedules. Buyer further agrees that none of Seller or its Affiliates or its or their Related Persons will have or be subject to any liability to Buyer or any other Person resulting from the distribution to Buyer, or Buyer's use of, any such information and any information, document or material made available to Buyer or its Related Persons, whether in certain "data rooms" and online "data sites," management, marketing or banking presentations or any other form, in expectation of the transactions contemplated by this Agreement.

(c) In connection with Buyer's investigation of the Business, Buyer may have reviewed certain projections, including projected statements of operating revenues and income from operations of the Business and certain business plan information regarding the Business. Buyer acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Buyer is familiar with such uncertainties, that Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the assumptions underlying such estimates, projections and forecasts), and that Buyer shall have no claim against Seller or its Affiliates or its or their Related Persons arising therefrom or related thereto. Accordingly, none of Seller or its Affiliates or its of their Related Persons makes any representations or warranties whatsoever with respect to such estimates, projections and other forecasts and plans (including the reasonableness of the assumptions underlying such estimates, projections and forecasts).

16.6. Survival of Representations and Warranties. The representations and warranties set forth in this Agreement or in any Ancillary Agreement shall survive the Closing and shall terminate on the date that is twelve (12) months after the Closing Date. The covenants and agreements of any Party set forth in this Agreement and in any Ancillary Agreement, to the extent requiring performance by such Party prior to the Closing, shall terminate on the date that is twelve (12) months after the Closing Date. Each covenant and agreement requiring performance at or after the Closing shall expressly survive Closing and nothing in this Section 16.6 shall be deemed to limit any rights or remedies of any Person for breach of any such covenant (with it being understood that nothing in this Section 16.6 shall limit or affect (i) Buyer's or any of its Affiliates' liability for the failure to pay the Purchase Price, assume the Assumed Liabilities or pay other amounts as required under this Agreement or (ii) Seller's or any of its Affiliates' liability for the failure to retain or discharge the Excluded Liabilities or to pay any other amounts as required under this Agreement).

16.7. No Recourse Against Affiliates or Related Persons.

(a) Buyer (on its behalf and on behalf of its Related Persons) acknowledges and agrees that, from and after the Closing, to the fullest extent permitted under

applicable Law, any and all rights, claims and causes of action it may have against Seller's Affiliates and Related Persons relating to the operation of the Business, the Refinery or relating to the subject matter of this Agreement or the Disclosure Schedules, and the transactions contemplated hereby or thereby, arising under or based upon any Law or in equity (including any right, whether arising at law or in equity, to seek indemnification, contribution, cost recovery, damages, or any other recourse or remedy, including as may arise under common law or Environmental Law) are hereby waived. Nothing in this Section 16.7(a) shall be deemed to limit or amend any rights of any Buyer Indemnitee set forth in this Agreement (i) for breach of this Agreement or (ii) with respect to the transactions contemplated hereby, in each case including but not limited to those rights set forth in Article 14.

(b) Seller (on its behalf and on behalf of its Related Persons) acknowledges and agrees that, from and after the Closing, to the fullest extent permitted under applicable Law, any and all rights, claims and causes of action it may have against Buyer's Affiliates and Related Persons relating to the subject matter of this Agreement or the Disclosure Schedules, and the transactions contemplated hereby or thereby, arising under or based upon any Law or in equity (including any right, whether arising at law or in equity, to seek indemnification, contribution, cost recovery, damages, or any other recourse or remedy, including as may arise under common law or Environmental Law) are hereby waived. Nothing in this Section 16.7(b) shall be deemed to limit or amend any rights of any Seller Indemnitee set forth in this Agreement (i) for breach of this Agreement or (ii) with respect to the transactions contemplated hereby, in each case including but not limited to those rights set forth in Article 14.

(c) Each of Buyer and Seller acknowledges and agrees that the representations, warranties, covenants, agreements contained in Section 16.5, Section 16.6 and this Section 16.7 are an integral part of the transactions contemplated by this Agreement and that, without these agreements, the Parties would not enter into this Agreement.

16.8. Mutual Drafting. This Agreement is the result of the joint efforts of Buyer and Seller, and each of them and their respective counsel have reviewed this Agreement and each provision hereof has been subject to the mutual consultation, negotiation and agreement of the Parties, and the language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and therefore there shall be no construction against either Party based on any presumption of that Party's involvement in the drafting thereof.

16.9. Expenses. Except as otherwise provided herein, each of the Parties hereto shall pay its own expenses in connection with this Agreement and the transactions contemplated hereby, including any legal, accounting, banking, consulting and advisory fees, whether or not the transactions contemplated hereby are consummated. Without limiting the generality of the foregoing, each of Seller and Buyer shall be solely responsible for payment of any brokerage, investment banking, brokerage or similar fee payable upon consummation of the transactions contemplated hereby to the extent entered into or agreed to by such party or an Affiliate of such party prior to the Closing. Buyer shall pay the cost of all surveys, title insurance policies, title and environmental consultant reports obtained by Buyer in connection with this Agreement and

the Ancillary Agreements and the transactions contemplated hereby and thereby and all filing fees required to be paid in connection with any filings made or notices given pursuant to any Antitrust Law in connection with this Agreement.

16.10. Severability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Agreement. In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision survives to the extent it is not so declared, and all of the other provisions of this Agreement remain in full force and effect only if, after excluding the portion deemed to be unenforceable, the remaining terms provide for the consummation of the transactions contemplated hereby in substantially the same manner as originally set forth at the later of the date this Agreement was executed or last amended.

16.11. Notices. All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (a) if personally delivered, on the date of delivery, (b) if delivered by express courier service of national standing (with charges prepaid), on the Business Day following the date of delivery to such courier service, (c) if deposited in the United States mail, first-class postage prepaid, on the fifth Business Day following the date of such deposit, or (d) if delivered by telecopy, upon confirmation of successful transmission, (i) on the date of such transmission, if such transmission is completed at or prior to 5:00 p.m., local time of the recipient Party on a Business Day, on the date of such transmission, and (ii) on the next day following the date of transmission, if such transmission is completed after 5:00 p.m., local time of the recipient Party, on the date of such transmission or is transmitted on a day that is not a Business Day. All notices, demands and other communications hereunder shall be delivered as set forth below, or pursuant to such other instructions as may be designated in writing by the Party to receive such notice:

Notices to Seller:

Big West of California, LLC
c/o Flying J Inc.
1104 Country Hills Drive
Ogden, Utah 84403
Attention: Senior Corporate Counsel
Facsimile: 810-624-1263
E-mail: Brett.Bailey@flyingj.com

with a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Attention: Adam C. Paul
Richard J. Campbell, P.C.

Facsimile: (312) 862-2200
E-mail: Adam.Paul@kirkland.com
Richard.Campbell@kirkland.com

Notices to Buyer:

Paramount Petroleum Corporation
c/o Alon USA Energy, Inc.
7616 LBJ Freeway, Suite 300
Dallas, TX 75251
Attention: General Counsel

with a copy to (which shall not constitute notice):

Jones Day
2727 N. Harwood St.
Dallas, TX 75201
Attention: Greg Gordon

16.12. Amendments; Waivers. This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by the Parties, or in the case of a waiver, by the Party waiving compliance. Any waiver by any Party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, is not deemed to be nor construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

16.13. Public Announcements. Prior to the Closing Date, no Party shall make any press release or public announcement concerning the transactions contemplated by this Agreement without the prior written approval of the other Party, unless a press release or public announcement is required by Law or Order of the Bankruptcy Court. If any such announcement or other disclosure is required by Law or Order of the Bankruptcy Court, the disclosing Party shall give the non-disclosing Party prior notice of, and an opportunity to comment on, the proposed disclosure. The Parties acknowledge that Seller will file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order and Bidding Procedures Order.

16.14. Entire Agreement. Except for the Confidentiality Agreement, this Agreement and the Ancillary Agreements contain the entire understanding among the Parties with respect to the transactions contemplated hereby and supersede and replace all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions. All Disclosure Schedules hereto and any documents and instruments delivered pursuant to any provision hereof are expressly made a part of this Agreement as fully as though completely set forth herein.

16.15. Parties in Interest.

(a) Nothing in this Agreement is intended to confer any rights or remedies under or by reason of this Agreement on any Persons other than Seller and Buyer and their respective successors and permitted assigns; provided that, subject to the provisions of Article 13 and Section 16.19, (i) it is acknowledged and agreed that the Seller and/or one or more of such Affiliates may liquidate in connection with the Chapter 11 Cases; (ii) any Related Person of Seller or its Affiliates or Buyer, as applicable, may enforce the terms of any provision of this Agreement in which such Related Person is referenced as a beneficiary of such provision; and (iii) the Buyer Indemnitees and the Seller Indemnitees are intended third party beneficiaries of Article 14 of this Agreement and shall be entitled to enforce the provisions contained therein.

(b) Without limiting or amending the obligations of Buyer hereunder, to the extent that any obligation or liability of Buyer hereunder is to be performed or paid by a Related Person of Buyer, this Agreement shall constitute an obligation of Buyer to cause such Related Person to perform. Nothing in this Agreement is intended to relieve or discharge the obligations or liability of any third Persons to Seller or Buyer or their respective Affiliates. No provision of this Agreement gives any third Persons any right of subrogation or action over or against Seller or Buyer or their respective Affiliates.

16.16. Guarantor. Guarantor hereby guarantees Buyer's obligation to pay the Base Purchase Price on the terms and subject to the conditions set forth in this Agreement (including without limitation Articles 12 and 13 and Section 16.19), and the amount, if any, required to be paid by Buyer upon any termination of this Agreement in accordance with Section 13.3 hereof. Guarantor hereby represents and warrants to Seller that (a) this Agreement has been duly authorized, executed and delivered by Guarantor, (b) no further corporate action is required on the part of Guarantor or any of its equityholders for Guarantor to authorize, execute or deliver this Agreement, (c) this Agreement represents the legal, valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a proceeding in equity or at law), and (d) the execution, delivery and performance by Guarantor of this Agreement and the consummation of the transactions contemplated hereby do not (i) violate the Organizational Documents of Guarantor, (ii) violate any material Law applicable to Guarantor or by which any property or asset of Guarantor is bound, (iii) result in any breach of, constitute a default under, require any consent of any Person pursuant to, or give to others any rights of termination, acceleration or cancellation of, any material contract or agreement to which Guarantor is a party, or (iv) violate any material Order, permit or other governmental authorization related to the business of Buyer. For the avoidance of doubt, this Section 16.16 shall survive termination of this Agreement solely with respect to the guarantee of Buyer's obligation to pay any amounts required to be paid by Buyer upon any termination of this Agreement in accordance with Section 13.3 hereof. Notwithstanding anything herein to the contrary, Guarantor may replace all or any portion of the guarantee described in this Section 16.16 with (i) a letter of credit or letters of credit on the terms reasonably acceptable to Buyer and Seller or (ii) a guarantee from Alon Israel Oil Company, Ltd., Guarantor's parent company, on the terms described in this Section 16.16. For the avoidance of doubt, Guarantor agrees to be bound by the terms and conditions of Section 16.2.

16.17. DAMAGES. FROM AND AFTER THE CLOSING, NO PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, EXEMPLARY, SPECIAL, INDIRECT OR PUNITIVE DAMAGES (INCLUDING LOST PROFITS, LOSS OF PRODUCTION OR OTHER DAMAGES ATTRIBUTABLE TO BUSINESS INTERRUPTION) ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT. THE EXCLUSION OF CONSEQUENTIAL, INCIDENTAL, EXEMPLARY, SPECIAL, INDIRECT OR PUNITIVE DAMAGES AS SET FORTH IN THE PRECEDING SENTENCE SHALL NOT LIMIT THE RIGHTS OF ANY PERSON ENTITLED TO INDEMNIFICATION UNDER THIS AGREEMENT TO ANY SUCH DAMAGES PAYABLE TO THIRD PERSONS IN CONNECTION WITH A MATTER FOR WHICH A PERSON IS ENTITLED TO INDEMNIFICATION UNDER THIS AGREEMENT.

16.18. WAIVER OF JURY TRIAL. THE PARTIES TO THIS AGREEMENT EACH HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (I) ARISING UNDER THIS AGREEMENT OR (II) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS RELATED HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY, OR OTHERWISE. THE PARTIES TO THIS AGREEMENT EACH HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

16.19. Specific Performance; Limitations on Liability. Seller acknowledges and agrees that irreparable damage would occur in the event that any of the covenants or obligations of Seller contained in this Agreement were not performed by Seller in accordance with their specific terms or were otherwise breached by Seller. It is accordingly agreed that Buyer shall be entitled (in addition to any other remedy that may be available to it whether in law or equity, including monetary damages, as the same may otherwise be limited by this Agreement) to seek and obtain (a) a decree or order of specific performance to enforce the observance and performance of such covenant or obligation, and (b) an injunction restraining such breach or threatened breach. Seller further agrees that (x) none of Buyer or its Affiliates or its or their Related Persons shall be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this Section 16.19, and Seller irrevocably waives any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument and (y) Seller irrevocably waives its right to contest any of the relief to which Seller is entitled. Except as provided in Section 14.7, Seller shall not in any event be entitled to seek or obtain any decree or order of specific performance, any injunction or any other form of equitable relief against Buyer in relation to any covenant or obligation of Buyer contained in this Agreement (including without limitation Buyer's obligation to deliver the Base Purchase Price after all other conditions hereunder have been satisfied or waived and the applicable cure period has expired). Notwithstanding anything to the contrary expressed or implied in this Agreement, unless the Closing shall have occurred (in which case the provisions

of Section 14.7 will be operative), Seller's right, if any, to terminate this Agreement in accordance with Article 13 and to receive in accordance with the provisions of Section 13.3 the applicable amount or amounts, if any, specified in Section 13.3 to be due to Seller in connection with any such termination shall constitute Seller's sole and exclusive remedy for or in relation to any breach by Buyer of any covenant or obligation of Buyer contained in this Agreement (including without limitation Buyer's obligation to deliver the Base Purchase Price after all other conditions hereunder have been satisfied or waived and the applicable cure period has expired).

16.20. Headings. The article and Section headings in this Agreement are for reference purposes only and do not affect the meaning or interpretation of this Agreement.

16.21. Construction. Unless the context of this Agreement otherwise requires, (a) words of any gender include the other gender, (b) words using the singular or plural number also include the plural or singular number, respectively, (c) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement as a whole and not to any other particular article, Section or other subdivision, (d) the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation," (e) "shall," "will," or "agrees" are mandatory, and "may" is permissive, and (f) "or" is not exclusive. For the avoidance of doubt, prior drafts of this Agreement shall not be used or otherwise considered in the interpretation of the terms hereof or the intent of the Parties.

16.22. Currency. Except where otherwise expressly provided, all amounts in this Agreement are stated and shall be paid in United States currency, and without discount, rebate or reduction and subject to no counterclaim or offset (other than withholding Tax obligations required to be withheld by law), on the dates specified herein.

16.23. Time of Essence. Time is of the essence of this Agreement.

16.24. Counterparts. This Agreement may be executed in counterparts, each of which is deemed an original, but all of which constitute the same agreement. This Agreement and any signed agreement entered into in connection herewith or contemplated hereby, and any amendments hereto or thereto, to the extent signed and delivered by facsimile (or other electronic transmission), shall be treated in all manner and respects as an original contract and is considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

## ARTICLE 17
## DEFINITIONS

17.1. Certain Terms Defined. As used in this Agreement, the following terms have the following meanings:

"***Acquired Assets***" means the property and assets constituting the Refinery and the Business, excluding the Excluded Assets, which includes the following:

(a) the Refinery;

(b) the Inventory;

(c) all Assigned Contracts, including deposits and prepaid items thereunder, the Real Property Easements, the Mineral Rights, the Pipeline Rights and the Transferred Permits;

(d) any Computer Software or systems located at the Real Property and owned exclusively by Seller and licenses held exclusively by Seller, to the extent transferable, in each case that pertain primarily to the Business;

(e) copies of all Business Records;

(f) subject to the terms and conditions of the Shell Purchase Agreement and the Terminal Lease, all Terminal Assets;

(g) all prepaid expenses of Seller with respect to the Business;

(h) the Hydrocarbon Inventories;

(i) the ERCs;

(j) the purchase orders with IAG as set forth on Schedule 7.4(b) and the equipment set forth on Schedule 17.1E1;

(k) to the extent transferable, all Intellectual Property Rights that are used in the operation of the Business, other than the Flying J Marks and Big West Marks;

(l) all goodwill exclusively generated by or associated with the Business;

(m) all assets to be acquired by Buyer pursuant to Article 9; and

(n) all proceeds from any condemnation or taking or casualty in accordance with Section 6.9.

"***Affiliate***" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under direct or indirect common control with such first Person where "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, through the ownership of voting securities, by contract, as trustee, executor or otherwise; provided that for purposes of Section 16.1 only, "Affiliate" shall also mean any domestic Person in which Buyer or one of its Affiliates holds an equity interest (or the equivalent) in excess of forty percent (40%).

"***Alternative Transaction***" means a transaction involving a sale of all or substantially all of the Business or the Acquired Assets by Seller to a purchaser or purchasers, other than Buyer, in accordance with the Bidding Procedures Order.

"***Ancillary Agreement***" means, collectively, any agreement to be executed by Seller and/or its Related Persons, on the one hand, and Buyer and/or it Related Persons on the other hand, in connection with the transactions contemplated by this Agreement.

"***Assigned Contracts***" means the Real Property Leases, the Real Property Licenses, the Customer Contracts, the Supplier Contracts, the Mineral Rights Contracts and the Contracts listed on Schedule 17.1A; provided that Buyer may elect, by giving written notice to Seller prior to the deadline for submission of competing bids, to acquire and accept any contract or lease not listed on any of the schedules, whereupon such contract or lease will be added to the applicable schedule and become an Assigned Contract. In the event Buyer elects to acquire and accept any contracts or leases not listed on the schedules, Buyer will pay such additional cure cost obligations associated with such leases and contracts.

"***Auction***" means the auction conducted by Seller pursuant to the Bidding Procedures Order.

"***Back-up Bidder***" has the meaning set forth in the Bidding Procedures Order.

"***Bankruptcy Code***" means Title 11 of the United States Code.

"***Bankruptcy Court***" means the United States Bankruptcy Court for the District of Delaware or such other court having jurisdiction over the Chapter 11 Case originally administered in the United States Bankruptcy Court of the District of Delaware.

"***Base Purchase Price***" means $40,000,000.00.

"***Big West Marks***" means all rights to or goodwill represented by or pertaining to all names, marks, trade names, trademarks and service marks incorporating the name Big West (including the names "Big West" and "Big West of California" and the domain name "bigwestca.com") or any other name set forth on Schedule 17.1B and any brand names or derivatives thereof, no matter how used, whether as a corporate name, domain name or otherwise and including the corporate design logo associated with any Big West Mark or variant of any Big West Mark.

"***Break-Up Fee***" means an amount equal to 2.5% of the Base Purchase Price.

"***Business***" means the business of operating facilities located on the Real Property (including the crude oil refinery, coker facility, product loading facility, crude truck terminal and tankage) to process heavy and light crudes to produce petroleum products and byproducts (including petroleum, diesel fuel, gas oil products, sulfur and anhydrous ammonia), including the maintenance, repair and expansion of the facilities, as managed and operated, and contemplated to be managed and operated, by Seller prior to its recent shutdown, and any business activities of Seller incidental to the foregoing.

"***Business Day***" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York, New York are authorized by Law or other Governmental action to close.

"***Business Records***" means all books, files and records, to the extent they apply primarily to the Acquired Assets or the Business, that either are located at the Refinery, are in the possession of the Seller or its Affiliates or have been uploaded to the Seller's online data room, including reports, plans, data, test results, product specifications, designs, drawings, diagrams,

training manuals, engineering data, engineering documents, safety reports, Environmental Reports, maintenance schedules, repair notes and archives, operating and production records, inventory records, business plans, and marketing and all other studies, documents and records, but excluding any Retained Books and Records.

"***Buyer Credit Amount***" means the amount as of the Closing Date, if any, of the Seller Cure Cost Obligations that Buyer has paid on Seller's behalf on or before the Closing Date.

"***Buyer Cure Cost Obligations***" means all cure costs required to be paid pursuant to Section 365 of the Bankruptcy Code in connection with the assignment and assumption of the Assigned Contracts (excluding, for the avoidance of doubts, costs to be paid by Buyer pursuant to Section 7.4(b)); provided that in no event shall the amount of "Buyer Cure Cost Obligations" exceed the sum of $500,000 and all cure costs required to be paid pursuant to Section 365 of the Bankruptcy Code in connection with the assignment and assumption of the Assigned Contracts added to the applicable schedule and becoming an Assigned Contract at the request of Buyer on or after the date of this Agreement, in the aggregate.

"***Chapter 11 Case***" means, collectively, the cases commenced and to be commenced by Seller under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"***Claims***" means all claims, defenses, cross claims, counter claims, debts, suits, remedies, liabilities, demands, rights, obligations, damages, expenses, rights to refunds, reimbursement, recovery, indemnification or contribution, attorneys' or other professionals' fees and causes of action whatsoever, whether based on or sounding in or alleging (in whole or in part) tort, contract, negligence, gross negligence, strict liability, bad faith, contribution, subrogation, respondat superior, violations of federal or state securities laws, breach of fiduciary duty, any other legal theory or otherwise, whether individual, class, direct or derivative in nature, liquidated or unliquidated, fixed or contingent, whether at law or in equity, whether based on federal, state or foreign law or right of action, foreseen or unforeseen, mature or not mature, known or unknown, disputed or undisputed, accrued or not accrued, contingent or absolute (including all causes of action arising under Sections 510, 544 through 551 and 553 of the Bankruptcy Code or under similar state Laws including fraudulent conveyance claims, and all other causes of action of a trustee and debtor in possession under the Bankruptcy Code) or rights of set off.

"***Clayton Act***" means Title 15 of the United States Code §§ 12-27 and Title 29 of the United States Code §§ 52-53, as amended.

"***Cleanup and Abatement Order***" means Cleanup and Abatement Order No. R5-2007-0728, dated October 10, 2007, and preceding Cleanup and Abatement Order No. R5-2007 0716, issued by the California Regional Water Quality Control Board, to Seller and Equilon Enterprises LLC with respect to the Refinery.

"***Code***" means the Internal Revenue Code of 1986, as amended.

"***Computer Hardware***" means any computer hardware, equipment and peripherals of any kind and of any platform, including desktop and laptop personal computers, handheld

computerized devices, servers, mid range and mainframe computers, process control and distributed control systems, but specifically excluding any Computer Software that may be located on such Computer Hardware.

"***Computer Software***" means any and all computer programs, including operating system and applications software, implementations of algorithms, and program interfaces, whether in source code or object code form, and all documentation, including user manuals relating to the foregoing.

"***Consent***" means any consent, approval, authorization, qualification, waiver or notification of a Government or any other Person.

"***Contract***" means any written or oral contract, agreement, license, sublicense, lease, sublease, easement, mortgage, instruments, guaranties, commitment, undertaking or other similar arrangement, whether express or implied, other than the Permits.

"***Cure Costs Contracts***" means each Contract listed on Schedule 4.7(b) which is, as of the date of this Agreement, an Assigned Contract with a cure cost amount set forth opposite thereof.

"***Customer Contracts***" means all of Seller's rights under sales orders, service agreements, customer contracts or other similar Contracts listed and described in reasonable detail on Schedule 17.1C entered into by Seller with the customers.

"***Delayed Acquired Assets***" means any Acquired Assets that this Agreement provides or contemplates are to be transferred to Buyer and that require the removal of a Legal Impediment or the receipt or delivery of a Consent for such transfer, which Legal Impediment is not removed or Consent is not obtained or delivered on or prior to the Closing Date.

"***Delayed Assumed Liabilities***" means any Assumed Liabilities that this Agreement provides or contemplates are to be assumed by Buyer and that require the removal of a Legal Impediment or the receipt or delivery of a Consent for such assumption, which Legal Impediment is not removed or Consent is not obtained or delivered on or prior to the Closing Date.

"***Disclosure Schedules***" means the schedules to this Agreement delivered by Seller to Buyer on the date hereof, as amended, supplemented or restated in accordance with this Agreement.

"***Effective Time***" means 12:01 a.m. eastern prevailing time on the Closing Date.

"***Employee Benefit Plan***" means any "employee benefit plan" (as such term is defined in ERISA § 3(3)) and any other material employee benefit plan, program or arrangement of any kind maintained by Seller or its ERISA Affiliates for the benefit of any current or former Seller employee, officer, director, independent consultant or contractor, or otherwise with respect to which Seller has any liability.

"***Environmental Laws***" means the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601 et seq., the Emergency Planning and

Community Right-to-Know Act of 1986, 42 U.S.C. 11001 et seq., the Resource Conservation and Recovery Act, 42 U.S.C. 6901 et seq., the Toxic Substances Control Act, 15 U.S.C. 2601 et seq., the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. 136 et seq., the Clean Air Act, 42 U.S.C. 7401 et seq., the Clean Water Act (Federal Water Pollution Control Act), 33 U.S.C. 1251 et seq., the Safe Drinking Water Act, 42 U.S.C. 300f et seq., the Occupational Safety and Health Act, 29 U.S.C. 641 et seq., the Hazardous Materials Transportation Act, 49 U.S.C. 1801 et seq., the Oil Pollution Act, 33, U.S.C. § 2701 et seq., the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq., the National Environmental Policy Act, 42, U.S.C. § 4321 et seq., the Rivers and Harbors Act of 1899, 33 U.S.C. § 401 et seq., the Endangered Species Act, 16 U.S.C. § 1531 et seq., as any of the above statutes have been or may be amended from time to time, all rules and regulations promulgated pursuant to any of the above statutes, and any other foreign, federal, state or local law, statute, ordinance, permit, order, decree, common law, legally binding administrative interpretation, rule or regulation or other directive governing environmental matters as the same have been or may be amended from time to time, and all applicable decisions, Orders and other legally enforceable requirements of any Government relating to noise, human health, occupational health and safety, or the Environment.

"***Environmental Reports***" means all environmental reports prepared for or on behalf of Buyer and its Affiliates (including the RMT Environmental Report) and any environmental reports and other documents furnished in Section 6 of the online data room.

"***Equipment***" means all of Seller's (i) owned equipment (including furnishings, furniture, Computer Hardware, telecommunications equipment, fittings, machinery, vehicles, refining process units, spare parts, tools, apparatus, pumps, valves, Pipeline Equipment, tanks, meters, engines, compressors, sewers, appliances, signs and other personal property) used, held for use or contemplated for use in the Business, whether located on the Real Property, in the possession of third parties (including in transit or in the possession of engineering, construction or fabrication firms) or otherwise (including, without limitation, the items listed on Schedule 17.1E1), other than the Retained Equipment, and (ii) rights, to the extent transferable, to the warranties and licenses received from manufacturers and sellers of the Equipment.

"***ERCs***" means emission reduction credits for nitrogen oxides (NOx), carbon monoxide (CO), particulate matter less than 10 microns in diameter (PM10), sulfur dioxides (SOx) and volatile organic compounds (VOCs) set out on Schedule 17.1E7, other than the Excluded ERCs.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended.

"***ERISA Affiliate***" means any entity treated as a single employer with Seller pursuant to Section 414 of the Code.

"***Escrow Agent***" means Wells Fargo, N.A., the escrow agent under the Master Escrow Agreement and the Indemnity Escrow Agreement.

"***Excluded Assets***" means the following:

(a) other than assets (but specifically excluding any intellectual property, corporate overhead and support and information technology) owned by Flying J or any of its Affiliates that are material to the operation of the Business as conducted as of the date of this Agreement or as required for the operation of the Refinery as it was being

operated until its most recent shutdown, any right, title or interest held by Flying J or any of its Subsidiaries (other than Seller) or any other Person in any right, property or asset (including the Flying J Marks), and any agreement or arrangement between Seller and Flying J or any of its Subsidiaries;

(b) all shares of capital stock or other equity interests of Seller and its Affiliates;

(c) all of Seller's cash and cash equivalents, marketable securities, surety accounts, deposits, checks in transit and undeposited checks;

(d) all accounts, notes and other receivables of Seller or any Related Person;

(e) all Excluded ERCs;

(f) all rights to Claims, refunds or adjustments, all other refunds, and all other adjustments with respect to (i) Excluded Assets, (ii) any proceeding before any Government relating to the period prior to the Closing, except to the extent that any such proceeding relates to any Assumed Liability, (iii) insurance proceeds or other insurance recoveries (x) that relate to, or are reimbursement for, Seller's or any of Seller's Affiliate's expenditures made prior to the Closing Date for which insurance proceeds are available or due to Seller or Seller's Affiliates, or (y) to the extent relating to Excluded Assets or Excluded Liabilities, and (iv) rights to indemnification claims made prior to the Closing, from or in connection with the Shell Environmental Agreement in an amount not to exceed $12,659,095 ("***Reserved Claims***") but excluding all rights to assert indemnification claims against the remaining amount equal to $17,340,905 provided for by the Shell Environmental Agreement;

(g) all losses, loss carry forwards and rights to receive refunds, credits and loss carry forwards with respect to any and all Taxes of Seller incurred or accrued on or prior to the Closing Date, including interest receivable with respect to any of the foregoing;

(h) all Claims of Seller or its Related Person or their Related Persons, including Claims arising out of or relating in any way to the Chapter 11 Case or any of the transactions contemplated thereby or entered into as a consequence thereof, including any claims (as defined in Section 101(5) of the Bankruptcy Code) filed, scheduled or otherwise arising in the Chapter 11 Case;

(i) forecasts, financial information or financial statements and proprietary manuals (except rights to use manuals specific to and necessary for the operation of the Business) prepared by or used by Seller or its Affiliates, to the extent not relating to the Business;

(j) all assets to be retained by Seller pursuant to Article 9, including all Seller Benefit Plans and all benefit administration contracts and other contracts relating to such Seller Benefit Plans;

(k) subject to Sections 1.5, 7.2 and 12.3(f), any assets (including Contracts and Permits) which are not transferable or for which Consent to a transfer is required and not obtained;

(l) all rights under any Contract that has been guaranteed by Flying J or an Affiliate of Flying J or to which Flying J is a party, other than rights under an Assigned Contract;

(m) all Retained Books and Records, Retained Equipment, Flying J Marks, Big West Marks, the Excluded Real Property and all Mineral Rights listed on Schedule 17.1E2;

(n) all accounts receivable and other amounts due to Seller from any Affiliate of Seller and all rights and Claims of Seller against any Affiliate of Seller,

(o) all bank accounts of Seller or any of its Affiliates;

(p) subject to Section 15.3, all insurance policies of Seller or any of its Affiliates;

(q) all rights of Seller arising under (i) this Agreement, (ii) any Ancillary Agreement, and (iii) any other agreement between Seller and Buyer entered into in connection with this Agreement;

(r) all rights (x) to recovery of Seller and its Related Persons to (i) security deposits, (ii) escrow deposits, (iii) cash collateral, (iv) any cash or other collateral given to obtain or maintain letters of credit or similar surety (including in respect of workers' compensation obligations), and (v) amounts drawn or paid on letters of credit and (y) under Contracts pursuant to which any security deposit, escrow deposit, cash collateral, or other collateral was established or maintained, in each case as listed and described on Schedule 17.1E3;

(s) all assets set forth on Schedule 17.1E4; and

(t) every asset of Seller that would constitute an Acquired Asset (if owned by Seller on the Closing Date) that is conveyed or otherwise disposed of during the period from the date hereof until the Closing Date either (i) at the direction of the Bankruptcy Court without any request to do so from Seller or its Related Persons or (ii) as otherwise permitted by the terms of this Agreement.

"***Excluded ERCs***" means those ERCs listed on Schedule 17.1E5.

"***Excluded Real Property***" means the buffer zone real property, real property subject to that certain Purchase and Settlement Agreement by and between Seller and the City of Bakersfield, dated May 20, 2009, and the certain additional ownership interests, each as further described on Schedule 17.1E6, together with any Improvements owned by Seller erected thereon and any fixtures attached thereto.

"***Federal Trade Commission Act***" means the Federal Trade Commission Act (15 U.S.C. § 41 *et seq.*), as amended, and the rules and regulations promulgated thereunder.

"***Flying J Marks***" means all rights to or goodwill represented by or pertaining to all names, marks, trade names, trademarks and service marks incorporating the name Flying J or any other name set forth on Schedule 17.1F and any brand names or derivatives thereof, no matter how used, whether as a corporate name, domain name or otherwise and including the corporate design logo associated with any Flying J Mark or variant of any Flying J Mark.

"***Government***" means any agency, division, subdivision, audit group, procuring office or governmental, legislative or regulatory authority in any event, or any adjudicatory body thereof, of the United States, any state, county or locality thereof or any foreign government.

"***Hazardous Materials***" means any hazardous or toxic substance or waste or any contaminant or pollutant regulated under Environmental Laws, or with the passage of time or deterioration, would become regulated under Environmental Laws, including, but not limited to, "hazardous substances" as currently defined by the Federal Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended, "hazardous wastes" as currently defined by the Resource Conservation and Recovery Act, as amended, including without limitation asbestos, polychlorinated biphenyls petroleum and petroleum products.

"***HSR Act***" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (15 U.S.C. §§ 15c-15h, 18a), as amended.

"***Hydrocarbon Inventory(ies)***" means all hydrocarbon inventories owned by Seller as of the Effective Time for use in or resulting from the Business, including each of the following as of the Effective Time: (i) all crude oil, blendstock, feedstock and intermediate and other petroleum products owned by Seller and that are located at the Refinery at the Effective Time; (ii) all refined and intermediate product inventories, including petroleum coke and sulfur; and (iii) all additives (excluding additives used by Seller in finished products); but in all cases excluding all finished and unfinished products that have left the Refinery and are en route to any customer or Affiliate of Seller where title has passed to such party. Hydrocarbon Inventories shall include (i) tank bottoms and heels, and (ii) all of the foregoing hydrocarbon inventories owned by Seller, whether located at or in, or are in transit to or from, the Refinery, the Terminal Assets, storage, process units, tanks, trucks, terminals, interconnecting lines, pipelines or elsewhere (in each case, whether on-site or off-site) as of the Effective Time, including the Kinder Morgan pipeline, the Kinder Morgan terminal in Fresno, California, and the tanks in Dominguez Hills; provided, however that notwithstanding anything herein to the contrary, Hydrocarbon Inventories will in all cases exclude all crude pipeline linefill not located at the Refinery. Hydrocarbon Inventory shall be measured and valued for all purposes of this Agreement in accordance with Exhibits C-1 and C-2.

"***Improvements***" means the buildings, improvements and structures now existing on the Real Property or demised under the Real Estate Leases.

"***Indemnity Escrow Agreement***" means that certain Indemnity Escrow Agreement by and among Buyer, Seller and the Escrow Agent, substantially in the form of Exhibit F attached hereto and as amended from time to time.

"***Indemnity Escrow Funds***" means the Indemnity Escrow Amount, as reduced in proportion to any distributions from the Indemnity Escrow Account and increased by any income earned on the Indemnity Escrow Account.

"***Intellectual Property***" means each of the Intellectual Property Rights registered or the subject of a pending application for registration that are used in the operation of the Business and owned by, or licensed to, Seller, other than the Flying J Marks and Big West Marks.

"***Intellectual Property Rights***" means all rights in and to the following: (i) patents (including all reissues, divisions, continuations and extensions thereof), patent applications and patent rights, (ii) trademarks, service marks, trade dress, business names, brand names, trade names, logos and corporate names and registrations and applications for registration thereof together with all of the goodwill associated therewith, (iii) copyrights and designs and registrations and applications for registration thereof, (iv) internet domain names, and (vi) trade secrets.

"***Inventory***" means all (a) supplies, materials, capital spares and critical spares that are owned by Seller on the Closing Date and are also (i) located on the Real Property or on the premises, or (ii) in transit to the Real Property, and (b) any rights of Seller, to the extent transferable, to the warranties received from suppliers with respect to such Inventory; provided that, when used herein, "Inventory" shall not include Hydrocarbon Inventories.

"***Knowledge of Seller***," "***Seller's Knowledge***" or any other similar term or knowledge qualification means the present actual knowledge, after reasonable inquiry, of Fred Greener, Brett Bailey, Mark Denis and Melinda Hicks; provided, that, reasonable inquiry may be satisfied by inquiry of those employees of Seller or its Affiliates that would reasonably be expected to have actual, present knowledge.

"***Law***" means any provision of law, regulation, statute, ordinance, rule, Order or other legal requirement of any Government.

"***Legal Impediment***" means a legal impediment preventing or restricting the transfer of an Acquired Asset or the assumption of an Assumed Liability, as the case may be, as of the Closing Date.

"***Lien***" means any mortgage, pledge, charge, security interest, encumbrance, claim, liability, right of first refusal, first offer, option, restriction, lien (statutory or other, including judgment liens and mechanic's liens regardless of whether liquidated) or conditional sale agreement.

"***Losses***" means any damages, fines, judgments, liabilities, losses, costs or expenses (including reasonable attorneys' fees).

"***Master Escrow Agreement***" means the escrow agreement by and between Flying J, acting on behalf of Seller, and Wells Fargo, N.A., dated as of February 2, 2010.

"***Material Adverse Effect***" means a change or effect that, individually or in the aggregate, is or is reasonably likely to result in a material adverse effect on the Acquired Assets or the

operation of the Business; provided that none of the following changes or effects, either alone or taken together with other changes or effects or whether arising directly or indirectly, shall be taken into account in determining whether there has been a Material Adverse Effect: (i) changes, or effects arising from or relating to changes, of Laws, that are not specific to the business or markets in which Seller operates; (ii) changes arising from or relating to, or effects of, increases in costs of commodities or supplies; (iii) changes arising from or relating to, or effects of, weather or meteorological events; (iv) changes arising from or relating to, or effects of, the transactions contemplated by this Agreement or the announcement thereof or the taking of any action in accordance with this Agreement; (v) changes, or effects arising from or relating to changes, affecting the industries of which the Business is a part generally (including any change, or any effect arising from or relating to any change, (a) generally affecting the international, national or regional petroleum industry or (b) generally affecting the international, national or regional wholesale or retail markets for refined petroleum products); (vii) changes, or effects arising from or relating to changes, in economic, political or regulatory conditions generally affecting the U.S. economy as a whole; (vi) changes arising from or relating to, or effects of, any motion, application, pleading or Order filed under or in connection with, the Chapter 11 Case or any motion, application, pleading or Order filed by any Government applicable to refined petroleum products generally; (vii) changes, or effects arising from or relating to changes, in financial, banking, or securities markets generally affecting the U.S. economy as a whole, (including (a) any disruption of any of the foregoing markets, (b) any change in currency exchange rates, (c) any decline in the price of any security or any market index and (d) any increased cost of capital or pricing related to any financing); (x) changes arising from or relating to, or effects of, any existing event, occurrence, or circumstance to the extent Buyer has actual knowledge thereof as of the date hereof (including any matter to the extent expressly set forth in the Disclosure Schedules), (xi) changes arising from or relating to, or effects of, any seasonal fluctuations in the business, (xii) any failure, in and of itself, to achieve any projections, forecasts, estimates, performance metrics or operating statistics (whether or not shared with Buyer or its Affiliates) or (ix) changes arising from or relating to, or effects of, any act(s) of war or of terrorism except (in the case of this clause (ix)) to the extent such events result in direct loss or damage to the Acquired Assets or the operation of the Business.

"***Mineral Rights***" means all of Seller's rights and obligations arising under the Mineral Rights Contracts

"***Mineral Rights Contracts***" means all oil and gas leases and other Contracts pursuant to which either Seller is granted by a third party the right to extract minerals from real property used in connection with the Business or Seller has granted a third party the right to extract minerals from the Owned Real Property.

"***Obligations***" means any duties, responsibilities, liabilities and obligations, costs and expenses of whatever kind and nature, whether vested, absolute or contingent, primary or secondary, direct or indirect, known or unknown, asserted or unasserted, accrued or unaccrued, pre-petition or post-petition, liquidated or unliquidated, due or to become due, and whether based in common law or statute or arising under Contract or otherwise.

"***Order***" means any order, judgment or decree of any court or Government.

"***Ordinary Course of Business***" means the operation of the Business by Seller consistent with prior practices with respect to the operation thereof, and taking into account the status and quality of the Business and requirements of any applicable regulations.

"***Owned Real Property***" means the real property owned by Seller and listed on Schedule 4.11, together with any Improvements owned by Seller erected thereon and any fixtures attached thereto.

"***Permits***" means any permit, license, authorization, approval, registration, franchise, variance, exemption, certification or approval issued, granted or required by any Government and any pending applications for the foregoing.

"***Permitted Liens***" means

(a) Liens imposed by any Government for Taxes, assessments, levies or charges not yet due;

(b) easements, rights-of-way, rights reserved to the grantors of any properties of the Seller, covenants, conditions, restrictions and other encumbrances of record affecting title to such Owned Real Property and other minor non-monetary title defects which do not or would not materially impair the current use or occupancy of such Owned Real Property or the operation of the Business or materially detract from the value of such Owned Real Property and, encumbrances consisting of zoning restrictions, building codes, land-use Laws regulating the use or occupancy of the Owned Real Property or the activities conducted thereon which are imposed by any governmental authority having jurisdiction over such Owned Real Property (which are not violated by the current use or occupancy of the Owned Real Property or the operation of the Business, or any violation which would not have a Material Adverse Effect on the Business);

(c) rights reserved to or vested in any Government by the terms of any right, power, franchise, grant, license or permit, or by any provision of law, to revoke or terminate any such right, power, franchise, grant, license or permit or to condemn or acquire same by eminent domain or similar process;

(d) rights reserved to or vested by law in any Government to, in any manner, control or regulate in any manner any of the assets used in the Business or the use thereof or the rights and interests of the Seller therein, in any manner under any and all laws;

(e) rights reserved to the grantors of any Acquired Assets, and the restrictions, conditions, restrictive covenants and limitations in respect thereto, pursuant to the terms, conditions and provisions of any Assigned Contract, Real Property Easement or Pipeline Right that do not in any case materially detract from the value of the property subject thereto or interfere with the ordinary conduct of the Business; and

(f) Liens reflected in the final owner's title insurance policy obtained by Buyer at Closing.

"***Person***" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or Government.

"***Pipeline Assets***" means all of the assets, properties and rights, whether real, personal or mixed, which are owned, leased or held for use by Seller in connection with the ownership or

operation of the Pipelines, including, without limitation, the Pipelines, Pipeline Equipment and Pipeline Rights.

"***Pipeline Equipment***" means all fittings, cathodic protection ground beds, rectifiers, other cathodic or electric protection devices, corrosion equipment, regulators, meters, machinery, engines, pipes, valves, valve boxes, connections, gates, scraper trap extenders, lines, wires, computer hardware, fixed or mobile machinery, equipment and/or other similar personal property or fixtures related to the Pipelines.

"***Pipeline Rights***" means all of Seller's rights under all easements, rights of way, property use agreements, line rights and real property licenses, leases and permits relating to the Pipeline Assets.

"***Pipelines***" means all of the pipelines, flow lines, gathering systems and appurtenances thereto used in the Business, whether located on the Real Property or otherwise, as listed and described in reasonable detail on Schedule 4.15 and/or the maps, plats or surveys attached to Schedule 4.15.

"***Real Property***" means, collectively, the Owned Real Property, the Real Property Leases, the Real Property Licenses, the Real Property Easements and the Pipeline Rights.

"***Real Property Easements***" means all of Seller's rights arising in connection with all easements, servitudes, air rights, rights of way and other real property entitlements relating to the operation of the Business, but excluding the Pipeline Rights.

"***Real Property Leases***" means all of Seller's rights under all leases of real property relating to the operation of the Business, but excluding the Pipeline Rights.

"***Real Property Licenses***" means all of Seller's rights under all licenses of real property and other executory agreements for the right to use, access or occupy real property relating to the operation of the Business, but excluding the Pipeline Rights.

"***Refinery***" means, collectively, the Real Property, the Equipment and the Pipeline Assets.

"***Related Person***" means, with respect to any Person, all past, present and future directors, officers, members, managers, stockholders, employees, controlling persons, agents, professionals, financial advisors, restructuring advisors, attorneys, accountants, investment bankers, Affiliates or representatives of (i) any such Person and (ii) of any Affiliate of such Person.

"***Release***" means, any release, spill, emission, leaking, pumping, pouring, dumping, emptying, injection, deposit, disposal, discharge, dispersal, leaching, or migration on or into the indoor or outdoor environment or into our out of any property.

"***Remedial Action***" means all actions, including any capital expenditures, required or voluntarily taken to (i) clean up, remove, treat, or in any other way address any Hazardous Material or other substance; (ii) prevent the Release or threat of Release, or minimize the further Release, of any Hazardous Material so it does not migrate or endanger or threaten to endanger

public health or welfare or the indoor or outdoor environment; (iii) perform pre-remedial studies and investigations or post-remedial monitoring and care; or (iv) bring facilities on any property owned, operated or leased by Seller and the facilities located and operations conducted thereon into compliance with all Environmental Laws and Environmental Permits.

"***Retained Books and Records***" means (a) all corporate seals, minute books, charter documents, corporate stock record books, original Tax and financial records and such other files, books and records to the extent they relate primarily to any of the Excluded Assets or Excluded Liabilities or the organization, existence, capitalization or debt financing of Seller or of any Affiliate of Seller, (b) customer lists and historical customer files, including payment records, receipts and invoices, (c) commodities pricing materials, (d) all books, files and records that would otherwise constitute a Business Record but for the fact that disclosure of such books, files or records would (i) violate any legal constraints or obligations regarding the confidentiality thereof, (ii) waive any attorney client, work product or other legal privilege, (iii) disclose information about Seller or any of its Affiliates that is unrelated to the Business, or (iv) disclose information about Seller or any of its Affiliates pertaining to project evaluation, price curves or projections or other economic predictive models, or (e) all books and records prepared in connection with or relating to the preparation of this Agreement, including bids received from other parties.

"***Retained Equipment***" means all of Seller's right and title to the fluid catalytic cracking unit, the merox unit, the alkylation unit and all associated equipment listed on Schedule 17.1R1.

"***Retained Litigation***" means all claims, cross-claims and counterclaims (and each defense related thereto) made on or prior to the date of this Agreement in respect of any litigation against or relating to Seller or its Related Persons, the Acquired Assets or the transactions contemplated hereby, including the litigation listed on Schedule 17.1R2.

"***RMT Environmental Report***" means the Phase I Environmental Site Assessment and Limited Environmental Compliance Assessment of Big West of California, LLC, Bakersfield, California, dated July 2009, prepared by RMT, Inc.

"***Rule***" or "***Rules***" means the Federal Rules of Bankruptcy Procedure.

"***SEC***" means the U.S. Securities and Exchange Commission.

"***Segregated Funds***" means, with respect to each Cure Cost Contract that is the subject of an unresolved objection as to the cure costs amount as of the Closing Date, an amount equal to the excess of (a) the lesser of (i) the amount claimed by the counterparty thereto to the cure amount applicable thereto or (ii) the amount determined by the Bankruptcy Court to be the amount required to be segregated in order to permit the assignment thereof on the Closing Date minus (b) the amount set forth opposite such Contract on Schedule 4.7(b) hereto.

"***Seller Cure Cost Obligations***" means if (and then only to the extent that) the aggregate cure costs required to be paid pursuant to Section 365 of the Bankruptcy Code in connection with the assignment and assumption of the Assigned Contracts exceeds the Buyer Cure Cost

Obligations, such additional cure costs that are required to be paid pursuant to Section 365 of the Bankruptcy Code in connection with the assignment and assumption of the Assigned Contracts.

"***Shell Environmental Agreement***" means that certain Environmental Agreement, by and between Equilon Enterprises LLC (d/b/a Shell Oil Products US) and Seller, dated as of March 15, 2005.

"***Shell/Motiva EPA Consent Decrees***" means the two consent decrees entered in 2001 with the U.S. Environmental Protection Agency by Equilon Enterprises LLC (d/b/a Shell Oil Products US) and Motiva Enterprises LLC with respect to air pollution control matters, to the extent and only to the extent relating to the Refinery, including: (a) the Consent Decree in United States, et al. v. Equilon Enterprises LLC, Civil Action No. H-01-0978 (S.D. Tex.), entered on August 20, 2001 with the U.S. Environmental Protection Agency, as amended in 2002 and 2006 (referred to as the "Equilon Consent Decree") and 2) the Consent Decree in United States, et al. v. Motiva Enterprises LLC, Equilon Enterprises LLC, and Deer Park Refining Limited Partnership, Civil Action No. H-01-0978 (S.D. Tex.), entered on August 20, 2001 with the U.S. Environmental Protection Agency, as amended in 2001, 2002, 2003, 2005, and 2006 (referred to as the "Heater and Boiler Consent Decree").

"***Shell Purchase Agreement***" means that certain Asset Purchase Agreement by and between Equilon Enterprises LLC (d/b/a Shell Oil Products US) and Seller, dated as of January 8, 2005, as amended by that certain First Amendment to Asset Purchase Agreement by and between the same parties, dated as of March 15, 2005, as modified by (i) that certain Agreement for Temporary Waiver of Lease Terms by and between the same parties, dated as of June 29, 2009 and (ii) that certain First Amendment to Agreement for Temporary Waiver of Lease Terms by and between the same parties, dated as of December 22, 2009.

"***Sherman Act***" means title 15 of the United States Code §§ 1-7, as amended.

"***Subsidiary***" means, with respect to any Person, any corporation, partnership, limited liability company, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a partnership, limited liability company, association or other business entity, a majority of the partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons is deemed to have a majority ownership interest in a partnership, limited liability company, association or other business entity if such Person or Persons is allocated a majority of partnership, limited liability company, association or other business entity gains or losses or is or controls the managing director or general partner of such partnership, limited liability company, association or other business entity.

"***Supplier Contracts***" means all of Seller's rights under outstanding purchase orders or other similar Contracts used in the Business and entered into by Seller with any supplier that are listed and described in reasonable detail on Schedule 17.1S.

"***Tax Return***" means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

"***Taxes***" means all taxes, however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Government, which taxes include all income taxes, Transaction Taxes, payroll and employee withholding, unemployment insurance, social security (or similar), sales and use, excise, franchise, gross receipts, occupation, real and personal property, stamp, transfer, workmen's compensation, customs duties, registration, documentary, value added, alternative or add-on minimum, estimated, environmental (including taxes under Section 59A of the Code) and other obligations of the same or a similar nature, whether arising before, on or after the Closing Date.

"***Terminal Assets***" means a parcel of approximately 14.28 acres, as further described on Schedule 17.1T1, together with all Improvements (including the eight-bay truck loading rack and 15 refining facility product tanks) erected thereon.

"***Terminal Lease***" means that certain lease for the Terminal Assets to be entered into pursuant to section 3.03 and Exhibit F of the Shell Purchase Agreement, as such rights and obligations are modified by (i) that certain Agreement for Temporary Waiver of Lease Terms by and between Equilon Enterprises LLC (d/b/a Shell Oil Products US) and Seller, dated as of June 29, 2009 and (ii) that certain First Amendment to Agreement for Temporary Waiver of Lease Terms by and between the same parties, dated as of December 22, 2009.

"***Transferred Permits***" means all of Seller's rights in those Permits listed on Schedule 17.1T2.

"***WARN Act***" means the Worker Adjustment Retraining and Notification Act of 1988, as amended, and Sections 1400 et seq. of the California Labor Code.

17.2. Cross-Referenced. Each of the following terms is defined in the section set forth opposite such term:

| Term | Section |
|---|---|
| Access Agreement | 1.2 |
| Additional Asset Conveyance Documents | 3.2(a)(xii) |
| Additional Deposit | 2.2 |
| Additional Liabilities Assumption Documents | 3.2(a)(xiv) |
| Agreement | *Preamble* |
| Allocation Schedule | 11.3 |
| Alternative Arrangements | 14.5 |
| Antitrust Approval | 10.2 |

Antitrust Law .......... 10.2
Assumed Liabilities .......... 1.3
Bidding Procedures .......... 8.2
Bidding Procedures Order .......... 8.1
Business Employees .......... 9.1
Buyer .......... *Preamble*
Buyer Indemnitees .......... 14.1(a)
Buyer Savings Plan .......... 9.3
Buyer Welfare Benefit Plan .......... 9.6
Cap .......... 14.2
Claiming Party .......... 14.4(c)
Closing .......... 3.1
Closing Date .......... 3.1
Confidentiality Agreement .......... 6.3
Deductible .......... 14.2
Defending Party .......... 14.4(c)
Deposit .......... 2.2
Environmental Permits .......... 4.9(a)
Estimated Hydrocarbon Inventory Value .......... 3.4(a)
Estimated Proration Amount .......... 11.4(d)
Excluded Liabilities .......... 1.4
Field Inspection Report .......... 3.4(b)
Field Inspector .......... 3.4(b)
Final Claim Amount .......... 14.6(b)
First Release Date .......... 14.6(a), 14.6(a)
Flying J .......... *Preamble*
Guarantor .......... *Preamble*
Hydrocarbon Inventory Balance .......... 3.4(d)
Hydrocarbon Inventory Deficit .......... 3.4(d)
Hydrocarbon Inventory Deposit .......... 3.4(a)
Hydrocarbon Inventory Notice Date .......... 3.4(c)
Hydrocarbon Inventory Statement .......... 3.4(c)
Hydrocarbon Inventory Value .......... 3.4(c)
IAG .......... 6.10

Indemnifying Party .......... 14.2
Indemnity Escrow Account .......... 3.3(a)
Initial Closing Date .......... 13.2(a)(ii)
Initial Deposit .......... 2.2
Initial Indemnity Escrow Amount .......... 3.3(a)
Inspector .......... 3.4(c)
Losses .......... 14.1(a)
**Material Contracts .......... 4.7(a)**
Organizational Documents .......... 4.3
Parties .......... *Preamble*
Prorations .......... 11.4
Protective Provisions .......... 7.8(b)
Sale Order .......... 8.1
Second Release Date .......... 14.6(b)
Seller .......... *Preamble*
Seller Contracts .......... 4.7(a)(vii)
Seller Designated Contacts .......... 6.3
Seller Indemnitees .......... 14.1(b)
Seller Savings Plan .......... 9.3
Shell Agreement Assignment .......... 3.2(a)(iii)
Termination Date .......... 13.2(a)(ii)
Termination Order .......... 13.2(a)(iv)
Third Party Claim .......... 14.4(a)
Transaction Taxes .......... 11.1
Transferred Employees .......... 9.2
Welfare Benefits .......... 9.6

*(Signatures are on the following page.)*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**PARAMOUNT PETROLEUM CORPORATION**

By: ______________________

Name: ______________________

Title: ______________________

**BIG WEST OF CALIFORNIA, LLC**

By: ______________________

Name: ______________________

Title: ______________________

**Solely with respect to Section 16.16:**

**ALON USA ENERGY, INC.**

By: ______________________

Name: ______________________

Title: ______________________

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**PARAMOUNT PETROLEUM CORPORATION**

By: ______________________

Name: ______________________

Title: ______________________

**BIG WEST OF CALIFORNIA, LLC**

By: Fred Greener

Name: Fred Greener

Title: Executive Vice President

**Solely with respect to <u>Section 16.16</u>:**

**ALON USA ENERGY, INC.**

By: ______________________

Name: ______________________

Title: ______________________