**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| FLYING J INC., et al.,[1] | ) | Case No. 08-13384 (MFW) |
| Debtors. | ) | Jointly Administered |
| | ) | **Hearing Date: March 11, 2010, at 10:30 a.m. (ET)**<br>**Objection Deadline: March 1, 2010, at 4:00 p.m. (ET)** |

**MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER (A) APPROVING THE DEBTORS' NOTICE OF SALE AND NOTICE PROCEDURES, (B) APPROVING THE SALE OF CERTAIN REFINERY EQUIPMENT, (C) APPROVING THE DEBTORS' ENTRY INTO AN ASSET PURCHASE AGREEMENT AND ALL ANCILLARY DOCUMENTS RELATING TO SUCH SALE, (D) AUTHORIZING THE TRANSFER OF THE REFINERY EQUIPMENT FREE OF ALL LIENS, CLAIMS, INTERESTS, LIABILITIES AND ENCUMBRANCES AND (E) AUTHORIZING THE DEBTORS TO PAY THE LIEN RELEASE AMOUNT TO ALLIANCE PROCESS PARTNERS LLC D/B/A INTERNATIONAL ALLIANCE GROUP**

Flying J Inc. ("Flying J") and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), file this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"): (a) approving the Debtors' notice (the "Notice") of the sale (the "Sale") of certain refinery equipment (the "Equipment") to Refinery Equipment Worldwide Inc. (the "Buyer") and notice procedures relating thereto; (b) approving the Sale; (c) approving the Debtors' entry into that certain Asset Purchase Agreement dated February 12, 2010 by and between Debtor Big West of California, LLC ("BWOC") and the Buyer (the "APA") and all ancillary documents relating to the Sale;

1 The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Flying J Inc. (3458); Big West of California, LLC (1608), Big West Oil, LLC (6982); Big West Transportation, LLC (6984); Longhorn Partners Pipeline, L.P. (0554); Longhorn Pipeline Holdings, LLC (0226), Longhorn Pipeline Inc. (0654). The location of the Debtors' corporate headquarters and the service address for all Debtors is: 1104 Country Hills Drive, Ogden, UT 84403.

(d) authorizing the transfer of the Equipment free of any mortgage, pledge, security interest, easement, encroachment, lien or encumbrance of any kind (as to all such encumbrances, if any, the "Liens"); (e) finding that the Buyer is a good faith purchaser and is entitled to the full protection of section 363(m) of the Bankruptcy Code; (f) finding that the Sale has been proposed and entered into by BWOC and the Buyer without collusion, in good faith and from arm's-length bargaining positions and that the Sale does not violate section 363(n) of the Bankruptcy Code; and (g) authorizing the Debtors to pay $2,648,528 (the "Lien Release Amount") to Alliance Process Partners LLC d/b/a International Alliance Group ("IAG") in consideration for IAG's release of its lien on the Equipment and pursuant to the *Order Approving Entry Into Settlement With International Alliance Group* [Docket No. 1312]. In support of this Motion, the Debtors respectfully state as follows:

## Jurisdiction and Venue

1. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory bases for the relief requested herein are sections 105(a), 363(b), (f), (m) and (n) and 503 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002(a)(2), 6004(a), (b), (c), (e) and (f), 9007 and 9014 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules") and Rule 6004-1 of the Local Rules for the United States Bankruptcy Court District of Delaware (the "Local Rules").

## Relief Requested

4. By this Motion, the Debtors request entry of an order: (a) approving the Notice and notice procedures relating thereto; (b) approving the Sale; (c) approving the Debtors' entry

into the APA and all ancillary documents relating to the Sale; (d) authorizing the transfer of the Equipment free of any Liens; (e) finding that the Buyer is a good faith purchaser and is entitled to the full protection of section 363(m) of the Bankruptcy Code; (f) finding that the Sale has been proposed and entered into by BWOC and the Buyer without collusion, in good faith and from arm's-length bargaining positions and that the Sale does not violate section 363(n) of the Bankruptcy Code; and (g) authorizing the Debtors to pay the Lien Release Amount to IAG in consideration for IAG's release of IAG's lien on the Equipment.

**Background**

5. On December 22, 2008 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of title 11 of the Bankruptcy Code. On January 5, 2009, the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors (the "Creditors' Committee") [Docket No. 85].

6. The Debtors and their wholly-owned non-debtor subsidiaries (collectively, the "Flying J Group") are a fully integrated oil company with operations in the field of exploration, production, refining, transportation, wholesaling and retailing of petroleum products. Debtor Flying J Inc. ("Flying J") is one of the 20 largest privately-held companies in America with fiscal year 2009 consolidated sales of approximately $18.5 billion and is the direct or indirect parent corporation of each of the other members of the Flying J Group.

7. The Flying J Group operates approximately 250 retail locations, including state-of-the-art travel plazas, convenience stores, restaurants, motels and truck service centers in 43 states and six Canadian provinces. In addition to usual rest stop services (food, fuel, shower

facilities), the Flying J Group offers banking, bulk fuel programs, communications (wireless Internet connections), fuel cost analysis, insurance and truck fleet sales. Furthermore, the Flying J Group explores for, refines and transports petroleum products and is one of the largest retail distributors of diesel fuel in North America. Other operations of the Flying J Group include online banking, card processing, truck and trailer leasing, and payroll services. In these widespread operations, the Flying J Group employs approximately 12,330 people.

8. Each of the Debtors in these chapter 11 cases is involved in or associated with the Flying J Group's core businesses of petroleum refining, supply and distribution. In particular, Debtors Big West Oil LLC and BWOC own and operate two refineries in North Salt Lake City, Utah and Bakersfield, California, respectively, which have the combined capacity to refine over 100,000 barrels of crude oil per day. These Debtors also are responsible for purchasing and transporting crude oil in parts of California, Utah, Wyoming and Colorado. On the Petition Date and through July 2009, the Debtors owned a 700-mile common-carrier pipeline from the Gulf Coast near Houston to El Paso, Texas (the "Longhorn Pipeline"). On July 27, 2009, the Court approved the sale of the Longhorn Pipeline to Magellan Midstream Partners, L.P. [Docket No. 1578] (the "Longhorn Sale").

9. The Debtors have filed these chapter 11 cases to address near-term liquidity and operational challenges brought on in part by the precipitous drop in the price of oil beginning in September of 2008 and continuing through the first quarter of 2009, as well as the recent tightening credit markets. Over the past year, the Debtors have implemented a range of aggressive restructuring actions, including shutting down non-performing businesses and downsizing continuing operations, designed to improve cash-flow performance and financial results. Moreover, the Debtors have aggressively marketed both core and non-core assets for

sale, including and in addition to the Longhorn Pipeline, in an attempt to maximize liquidity in preparation for the Debtors' eventual exit from bankruptcy. Such assets include: (a) the Debtors' 50% equity interest in Haycock Petroleum Company; and (b) substantially all the assets of Flying J Oil & Gas Inc. and its subsidiaries, each of which are wholly-owned, directly or indirectly, by Flying J (collectively, the "Asset Sales"). The Debtors believe that, after these restructuring actions, in particular the Sales, their businesses will be fundamentally sound and profitable and that these chapter 11 cases will allow them to resolve their liquidity constraints and emerge as stronger, healthier companies.

10. In March, 2009, BWOC began soliciting potential buyers in connection with the sale (the "BWOC Sale") of substantially all assets of BWOC (the "BWOC Acquired Assets") other than the Equipment subject to this Motion. After an extensive marketing process, BWOC determined that Alon USA Energy, Inc. ("Alon") had submitted the most qualified bid for the BWOC Acquired Assets. Following such determination, BWOC and Alon have conducted extensive negotiations regarding the terms of a purchase agreement for the BWOC Acquired Assets. On February 2, 2010 BWOC and Alon signed a definitive asset purchase agreement. Contemporaneously therewith, the Debtors filed a motion seeking approval of bidding procedures and the BWOC Sale.[2] The Debtors anticipate that the BWOC Sale, if consummated, will maximize the value of BWOC's estate and result in a substantially higher recovery for BWOC creditors than any alternative disposition of the BWOC Acquired Assets.

11. The Debtors have determined that a sale of substantially all of the Debtors' retail operations to Pilot Travel Centers LLC ("Pilot") will maximize creditor recoveries and is in the best interests of the Debtors' estates. On July 30, 2009, the Court granted the Debtors the

---

[2] See *Motion to Approve Bid Procedures, Break-Up Fee and Sale of Substantially All Assets of Debtor Big West of California LLC Pursuant to Section 363(b) of the Bankruptcy Code* [Docket No. 2694].

authority to obtain up to $100,000,000 of secured superpriority postpetition financing (the "DIP Facility") from Pilot and to execute a letter of intent to sell its travel center and trucking operations, corporate headquarters building and certain other assets relating to the Debtors' retail business operations to Pilot (the "Pilot Transaction"). The DIP Facility provides the Debtors with much-needed liquidity to continue business operations pending the sale to Pilot. On January 27, 2010, the Court granted the Debtors' motion to execute the Pilot Transaction.[3] The Pilot Transaction would pay all creditors of Flying J in full, provide value to Flying J's shareholders, allow Flying J to exit bankruptcy protection expeditiously as a stronger, healthier business and better position Flying J to succeed in today's highly competitive market.

**The Equipment**

12. Each piece of the Equipment is an individual component of a specialized unit (the "Unit") owned by BWOC and primarily located at the Debtors' Bakersfield, California refinery (the "Bakersfield Refinery"), designed for converting liquefied petroleum gas into refined fuel products. The Debtors purchased the Equipment over time and, since January 2006, have sought to obtain permits from the state of California (the "State") necessary for operating the Unit. Because of the presence of a certain volatile catalyst required for operating the Unit, the State has repeatedly and consistently refused to grant such permits. Therefore, the Equipment is of no use to BWOC's estate and is not included in the BWOC Sale.

13. Given that the State will not issue a permit for operation of the Unit, over the past year, the Debtors have marketed the Equipment, independently of their efforts with respect to the BWOC Sale, to a number of potential purchasers with out-of-state, and in some cases

---

[3] See *Order (I) Authorizing Sale of Target Holdings Free and Clear of Liens, Claims, Encumbrances and Other Interests, (II) Approving Assumption and Assignment of Certain Agreements., (III) Approving Contribution Agreement and Transactions Contemplated Therein, (IV) Approving the ConocoPhillips Agreement and (V) Granting Related Relief* [Docket No. 2637].

international, refinery operations. Because the Equipment is highly specialized and unique, the Debtors targeted and canvassed the potential purchasers with refinery equipment of a type and scale conducive to utilizing the Equipment. In all, the Debtors contacted over 50 potential bidders to discuss a potential purchase of the Equipment. The Debtors believe that, given the limited market for the Equipment and the broad scope of the Debtors' marketing efforts, the Debtors have approached all potential purchasers of the Equipment. To date, the Buyer is the only party that has bid on the Equipment.

14. The Buyer, a broker of refinery equipment on an international scale, intends to sell the Equipment to a third party, likely outside the United States, after acquiring the Equipment from BWOC. In connection therewith, the Buyer has identified a potential purchaser of the Equipment and has been negotiating the terms of a purchase agreement. Given that the two agreements are, for practical purposes, dependant on each other, time is of the essence.

15. The Debtors believe that the Sale provides the highest purchase price and best terms available for the Equipment. As the Asset Sales demonstrate, the Debtors have sought to maximize liquidity and creditor recoveries by selling underutilized or underperforming assets throughout these chapter 11 cases. The Sale will provide a cash infusion of over $17 million to the Debtors' estates. Given that the Equipment has been specifically excluded from the BWOC Sale, and given that the Debtors will not be authorized by the State to operate the Unit in the foreseeable future, selling the Equipment to the Buyer pursuant to the terms of the APA is in the best interests of the Debtors and their estates.

## The APA

16. Following an initial bid from the Buyer, the Debtors and the Buyer negotiated the APA, the primary terms of which are as follows:[4]

(A) **Basic Transaction**

(i) The purchase price (the "Purchase Price") for the sale and conveyance to the Buyer of the Equipment shall be $20,081,600.

(ii) Purchase and Sale of Assets. On the terms and subject to the conditions set forth in the APA, on the Closing Date, Buyer will purchase for the Purchase Price from BWOC, and BWOC will sell, convey, assign, transfer and deliver to Buyer, all of the right, title and interest that BWOC possesses and has the right to transfer to the Equipment.

(B) **Closing Transactions**

(i) Pre-Closing Transactions. Subject to the terms and conditions of the APA, the Parties agree to consummate the following Pre-Closing transactions on the Pre-Closing Date:

(a) Buyer shall deliver to the Escrow Agent evidence of the Buyer Insurance (the "Seller Document"); and

(b) BWOC shall deliver to the Escrow Agent (x) the bill of sale in the form set forth in Exhibit B to the APA (the "Bill of Sale"), (y) the IAG Lien Release Letter and (z) a copy of the Order (collectively, the "Buyer Documents").

(ii) Closing Transactions. Subject to the terms and conditions of the APA, the Parties agree to consummate the following "Closing Transactions" on the Closing Date:

(a) Buyer will deliver to the Escrow Agent, no later than on the Closing Date, by wire transfer of immediately available funds to the Escrow Account, an amount of $20,081,600.

(b) the Escrow Agent, in accordance with the terms of the Escrow Agreement, shall undertake the following actions:

---

4 The APA is attached hereto as **Exhibit B**. In the event of any conflict between this summary and the APA, the APA controls. Any terms not defined herein shall have the meaning assigned to them in the APA.

(1) if (and only if) the Closing Date occurs prior to March 1, 2010, deliver to IAG an amount equal to \$2,648,528, on behalf of BWOC;

(2) deliver to BWOC an amount equal to (x) \$20,081,600, minus (y) the amount, if any, delivered to IAG pursuant to subparagraph 16(B)(2)(b)(1) hereof;

(3) deliver the Seller Document to BWOC; and

(4) deliver the Buyer Documents to the Buyer.

(c) BWOC shall convey all of the Equipment to the freight forwarding agent (the "Freight Forwarder") pursuant to the terms of the APA.

(iii) Transfer of Assets and Risk of Loss. Buyer shall be solely responsible for coordinating the removal and delivery of the Equipment, through the Freight Forwarder, from BWOC's Bakersfield facility and, with respect to certain vessels included in the sale, from Houston, Texas. The Buyer confirms and undertakes that: (a) the Equipment will be for use solely outside of the state of California, (b) the Equipment will be delivered directly by Freight Forwarder to a port outside of the continental limits of the United States ("USA"), and (c) the transaction will otherwise comply with Section 6387 of the California Revenue Code – Delivery to Export Packers. Accordingly, the transfer of the Equipment will be to the Freight Forwarder, which shall follow the Intercoms 2000 EXW protocol; provided that (i) export packing shall be at the sole cost and expense of Buyer and (ii) risk of loss of the Equipment transfers from BWOC to Buyer upon the Freight Forwarder's initial access to the Equipment shall be coincident with the Closing Date. For the avoidance of doubt, Buyer shall, at its sole cost and expense, pay for and coordinate for all removal and transport of the Equipment by the Freight Forwarder.

(C) **Condition to Closing**

(i) The respective obligations of BWOC and Buyer to consummate the transactions contemplated by the APA are subject only to (a) the Court having entered the Order and (b) no order staying, reversing, modifying or amending the Order is in effect on the Closing Date.

(D) **Miscellaneous**

(i) Termination. Notwithstanding anything to the contrary contained in the APA, the APA may be terminated only as provided in Section 7.02 thereof. In the case of any such termination, the terminating party shall give notice to the other party specifying the provision pursuant to which the APA is being terminated.

(a) Agreement may be terminated at any time before Closing:

(1) by mutual written consent of BWOC and Buyer;

(2) by BWOC, on or after April 15, 2010, if the condition set forth in Article IV of the APA, requiring Court approval of he Sale, has not been satisfied or waived; or

(3) by BWOC, immediately upon an order becoming final and non appealable that declares the APA invalid or unenforceable in any material respect or that prevents the consummation of the transactions contemplated hereby or thereby (a "Termination Order"); provided, however, that BWOC does not have the right to terminate the APA pursuant to this Section 7.02(a)(iii) if it has sought entry of, or has failed to use its reasonable best efforts to oppose entry of, such Termination Order.

(b) In the event of termination of the APA as provided in Section 7.02 thereof, the APA shall forthwith become void and there shall be no liability on the part of any Party to any other Party under the APA, except that the provisions of Section 7.02 and Sections 7.03 7.15 of the APA shall continue in full force and effect and except that nothing herein shall relieve any Party from liability for any breach of the APA before such termination.

**The Lien Release Amount**

17. As set forth in subparagraph 16(D)(i)(a) above, the APA includes a covenant that BWOC will obtain a release of any mortgage, pledge, security interest, easement, encroachment, lien or encumbrance of any kind on the Equipment held by IAG. Pursuant to the *Order Approving Entry into Settlement with International Alliance Group* [Docket No. 1312], the Equipment and certain other equipment at the Bakersfield Refinery (collectively, the

"Collateral Equipment") is subject to a lien by IAG (the "IAG Lien") pending: (a) a $5,000,000 payment to IAG from the proceeds of a sale of the Collateral Equipment; and (b) the settlement of certain purchase orders. The Debtors have negotiated the release of the IAG Lien as to the Equipment upon the payment of the Lien Release Amount.

## Basis for Relief

### I. The Proposed Notice of the Sale is Appropriate.

18. Under Bankruptcy Rule 2002(a) and (c), the Debtors are required to notify creditors of a proposed sale, including a disclosure of the terms and conditions of such sale and the deadline for filing any objections thereto. The Debtors respectfully request the Notice, substantially in the form attached hereto as **Exhibit C**,[5] be deemed adequate and sufficient if, within two business days of the filing of the Motion, the Debtors (or their agents) have served by overnight mail, postage prepaid, copies of the Notice upon the following entities (collectively, the "Notice Parties"):

(a) all parties entitled to receive notice as of the date hereof pursuant to Bankruptcy Rule 2002(a)(2);

(b) all parties known to the Debtors who have an interest in or rights to the Equipment;

(c) all entities who have recorded in the public record any lien, interest or encumbrance in or upon the Equipment;

(d) the Office of the United States Trustee for the District of Delaware;

(e) applicable federal, state and local governmental authorities or units thereof;

(f) all taxing authorities having jurisdiction over any of the Equipment, including the Internal Revenue Service;

---

[5] The Sale Notice will instruct parties in interest that a copy of the Motion and ancillary documentation may be obtained from the Debtors' notice and claims agent, Epiq Bankruptcy Solutions LLC, (a) at its website at http://chapter11.epiqsystems.com/fji or (b) by writing (sent via first class mail) to Epiq Bankruptcy Solutions, LLC, Attn.: Flying J Inc., FDR Station, P.O. Box 5082, New York, NY 10150 or (c) by calling 646-282-2500.

(g) counsel for the Creditors' Committee;

(h) counsel for the agents for the Debtors' prepetition and postpetition secured and unsecured lenders;

(i) all persons known or reasonably believed to have expressed an interest in acquiring the Equipment;

(j) counsel for Buyer; and

(k) the Buyer.

19. The Debtors submit that the foregoing notice complies fully with Bankruptcy Rule 2002 and was reasonably calculated to provide timely and adequate notice of the Sale to the Debtors' creditors and other parties in interest. Based upon the foregoing, the Debtors respectfully request that the Court approve the notice procedures herein.

## II. <u>The Proposed Sale Transaction is Appropriate.</u>

20. In accordance with section 363(b)(1) of the Bankruptcy Code and Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be conducted as a private sale. The Debtors have determined: (a) that selling the Equipment through a private negotiated sale will enable it to capture the maximum value from this transaction for the Debtors' estates, especially given the favorable terms of the APA, the Debtors' year-long efforts in marketing the Equipment and the limited field of potential buyers; and (b) that the Sale is in the best interests of the Debtors and their estates. Given that the successful closing of the Sale of the Equipment by BWOC and the closing of the sale of the Equipment by the Buyer are mutually dependant, the Debtors must proceed expeditiously to closing.

21. The APA memorializes a comprehensive, arm's-length transaction that will provide a greater recovery for the Debtors' estates than would be provided by any alternative disposition of the Equipment available to the Debtors. The bases for the relief requested in this

Motion are founded on a number of provisions of the Bankruptcy Code and the Bankruptcy Rules. These bases are discussed in detail below.

### A. The Sale of the Equipment Pursuant to the APA is Authorized by Section 363 of the Bankruptcy Code as a Sound Exercise of the Debtors' Business Judgment.

22. Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Although section 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of estate property, bankruptcy courts routinely authorize sales of a debtor's assets if such sale is based upon a debtor's sound business judgment. See, e.g., Meyers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); In re Trans World Airlines, Inc., No. 01-00056, 2001 Bankr. LEXIS 980, at *29 (Bankr. D. Del. Apr. 2, 2001); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991).

23. Courts typically consider the following factors in determining whether a proposed sale satisfies the "sound business judgment" standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was given to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith. See In re Delaware & Hudson Ry., 124 B.R. at 176; In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987); In re United Healthcare Sys., Inc., No. 97-1159, 1997 U.S. Dist. LEXIS 5090, at *13-14 and n.2 (D.N.J. Mar. 26, 1997). The Delaware & Hudson Railway court further held that:

> [o]nce a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale, the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and

> reasonable and that the purchaser [or proposed purchaser] is proceeding in good faith.

In re Delaware & Hudson Ry., 124 B.R. at 176.

24. A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders. See, e.g., In re Abbotts Dairies of Pa, Inc., 788 F.2d 143 (3rd Cir. 1986); In re Lionel Corp., 722 F.2d 1063 (2nd Cir. 1983). In fact, the paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. See Food Barn, 107 F.3d at 564-65 (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); In re Integrated Res., 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the [Debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting In re Atlanta Packaging Prods., Inc., 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

25. Furthermore, once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." Creditors' Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." In re Integrated Res., 147 B.R. at 656 (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1). Indeed, when applying the "business judgment" standard, courts show great

deference to a debtor's business decisions. See Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.), Case No. 89C593, 1989 WL 106838, at *3 (N.D. Ill. Sept. 8, 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion").

26. The Sale is an exercise of the Debtors' sound business judgment. As set forth above, the Debtors marketed the Equipment through an extensive yet targeted search of potential buyers. Specifically, the Debtors identified and contacted over 50 parties worldwide most likely to have an interest in purchasing the Equipment. Following the Debtors' marketing efforts over the past year, the Buyer is the only party to bid on the Equipment. In light of the highly specialized nature of the Equipment and the results of the Debtors' marketing efforts thusfar, the Debtors believe that the Sale under the terms of the APA is the best available disposition of the Equipment and that the sale will increase liquidity and maximize creditor recoveries. Moreover, the Purchase Price constitutes: (a) reasonably equivalent value under the Bankruptcy Code and Uniform Fraudulent Transfer Act; (b) fair consideration under the Uniform Fraudulent Conveyance Act; and (c) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession, or the District of Columbia for the Equipment.

**B. Sale of the Equipment Free and Clear of the Liens is Authorized by Section 363(f) of the Bankruptcy Code.**

27. The Debtors submit that it is appropriate to sell the Equipment free and clear of any Liens pursuant to section 363(f) of the Bankruptcy Code.[6] Section 363(f) authorizes a debtor

---

[6] The Liens do not include the IAG Lien because the Debtors have separately negotiated the release thereof through payment of the Lien Release Amount.

to sell assets free and clear of liens, claims, interests and encumbrances if any of the following are met:

> (a) applicable non-bankruptcy law permits sale of such property free and clear of such interests;
>
> (b) such entity consents;
>
> (c) such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;
>
> (d) such interest is in bona fide dispute; or
>
> (e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

28. Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Equipment "free and clear" of a given Lien. See In re Kellstrom Indus., Inc. 282 B.R. 787, 793 (Bankr. D. Del. 2002) (Walrath, J.) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); In re Dundee Equity Corp., 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); In re Bygaph, Inc., 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same); Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive and holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

29. One or more of the tests of section 363(f) will be satisfied with respect to each of the Liens. Particularly, each of the parties holding a Lien will consent, or absent any objection to this Motion, will be deemed to have consented to, the Sale. See 11 U.S.C. § 363(f)(2). Any holder of a Lien also will be adequately protected by having their encumbrances, if any, in each instance against the Debtors or their estates, attach to the cash proceeds of the Sale ultimately attributable to the Equipment in which such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor had prior to the Sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto. Accordingly, section 363(f) authorizes the transfer and conveyance of the Equipment free and clear of any Liens.

**C. The Buyer is a Good Faith Purchaser and is Entitled to the Full Protection of Section 363(m) of the Bankruptcy Code, and the Sale Does Not Violate Section 363(n) of the Bankruptcy Code.**

30. Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

31. While the Bankruptcy Code does not define "good faith," the Third Circuit in In re Abbotts Dairies of Pa., Inc., held that:

> [t]he requirement that a [buyer] act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [Proposed Buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted).

32. The APA was negotiated at arm's length and in good faith. Thus, the Buyer should be entitled to the full protections of section 363(m) of the Bankruptcy Code. A party must show fraud or collusion between a purchaser and a debtor in possession or trustee or other bidders in order to demonstrate a lack of good faith. See In re Triangle Transport, Inc., 419 B.R. 603, 610 (Bankr. D. N.J. 2009) (quoting 3 Collier on Bankruptcy, ¶ 363.11 (15th ed. rev.) ("Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269, 276 (2d Cir. 1997) (same); see also In re Angelika Films, 57th, Inc., Case No. 97 Civ. 2239, 1997 WL 283412, at *7 (S.D.N.Y. May 29, 1997); In re Bakalis, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998).

33. By the time of execution of the APA, the Debtors and the Buyer had engaged in thorough arm's-length negotiations over the terms of the APA, and there was no fraud or collusion in those negotiations. Additionally, all payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sale have been disclosed.

34. Additionally, section 363(n) of the Bankruptcy Code provides:

> The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale, or may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount. In addition to any recovery under the preceding sentence, the court may grant judgment for punitive damages in favor of the estate and against any such party that entered into such an agreement in willful disregard of this subsection.

11 U.S.C. § 363(n).

35. As discussed above, the Debtors and the Buyer have engaged in thorough arm's-length negotiations over the terms of the APA, and there has been no fraud or collusion in those negotiations. In addition, the Buyer is not an "insider" of any of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

36. In this case, there is absolutely no evidence or indication of fraud or improper insider dealing of any kind. The APA does not constitute an avoidable transaction pursuant to section 363(n), and the Buyer should receive the protections afforded good faith purchasers by section 363(m). Accordingly, the Debtors request that the Court make a finding that the APA entered into with the Buyer was at arm's length and is entitled to the full protections of section 363(m) of the Bankruptcy Code.

## Highlighted Provisions Under the Local Rule 6004-1

37. Local Rule 6004-1 requires that the Motion "highlight material terms, including but not limited to (a) whether the proposed form of sale order and/or the underlying purchase agreement constitutes a sale or contains [certain highlighted provisions], (b) the location of any such provision in the form of order or purchase agreement, and (c) the justification for the inclusion of such provision." Local Rule 6004-1(b)(iv). The Order contains certain of these highlighted provisions. In accordance with Local Rule 6004-1, the reasons are set forth below.

38. The Sale does not contemplate a "stalking horse" bidder and public auction. As discussed in detail above, the market for the Equipment is extremely limited. The Debtors have, throughout the past year, identified and contacted all potential purchasers of the Equipment. Given that the Debtors have comprehensively surveyed the market for the Equipment, the Debtors aver that a public auction would not result in a higher or better offer for the Equipment. Further, given that the Sale will provide the Debtors with approximately $17,500,000 of

additional liquidity (the Purchase Price minus the Lien Release Amount), and given that the Debtors' experience thusfar in marketing the Equipment indicates that the Buyer is the only existing party with a serious interest in acquiring the Equipment, the Debtors submit that an auction would not result in more favorable purchase terms for the Debtors.

39. Bankruptcy Rule 6004(f)(1) specifically authorizes sales outside of the ordinary course of business to be by private sale. The Debtors respectfully submit that a private negotiated sale will allow the Debtors to maximize the value from this situation to enable the Debtors to capitalize on the liquidity flowing from the Sale as quickly as possible. See In re Jewel Terrace Corp., 10 B.R. 1008, 1012 (E.D.N.Y. 1981) (private sale appropriate when sale must be consummated expediently); In re National Health & Safety Corp., 1999 WL 703208 at *2 (Bankr. E.D. Pa. 1999) (court approved sale with no competitive bidding on one day notice due to "the Debtor's precarious financial predicament"). Cf. Uniform Commercial Code, § 9-610, Comment 2 ("Although subsection (b) permits both public and private dispositions [of collateral after default] . . . [t]his section encourages private dispositions on the assumption that they frequently will result in higher realization on collateral for the benefit of all concerned."). Given that the Buyer is the only party to have seriously pursued acquiring the Equipment, the Debtors are anxious to consummate the Sale as expeditiously as possible, particularly given the complexity of coordinating both BWOC's and the Buyer's contemporaneous sale efforts. As such, the Debtors submit that this negotiated Sale provides the best value for the Debtors' estates under the circumstances and is supported by sound business reasons.

**Notice**

40. The Debtors have provided notice of this Motion via first class mail to: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel for the Creditors' Committee; (c) counsel for the agents for the Debtors' prepetition and postpetition secured and

unsecured lenders; (d) any persons who have filed a request for notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002; (e) all parties known to the Debtors who have an interest in or rights to the Equipment; (f) all entities who have recorded in the public record any lien, interest or encumbrance in or upon the Equipment; (g) applicable federal, state and local governmental authorities or units thereof; (h) all persons known or reasonably believed to have expressed an interest in acquiring the Equipment; (i) all taxing authorities having jurisdiction over any of the Equipment, including the Internal Revenue Service; (j) counsel to IAG; (k) the Buyer; and (l) counsel for the Buyer. In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

## No Prior Request

41. No prior motion for the relief requested herein has been made to this or any other court.

*[The Remainder of This Page Is Intentionally Left Blank]*

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and granting such other and further relief as the Court deems appropriate.

Dated: February 12, 2010
Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

/s/ Ryan M. Bartley
Pauline K. Morgan (Bar No. 3650)
Edmon L. Morton (Bar No. 3865)
Donald J. Bowman, Jr. (Bar No. 4383)
Ryan M. Bartley (No. 4985)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: 302-571-6637
Facsimile: 302-576-3320

- and -

**KIRKLAND & ELLIS LLP**
David L. Eaton (admitted *pro hac vice*)
Adam C. Paul (admitted *pro hac vice*)
Jeffrey W. Gettleman (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: 312-862-2000
Facsimile: 312-862-2200

Counsel for the Debtors and Debtors in Possession