**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| FLYING J INC. *et al*. | ) | |
| | ) | Case No. 08-13384 (MFW) |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | Objection Deadline: March 16, 2010 at 4:00 p.m. |
| | ) | Hearing Date: March 23, 2010 at 11:30 a.m. |
| | ) | |
| | ) | Related Docket No. 2694 |

**OBJECTION OF UNITED STEELWORKERS TO DEBTORS' MOTION TO SELL SUBSTANTIALLY ALL ASSETS OF DEBTOR BIG WEST OF CALIFORNIA PURSUANT TO SECTION 363(b) OF THE BANKRUPTCY CODE**

United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("USW" or "Union") files this objection to the motion ("Motion") of Debtors Flying J Incorporated et al. ("Debtors") to sell substantially all of the assets of Debtor Big West of California, LLC ("Big West"). The Union objects to the sale because, as currently presented,[1] the Debtors' intended course of action violates Big West's contractual obligations to the USW, and thus its obligations under the Bankruptcy Code.[2]

[1] The deadline for objecting to the sale is March 16, 2010, even though potential purchasers have until 4:00 PM on March 16, 2010 to submit a bid, with an auction, if necessary, to be held on March 19, 2010. The Union thus files this Objection without knowing the identity of the purchaser or the precise terms of the sale. The Union expressly reserves the right to supplement this Objection at or prior to the hearing on the Motion.

[2] The USW has filed herewith a declaration made by Edward F. Huhn, who is the Secretary-Treasurer of USW Local Union No. 219. The USW will refer to this declaration as the "Huhn Decl." throughout this Objection.

## INTRODUCTION AND BACKGROUND

The USW and its Collective Bargaining Agreement with Big West

1. The USW, on behalf of its Local Union No. 219, is the collective bargaining agent for certain employees of Big West at its refinery located in Bakersfield, California.

2. Local 219 originally was a local union charted by the Oil, Chemical, and Atomic Workers International Union, or "OCAW." In 1999, OCAW merged with another labor organization to form the Paper, Allied-Industrial, Chemical and Energy Workers International Union, or "PACE." In 2005, PACE merged with the USW. (Huhn Decl. ¶ 3.)

3. The Union and Big West (and its predecessors) have been parties to a series of collective bargaining agreements ("CBAs"). Big West and its predecessor employers have participated in the International Union's National Oil Bargaining Program ("NOBP"). Typically, in NOBP negotiations, the International Union and larger oil refiners have negotiated labor agreements which form a pattern agreement for the agreements to be negotiated with the other covered companies. (Huhn Decl. ¶ 4.)[3]

4. A CBA between the Union and Texaco Refining and Marketing, Inc. was in effect at the Bakersfield refinery from February 1, 1996 through January 31, 1999. This CBA made no mention of successorship. (Huhn Decl. ¶ 5, Ex. A.)

5. In November 1997, the parties agreed to extend the 1996 CBA through January 31, 2002, with certain modifications as negotiated in the NOBP settlement. Included in the 1997 settlement was a Letter of Understanding regarding successorship. This Letter provided that if

[3] Here, as is common under NOBP bargaining, the parties' collective bargaining agreement consists of several national and local agreements that are not collected under one cover. (Huhn Decl. ¶ 4.)

the Bakersfield refinery were sold,

> the Company will include in any sale, merger or joint venture agreement the requirement that the successor company shall recognize the Union as the exclusive representative of the bargaining unit and shall adopt the Collective Bargaining Agreement and all existing Memoranda of Agreement. Such Collective Bargaining Agreement shall remain in full force and effect for its duration, except for mutually agreed to changes ….

(Huhn Decl. ¶ 6, Ex. B.) Provisions such as this Letter of Understanding are commonly known as "successorship" clauses, as they describe the obligations that an employer must satisfy before selling, or transferring to a successor employer, assets that are subject to an existing collective bargaining agreement.

6. The next CBA, effective from February 1, 2002 to January 1, 2006, also incorporated the Successorship Letter of Understanding and made certain modifications to the successorship agreement which are not relevant to the matters in dispute in this case. At the time, the Bakersfield refinery was owned by Equilon Enterprises, LLC d/b/a Shell Oil Products US. (Huhn Decl. ¶ 7, Ex. C.)

7. In 2005, Big West purchased the Bakersfield refinery. By agreement with the Union dated February 7, 2005, Big West assumed the 2002 CBA. The 2005 agreement provided that, with certain modifications, Big West would assume the 2002 CBA; the 2005 agreement did not modify the successorship agreement. (Huhn Decl. ¶ 8, Ex. D.)

8. By an agreement dated January 27, 2006, Big West and the Union agreed to extend the 2002 CBA through January 31, 2009. Nothing in the extension agreement modified or abrogated the Successorship Letter. (Huhn Decl. ¶ 9, Ex. E.)

Negotiations for a New Collective Bargaining Agreement

9. Bargaining between the Union and Big West commenced on or around December 17, 2008. During these meetings, the Union's chief negotiators were Local 219 Secretary-Treasurer Edward Huhn and USW Staff Representative Saul McGarity. The purpose of the parties' meeting on December 17, 2008 was to permit the USW to explain the NOBP proposal and bargaining process to Big West. Big West was represented by Vice President of Operations Fred Greener and Vice President of Human Resources Jerry Beckman, among others. At this meeting Huhn and McGarity furnished the Company representatives with a document explaining the NOBP. In addition, Huhn and McGarity explained that there would be a rolling 24-hour (day to day) extension of the collective bargaining agreement, which reflected the fact that the USW was negotiating the lead NOBP agreement with other refinery employers which employed greater numbers of employees than Big West, and these negotiations might not conclude before January 31, 2009. McGarity then asked if Big West had any questions, and Company representative Fred Greener said that he did not have any problems with what the Union had explained. (Huhn Decl. ¶ 10, Ex. F.)

10. Big West filed its Chapter 11 bankruptcy petition on December 22, 2008. The USW and Big West commenced negotiations for a new agreement on local issues before the January 31 expiration date, and the parties reached numerous agreements. During these negotiation sessions, Big West never proposed eliminating the successorship clause. Around the time the CBA was set to expire, USW Vice President Gary Beevers authorized a rolling 24-hour (day to day) extension of the CBA. (Huhn Decl. ¶¶ 10-11, Ex. G.)

11. On February 5, 2009, Big West's counsel Alan Berkowitz sent a letter to Huhn and McGarity regarding bargaining in connection with anticipated layoffs. In this letter,

Berkowitz referred at least five times to the "contract" or "existing contract" and stated that Big West would comply with the existing contract in the absence of an agreement to modify it. (Huhn Decl. ¶ 12, Ex. H.)

12. The parties continued bargaining throughout 2009. In early February, in anticipation of layoffs, Big West approached the Union with a proposal to modify certain provisions of the collective bargaining agreement involving the layoff notice and plant shutdown commitments. The parties bargained over this proposal and reached an agreement on February 17, 2009. Big West thereafter presented the parties' agreement to Bankruptcy Court for approval. This agreement included the following provisions:

> 8) The proposals above are not intended to supersede any provisions in the Collective Bargaining Agreement and any side letters or memoranda adding to or modifying the Agreement that are inconsistent with the substance or spirit of these proposals.
>
> 9) The Union agrees that it will not file or pursue on behalf of any of its members or any employee any grievance or claim that the company violated any term of the contract in the notice it provided to the Union with regard to the temporary layoff, the selection of employees for layoff, or the failure to provide any other right or benefit to employees in connection with the temporary layoff.
>
> 10) The Company agrees that it will meet the Union starting on February 24, 2009 to negotiate the NOBP and any outstanding issues and will continue to meet and bargain at least twice a week to conclusion.

The Bankruptcy Court later entered an order authorizing Big West to enter into the February 17, 2009 agreement. (Huhn Decl. ¶ 13, Ex. I.) (D.I. No. 908).

13. The parties continued bargaining throughout 2009. All local issues were resolved by February 2009. On or around February 3, 2009, the USW reached a contract settlement with Shell Oil, which was the lead industry negotiator. This agreement became the "NOBP"

settlement, which the Union presented to Big West. Big West's counsel Alan Berkowitz said that the Company could not agree to the NOBP settlement in light of the pending bankruptcy proceedings. (Huhn Decl. ¶ 14.)

Big West Demands that the USW Drop the Successorship Clause

14. Big West first asked the Union to drop the successorship clause in or around early December 2009. Big West first expressed its view that the CBA had expired on December 4, 2009, in a letter from Berkowitz to McGarity and Huhn. At this time, Big West was negotiating a sale of the Bakersfield refinery. In this letter, Berkowitz contended that if a successorship clause were in effect, the sale would require that the Union give up its successorship protection. (Huhn Decl. ¶ 15, Ex. J.)

15. At a meeting between the parties on December 7, 2009, Berkowitz stated that it was not Flying J's intent to void the current contract. At this meeting, the Union asked for the name of the purchaser and an opportunity to meet with the purchaser for bargaining purposes. Big West refused to provide the Union with the purchaser's name, citing a confidentiality agreement. (Huhn Decl. ¶ 15, Ex. K.)

16. Following this meeting, on December 18, 2009, Berkowitz sent another letter to McGarity and Huhn. In this letter, Berkowitz repeated his claims that the CBA had expired, and that the Union must give up any successorship protection that might exist. Berkowitz claimed that the impending sale created exigent circumstances that required the Union to bargain over the elimination of the successorship provision or forfeit its right to do so. Berkowitz stated that all negotiations on this matter had to be completed by December 24, 2009. (Huhn Decl. ¶ 16, Ex. L.)

17. USW Associate General Counsel David Jury responded to Berkowitz's letter by e-mail on December 21, 2009. Jury emphasized the Union's willingness to meet with the buyer for the purpose of negotiating a new CBA or to continue bargaining with Big West. Jury expressed the Union's disagreement with Big West's assertions that exigent circumstances existed and that negotiations must conclude by December 24. Rather, as Jury explained, any agreement concerning the sale of the Bakersfield refinery would be subject to a court-directed bidding procedure and Bankruptcy Court hearing, which would give the Union ample time to negotiate with Big West or the purchaser. Jury and Berkowitz exchanged several e-mails over the next week reiterating their positions. (Huhn Decl. ¶ 17, Ex. M.)

18. The parties next met for bargaining on January 7, 2010. Big West's negotiators included Berkowitz, Mike Shilling, Gus Flores, and Sylvia Parrolivelli. At this meeting, the Union presented a proposal to modify the successorship clause. Big West rejected this proposal, but Berkowitz said he would pass it on to the buyer. (Huhn Decl. ¶ 18.)

19. Big West has never given notice of its intent to terminate the rolling 24-hour extension. At all times since January 31, 2009, Big West has continued, and still continues, check-off of Union dues. (Huhn Decl. ¶ 19.)

<u>The Debtor Enters into an Asset Purchase Agreement</u>

20. On or about February 2, 2010, Big West signed an Asset Purchase Agreement ("APA") with the proposed stalking horse bidder, Alon USA Energy, Inc. ("Alon" or "Purchaser") for the sale of substantially all of Big West's operating assets. The Debtor has filed an executed version of the APA with this Court in connection with the Motion.

21. Contrary to Big West's obligations under the Successorship Letter of Understanding, Big West has failed to include in the APA the condition that Alon "shall

recognize the Union … and adopt the Collective Bargaining Agreement and all Memoranda of Agreement." Rather, the APA provides, at Article 9, Section 9.1:

> Buyer understands that some of the Business Employees are currently represented at Seller by the [USW], and Buyer understands its rights and obligations under the National Labor Relations Act arising from this transaction in regard to those employees and [the USW].

(APA, Section 9.1.)

22. Pursuant to the Bidding Procedures, the APA serves as the form of the purchase agreement for bidders to become Qualified Bidders.

23. By having agreed to the content of Section 9.1 of the APA, Big West has violated its obligation to assure that the Purchaser will be bound by the collective bargaining agreement.

<u>Big West Has Failed to Condition the Sale Upon the Assumption of the Collective Bargaining Agreement</u>

24. The Purchaser has refused to assume the collective bargaining agreement. Toward this end, the Debtors have repeatedly demanded that the Union agree to remove the successorship language from the contract.[4] The Union has not agreed to this, but instead has proposed meeting with the Purchaser to negotiate a new agreement. The Debtors have not filed an application for relief pursuant to Section 1113 of the Bankruptcy Code, 11 U.S.C. § 1113, to reject the collective bargaining agreement.

25. Even though it is not required by the collective bargaining agreement to do so, the USW has proposed meeting immediately with the Purchaser in order that the parties may attempt to negotiate a mutually acceptable collective bargaining agreement. The Purchaser, however, currently refuses to meet with the Union.

---

[4] Big West also contends that there is no collective bargaining agreement in effect, but that if there is, it does not include a successorship provision. We will address *infra* at ¶¶ 36-39 the errors in Big West's position.

26. Big West has not secured the consent of the USW to modify the successorship provisions of the labor agreement.

## OBJECTION

The Proposed Sale Violates Section 1113(f) of the Code

27. A collective bargaining agreement is currently in effect between Big West and the Union. This agreement includes a successorship provision, which requires any asset purchase agreement to contain a provision stating that the purchaser will assume the collective bargaining agreement.

28. In violation of the CBA, the APA does not require the Purchaser to assume the CBA.

29. Under federal labor law, Big West has an obligation to bargain with the Union in a meaningful manner over any changes to the CBA[5] and over the effects of any decision to change the scope of its business, whether through sale, shutdown, or otherwise.[6] Further, Section 1113 sets forth the exclusive means by which a debtor may reject a collective bargaining agreement. *See* 11 U.S.C. § 1113(a) ("[t]he debtor in possession . . . may assume or reject a collective bargaining agreement only in accordance with the provisions of this section").

30. Just as Big West has an obligation to bargain in good faith with the Union, so too does the Purchaser. *See In re Maxwell Newspapers*, 981 F.2d 85, 87-88 (2d Cir. 1992) (explaining that if a purchaser wishes to condition the sale upon certain modifications to an

---

5 *See* 29 U.S.C. § 158(d) (providing that modifications to a CBA must be mutually agreed upon); 11 U.S.C. § 1113(f) ("[n]o provision of [Title 11] shall be construed to permit a trustee to unilaterally terminate or alter any provision of a collective bargaining agreement").

6 *See First Nat'l Maint. Corp. v. NLRB*, 452 U.S. 666, 681-82 (1981).

existing CBA, that purchaser must meet with the union and the requirements of section 1113 must be met in the absence of an agreement).

31. As the Third Circuit has explained,

> The intent behind section 1113 is to preclude debtors or trustees in bankruptcy from unilaterally terminating, altering, or modifying the terms of a collective bargaining agreement without following its strict mandate. Moreover, the provision operates to preclude the application of other bankruptcy code provisions to the advantage of debtors and trustees to permit them to escape the terms of a collective bargaining agreement without complying with the requirements of section 1113.

*Air Line Pilots Ass'n v. Continental Airlines (In re Continental Airlines)*, 125 F.3d 120, 137 (3d Cir. 1997) (citing *In re Ionosphere Clubs*, 922 F.2d 984, 989-90 (2d Cir. 1990)).

32. Under the current circumstances, if Big West were to sell to Alon – even though Alon has not agreed to be bound by the CBA and Big West has not secured the Union's consent to modify the CBA – Big West would unilaterally abrogate the CBA in violation of Section 1113(f), which provides that "[n]o provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section."[7] 11 U.S.C. § 1113(f). Without providing for satisfaction of the successorship clause, the proposed asset sale would cause, and indeed require, Big West to violate Section 1113(f).

33. Pursuant to the strict requirements of Section 1113(f), Big West may not use an asset sale to circumvent the requirements of Section 1113, which is what Big West attempts to do here. In *American Flint Glass Workers v. Anchor Resolution Corp.*, 197 F.3d 76 (3d Cir.

---

[7] *See United Steelworkers v. Unimet Corp. (In re Unimet Corp.)*, 842 F.2d 879, 884 (6th Cir. 1988) (emphasizing that "section 1113 unequivocally prohibits the employer from *unilaterally* modifying *any provision* of the collective bargaining agreement" (emphasis in original)).

1999), the Third Circuit held that a debtor violated Section 1113(f) when it bound itself in an asset purchase agreement to a provision that would, as a condition of sale, alter the obligations in a collective bargaining agreement by eliminating payment of retroactive wage increases. As the court explained:

> [W]e hold that when as here a debtor in possession … binds itself contractually to obtain a change in the legal relationship created by a CBA as a condition precedent to closing a sale of substantially all of the debtor's assets, that constitutes an attempt to effect an alteration of the CBA. That being so, Anchor was required to comply with the procedures set out in Code § 1113 – and it did not.
> . . .
> In effect, the Agreement's condition precedent stripped [the union] of whatever bargaining power it might otherwise have had.

*Anchor Resolution*, 197 F.3d at 81-82; *see also In re Agripac, Inc.* No. 699-60001-frall, Slip Op. at 9-12 (Bankr. D. Ore. April 2, 1999) (concluding that "[f]ailure to include in the Sale Agreement a successor clause as required by the CBA is a breach of the Collective Bargaining Agreement which may result in a substantial claim against the estate," and holding that the sale could not proceed absent compliance with Section 1113).[8]

34. In a similar case, the bankruptcy court for the Eastern District of Pennsylvania denied confirmation of a plan of reorganization that featured a sale of assets that did not comply with a provision of the debtor's collective bargaining agreement requiring that the agreement "shall be binding upon [the debtor's] successors … and assigns." *In re Stein Henry Co.*, 1992 Bankr. LEXIS 2574, and *2 (Bankr. E.D. Pa. June 1, 1992).[9] The court in *Stein Henry* found that the failure of the sales agreement to provide for successor protection violated Section 1113(f) of the Code because the "[r]ights provided in [a collective bargaining] agreement as to

---

8 A true and correct copy of *Agripac* is attached hereto as Exhibit 1.

9 A copy of the reported decision in *Stein Henry* is attached hereto as Exhibit 2.

successor-entities must be preserved unless there is, unlike here, compliance with the procedures of 11 U.S.C. § 1113" and that "[t]o be confirmed, the plan must satisfy all applicable Code requirements." *Id.* at *6, *8. The court added that "workers' collective rights have traditionally been won by deference of immediate gratification to long-term collective ends, and the theory that, if push comes to shove, management will, at least in most instances and if compelled to do so, accommodate itself to labor's needs." *Id.* at *8-*9.

35. As in *Agripac* and *Stein Henry*, Big West's failure here to insist on the Purchaser's assumption of the CBA violates Section 1113(f). As such, this Court cannot approve the sale as currently proposed.

A Collective Bargaining Agreement with a Successorship Clause is in Effect

36. In January 2009, USW Vice President Gary Beevers authorized a rolling 24-hour (day to day) extension of the CBA. Big West's negotiators agreed to the extension.

37. From February 1, 2009 until December 2009, Big West's conduct and statements indicated a belief that a CBA was in effect. For example, Berkowitz' February 5 letter to McGarity and Huhn, sent a mere five days following the purported expiration of the CBA, referred to the "existing contract," stated that Big West would comply with the contract, and informed the Union that any disagreements over interpretation of the contract were to be addressed through the Bankruptcy Court's objection procedure. (Huhn Decl. Ex. H.) Then, in early February, Big West approached the Union with a proposal to modify certain provisions of the CBA. Big West's proposals included a waiver by the Union of its right to file certain grievances and a statement that "[t]he proposals above are not intended to supersede any provisions in the Collective Bargaining Agreement." (Huhn Decl. Ex. I.)

38. Big West continued, and still continues, to check-off Union dues, which should lead to a conclusion that, as a matter of law, a collective bargaining agreement is in effect, as courts have found that dues check-off is "lawful only when expressly authorized in writing." *See Office and Prof'l Employees Int'l Union, Local 95 v. Wood Cty. Tel. Co.*, 408 F.3d 314, 315 (7th Cir. 2005). In *Wood County Telephone,* a union sued to compel arbitration after the expiration date of the parties' collective bargaining agreement. *Id.* at 315. The agreement contained an evergreen clause that provided that the contract would continue in effect until one party gave notice of its intent to terminate the contract. *Id.* The employer argued that because the parties had reopened negotiations, the contract had terminated, and therefore the employer had no obligation to arbitrate because no contract was in effect. *Id.* The Seventh Circuit found the employer's continued check-off of union dues to be evidence that the contract had continued in effect. *Id.* at 317 (citing 29 U.S.C. § 158(a)(3), § 186(c)(4)); *see also U.S. Can Co. v. NLRB*, 984 F.2d 864, 869 (7th Cir. 1993) (citing, among other things, 29 U.S.C. § 186(c)(4)) (observing that "[c]heckoffs of dues and other payments from the employer to the union, like the enforcement of a union-security clause, depend upon the existence of a real *agreement* with the union" (emphasis in original)).

39. As in *Wood County Telephone* and *U.S. Can*, Big West's statements and conduct show that a collective bargaining agreement with the USW is still in effect. Big West first announced its view that there is no collective bargaining agreement in effect in December 2009 when it was engaged in the negotiation of the asset purchase agreement with Alon. Big West's belated conversion to the position that there is no collective bargaining agreement in effect does not erase one year of conduct. Because the contract has not been rejected or modified pursuant

to 11 U.S.C. § 1113, the proposed sale of the Bakersfield refinery to Alon violates the Bankruptcy Code.

<u>The Impasse Doctrine Does Not Permit Big West's Unilateral Implementation of its Proposal to Eliminate the Successorship Clause</u>

40. Big West also asserts that the parties have bargained to an impasse over the issue of the employer's proposal to remove the successorship clause from the collective bargaining agreement. There is no merit to this position, as Big West may not make unilateral changes while a collective bargaining agreement is in effect. *See* 29 U.S.C. § 158(d) ("[T]he [duty to bargain collectively] shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the terms of the contract.").

41. Further, even if we were to assume that no labor agreement is in effect, impasse occurs only where negotiations between the parties have been exhaustive. *Storer Communications, Inc.*, 294 NLRB 1056, 1088 (1989). The parties here have not engaged in exhaustive negotiations. And, in any event, the determination whether the parties have bargained in good faith to impasse is within the exclusive jurisdiction of the National Labor Relations Board. *See* 29 U.S.C. § 160(a).

<u>Conclusion</u>

42. Even though the Successorship Letter of Understanding does not require it to do so, the Union remains willing to bargain in good faith with Big West, Alon, or any other prospective purchaser in order to protect the livelihood of its members and to aid in Big West's reorganization. The Union is not, however, willing to permit Big West to ignore the obligations to which it agreed and expose the Union's members to the harm that Big West intends.

43. For the reasons set forth herein, the Motion must be denied unless the eventual purchaser agrees to be bound by the CBA or Big West otherwise secures the consent of the USW to modify the CBA.

DATED: March 16, 2010

Cooch and Taylor, P.A.

*/s/ Susan E. Kaufman*
Susan E. Kaufman, (DSB#3381)
1000 West Street, 10th Floor
The Brandywine Building
Wilmington, DE 19899
(302) 984-3893 / (302) 984-3939 Fax
Skaufman@coochtaylor.com

and

David R. Jury, Esquire
Sasha Shapiro, Esquire
United Steelworkers
Five Gateway Center, Room 807
Pittsburgh, PA 15222
(412) 562-2545 (phone)
(412) 562-2429 (fax)
djury@usw.org
sshapiro@uswa.org