CLERK, U.S. BANKRUPTCY COURT
APR - 2 1999

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In Re:<br>AGRIPAC, INC.,<br>Debtor. | Bankruptcy Case No. 699-60001-fra11<br>MEMORANDUM OPINION |

The Debtor-in-Possession seeks leave to sell its Canned Foods Division, pursuant to Bankruptcy Code § 363. In connection with the sale it seeks leave to assume certain executory contracts, and assign them to the purchaser, pursuant to Code § 365.

The matter came on for hearing on March 31 and April 1, 1999. Having considered the evidence, testimony and argument of the parties, the Court concludes that the sale and assignment of contracts may proceed, but only on certain conditions discussed in this opinion. Moreover, the Court finds that the proceeds of the sale must be held by the Debtor-in-Possession pending further proceedings in this Chapter 11 case.

I. FACTS

The Debtor-in-Possession has reached an agreement with NorPac Foods, Inc., for the sale by the Debtor-in-Possession and purchase



EXHIBIT 1

99-8(16)
212

by NorPac of the DIP's Canned Foods Division. A complete copy of the written agreement was placed into evidence as Exhibit 2. The purchase price, set out at Paragraph 2.4 of the Agreement, is $10 Million, plus 80% of the value of the bulk of the Debtor's inventory, 50% of the remaining inventory, and 95% of the book value of the Debtor-in-Possession's receivables. The value of the inventory is to be determined in accordance with generally accepted accounting principles, and the contract provides, at Paragraph 2.5, for post-closing adjustments which take into account, among other things, variations in the available inventory. A provision is also made for arbitration in the event of any dispute regarding the amount or value of the inventory.

At Paragraph 2.6 the Agreement contemplates that it will be closed in escrow, with CoBank, ACB, acting as escrow agent. CoBank is a secured creditor of the Debtor-in-Possession, and has a standing banking relationship with NorPac. The Agreement contemplates that CoBank will finance the sale for NorPac. The security interest securing the Debtor-in-Possession's obligation to the Bank attaches to the proceeds of this sale. The Agreement provides for payment to the Bank by allowing the Bank simply to issue a new note to NorPac, acquire a new security agreement, and make appropriate entries crediting the sale price against the amount owed to the Bank by AgriPac. In furtherance of a prior agreement between the Bank, AgriPac, and the Unsecured Creditors' Committee, the Bank would cause $3 Million in cash to be paid to the Debtor-in-Possession, free and clear of any security interest.

While the terms are not spelled out in Exhibit 2, implicit in the understanding between AgriPac and NorPac is NorPac's announced intention to pay $2 Million in "sign-up bonuses" to growers who, once the sale closes, contract with NorPac to provide crops for processing. The parties assume that a significant number of the farmers availing themselves of this arrangement will be growers previously associated with AgriPac.

Three interested parties have raised objections to the sale. The Unsecured Creditors' Committee, and Crown Cork and Seal ("CCS"), an unsecured creditor, each claim that the sale price in inadequate, and that the Debtor-in-Possession has failed to articulate a sound business reason for the sale in the absence of a confirmed plan of reorganization. Counsel for the Committee advised at the hearing that the Committee did "not Necessarily oppose" the sale, but was concerned that the Debtor-in-Possession had not provided sufficient, and timely, information from which the Committee could ascertain whether the sale was appropriate. In addition, Crown Cork and Seal objects to the handling of the sale proceeds, in light of claims it is asserting against the Bank. Finally, Teamster Local 670 has objected for the reason that the sale, as constituted, violates provisions of the Union's collective bargaining agreement with the Debtor-in-Possession, and because the Debtor-in-Possession has failed to comply with Code § 1113 regarding the rejection of Collective Bargaining Agreements.

// // //

// // //

## II. DISCUSSION

Ordinarily, estate property in a Chapter 11 case is disposed of, and the proceeds distributed, pursuant to a plan of reorganization. Proceeding in this manner provides significant protections to the interests of creditors, who are entitled to full disclosure of the provisions of the plan, and an opportunity to vote. This general rule notwithstanding, the courts in many cases have recognized that, under certain circumstances, partial or even total liquidation of the assets of a debtor-in-possession under Code § 363, in the absence of a plan of reorganization, may be appropriate. See, e.g., In re Lionel Corp., 722 F.2d 1063 (2d Cir.1983); In re Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992). A review of the applicable case law yields the following distillation of the factors a court should consider in reviewing an application for a sale, prior to or in lieu of confirmation of a plan, of a substantial portion of the Debtor's assets:

1. Whether there is an articulated business justification for the sale. This requires consideration of (a) the proportion of the assets to be sold to the whole of the estate; (b) the time which has elapsed since commencement of the case; (c) the likelihood of any reorganization, or, conversely, whether a liquidation is being proposed; (d) whether the assets to be sold are gaining or losing value, or whether an immediate sale as a going concern is likely to yield materially more than an orderly liquidation over time.

2. Whether there has been fair, adequate and accurate notice to interested parties of the transaction and its terms. "Fairness"

in this context includes time to make reasonable inquiry into the value of the assets and the terms of the transaction. Whether the time allowed is reasonable will depend on the particular situation, and exigent circumstances may justify an otherwise unreasonably short time for review and decision. However, less weight should be given to such circumstances if the exigency is attributable to the debtor's unjustified delay in seeking relief.

The Court must also consider whether there has been adequate information given to interested parties, either through discovery or the original notice. In particular, the Court must look at whether any material terms remain to be negotiated, and whether doubts about such terms render notice ineffective.

3. Whether the price is adequate and fair under the circumstances. This does not mean simply the highest bid, or proof that a quick sale may yield something more than an ordered liquidation. Where the face value of a quick sale is only marginally higher than an ordered liquidation, the Court must weigh the marginal benefit against the loss of vital creditor protections under Chapter 11, including the right to vote on a plan after full disclosure.

4. Whether the terms of the proposed transaction are severable, allowing the Court to defer or deny approval of particular aspects of the agreement which may be inappropriate under the circumstances.

// // //

// // //

5. Whether the transaction requires approval of assumption and assignment of executory contacts, and whether in fact such contracts may be assigned.

6. Whether the transaction is proposed in good faith. This includes the requirement that the proposed transaction not unfairly discriminate against any creditor or class of creditors or claimants, and that it not give undue advantage to the purchaser, or to equity holders, or any class of creditors or claimants.

7. Whether the proposed transaction, and any resulting distribution, is consistent with the provisions of the Bankruptcy Code. The sale should not contemplate a transfer of assets in derogation of the absolute priority rule either by direct payment to interest holders or agreed payments to holders (as such) by the purchaser.

8. Whether the transaction subjects the estate to unjustified administrative expenses or claims.

*These principles lead to the following conclusions regarding the issues in dispute:*

A. Justification of Sale

The agreement to sell to NorPac was reached after lengthy negotiations between the Debtor-in-Possession and NorPac, and Chiquita Brands, a competing suitor. These discussions culminated in an auction spread over two to three days immediately prior to the hearing on this matter. I am persuaded that the auction yielded the best available price, particularly in light of time constraints

which required a virtually immediate sale of the assets prior to the commencement of this year's growing season.

The objecting parties' expert testified to certain aspects of the Debtor's records which suggest that further investigation might yield evidence tending to prove that a liquidation over time, as opposed to a sale as a going concern, might have yielded a better result. However, there is no firm evidence to that effect. The Debtor-in-Possession has, at the very least, made out a *prima facie* case that the consideration for the sale is adequate, and that a valid business purpose exists for allowing the sale at this time. Evidence that the Debtor-in-Possession might have tried harder is not, by itself, sufficient to overcome this *prima facie* demonstration. I find that there is an articulated business reason for the sale.

The Unsecured Creditors' Committee argues that the sale price is indefinite, since the contract is based on the value of the Debtor-in-Possession's inventory, and the contract is not clear in defining how that value is to be arrived at. However, it appears that the contract calls for application of generally accepted accounting principles, and arbitration by an accountant in the event of a dispute. These provisions provide adequate protection of the Debtor-in-Possession's and the estate's interests, under the contract.

The issue of adequacy of notice is more difficult. Opposing counsel have pointed out frequently, and not unreasonably, that important information has been delivered to them at the last minute.

There is no denying that this case has proceeded at a breathtaking pace. The Debtor-in-Possession justifies its insistence on accelerated action by pointing out that the sale (and the sale of the frozen food division that proceeded it) can only succeed if accomplished in time for the growing season. It is true that nature will not slow down in order to accommodate lawyers and judges. In this case the crops necessary to support the canned foods operation have to be planted by early April. On top of that, the auction process that finally yielded the enhanced sale price makes it impossible to obtain complete information days in advance, much less provide the information to others.

On the other hand, the deadlines imposed by nature have been known to the parties all along. The Debtor-in-Possession also knew, as early as August 1998, that it was in severe financial trouble.[1] This case was commenced on January 4, 1999. Given the delay in starting the bankruptcy process, the DIP's argument that the high-speed treatment of the case is appropriate is not entirely satisfactory.

This is not to suggest that opposing creditors have been kept completely in the dark, at least judging by the record before the Court. The Court finds that, on balance, the inadequacy of notice is not by itself sufficient to deny approval of the sale.

// // //

// // //

---

[1]This is based on testimony by the Debtor-in-Possession's CEO on previous occasions.

B. Payments to Growers

The Unsecured Creditors object to the Agreement to the extent it provides for payment by the purchaser to AgriPac member/growers. It is argued that such payments violate the absolute priority rule. 11 U.S.C. § 1129(b)(2)(B)(ii).

The absolute priority rule, is not violated by the proposed payments to growers, if the funds are not payable from the estate, or paid strictly on account of the recipient's prior relationship with AgriPac. It is necessary for any entity purchasing the Debtor-in-Possession's assets to induce growers to contract to provide agricultural products to be processed. Payment of sign-up bonuses is a standard practice. It follows that these payments are an ordinary cost to the purchaser in a transaction such as the one under review here. This is not the equivalent to receipt by the growers of property of the estate, or payments on account of their interest in AgriPac.

The Court was assured at the hearing that there would be no discrimination in the payment of bonuses in favor of, or for that matter, against, any former member/grower of AgriPac. The order approving the sale should so direct, in order to remove any doubt on this point.

C. Collective Bargaining Agreement

The Sale Agreement contains the following provisions of concern to Teamster Local 670:

> 3.18. Labor Matters. Seller has not engaged in any unfair labor practice with respect to its present or former personnel which could reasonably be expected to

have a material adverse effect on the results of operations or financial condition of the Canned Food Business, nor is there any unfair labor practice complaint pending against Seller with respect to any of its present or former personnel. There is no labor strike, dispute, slowdown or stoppage pending, or, to the knowledge of Seller, threatened against or affecting Seller and Seller has not experienced any primary work stoppage or other labor dispute involving their employees during the last five years. There are no pending or, to Seller's knowledge, threatened, state or federal administrative claims, grievances, arbitrations, litigation or consent decrees against Seller.

3.22. <u>Employee Relations</u>. Buyer shall have no obligation to hire any specific number of Seller's former employees or to assume Seller's collective bargaining agreements with respect to the Canned Food Business. Section 3.22 of the Disclosure Memorandum contains a list of each salaried and hourly employee of the Seller and such employee's years of service, salary and grade. Seller believes that its relations with its employees are satisfactory. Except as set forth in Section 3.22 of the Disclosure Memorandum, no claim has been asserted or, to the knowledge of Seller, threatened by an employee on account of any alleged violation by Seller of any law relating to employment discrimination or employment practices or any other law governing the employment relationship within the last three (3) years.

5.1. <u>Employees</u>. Buyer will offer employment to some of the Seller's administrative personnel and some of the production workers involved in the Canned Food Business, in its sole discretion according to its business needs and plans.

8.3. <u>Labor Agreement</u>. (As a condition of closing) Buyer must have reached a full agreement with Teamsters Local 670 resolving all issues and questions with respect to: all seniority, hiring and benefit rights and obligations of Buyer with respect to former employees of Seller that Buyer may hire; the integration of the pre-existing supervisory and union workforces of Buyer into the Canned Food Business, and vice versa; and a complete labor agreement and/or agreement resolving all grievances and unfair labor practice or other employment related claims, satisfactory to Buyer in its sole discretion, applicable to the operations of the Assets.

The Collective Bargaining Agreement ("CBA") between Teamsters Local 670 and the Debtor-in-Possession provides that:

> This Agreement shall be binding upon the parties and their successors. In the event that the Company's business is sold, transferred or merged, such business shall continue to be subject to the terms and conditions of this Agreement. The Company shall give notice of the existence of this Agreement to any purchaser, assignee, etc., of the business. Such notice shall be in writing with a copy to the Union and shall be given at the time of such sale or transfer of the business. In the event that the Company fails to require the purchaser or transferee to assume the obligations of this contract, the Company shall be liable to the Union and to the employees for all damages sustained as a result of such failure to require the assumption of the terms of this Agreement, but shall not be liable if the purchaser or transferee has agreed to assume the obligation of this Agreement.

The proposed sale agreement does not comply with the terms of the Collective Bargaining Agreement. Moreover, it is obvious from the Union's protests that provisions in the Sale Agreement concerning labor relations have not been complied with.

The proposed sale is a sale of the Debtor-in-Possession's business as that term is employed in Article XII of the Collective Bargaining Agreement. Failure to include in the Sale Agreement a successor clause as required by the CBA is a breach of the Collective Bargaining Agreement which may result in a substantial claim against the estate. Moreover, the claim may be subject to priority treatment as an administrative expense, having occurred post-petition. It follows that any order permitting the sale to go forward must be conditioned on compliance with the CBA, or a waiver of strict compliance by the Union. Otherwise the economic benefit

of the sale to the estate will be substantially eroded by the Union's claims under the CBA.

In addition, Bankruptcy Code § 1113 requires that the Debtor-in-Possession bargain in good faith with the Union prior to rejecting the Collective Bargaining Agreement. The sale of the Canned Foods Business without compliance with the Collective Bargaining Agreement, amounts to a rejection of the contract for purposes of §1113. It follows that the sale cannot go forward until §1113 is complied with, or an agreement between the Union and the new buyer renders compliance moot.

D. Sequestration of Funds

Crown Cork and Seal objects to that part of the Agreement which effectively provides for direct payment of the sale proceeds to CoBank, the secured creditor. CCS has commenced an adversary proceeding seeking equitable subordination of CoBank's secured claim, pursuant to Code § 510. They now argue that the escrow arrangement contemplated by the sale deprives them of their remedy under § 510.

In response, the Bank refers to a settlement agreement entered into between the Debtor-in-Possession, Unsecured Creditors' Committee, and the Banks, in connection with the prior sale of the Debtor-in-Possession's Frozen Food Division. The agreement was approved by the Court and incorporated into its order of February 18, 1999, approving that sale.

// // //

// // //

The provisions relied on by the Bank read as follows:

> 2.d. Any unsold collateral that has not been transferred to the Buyer of either the Frozen or Canned Divisions will be transferred or surrendered to the Banks in partial satisfaction of debt or sold pursuant to a sale under § 363.

The Bank further argues that the settlement agreement constituted a release of claims such as the one now asserted by Crown Cork and Seal in its action under Code § 510.

It does not appear that the equitable subordination claim was subject to the February 18 agreement. Paragraph 4 of the agreement provides, in part, that "This release does not extend to any claim or cause of action of a creditor which is not derivative of a claim or cause of action of the bankruptcy estate." The complaint in the adversary proceeding alleges a claim on behalf of Crown Cork and Seal, and not a derivative claim on behalf of the estate.

The sale of estate property and distribution of the proceeds of the sale are distinct matters. The general rule is that distribution on pre-petition debt in a Chapter 11 case should not take place except pursuant to a confirmed plan of reorganization, absent extraordinary circumstances. In re Air Beds, Inc., 92 B.R. 419 (9th Cir. BAP 1988); In re Conroe Forge & Manufacturing Corp., 82 B.R. 781 (Bankr. W.D. Penn. 1988).

I find no compelling circumstance which justifies distribution of the proceeds of the sale in the absence of a plan of

reorganization, and in light of a colorable claim asserted for equitable subordination of the Bank's interest.[2]

A provision in the settlement agreement relied on by the Bank provides that "unsold collateral" will be surrendered to the Bank or sold pursuant to Code § 363. This language does not appear to include cash collateral. To the extent that it does, the provision is inconsistent with the rule laid down in Air Beds and Conrow. The agreement and the order approving it should be construed in a manner consistent with applicable legal principles and, accordingly, I find that the provision does not apply to the proceeds of the sale.

Pending further proceedings, the sale proceeds must be retained by the Debtor-in-Possession in an appropriate interest bearing account.

F. Assumption of Contracts

The Unsecured Creditors' Committee argues, not unreasonably, that the Court should not allow the Debtor-in-Possession's motions seeking leave to assume certain contracts for the purpose of assigning them to the purchaser. On the other hand, in a sale of this complexity, where the identity of the buyer could not be determined until the end of an auction, it is difficult to fashion a method consistent both with the review requirements of the Code and the need for the parties to move quickly to close the sale. The principal concern of the Unsecured Creditors is the cost to the estate of assuming the contracts (which is a condition of

[2] Nothing in this opinion should be construed as reflecting any judgment by the Court as to the merits of CCS's claim, or the Bank's response.

assignment, see Code § 363) may have been severely underestimated. Protection of the estate and vindication of Code requirements of Court approval (which implies that the Court and all parties be duly advised) require some conditions on approval. That the assumption and assignment should be approved goes without saying, since the assignment of the contracts is an integral part of the purchase transaction.

The Court will approve the proposed assumption and assignment, on the condition that the total cost to the estate of assuming the subject contracts not exceed $60,000. Any costs above that amount must be waived by the third party or paid by the purchaser. In addition, the buyer must identify the contracts to be assumed prior to closing, and notify interested parties.

## III. SUMMARY

1. The sale of the Canned Food Division is approved, subject to the following conditions:

a. The Sale Agreement must be modified to comply with the requirements of the Collective Bargaining Agreement, or an agreement reached between the Union and the Purchaser wherein the Union waives the requirement;

b. Code § 1113 must be complied with *before* the sale is closed, unless compliance is rendered moot by an agreement between the buyer and he Union;

c. The proceeds of the sale, net of costs attributable to the closing, must be retained by the Debtor-in-Possession in an

appropriate interest-bearing account pending further proceedings in this Court;

e. The order approving the sale shall specify that any asset not explicitly described in the Sale Agreement is retained by the estate;

f. Sign-up bonuses or similar consideration paid to growers contracting with the Buyer shall not discriminate in favor of or against any person or entity on account of its prior association with AgriPac.

2. The assumption by the Debtor-in-Possession of contracts necessary to be assumed and assigned to the Buyer is approved, on the following conditions:

a. Total costs of assumption to the estate shall not exceed $60,000; and

b. The Buyer shall, at least seven days prior to the closing, identify the contracts to be acquired by it, and give notice of those contracts to the Debtor, Creditors' Committee, Crown Cork and Seal, and U.S. Trustee.

The foregoing constitutes the Court's findings of fact and conclusions of law, which will not be separately stated. Counsel for the Debtor-in-Possession shall prepare a form of order consistent with this memorandum.

FRANK R. ALLEY, III
Bankruptcy Judge