**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| FLYING J INC. *et al.* | ) | |
| | ) | Case No. 08-13384 (MFW) |
| Debtors. | ) | |
| | ) | Jointly Administered |
| | ) | |

**DECLARATION OF EDWARD F. HUHN**

I, Edward F. Huhn, do hereby declare that I have personal knowledge of the facts attested to herein and that the following statements are true and correct:

1. I am the Secretary-Treasurer of United Steelworkers Local 219 (formerly PACE Local 219), which represents bargaining unit employees at Big West of California's Bakersfield, California refinery. I have held the position of Secretary-Treasurer of Local 219 for approximately 24 years. This Declaration is submitted in connection with the USW's objection to the motion filed by Flying J Incorporated to sell the assets of its Bakersfield, California refinery.

2. My duties as Local Union Secretary-Treasurer include participating in collective bargaining. As a result of my participation in collective bargaining, I am familiar with the union's bargaining policies and practices.

3. Local 219 originally was a local union charted by the Oil, Chemical, and Atomic Workers International Union, or "OCAW." In 1999, OCAW merged with another labor organization to form the Paper, Allied-Industrial, Chemical and Energy Workers International Union, or "PACE." In 2005, PACE merged with the United Steelworkers of America to form the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("USW" or "United Steelworkers").

4. The Union and Big West (and its predecessors) have been parties to a series of collective bargaining agreements ("CBAs"). Big West and its predecessor employers have participated in the International Union's National Oil Bargaining Program ("NOBP"). Typically, in NOBP negotiations, the International Union and larger oil refiners have negotiated labor agreements which form a pattern agreement bargaining between the International Union and the other covered employers. It is my experience that the NOBP agreements on various issues and the local agreements on issues outside of the NOBP have often not all been collected under one cover. Rather, several separate documents together comprise the full scope parties' agreement.

5. A CBA between the Union and Texaco Refining and Marketing, Inc. was in effect at the Bakersfield refinery from February 1, 1996 through January 31, 1999. This CBA made no mention of successorship. A copy of the 1996 CBA is attached to this Declaration as Exhibit A.

6. In November 1997, the parties agreed to extend the 1996 CBA through January 31, 2002, with certain modifications as negotiated in the NOBP settlement. Included in the 1997 settlement was a Letter of Understanding regarding successorship. This Letter provided that if the Bakersfield refinery were sold,

> the Company will include in any sale, merger or joint venture agreement the requirement that the successor company shall recognize the Union as the exclusive representative of the bargaining unit and shall adopt the Collective Bargaining Agreement and all existing Memoranda of Agreement. Such Collective Bargaining Agreement shall remain in full force and effect for its duration, except for mutually agreed to changes ....

A true and correct copy of the 1997 CBA extension agreement and Successorship Letter of Understanding is attached to this Declaration as Exhibit B. Although the attached document is not signed, it is the final agreement of the parties.

7. The next CBA, effective from February 1, 2002 to January 1, 2006, also incorporated the Successorship Letter of Understanding and made certain modifications to the successorship agreement which are not relevant to the matters in dispute in this case. At this time, the Bakersfield refinery was owned by Equilon Enterprises, LLC. A true and correct copy of the 2002 agreement is attached as Exhibit C.

8. In 2005, Big West purchased the Bakersfield refinery. By agreement with the Union dated February 7, 2005, Big West assumed the 2002 CBA, with certain modifications. The bargaining associated with the sale conformed to the terms of the Successorship Letter of Understanding. A true and correct copy of the 2005 agreement is attached as Exhibit D. The 2005 agreement did not modify the successorship agreement.

9. The 2002 CBA was extended through January 31, 2009. Nothing in the extension agreement modified or abrogated the successorship provisions of the CBA. A true and correct copy of the 2006 extension agreement is attached as Exhibit E.

10. Big West filed its Chapter 11 bankruptcy petition on December 22, 2008. The parties met on December 17, 2008, to discuss upcoming bargaining. The main purpose of the meeting was for the Union to explain the NOBP proposal and bargaining process to Big West's management. At the December 17, 2008 meeting, the Union's chief spokespersons were myself and USW Staff Representative Saul McGarity. Big West's representatives included Vice President of Operations Fred Greener and Vice President of Human Resources Jerry Beckman. At this meeting, we handed the Company representatives a document explaining the NOBP, a true and correct copy of which is attached as Exhibit F. After addressing the Union's substantive bargaining proposals, we discussed the bargaining process, and among the last things that we explained was the fact that there would be a rolling 24-hour (day to day) extension of the

collective bargaining agreement, which reflected the fact that the USW was negotiating the lead NOBP agreement with other refinery employers which employed greater numbers of employees than Big West, and these negotiations might not conclude before January 31, 2009. I explained the 24-hour rolling extension. McGarity then asked if the Company representatives had any questions about what the Union had explained. Company representative Fred Greener said that he did not have any problems with what the Union had explained.

11. The USW and Big West engaged in bargaining on local issues throughout the month of January 2009, and the parties reached numerous agreements. During these negotiation sessions, Big West never proposed eliminating the successorship clause. Around the time the CBA was set to expire, USW Vice President Gary Beevers authorized a rolling 24-hour (day to day) extension of the CBA because NOBP negotiations were still in progress. A copy of the relevant memoranda from Beevers is attached as Exhibit G. In my experience in bargaining with other employers in the oil industry, it is not uncommon for the parties to extend a CBA without written affirmation of the extension.

12. On February 5, 2009, Big West's attorney Alan Berkowitz sent a letter to McGarity and me regarding bargaining in connection with anticipated layoffs associated with the curtailment of operations at the Bakersfield facility. In this letter, Berkowitz referred on five occasions to the "contract" or the "existing contract" and stated that "[l]aid-off employees will be provided with the temporary layoff benefits set forth in Article XIV of the contract." A true and correct copy of this letter is attached as Exhibit H.

13. Following receipt of the Company's February 5, 2009 letter, the parties engaged in negotiations concerning the curtailment of operations at the Bakersfield facility. The parties concluded negotiations on February 17, 2009 and agreed to modify certain provisions of the

collective bargaining agreement involving the layoff notice and plant shutdown commitments. Big West presented this agreement to the Bankruptcy Court for approval. This agreement included the following provisions:

> 8) The proposals above are not intended to supersede any provisions in the Collective Bargaining Agreement and any side letters or memoranda adding to or modifying the Agreement that are inconsistent with the substance or spirit of these proposals.
>
> 9) The Union agrees that it will not file or pursue on behalf of any of its members or any employee any grievance or claim that the company violated any term of the contract in the notice it provided to the Union with regard to the temporary layoff, the selection of employees for layoff, or the failure to provide any other right or benefit to employees in connection with the temporary layoff.
>
> 10) The Company agrees that it will meet the Union starting on February 24, 2009 to negotiate the NOBP and any outstanding issues and will continue to meet and bargain at least twice a week to conclusion.

A copy of this agreement is attached as Exhibit I. The Bankruptcy Court later entered an order authorizing Big West to enter into the February 17, 2009 agreement.

14. All local issues were resolved by February 2009. On or around February 3, 2009, the USW reached an agreement with Shell Oil, which was the lead industry negotiator. The agreement with Shell became the "NOBP" settlement, and the Union later presented those terms to Big West. Attorney Alan Berkowitz said that Big West could not agree to the NOBP settlement in light of the Company's pending bankruptcy proceedings. The parties continued bargaining throughout 2009.

15. Big West first asked the Union to drop the successorship clause in or around early December 2009. Big West first expressed its view that the CBA had expired on December 4, 2009, in a letter from Berkowitz to McGarity and me. I note that the December 4, 2009

statement that there was no CBA in effect contradicts statements made in the Company's February 5, 2009 letter which refers repeatedly to the existence of a contract. In December 2009, Big West said that it was negotiating a sale of the Bakersfield refinery. In this letter, Berkowitz contended that if a successorship clause were in effect, the sale would require that the Union give up its successorship protection. A true and correct copy of this letter is attached as Exhibit J. After receiving the December 4, 2009 letter, the parties agreed to meet on December 7, 2009. However, at a meeting between the parties on December 7, 2009, Berkowitz stated that it was not Flying J's intent to void the current contract. The Union asked for the name of the purchaser and an opportunity to meet with the purchaser for bargaining purposes. Big West refused to provide us with the purchaser's name, citing a confidentiality agreement. A copy of my notes from this meeting is attached as Exhibit K.

16. Following this meeting, on December 18, 2009, Berkowitz sent another letter to McGarity and me. In this letter, Berkowitz repeated his claims that the CBA had expired, and that the Union must give up any successorship protection that might exist. Berkowitz claimed that the impending sale created exigent circumstances that required the Union to bargain over the elimination of the successorship provision or forfeit its right to do so. Berkowitz stated that all negotiations on this matter must be completed by December 24, 2009. A true and correct copy of this letter is attached as Exhibit L.

17. USW Associate General Counsel David Jury responded to Berkowitz's letter by e-mail on December 21, 2009. Jury emphasized the Union's willingness to meet with the buyer for the purpose of negotiating a new CBA or to continue bargaining with Big West. Jury expressed the Union's disagreement with Big West's assertions that exigent circumstances existed and that negotiations must conclude by December 24. Rather, as Jury explained, any

agreement concerning the sale of the Bakersfield refinery would be subject to a court-directed bidding procedure and Bankruptcy Court hearing, which would give the Union ample time to negotiate with Big West or the purchaser. Jury and Berkowitz exchanged several e-mails over the next week reiterating the parties' respective positions. A copy of these e-mails is attached as Exhibit M.

18. The parties next met for bargaining on January 7, 2010. Big West's negotiators included Berkowitz, Mike Shilling, Gus Flores, and Sylvia Parrolivelli. At this meeting, we presented a proposal to modify the successorship clause. Big West rejected this proposal, but Berkowitz said he would pass it on to the buyer.

19. The Company has never given notice of its intent to terminate the rolling 24-hour extension. In addition, the Company continued, and still continues, check-off of Union dues.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Edward F Huhn

Edward F. Huhn

March 14, 2010

Date

# ARTICLES OF AGREEMENT

Between

TEXACO REFINING AND MARKETING INC.
BAKERSFIELD PLANT

and

OIL, CHEMICAL & ATOMIC WORKERS
INTERNATIONAL UNION, AFL-CIO

On Behalf of
KERN RIVER
LOCAL 1-219

FEBRUARY 1, 1996
THROUGH JANUARY 31, 1999

EXHIBIT
A

INDEX


| Subject | Article | Page |
|---|---|---|
| Preamble | | 1 |
| Amendments for Federal Compliance | XXVIII | 55 |
| Bulletin Boards | XVII | 47 |
| Complaints and Grievances | XV | 40 |
| Contract Work | XIX | 49 |
| Demotions | XIII | 34 |
| Employee Benefits | XXXIII | 57 |
| Employees Covered | I | 1 |
| Funeral Leave | XXII | 52 |
| Health and Safety | XVI | 43 |
| Holidays | IX | 23 |
| Hours of Work | III | 2 |
| Job Security | XXIII | 52 |
| Jury Service | XXI | 51 |
| Layoffs | XIV | 36 |
| Leaves of Absence | XVIII | 47 |
| Management Rights | XXXII | 57 |
| Military Service | XX | 50 |
| No Cessation of Work | XXVII | 54 |
| Non-Discrimination | XXIV | 53 |
| Notices | XXIX | 55 |
| OCAW-COPE Check-Off | V | 8 |
| Overtime | VI | 11 |
| Period of Agreement | II | 2 |
| Permission to Enter Upon Company Property | XXV | 53 |
| Plant Closure | XXXI | 56 |
| Prior and Collateral Agreements | XXX | 56 |
| Promotions | XII | 30 |
| Rates of Pay and Changes in Classifications of Work | VII | 18 |
| Seniority | XI | 29 |
| Shift Differential | VIII | 20 |
| Union Security, Dues Deduction, Service Charge Deduction | IV | 4 |
| Vacations | X | 26 |
| Validity | XXVI | 54 |
| Vacation Penalty Table | Appendix | 63 |

## PREAMBLE

TEXACO REFINING AND MARKETING INC., BAKERSFIELD PLANT (hereinafter called "Company") and OIL, CHEMICAL AND ATOMIC WORKERS INTERNATIONAL UNION, Local 1-219 (hereinafter called "Union") as the exclusive bargaining representative of all employees of the Company hereinafter described, mutually agree as follows:

## ARTICLE I
### *Employees Covered*

This Agreement made and entered into this 14th day of March, 1996, by and between the TEXACO REFINING AND MARKETING INC., BAKERSFIELD PLANT, and the OIL, CHEMICAL AND ATOMIC WORKERS INTERNATIONAL UNION, in its capacity as bargaining agent, for and on behalf of all employees of the Company in the Refinery, except sales, office and clerical employees, employees engaged in technical work, professional employees, and supervisory employees as defined in the Labor Management Relations Act, 1947, as Amended by Public Laws 86-257, 1959 and 93-360, 1974.

## ARTICLE II
### *Period of Agreement*

This Agreement shall take effect February 1, 1996. It shall remain in effect through January 31, 1999. Either party shall give written notice at least sixty (60) days prior to January 31, 1999, of their intention to terminate, modify or amend the Agreement. If notice to change or amend is given, a conference shall be held to consider the proposed changes or amendments. In the event no Agreement is reached by January 31, 1999, either party may, on at least sixty (60) days written notice to the other, terminate this Agreement.

## ARTICLE III
### *Hours of Work*

1. The regular scheduled hours of work shall consist of not more than eight (8) hours a day, forty (40) hours per week, without the payment of overtime as hereinafter provided. In no case shall an employee be required to work more than sixteen (16) hours in any twenty-four (24) hour period. The regular work cycle for day employees shall be five (5) consecutive eight (8) hour days. The regular work cycle in the master schedule(s) for shift employees shall not exceed six (6) consecutive eight (8) hour days which shall be followed by not less than two (2) consecutive days off. The regular work cycles in the master schedule(s) as defined above for both day and shift employees will not be changed due to



situations such as turnarounds. The master schedule(s) for shift employees may be changed for long term reasons, and in the manner described in Section 4 of this Article. The established work week shall start at 12:01 a.m. Monday and end at 12:00 midnight the following Sunday. The established work day shall be a calendar day.

2. The following periods shall be established as regular straight time daily schedules:

   (a) Shift Employees
   From 10:30 p.m. to 6:30 a.m.
   From 6:30 a.m. to 2:30 p.m.
   From 2:30 p.m. to 10:30 p.m.
   or
   From 6:00 a.m. to 6:00 p.m.
   From 6:00 p.m. to 6:00 a.m.

   (b) Day Employees
   Maintenance
   From 7:30 a.m. to 11:30 a.m. and
   From 12:00 noon to 4:00 p.m.

   (c) Laboratory
   From 7:30 a.m. to 11:30 a.m. and
   From 12:00 noon to 4:00 p.m.
   From 8:00 a.m. to 4:00 p.m.
   From 4:00 p.m. to 12:00 midnight
   From 12:00 midnight to 8:00 a.m.

(d) As working conditions may require, the Company may adjust up or down individual or group starting working hours a maximum of two (2) hours as listed in groups a, b, and c above.

3. The provisions of this Agreement shall not be construed as a guarantee that any employee will receive any specified number of hours of work per day or per week.

4. The Company may, upon thirty (30) days written notice to the Union, change the rotating shift/days-off master schedule for any group of shift employees.

## ARTICLE IV
### *Union Security-Dues Deduction*
### *Service Charge Deduction*

1. Employees are free to join or not join the Union.

2. All present employees who are not Union members and who do not in the future become and remain members shall, as of the effective date of this Agreement, be required as a condition of employment to continue to pay to the Union each month a service charge as a contribution toward the administration of this Agreement, in an amount



equal to the regular monthly dues (not including initiation fees, fines, assessments, or any other charges uniformly required as a condition of acquiring or maintaining membership) in the Union.

3. All new employees who do not become Union members after thirty-one (31) calendar days of employment shall as a condition of employment, pay to the Union each month commencing after said date, a service charge as a contribution toward the administration of this Agreement in an amount equal to the regular monthly dues (not including initiation fees, fines, assessments or any other charges uniformly required as a condition of acquiring or retaining membership) in the Union. Upon failure of any non-member employee to pay or tender the above-mentioned service charge, the Employer will discharge such employee when so informed by the Union.

4. All employees covered by this Agreement who are members of the Union on the effective date of this Agreement, or who voluntarily become members thereafter, will be required as a condition of employment, to maintain membership in the Union throughout the term of this Agreement. It is understood that this requirement of maintenance of Union membership shall be met upon the payment or tender by the employee to the Union

of the amount of dues uniformly required for maintaining membership therein. The Company will mail the name(s) of new hires to the local Union within ten (10) days of the hiring date.

5. The requirement of maintenance of Union membership shall not apply to any employee who gives written notice to the Union and the Company during the fifteen (15) days immediately preceding the anniversary date of this Agreement of the employee's desire to withdraw from membership in the Union.

6. The Company will deduct Union initiation fees and dues or service charges equivalent to the monthly dues from the wages of employees who individually and voluntarily authorize such deduction in writing in the following form, and will remit these dues or service charges to the proper officers of the Union.

7. UNION DUES DEDUCTION

Date ______________________

"I hereby authorize you to deduct from my wages the initial fees and the current amount of my Union dues as reported to you by the Local Union Secretary-Treasurer and remit said sum to the Union as my membership dues."

"This assignment is voluntary and I understand that I may revoke it at any time in writing by giving



notice thereof to the Company and the Union."

Signed______________________

UNION SERVICE CHARGE DEDUCTION

Date______________________

"I hereby authorize you to deduct from my wages the Union service charges as reported to you by the Local Union Secretary-Treasurer and remit said sum to the Union as my service fee as provided in Article IV."

"This assignment is voluntary and I understand that I may revoke it at any time in writing by giving notice thereof to the Company and the Union."

Signed______________________

## ARTICLE V
### *OCAW-COPE CHECK-OFF*

1. In consideration of the Union's payment of the costs and expenses associated with the Company's establishment and maintenance of an OCAW-COPE Check-off System, the Company agrees to deduct from the wages of those employees, who are members of the Union and who voluntarily authorize such deductions on forms provided by the Company, the amount specified as the employee's contribution to the Oil, Chemical and Atomic Workers International Union Committee on Political Education Fund (OCAW-COPE) on a single monthly deduction basis.

   The Company also agrees to transmit said payroll deductions to the Secretary-Treasurer of Local 1-219, together with a list of the names of employees for whom the deductions have been made and the amount deducted for each such employee.

   The foregoing procedure and arrangement will be implemented and become effective within sixty (60) days following receipt of the Union's payment of the costs and expenses associated with the establishment of such system, as outlined in the Company's letter to Local Union No. 1-219, dated February 12, 1986.

2. The payroll deduction procedure will be implemented within sixty (60) days after receiving notice of the Union's intent to proceed, as follows:



a) Deductions will be made the first pay period of each calendar month from the paychecks of those employees who submit to the Company a signed authorization form supplied by the Company specifying the amount to be withheld;

b) All funds collected during each calendar month will be mailed to the designated local not later than January 15 of the following year;

c) A list of names of all employees contributing and the amount of their contribution for the year will be supplied at the time the funds are transferred to the local union;

d) A one-time setup charge of $500 for each participating local of the Union will be assessed, with payment due prior to any payroll deductions being made;

e) A $100 annual charge for each participating local will be assessed to defray the administrative cost of maintaining a monthly payroll deduction roster, issuing reports, and check processing;

f) A check for aforestated amount in Item e) will be forwarded by the local Union to the Company no later than January 15 of the year immediately following that in which the administration costs were incurred by the Company.

3. OCAW-COPE Check-off Authorization:

"I hereby authorize and direct the Company to deduct from my pay each month the amount of $________(from the pay period for work performed during the first pay period of each month), and to remit said amount to the Secretary-Treasurer of Local 1-219, as my voluntary contribution to OCAW-COPE.

This authorization and my contributions are voluntarily made based on my specific understanding: that they are not conditions of membership in the Union or of employment by my Employer; that I may contribute more or less than any guideline amount suggested and I will not be favored or disadvantaged by the Union for doing so; that I may refuse to contribute without reprisal; and, that OCAW-COPE, (which is connected with OCAWIU and the AFL-CIO COPE), will use the money contributed for political purposes, including but not limited to making contributions to and expenditures for candidates for federal, state and local offices and addressing political issues of public importance. I understand, also, that my contributions to OCAW-COPE are authorized by OCAWIU and the AFL-CIO on behalf of joint fund-raising efforts for OCAW-COPE and AFL-CIO COPE.



This authorization is a continuing authorization and shall remain in full force and effect during the term of the current Agreement or until specifically modified or revoked in writing by me, whichever first occurs."

Oate ______________________________

Signature ______________________________

Employee Name ______________________________

Social Security No. ______________________________

## ARTICLE VI
### *Overtime*

1. If an employee is required to work any additional time after completing eight (8) hours of work during the established work day, or forty (40) hours of the regular scheduled work week, the employee shall be paid at one and one-half (1½) times the regular rate of the classification of work performed for the additional time worked in excess of that specified herein.

2. If an employee works eight (8) hours or less during any normal working day, and leaves the job at the request of the management, and later during such day of twenty-four (24) hours is required by the Company to return to the job for additional work, the employee will be paid at one and one-half (1½) times the employee's regular rate for

any such additional time worked during such day of twenty-four (24) hours, but not less than a minimum payment equal to four (4) hours at the employee's regular rate. In the event no work shall be required of any employee so called for duty, the employee shall receive pay for four (4) hours at the employee's regular rate.

3. When an employee is required to report for work on schedule, and then shall not be required to work, or shall be required to work less than four (4) hours, the employee shall receive pay at the employee's regular rate for not less than four (4) hours work.

4. An employee required to work on one or both of the employee's regular days off shall receive one and one-half (1½) times the employee's regular rate of pay for all hours worked in excess of forty (40) hours within the established workweek. Notwithstanding the foregoing, if an employee is reassigned to work a different spot on the master schedule(s) and such re-assignment results in the employee working in excess of six (6) consecutive regularly scheduled days, one and one-half (1½) times shall be paid for all hours worked by the employee on such seventh (7th) consecutive regularly scheduled day. The payment of such seventh (7th) day premium shall not be offset against any additional premiums resulting from work performed by the employee on the employee's regularly scheduled days off.



5-A Meal Allowance: Daylight Maintenance Department

(1) If an employee is required to work more than two (2) hours in excess of and contiguous with the employee's regular 8-hour work day, the Company will furnish the employee a meal and shall allow one-half (½) hour without pay to eat the meal. For each successive five (5) hours worked in excess of the employee's regular 8-hour day after the first meal period, the Company will furnish the employee with another meal. If the Company is unable to furnish any such meal, the employee shall be paid meal money in the amount of five dollars ($5.00) in lieu thereof. In no case, however, will the employee be entitled to overtime meals or meal money if given at least four (4) hours notice before being required to report to work.

(2) If an employee who has been given less than four (4) hours notice is required to work four (4) hours, and such work is not contiguous with the employee's regular 8-hour work day, the Company will furnish the employee with a meal and shall allow one-half (½) hour without pay to eat the meal. For each successive five (5) hours worked, after the first meal period, the Company will furnish the employee with another meal. If the Company is unable to furnish any such meal, the employee shall be paid meal money in the amount of five dollars ($5.00) in lieu thereof.

(3) If an employee is required to work on the employee's day off and has been given at least four (4) hours notice, and such overtime is not contiguous with the employee's regular 8-hour work day, no overtime meal will be furnished, except as provided in paragraph (A-1) and (A-2) above.

(4) When an employee is notified four (4) hours in advance for scheduled overtime, no meals or meal allowance will be provided. If an employee works in excess of the scheduled overtime period, the employee will be provided an overtime meal or meal allowance.

5-B Meal Allowance: Operations, Oil Movements, and Laboratory Department

(1) Overtime contiguous with, but ahead of regular scheduled work:

An employee who is required to report to work more than two (2) hours early shall be entitled to a meal or, at the Company's option, a meal allowance in the amount of five dollars ($5.00). These meal allowances become due at the fourth (4th) hour, and each five (5) hour interval thereafter. In no case, however, will the employee be entitled to overtime meals or meal money if given at least four (4) hours notice before being required to report to work.



(2) Overtime contiguous with, but after regular scheduled work:

An employee who is required to work more than two (2) hours beyond the employee's regular scheduled eight (8) hours shall be entitled to a meal or, at the Company's option, a meal allowance in the amount of five dollars ($5.00) at the following consecutive clock hours worked intervals, the tenth (10th) hour and each five (5) hour interval thereafter. In no case, however, will the employee be entitled to overtime meals or meal money if given at least four (4) hours notice before being required to report to work.

(3) Overtime not contiguous with regular scheduled work:

An employee who is required to work more than four (4) hours of work not contiguous with the employee's regular scheduled eight (8) hour working period and who has been given less than four (4) hours notice of such work shall be entitled to a meal or, at the Company's option, a meal allowance of five dollars ($5.00). These meal allowances become due at the following consecutive clock hours worked intervals: the fourth (4th) hour, and each five (5) hour interval thereafter.

(4) Employees under this provision shall be required to remain on duty during any such meal

period. If the Company is unable to furnish any such meal, the employee shall be paid a meal allowance of five dollars ($5.00) in lieu thereof.

(5) If an employee is required to work on a scheduled day off and has been given at least four (4) hours notice, and such overtime is not contiguous with the employee's regular 8-hour work day, no overtime meal will be furnished, except as provided in paragraph (B-1) and (B-2) above.

6. For the purpose of computing overtime under this Article, an employee working any fraction of an overtime hour will be paid on a fifteen (15) minute or one quarter (¼) of an hour basis. Time required to pass information or instructions between incoming and outgoing shifts or other employees shall not be considered time worked. There shall be a sixteen (16) hour rest period between shift changes, or the Company shall be required to pay time and one-half (1½) to employees called to work without such sixteen (16) hour rest period. This sixteen (16) hour rest period shall not apply to day employees who are assigned a regular lunch period, nor employees working a twelve (12) hour shift schedule who shall be given twelve (12) hours rest or this overtime requirement shall apply. All overtime shall be approved in advance by the Supervisor or the Supervisor's designee.



7. Employees shall be given notice of schedule changes twenty-four (24) hours in advance of their starting time. In the event the Company does not give such notice, payment for all continuous hours worked during the first shift immediately following the starting time of the revised schedule will be paid for at one and one-half (1½) times the applicable straight time hourly rate.

8. An employee who is required to report to work on an emergency callout will perform said work and any other emergency work that occurs following such emergency callout and prior to the employee leaving the job.

9. Regularly scheduled hours not worked up to a maximum of eight (8) per day on a regular holiday, funeral leave, vacations, or jury duty, and for authorized sick or industrial accident leave as defined herein, will be included in computing the forty (40) hours in a work week beyond which the overtime rate is paid.

10. There shall be no duplication or pyramiding of overtime or other premium rates required by this Article or any other Article of this Agreement. In cases where two (2) or more overtime or premium payments are applicable, only the one (1) resulting in the greatest payment shall be applicable.

11. The Company will schedule a minimum of two (2) consecutive days off. When it becomes

necessary for the Company to split an employee's days off, the employee shall receive one and one-half (1½) times the employee's regular rate of pay for the first scheduled work day following the employee's first day off.

## ARTICLE VII
### *Rates of Pay and Changes in Classifications of Work*

1. The classifications and rates specified in the attached schedule and considered a part hereof are the only classifications and rates applicable to personnel covered by this Agreement.

2. An employee working any job shall perform any duties to which the employee may be assigned. Work performed by employees assigned to a Department shall be done by employees holding bid classifications regularly assigned to the Department, except in cases of emergency.

3. If work of a higher paid classification is required of any employee, the employee shall receive the minimum rate of wages specified for such higher paid classification for as long as the employee occupies that position; and with a minimum of two (2) hours pay paid in the higher classification if the employee works therein for two (2) hours or less. Employees working in excess of two (2) hours in the higher rated classification shall be paid the rate for actual hours worked.



4. Regular relief employees whose schedule requires work at more than one classification will be paid at the rate of the highest classification for all work performed in such combination classifications. This paragraph also applies to employees scheduled for at least one week who provide relief for regular relief employees for that period of relief.

5. Within sixty (60) days of the creation of a new job classification or the re-establishment of a former classification not now listed in the wage schedule, the wage rate(s) and working conditions thereto shall be determined by collective bargaining, subject to arbitration. When agreement is reached between the Company and the Union on the working conditions and rates of pay for the new or re-established classification(s), said rate(s) shall become effective as of the date that the new or re-established classification(s) were established by the Company.

6. Within sixty (60) days of re-assignment of duty(ies) within existing classifications or the creation of new or unlisted job classification, the rate applicable thereto shall be determined by collective bargaining, subject to arbitration, and shall become effective as of the time such new duty(ies) or job classification was established.

7. An employee being trained for a higher classification may perform work in that higher classification at the employee's regular rate of pay.

8. All work incident to or in connection with good housekeeping, running maintenance, and the like, will, consistent with efficient operation and insofar as is reasonable, be performed or done by such employees. The Union recognizes management's right to make work assignments. Employees may be required to perform work outside their primary duties.

## ARTICLE VIII
### *Shift Differential*

1. A shift differential for hours worked outside of the daylight shift shall be added to all basic rates of pay as follows:

   a) Afternoon Shift - A shift differential of fifty cents ($.50) per hour shall be paid to any employee whose shift is regularly scheduled to commence within one (1) hour of 4:00 p.m. and end within one (1) hour of 12:00 midnight.

   b) Morning Shift - Shift differential of one dollar ($1.00) per hour shall be paid to any employee whose shift is regularly scheduled to commence within one (1) hour of 12:00 midnight and end within one (1) hour of 8:00 a.m.



   c) Daylight Shift or Day Work - No shift differential shall be paid to an employee whose shift is regularly scheduled to commence after 6:00 a.m. and end before 6:00 p.m.

2. Off Schedule Shift: Employees assigned to regular Off Schedule Shifts:

   a) which start before 6:00 a.m. and end after the starting hour of the regular day shift shall be paid the applicable morning shift differential from the start of the shift until the starting hour of the regular day shift only, and

   b) which start before the starting hour for the afternoon shift and end after 6:00 p.m. shall be paid the applicable afternoon shift differential from the starting hour of the afternoon shift only, until the end of the shift.

   c) When a shift crosses the afternoon and night shifts, differentials will be paid in accordance with the clock hours worked on each shift.

3. Daylight Employees: A daylight employee is an employee working on an operation which normally continues only through eight (8) hours between 6:00 a.m. and 6:00 p.m., except for Operating Department and Oil Movements Department employees, all of whom are considered to be shift employees.

a) Daylight employees who work outside the hours of 6:00 a.m. through 6:00 p.m., when such hours are contiguous with such employees' regular scheduled daylight shift, shall receive the appropriate shift differential for such hours worked which are outside of the hours of 6:00 a.m. through 6:00 p.m.

b) Daylight employees rescheduled or assigned to work during the afternoon and/or morning shift periods, for any reason, shall receive the appropriate shift differential for the shift period worked, except that no shift differential shall be paid for overtime hours between the hours of 6:00 a.m. through 6:00 p.m. which are contiguous to the employees' regular daylight shift.

c) Daylight employees called out to work outside the hours of 6:00 a.m. through 6:00 p.m. shall receive the appropriate shift differential for such hours worked, except that no shift differential shall be paid for hours worked between 6:00 a.m. and 6:00 p.m. where such hours worked are contiguous to the employees' regular or scheduled shift.

4. Overtime Rate on Shift Differential: When an overtime rate applies, and a shift differential applies, the overtime rate shall also be applied to the shift differential.



5. Benefits: Shift differential payment will not be included in computing pay for any reasons other than for hours worked.

## ARTICLE IX
### *Holidays*

1. Employees assigned to the Maintenance Department and employees in the Refinery Utility Classification not assigned to shift work shall observe the following holidays: New Year's Day, Presidents' Day, Good Friday, Memorial Day, Independence Day, Labor Day, Thanksgiving, the day after Thanksgiving and Christmas Day. A 'floating' holiday will also be observed on a day adjacent to Christmas. If Christmas is to be observed on Monday, the preceding Friday will be the 'floating' holiday. If Christmas is to be observed on Tuesday, Wednesday or Friday, the 'floating' holiday will be observed on the day before Christmas. If Christmas is to be observed on Thursday, the 'floating' holiday will be observed on the following Friday.

2. Should any of these holidays fall on Sunday, employees not assigned to seven (7) day per week operations will observe the holiday on the following Monday instead of Sunday, and if the holiday falls on Saturday, the holiday will be observed on the preceding Friday.

3. Employees designated as shift workers and employees assigned to the Laboratory shall observe the following holidays: New Year's Day, Presidents' Day, Good Friday, Memorial Day, Independence Day, Labor Day, Thanksgiving and Christmas Day. Two 'floating' holidays will also be observed in accordance with Section 4 of this Article. For employees designated as shift workers and employees assigned to the Laboratory, the recognized holiday shall be the calendar day on which it occurs.

4. With respect to the 'floating' holidays as specified under Section 3 above, each employee shall give the Company thirty (30) days notice for the requested holidays. The Company may, at its discretion, allow an employee to take the employee's 'floating' holiday without such notice. New employees must complete one hundred eighty (180) days service before becoming eligible for the 'floating' holiday.

5. All employees, excluding probationary employees specified in Article XI, Section 2, shall receive holiday pay in an amount equal to eight (8) hours pay at their classified rate for the observed holidays specified, provided the employee is not required to work, and works on the scheduled work day immediately prior to or following the holiday. No holiday pay will be paid to any employee who is on an unpaid leave of absence; i.e., Union business,



previously exhausted occupational and/or non-occupational sickness and accident benefits, etc. Any employee with more than one hundred twenty (120) days of service who would not have received a day's pay on any of the above holidays occurring prior to the completion of such one hundred twenty (120) days service shall receive a day's pay at the employee's straight time rate for each such holiday on which the employee lost such pay.

6. In addition to the eight (8) hours holiday pay specified in paragraphs 1 and 3 above, all full-time employees will receive one and one-half (1½) times the classified hourly rate to which they are assigned for the first eight (8) hours worked on an observed holiday. Employees who are required to work beyond eight (8) hours on any of the observed holidays will receive two (2) times the classified hourly rate to which they are assigned for those hours worked in excess of eight (8) hours. An employee who works on an observed holiday shall be paid at the wage rate for the classification to which the employee is assigned or the employee's regular classified rate, whichever is greater.

7. Hours worked by employees as the result of a callout on an observed holiday shall be paid at one and one-half (1½) times the classified hourly rate to which they are assigned for the first eight (8) hours worked on the observed holiday, and two (2) times the classified hourly rate to which they

are assigned for those hours in excess of eight (8) hours. An employee who is called out to work on a holiday, and after reporting to work shall not be required to work, or shall be required to work four (4) hours or less, will receive a minimum payment equivalent to four (4) hours at the rate of one and one-half (1½) times the classified hourly rate.

8. A designated holiday not worked, but paid for, shall be counted as a day worked in computing overtime in excess of forty (40) hours in the established work week, except when such holiday occurs on one (1) of the employee's regular days off.

## ARTICLE X
### *Vacations*

1. Employees will be eligible for vacation as follows:

   a) All employees who have completed one (1) year of continuous service will be eligible for two (2) weeks vacation with pay and will thereafter qualify for two (2) weeks vacation on each successive January 1st.

   b) Commencing with January 1st of the year in which the 5th anniversary of accredited service occurs, employees will be eligible for three (3) weeks vacation with pay during that year and in each year thereafter.



   c) Commencing with January 1st of the year in which the 10th anniversary of accredited service occurs, employees will be eligible for four (4) weeks vacation with pay during that year and each year thereafter.

   d) Commencing with January 1st of the year in which the 20th anniversary of accredited service occurs, employees will be eligible for five (5) weeks vacation with pay during that year and in each year thereafter.

   e) Commencing with January 1st of the year in which the 30th anniversary of accredited service occurs, employees will be eligible for six (6) weeks vacation with pay during that year and in each year thereafter.

2. Vacations shall be granted and taken annually in accordance herewith and cannot be accumulated except as provided by the Vacation Plan. Each employee on vacation shall be entitled to compensation for the period of such vacation on the basis of the employee's average full time weekly (excluding overtime) pay paid the employee by the Company during the two (2) week period immediately prior to the date of taking the employee's vacation. In no case will the employee's vacation pay average be less than that employee's classified hourly rate.

3. If a recognized holiday, as covered by this Agreement, falls during an employee's vacation, the employee shall receive an additional day's vacation with pay or an additional day's pay.

4. In the assignment of vacation time, the Company will, as far as possible, comply with the requests of the employees, giving preference to requests of the senior employees. The Company will issue vacation schedule forms by October 1 requesting each employee to select their vacation preference. All selections shall be made by December 1. In the event an employee does not make a selection by December 1, the Company will make the vacation assignment. When approved, the vacation schedule will be published. The Company will post, on the bulletin boards, the approved vacation schedule, taking into account some changes might be required due to unforeseen circumstances such as emergencies, illnesses, etc. Vacations will start January 1 and continue to December 31. All employees who are eligible for vacation time will be allowed, if they so desire, to split their vacation time in one week intervals. When employees choose to split their vacation, the employees' choices will be ranked; each employee's first choice will outrank and be assigned prior to any employee's second choice, which will outrank and be assigned prior to any employee's third choice, etc. Vacations shall otherwise be governed by the Bakersfield Plant's vacation rules in effect or by the Vacation Plan.



## ARTICLE XI
### *Seniority*

1. In making promotions, filling of vacancies, demotions, layoffs, reemployment, the Company will, in all cases, be governed by the seniority and qualifications of the employee.

2. Every new employee shall be on probation for the first three hundred sixty-five (365) days. Continuous employment thereafter shall entitle the employee to the status of "permanent employee" and seniority shall start with the first day of employment.

3. Seniority for each employee shall be that date as shown on the seniority lists. The Company will furnish the Local Union and Workmen's Committee semi-annually with current plant and departmental seniority lists for all employees covered under this Agreement.

4. Employees will start their employment in the refinery utility pool. The classification of Refinery Utility is not a bid classification and carries no departmental seniority.

5. All bid classifications shall fall in the following departments as listed in the Wage and Classification Schedule:

(a) Operating Units
(b) Maintenance
(c) Laboratory
(d) Oil Movements

6. An employee's departmental seniority shall become effective upon completion of the employee's promotional probationary period, but shall be computed from the date when the employee first was awarded the classification bid in that department.

## ARTICLE XII
### *Promotions*

1. All promotions to a higher rated classification, voluntary demotions to a lower rated classification and bids to a classification with an equal rate of pay shall be probationary for a period not to exceed sixty (60) days. If, in the opinion of the Company, any employee, within the period of sixty (60) days after any of the above moves, does not display the ability and skill necessary to perform the employee's job satisfactorily to the Company, then such employee will be returned to the employee's previous position without loss of any seniority. Any employee awarded a job which represents a voluntary demotion within the employee's own department will be ineligible to bid on any other vacancy for a period of one hundred and eighty (180) days.



2. All job opportunities shall be posted on the bulletin boards for one (1) full calendar week from the date the Company has knowledge of such vacancy, in order that eligible employees may have the opportunity to bid on said jobs. A copy of such bids will be furnished to both the Secretary-Treasurer of Local 1-219 and to the Chairman of the Workmen's Committee. An employee who is on leave of absence, sick leave or vacation, and who has not already been notified by registered mail, return receipt requested, and given an opportunity to bid on the posted vacancy, may apply for said posted permanent assignment based on the employee's seniority, qualifications and eligibility within five (5) working days following the employee's return to work, and receive the assignment, subject to the provisions of Section I of this Article, if the employee is capable of handling the job after the break-in period. The employee who has occupied the job will be considered to be temporarily assigned.

3. The Company shall provide suitable job bid forms. Bids are to be filled out completely.

4. The Company will notify the successful bidder within fifteen (15) calendar days from the date of the posting of said vacancy.

5. The job shall be filled within sixty (60) days by the senior eligible employee bidding for same. Time off from work by the employee during this period due

to personal illness, injury, vacation, holidays, jury duty, or similar causes shall extend the above sixty (60) day period by the amount of said time off.

6. When it is deemed necessary to deviate from seniority, except as provided elsewhere in this Agreement, the matter shall be subject for discussion with the Workmen's Committee prior to the permanent placement, and if not adjusted satisfactorily, may become a matter of action under Article XV.

7. Refusal to accept promotions shall not jeopardize an employee's opportunities for future promotions. A Refinery Utility, or any employee bidding on an opening within that employee's department, may withdraw the employee's bid up to the close of the bidding period. Once the bid has been closed, the successful bidder must accept the promotion. Any employee bidding on an opening to the entry level of another department shall have until the end of the employee's break-in period or three weeks after the employee starts working in the new department, whichever is later, to refuse the promotion by notifying the employee's supervisor in writing of the employee's decision, in which event the employee wil be returned to the employee's previous position without loss of seniority.



8. Vacancies in the entry level classifications within each department shall be filled, based on plant seniority and qualifications, by bid from qualified employees within the Refinery Utility classification. Every third entry level opening in each department shall be open to interdepartmental bidding by qualified employees within other departments. If there are no bids from such qualified employees, the Company may assign the junior qualified employee in the Refinery Utility classification to the vacancy, or the Company may hire an applicant for such vacancy.

9. Only employees holding seniority in a department will be eligible to bid an opening above the entry level in that same department and will be awarded the bid on the basis of departmental seniority and qualifications. When no bids are received from qualified employees holding seniority in that department, the opening shall be filled by the Company's assignment of the most junior qualified employee within the department. If there are no qualified junior employees within the department, the opening shall be filled by bid from qualified employees within the Refinery Utility classification. If there are no bids from qualified employees within the Refinery Utility classification, the Company may assign the junior employee in the Refinery Utility classification to the opening, or the Company may hire an applicant for such opening.

10. In the event an employee bids for and is awarded a classification outside the employee's depart-ment, that employee shall be ineligible to bid out of the employee's new department on any position for a period of one hundred and twenty (120) days.

11. At any time that the Plant is being expanded through the addition of a major unit(s), interdepartmental bidding shall be suspended for a period starting nine (9) months prior to the scheduled startup and ending six (6) months after the completion of the successful startup of such unit(s).

## ARTICLE XIII
### *Demotions*

1. Demotions due to curtailment or lack of work shall be done by departmental seniority, that is, the employee with the least departmental seniority shall be the first to be demoted. When a job is eliminated, the affected employee will have the right to displace a junior employee in an equal pay classification, or a lower pay classification, within the employee's department.

2. Anyone displaced to the refinery utility pool shall have the right to displace a junior employee in an equal pay classification, or a lower pay



classification, in any department based upon the employee's plant seniority. The employee shall retain seniority in the department from which the employee was demoted for a period of one (1) year or until the employee bids to the entry level classification in the department from which the employee was demoted or of another department, whichever occurs first.

3. An employee retained on the payroll who is reduced to a lower pay classification because of operational changes as determined by management shall receive the rate of the employee's permanent classification from which the employee was reduced for an appropriate period as follows:

   Three (3) months for one hundred and eighty one (181) days through four (4) years' service.

   Six (6) months for five (5) years through fourteen (14) years' service.

   Nine (9) months for fifteen (15) years through twenty-four (24) years' service.

   One (1) year for service of twenty-five (25) years or more.

4. To qualify for rate protection, such an employee must have held the employee's permanent classification for at least ninety (90) days and

must have worked in or above the employee's permanent classification for a period of ninety (90) days within the twelve (12) month period immediately prior to the effective date of the employee's reduction in permanent classification. Approved absence from permanent classification shall count as time worked for the purpose of this paragraph.

5. An employee who during the rate retention period, refuses to accept a promotion to a higher-rated classification and for which the employee is qualified, will immediately be disqualified from further rate retention. The rate retention provision will not apply to seasonal employees, nor to demotions resulting from circumstances such as fires, floods, acts of God, catastrophes, wars or other events beyond the reasonable control of the Company.

## ARTICLE XIV
### *Layoffs*

1. Layoff shall be by seniority, that is, the last employee hired will be the first employee laid off. An employee who has been laid off due to no fault of the employee's own will not forfeit the employee's right to be reemployed until and unless the employee has been off the payroll for a period of one (1) year. Any employee rehired within the aforementioned time period shall be regarded as



a regular employee, and all such seniority accrued prior to layoff shall be restored to such employee so rehired within said time period.

2. Recall notices shall be by Telegram With Report (confirmation of receipt), or Certified Mail - Return Receipt Requested, to the last known address of the employee(s). Said employee(s) must accept reemployment offer within ten (10) working days after issuance of such notice, or the employee(s) shall lose all rights for said reemployment offer.

3. Any bargaining unit employee covered by this Agreement who is permanently promoted or permanently transferred to a position outside the bargaining unit shall lose all bargaining unit seniority as of the effective date of such promotion and/or transfer. Temporary assignments of bargaining unit personnel to non-bargaining unit positions for continuous periods of three (3) months or less shall not adversely affect the employee's seniority status or interfere with the accrual of seniority and benefits based on such employee's normal bargaining unit status. Any employee temporarily filling a non-bargaining unit position in excess of three (3) months shall lose all bargaining unit seniority concurrent with the expiration of such three (3) month period.

4. In the event the Company determines it necessary to invoke temporary layoffs (defined as 120 days or less) of employees, such layoffs will

commence on or after fourteen (14) days advance notice has been given to the Union of the Company's intent. All obligations imposed by Sections 1 and 2 above, Article XXIII and Article XXXI shall be without force or effect in the case of temporary layoffs.

The foregoing will have application only in the event of a complete temporary shutdown of the Bakersfield Plant, exclusive of boilers and oil movements operations, and such other facilities that may have to be operated for environmental reasons in accordance with any applicable governmental regulations. Employees deemed necessary to man these operations shall be exempted from the layoff, demotions and/or bumping procedures of the Articles of Agreement. Otherwise, the seniority provisions of the Articles of Agreement respecting layoffs and/or demotions, etc. will apply. The schedule of benefits applicable to temporary layoffs shall be as follows:



| **Full Years of Company Service** | **Severance Pay** |
| --- | --- |
| 1 | One (1) payment amounting to the dollar difference between three-quarters (¾) of an employee's weekly base pay and the maximum weekly unemployment insurance compensation that the State is allowed to provide by law. |
| 2 | Two (2) such weekly payments based on ¾ pay. |
| 3 | Three (3) such weekly payments based on ¾ pay. |
| 4 | Four (4) such weekly payments based on ¾ pay. |
| 5 | Five (5) such weekly payments based on ¾ pay. |
| 6 | Six (6) such weekly payments based on ¾ pay. |
| 7 | Seven (7) such weekly payments based on ¾ pay. |
| 8 | Eight (8) such weekly payments based on ¾ pay. |
| 9 | Nine (9) such weekly payments based on ¾ pay. |
| 10 | Ten (10) such weekly payments based on ¾ pay. |
| 11 | Eleven (11) such weekly payments based on ¾ pay. |
| 12 | Twelve (12) such weekly payments based on ¾ pay. |
| 13 | Twelve (12) such weekly payments based on ¾ pay and one (1) such weekly payment based on ½ pay. |
| 14 | Twelve (12) such weekly payments based on ¾ pay and two (2) such weekly payments based on ½ pay. |

Eligibility for the temporary layoff severance benefits described herein shall be the same, in all respects, as eligibility for benefits under the Company's regular Severance Pay Plan.

In the event the Company converts a temporary shutdown to a permanent shutdown which will result in the permanent layoff of employees, the provisions of Article XXIII, the sixty (60) day written notice for layoff clause, and/or Article XXXI, the six (6) month Plant Closure Agreement shall become operative.

5. No employee who has acquired seniority rights shall be suspended or discharged, except for just cause. When an employee voluntarily leaves the employment of the Company, the employee's seniority shall terminate upon receipt of the employee's final paycheck.

## ARTICLE XV
### *Complaints and Grievances*

1. For the purpose of handling any dispute or grievance arising under the terms of the Agreement, the Company agrees to meet, according to the procedures provided in this Article, with Members of the Workmen's Committee chosen by the Union employees of the Company, so that they properly represent the different Departments of the Refinery.



2. Any individual employee, group of employees or the Workmen's Committee shall have the right to submit grievances to the Company.

3. If an employee shall have a complaint, the employee shall first discuss it with the employee's foreman. When discussing the complaint, the employee may be accompanied by a member of the Workmen's Committee.

4. If the complaint is not adjusted to the satisfaction of the employee within ten (10) days after discussion thereof with the foreman, the employee may present the employee's complaint to the Workmen's Committee. The Workmen's Committee may submit the complaint in writing to the local Management of the Company and the local Management shall meet with up to three (3) members of the Committee within seven (7) days after receipt of such complaint for the purpose of arriving at a satisfactory adjustment thereof. The local Management shall give a written decision of the complaint within seven (7) days after such meeting and a copy of such decision shall be delivered to the employee and to the Committee.

5. It is agreed that no adjustment shall be made on any complaint unless the complaint has been so presented to the local Management within thirty (30) days after the occurrence of the matter complained of, nor shall a complaint arising from the termination of an employee be given

consideration unless it is presented in writing by the employee to the local Management within seven (7) days after termination. Any grievance may be brought up and discussed at any time, but no retroactive adjustment shall be made unless presented within the time specified.

6. In the event the decision of the local Management does not afford satisfaction, the Union shall have the right within thirty (30) days after the local Management's decision has been given, to request joint consideration of the complaint by the District Director of the Union, or the District Director's designated representative, and the Plant Manager or the Plant Manager's designated representative, and they shall confer within thirty (30) days after the Company's receipt of such request for the purpose of discussing the complaint and attempting to arrive at a fair and just decision. If they fail to agree upon the settlement of the complaint, they shall, within fifteen (15) days, select a third person to act with them as a Board of Arbitration. Should they fail to agree upon a third person as specified herein, they shall request the American Arbitration Association to submit a list of arbitrators, one of which will act as the third party to the Board of Arbitration. The decision of any two (2) of the Board shall be final and binding to all persons concerned. Any cost or expense of such arbitration shall be divided equally between the Company and the Union.



7. For the purpose of the time limits referred hereto, Saturdays and Sundays and holidays covered by this Agreement will be excluded.

8. If a dispute arises over the physical fitness of an employee to return to work or continue to work, a board of three (3) physicians shall be selected; one by the Company, one by the employee, and one selected by the two (2) so named. The decision of the majority of the board shall decide the case.

## ARTICLE XVI
### *Health and Safety*

1. There shall be established a Joint Labor-Management Health and Safety Committee, consisting of equal Union and Company representatives, and not less than two (2) nor more than four (4) each.

2. The Company will, from time to time, retain at its expense, qualified independent industrial health consultants, mutually acceptable to the International Union President or the International Union President's designee and the Company, to undertake industrial health research surveys as decided upon by the Committee, to determine if any health hazards exist in the work place.

3. Such research surveys shall include measurements of exposures in the work place, the results of which shall be submitted in writing to the Company, the International Union President, and the Joint Committee by the research consultant, and the results will also relate the findings to existing recognized standards.

4. The Company agrees to pay for appropriate physical examinations and medical tests at a frequency and extent necessary in light of findings set forth in the industrial consultant's report as may be determined by the Joint Committee.

5. The Union agrees that each research report shall be treated as privileged and confidential and will be screened by the Company to prevent disclosure of proprietary information or any other disclosures not permitted by legal or contractual obligations.

6. At a mutually established time, subsequent to the receipt of such reports, the Joint Committee will meet for the purpose of reviewing such reports and to determine whether corrective measures are necessary in light of the industrial consultant's finding, and to determine the means of implementing such corrective measures.

7. On each successive October 1 following the execution of this Agreement, the Company will furnish to the Union all available information on the mortality and morbidity experience of its employees.

8. The Joint Committee shall meet as often as necessary, but not less than once each month at a regularly scheduled time and place, for the purpose of considering, inspecting, investigating and reviewing health and safety conditions and practices. Union Committeemen shall have the right to investigate accidents under procedures developed by the Joint Committee. The Joint Committee shall make constructive recommendations with respect thereto, including but not limited to the implementation of corrective measures to eliminate unhealthy and unsafe conditions and practices and to improve existing health and safety conditions and practices.

9. All matters considered and handled by the Committee shall be reduced to writing, and joint minutes of all meetings of the Committee shall be made and maintained, and copies thereof furnished to the International Union President.

10. Time spent in connection with the work of the Committee by Union representatives, including walkaround time spent in relation to inspections and investigations, shall be considered and compensated for as their regularly assigned work.

11. In addition to the foregoing, Company intends to continue its existing industrial hygiene program as administered by Company personnel.

12. Any dispute arising with respect to the interpretation or application of the provisions hereto shall be subject to the grievance and arbitration procedure set forth in the Agreement.

13. No employee shall be required to perform services that seriously endanger the employee's physical safety, and the employee's refusal to do such work shall not warrant or justify discharge.

14. The Company will, at its expense, provide for the training of the Union members of the Joint Committee, twice during the term of this Agreement, when such training is requested by the Union members of the Committee. Such training will be limited to five (5) days per Committee member and will be conducted by qualified individuals, institutions and organizations recognized in the field of health and safety.

15. Employees having to perform work inside any vessel, tank or boiler will receive suitable clothing when requested.



## ARTICLE XVII
### *Bulletin Boards*

The Company will provide bulletin boards at convenient locations where they may be seen by the employees during their working hours. Such boards will be used exclusively by the Union for notices indicating the time and place of meetings and other regular functions of the Union having to do with the employees. Notices covering other items must be approved by the local Management before posting.

## ARTICLE XVIII
### *Leaves of Absence*

1. If an employee desires a leave of absence in order to engage in any business pertaining exclusively to the Oil, Chemical and Atomic Workers International Union, said leave will be granted when requested in writing to the local Management. Such employee shall be entitled to resume the employee's employment with the employer, without loss of seniority, and return to the employee's former Department at a rate of pay not less than that applicable to the job from which the employee left. There shall not be more than one (1) employee absent on such leave at any one time.

2. Leaves of absence may be granted, after one (1) year of continuous service with the Company, in

emergency cases when such leave will not seriously affect the Company's operations and where adequate notice requesting such leave is given by the employee. In no case will more than two (2) personal leaves of absence be granted to any employee within a twelve (12) month period.

3. The employee shall be responsible for maintaining all costs of benefit plans provided by the Company during the entire leave of absence.

4. Otherwise, leaves of absence will be subject to Company regulations.

5. Family leave will be available to all represented employees in the event of a birth or adoption of a child or the serious illness of a child, spouse or parent. The leave will be without pay and will be granted for up to a maximum of twelve weeks in a twelve-month period. An employee may request more than one family leave during a twelve-month period, but the total time on leave within that period may not exceed twelve weeks. The employee's request for such leave shall be in writing and submitted to his or her supervisor as far in advance as possible to minimize any adverse impact on operations.

   Credited service will accrue during the period covered by the family leave of absence. The leave will be granted with the understanding that the employee will be reinstated to the position held prior to the leave or to a comparable position.



## ARTICLE XIX
### *Contract Work*

1. The Company will not subcontract any of its work if such subcontracting will cause displacement, layoff, demotion, or jeopardize the promotion of employees within the classifications covered by this Agreement.

2. In the subcontracting of routine maintenance work presently also performed by Company employees, the Company shall give first preference to subcontractors having the collective bargaining agreements with OCAW, provided said subcontractors can perform the work efficiently and economically to the satisfaction of the Company.

3. The Company agrees that prior to working subcontractor employees, the Company will afford these supplemental employees the same Health and Safety orientation as they afford their own employees, and will insist upon enforcing the same safety rules.

4. Paragraph 2 above shall not apply to new construction, major repairs, turnarounds, and/or installation of special or patented equipment not ordinarily performed by Company employees as part of routine maintenance.

5. Any decoking or coke handling required as a part of the operations of the delayed coker will be work

performed by a qualified contractor, acceptable to the Company, and will not be work performed by the bargaining unit employees. (In the bidding and selection process to obtain a qualified contractor to perform the decoking or coke handling activities, the Company will include any available, qualified OCAW affiliated contractors, if any, on its bid list for such work, with the understanding that the contractor selected will be the bidder considered to be able to perform the work efficiently and economically to the satisfaction of the Company.)

## ARTICLE XX
### *Military Service*

1. Employees who shall leave the service of the Company to enter the services of the United States Government or any agency thereof for the purpose of performing military service for the United States, and shall notify the Company upon their release from such service (providing the time does not exceed ninety (90) days after their official release by the United States Government) shall be taken back into the service of the Company and allowed the seniority and position they held at the time they left for said military service, insofar as possible after they have proven their ability for that certain position.

2. Any full time employee who is a member of a reserve component of the armed forces of the United States, or a member of the National Guard or Air National Guard, will be granted a leave of absence for annual training duty or for emergency National Guard duty at the call of the Governor of California. An employee who has been employed by the Company for one (1) year or longer and who is on annual training duty or emergency duty will receive one (1) week's leave of absence with pay and a leave of absence without pay for such additional time as may be required to complete the annual training duty or emergency National Guard duty. An employee who has not taken the current year's vacation entitlement may substitute an equivalent part of the vacation for the leave of absence without pay.

## ARTICLE XXI
### *Jury Service*

When a permanent employee is summoned for jury service, the employee will not be required to report to work for any day the service is required unless the employee is released from such service not later than 12:00 noon, and is not required to report for such service the following day. An employee assigned to the morning shift will have the option to work the night previous to or the night after the employee has been summoned by the court for jury service, regardless of the time the employee is relieved from service. Such employee shall elect which of these shifts the employee desires to be relieved and shall notify the employee's supervisor of such election 24

hours in advance of the first of these shifts. Such service will be without loss of straight time pay for days that the employee was scheduled to work. While on such service the employee will report to the Company supervisor on duty each day upon release from such service on that day. The employee may retain any monies paid to the employee for such service, including all expense money such as mileage and per diem.

## ARTICLE XXII
### *Funeral Leave*

Employees may be granted up to three (3) days off, with pay, when absent on account of a death in the immediate family, i.e., spouse, parents, children, brothers, sisters, grandparents, grandchildren, and in-laws (defined as the grandparents, parents, brothers and sisters of the spouse). An employee may be paid for additional time lost at the discretion of the Plant Manager or his designee.

Employees shall have reasonable time off without pay to attend funerals of other relatives or close friends, after receiving permission from the Company.

## ARTICLE XXIII
### *Job Security*

In the event circumstances develop which make layoffs necessary prior to the expiration of this Agreement on



January 31, 1999, the Company shall give at least sixty (60) days written notice prior to any layoff. Either the Company or the Union may, prior to such layoffs, terminate this Agreement by giving sixty (60) days written notice. During the period following the initial Company notice and the termination of the Agreement pursuant to said termination notice, the Company will discuss the matter with the Union for the purpose of determining ways and means of avoiding the layoff or lessening the effect on employees involved.

## ARTICLE XXIV
### *Non-Discrimination*

1. The Company and the Union mutually agree that practices pertaining to hiring, promotions, pay, transfers, job assignments and other economic opportunities will be performed without regard to race, religion, color, sex, age or national origin.

2. When the masculine pronoun is used in this Agreement, it shall refer to both male and female.

## ARTICLE XXV
### *Permission To Enter Upon Company Property*

1. Duly authorized representatives of the Union shall be granted permission to enter the premises of the Company during working hours, provided that they

first obtain permission from the Refinery Manager or duly authorized representative of the Refinery Manager, observe the same security and safety rules and regulations of the Company as other visitors, and do not in any manner interfere with the performance of work by any employee or group of employees.

2. The Union shall notify the Company in writing of the names of the duly authorized representatives of the Union who shall be entitled to be granted permission to enter the premises of the Company under this Article, and the Company shall notify the Union in writing of the names of the person or persons who are authorized to grant the Union representatives permission to enter the premises of the Company under this Article.

## ARTICLE XXVI
### *Validity*

If any Court shall hold any part of this Agreement invalid, such holding shall not invalidate any other part of this Agreement.

## ARTICLE XXVII
### *No Cessation of Work*

During the term of this Agreement, the Union agrees that there shall be no cessation of work through strikes, stoppage or slow down of work for any cause, including



sympathy strikes, and the Company agrees there shall be no lockouts.

## ARTICLE XXVIII
### *Amendments For Federal Compliance*

It is expressly understood and agreed by the parties hereto that if, at any time after the execution of this Agreement, any Federal Statute, Order, Rule, Regulation or Directive shall in any way conflict with any of the provisions of this Agreement, then and in that event the particular provisions of this Agreement in conflict with such Federal Statute, Order, Rule, Regulation or Directive, shall be automatically amended to comply therewith until such Statute, Order, Rule, Regulation or Directive shall no longer be in effect, at which time the original provisions of this Agreement shall again be effective, if this Agreement has not otherwise terminated.

## ARTICLE XXIX
### *Notices*

Any notices provided herein may be given by depositing same in the United States Mail in a sealed envelope, sent by Registered or Certified Mail and postage prepaid, and addressed to the Union at the Office of the District Director, 304 Freeway Center Building, 3605 Long Beach Boulevard, Long Beach, California 90807; and Kern River

Local No. 1-219, 607 Nineteenth Street, Bakersfield, California 93301; or to the Company at P.O. Box 1476, Bakersfield, California 93302.

## ARTICLE XXX
### *Prior and Collateral Agreements*

1. This Agreement shall constitute the entire Agreement between the Union and the Company relating to employees to whom this Agreement applies and no other stipulation or understanding shall limit or qualify its terms.

2. This Agreement shall cancel and supersede all prior agreements, written and verbal, between the Union and the Company.

## ARTICLE XXXI
### *Plant Closure*

The Company will notify the Union in writing at least six (6) months in advance of a planned complete closure of the Texaco Refining and Marketing Inc., Bakersfield Plant, that will involve permanent layoff or permanent transfer of bargaining unit employees.

The Company and the Union will meet within fifteen (15) days after such written notice for the purpose of



discussing the effect of such closure on bargaining unit employees and to negotiate appropriate conditions and benefits for the affected employees. In the event the parties are unable to arrive at a satisfactory agreement, either party shall have the right to serve a sixty (60) day written notice to terminate this Agreement. The Union shall have the right to strike or the Company shall have the right to lock out at the end of the sixty (60) day period, unless a mutual agreement has been reached. The letter of understanding dated March 14, 1996, will become a part of this Article.

## ARTICLE XXXII
### *Management Rights*

All the rights, powers and authority exercised or had by the Company prior to the time the Union became the bargaining agent, are specifically retained hereunder by the Company, except to the extent that they are expressly limited by specific provisions of this Agreement.

## ARTICLE XXXIII
### *Employee Benefits*

1. Employees covered by this Agreement are entitled to full participation rights under the Texaco Group Pension Plan, Group Life Insurance Plan, Vacation Plan, Accident and Sick Benefit Plan, Permanent

Total Disability Plan, Accidental Death and Dismemberment Insurance Plan, and Severance Pay Plan.

2. Accident and Sick Benefits shall be paid to employees represented by the Union in accordance with the following schedule:

   A. On the first instance of absence in a 12-month period, there will be no waiting day assessed for purposes of administering A & S pay.

   B. On the second instance of absence in a 12-month period, there will be one (1) day of waiting assessed for purposes of administering A & S pay.

   C. On the third instance of absence and each instance of absence thereafter in a 12-month period, there will be a three (3) day waiting period assessed for purposes of administering A & S pay.

   D. In order to requalify for A. above, an employee will be required to have a twelve (12) month absence-free period (a chargeable A & S absence) from the date of the last absence.

   E. Payment of A & S Benefits on or after the commencement of any strike, including sympathy strikes, will no longer be paid.



3. In applying Article XXXIII, it is recognized and agreed that the failure or refusal of the Company to offer and/or extend employee benefits, incentives, etc., of whatever nature, kind or type to employees covered by the Labor Agreement while extending such benefits, incentives, etc., to employees excluded from the Labor Agreement does not constitute discrimination within the meaning of Article XXIV, nor is it to be construed as a violation of any other provision of the Labor Agreement.

4. The Company will not voluntarily discontinue, change or modify the above Plans during the term of this Agreement in such a way as to decrease the benefits under the Plans to any employee covered by this Agreement; provided, however, that periodic adjustments in actuarial factors used to achieve actuarial equivalence under the Group Pension Plan shall not be considered as changes or modifications of the Plan and shall not be construed as decreases in benefits under the said Plan.

5. No dispute, grievance or question in connection with the above Plans will be subject to arbitration; except that upon the request of any member of the above Plans or their representative any dispute concerning the following only as they apply to these Plans, may be arbitrated in accordance with the provisions of Article XV:

a) Length of service.

b) Pay class or normal rate of pay, whichever is applicable.

c) If the computation of benefits was correct in accordance with the provisions of the above Plans as established by (a) and (b) above, and if such benefits were paid.

6. Employees covered by this Agreement are entitled to full participation rights under the Texaco Employees Savings Plan. Nothing in these articles shall in any way affect any rights of any person under the provisions of the Employees Savings Plan or the rules and regulations in any respect thereto. The said Plan and rules and regulations shall determine all questions arising thereunder.

No dispute, grievance, or question arising from the application or interpretation of or in connection with the Savings Plan will be subject to the arbitration procedure described in Article XV of the Labor Agreement between the parties.

7. Employees covered by this Agreement are entitled to full participation in the Employee Stock Ownership Plan subject to any revision or revocation which is made generally effective throughout the Company.

8. There shall be no strike, stoppage, or slowdown of work for any cause, including sympathy strikes,



because of any dispute, grievance, or question arising in connection with any of the above Plans.

IN WITNESS WHEREOF, the parties hereto caused this Agreement to be executed March 14, 1996.

TEXACO REFINING AND MARKETING INC.
BAKERSFIELD PLANT

A. S. Abay
Plant Manager

OIL, CHEMICAL AND ATOMIC WORKERS
INTERNATIONAL UNION,
AFL-CIO

David Welty
International Representative, OCAW

Edward F. Huhn
Secretary-Treasurer, Local 1-219

Rick L. Berry
Chairman, Workmen's Committee

**TEXACO REFINING AND MARKETING INC.**
**Bakersfield Plant**
**WAGE SCHEDULE**

| **Classification** | **Hourly Rate** 2/1/96 | 2/1/97 | 2/1/98 |
|---|---|---|---|
| A. Operations | | | |
| No. 1 Operator | 21.16 | 21.69 | 22.34 |
| Shift Breaker Utility | 20.67 | 21.19 | 21.82 |
| No. 2 Operator | 20.31 | 20.82 | 21.44 |
| No. 3 Operator | 19.65 | 20.14 | 20.75 |
| (36 Months) | 19.65 | 20.14 | 20.75 |
| (30 Months) | 17.91 | 18.36 | 18.91 |
| (24 Months) | 16.18 | 16.58 | 17.08 |
| (18 Months) | 14.45 | 14.81 | 15.26 |
| (12 Months) | 13.52 | 13.86 | 14.27 |
| (6 Months) | 12.59 | 12.90 | 13.29 |
| (Start) | 11.78 | 12.07 | 12.44 |
| B. Oil Movements | | | |
| Loader Blender A | 20.67 | 21.19 | 21.82 |
| Loader Blender B | 19.57 | 20.06 | 20.66 |
| (36 Months) | 19.57 | 20.06 | 20.66 |
| (30 Months) | 17.85 | 18.30 | 18.85 |
| (24 Months) | 16.16 | 16.56 | 17.06 |
| (18 Months) | 14.45 | 14.81 | 15.26 |
| (12 Months) | 13.52 | 13.86 | 14.27 |
| (6 Months) | 12.59 | 12.90 | 13.29 |
| (Start) | 11.78 | 12.07 | 12.44 |
| C. Laboratory | | | |
| Tester A | 20.75 | 21.27 | 21.91 |
| Tester B | 19.57 | 20.06 | 20.66 |



| **Classification** | **Hourly Rate** 2/1/96 | 2/1/97 | 2/1/98 |
|---|---|---|---|
| (36 Months) | 19.57 | 20.06 | 20.66 |
| (30 Months) | 17.85 | 18.30 | 18.85 |
| (24 Months) | 16.16 | 16.56 | 17.06 |
| (18 Months) | 14.45 | 14.81 | 15.26 |
| (12 Months) | 13.52 | 13.86 | 14.27 |
| (6 Months) | 12.59 | 12.90 | 13.29 |
| (Start) | 11.78 | 12.07 | 12.44 |
| D. Maintenance | | | |
| Electr./Instrument Mechanic | 20.94 | 21.46 | 22.11 |
| No. 1 Craft Mechanic | 20.75 | 21.27 | 21.91 |
| No. 2 Craft Mechanic | 19.57 | 20.06 | 20.66 |
| Storekeeper | 19.57 | 20.06 | 20.66 |
| No. 3 Craft Mechanic | 18.46 | 18.92 | 19.49 |
| (36 Months) | 18.46 | 18.92 | 19.49 |
| (30 Months) | 17.11 | 17.54 | 18.06 |
| (24 Months) | 15.78 | 16.17 | 16.66 |
| (18 Months) | 14.45 | 14.81 | 15.26 |
| (12 Months) | 13.52 | 13.86 | 14.27 |
| (6 Months) | 12.59 | 12.90 | 13.29 |
| (Start) | 11.78 | 12.07 | 12.44 |
| E. Refinery Utility | | | |
| Refinery Utility (Hired1/7/81 or before) | 17.88 | 18.33 | 18.88 |
| Refinery Utility (Hired after 1/7/81 and before 1/8/84) | 16.58 | 16.99 | 17.50 |
| Refinery Utility (Hired after 1/8/84 and before 1/8/86) | 13.94 | 14.29 | 14.72 |
| Refinery Utility (Hired 1/8/86 or after) | 11.78 | 12.07 | 12.44 |

## MEMORANDUM OF UNDERSTANDING

The Company and Union recognize that continued employment opportunites for refinery bargaining unit personnel are directly linked to the Plant's efficient, competitive and profitable operations.

In the event, however, the Company considers that it is necessary to lay off employees, it will provide the Union with ninety (90) days written notice. At the written request of the Union, the parties shall meet during such ninety (90) day period for the following purposes:

1. The Company will inform the Union of the business reason(s) for any planned changes resulting in layoffs within the bargaining unit.

2. The Union may submit recommendations for minimizing or eliminating the need for the layoff, and the Company will consider adopting such recommendations and respond to the Union appropriately within fourteen (14) days.

3. If the layoff is deemed by the Company to be unavoidable, the Company will initiate a meeting(s) with the Union during the ninety (90) day period to discuss the effect of such reduction and will be prepared to negotiate on the following subjects for the affected employees:

   i. Specific application of the demotion and layoff procedures.



   ii. Possibilities of continued employment at other Company facilities and/or operations; and if the determines such opportunities are available, it is understood that moving and relocation expenses appropriate to the circumstances are subject to negotiations.
   iii. Vocational retraining or outplacement assistance.
   iv. Benefit plan applications, including plans such as: severance pay, pension benefits, medical and group life insurance.

Should disagreement arise over the intent and purpose of the discussions, the willingness of either party to continue the discussions, or any other provision of the Memorandum of Understanding, the objecting party will provide the other party the opportunity to discuss, at a higher level in the International Union or the Company, the prospects of continuing the discussions. If the discussions are terminated by either party at the higher level, the layoff will be implemented.

This Memorandum of Understanding is not intended to reduce or otherwise limit the rights of the parties contained elsewhere in the current collective bargaining agreement. Therefore, the provisions of this Memorandum of Understanding shall not be subject to arbitration. It is further agreed this Memorandum of Understanding will expire on January 31, 1999.

Dated this 26th Day of March, 1998

(Company) (Union)

LETTER OF AGREEMENT
BETWEEN
TEXACO REFINING AND MARKETING INC.
AND THE
OIL, CHEMICAL AND ATOMIC
WORKERS INTERNATIONAL UNION
AND ITS LOCAL 1-219

March 14, 1996
Health and Safety

It is agreed as follows:

This agreement, effective February 1, 1996, by and between Texaco Refining and Marketing Inc., Bakersfield Plant, herein referred to as the "Company", and the Oil, Chemical and Atomic Workers International Union, herein referred to as the "Union", shall be effective as of February 1, 1996, and thereafter, subject to sixty (60) days prior written notice by either party of its desire to amend, modify or terminate this Agreement.

Whereas, the Company and the Union agree that it is desirable that there be a top level review of the Health and Safety programs for the purpose of reviewing the application and operation of said programs, it is hereby mutually agreed as follows:

1. That there shall be established a Health and Safety Review Committee consisting of representatives of the Company and the International Union;





2. That within sixty (60) days following the effective date of this agreement, or as soon thereafter as practicable, the parties hereto shall confer with respect to a mutually agreeable time and location for the initial meeting of said committee;

3. That said committee shall meet at mutually agreeable times and locations, and as often as may be necessary, for the purpose of engaging in a comprehensive study of the application and operation of said programs;

4. That said committee shall review the implementation of Health and Safety contract clauses to insure that the intent and purposes of such clauses are carried out; and

5. That said committee shall be provided with full, complete, and detailed information relative to said programs that will enable it to effectively and properly implement the purposes of this Agreement.

TEXACO REFINING AND MARKETING INC.

A. S. Abay
Plant Manager

OIL, CHEMICAL AND ATOMIC WORKERS
INTERNATIONAL UNION, AFL-CIO

David Welty
International Representative, OCAW

Edward F. Huhn
Secretary-Treasurer, Local 1-219

Rick L. Berry
Chairman, Workmen's Committee



LETTER OF AGREEMENT
BETWEEN
TEXACO REFINING AND MARKETING INC.
AND THE
OIL, CHEMICAL AND ATOMIC
WORKERS INTERNATIONAL UNION
AND ITS KERN RIVER LOCAL 1-219

March 14, 1996

Shift Exchanges Between Employees

The Company will permit employees to exchange shifts under the following conditions:

1. The employee(s) receives prior approval of his/her supervisor.

2. The employee(s) advises his/her supervisor(s) at least three (3) working days prior to exchange of shifts unless notice is waived by the Company.

3. The reason for request is reasonable in the judgment of the supervisor(s).

4. The resulting exchange of shifts does not create an economic or operational burden on the Company.

5. The employee(s) agrees to waive all rights to overtime premiums which would be due and owing as a result of the exchange.

Shift Exchanges Between Employees
March 14, 1996 page 2

This Agreement is limited to the exchange of shifts whether they result in overtime eligibility or not and will not be applied outside the periphery stated herein.

TEXACO REFINING AND MARKETING INC.

A. S. Abay
Plant Manager

OIL, CHEMICAL AND ATOMIC WORKERS
INTERNATIONAL UNION, AFL-CIO

David Welty
International Representative, OCAW

Edward F. Huhn
Secretary-Treasurer, Local 1-219

Rick L. Berry
Chairman, Workmen's Committee



MEMORANDUM OF UNDERSTANDING
BETWEEN
TEXACO REFINING AND MARKETING INC.
AND THE
OIL, CHEMICAL AND ATOMIC
WORKERS INTERNATIONAL UNION
AND ITS
KERN RIVER LOCAL 1-219

March 14, 1996

Employee Benefits

This will cover the parties' understanding pertaining to certain items contained in the Union's National Oil Bargaining Policy and local issues which were agreed upon during the 1996 Negotiations.

A. GROUP MEDICAL AND DENTAL INSURANCE PLAN

1. The effective date shall be February 1, 1996, and shall terminate midnight, January 31, 1999. The present level of benefits for all employees shall remain unchanged, unless required by Federal and State law. The medical and dental coverages will be obtained and administered by the Union. The Union agrees that upon the request of Management it will fully cooperate with the Company in the implementation of cost containment features, if practicable, during the term of this Agreement. Such cost containment features may include but

shall not be limited to: pre-admission testing, second surgical opinion, ambulatory surgical centers, outpatient hospital surgery, deductibles for major medical expense, and supplemental Medicare coverage to Medicare eligible retirees and/or their dependents. Such retirees are intended to mean those employees retiring subsequent to January 8, 1986.

For the duration of this Agreement, the Company agrees to maintain the currently negotiated level of contributions to the Texaco Comprehensive Medical Plan (TCMP), approved HMOs or authorized alternate medical plans, up to the following monthly amounts, which are the currently negotiated levels:

| Medical<br>Class of Coverage | |
|---|---|
| Employee Only | $156.50 |
| Employee Plus One Dependent | $351.00 |
| Employee Plus Two or More Dependents | $420.50 |

If at any time during this Agreement, there is an increase in the monthly premiums for the medical plans applicable to the bargaining unit employees, the Company shall absorb all such increase to the extent of the amount set forth above. If there are additional increases in the monthly premiums for such plans, the Company will increase its contribution to those plans by the amount of





that increase but not to exceed the following amounts:

| Class of Coverage | 1996 | 1997 | 1998 |
|---|---|---|---|
| Employee Only | $2.50 | $5.00 | $5.00 |
| Employee Plus One Dependent | $3.00 | $7.50 | $7.50 |
| Employee Plus Two or More Dependents | $5.00 | $10.00 | $10.00 |

In no event, however, will the Company's contributions to applicable plans exceed its contributions to the TCMP. To the extent that there are unused contributions in any year of this Agreement, there shall be no carry forward, except that in the third year of this Agreement, it is agreed that one-half of the contributions from the second year, if unused in the second year, can be used in the third year.

If there are any reductions to the total plan premiums during the term of this Agreement, employee contributions will be reduced before any reduction is made to the Company contributions.

| Dental | |
|---|---|
| Employee Only | $ 6.00 |
| Employee and Dependents | $18.75 |

All increased costs beyond the negotiatied level shall be borne by the employee, except in cases where required by Federal or State law. In no event will the Company's contribution exceed the total premium cost of either the medical or dental plans.

B. GENERAL
The Company's obligation to make contributions or to provide coverage hereunder on behalf of any covered employee shall become effective on the first day of the month following completion of four (4) months of company employment.

C. NATIONAL HEALTH INSURANCE
If National Health Insurance becomes a law, the Company's present and future contributions toward the present plan premiums shall be used toward the cost of the National Health Insurance and that any unused portions of the Company's contributions shall be used for other benefits as determined by the Union and Company.

If the foregoing correctly reflects the parties' understanding of this matter, please indicate your agreement by signing in the space provided below, returning one copy to the undersigned.





Very truly yours,

A. S. Abay

AGREED:

David Welty
International Representative, OCAW

Edward F. Huhn
Secretary-Treasurer, Local 1-219

Rick L. Berry
Chairman, Workmen's Committee

March 14, 1996

Mr. David Welty, International Representative
Oil, Chemical and Atomic Workers
International Union, Local 1-219
607 Nineteenth Street
Bakersfield, California 93301

Subject: Article XXXI
Plant Closure

Dear Mr. Welty:

It is agreed and understood that the referenced Article is applicable only to a planned complete closure of the Bakersfield Plant because of economic reasons only.

This Article shall not apply to a complete closure resulting from, but not limited to, fire, flood, earthquake, war, insurrection, Federal, State or local laws, regulations, or decisions, or any other cause beyond the reasonable control of the Company.

If this fully expresses our understanding, please signify your acceptance by signing in the space provided below.

Very truly yours,

A. S. Abay

AGREED:

David Welty
International Representative, OCAW



January 30, 1982

Messrs. David Welty, International Representative
and Pete Hambaroff, Chairman, Workmen's Committee
Oil, Chemical and Atomic Workers
International Union, Local 1-19
607 19th Street
Bakersfield, Calif. 93301

RE: Article XXXIV
Employee Benefits, GOC Pension Plan

Gentlemen:

This is to confirm the discussions between the Company and the Union during the negotiations of the 1982-84 collective bargaining agreement wherein it was agreed that the Bakersfield Refinery bargaining unit employees will be transferred, as a group, from the OCAW Union-Industry Pension Fund to the Getty Pension Plan under the following terms and conditions:

1. Effective Date

Effective date of transfer to the GOC pension plan will be April 1, 1982. This transfer is subject to the approval of the GOC Board and the IRS. If GOC Board approval is obtained we will implement the plan on April 1, 1982 even though we will not have IRS approval at that time.

Messr. David Welty and
Pete Hambaroff
January 30, 1982 page 2

2. Service Credits

a) Vesting

Vesting service under the GOC plan will be equal to the sum of (i) and (ii):

(i) The vesting service earned under the OCAW plan prior to April 1, 1982.

(ii) The vesting service earned under the GOC plan subsequent to March 31, 1982.

b) Benefit Accrual

Benefit accrual service shall be equal to the service earned under the GOC plan for service subsequent to April 1, 1982.

3. Compensation

Where necessary, we will use compensation earned prior to April 1, 1982 in computing the highest 36 months out of the last 120 months in accordance with the definitions of compensation in the GOC plan.

4. Minimum Benefit

The minimum normal retirment benefit will be equal to the amount the employee would have earned under the OCAW plan using Getty plus OCAW plan service and the $572 benefit for thirty years of service as the basis for determination. Thus, if a vested employee terminates



Messr. David Welty and
Peter Hambaroff
January 30, 1982 page 3

or retires with less than 30 years of service (GOC plus OCAW service), the minimum benefit would be calculated as follows:

$$\frac{\text{Actual Service}}{30} \times \$572$$

If a vested employee terminates with 30 or more years of service (GOC plus OCAW service), the minimum benefit would be $572.

5. Normal Retirement Benefit (GOC Plan)

a) For vested employees as of March 31, 1982:

The normal retirement benefit shall be equal to the greater of (i) the benefit earned under the GOC plan for service subsequent to April 1, 1982, or (ii) Minimum Benefit described above minus the normal retirement benefit earned under the OCAW plan as of April 1, 1982

b) For non-vested employees as of March 31, 1982:

The normal retirement benefit shall be equal to the greater of (i) the benefit earned under the GOC plan for service subsequent to April 1, 1982 plus the accrued normal retirement benefit earned under the OCAW plan as of April 1, 1982 or (ii) the Minimum Benefit described above.

Messr. David Welty and
Peter Hambaroff
January 30, 1982 page 4

6. Calculation of OCAW Accrued Benefit
The OCAW accrued benefit as of April 1, 1982, shall be equal to:

$$\frac{\text{OCAW pension service to April 1, 1982 (max:30)}}{30} \times 572$$

NOTE: If the employee is vested as of April 1, 1982, the benefit described above will become the responsibility of the OCAW Pension Trust.

If the employee is not vested as of April 1, 1982, the benefit described above shall become the responsibility of the GOC plan subject to the employee ultimately becoming vested under the GOC plan.

7. Option and Early Retirement Factors for Benefits Paid from the GOC Plan
The GOC factors in effect when termination or retirement occurs will be used.

NOTE: Calculations of the appropriate accrued OCAW benefit as of March 31, 1982 will be based on the benefit level in existence on January 7, 1982 and service credit through March 31, 1982.

The Company will continue its contribution to the OCAW Pension Trust of seventy cents (70¢) per hour





up to a maximum of forty (40) hours per week through March 31, 1982.

The Company agrees that its withdrawal from the OCAW Union-Industry Pension Fund will be made in accordance with the provisions of the Employee Retirement Income Security Act (ERISA) and the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA).

If the foregoing correctly reflects the parties' understanding of this matter, please indicate your agreement by signing in the space provided below, returning one copy to the undersigned.

Messr. David Welty and
Peter Hambaroff
January 30, 1982 page 6

Very truly yours,

L. A. Amidei
Vice President, Manufacturing

Agreed:

David Welty ______ Date
OCAW, International Representative

Bob A. Johnston ______ Date
Secretary-Treasurer, Local 1-19

Peter J. Hambaroff 5/26/82 Date
Workmen's Committee Chairman



# APPENDIX A
## Vacation Penalty Table

| | | Hours Absent | | | Scheduled |
|---|---|---|---|---|---|
| Two Wk Basis | Three Wk Basis | Four Wk Basis | Five Wk Basis | Six Wk Basis | Work Days Penalty |
| 0-207 | 0-207 | 0-207 | 0-207 | 0-207 | 0 |
| 208-415 | 208-340 | 208-305 | 208-285 | 208-271 | 1 |
| 416-623 | 341-474 | 306-404 | 286-363 | 272-336 | 2 |
| 524-831 | 475-608 | 405-502 | 364-441 | 337-400 | 3 |
| 832-1,039 | 509-742 | 503-601 | 442-519 | 401-465 | 4 |
| 1,040-1,247 | 743-875 | 602-699 | 520-597 | 466-529 | One Wk |
| 1,248-1,455 | 876-1,009 | 700-798 | 598-675 | 530-594 | 6 |
| 1,456-1,663 | 1,010-1,143 | 799-897 | 676-753 | 595-659 | 7 |
| 1,564-1 871 | 1,144-1,277 | 898-995 | 754-831 | 660-723 | 8 |
| 1,872-2,079 | 1,278-1,411 | 996-1,094 | 832-909 | 724-788 | 9 |
| 2,080 | 1,412-1,544 | 1,095-1,192 | 910-987 | 789-852 | Two Wks |
| | 1,545-1,678 | 1,193-1,291 | 988-1,065 | 853-917 | 11 |
| | 1,679-1,812 | 1,292-1,389 | 1,066-1,143 | 918-982 | 12 |
| | 1,613-1,946 | 1,390-1,488 | 1,144-1,221 | 983-1,046 | 13 |
| | 1,947-2,079 | 1,489-1,587 | 1,222-1,299 | 1,047-1,111 | 14 |
| | 2,080 | 1,588-1,685 | 1,300-1,377 | 1,112-1,175 | Three Wks |
| | | 1,686-1,784 | 1,378-1,455 | 1,176-1,240 | 16 |
| | | 1,785-1,882 | 1,456-1,533 | 1,241-1,304 | 17 |
| | | 1,883-1,981 | 1,534-1,611 | 1,305-1,369 | 18 |
| | | 1,982-2,079 | 1,612-1,689 | 1,370-1,434 | 19 |
| | | 2,080 | 1,690-1,767 | 1,435-1,498 | Four Wks |
| | | | 1,768-1,845 | 1,499-1,563 | 21 |
| | | | 1,846-1,923 | 1,564-1,627 | 22 |
| | | | 1,924-2,001 | 1,628-1,692 | 23 |
| | | | 2,002-2,079 | 1,693-1,757 | 24 |
| | | | 2,080 | 1,758-1,821 | Five Wks |
| | | | | 1,822-1,886 | 26 |
| | | | | 1,887-1,950 | 27 |
| | | | | 1,951-2,015 | 28 |
| | | | | 2,016-2,079 | 29 |
| | | | | 2,080 | Six Wks |

TEXACO REFINING AND MARKETING INC. (TRMI)

Bakersfield Plant

OFFERS TO AMEND AND EXTEND THE
COLLECTIVE BARGAINING AGREEMENT
BETWEEN

Oil, Chemical & Atomic Workers
International Union, AFL-CIO
On Behalf of
Kern River
Local 1-219

AND

Texaco Refining and Marketing Inc.
Bakersfield Plant
Bakersfield, California

The parties agree that the term of the current contract (February 1, 1996 through January 31, 1999) and all provisions therein will be extended through January 31, 2002 and will be an early settlement of the 1999 OCAW National Oil Bargaining Program subject to the following stipulations:

**WAGES**

- Effective February 1, 1998, current 3% hourly wage increase will be increased to 3.5%, rounded to the nearest cent.
- Effective February 1, 1999, all hourly wage rates will be increased by 3.5%, rounded to the nearest cent.
- Effective February 1, 2000, all hourly wage rates will be increased by 3.5%, rounded to the nearest cent.
- Effective February 1, 2001, all hourly wage rates will be increased by 3.5%, rounded to the nearest cent.

**MEDICAL PLAN**

EXHIBIT B

**Company Contributions to Hospital-Surgical-Major Medical Insurance Coverage**

For the duration of this Agreement (beginning in 1999 and ending in 2002), the Company agrees to maintain the currently negotiated level of contributions to the Texaco Comprehensive Medical Plan (TCMP), approved HMOs or authorized alternate medical plans, up to the following monthly amounts, which are the currently negotiated levels:

| Class of Coverage | |
|---|---|
| Employee Only | $156.50 |
| Employee Plus One Dependent | $351.00 |
| Employee Plus Two or More Dependents | $420.50 |

If at any time during this Agreement, there is an increase in the monthly premiums for the medical plans applicable to the bargaining unit employees, the Company shall absorb all such increase to the extent of the amount set forth above. If there are additional increases in the monthly premiums for such plans, the Company will increase its contribution to those plans by the amount of that increase, but not to exceed the following amounts:

| Class of Coverage | 1999 | 2000 | 2001 |
|---|---|---|---|
| Employee Only | $2.50 | $ 5.00 | $ 5.00 |
| Employee Plus One Dependent | $3.00 | $ 7.50 | $ 7.50 |
| Employee Plus Two or More Dependents | $5.00 | $10.00 | $10.00 |

In no event, however, will the Company's contributions to applicable plans exceed its contributions to the TCMP. To the extent that there are unused contributions in any year of this extended Agreement, there shall be no carry forward, except that in the third year of this Agreement (2001), it is agreed that one-half of the contributions from the second year (2000), if unused in the second year, can be used in the third year.

If there are any reductions to the total plan premiums during the term of this Agreement, employee contributions will be reduced before any reduction is made to the Company contributions.

**SUCCESSORSHIP LETTER OF UNDERSTANDING**

The attached Successorship Letter of Understanding will apply only to OCAW represented refineries and chemical plants. The Letter will expire at the end of the three-year extension and will not be part of the historical "No Retrogression" language during the 2002 negotiations.

This contract extension offer is subject to ratification within 15 days from the date of this offer.

Agreed to the ______ day of November, 1997.

Oil, Chemical, and Atomic
Workers International Union and
its Kern River Local 1-219

Texaco Refining and Marketing Inc.

______________________ ______________________

______________________ ______________________

## LETTER OF UNDERSTANDING
### Successorship

The parties agree that in the event the Company enters into an agreement to sell Texaco Refining and Marketing Inc., Bakersfield Plant, covered by the Collective Bargaining Agreement in its entirety to a third party or enters into a joint venture or merger agreement covering Texaco Refining and Marketing Inc., Bakersfield Plant, in its entirety, the Company will include in any sale, merger or joint venture agreement the requirement that the successor company shall recognize the Union as the exclusive representative of the bargaining unit and shall adopt the Collective Bargaining Agreement and all existing Memoranda of Agreement. Such Collective Bargaining Agreement shall remain in full force and effect for its duration, except for mutually agreed to changes, and continued employment with the successor company shall not require any form of a severance payment from the Company.

Except that such successor company shall not be required to continue the existing employee benefits, but shall be entitled to establish a package of benefits for employees covered by the Collective Bargaining Agreement that are reasonably comparable in the aggregate. If requested by the Union, the company shall negotiate with the Union in good faith regarding those benefits. Should an agreement not be reached, the successor company may proceed with implementation of the proposed Benefits Plans and the Union will not have the right to strike.

However, if the parties are unable to reach an agreement on Benefits Plans, the successor company will have the option to waive the foregoing "reasonably comparable Benefits Plans in the aggregate" commitment and provide the Union with the option to strike the successor employer on Benefits Plans only by giving the successor company 45 days notice within 15 days after the Union has been informed by the successor company that it is waiving the commitment for "reasonably comparable Benefits Plans in the aggregate".

This LETTER OF UNDERSTANDING Successorship will terminate on January 31, 2002.

In WITNESS whereof the parties have set their hands this ____ day of November, 1997.

| FOR THE UNION: | FOR THE COMPANY: |
|---|---|
| ______________________ | ______________________ |
| ______________________ | ______________________ |

ARTICLES OF AGREEMENT

Between

SHELL OIL PRODUCTS US

BAKERSFIELD REFINERY

And

PAPER, ALLIED-INDUSTRIAL, CHEMICAL AND ENERGY WORKERS

INTERNATIONAL UNION, AFL-CIO

On Behalf of

LOCAL 8-219

FEBRUARY 1, 2002 THROUGH JANUARY 31, 2006

EXHIBIT

tabbies

C

## INDEX


| Subject | Article | Page |
|---|---|---|
| Preamble | | 3 |
| Amendments for Federal Compliance | XXVIII | 30 |
| Bulletin Boards | XVII | 25 |
| Complaints and Grievances | XV | 23 |
| Contract Work | XIX | 26 |
| Demotions | XIII | 20 |
| Employee Benefits | XXXIII | 31 |
| Employees Covered | I | 3 |
| Funeral Leave | XXII | 28 |
| Health and Safety | XVI | 24 |
| Holidays | IX | 14 |
| Hours of Work | III | 4 |
| Job Security | XXIII | 28 |
| Jury Service | XXI | 28 |
| Layoffs | XIV | 21 |
| Leaves of Absence | XVIII | 26 |
| Management Rights | XXXII | 31 |
| Military Service | XX | 27 |
| No Cessation of Work | XXVII | 29 |
| Non-Discrimination | XXIV | 29 |
| Notices | XXIX | 30 |
| PACE-COPE Check-Off | V | 7 |
| Overtime | VI | 9 |
| Period of Agreement | II | 3 |
| Permission to Enter Upon Company Property | XXV | 29 |
| Plant Closure | XXXI | 30 |
| Prior and Collateral Agreements | XXX | 30 |
| Promotions | XII | 18 |
| Rates of Pay and Changes in Classifications of Work | VII | 12 |
| Seniority | XI | 17 |
| Shift Differential | VIII | 13 |
| Union Security, Dues Deduction, Service Charge Deduction | IV | 5 |
| Vacations | X | 16 |
| Validity | XXVI | 29 |
| Wage Schedule | | 33 |

**PREAMBLE**

SHELL OIL PRODUCTS US

BAKERSFIELD REFINERY (hereinafter called

"Company") and PACE
INTERNATIONAL UNION,

Local 8-219 (hereinafter called

"Union") as the exclusive bargaining

representative of all employees

of the Company hereinafter described,

mutually agree as follows:

**ARTICLE I**

***Employees Covered***

This Agreement made and entered into this 1st day of February, 2002, by and between the SHELL OIL PRODUCTS US, BAKERSFIELD REFINERY, and PAPER, ALLIED-INDUSTRIAL, CHEMICAL AND ENERGY WORKERS INTERNATIONAL UNION, in its capacity as bargaining agent, for and on behalf of all employees of the Company in the Refinery, except sales, office and clerical employees, employees engaged in technical work, professional employees, and supervisory employees as defined in the Labor Management Relations Act, 1947, as Amended by Public Laws 86-257, 1959 and 93-360; 1974.

**ARTICLE II**

***Period of Agreement***

This Agreement shall take effect February 1, 2002, it shall remain in effect through January 31, 2006. Either party shall give written notice at least sixty (60) days prior to January 31, 2006, of their intention to terminate, modify or amend the Agreement. If notice to change or amend is given, a conference shall be held to consider the proposed changes or amendments. In the event no Agreement is reached by January 31, 2006, either party may, on at least sixty (60) days written notice to the other, terminate this Agreement.

## ARTICLE III

### *Hours of Work*

1. The regular scheduled hours of work shall consist of not more than eight (8) hours a day, forty (40) hours per week, without the payment of overtime as hereinafter provided. In no case shall an employee be required to work more than sixteen (16) hours in any twenty-four (24) hour period. The regular work cycle for day employees shall be five (5) consecutive eight (8) hour days. The regular work cycle in the master schedule(s) for shift employees shall not exceed six (6) consecutive eight (8) hour days which shall be followed by not less than two (2) consecutive days off. The regular work cycles in the master schedule(s) as defined above for both day and shift employees will not be changed due to situations such as turnarounds. The master schedule(s) for shift employees may be changed for long term reasons, and in the manner described in Section 4 of this Article. The established work week shall start at 12:01 a.m. Monday and end at 12:00 Midnight the following Sunday. The established workday shall be a calendar day.

2. The following periods shall be established as regular straight time daily schedules:

   (a) Shift Employees-
   From 10:30 p.m. to 6:30 a.m.
   From 6:30 a.m. to 2:30 p.m.
   From 2:30 p.m. to 10:30 p.m.
   or
   From 6:00 a.m. to 6:00 p.m.
   From 6:00 p.m. to 6:00 a.m.

   (b) Day Employees -
   Maintenance
   From 7:30 a.m. to 11:30 a.m. and
   From 12:00 Noon to 4:00 p.m.

   (c) Laboratory -
   From 7:30 a.m. to 11:30 a.m. and
   From 12:00 Noon to 4:00 p.m.

   From 8:00 a.m. to 4:00 p.m.

   From 4:00 p.m. to 12:00 Midnight

   From 12:00 Midnight to 8:00 a.m.

   (d) As working conditions may require, the Company may adjust up or down individual or group starting working hours a maximum of two (2) hours as listed in groups a, b, and c above.

3. The provisions of this agreement shall not be construed as a guarantee that any employee will receive any specified number of hours of work per day or per week.

4. The Company may, upon thirty (30) days written notice to the Union change the rotating shift/days-off master schedule for any group of shift employees.

## ARTICLE IV

### *Union Security-Dues Deduction Service Charge Deduction*

1. Employees are free to join or not join the Union.

2. All present employees who are not Union members and who do not in the future become and remain members shall, as of the effective date of this Agreement, be required as a condition of employment to continue to pay to the Union each month a service charge as a contribution toward the administration of this Agreement, in an amount equal to the regular monthly dues (not including initiation fees, fines, assessments, or any other charges uniformly required as a condition of acquiring or maintaining membership) in the Union.

3. All new employees who do not become Union members after thirty-one (31) calendar days of employment shall as a condition of employment, pay to the Union each month commencing after said date, a service charge as a contribution toward the administration of this Agreement in an amount equal to the regular monthly dues (not including initiation fees, fines, assessments or any other charges uniformly required as a condition of acquiring or retaining membership) in the Union. Upon failure of any non-member employee to pay or tender the above-mentioned service charge, the Employer will discharge such employee when so informed by the Union.

4. All employees covered by this Agreement who are members of the Union on the effective date of this Agreement, or who voluntarily become members thereafter, will be required as a condition of employment, to maintain membership in the Union throughout the term of this Agreement. It is understood that this requirement of maintenance of Union membership shall be met upon the payment or tender by the employee to the Union of the amount of dues uniformly required for maintaining membership therein. The Company will mail the name(s) of new hires to the local Union within ten (10) days of the hiring date.

5. The requirement of maintenance of Union membership shall not apply to any employee who gives written notice to the Union and the Company during the fifteen (15) days immediately preceding the anniversary date of this Agreement of the employee's desire to withdraw from membership in the Union.

6. The Company will deduct Union initiation fees and dues or service charges equivalent to the monthly dues from the wages of employees who individually and voluntarily authorize such deduction in writing in the following form, and will remit these dues or service charges to the proper officers of the Union.

7. UNION DUES DEDUCTION

Date______________________________

"I hereby authorize you to deduct from my wages the initial fees and the current amount of my Union dues as reported to you by the Local Union Secretary-Treasurer and remit said sum to the Union as my membership dues."

"This assignment is voluntary and I understand that I may revoke it at any time in writing by giving notice thereof to the Company and the Union."

Signed______________________________

UNION SERVICE CHARGE DEDUCTION

Date______________________________

"I hereby authorize you to deduct from my wages the Union service charges as reported to you by the Local Union Secretary-Treasurer and remit said sum to the Union as my service fee as provided in Article IV."

"This assignment is voluntary and I understand that I may revoke it at any time in writing by giving notice thereof to the Company and the Union."

Signed______________________________

## ARTICLE V

### *PACE-COPE CHECK-OFF*

1. In consideration of the Union's payment of the costs and expenses associated with the Company's establishment and maintenance of an PACE-COPE Check-off System, the Company agrees to deduct from the wages of those employees, who are members of the Union and who voluntarily authorize such deductions on forms provided by the Company, the amount specified as the employee's contribution to the Oil, Chemical and Atomic Workers International Union Committee on Political Education Fund (PACE-COPE) on a single monthly deduction basis.

   The Company also agrees to transmit said payroll deductions to the Secretary-Treasurer of Local 8-219, together with a list of the names of employees for whom the deductions have been made and the amount deducted for each such employee.

   The foregoing procedure and arrangement will be implemented and become effective within sixty (60) days following receipt of the Union's payment of the costs and expenses associated with the establishment of such system, as outlined in the Company's letter to Local Union No. 8-219, dated February 12, 1986.

2. The payroll deduction procedure will be implemented within sixty (60) days after receiving notice of the Union's intent to proceed, as follows:

   a) Deductions will be made the first pay period of each calendar month from the paychecks of those employees who submit to the Company a signed authorization form supplied by the Company specifying the amount to be withheld;

   b) All funds collected during each calendar month will be mailed to the designated local not later than January 15 of the following year;

   c) A list of names of all employees contributing and the amount of their contribution for the year will be supplied at the time the funds are transferred to the local union;

   d) A one-time setup charge of $500 for each participating local of the Union will be assessed, with payment due prior to any payroll deductions being made;

   e) A $100 annual charge for each participating local will be assessed to defray the administrative cost of maintaining a monthly payroll deduction roster, issuing reports, and check processing;

   f) A check for aforestated amount in item e) will be forwarded by the local Union to the Company no later than January 15 of the year immediately following that in which the administration costs were incurred by the Company.

3. PACE-COPE Check-off Authorization:

"I hereby authorize and direct the Company to deduct from my pay each month the amount of $________(from the pay period for work performed during the first pay period of each month), and to remit said amount to the Secretary-Treasurer of Local 8-219, as my voluntary contribution to PACE-COPE.

This authorization and my contributions are voluntarily made based on my specific understanding: That they are not conditions of membership in the Union or of employment by my Employer; that I may contribute more or less than any guideline amount suggested and I will not be favored or disadvantaged by the Union for doing so; that I may refuse to contribute without reprisal; and, that PACE-COPE, (which is connected with PACEIU and the AFL-CIO COPE), will use the money contributed for political purposes, including but not limited to making contributions to and expenditures for candidates for federal, state and local offices and addressing political issues of public importance. I understand, also, that my contributions to PACE-COPE are authorized by PACEIU and the AFL-CIO on behalf of joint fund-raising efforts for PACE-COPE and AFL-CIO COPE.

This authorization is a continuing authorization and shall remain in full force and effect during the term of the current agreement or until specifically modified or revoked in writing by me, whichever first occurs."

Date______________________________________________

Signature__________________________________________

Employee Name ____________________________________

Social Security No. _________________________________

## ARTICLE VI

### *Overtime*

1. If an employee is required to work any additional time after completing eight (8) hours of work during the established workday, or forty (40) hours of the regular scheduled workweek, the employee shall be paid at one and one-half (1½) times the regular rate of the classification of work performed for the additional time worked in excess of that specified herein.

2. If an employee works eight (8) hours or less during any normal working day, and leaves the job at the request of the management, and later during such day of twenty-four (24) hours is required by the Company to return to the job for additional work, the employee will be paid at one and one-half (1½) times the employee's regular rate for any such additional time worked during such day of twenty-four (24) hours, but not less than a minimum payment equal to four (4) hours at the employee's regular rate. In the event no work shall be required of any employee so called for duty, the employee shall receive pay for four (4) hours at the employee's regular rate.

3. When an employee is required to report for work on schedule, and then shall not be required to work, or shall be required to work less than four (4) hours, the employee shall receive pay at the employee's regular rate for not less than four (4) hours work.

4. An employee required to work on one or both of the employee's regular days off shall receive one and one-half (1½) times the employee's regular rate of pay for all hours worked in excess of forty (40) hours within the established workweek. Notwithstanding the foregoing, if an employee is reassigned to work a different spot on the master schedule(s) and such re-assignment results in the employee working in excess of six (6) consecutive regularly scheduled days, one and one-half (1½) times shall be paid for all hours worked by the employee on such seventh (7th) consecutive regularly scheduled day. The payment of such seventh (7th) day premium shall not be offset against any additional premiums resulting from work performed by the employee on the employee's regularly scheduled days off.

5-A Meal Allowance: Daylight Maintenance Department

(1) If an employee is required to work more than two (2) hours in excess of and contiguous with the employee's regular 8-hour work day, the Company will furnish the employee a meal and shall allow one-half (½) hour without pay to eat the meal. For each successive five (5) hours worked in excess of the employee's regular 8-hour day after the first meal period, the Company will furnish the employee with another meal. If the Company is unable to furnish any such meal, the employee shall be paid meal money in the amount of seven dollars ($7.00) in lieu thereof. In no case, however, will the employee be entitled to overtime meals or meal money if given at least four (4) hours notice before being required to report to work.

(2) If an employee who has been given less than four (4) hours notice is required to work four (4) hours, and such work is not contiguous with the employee's regular 8-hour work day, the Company will furnish the employee with a meal and shall allow one-half (½) hour without pay to eat the meal. For each successive five (5) hours worked, after the first meal period, the Company will furnish the employee with another meal. If the Company is unable to furnish any such meal, the employee shall be paid meal money in the amount of seven dollars ($7.00) in lieu thereof.

(3) If an employee is required to work on the employee's day off and has been given at least four (4) hours notice, and such overtime is not contiguous with the employee's regular 8-hour work day, no overtime meal will be furnished, except as provided in paragraph (A-1) and (A-2) above.

(4) When an employee is notified four (4) hours in advance for scheduled overtime, no meals or meal allowance will be provided. If an employee works in excess of the scheduled overtime period, the employee will be provided an overtime meal or meal allowance.

5-B Meal Allowance: Operations, Oil Movements, and Laboratory Department

(1) Overtime contiguous with, but ahead of regular scheduled work:

An employee who is required to report to work more than two (2) hours early shall be entitled to a meal or, at the Company's option, a meal allowance in the amount of seven dollars ($7.00). These meal allowances become due at the fourth (4th) hour, and each five (5) hour interval thereafter. In no case, however, will the employee be entitled to overtime meals or meal money if given at least four (4) hours notice before being required to report to work.

(2) Overtime contiguous with, but after regular scheduled work:

An employee who is required to work more than two (2) hours beyond the employee's regular scheduled eight (8) hours shall be entitled to a meal or, at the Company's option, a meal allowance in the amount of seven dollars ($7.00) at the following consecutive clock hours worked intervals, the tenth (10th) hour and each five (5) hour interval thereafter. In no case, however, will the employee be entitled to overtime meals or meal money if given at least four (4) hours notice before being required to report to work.

(3) Overtime not contiguous with regular scheduled work:

An employee who is required to work more than four (4) hours of work not contiguous with the employee's regular scheduled eight (8) hour working period and who has been given less than four (4) hours notice of such work shall be entitled to a meal or, at the Company's option, a meal allowance of seven dollars ($7.00). These meal allowances become due at the following consecutive clock hours worked intervals, the fourth (4th) hour, and each five (5) hour interval thereafter.

(4) Employees under this provision shall be required to remain on duty during any such meal period. If the Company is unable to furnish any such meal, the employee shall be paid a meal allowance of five dollars ($5.00) in lieu thereof.

(5) If an employee is required to work on a scheduled day off and has been given at least four (4) hours notice, and such overtime is not contiguous with the employee's regular 8-hour work day, no overtime meal will be furnished, except as provided in paragraph (B-1) and (B-2) above.

6. For the purpose of computing overtime under this Article, an employee working any fraction of an overtime hour will be paid on a fifteen (15) minute or one quarter (¼) of an hour basis. Time required to pass information or instructions between incoming and outgoing shifts or other employees shall not be considered time worked. There shall be a sixteen (16) hour rest period between shift changes, or the Company shall be required to pay time and one-half (1½) to employees called to work without such sixteen (16) hour rest period. This sixteen (16) hour rest period shall not apply to day employees who are assigned a regular lunch period, nor employees working a twelve- (12) hour shift schedule who shall be given twelve (12) hours rest or this overtime requirement shall apply. All overtime shall be approved in advance by the Supervisor or the Supervisor's designee.

7. Employees shall be given notice of schedule changes twenty-four (24) hours in advance of their starting time. In the event the Company does not give such notice, payment for all continuous hours worked during the first shift immediately following the starting time of the revised schedule will be paid for at one and one-half (1½) times the applicable straight time hourly rate.

8. An employee who is required to report to work on an emergency callout will perform said work and any other emergency work that occurs following such emergency callout and prior to the employee leaving the job.

9. Regularly scheduled hours not worked up to a maximum of eight (8) per day on a regular holiday, funeral leave, vacations, or jury duty, and for authorized sick or industrial accident leave as defined herein, will be included in computing the forty (40) hours in a work week beyond which the overtime rate is paid.

10. There shall be no duplication or pyramiding of overtime or other premium rates required by this Article or any other Article of this Agreement. In cases where two (2) or more overtime or premium payments are applicable, only the one (1) resulting in the greatest payment shall be applicable.

11. The Company will schedule a minimum of two (2) consecutive days off. When it becomes necessary for the Company to split an employee's days off, the employee shall receive one and one-half (1½) times the employee's regular rate of pay for the first scheduled work day following the employee's first day off.

## ARTICLE VII

### *Rates of Pay and Changes In Classifications of Work*

1. The classifications and rates specified in the attached schedule and considered a part hereof are the only classifications and rates applicable to personnel covered by this Agreement.

2. An employee working any job shall perform any duties to which the employee may be assigned. Work performed by employees assigned to a Department shall be done by employees holding bid classifications regularly assigned to the Department, except in cases of emergency.

3. If work of a higher paid classification is required of any employee, the employee shall receive the minimum rate of wages specified for such higher paid classification for as long as the employee occupies that position; and with a minimum of two (2) hours pay paid in the higher classification if the employee works therein for two (2) hours or less. Employees working in excess of two (2) hours in the higher rated classification shall be paid the rate for actual hours worked.

4. Regular relief employees whose schedule requires work at more than one classification will be paid at the rate of the highest classification for all work performed in such combination classifications. This paragraph also applies to employees scheduled for at least one week who provide relief for regular relief employees for that period of relief.

5. Within sixty (60) days of the creation of a new job classification or the re-establishment of a former classification not now listed in the wage schedule, the wage rate(s) and working conditions thereto shall be determined by collective bargaining, subject to arbitration. When agreement is reached between the Company and the Union on the working conditions and rates of pay for the new or re-established classification(s), said rate(s) shall become effective as of the date that the new or re-established classification(s) were established by the Company.

6. Within sixty (60) days of re-assignment of duty(ies) within existing classifications or the creation of new or unlisted job classification, the rate applicable thereto shall be determined by collective bargaining, subject to arbitration, and shall become effective as of the time such new duty(ies) or job classification was established.

7. An employee being trained for a higher classification may perform work in that higher classification at the employee's regular rate of pay.

8. All work incident to or in connection with good housekeeping, running maintenance, and the like, will, consistent with efficient operation and in so far as is reasonable, be performed or done by such employees. The Union recognizes management's right to make work assignments. Employees may be required to perform work outside their primary duties.

## ARTICLE VIII

### *Shift Differential*

1. A shift differential for hours worked outside of the daylight shift shall be added to all basic rates of pay as follows:

   a) Afternoon Shift - A shift differential of seventy-five cents ($.75) per hour shall be paid to any employee whose shift is regularly scheduled to commence within one (1) hour of 4:00 p.m. and end within one (1) hour of 12:00 Midnight.

   b) Morning Shift - Shift differential of one dollar and fifty cents ($1.50) per hour shall be paid to any employee whose shift is regularly scheduled to commence within one (1) hour of 12:00 Midnight and end within one (1) hour of 8:00 a.m.

   c) Daylight Shift or Day Work - No shift differential shall be paid to an employee whose shift is regularly scheduled to commence after 6:00 a.m. and end before 6:00 p.m.

2. Off Schedule Shift: Employees assigned to regular Off Schedule Shifts:

   a) which start before 6:00 a.m. and end after the starting hour of the regular day shift shall be paid the applicable morning shift differential from the start of the shift until the starting hour of the regular day shift only, and

   b) which start before the starting hour for the afternoon shift and end after 6:00 p.m. shall be paid the applicable afternoon shift differential from the starting hour of the afternoon shifts only, until the end of the shift.

   c) When a shift crosses the afternoon and night shifts, differentials will be paid in accordance with the clock hours worked on each shift.

3. Daylight Employees: A daylight employee is an employee working on an operation which normally continues only through eight (8) hours between 6:00 a.m. and 6:00 p.m., except for Operating Department and Oil Movements Department employees, all of whom are considered to be shift employees.

   a) Daylight employees who work outside the hours of 6:00 a.m. through 6:00 p.m., when such hours are contiguous with such employees' regular scheduled daylight shift, shall receive the appropriate shift differential for such hours worked which are outside of the hours of 6:00 a.m. through 6:00 p.m.

   b) Daylight employees rescheduled or assigned to work during the afternoon and/or morning shift periods, for any reason, shall receive the appropriate shift differential for the shift period worked, except that no shift differential shall be paid for overtime hours between the hours of 6:00 a.m. through 6:00 p.m. which are contiguous to the employees' regular daylight shift.

   c) Daylight employees called out to work outside the hours of 6:00 a.m. through 6:00 p.m. shall receive the appropriate shift differential for such hours worked, except that no shift differential shall be paid for hours worked between 6:00 a.m. and 6:00 p.m. where such hours worked are contiguous to the employees' regular or scheduled shift.

4. Overtime Rate on Shift Differential: When an overtime rate applies, and a shift differential applies, the overtime rate shall also be applied to the shift differential.

5. Benefits: Shift differential payment will not be included in computing pay for any reasons other than for hours worked.

## ARTICLE IX

### *Holidays*

1. Employees assigned to the Maintenance Department and employees in the Refinery Utility Classification not assigned to shift work shall observe the following holidays: New Year's Day, Presidents' Day, Good Friday, Memorial Day, Independence Day, Labor Day, Thanksgiving, the day after Thanksgiving and Christmas Day. A "Floating" holiday will also be observed on a day adjacent to Christmas. If Christmas is to be observed on Monday, the preceding Friday will be the "Floating" holiday. If Christmas is to be observed on Tuesday, Wednesday or Friday, the "Floating" holiday will be observed on the day before Christmas. If Christmas is to be observed on Thursday, the "Floating" holiday will be observed on the following Friday.

2. Should any of these holidays fall on Sunday, employees not assigned to seven (7) day per week operations will observe the holiday on the following Monday instead of Sunday, and if the holiday falls on Saturday, the holiday will be observed on the preceding Friday.

3. Employees designated as shift workers and employees assigned to the Laboratory shall observe the following holidays: New Year's Day, Presidents' Day, Good Friday, Memorial Day, Independence Day, Labor Day, Thanksgiving, and Christmas Day. Two "Floating" holidays will also be observed in accordance with Section 4 of this Article. For employees designated as shift workers and employees assigned to the Laboratory, the recognized holiday shall be the calendar day on which it occurs.

4. With respect to the "Floating" holidays as specified under Section 3 above, each employee shall give the Company thirty (30) days notice for the requested holidays. The Company may, at its discretion, allow an employee to take the employee's floating holiday without such notice. New employees must complete one hundred eighty (180) days service before becoming eligible for the floating holiday.

5. All employees, excluding probationary employees specified in Article XI, Section 2, shall receive holiday pay in an amount equal to eight (8) hours pay at their classified rate for the observed holidays specified, provided the employee is not required to work, and works on the scheduled workday immediately prior to or following the holiday. No holiday pay will be paid to any employee who is on an unpaid leave of absence; i.e., Union business, previously exhausted occupational and/or non-occupational sickness and accident benefits, etc. Any employee with more than one hundred twenty (120) days of service who would not have received a day's pay on any of the above holidays occurring prior to the completion of such one hundred twenty (120) days service shall receive a day's pay at the employee's straight time rate for each such holiday on which the employee lost such pay.

6. In addition to the eight (8) hours holiday pay specified in paragraph 1 and 3 above, all full-time employees will receive one and one-half (1½) times the classified hourly rate to which they are assigned for the first eight (8) hours worked on an observed holiday. Employees who are required to work beyond eight (8) hours on any of the observed holidays will receive two (2) times the classified hourly rate to which they are assigned for those hours worked in excess of eight (8) hours. An employee who works on an observed holiday shall be paid at the wage rate for the classification to which the employee is assigned or the employee's regular classified rate, whichever is greater.

7. Hours worked by employees as the result of a callout on an observed holiday shall be paid at one and one-half (1½) times the classified hourly rate to which they are assigned for the first eight (8) hours worked on the observed holiday, and two (2) times the classified hourly rate to which they are assigned for those hours in excess of eight (8) hours. An employee who is called out to work on a holiday, and after reporting to work shall not be required to work, or shall be required to work four (4) hours or less, will receive a minimum payment equivalent to four (4) hours at the rate of one and one-half (1½) times the classified hourly rate.

8. A designated holiday not worked, but paid for, shall be counted as a day worked in computing overtime in excess of forty (40) hours in the established work week, except when such holiday occurs on one (1) of the employee's regular days off.

## ARTICLE X

### *Vacations*

1. Employees will be eligible for vacation as follows:

   a) All employees who have completed one (1) year of continuous service will be eligible for eighty (80) hours vacation with pay and will thereafter qualify for two (2) weeks vacation on each successive January 1st.

   b) Commencing with January 1st of the year in which the 5th anniversary of accredited service occurs, employees will be eligible for one hundred twenty (120) hours vacation with pay during that year and in each year thereafter.

   c) Commencing with January 1st of the year in which the 10th anniversary of accredited service occurs, employees will be eligible for one hundred sixty (160) hours vacation with pay during that year and each year thereafter.

   d) Commencing with January 1st of the year in which the 20th anniversary of accredited service occurs, employees will be eligible for two hundred (200) hours vacation with pay during that year and in each year thereafter.

   e) Commencing with January 1st of the year in which the 30th anniversary of accredited service occurs, employees will be eligible for two hundred forty (240) hours vacation with pay during that year and in each year thereafter.

   f) Employees working a 12-hour shift schedule will follow the current 12-hour shift policy regarding vacation.

2. Vacations shall be granted and taken annually in accordance herewith and cannot be accumulated except as provided by the Vacation Plan. Each employee on vacation shall be entitled to compensation for the period of such vacation on the basis of the employee's average full time weekly (excluding overtime) pay paid the employee by the Company during the two (2) week period immediately prior to the date of taking the employee's vacation. In no case will the employee's vacation pay average be less than that employee's classified hourly rate.

3. If a recognized holiday, as covered by this Agreement, falls during an employee's vacation, the employee shall receive an additional day's vacation with pay or an additional day's pay.

4. In the assignment of vacation time, the Company will, as far as possible, comply with the requests of the employees, giving preference to requests of the senior employees. The Company will issue vacation schedule forms by October 1 requesting each employee to select their vacation preference. All selections shall be made by December 1. In the event an employee does not make a selection by December 1, the Company will make the vacation assignment. When approved, the vacation schedule will be published. The Company will post, on the bulletin boards, the approved vacation schedule, taking into account some changes might be required due to unforeseen circumstances such as emergencies, illnesses, etc. Vacations will start January 1 and continue to December 31. All employees who are eligible for vacation time will be allowed, if they so desire, to split their vacation time in one week intervals. When employees choose to split their vacation, the employees' choices will be ranked; each employee's first choice will outrank and be assigned prior to any employee's second choice, which will outrank and be assigned prior to any employee's third choice, etc. Vacations shall otherwise be governed by the Bakersfield Plant's vacation rules in effect or by the Vacation Plan.

## ARTICLE XI

### *Seniority*

1. In making promotions, filling vacancies, demotions, layoffs, reemployment, the Company will, in all cases, be governed by the seniority and qualifications of the employee.

2. Every new employee shall be on probation for the first three hundred sixty-five (365) days. Continuous employment thereafter shall entitle the employee to the status of "permanent employee" and seniority shall start with the first day of employment.

3. Seniority for each employee shall be that date as shown on the seniority lists. The Company will furnish the Local Union and Workmen's Committee semi-annually with current plant and departmental seniority lists for all employees covered under this Agreement.

4. Employees will start their employment in the refinery utility pool. The classification of Refinery Utility is not a bid classification and carries no departmental seniority.

5. All bid classifications shall fall in the following departments as listed in the Wage and Classification Schedule:

   (a) Operating Units
   (b) Maintenance
   (c) Laboratory
   (d) Oil Movements

6. An employee's departmental seniority shall become effective upon completion of the employee's promotional probationary period, but shall be computed from the date when the employee first was awarded the classification bid in that department.

## ARTICLE XII

### *Promotions*

1. All promotions to a higher rated classification, voluntary demotions to a lower rated classification and bids to a classification with an equal rate of pay shall be probationary for a period not to exceed sixty (60) days.. If, in the opinion of the Company, any employee, within the period of sixty (60) days after any of the above moves, does not display the ability and skill necessary to perform the employee's job satisfactorily to the Company, then such employee will be returned to the employee's previous position without loss of any seniority. Any employee awarded a job which represents a voluntary demotion within the employee's own department will be ineligible to bid on any other vacancy for a period of one hundred and eighty (180) days.

2. All job opportunities shall be posted on the bulletin boards for one (1) full calendar week from the date the Company has knowledge of such vacancy, in order that eligible employees may have the opportunity to bid on said jobs. A copy of such bids will be furnished to both the Secretary-Treasurer of Local 8-219 and to the Chairman of the Workmen's Committee. An employee who is on leave of absence, sick leave or vacation, and who has not already been notified by registered mail, return receipt requested, and given an opportunity to bid on the posted vacancy, may apply for said posted permanent assignment based on the employee's seniority, qualifications and eligibility within five (5) working days following the employee's return to work, and receive the assignment, subject to the provisions of Section I of this Article, if the employee is capable of handling the job after the break-in period. The employee who has occupied the job will be considered to be temporarily assigned.

3. The Company shall provide suitable job bid forms. Bids are to be filled out completely.

4. The Company will notify the successful bidder within fifteen (15) calendar days from the date of the posting of said vacancy.

5. The job shall be filled within sixty (60) days by the senior eligible employee bidding for same. Time off from work by the employee during this period due to personal illness, injury, vacation, holidays, jury duty, or similar causes shall extend the above sixty (60) day period by the amount of said time off.

6. When it is deemed necessary to deviate from seniority, except as provided elsewhere in this Agreement, the matter shall be subject for discussion with the Workmen's Committee prior to permanent placement, and if not adjusted satisfactorily, may become a matter of action under Article XV.

7. Refusal to accept promotions shall not jeopardize an employee's opportunities for future promotions. A Refinery Utility, or any employee bidding on an opening within that employee's department, may withdraw the employee's bid up to the close of the bidding period. Once the bid has been closed, the successful bidder must accept the promotion. Any employee bidding on an opening to the entry level of another department shall have until the end of the employee's break-in period or three weeks after the employee starts working in the new department, whichever is later, to refuse the promotion by notifying the employee's supervisor in writing of the employee's decision, in which event the employee will be returned to the employee's previous position without loss of seniority.

8. Vacancies in the entry level classifications within each department shall be filled, based on plant seniority and qualifications, by bid from qualified employees within the Refinery Utility classification. Every other entry level opening in each department shall be open to interdepartmental bidding by qualified employees within other departments. If there are no bids from such qualified employees, the Company may assign the junior qualified employee in the Refinery Utility classification to the vacancy, or the Company may hire an applicant for such vacancy. Every other opening in the Maintenance department will be open to interdepartmental bidding by employees qualified at the No. 1 Craft Mechanic level. If there are no bids from such qualified employees, the Company may hire an applicant for such vacancy.

9. Only employees holding seniority in a department will be eligible to bid an opening above the entry level in that same department and will be awarded the bid on the basis of departmental seniority and qualifications. When no bids are received from qualified employees holding seniority in that department, the opening shall be filled by the Company's assignment of the most junior qualified employee within the department. If there are no qualified junior employees within the department, the opening shall be filled by bid from qualified employees within the Refinery Utility classification. If there are no bids from qualified employees within the Refinery Utility classification, the Company may assign the junior employee in the Refinery Utility classification to the opening, or the Company may hire an applicant for such opening.

10. In the event an employee bids for and is awarded a classification outside the employee's department, that employee shall be ineligible to bid out of the employee's new department on any position for a period of one hundred and twenty (120) days.

11. At any time that the Plant is being expanded through the addition of a major unit(s), interdepartmental bidding shall be suspended for a period starting nine (9) months prior to the scheduled startup and ending six (6) months after the completion of the successful startup of such unit(s).

## ARTICLE XIII

***Demotions***

1. Demotions due to curtailment or lack of work shall be done by departmental seniority, that is, the employee with the least departmental seniority shall be the first to be demoted. When a job is eliminated, the affected employee will have the right to displace a junior employee in an equal pay classification, or a lower pay classification, within the employee's department.

2. Anyone displaced to the refinery utility pool shall have the right to displace a junior employee in an equal pay classification, or a lower pay classification, in any department based upon the employee's plant seniority. The employee shall retain seniority in the department from which the employee was demoted for a period of one (1) year or until the employee bids to the entry level classification in the department from which the employee was demoted or of another department, whichever occurs first.

3. An employee retained on the payroll who is reduced to a lower pay classification because of operational changes as determined by management shall receive the rate of the employee's permanent classification from which the employee was reduced for an appropriate period as follows:

   Three (3) months for one hundred and eighty one (181) days through four (4) years' service.

   Six (6) months for five (5) years through fourteen (14) years' service.

   Nine (9) months for fifteen (15) years through twenty-four (24) years' service.

   One (1) year for service of twenty-five (25) years or more.

4. To qualify for rate protection, such an employee must have held the employee's permanent classification for at least ninety (90) days and must have worked in or above the employee's permanent classification for a period of ninety (90) days within the twelve (12) month period immediately prior to the effective date of the employee's reduction in permanent classification. Approved absence from permanent classification shall count as time worked for the purpose of this paragraph.

5. An employee who during the rate retention period, refuses to accept a promotion to a higher-rated classification and for which the employee is qualified, will immediately be disqualified from further rate retention. The rate retention provision will not apply to seasonal employees, nor to demotions resulting from circumstances such as fires, floods, acts of God, catastrophes, wars or other events beyond the reasonable control of the Company.

## ARTICLE XIV
*Layoffs*

1. Layoff shall be by seniority, that is, the last employee hired will be the first employee laid off. An employee who has been laid off due to no fault of the employee's own will not forfeit the employee's right to be re-employed until and unless the employee has been off the payroll for a period of one (1) year. Any employee rehired within the aforementioned time period shall be regarded as a regular employee, and all such seniority accrued prior to layoff shall be restored to such employee so rehired within said time period.

2. Recall notices shall be by Telegram With Report (confirmation of receipt), or Certified Mail - Return Receipt Requested, to the last known address of the employee(s). Said employee(s) must accept reemployment offer within ten (10) working days after issuance of such notice, or the employee(s) shall lose all rights for said reemployment offer.

3. Any bargaining unit employee covered by this Agreement who is permanently promoted or permanently transferred to a position outside the bargaining unit shall lose all bargaining unit seniority as of the effective date of such promotion and/or transfer. Temporary assignments of bargaining unit personnel to non-bargaining unit positions for continuous periods of three (3) months or less shall not adversely affect the employee's seniority status or interfere with the accrual of seniority and benefits based on such employee's normal bargaining unit status. Any employee temporarily filling a non-bargaining unit position in excess of three (3) months shall lose all bargaining unit seniority concurrent with the expiration of such three (3) month period.

4. In the event the Company determines it necessary to invoke temporary layoffs (defined as 120 days or less) of employees, such layoffs will commence on or after fourteen (14) days advance notice has been given to the Union of the Company's intent. All obligations imposed by Sections 1 and 2 above, Article XXIII and Article XXXI shall be without force or effect in the case of temporary layoffs.

   The foregoing will have application only in the event of a complete temporary shutdown of the Bakersfield Plant, exclusive of boilers and oil movements operations, and such other facilities that may have to be operated for environmental reasons in accordance with any applicable governmental regulations. Employees deemed necessary to man these operations shall be exempted from the layoff, demotions and/or bumping procedures of the Articles of Agreement. Otherwise, the seniority provisions of the Articles of Agreement respecting layoffs and/or demotions, etc. will apply. The schedule of benefits applicable to temporary layoffs shall be as follows:

| Full Years of Company Service | Severance Pay |
|---|---|
| 1 | One (1) payment amounting to the dollar difference between three-quarters (¾) of an employee's weekly base pay and the maximum weekly unemployment insurance compensation that the State is allowed to provide by law. |
| 2 | Two (2) such weekly payments based on ¾ pay. |
| 3 | Three (3) such weekly payments based on ¾ pay. |
| 4 | Four (4) such weekly payments based on ¾ pay. |
| 5 | Five (5) such weekly payments based on ¾ pay. |
| 6 | Six (6) such weekly payments based on ¾ pay. |
| 7 | Seven (7) such weekly payments based on ¾ pay. |
| 8 | Eight (8) such weekly payments based on ¾ pay. |
| 9 | Nine (9) such weekly payments based on ¾ pay. |
| 10 | Ten (10) such weekly payments based on ¾ pay. |
| 11 | Eleven (11) such weekly payments based on ¾ pay. |
| 12 | Twelve (12) such weekly payments based on ¾ pay. |
| 13 | Twelve (12) such weekly payments based on ¾ pay and one (1) such weekly payment based on ½ pay. |
| 14 | Twelve (12) such weekly payments based on ¾ pay and two (2) such weekly payments based on ½ pay. |

Eligibility for the temporary layoff severance benefits described herein shall be the same, in all respects, as eligibility for benefits under the Company's regular Severance Pay Plan.

In the event the Company converts a temporary shutdown to a permanent shutdown which will result in the permanent layoff of employees, the provisions of Article XXIII, the sixty (60) day written notice for layoff clause, and/or Article XXXI, the six (6) month Plant Closure Agreement shall become operative.

5. No employee who has acquired seniority rights shall be suspended or discharged, except for just cause. When an employee voluntarily leaves the employment of the Company, the employee's seniority shall terminate upon receipt of the employee's final paycheck.

## ARTICLE XV
### *Complaints and Grievances*

1. For the purpose of handling any dispute or grievance arising under the terms of the Agreement, the Company agrees to meet, according to the procedures provided in this Article, with Members of the Workmen's Committee chosen by the Union employees of the Company, so that they properly represent the different Departments of the Refinery.

2. Any individual employee, group of employees or the Workmen's Committee shall have the right to submit grievances to the Company.

3. If an employee shall have a complaint, the employee shall first discuss it with the employee's foreman. When discussing the complaint, the employee may be accompanied by a member of the Workmen's Committee.

4. If the complaint is not adjusted to the satisfaction of the employee within ten (10) days after discussion thereof with the foreman, the employee may present the employee's complaint to the Workmen's Committee. The Workmen's Committee may submit the complaint in writing to the local Management of the Company and the local Management shall meet with up to three (3) members of the Committee within seven (7) days after receipt of such complaint for the purpose of arriving at a satisfactory adjustment thereof. The local Management shall give a written decision of the complaint within seven (7) days after such meeting and a copy of such decision shall be delivered to the employee and to the Committee.

5. It is agreed that no adjustment shall be made on any complaint unless the complaint has been so presented to the local Management within thirty (30) days after the occurrence of the matter complained of, nor shall a complaint arising from the termination of an employee be given consideration unless it is presented in writing by the employee to the local Management within seven (7) days after termination. Any grievance may be brought up and discussed at any time, but no retroactive adjustment shall be made unless presented within the time specified.

6. In the event the decision of the local Management does not afford satisfaction, the Union shall have the right within thirty (30) days after the local Management's decision has been given, to request joint consideration of the complaint by the District Director of the Union, or the District Director's designated representative, and the Plant Manager or the Plant Manager's designated representative, and they shall confer within thirty (30) days after the Company's receipt of such request for the purpose of discussing the complaint and attempting to arrive at a fair and just decision. If they fail to agree upon the settlement of the complaint, they shall, within fifteen (15) days, select a third person to act with them as a Board of Arbitration. Should they fail to agree upon a third person as specified herein, they shall request the American Arbitration Association to submit a list of arbitrators, one of which will act as the third party to the Board of Arbitration. The decision of any two (2) of the Board shall be final and binding to all persons concerned. Any cost or expense of such arbitration shall be divided equally between the Company and the Union.

7. For the purpose of the time limits referred hereto, Saturdays and Sundays and holidays covered by this Agreement will be excluded.

8. If a dispute arises over the physical fitness of an employee to return to work or continue to work, a board of three (3) physicians shall be selected; one by the Company, one by the employee, and one selected by the two (2) so named. The decision of the majority of the board shall decide the case.

## ARTICLE XVI

### *Health and Safety*

1. There shall be established a Joint Labor-Management Health and Safety Committee, consisting of equal Union and Company representatives, and not less than two (2) nor more than four (4) each.

2. The Company will, from time to time, retain at its expense, qualified independent industrial health consultants, mutually acceptable to the International Union President or the International Union President's designee and the Company, to undertake industrial health research surveys as decided upon by the Committee, to determine if any health hazards exist in the work place.

3. Such research surveys shall include measurements of exposures in the work place, the results of which shall be submitted in writing to the Company, the International Union President, and the Joint Committee by the research consultant, and the results will also relate the findings to existing recognized standards.

4. The Company agrees to pay for appropriate physical examinations and medical tests at a frequency and extent necessary in light of findings set forth in the industrial consultant's report as may be determined by the Joint Committee.

5. The Union agrees that each research report shall be treated as privileged and confidential and will be screened by the Company to prevent disclosure of proprietary information or any other disclosures not permitted by legal or contractual obligations.

6. At a mutually established time, subsequent to the receipt of such reports, the Joint Committee will meet for the purpose of reviewing such reports and to determine whether corrective measures are necessary in light of the industrial consultant's finding, and to determine the means of implementing such corrective measures.

7. On each successive October one following the execution of this Agreement, the Company will furnish to the Union and Workmen's Committee all available information on the mortality and morbidity experience of its employees.

8. The Joint Committee shall meet as often as necessary, but not less than once each month at a regularly scheduled time and place, for the purpose of considering, inspecting, investigating and reviewing health and safety conditions and practices. Union Committeemen shall have the right to investigate accidents under procedures developed by the Joint Committee. The Joint Committee shall make constructive recommendations with respect thereto, including but not limited to the implementation of corrective measures to eliminate unhealthy and unsafe conditions and practices and to improve existing health and safety conditions and practices.

9. All matters considered and handled by the Committee shall be reduced to writing, and joint minutes of all meetings of the Committee shall be made and maintained, and copies thereof furnished to the International Union President and Workmen's Committee.

10. Time spent in connection with the work of the Committee by Union representatives, including walkaround time spent in relation to inspections and investigations, shall be considered and compensated for as their regularly assigned work.

11. In addition to the foregoing, Company intends to continue its existing industrial hygiene program as administered by Company personnel.

12. Any dispute arising with respect to the interpretation or application of the provisions hereto shall be subject to the grievance and arbitration procedure set forth in the Agreement.

13. No employee shall be required to perform services that seriously endanger the employee's physical safety, and the employee's refusal to do such work shall not warrant or justify discharge.

14. The Company will, at its expense, provide for the training of the Union members of the Joint Committee, twice during the term of this Agreement, when such training is requested by the Union members of the Committee. Such training will be limited to five (5) days per Committee member and will be conducted by qualified individuals, institutions and organizations recognized in the field of health and safety.

15. Employees having to perform work inside any vessel, tank or boiler will receive suitable clothing when requested.

## ARTICLE XVII

### *Bulletin Boards*

The Company will provide bulletin boards at convenient locations where they may be seen by the employees during their working hours. Such boards will be used exclusively by the Union for notices indicating the time and place of meetings and other regular functions of the Union having to do with the employees. Notices covering other items must be approved by the local Management before posting.

## ARTICLE XVIII

### *Leaves of Absence*

1. If an employee desires a leave of absence in order to engage in any business pertaining exclusively to the PAPER, ALLIED-INDUSTRIAL, CHEMICAL AND ENERGY WORKERS International Union, said leave will be granted when requested in writing to the local Management. Such employee shall be entitled to resume the employee's employment with the employer, without loss of seniority, and return to the employee's former Department at a rate of pay no less than that applicable to the job from which the employee left. There shall not be more than one (1) employee absent on such leave at any one time.

2. Leaves of absence may be granted, after one (1) year of continuous service with the Company, in emergency cases when such leave will not seriously affect the Company's operations and where adequate notice requesting such leave is given by the employee. In no case will more than two (2) personal leaves of absence be granted to any employee within a twelve (12) month period.

3. The employee shall be responsible for maintaining all costs of benefit plans provided by the Company during the entire leave of absence.

4. Otherwise, leaves of absence will be subject to Company regulations.

5. Family leave will be available to all represented employees in the event of a birth or adoption of a child or the serious illness of a child, spouse or parent. The leave will be without pay and will be granted for up to a maximum of twelve weeks in a twelve-month period. An employee may request more than one family leave during a twelve-month period, but the total time on leave within that period may not exceed twelve weeks. The employee's request for such leave shall be in writing and submitted to his or her supervisor as far in advance as possible to minimize any adverse impact on operations.

   Credited service will accrue during the period covered by the family leave of absence. The leave will be granted with the understanding that the employee will be reinstated to the position held prior to the leave or to a comparable position.

## ARTICLE XIX

### *Contract Work*

1. The Company will not subcontract any of its work if such subcontracting will cause displacement, layoff, demotion, or jeopardize the promotion of employees within the classifications covered by this Agreement.

2. In the subcontracting of routine maintenance work presently also performed by Company employees, the Company shall give first preference to subcontractors having the collective bargaining agreements with PACE, provided said subcontractors can perform the work efficiently and economically to the satisfaction of the Company.

3. The Company agrees that prior to working subcontractor employees, the Company will afford these supplemental employees the same Health and Safety orientation as they afford their own employees, and will insist upon enforcing the same safety rules.

4. Paragraph 2 above shall not apply to new construction, major repairs, turnarounds, and/or installation of special or patented equipment not ordinarily performed by Company employees as part of routine maintenance.

5. Any decoking or coke handling required as a part of the operations of the delayed coker will be work performed by a qualified contractor, acceptable to the Company, and will not be work performed by the bargaining unit employees. (In the bidding and selection process to obtain a qualified contractor to perform the decoking or coke handling activities, the Company will include any available, qualified PACE affiliated contractors, if any, on its bid list for such work, with the understanding that the contractor selected will be the bidder considered to be able to perform the work efficiently and economically to the satisfaction of the Company.)

## ARTICLE XX

### *Military Service*

1. Employees who shall leave the service of the Company to enter the services of the United States Government or any agency thereof for the purpose of performing military service for the United States, and shall notify the Company upon their release from such service (providing the time does not exceed ninety (90) days after their official release by the United States Government) shall be taken back into the service of the Company and allowed the seniority and position they held at the time they left for said Military service, insofar as possible after they have proven their ability for that certain position.

2. Any full time employee who is a member of a reserve component of the armed forces of the United States, or a member of the National Guard or Air National Guard, will be granted a leave of absence for annual training duty or for emergency National Guard duty at the call of the Governor of California. An employee who has been employed by the Company for one (1) year or longer and who is on annual training duty or emergency duty will receive one (1) week's leave of absence with pay and a leave of absence without pay for such additional time as may be required to complete the annual training duty or emergency National Guard duty. An employee who has not taken the current year's vacation entitlement may substitute an equivalent part of the vacation for the leave of absence without pay.

## ARTICLE XXI

### *Jury Service*

When a permanent employee is summoned for jury service, the employee will not be required to report to work for any day the service is required unless the employee is released from such service not later than 12:00 Noon, and is not required to report for such service the following day. An employee assigned to the morning shift will have the option to work the night previous to or the night after the employee has been summoned by the court for jury duty, regardless of the time the employee is relieved from service. Such employee shall elect which of these shifts the employee desires to be relieved and shall notify the employee's supervisor of such election 24 hours in advance of the first of these shifts. Such service will be without loss of straight time pay for days that the employee was scheduled to work. While on such service the employee will report to the Company supervisor on duty each day upon release from such service on that day. The employee may retain any monies paid to the employee for such service, including all expense money such as mileage and per diem.

## ARTICLE XXII

### *Funeral Leave*

Employees may be granted up to three (3) days off, with pay, when absent on account of a death in the immediate family, i.e., spouse, parents, children, brothers, sisters, grandparents, grandchildren, and in-laws (defined as the grandparents, parents, brothers and sisters of the spouse). An employee may be paid for additional time lost at the discretion of the Plant Manager or his designee.

Employees shall have reasonable time off without pay to attend funerals of other relatives or close friends, after receiving permission from the Company.

## ARTICLE XXIII

### *Job Security*

In the event circumstances develop which make layoffs necessary prior to the expiration of this Agreement on January 31, 2006, the Company shall give at least sixty (60) days written notice prior to any layoff. Either the Company or the Union may, prior to such layoffs, terminate this Agreement by giving sixty (60) days written notice. During the period following the initial Company notice and the termination of the Agreement pursuant to said termination notice, the Company will discuss the matter with the Union for the purpose of determining ways and means of avoiding the layoff or lessening the effect on employees involved.

## ARTICLE XXIV

### *Non-Discrimination*

1. The Company and the Union mutually agree that practices pertaining to hiring, promotions, pay, transfers, job assignments and other economic opportunities will be performed without regard to race, religion, color, sex, age or national origin.

2. When the masculine pronoun is used in this Agreement, it shall refer to both male and female.

## ARTICLE XXV

### *Permission To Enter Upon Company Property*

1. Duly authorized representatives of the Union shall be granted permission to enter the premises of the Company during working hours, provided that they first obtain permission from the Refinery Manager or duly authorized representative of the Refinery Manager, observe the same security and safety rules and regulations of the Company as other visitors, and do not in any manner interfere with the performance of work by any employee or group of employees.

2. The Union shall notify the Company in writing of the names of the duly authorized representatives of the Union who shall be entitled to be granted permission to enter the premises of the Company under this Article, and the Company shall notify the Union in writing of the names of the person or persons who are authorized to grant the Union representatives permission to enter the premises of the Company under this Article.

## ARTICLE XXVI

### *Validity*

If any Court shall hold any part of this Agreement invalid, such holding shall not invalidate any other part of this Agreement.

## ARTICLE XXVII

### *No Cessation of Work*

During the term of this Agreement, the Union agrees that there shall be no cessation of work through strikes, stoppage or slow down of work for any cause, including sympathy strikes, and the Company agrees there shall be no lockouts.

## ARTICLE XXVIII

### *Amendments For Federal Compliance*

It is expressly understood and agreed by the parties hereto that if, at any time after the execution of this Agreement, any Federal Statute, Order, Rule, Regulation or Directive shall in any way conflict with any of the provisions of this Agreement, then and in that event the particular provisions of this Agreement in conflict with such Federal Statute, Order, Rule, Regulation or Directive, shall be automatically amended to comply therewith until such Statute, Order, Rule, Regulation or Directive shall no longer be in effect, at which time the original provisions of this Agreement shall again be effective, if this Agreement has not otherwise terminated.

## ARTICLE XXIX

### *Notices*

Any notices provided herein may be given by depositing same in the United States Mail in a sealed envelope, sent by Registered or Certified Mail and postage prepaid, and addressed to the Union at the Office of the Regional Director, 7728 N.E. Hazel Dell Avenue, Vancouver, Washington 98665, and Local No. 8-219, 607 Nineteenth Street, Bakersfield, California 93301; or to the Company at P. O. Box 1476, Bakersfield, California 93302.

## ARTICLE XXX

### *Prior and Collateral Agreements*

1. This Agreement shall constitute the entire Agreement between the Union and the Company relating to employees to whom this Agreement applies and no other stipulation or understanding shall limit or qualify its terms.

2. This Agreement shall cancel and supersede all prior agreements, written and verbal, between the Union and the Company.

## ARTICLE XXXI

### *Plant Closure*

The Company will notify the Union in writing at least six (6) months in advance of a planned complete closure of the Shell Oil Products US, Bakersfield Refinery, that will involve permanent layoff or permanent transfer of bargaining unit employees.

The Company and the Union will meet within fifteen (15) days after such written notice for the purpose of discussing the effect of such closure on bargaining unit employees and to negotiate appropriate conditions and benefits for the affected employees. In the event the parties are unable to arrive at a satisfactory agreement, either party shall have the right to serve a sixty (60) day written notice to terminate this Agreement. The Union shall have the right to strike or the Company shall have the right to lockout at the end of the sixty (60) day period, unless a mutual agreement has been reached. The letter of understanding dated March 14, 1996, will become a part of this Article.

## ARTICLE XXXII

### *Management Rights*

All the rights, powers and authority exercised or had by the Company prior to the time the Union became the bargaining agent, are specifically retained hereunder by the Company, except to the extent that they are expressly limited by specific provisions of this Agreement.

## ARTICLE XXXIII

### *Employee Benefits*

1. Employees covered by this Agreement will be eligible to participate in the company-wide benefit plans as agreed in the Alliance/OCAWIU Master Agreement dated August 21, 1998.

2. Short Term Disability (STD) Benefits shall be paid to employees represented by the Union in accordance with the following schedule:

   A. On the first incident of absence in a 12-month period, there will be no waiting day assessed for purposes of administering STD pay.

   B. On the second instance of absence in a 12-month period, there will be one (1) day of waiting assessed for purposes of administering STD pay.

   C. On the third instance of absence and each instance of absence thereafter in a 12-month period, there will be a three (3) day waiting period assessed for purposes of administering STD pay.

   D. In order to re-qualify for A. above, an employee will be required to have a twelve (12) month absence-free period (a chargeable STD absence) from the date of the last absence.

   E. Payment of STD Benefits on or after the commencement of any strike, including sympathy strikes, will no longer be paid.

IN WITNESS WHEREOF, the parties hereto caused this Agreement to be executed February 1, 2002.

SHELL OIL PRODUCTS US
BAKERSFIELD REFINERY

L. J. Heasley
Bakersfield Refinery Human Resources Manager

PAPER, ALLIED-INDUSTRIAL, CHEMICAL AND ENERGY WORKERS
INTERNATIONAL UNION,
AFL-CIO

Robert Johnston
International Representative, PACE

Edward F. Huhn
Secretary-Treasurer, Local 8-219

Gene Smith
Chairman, Workmen's Committee

**SHELL OIL PRODUCTS US**
**Bakersfield Refinery**

**Wage Schedule Inserted Here**
**Document is in Excel**

**Copy of Signed**
**Memorandum of Understanding Inserted Here**

Amendment to Articles of Agreement Between Shell Oil Products, U.S. Bakersfield Refinery And Paper, Allied-Industrial, Chemical & Energy Workers International Union, AFL-CIO Local 8-219

Dated: February 1, 2002 through January 31, 2006

This addendum reflects changes agreed to by Shell Oil Products U.S. and P.A.C.E. Local 8-219 subsequent to the agreement being signed for the period February 1,2002 through January 31, 2006 which Big West Oil of California agrees to comply with. Additionally, it reflects the benefits offering of Big West Oil of California effective from March 1, 2005 through January 31, 2006. Any reference in these attached agreements regarding benefits is superseded by the offering of benefits dated January 26, 2005.

Date: Monday, February 7,2005

EXHIBIT

D

AGREEMENT TO ASSUME AND AMEND

ARTICLES OF AGREEMENT BETWEEN
SHELL OIL PRODUCTS US
AND
THE PAPER ALLIED-INDUSTRIAL CHEMICAL AND ENERGY WORKERS INTERNATIONAL UNION, AFL-CIO ON BEHALF OF LOCAL 8-219

This Agreement to assume and amend Articles of Agreement between Shell Oil Products US and the Paper Allied-Industrial Chemical and Energy Workers International Union, AFL-CIO on behalf of Local 8-219 (THE "Agreement") is made the 4 day of February 2005, by and between Big West of California, LLC, a Utah limited liability Company ("Big West") and the Paper, Allied-Industrial, Chemical and Energy Workers International Union, AFL-CIO on behalf of Local 8-219 (the "Union")

WITNESS THAT

WHEREAS Equilon Enterprises LLC d/b/a Shell Oil Products U.S. ("Shell") is the owner and operator of a crude oil refinery in Bakersfield, California (the "Refinery"), and

WHEREAS Shell is party to an agreement with the Union dated February 1, 2002, through January 31, 2006 (the "Union Contract"), whereby Shell has agreed to provide certain wages, benefits and working conditions to Union represented employees at the Refinery and the Union has agreed to certain other terms and conditions, and

WHEREAS Big West has entered into an agreement with Shell, dated January 8, 2005 (the "Purchase Agreement"), to purchase from Shell its interest in the Refinery with a target closing date of February 28, 2005 (the "Transaction"), and

WHEREAS Big West has agreed with Shell, consistent with Shell's agreement with the Union, to assume the Union Contract upon closing of the Transaction, and

WHEREAS Big West and the Union have negotiated the substitution of certain Big West benefits to replace Shell benefits for employees covered by the Union Contract, and

WHEREAS the parties hereto desire to define exactly the agreements that shall be effective between them commencing upon the date that Big West and Shell close the Transaction.

NOWTHEREFORE, in consideration of the mutual agreements contained herein and assumed hereby the parties hereto agree between themselves as follows:

1. Effective upon the Effective Date, defined below, Big West agrees to assume and be bound by the terms and conditions of the Union Contract as the same went into effect on February 1, 2002, except that the Union Contract shall be amended to provide that the employee benefits provided by Shell under the Union Contract shall be replaced with the employee benefits described in Exhibit A attached to this Agreement.

2 Big West agrees that upon the Effective Date, defined below, Big West shall assume and be bound by the letter agreements and procedures attached hereto as Exhibit B each of which was entered into after the date of the Union Contract.

3. The Union hereby agrees that upon the Effective Date the Union shall accept and consent to Shell's assignment of the Union Contract to Big West and the Union shall, upon the Effective Date, be bound by and perform in favor of Big West all of the terms, conditions and agreements of the Union Contract as in effect on February 1, 2002, together with the letter agreements and procedures contained in Exhibit B, except that all of the employee benefits provided by Shell under the Union Contract shall be replaced with the employee benefits described in Exhibit A.

4. The parties hereby agree that the Union Contract, as modified in accordance with Section 1 above and the letter agreement and procedures contained in Exhibit B, constitute the entirety of the agreements between Big West and the Union and that neither party herein shall be bound by or entitled to any benefits under any other agreement, understanding, representation, warranty, or other writing, including but not limited to other prior agreements between Shell and the Union, except to the extent signed by Big West and the Union.

5. For purposes of this Agreement, the term "Effective Date", as used in this Agreement, shall mean the date upon which Shell conveys to Big West fee title to and full operational control over the Refinery and a leasehold interest in the adjacent terminal. Until the Effective Date, this Agreement shall have no effect on the Union Contract, as amended, between Shell and the Union.

6. The parties hereto further agree that upon the Effective Date the Union shall and does hereby release Shell from any and all liability arising from or related to the performance or non-performance of the Union Contract after the Effective Date. Nothing herein is intended to release or modify any liability between Shell and the Union relating to periods prior to the Effective Date.

7. The parties hereby agree and acknowledge that Big West shall have no liability to the Union or otherwise with respect to Shell's performance or failure to perform the Union Contract prior to the Effective Date. Likewise, the Union shall have no liability to Big West for its performance or failure to perform the Union Contract prior to the Effective Date.

8. This Agreement, the Union Agreement and Exhibit A and B hereto, constitutes the entire understanding of the parties with respect to the subject matter hereof. The parties acknowledge that the forgoing Agreement is the result of good faith bargaining between Big West and the Union.

Dated: February 16, 2005

| | |
|---|---|
| BIG WEST OF CALIFORNIA, LLC | THE PAPER, ALLIED-INDUSTRIAL, CHEMICAL AND ENERGY WORKERS INTERNATIONAL UNION, AFL-CIO ON BEHALF OF LOCAL 8-219 |
| JEFF UTLEY | |
| By: [signature] | By: [signature] |
| Its: SR VP Refining | Its: PACE IU |

**Benefits Offer to Bakersfield Refinery P.A.C.E. Members**
26-Jan-05

| | |
|---|---|
| Wages | According to existing contract provisions. |
| Vacation, Sick Leave, Holidays | According to existing contract provisions honoring prior service. |
| 401K Defined Contribution Plan | Employees may contribute 1-25% of wages pre-tax subject to |
| | I.R.S. regulations and limitations. |
| | Employer contribution as follows: |
| | 1-5 years of service 2.5% of wages |
| | 6-8 years of service 5.0% of wages |
| | 9 + years of service 10.0% of wages |
| | Employer contribution will be made after one year of service for |
| | new employees. Contributions made at least monthly. |
| | Employees may invest employee and employer contributions in |
| | 9 different mutual funds. Daily valuation and election changes. |
| Health and Welfare Benefits | Flying J medical program with Company allowing $720 towards |
| | purchase of benefits (medical, dental, health &dependent care |
| | spending accounts, other insurance plans. |
| | Or |
| | Choose HMO type medical plan to be offered and employee will |
| | pay 20% of premium. All other insurance plans according to |
| | Flying J plans and premiums. |
| | Retiree medical based upon same eligibility as current Shell plan |
| | using Flying J plan design. Retirees pay 20% of premium and |
| | no MSA account available. |
| Protection | Flying J paid life insurance equal to 2 times base wage. |
| | Flying J paid Occupational Accidental Death benefit of $500,000. |
| | Includes business travel benefit. |
| | Supplemental Life according to Flying J plan provisions and cost. |
| | Includes coverage options for spouse and children employee |
| | paid. |
| | Voluntary Personal Accident employee paid covering employee |
| | and option to cover family. 10 times base wage to maximum of |
| | $400,000.00 |
| | Short term disability according to schedule in current Shell benefits |
| | book.Based on service. See attached schedule. |
| | Long Term disability with 90 day waiting period - employee paid. |
| Balance | Tuition Reimbursement similar to current Shell plan. Requires |
| | management approval, course work related to current job, and |
| | passing grade. Employee pays upfront and is reimbursed if qualify. |
| Wealth/Defined Benefit pension | Benefit paid by Flying J and calculated according to current Shell |
| | formula that includes Social Security Offset. Eligibility subject to |
| | 80 points formula. No lump sum distribution option. |
| | |
| | Any existing plan not mentioned above is not considered part |
| | of the benefits offering. |
| | |
| | |

To - Jim McHenry

# MEMORANDUM OF AGREEMENT

Big West of California, LLC (the "Company") and the United Steel Workers and its Local 219 (the "Union") (collectively, the "Parties") agree that the term of the current Articles of Agreement, effective February 1, 2002, through January 31, 2006, ("Contract") and all provisions therein shall be extended and renewed through January 31, 2009, except that the following modifications shall be made to the Contract:

## *MODIFICATIONS CONSISTENT WITH NATIONAL AGREEMENT*

### A. Wages

Effective February 1, 2006, all hourly wage rates will be increased by 3.5% rounded to the nearest cent.

Effective February 1, 2007, all hourly wage rates will be increased by 3.5% rounded to the nearest cent.

Effective February 1, 2008, all hourly wage rates will be increased by 3.7% rounded to the nearest cent.

### B. Extension Payment

As soon as practical following notification to the Company of union ratification of this entire Agreement, all represented, full time, active Big West of California employees in the Union represented bargaining unit on the payroll as of the date of ratification of the Agreement, will receive a one time, lump sum payment of $1,500.

The extension payment is a discretionary bonus under the Fair Labor Standards Act and is not subject to overtime calculations. The payment is non-benefits bearing, meaning that it will not be included in the definition of earnings in calculating any Big West of California employee benefit under any Big West of California benefit plan, policy, payroll practice, or compensation program.

The extension payment will not be included in wages for purposes of calculating vacation pay, holiday pay, sickness and disability pay, occupational illness and injury pay, overtime pay, workers compensation premiums, or any other types of premium or special payment.

The extension payment will be subject to all deductions required by law, such as applicable withholding for federal, state and local taxes.



EXHIBIT
tabbies
E

E3N/DC

## *LOCAL UNIT MODIFICATIONS*

C. **Amendment to Article XII**

Article XII of the Contract shall be amended as follows:

Section 1 of Article XII shall be modified to read in its entirety as follows:

1. All promotions to a higher rated classification, voluntary demotions to a lower rated classification and bids to a classicization with an equal rate of pay shall be probationary for a period not to exceed sixty (60) days commencing with the date that the employee's prior position is filled with a qualified operator and the employee reports for full time training at the new classification job. The Company may, but shall not be obligated to, extend the probationary period an additional thirty (30) days. Until an employee is certified as satisfactorily trained in a new classification, the employee shall receive the pay rate applicable to the employee's previous position. When the employee is certified as satisfactorily trained in a new classification, the employee's pay will be increased to that of the new classification retroactive to the date that is sixty (60) days after the date the employee was awarded the bid for the new classification. If in the sole judgment of the Company an employee training for a different classification does not display the ability, skill, knowledge or aptitude for the new classification within the probationary period, then the Company shall return the employee to the employee's previous position and pay rate with no loss of seniority. An employee awarded a job which represents a voluntary demotion within the employee's own department will be ineligible to bid on any other vacancy for a period of one hundred eighty (180) days.

The first sentence of Section 5 Article XII shall be replaced by the following:

5. The senior eligible employee bidding for a position shall be awarded the position. When practical, a job vacancy shall be filled within sixty (60) days of the vacancy.

D. **Amendment to Article III**

The Company and Union agree that Sections 1 of Article III of the Contract shall be modified to provide that the workweek shall be 12:01 a.m. Sunday to midnight the following Saturday.

This Contract extension offer is subject to ratification within fifteen (15) days from the date of this offer.

Agreed to and accepted this 27th day of January 2006.



E34/DC
1-26-06

**For the United Steel Workers Local 219**

Edward J Huhn

Edward Huhn
Secretary Treasurer

Kevin Cable

Kevin Cable
Work Committee Chairman

January 27, 2006
Date

**For Big West of California, LLC**

Gene Cotten

Gene Cotten
Refinery Manager

Mark S Boone

Mark Boone
Operations Director

1-27-06
Date



EJH / KC
1-26-06

# 2009 USW National Oil Bargaining Policy

## 1. Term of Agreement

All agreements shall expire at 12:01A.M. on February 1, 2012

## 2. Wages

Substantial wage increase which includes Cost of Living Adjustment

## 3. Shift Differential

5% for after-noon shift and 10% for night shift of highest rate in contract

## 4. Medical

The company will provide fully paid medical, dental and vision coverage with no reduction in the benefits for the term of the agreement.

## 5. Retiree Medical

The company will provide future retirees with a comprehensive medical plan at no cost to the employees.

## 6. Pension

All pension benefits must meet a minimum $85 X yrs of service

## 7. Health & Safety

Health, Safety and Environmental document as presented

## 8. Occupational Death

Increased to 2 million

## 9. Holidays

2 additional paid holidays – MLK and one to be determined

EXHIBIT

tabbies

F

## 10. Successorship

Renew and expand successorship language to cover partial sales.

## 11. Neutrality

Organizing Neutrality language

## 12. No Retrogression

There shall be no retrogression in previous terms and conditions, including but not limited to agreements on no layoffs, rate retention, plant closure, health and safety clauses, pension review, and health and safety review.

All letters of agreement including, but not limited to agreements in rate retention, national health insurance, health and safety review, no layoffs and plant closures shall be made part of the current Articles of Agreement between the parties.

# FINAL 9-12-2008

## 2009 National Oil Bargaining Health, Safety and Environment Language

**Section 1.0**

Employee and Union Rights

Employees have the right to a safe and healthful workplace, to refuse dangerous work, to adequate personal protective equipment, to safety and health training, to a proper medical program for workplace injuries and illnesses.

The company will provide safe and healthful conditions of work for its employees and will, at a minimum, comply with all applicable laws and regulations concerning the health and safety of employees at work and the protection of the environment. The company will install and maintain any equipment reasonably necessary to protect employees from hazards.

The company will make every reasonable effort to ensure that all equipment is maintained in a safe condition. Its inspection and maintenance program will give top priority to equipment critical to employee safety and health. Where faulty equipment creates a risk to employees, the company will take all necessary steps to eliminate the risk.

**Section 1.1**

Right to Refuse Unsafe Work

If an employee, acting in good faith, believes that there exists an unsafe or unhealthful condition they will notify their immediate supervisor. The employee and the supervisor will make every attempt to resolve the condition in the interest of safety. Thereafter, the employee has the right to refuse to perform the job until the unsafe condition has been remedied.

No employee who in good faith exercises their rights under this section will be disciplined or lose any earnings for doing so.

If the determination that an unsafe condition within the meaning of this section exists, the company will order that the unsafe condition be corrected and that the correction occur before work resumes on the job in question.

**Section 1.2**

Cooperative Efforts to Achieve Objectives

The company and the union will cooperate in the continuing objective to eliminate accidents and health hazards, including the reporting of unsafe actions and unsafe conditions to supervision. The company will make reasonable provisions for the safety and health of its employees at the facility during the hours of their employment.

It is understood by the parties that to achieve the above objective, it is necessary that employees use and take reasonable care of protective devices, wearing apparel and other safety equipment provided by the company. It is further understood that the International union, local unions, union Health, Safety and Environment Committees and their officers, employees and agents will not be liable for any work-connected injuries, disabilities or diseases which may be incurred by employees.

**Section 1.3**

Protective Equipment

The company will provide, repair or replace when necessary, personal protective devices, wearing apparel and other equipment (including, but not limited to, goggles, hard hats, safety glasses, hearing protectors, face shields, respirators, special purpose gloves, protective clothing, footwear, and harnesses) necessary to properly protect employees without cost to the employee.

The company will be required to supply cleaning services or facilities to launder required wearing apparel.

Protective equipment will be provided by the company in accordance with practices no less than now prevailing or as such practices may be improved from time to time. Personal protective equipment will be provided by the company without cost except that the company may assess a fair charge to cover the willful destruction thereof by the employee. The company will provide, as needed, prescription lens inserts at no cost to the employee.

**Section 1.4**

Testing

The company will conduct a program of periodic air sampling and noise testing under the direction of mutually agreeable qualified personnel. Where the union co-chairperson of the Joint Health, Safety and Environment Committee alleges a significant on-the-job health hazard due to chemical and physical agents, the company will also make such additional tests and investigations as are necessary.

The union co-chairperson of the Joint Health, Safety and Environment Committee will be notified of any monitoring work to be conducted, will be provided the opportunity to provide suggestions, and will be provided reasonable access to observe the monitoring upon request. The company will provide to the union co-chairperson of the Joint Health, Safety and Environment Committee copies of environmental or employee exposure tests or survey reports.

The company will also comply with the recommendations of the National Institute for Occupational Safety and Health (NIOSH) and the American Conference of Government Industrial Hygienists (ACGIH) concerning toxic substances and harmful physical agents.

**Section 1.5**

Medical Assistance at Work

The company will provide adequate first aid for all employees during their working hours.

The company will provide first aid equipment and trained personnel in close proximity to each of its facilities. The company will provide employees who are seriously injured on the job with prompt emergency transportation to an appropriate treatment location.

**Section 2.0**

Health, Safety and Environment Committee

There will be established a Joint Labor/Management Health, Safety and Environment Committee, (Joint HSE Committee) consisting of equal union and company representatives, with not less than two members each. The parties agree to maintain the local practices and agreements in effect with respect to the total number of members of the Joint HSE Committee.

The parties will designate their own representatives and respective co-chairs and will provide each other with updated lists of the members of the Joint HSE Committee.

**Section 2.1**

Meeting Frequency

The Joint HSE Committee will meet as often as necessary, but not less than once each month at a regularly scheduled time and place. Either co chair may request a special meeting of the Joint HSE Committee, which request will not unreasonably be denied.

The union members will be afforded time to meet privately as needed to prepare for meetings of the Joint HSE Committee.

Management and the union will each keep their own minutes of the meeting. Prior to every regular meeting of the Joint HSE Committee, the company will prepare a written response to concerns or action items noted at the previous meeting, as well as any open items from previous meetings. The two sets of minutes, or a jointly agreed reconciled version of the minutes, along with the company's written response to concerns and action items, will constitute the official record of the meeting.

**Section 2.2**

Facility Training

The company will not make any changes to facility safety and health programs, policies or rules; introduce new protective equipment or eliminate existing protective equipment; or modify safety and health training, unless the Joint HSE Committee has been notified and the union has been provided the opportunity to negotiate the change.

All safety and health training programs will be fully discussed and reviewed by the Joint HSE Committee. The company will use employees chosen by the local union president and/or unit chair as trainers and will ensure trainers have been trained in effective teaching techniques.

Upon request, the International Union's Health, Safety and Environment Department (USW HSE Department) will be provided with a copy of all safety and health training materials and be afforded the opportunity to review the training.

**Section 2.3**

Joint HSE Committee Training

The company will pay for time and costs associated with one week (40 hours) of annual health, safety and environment training for union members serving on the Joint HSE Committee, to be conducted by the union.

When the United Steelworkers (USW) or their designee holds a union only or joint conference, the members of the Joint HSE Committee (union only members for the union only meetings, joint groups for joint conferences) will have arrangements for attending the conference, including payment of registration fees, lodging, travel, per diem, payment of time away from work while attending the conference, and other related expenses paid for union representatives by the company.

**Section 2.4**

Compensation for Committee Work

The union members of the Joint HSE Committee will be compensated for lost time in accordance with local facility understandings for all hours spent on committee related work.

This will include but not be limited to: regular joint meetings; special meetings; union only preparation and sum-up for joint meetings; inspections, tours, and audits of facility; attending, developing, reviewing and/or conducting training programs; conference attendance; accident, incident, illness, near miss and/or hazard/potential hazard investigations and research; and workplace evaluations.

Union members serving on the Joint HSE Committee who accompany OSHA, NIOSH and/or other government officials during inspections and workplace evaluations, and other bargaining unit members who are involved in these inspections/evaluations (including but not limited to interviews) will have their time considered hours worked, and will be compensated as such by the company.

**Section 2.5**

Accident Reporting

A union member of the Joint HSE Committee will be notified, as promptly as possible, of any reported accident(s), incident(s) exposures or disease(s) that are work-related and require an investigation.

The company will provide the International USW HSE Department with prompt notification of any accident resulting in a fatality, probable death or cases where a life altering event takes place to a union member, or to any other person on the workplace site. This notification will be by phone and in writing, and will include the date of the fatality, serious injury or illness, the workplace location of the fatality, serious injury or illness and, if known, the cause of the fatality, serious injury or illness. When it becomes available, the company will provide the International USW HSE Department with a copy of any accident or incident report prepared by the company, the Joint HSE Committee or any other investigating body pursuant to that fatality, serious injury or illness.

When the director of the International USW HSE Department or their designee requests access to a company facility for the purpose of an accident investigation or hazard evaluation, such access may not be delayed except by mutual consent, provided that this provision does not apply to areas that have been evacuated due to hazardous conditions.

**Section 3.0**

Health, Safety and Environmental Representative

A union represented position of Health, Safety and Environment Representative (HSE Representative) will be established.

The local union president and/or unit chair at each location will appoint this full time HSE Representative. This position will work with the company's safety and health personnel, but under the direction of the local union president/unit chair, and union Joint HSE Committee co chair.

The length of the HSE Representative assignment will normally be for the term of the Articles of Agreement. The HSE Representative's performance will be reviewed jointly by the Joint HSE Committee, the location safety manager and by the local union president/unit chair. The reviews may occur at any time but must be done at least annually.

The HSE Representative will be paid not less than $1.00 per hour above the highest rate in the collective bargaining agreement or will be compensated per current local agreement, whichever is greater.

The HSE Representative will continue to accrue seniority in the department from which they came during assignment to the HSE Representative position.

The HSE Representative will normally work day shift hours; however, hours may vary as necessary to meet requirements of this position.

The HSE Representative will be provided with the physical resources, such as office space and equipment, necessary to perform their job functions.

The HSE Representative will participate in accident and incident investigations.

During their term the HSE Representative may ask to be returned to their traditional assignment upon 30 days notice to the local union president and/or unit chair. Also upon 30 days notice the local union president and/or unit chair has the right to return the individual to their traditional assignment.

**Section 3.1**

Alternate Health, Safety and Environmental Representative

The local union president and/or unit chair at each location will appoint this alternate union HSE Representative.

The alternate HSE Representative will fill any absence of the HSE Representative of one week or longer. Absences of less than one week will be filled at the discretion of the Joint HSE Committee.

The alternate HSE Representative will be paid not less than $1.00 per hour above the highest rate in the collective bargaining agreement or will be compensated per current local agreement, whichever is greater for the duration that they fill in for the full time HSE Representative.

**Section 3.2**

Training for HSE Representatives and Alternates

In addition to the health and safety training provided by the company the HSE Representative and alternate will be provided, at the company's expense; forty (40) hours of USW HSE Representative training, which will be required per term; plus forty (40) hours of additional USW safety related training each year.

**Section 3.3**

Additional Positions

It is the intention of the parties that the HSE Representative position will have a positive influence on the facility's safety performance.

The Joint HSE Committee may, provided there is sufficient justification to demonstrate that the existing HSE Representative has been effective, recommend to the location manager that an additional represented HSE Representative position be created. The location manager will consider any recommendation received; however, the final determination concerning the establishment of an additional position will rest solely with the location manager.

**Section 3.4**

Disclosure

Both parties understand and agree that employees working in assignments covered by this agreement are intended to carry out their responsibilities in a constructive and co-operative fashion with the aim of furthering the facility's health and safety efforts.

Both parties understand that USW represented employees will have access to and use information that may be considered trade secrets or proprietary. Such information must be handled in a confidential manner and not disclosed outside the location. If there is any question about the confidential nature of information, the USW represented employee must seek the advice of the location safety manager.

## Section 3.5

Job Duties for HSE Representative

Some of the duties and responsibilities may include, but not be limited to:

- Attend and participate in meetings of the Joint Health & Safety Committee.
- Attend, as necessary, "tailgate" safety meetings to present information on elements of Process Safety Management and help get identified hazards eliminated. Attend safety meetings of each department or unit at least once annually.
- Will participate in near miss, incident and accident investigations.
- Assist in tracking Process Safety Management and safety recommendations and see that recommendations are done to completion on a timely basis.
- Review expectations and monitor implementations regarding contractor safety practices including reviews of accident investigation reports and recommendations.
- Work with operating departments as a field auditor for health, safety and environmental matters.
- Assist with industrial hygiene monitoring.
- Participate in developing, delivering and revising health and safety training programs.
- Assist in the coordinating and conducting of safety training for new employees and refresher training for other employees as determined by the Joint Health and Safety Committee.
- Interface with governmental agencies during site visits or respond to questions that may arise as part of normal regulatory audits or complaint investigations.
- Work with the Joint Health and Safety Committee and the HSE department to develop site-specific training materials and/or programs.
- Assist in investigating, researching and providing answers to employee questions relative to health and safety.
- Participate in inspections, investigations and reviews of health and safety conditions and practices.

- Evaluate, review and report the results of the site safety inspections/audits to the work area supervisor and the Manager HSE, and discuss follow-up corrective action.

**Section 4.0**

Process Safety Management Representative

A union represented position of Process Safety Management Representative (PSM Representative) will be established.

The local union president and/or unit chair at each location will appoint this full time PSM Representative. This position will work with the company's safety and health personnel, but under the direction of the local union president/unit chair, and union Joint HSE Committee co chair.

The length of the PSM Representative assignment will normally be for the term of the Articles of Agreement. The PSM Representative's performance will be reviewed jointly by the Joint HSE Committee, the location safety manager and by the local union president/unit chair. The reviews may occur at any time but must be done at least annually.

The PSM Representative will be paid not less than $1.00 per hour above the highest rate in the collective bargaining agreement or will be compensated per current local agreement, whichever is greater.

The PSM Representative will continue to accrue seniority in the department from which they came during assignment to the PSM Representative position.

The PSM Representative will normally work day shift hours; however, hours may vary as necessary to meet requirements of this position.

The PSM Representative will be provided with the physical resources, such as office space and equipment, necessary to perform their job functions.

During their term the PSM Representative may ask to be returned to their traditional assignment upon 30 days notice to the local union president and/or unit chair. Also upon 30 days notice the local union president and/or unit chair has the right to return the individual to their traditional assignment.

**Section 4.1**

Alternate Process Safety Management Representative

The local union president and/or unit chair at each location will appoint this alternate union PSM Representative.

The alternate PSM Representative will fill any absence of the PSM Representative of one week or longer. Absences of less than one week will be filled at the discretion of the Joint HSE Committee.

The alternate PSM Representative will be paid not less than $1.00 per hour above the highest rate in the collective bargaining agreement or will be compensated per current local agreement, whichever is greater for the duration that they fill in for the full time PSM Representative.

**Section 4.2**

Training for PSM Representatives and Alternates

In addition to the health and safety training provided by the company the PSM Representative will be provided, at the company's expense; forty (40) hours of USW PSM Representative training, which will be required per term; plus forty (40) hours of additional USW safety related training each year.

**Section 4.3**

Additional Positions

It is the intention of the parties that the PSM Representative position will have a positive influence on the facility's safety performance.

The Joint HSE Committee may, provided there is sufficient justification to demonstrate that the existing PSM Representative has been effective, recommend to the location manager that an additional represented PSM Representative position be created. The location manager will consider any recommendation received; however, the final determination concerning the establishment of an additional position will rest solely with the location manager.

**Section 4.4**

Disclosure

Both parties understand and agree that employees working in assignments covered by this agreement are intended to carry out their responsibilities in a constructive and co-operative fashion with the aim of furthering the facility's health and safety efforts.

Both parties understand that USW represented employees will have access to and use information that may be considered trade secrets or proprietary. Such information must be handled in a confidential manner and not disclosed outside the location. If there is any question about the confidential nature of information, the USW represented employee must seek the advice of the location safety manager.

**Section 4.5**

Job Duties for PSM Representative

Some of the duties and responsibilities may include, but not be limited to:

- Field concerns from plant employees on PSM issues.
- Encourage all employees to provide input on PSM and safety activities and maintain records of employee questions, inputs and actions taken.
- Participate in developing, delivering and revising health and safety training programs involving PSM required training.
- Attend, as necessary, "tailgate" safety meetings to present information on elements of PSM and help get identified hazards eliminated. Attend safety meetings of each department or unit at least once annually.
- Attend and participate in meetings of the Health & Safety Committee.
- Participate in Process Hazard Analysis (PHA) revalidation meetings for all process units.
- Review operating procedures to verify they are current and cover the elements required under CFR 1910.119 (f) with assistance of unit trainers.
- Participate in Management of Change (MOC) meetings when possible and review MOC's to assure they are being followed.
- Assist in the coordinating and conducting of safety training for new employees and refresher training for other employees as determined by the Joint Health and Safety Committee.
- Interface with governmental agencies during site visits or respond to questions that may arise as part of normal regulatory audits or complaint investigations.
- Assist in tracking PSM and safety recommendations and see that recommendations are done to completion on a timely basis.
- Participate in pre-startup safety reviews prior to introducing highly hazardous chemicals to process units that have been out of service.

UNITED STEELWORKERS

USW

UNITY AND STRENGTH FOR WORKERS

**Gary Beevers**
International Vice President

DATE: January 31, 2009

TO: National Oil Bargaining Groups
Staff Representatives service NOBP Locals

FROM: Gary Beevers, International Vice President

COPY: USW International Executive Board
NOPB Policy Committee

**NOBP General Message 10**

Greetings:

Please be advised that sufficient progress has been made in our deliberations today to warrant a rolling 24 hour extension at all locations.

As a result, all bargaining locations are instructed to offer their employers an extension of the current agreement on a rolling 24-hour basis. That is, you are authorized to extend the agreements on a day-to-day basis subject to a 24-hour notice of canceling the extension. If you have any questions regarding this please advise.

If any group is contemplating serving strike notice on local issues tonight and have submitted proper requests for strike authorization on local issues, I would ask that you stand down at least for the first 24 hour extension so that we can continue to work on national issues at the table and establish a pattern.

We will give further instruction tomorrow as to the availability of another rolling 24 hour extension.

In solidarity,

EXHIBIT
G

United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union
470 Orleans St., Suite 900, Beaumont, TX 77701 • Office 409-838-1972 • Fax 409-838-1379 • www.usw.org

UNITED STEELWORKERS

USW

UNITY AND STRENGTH FOR WORKERS

**Gary Beevers**
International Vice President

DATE: February 1, 2009

TO: National Oil Bargaining Groups
Staff Representatives service NOBP Locals

FROM: Gary Beevers, International Vice President

COPY: USW International Executive Board
NOPB Policy Committee

**NOBP General Message 11**

Greetings:

We have received no official offers today but have continued to bargain over the outstanding issues and will continue to do so this evening.

Be advised we are still operating under a rolling 24 hour extension and it will continue unless either party cancels.

In solidarity,

UNITED STEELWORKERS

USW

UNITY AND STRENGTH FOR WORKERS

**Gary Beevers**
International Vice President

DATE: February 2, 2009

TO: National Oil Bargaining Groups
Staff Representatives service NOBP Locals

FROM: Gary Beevers, International Vice President

COPY: USW International Executive Board
NOPB Policy Committee

**NOBP General Message 12**

Greetings:

Our talks are continuing. We are continuing to work through the issues in an effort to reach a mutually satisfactory settlement. We are still working under a 24 hour rolling contract extension.

I know the tempo of this round of bargaining is frustrating but continue to work your local issues as we are making progress.

In solidarity,

BINGHAM

Direct Phone: 415.393.2636
Direct Fax: 415.262.9223
alan.berkowitz@bingham.com
Our File No.: 3002401-0000337200

February 5, 2009

**Via Facsimile (661 325-1068)**

Mr. Edward F. Huhn
Secretary/Treasurer
United Steelworkers, Local 219
607 19th Street
Bakersfield, CA 93301

**Via Facsimile (626-966-5661)**

Mr. Saul W. McGarity
Staff Representative
United Steelworkers, District 12
927 South Village Oaks Dr., Suite 100
Covina, CA 91724

**Re: Big West Negotiations**

Dear Mr. Huhn and Mr. McGarity:

When we first met last Thursday, January 29, we presented the Company's proposals to address the exigent circumstances facing the Company which would require curtailing operations at the refinery and the temporary layoff of employees. The Union made no response to our proposals at that meeting. Although we offered to meet the following day and over the weekend, you said you were not available until Tuesday, February 3. I urged you to send me any counter-proposals you wished to make over the weekend so that we would not have to waste time reviewing them for the first time when we met on the 3rd. You did not send us any proposals in advance of the meeting and did not have any response to our initial proposal until after lunch. Your only counter-proposal at that time was to offer an insignificant change to Article VII with respect to emergency situations.

Although we got virtually no counter-proposals from the Union, the Company put together a comprehensive proposal which we presented to the Union that afternoon. That proposal offered temporary layoff benefits beyond what was required under the contract as well as severance pay in lieu of the 6-month notice provision for a permanent plant closure. In return, the Company wanted a clear understanding of its right to use a small crew of critical management personnel in addition to some bargaining unit employees to work the few functions that would remain open during the curtailment. Again, the Union made no counter-proposals. Nor did you even comment on the Company's offer except to argue that management employees were not qualified to operate the facilities that would remain functioning. You requested a list of the management employees who

Boston
Hartford
Hong Kong
London
Los Angeles
New York
Orange County
San Francisco
Santa Monica
Silicon Valley
Tokyo
Walnut Creek
Washington

Bingham McCutchen LLP
Three Embarcadero Center
San Francisco, CA
94111-4067

T 415.393.2000
F 415.393.2286
bingham.com

EXHIBIT
H

Mr. Edward F. Huhn
Mr. Saul W. McGarity
February 5, 2009
Page 2

would be kept on and the jobs they would be assigned to. We told you that we had not made that determination yet, but when we did we would give you the information. However, we told you we would not bargain with you over whether managers are qualified to do the jobs to which they would be assigned. I told you that the Company would not assign managers to jobs unless they were qualified to do them.

We concluded the negotiations that day because you said you needed to consult with your attorneys. Although we requested to set another date for negotiations, Mr. McGarity declined stating that he didn't know who may be replacing him in the negotiations. Mr . McGarity promised to provide me with a response to our proposals on Wednesday, February 4 and a proposed date to resume negotiations. I received no communication from Mr. McGarity on the 4th or today.

The Union is obviously not interested in engaging in good faith negotiations to reach an agreement in a timely manner. As we advised you last week, the circumstances are exigent and the Company must move forward with the curtailment of operations. Certain non-union employees will be laid off this Friday. The first group of bargaining unit employees will be laid off starting next Thursday, February 12. Other layoffs will follow.

In the absence of an agreement modifying the existing contract, the Company will comply with the contract with regard to temporary layoffs. Laid-off employees will be provided with the temporary layoff benefits set forth in Article XIV of the contract. The benefit will be calculated on years of service with Big West only. As this does not represent any change in the existing contract requirements, it is unclear whether these payments will be treated as pre-petition claims. Also, if the Union disagrees with our interpretation of the contract, it will have to raise its objections through the Bankruptcy Court.

Our proposal of February 3 remains on the table. Please contact me immediately to resume negotiations.

Very truly yours,

Alan R. Berkowitz

A/72837832.1

BINGHAM

7568

# Facsimile

DATE: February 5, 2009

| | NAME | FAX | PHONE |
|---|---|---|---|
| TO: | Mr. Edward F. Huhn<br>United Steelworkers, Local 219 | (661) 325-1068 | (661) 322-4023 |
| | Mr. Saul W. McGarity<br>United Steelworkers, District 12 | (626) 966-5661 | (626) 966-6852) |

FROM: Alan R. Berkowitz 415.262.9223 415.393.2636
alan.berkowitz@bingham.com

PAGES: (INCLUDING THIS COVER PAGE): 3

RE: Big West Neogotiations

**MESSAGE:**

My letter of today.

Boston
Hartford
Hong Kong
London
Los Angeles
New York
Orange County
San Francisco
Santa Monica
Silicon Valley
Tokyo
Walnut Creek
Washington

**For transmission problems, please call 415.393.2174**

The information in this transmittal (including attachments, if any) is privileged and confidential and is intended only for the recipient(s) listed above. If you are neither the intended recipient(s) nor a person responsible for the delivery of this transmittal to the intended recipient(s), you are hereby notified that any unauthorized reading, distribution, copying or disclosure of this transmittal is prohibited. If you have received this transmittal in error, please notify us immediately at (same telephone number as in first paragraph - will duplicate) and return the transmittal to the sender. Thank you.

| | | | | |
|---|---|---|---|---|
| Timekeeper No: | 22405 | Client/Matter No: | 3002401-0000337200 | DATE/TIME STAMP |
| Client/Matter Name: | Flying J/Big West Oil: Refinery Labor Matters | | | |
| Return To: | Anna Lee | | Floor No: | 27 |

Bingham McCutchen LLP
Three Embarcadero Center
San Francisco, CA
94111-4067

T 415.393.2000
F 415.393.2286
bingham.com

A/72837924.1

orig

**Big West - Proposal 02/17/09**
*Subject to approval by the Bankruptcy Court*

1) Article XIV, Layoffs
Paragraph 4 - During the time the Company is in bankruptcy suspend the 14-day notice requirement for temporary layoff.

2) Company will pay the benefits defined in Article XIV, giving credit to employees for years of service at the Refinery as reflected on the current seniority list. Employees who previously worked at the Refinery for Shell and received severance pay from Shell will be given service credit only for time worked for Big West. All employees laid off will be eligible for a minimum of 5 weeks of benefits under Article XIV. Benefits under Article XIV will be paid weekly during the period of layoff for the number of weeks the individual employee is entitled to the benefit but in no event will an employee be entitled to the benefit after he or she is recalled to work.

3) Article XIV
During the time the Company is in bankruptcy suspend the paragraph in Article XIV addressing what happens in the event the Company converts a temporary shutdown to a permanent shutdown.

4) Article XXIII, Job Security
During the time the Company is in bankruptcy suspend the 60-day notice requirement prior to layoffs necessary before the expiration of the Agreement.

5) During the time of the temporary or permanent plant shutdown, certain maintenance functions and the following operations of the Refinery that will remain in operation may be manned by management personnel and those bargaining unit employees deemed necessary in the judgment of management:

- Vapor Recovery
- Boiler
- Flare
- Amine
- Sulfur Recovery Unit
- Waste Water Treatment/inj wells
- Raw Water Treater

In order to retain more bargaining unit employees during the period of curtailment, the Company will train and retain 5 employees to do hazardous waste work previously performed by an outside contractor. This function will continue to be managed by the Contractor's supervisor.

In maintaining the functions and operations described in this paragraph 5, the Company will utilize a composite crew of approximately 50% bargaining unit employees and 50% management personnel. In the event the curtailment is converted to a permanent shutdown,

EXHIBIT
tabbies
I

this 50/50 ratio for the composite crew may not be maintained and staffing will be at the discretion of management.

6) Article XXXI, Plant Closure
Subject to Union's agreement on No. 5 above, temporarily (during the time the Company is in bankruptcy) replace the 6-month notice requirement for a planned complete closure that will involve permanent layoff or permanent transfer of bargaining unit employees with the following: In the event of complete closure that will involve a permanent layoff or permanent transfer of bargaining unit employees, or in the event that a temporary layoff is converted to a permanent layoff, bargaining unit employees who were employed at the refinery on or before August 5, 2004 will receive severance benefits in the amount of 3 weeks' severance pay, plus 1 week of severance pay per full year of service with Big West. However, this severance pay shall be reduced by the benefits provided to the bargaining unit employees under Article XIV.

7) During the time the Company is in bankruptcy, seniority shall not be determinative for purposes of temporary layoff and there shall be no bumping rights. Recall shall be by departmental seniority and qualifications. Employees will have recall rights for one (1) year.

8) The proposals above are intended to supersede any provisions in the Collective Bargaining Agreement and any side letters or memoranda adding to or modifying the Agreement that are inconsistent with the substance or spirit of these proposals.

9) The Union agrees that it will not file or pursue on its behalf or on behalf of any of its members or any employee any grievance or claim that the company violated any term of the contract in the notice it provided to the Union with regard to the temporary layoff, the selection of employees for layoff, or the failure to provide any other right or benefit to employees in connection with the temporary layoff.

10) The Company agrees that it will meet the Union starting on February 24, 2009 to negotiate the NOBP and any outstanding issues and will continue to meet and bargain at least twice a week to conclusion.

Agreed to, on this seventeenth day of February, 2009

*For United Steel Workers*

Saul W. McSanity [signature]

Edward J. Hahn [signature]

*For Big West of CA*
*A subsidiary of Flying J, Inc*

[signature]

[signature]

BINGHAM

Direct Phone: 415.393.2636
Direct Fax: 415.262.9223
alan.berkowitz@bingham.com
Our File No.: 3002401-0000337200

December 4, 2009

Mr. Edward Huhn
Secretary/Treasurer
United Steelworkers, Local 219
607 19th Street
Bakersfield, CA 93301

Mr. Saul McGarity
Staff Representative
United Steelworkers, District 12
927 South Village Oaks Drive, Suite 100
Covina, CA 91724

**Re: Big West Negotiations**

Dear Mr. Kuhn and Mr. McGarity:

As you know, as a result of the severe financial problems facing the Company due to the economic downtown and the price and availability of oil, Flying J filed for Chapter 11 bankruptcy protection. Since that time, the Company has been seeking buyers for portions of the business, including the Big West Bakersfield refinery. It has been a long and difficult process. At the present time, negotiations to sell the Bakersfield refinery are focused on one buyer. No other potential buyers have been able to demonstrate, to date, an ability to consummate a transaction that would include operating the refinery.

The Union contract covering the Bakersfield Refinery expired on January 31, 2009. Since then the facility has been operating with a skeleton crew. The few remaining bargaining unit employees have been working under expired agreement terms, and our agreement of February 17, 2009. At the time of the curtailment of operations the parties contemplated that there would be negotiations for a new agreement. However, as a practical matter, in view of the inability of the Company to obtain a business partner or financing to reopen the refinery, and the decision by the Company that it will not operate the refinery in the future, the parties realistically have not pressed to conclude a new agreement.

At our last bargaining session, the Union asserted that the Bakersfield facility was subject to successorhip requirements under the expired agreement. It was the Union's position that two side-letters containing successorship provisions negotiated years ago are part of the expired contract and remain effective. The Union contends that under these side-letters a buyer must be required by Big West to recognize the Union and apply the terms of the expired agreement or, in its place, whatever new agreement might be negotiated.

Boston
Hartford
Hong Kong
London
Los Angeles
New York
Orange County
San Francisco
Santa Monica
Silicon Valley
Tokyo
Walnut Creek
Washington

Bingham McCutchen LLP
Three Embarcadero Center
San Francisco, CA
94111-4067

T 415.393.2000
F 415.393.2286
bingham.com

EXHIBIT
tabbies
J

Having reviewed the side-letters, the Company seriously questions whether they are applicable today, and in any event whether they would be applicable to an outright sale of the Bakersfield Refinery to a third party by a debtor in bankruptcy pursuant to Section 363 of the Bankruptcy Code. In other words, the Company disagrees with the Union's interpretation of those side-letters. Nevertheless, at this juncture, there is little time to argue over such matters.

The Company on numerous occasions has attempted to obtain the potential buyer's agreement to adopt existing collectively bargained terms. The potential buyer has consistently declined to agree to do so. The Potential Buyer has advised the Company that although it will fully comply with its obligations under the labor law with respect to any obligations to recognize and bargain with the United Steelworkers as a result of the sale, it wishes to negotiate any new collective bargaining agreement with the Union.

The bottom line is that the potential buyer for the Bakersfield Refinery has refused to adopt any collectively bargained terms or successorship obligations, and has steadfastly refused to change its position. As a result, the sale requires the elimination of potential successorship terms. Substantial efforts have been made to locate buyers and to effect this sale. Suitors have been scarce, and after many months we know of no other realistic alternative that will allow the Bakersfield facility to re-open and operate as a refinery.

As negotiations for the sale of the Bakersfield refinery are in the final stages, the circumstances surrounding the elimination of this barrier to the sale are urgent. When we meet for negotiations on December 7, the Company will propose the immediate elimination of any successorship obligations the Union contends presently exist. The Company is willing to fully consider any position the Union may wish to advance. In the end, though, it is difficult to see, as a practical matter, how the Company will be persuaded that the sale of the facility should be subject to any successorship requirements where the buyer in question has steadfastly rejected them.

The urgency of our negotiations on this subject is underscored by the exigencies of the sale and re-structuring process. This potential sale is the best hope of having the Bakersfield facility re-open as a refinery. We trust the Union will recognize the realities of this difficult and unfortunate situation and will cooperate with us in removing potential obstacles to the sale as quickly as possible.

We look forward to discussing this with you when we meet on December 7.

Very truly yours,

Alan R. Berkowitz

[illegible]

December 7, 2009

RC

NOBP - Issues -

* Flying J not going to operate the Refinery

AB - Recognize to bargain with the Union

Buyer can probably go into court & get it free & clear - without contract or successorship

want to negotiate out successorship letters

ED 37.3% - 3% - $2,500

goal end of year - before 1st of year

AB Economics on that - we can't deal with it on that

69 - total employees

anything retroactivity - big chunk of dough

ED. feb - recall rights?

EXHIBIT

K

can't agree -
couldn't -

AB. not fixing ?'s - intent to void the current contract -

can't tell us - under confidentiality

he would be willing to sit down + discuss issues

UNITED STEELWORKERS

USW

Big West - USW Local 219

MEETING DATE December 7, 2007 TIME 1:30 P.M.

ATTENDANCE - ROSTER

| UNION | COMPANY |
| --- | --- |
| Edward J [illegible] | [illegible] |
| [illegible] | Alan [illegible] |
| [illegible] | M F Schilling |
| [illegible] | |
| | |
| | |
| | |
| | |
| | |
| | |

Direct Phone: 415.393.2636
Direct Fax: 415.262.9223
alan.berkowitz@bingham.com
Our File No.: 3002401-0000337200

December 18, 2009

Mr. Edward Huhn
Secretary/Treasurer
United Steelworkers, Local 219
607 19th Street
Bakersfield, CA 93301

Mr. Saul McGarity
Staff Representative
United Steelworkers, District 12
927 South Village Oaks Drive, Suite 100
Covina, CA 91724

**Re: Big West Negotiations**

Dear Mr. Huhn and Mr. McGarity:

Both in my letter to you of December 4, 2009 and, again, during our negotiations on December 7, 2009, I explained the need and urgency for the Company to eliminate any successorship obligations the Union contends presently exist. We understand the Union contends that the Successor Letter of Understanding entered into by Equilon Enterprises in December 1997, as modified by the January 31, 2002 letter between Equilon Enterprises and the Paper, Allied-Industrial Chemical and Energy Worker's International Union, Local 8-219, is still in effect and applicable to Big West. Although we do not concede the applicability or viability of those agreements to Big West, we demanded to bargain about the elimination of any and all successorship obligations that may even arguably exist as they present an impediment to the sale of the Bakersfield Refinery.

When we met on December 7, I explained that the Company had attempted many times to require the potential buyer for the Bakersfield facility to adopt the now-expired collective bargaining agreement but that it had steadfastly refused to do so. I explained that the potential buyer wishes to negotiate its own contract. I further explained that as the current potential buyer provides the only real possibility of the facility re-opening and operating as a refinery, it is imperative that we remove the alleged successorship obligations as obstacles to the potential sale. I requested another bargaining session to specifically discuss the elimination of these alleged successorship obligations and asked for your available dates the following week. Because Mr. McGarity was not present during those negotiations, Mr. Huhn stated that he would get together with Mr. McGarity and provide me with dates when we could meet the following week. Mr. Huhn assured us that he would not attempt to avoid bargaining over the issue and would set a bargaining session as soon as he and Mr. McGarity were available.

EXHIBIT
L

By email dated December 9, 2009, I, again, requested a date to resume negotiations and reminded Mr. Huhn of his agreement that before our next bargaining session, he would contact the Union's Vice President in charge of the NOBP to determine whether the local would have the authority to agree to delete this successorship obligations from the now-expired contract should it decide to do so. The following day on December 10, I notified you that I was no longer available to meet on December 16 and asked whether we could meet on December 13, 15, or 18. This week is now over and I have not heard a word from either of you.

Failing to provide dates to meet for negotiations in these circumstances, which are exigent, is unacceptable. You are aware of the urgency and critical need to address the successorship issues. Our position is clear and is what we have no choice but to do: we propose the immediate elimination of any successorship obligations the Union contends presently exist. The Union must either bargain with us over this matter or forfeit its right to do so. If you have an alternate proposal you wish the Company to consider, you need to make it immediately. As the deal is in the final stages of negotiations, we must meet and conclude an agreement by December 24, 2009. If you do not commit to a firm date for negotiations before that date, it is our view that the Union has refused to timely bargain with us on this subject and we are at impasse. If you cannot meet but wish to make a counterproposal, submit it to me by email and we will consider it and respond immediately. If it warrants direct discussion we will be available by telephone. But in any event we must conclude our discussions on this issue by December 24.

We look forward to your immediate response.

Very truly yours,

Alan R. Berkowitz

## Jury, David

**From:** Jury, David

**Sent:** Thursday, December 31, 2009 12:34 PM

**To:** Berkowitz, Alan R.

**Cc:** Beevers, Gary; LaVenture, Robert; Latham, Rick; McGarity, Saul W.; bkfdlocal219@att.net; David Eaton

**Subject:** RE: Big West of California and USW

Mr. Berkowitz:

I have reviewed Seaport and Bottom Line, as well other cases involving the NLRB's "economic exigency" exception, and have concluded that those cases are inapposite. The NLRB applies this exception narrowly, and the instant matter does not involve the sort of "extraordinary" and "unforeseen" occurrence that justifies unilateral action. As a consequence, the USW disagrees that the parties are at impasse.

In addition, the USW disagrees that the Bakersfield agreement has expired. Rather, the parties have agreed to extend the agreement per the NOBP process and the agreement continues in effect.

In an effort to address the parties' disputes, I am writing to inform you that the USW is willing to meet next week to continue negotiations. Saul McGarity is available to meet on January 6 or 7, and you should contact Mr. McGarity directly to schedule a meeting. The USW will present a proposal at that meeting to modify the existing successorship clause of the Bakersfield collective bargaining agreement; it is also possible that the USW may address other matters involving the bargaining relationship.

The USW continues to urge Big West/ Flying J to encourage the prospective buyer to meet with the Union. As I have stated before, we believe that this is a practical approach to addressing any concerns that the prospective buyer may have with regard to labor issues at Bakersfield. In the event that either the Debtors or the prospective buyer have concerns relating to the confidentiality of the prospective buyer's identity, the USW is willing to consider an appropriate confidentiality agreement covering this subject. Please send any draft agreement to my attention. In all events, allowing the USW to speak with the prospective buyer is an approach that, in our view, will not only protect the interests of the Bakersfield workforce but will also allow Flying J to maximize the returns for its creditors. Please advise if the Debtors are prepared to take the same practical approach.

David R. Jury
Associate General Counsel
United Steelworkers
Five Gateway Center, Room 807
Pittsburgh, Pennsylvania 15222
(412) 562-2545
(412) 562-2429 (Facsimile)

Please note my new e-mail address:
djury@usw.org

---

**From:** Berkowitz, Alan R. [mailto:alan.berkowitz@bingham.com]
**Sent:** Monday, December 28, 2009 7:11 PM
**To:** Jury, David
**Cc:** Beevers, Gary; LaVenture, Robert; Latham, Rick; McGarity, Saul W.; bkfdlocal219@att.net
**Subject:** RE: Big West of California and USW

EXHIBIT

M

Dear Mr. Jury,

Your statement that the Union remains prepared to discuss this matter, combined with your vague "expectation" that the Union will respond sometime after January 1, are unsatisfactory in the exigent circumstances present here. As I have stated over and over, the Company is on the threshold of

completing a critical sale to the only available purchaser of the Bakersfield refinery. The Union's refusal to provide us with dates to meet or to give us a counter proposal, and your statement that that "the company's demand that the union surrender its successorship rights is not constructive," leads us to the obvious conclusion that the Union continues to reject the Company's position.

Without conceding the existence of any applicable successorship provisions, the Company has sought an agreement that any such provisions are inapplicable to this sale. The Union has continuously rejected, and continues to reject, the Company's position. Accordingly, faced with having to conclude the sale in the absence of Union agreement, the Company will regard any such successorship constraints, to the extent they may have existed, to have been eliminated through negotiations to impasse or to have lapsed as a matter of law. The Company has no other practical option. The Union has failed or refused to bargain at its peril. The Company cannot, and will not, delay the sale until it hears from the Union. If the Union submits a proposal before the deal is signed the Company will consider it. Meanwhile, until this impasse is broken, the Company will proceed with the sale on the basis that there are no successorship constraints applicable.

Alan Berkowitz

---

**From:** Jury, David [mailto:DJury@usw.org]
**Sent:** Thursday, December 24, 2009 11:09 AM
**To:** Berkowitz, Alan R.
**Cc:** Beevers, Gary; LaVenture, Robert; Latham, Rick; McGarity, Saul W.; bkfdlocal219@att.net
**Subject:** Re: Big West of California and USW

Thank you for your reply, albeit delayed, to my December 21 message. The USW disagrees with your portrayal of the circumstances. Rather than replying point by point, I will simply state that the union remains prepared to discuss this matter with the company, though, as our representatives have made clear, the company's demand that the union surrender it successorship rights is not constructive. I expect that the union will reply after January 1 on this matter. In the meantime, please continue to urge the prospective buyer to agree to meet with the union and please report on your efforts.

----- Original Message -----
From: Berkowitz, Alan R. <alan.berkowitz@bingham.com>
To: Jury, David
Cc: Beevers, Gary; LaVenture, Robert; Latham, Rick; McGarity, Saul W.; edward huhn <bkfdlocal219@att.net>
Sent: Thu Dec 24 13:53:17 2009
Subject: RE: Big West of California and USW

Dear Mr. Jury,

Thank you for your response to my letter to Mr. Huhn and Mr. McGarity. Initially I would like to correct some erroneous factual assertions in your letter. First, Big West has never refused to permit the potential buyer to meet with the USW. In fact, in response to Mr. Huhn's bargaining table request to meet with the potential buyer, I told him that we would convey the Union's request and that I did not know whether they would want to meet or not. We immediately conveyed that request to the buyer but have not yet received their response. We will let you know as soon as we hear from them.

Second, the contract has clearly expired by its terms and there is no agreement to extend the contract. Nevertheless we recognize our obligations under the law and continue to maintain appropriate terms and conditions in effect. As you no doubt know, this is not the same as having a "binding collective bargaining agreement" as you assert. Moreover, we do not believe that a successorship provision would survive contract expiration in any event.

We strongly disagree with your statement that there is no reason why the parties must meet and conclude an agreement by December 24. There is strong and compelling reason to reach agreement or impasse on the elimination of any alleged successorship obligations before the sale is complete. So there is no misunderstanding, we have never insisted on the conclusion of a full agreement on a new contract by December 24. Indeed it is impractical to even attempt to do so. Rather, we have made it clear that we must conclude negotiations on the single issue of the elimination of any successorship obligations the Union believes exist by that date. The reasons for this are plainly stated in my letter and in my oral explanations to the Union.

Your statement that there is nothing under federal labor law to support our position that the Union must either timely bargain over this issue or forfeit it right to do so is simply wrong. If you are unfamiliar with the rights and obligations of parties to

bargain under exigent circumstances, please see such cases as Seaport Printing & Ad Specialties, 351 NLRB 1269 (2007) and Bottom Line, 302 NLRB 80 (1995).

Significantly, your letter neither offers a date to bargain over the successorship issue nor offers a counter proposal, and simply underscores the Union's consistent rejection of the Company's position. After almost three weeks of having no response to our request to complete negotiations on the elimination of any alleged successorship provisions we recognize the reality that the USW does not intend to bargain in a timely manner on this issue. If there is a proposal regarding successorship the Union wishes to submit, it should do so immediately so that the Company may consider it before the sale agreement is signed. If not, the Company will be forced to conclude that there is an impasse on this issue and that the successorship clauses, to the extent they exist and were applicable to Big West, are eliminated.

Alan Berkowitz | Bingham McCutchen LLP

Three Embarcadero Center

San Francisco, CA 94111

T 415.393.2636 | F 415.262.9223

alan.berkowitz@bingham.com

---

From: Jury, David [mailto:DJury@usw.org]
Sent: Monday, December 21, 2009 3:34 PM
To: Berkowitz, Alan R.
Cc: Beevers, Gary; LaVenture, Robert; Latham, Rick; McGarity, Saul W.; edward huhn
Subject: Big West of California and USW

Dear Mr. Berkowitz,

I have been asked to respond to your December 18, 2009 letter sent to Edward Huhn, Secretary-Treasurer of USW Local Union 219, and Saul McGarity, USW Staff Representative. I am the United Steelworkers' counsel in Flying J/ Big West bankruptcy cases. Although you and I have not spoken during the Chapter 11 cases, I have spoken on several occasions to David Eaton and others at Kirkland & Ellis about a variety of matters, including the efforts to sell the Bakersfield, California facility.

It is my understanding that Big West has proposed that the United Steelworkers agree to eliminate any and all successorship obligations found in the parties' collective bargaining agreement. As you state in your December 18 letter, Big West "[has] attempted many times to require the potential buyer for the Bakersfield facility to adopt the now-expired collective bargaining agreement but that it [has] steadfastly refused to do so" because "the potential buyer wishes to negotiate its own contract."

The United Steelworkers understands that the potential buyer – whom you have doggedly refused to identify – does not wish to adopt the existing collective bargaining agreement. As a consequence, the United Steelworkers has asked that it be given the opportunity to meet directly with the buyer and attempt to negotiate a mutually agreeable, new collective bargaining agreement. We believe that this is a practical approach to the matter which will enable the union and the potential new owner – the two stakeholders who will be involved long-term at the Bakersfield facility – to negotiate an agreement that meets their common needs. Big West's refusal to permit the United Steelworkers to meet with the potential buyer has been an impediment to the sale process, and this impediment ultimately is to the detriment of the company's creditors.

The United Steelworkers disagrees that the Bakersfield has expired. Rather, it is the Union's position that the parties have a binding collective bargaining agreement.

In your December 18 letter, you threaten that "[t]he Union must either bargain" with Big West over the proposed modification to the collective bargaining agreement "or forfeit its right to do so." You also claim that "the deal [to sell the Bakersfield facility] is in the final stages of negotiations" and that the parties "must meet and conclude an agreement by December 24, 2009." Whether or not it is true that the proposed sale of the Bakersfield facility is "in the final stages" – and I am aware of nothing that suggests that it is – there is no reason why the parties "must meet and conclude an agreement by December 24, 2009." You also threaten that "[i]f the [Union does] not commit to a firm date for negotiations [by December 24, 2009], it is our view that the Union has refused to timely bargain with us on this subject and we are at impasse.

As you probably know, even if Big West and a purchaser were to reach an agreement in the near term relating to the sale of the Bakersfield facility, the purchase would be subject to a court-directed bidding procedure and a subsequent bankruptcy court hearing to approve the sale. In short, there would be ample time for the United Steelworkers and the purchaser to negotiate an acceptable labor agreement, and the Union is prepared to meet with that buyer in a timely fashion.

Your suggestion that the Union would "forfeit its right" to bargain over proposed changes to the collective bargaining agreement is nonsense. Nothing under either federal labor law or the Bankruptcy Code supports this view, so please understand that the Union disagrees that anything which may occur in the near term would cause a forfeiture of the Union's right to bargain. In addition, your claim of a possible, imminent impasse is without any credible basis. Moreover, the Union treats Big West's demand that the workers simply surrender their successorship protections as being a proposal made in bad faith.

The Union is willing to continue bargaining with Big West in relation to the Bakersfield transaction. It is my understanding that Staff Representative Saul McGarity is on vacation. You should coordinate scheduling with Mr. McGarity. In the meantime, in order to assist the process, and in connection with your concession that the potential buyer "wishes to negotiate its own contract," we continue to encourage Big West to identify the potential buyer and permit the Union to negotiate with that party. The Union has negotiated with scores of potential buyers in other cases and often finds that being given the opportunity to negotiate with a party that takes a fresh look at bargaining is an overall aid to the process. The potential sale of the Bakersfield facility will only be a success if Big West is willing to be transparent about the process.

If you care to discuss this matter with me, please contact me at 412-562-2545.

David R. Jury

Associate General Counsel

United Steelworkers

Five Gateway Center, Room 807

Pittsburgh, Pennsylvania 15222

(412) 562-2545

(412) 562-2429 (Facsimile)

Please note my new e-mail address:

djury@usw.org

---

Confidentiality Notice: The information in this e-mail (including attachments, if any) is considered confidential and is intended only for the recipient(s) listed above. Any review, use, disclosure, distribution or copying of this e-mail is prohibited except by or on behalf of the intended recipient. If you have received this email in error, please notify me immediately by reply email, delete this email, and do not disclose its contents to anyone.

Bingham McCutchen LLP Circular 230 Notice: To ensure compliance with IRS requirements, we inform you that any U.S. federal tax advice contained in this communication is not intended or written to be used, and cannot be used by any taxpayer, for the purpose of avoiding any federal tax penalties. Any legal advice expressed in this message is being delivered to you solely for your use in connection with the matters addressed herein and may not be relied upon by any other person or entity or used for any other purpose without our prior written consent.