**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| FLYING J INC., et al.,[1] | ) | Case No. 08-13384 (MFW) |
| Debtors. | ) | Jointly Administered |
| | ) | **Hearing Date: March 23, 2010 at 11:30 a.m. (ET)** |

**REPLY OF THE DEBTORS TO THE OBJECTION OF THE UNITED STEELWORKERS TO THE DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING BIDDING PROCEDURES, BREAK-UP FEE AND SALE OF SUBSTANTIALLY ALL ASSETS OF BIG WEST OF CALIFORNIA, LLC**

Flying J Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), file this reply (the "Reply") to the *Objection of the United Steelworkers to the Debtors' Motion to Sell Substantially All Assets of Debtor Big West of California Pursuant to Section 363(b) of the Bankruptcy Code* [Docket No. 3025] (the "Objection").[2] In support of this Reply, the Debtors respectfully state as follows:

1. The Objection filed by the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy Allied Industrial and Service Workers International Union (the "USW") is littered with factual inaccuracies and, astoundingly, attempts to scuttle the only chance for its members to retain their jobs at the Bakersfield, California refinery in an attempt to burden the

---

1 The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Flying J Inc. (3458); Big West of California, LLC (1608); Big West Oil, LLC (6982); Big West Transportation, LLC (6984); Longhorn Partners Pipeline, L.P. (0554); Longhorn Pipeline Holdings, LLC (0226); Longhorn Pipeline Inc. (0654). The location of the Debtors' corporate headquarters and the service address for all Debtors is: 1104 Country Hills Drive, Ogden, UT 84403.

2 Capitalized terms used but not otherwise defined herein shall have the meanings ascribed thereto in the *Motion to Approve Bidding Procedures, Break-Up Fee and Sale of Substantially All Assets of Big West of California, LLC* [Docket No. 2694] (the "Motion").

unwilling (and only existing) purchaser of the Acquired Assets with obligations under a collective bargaining agreement that expired under its own terms on January 31, 2009 (the "Expired CBA"). Indeed, the Objection is even more shocking given the fact that the Debtors have poured more than $3 million per month into the Bakersfield refinery to operate it on a "warm idle" basis rather than simply abandoning it in an attempt to sell the Bakersfield refinery as a going concern, thus preserving the USW's jobs. In any event, since the Objection fails as a matter of law and is contrary to well-reasoned precedent (and while the Debtor is prepared for an evidentiary hearing), the Court should summarily overrule the objection and need not address the Objection's numerous factual fallacies.

2. The Objection asserts that the requirements of section 1113 of the Bankruptcy Code prevent the Debtors from selling the Acquired Assets free and clear of obligations under the Expired CBA. In particular, the USW posits that, unless and until formally rejected, the expired collective bargaining agreement must be foisted on the buyer by virtue of a "successorship clause" asserted to be contained therein under section 1113 of the Bankruptcy Code thereby saddling the Acquired Assets with the burdens of the agreement. (Objection at ¶¶ 27-35).

3. The Objection fails for a variety of reasons. First, assuming, *arguendo*, that a collective bargaining agreement containing a successorship clause were still in effect (which it is not), the plain language of section 363 of the Bankruptcy Code allows the Debtors to sell the Acquired Assets free and clear of any such agreement, thus ending the inquiry. Second, under applicable nonbankruptcy law, there is no applicable successorship clause that would impose the Expired CBA upon the buyer because any such clause has been eliminated either by: (i) the expiration of the Expired CBA by its express terms on January 31, 2009; and/or (ii) through the

bargaining process undertaken by Big West of California, LLC ("BWOC") and the USW to eliminate the successorship clause.

4. As discussed further below, even in situations where collective bargaining agreements are still in effect at the time of a sale, multiple courts have rejected the USW's argument and held that the plain language of section 363(f) permits the sale free and clear of any obligations under collective bargaining agreements. In re Lady H. Coal Co., Inc., 193 B.R. 233, 247 (Bankr. S.D. W. Va. 1996) (a case directly on point and one in which the court rejected the union's argument that section 1113 of the Bankruptcy Code applies to sales of substantially all of a debtor's assets); International Union, Etc. v. Morse Tool, Inc., 85 B.R. 666 (D. Mass. 1988) (district court upheld bankruptcy court order rejecting union's arguments that section 1113 of the Bankruptcy Code prohibited sale free and clear of collective bargaining agreement obligations).

5. Further, given the absence of a successorship agreement between the parties, expiration of the Expired CBA purportedly containing such a provision, and BWOC's negotiations with the USW, there are no successorship obligations still in effect and nothing in section 1113 of the Bankruptcy Code resurrects any such obligation. Courts have repeatedly held that "[s]ection 1113 of the bankruptcy code does not apply to expired collective bargaining agreements." In re San Rafael Baking Co., 219 B.R. 860, 867 (9th Cir. BAP 1998); In re Charles P. Young Co., 111 B.R. 410, 413 (Bankr. S.D.N.Y. 1990) ("Section 1113(f), in speaking of rejection or modification of the provisions of a collective bargaining agreement, incorporates an underlying assumption that there is an existing collective bargaining Contract to reject or modify."); see also Gloria Mfg. Corp. v. International Ladies' Garment Workers' Union, 734 F.2d 1020 (4th Cir. 1984) (holding a debtor/employer's effort to reject a non-executory collective bargaining agreement was moot); In re Sullivan Motor Delivery, Inc., 56 B.R. 28 (Bankr. E.D.

Wis. 1985) (holding section 1113 of the Bankruptcy Code does not apply to a collective bargaining agreement that has expired); In re Pesce Baking Co., 43 B.R. 949, 957 (Bankr. N.D. Ohio 1984) ("Although a collective bargaining agreement may be executory on the date the debtor's bankruptcy petition is filed, once the agreement expires of its own terms, the debtor's application to reject it becomes moot.").[3] Since there is no collective bargaining agreement in effect (whether or not the agreement contains a successorship clause), and there are no successorship obligations in place under applicable nonbankruptcy law, section 1113 of the Bankruptcy Code simply does not apply.

6. Finally, granting the Objection would almost inevitably result in the collapse of the Sale, to the detriment of not only the BWOC estate and employees, but possibly other Debtors, as well. Indeed, the Debtors' plan of reorganization, which calls for 100% recoveries for all unsecured creditors, including those at BWOC, would be imperiled if the Objection is granted because the Sale is an integral part of the Debtors' reorganization efforts. It is clear that it is in the best interests of the estate to approve the Sale and enter an order transferring the Acquired Assets free and clear of any obligations under the Expired CBA. As a result, the Objection should be overruled and the Motion should be granted.

## I. Even if the Expired CBA and Successorship Clause Were Still in Effect, Section 363(f)(5) Permits the Sale of the Acquired Assets Free and Clear of Any Obligations Under the Expired CBA.

7. Recognizing that section 363 disposes of the Objection, USW chooses to ignore section 363 and asserts that the Sale violates section 1113(f) of the Bankruptcy Code. (Objection

---

[3] Indeed, it is black letter law that an expired contract cannot be assumed, so even if BWOC wished to assume the Expired CBA, it would not legally be able to do so. See Counties Contracting and Const. Co. v. Constitution Life Ins. Co., 855 F.2d 1054, 1061 (3rd Cir. 1988) ("A contract may not be assumed under § 365 if it has already expired according to its terms."); In re Triangle Laboratories, Inc., 663 F.2d 463, 467 (3d Cir. 1981) ("'[F]or section 365 to apply, the contract ... must be in existence. If the contract ... has been terminated prior to the commencement of the bankruptcy case, then there is nothing left for the trustee to assume....'" (citations omitted); In re Coast Cities Truck Sales, Inc., 147 B.R. 674, 677 (D. N.J. 1992) (same).

at ¶¶27-35.)[4] However, by its own terms, section 1113(f) does not apply, since the Motion does not seek to reject or modify the Expired CBA. Instead, the plain language of section 363 of the Bankruptcy Code authorizes the Debtors to sell free and clear of any obligations under the Expired CBA.[5]

8. Section 363(f)(5) of the Bankruptcy Code provides that an asset may be sold free and clear of interests if the interest holder "could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." 11 U.S.C. § 363(f)(5).[6] Section 363(f)(5) merely requires that the obligation could be satisfied by money, so it is a hypothetical test and does not require actual monetary satisfaction of the interest. See In re Lady H. Coal Co., Inc., 193 B.R. 233, 247 (Bankr. S.D. W. Va. 1996); In re WBQ P'ship, 189 B.R. 97, 107 (Bankr. E.D. Va. 1995). Indeed, courts have recognized that obligations under collective bargaining agreements are interests, like any other contract, that can be satisfied by money and thus are subject to section 363(f)(5). Lady H. Coal 193 B.R. at 246-47 ("All of the claims asserted by the [unions and other objecting parties] may be compensable in a monetary satisfaction. . .").

---

4 The USW argues that the Debtors should have "insist[ed]" Alon assume the Expired CBA. (Objection ¶35) Aside from the fact that the Expired CBA cannot be assumed, the USW provides no mechanism by which the Debtors could have forced Alon to assume the Expired CBA. Indeed, Alon has repeatedly refused to assume those obligations.

5 Section 363 of the Bankruptcy Code authorizes the Debtors to sell free and clear of any obligations under the Expired CBA even if the successorship clause were still in effect, which, as discussed further below, it is not.

6 The case law the Objection relies upon, In American Flint Glass Workers v. Anchor Resolution Corp. 198 F. 3d 76 (3d Cir. 1999) which involves the unilateral assumption and modification of unexpired collective bargaining agreements in a sale, is inapposite. (Objection at ¶¶33-34). BWOC is not seeking to assume or modify the Expired CBA in connection with the Sale, thus American Flint is clearly distinguishable. Likewise, the unpublished decision in In re Agripac, Inc. Case No. 699-60001 (Bankr. D. Or. Apr. 2 1999) involved a situation where an unexpired collective bargaining agreement was being assumed and assigned. Further, In re Stein Henry Co., 1992 Bankr. Lexis 2574 (Bankr. E.D. Pa. Jun. 1, 1992) involved the assumption and modification of an unexpired collective bargaining agreement pursuant to a plan of reorganization, not the sale of assets free and clear pursuant to section 363 of the Bankruptcy Code without the modification or assumption of an (expired) collective bargaining agreement.

9. The bankruptcy court for the Southern District of West Virginia thoroughly addressed the exact issues raised in the Objection in In re Lady H. Coal. In Lady H. Coal the debtors sold substantially all of their assets pursuant to section 363 of the Bankruptcy Code. There the debtor had *unexpired* collective bargaining agreements that were not being assumed by the purchaser of the assets. Lady H. Coal 193 B.R. at 246. Additionally, unlike here, the collective bargaining agreement at issue in Lady H. Coal unambiguously contained a successorship clause. Id. The unions objected, asserting that selling the assets free and clear of the obligations under the collective bargaining agreement would violate section 1113 of the Bankruptcy Code. Lady H. Coal 193 B.R. at 246 (noting the union's objections were based on section 1113).

10. The bankruptcy court rejected this argument, holding that any claims created under the collective bargaining agreement were subject to monetary satisfaction and that the plain language of section 363(f) of the Bankruptcy Code allowed the debtors to transfer the assets free and clear of the obligations under the collective bargaining agreements. Id. at 246-248 (overruling the union's objections and noting that granting the objections "would permit the [union] employees to enjoin the sale of property" and that "[n]o law permits this Court to impose such a penalty on all creditors in the case"). Indeed, the bankruptcy court noted that forcing the purchaser of the assets to assume the collective bargaining agreements would conflict with fundamental tenets of the Bankruptcy Code: "[s]ince the Debtors propose to sell substantially all assets, the claims of all creditors in these cases will attached to the proceeds. Courts cannot permit creditors to accept payment of their claim in the bankruptcy case, and also attempt to collect the very same claim from a good faith purchaser of a debtor's property **as 11 U.S.C. § 363(f) permits sales to be free of 'any interests.'**" Id. at 247 (emphasis added). Since the

claims under the collective bargaining agreement were "interests" within the meaning of section 363 of the Bankruptcy Code, the debtor's assets could be transferred free and clear of any claims under those agreements. Id. at 248; In re Kaiser Steel Co., 106 B.R. 669 (Bankr. D. Col. 1989) (holding that section 363(f) authorized the sale of assets free and clear of any obligations owed under an expired collective bargaining agreement); see also International Union, Etc. v. Morse Tool, Inc., 85 B.R. 666 (D. Mass. 1988) (district court upheld bankruptcy court order selling assets free and clear of all encumbrances, including collective bargaining agreements). Indeed, the Lady H. Coal court held that section 363, not section 1113, of the Bankruptcy Code governs whether assets can be sold free and clear of obligations under collective bargaining agreements. Lady H. Coal 193 B.R. at 246; Morse Tool, Inc. 85 B.R. at 667 (noting that the bankruptcy court overruled objections to the sale free and clear of collective bargaining agreements based on section 1113(f) of the Bankruptcy Code).

11. The Objection should be overruled for exactly the same reasons. The Debtors are simply selling assets pursuant to section 363 of the Bankruptcy Code. The Debtors are not, at this time, assuming or rejecting the Expired CBA (even if such assumption or rejection were possible). Thus section 1113 of the Bankruptcy Code simply does not apply on its own terms. Further, the plain language of section 363(f) authorizes the sale free and clear of all interests under the Expired CBA,[7] since the obligations, if any, under the Expired CBA constitute "interests" under section 363(f). Therefore, the Debtors can transfer the Acquired Assets free and clear of those interests pursuant to section 363(f)(5) of the Bankruptcy Code.

---

7 The USW has filed Claim No. 3991 against Big West of California, LLC in the partially liquidated amount of approximately $2.88 million asserting a variety of claims under the Expired CBA and other legal theories.

## II. Under Applicable Nonbankruptcy Law, any Successorship Clause in the Expired CBA is of No Force or Effect[8]

12. As discussed above, because section 363(f) authorizes the sale free and clear of even an existing collective bargaining agreement that contains an express successorship clause, the Court need not reach disputes of fact. Nevertheless, the USW's assertion that the Expired CBA remained in effect after its January 31, 2009 expiration mischaracterizes the relevant contractual language and post-expiration bargaining, and also misstates fundamental labor law principles with respect to post-term collective bargaining agreements. (Objection ¶¶ 36-39). Moreover, even if the Expired CBA or certain provisions of that agreement continued in effect after its stated term, a successorship clause did not survive the January 31, 2009 expiration date both as a matter of contract and a matter of law. Finally, even if a successorship clause survived the Expired CBA's expiration, under applicable labor law principles and in the exigent circumstances presented by the BWOC Sale, the Debtor and the USW bargained to a valid impasse over the elimination of any successorship provisions, after which impasse the Debtors were entitled to implement their proposal to eliminate any such provisions.

13. Contrary to the USW's assertion, a successorship clause was not a provision of the Expired CBA. The concept of a successorship obligation can be traced back to a December 30, 1997 Successor Letter of Understanding ("Successor Letter") between the USW and Texaco Refining and Marketing, Inc. ("Texaco Refining"), a prior owner of the facility. (Huhn Decl., Ex. B.) The Successor Letter was a stand-alone agreement that terminated on January 31, 2001. Id. The Successor Letter appears to have remained unmodified until a January 31, 2002 letter agreement identifying various agreements reached between Equilon Enterprises LLC (a prior

8 To the extent any facts contained herein are relevant and controverted, the Debtors will make a witness available at the hearing.

owner of the facility and successor to Texaco Refining) and the USW (the "2002 Letter Agreement" a copy of which is attached as Exhibit A). The 2002 Letter Agreement, among other things, indicated that the Successor Letter would "continue in effect" during the term of the 2002-2006 collective bargaining agreement (the "2002-2006 CBA"). The 2002 Letter Agreement, however, did not incorporate the Successor Letter into the 2002-2006 CBA. Indeed, the 2002-2006 CBA, which became effective as of February 1, 2002, did not set forth any successorship provision, and, in Article XXX, explicitly stated that it "shall cancel and supersede all prior agreements, written and verbal, between the Union and the Company." (Huhn Decl., Ex. C.) Accordingly, there was no successorship provision in the 2002-2006 CBA at the time the Debtors acquired the refinery.

14. Upon acquiring the refinery, Debtors negotiated certain modifications (not relevant here) to the 2002-2006 CBA. The February 16, 2005 agreement pursuant to which the Debtors assumed 2002-2006 CBA (the "Assumption Agreement") states that "the Union Contract,[9] as modified in accordance with Section 1 above and the letter agreement and procedures contained in Exhibit B, constitute the entirety of the agreements between Big West and the Union and that neither party hereto shall be bound by or entitled to any benefits under any other agreement, understanding, representation, warranty, or other writing, including but not limited to other prior agreements between Shell and the Union, except to the extent signed by Big West and the Union." (Huhn Decl., Ex. D.) (emphasis added.) The referenced "letter agreement and procedures" set forth in "Exhibit B" to the Assumption Agreement are characterized as having been "entered into after the date of the Union Contract," necessarily excluding the Successor Letter and the 2002 Letter Agreement, which predate the 2002-2006

9 The term "Union Contract" in the Assumption Agreement refers to the 2002-2006 CBA. (Huhn Decl., Ex. D.)

CBA. (Huhn Decl., Ex. D.) Accordingly, the successorship provision set forth in the Successor Letter and the 2002 Letter Agreement, the only sources of any purported successorship obligations here, was not a contractual term between the Debtors and the USW.

### A. Any Successorship Clause Did Not Survive Expiration of the Expired CBA

15. Even if, *arguendo*, the successorship clause was a term of the Expired CBA, that agreement expired by its own terms. The Expired CBA states that it "shall take effect February 1, 2002, [and] it shall remain in effect through January 31, 2006." (Huhn Decl., Ex. C.) In a January 27, 2006 Memorandum of Agreement ( the "2006 MOU"), the Debtor and the USW agreed that "the term of the current Articles of Agreement, effective February 1, 2002 through January 31, 2006, and all provisions therein shall be extended and renewed through January 31, 2009" except for certain modifications not relevant to the issue before the Court. (Huhn Decl., Ex. E.) Neither document contains any language suggesting that the Expired CBA would extend beyond its stated term. Thus, by its own express terms, the Expired CBA expired on January 31, 2009.

16. Any assertion by the USW that the Expired CBA remained in effect after its expiration is unequivocally belied by the very documents the USW attached to the Objection. For example, the December 24, 2009 email from the Debtor's counsel to counsel for the USW clearly states "...the contract has clearly expired by its terms and there is no agreement to extend the contract." (Huhn Decl,, Ex. M.) Debtors consistently expressed this view that the Expired CBA was, in fact, expired throughout the post-expiration period. Indeed, on January 28, 2009, just three days before the Expired CBA was set to expire and after the USW claims it explained the "rolling 24-hour (day-to-day)" extension, the Debtors sent the USW a letter stating "[o]ur current Collective Bargaining Agreement, [ ] expires on January 31, 2009…." (the "January 28 Letter," a copy of which is attached as Exhibit B.) Subsequent communications also made clear

Debtors view that the contract was, and remains to this day, expired and that there was, and remains, no agreement to extend its term on any basis. (Huhn Decl., Ex. J, L & M.)

17. Contrary to the USW's suggestion, Debtors never agreed to a "rolling 24-hour (day to day) extension" of the Expired CBA. The USW has presented no evidence of an agreement to any such extension; instead, the USW relies on internal USW memoranda authorizing local USW representatives to "offer their employers an extension of the agreements on a day-to-day basis subject to a 24-hour notice of canceling the extension." (Huhn Decl. Ex. G.) The USW does not, and cannot, claim that any such extension with cancellation provisions was offered to, much less accepted by, the Debtors at any time, including after the January 31, 2009 expiration. The USW's "explanation" of the "rolling 24-hour (day-to-day)" extension, even if it happened, does not amount to a proposal, nor does the Debtor's alleged indication that it "did not have any problems" with that explanation amount to an acceptance of any such proposal. The January 28 Letter which was drafted after the USW purports to have explained the "rolling 24-hour (day-to-day)" extension, further underscores Debtors' view that no such extension was agreed upon. Moreover, despite the USW's assertion that "it is not uncommon for the parties to extend a CBA without written affirmation of the extension," the 2006 MOU demonstrates that the parties' practice was to extend the collective bargaining agreement only by written agreement.

18. Under well established labor law, certain terms and conditions of employment set forth in the Expired CBA survived its expiration, not as contractual terms, but as representative of the *status quo ante* from which the Debtor may not stray without satisfying its bargaining obligations. The United States Supreme Court has recognized that an expired collective bargaining agreement no longer has any force or effect. "[A]n expired contract has, by its own

terms, released all its parties from their respective contractual obligations, except obligations already fixed under the contract but yet unsatisfied. Although after expiration most terms and conditions of employment are not subject to unilateral change, those terms and conditions no longer have force by virtue of the contract. [T]hey are no longer agreed-upon terms; *they are terms imposed by law, at least so far as there is no unilateral right to change them.*" Litton Financial Printing Div. v. NLRB, 501 U.S. 190, 206 (1991) (emphasis added). An expired contract's terms do not survive as contractual agreements, instead, "an expired contract continues define the status quo as to wages and working conditions and [] an employer is required to maintain that status quo until the parties reach a new agreement or bargain to impasse." Imperia Foods, Inc., 287 NLRB 1200, 1204 (citing NLRB v. Katz, 369 U.S. 736 (1962)); accord Altorfer Machinery Co., 332 NLRB 130,162 (2000) (quoting NLRB v. Carilli, 648 F.2d 1206, 1212 (9th Cir. 1981) ("the collective bargaining agreement survives its expiration date for purposes of marking the status quo as to wages and working conditions, which the employer is obliged to maintain until the parties negotiate a new agreement or bargain in good faith to impasse"). The Supreme Court has recognized that "freezing the status quo ante after a collective bargaining agreement has expired promotes industrial peace by fostering a non-coercive atmosphere that is conducive to serious negotiations on a new contract...." Laborers Trust Fund v. Advanced Lightweight Conc., 484 U.S. 539, 545 n.6 (1988). Freezing the status quo does not mean that all contractual provisions remain in effect.[10]

19. A successorship clause was not a term of employment that survived the expiration of the Expired CBA. A successorship clause purports to limit an employer's fundamental and

---

[10] The National Labor Relations Board and the courts have recognized that some contractual terms do not survive expiration of a collective bargaining agreement, including union security provisions, no-strike clauses, and arbitration clauses. See, e.g., Litton Financial Printing Div. v. NLRB, 501 U.S. at 206.

unqualified right to sell its business without regard to whether a purchaser is willing to assume the employer's collective bargaining agreement, even where the labor law would require the purchaser to succeed to the employer's obligation to recognize an incumbent union as representative of its employees. The United States Supreme Court has recognized the right of employers to sell their assets without requiring them to pass along existing collective bargaining agreements:

> [H]olding either the union or the new employer bound to the substantive terms of an old collective-bargaining contract may result in serious inequities. A potential employer may be willing to take over a moribund business only if he can make changes in corporate structure, composition of the labor force, work location, task assignment, and nature of supervision. Saddling such an employer with the terms and conditions of employment contained in the old collective-bargaining contract may make these changes impossible and may discourage and inhibit the transfer of capital. On the other hand, a union may have made concessions to a small or failing employer that it would be unwilling to make to a large or economically successful firm. The congressional policy manifest in the Act is to enable the parties to negotiate for any protection either deems appropriate, but to allow the balance of bargaining advantage to be set by economic power realities.

NLRB v. Burns International Security Services, Inc., 406 U.S. 1571, 1582 (1972). The rule implicit in this recognition is that any agreement restricting this unqualified right is effectively a waiver of such right for the term of the agreement, a "negotiated protection" that is purely a creature of contract.

20. Consistent with the Supreme Court's clear direction in NLRB v. Burns International, similar contractual waivers have been held not to survive contract expiration. For example, a "management's rights" clause is a standard contractual provision retaining in management the right to act unilaterally (i.e., without bargaining with the union) in certain specified areas (e.g., work relocation, jobs elimination, subcontracting of bargaining unit work), despite a statutory obligation to bargain with its employees' union over these otherwise

"mandatory subjects of bargaining." Such clauses have been characterized as contractual waivers of unions' statutory right to bargain over those terms and conditions of employment over which management has retained the right to act unilaterally. See, e.g., Beverly Health and Rehabilitation Services v. NLRB, 297 F.3d 468, 480-482 (6th Cir. 2002). Such waivers do not survive the termination of the underlying contract, as management's rights clauses are not terms and conditions of employment in the traditional sense. Id. (quoting Holiday Inn of Victorville, 284 NLRB 916, 916 (1987)). Rather, they are waivers of bargaining rights that are limited to the duration of the contract, absent some indication that their terms are meant to extend beyond the contracts expiration. Id.; see also Buck Creek Coal, 310 NLRB 1240, 1993 WL 148974 (1993) (following Holiday Inn) ("Moreover, we note that a waiver of bargaining rights contained in a contractual management rights provision normally is limited to the time during which the contract that contains it is in effect."); Furniture Rentors of America v. NLRB, 36 F.3d 1240, 1245 (3d Cir. 1994) (holding that the management-rights clause did not survive the expiration of a contract because there was no clear waiver of the right to negotiate when the contract specified that it would end as of a specific date, but would reopen to discuss "only wages"). Accordingly, any successorship clause, which would have represented a contractual waiver of Debtors' fundamental right to sell its assets free of a collective bargaining agreement, was not a term or condition of employment that survived the expiration of the Expired CBA.

### B. Even if the Successorship Clause Survived the Expiration of the Expired CBA, BWOC has Eliminated the Successorship Clause Under Applicable Nonbankruptcy Law Through Good Faith Negotiations

21. It is clear, in any event, that any successorship restrictions were eliminated after a good faith bargaining impasse. Unfairly faced with USW assertions of survival of successorship provisions and with exigent circumstances in which the sole interested 363 bidder was unwilling to assume the Expired CBA, in order to protect itself and the estate, the Debtor nonetheless

undertook to bargain with the USW over the elimination of any successorship restrictions that might have existed. (Huhn Decl, Exs. J & L.) In support of its position, Debtor's labor counsel fully explained the urgent need for the elimination of any such terms, including the likelihood that the refinery would close permanently if the 363 sale to this sole prospective purchaser was to fail. Id. By December 28, 2009 it was clear that the parties were at loggerheads on the issue of such successorship elimination after which, and after fair warning to the USW, Debtor declared a bargaining impasse and implemented its final bargaining position that any successorship restrictions be regarded as eliminated.

22. When parties are engaged in negotiations for a collective-bargaining agreement, an employer's obligation to refrain from unilateral changes absent overall impasse on bargaining for the agreement as a whole is excused "when economic exigencies compel prompt action." Bottom Line Enterprises, 302 NLRB 373, 374 (1991). In cases subsequent to Bottom Line, the National Labor Relations Board has characterized the economic exigency exception as requiring a heavy burden, and as involving the existence of circumstances which require implementation at the time the action is taken or an economic business emergency that requires prompt action. See RBE Electronics of S.D., 320 NLRB 80, 81 (1995). According to the Board, in these and other related circumstances, "management does need to run its business, and changes in operations toward that end often cannot await the ultimate full-fledged contract bargaining." Id. (quoting Dixon Distributing Co., 211 NLRB 241, 244 (1974)). In such circumstances, the employer satisfies its statutory obligation by providing the union with adequate notice and an opportunity to bargain. Id. at 82. In that event, consistent with established Board law in situations where negotiations are not in progress, the employer can act unilaterally if either the union waives its right to bargain or the parties reach impasse on the matter proposed for change. Id.

23. The circumstances here compelled prompt action, especially since BWOC was incurring expenses of over **$3 million per month** to keep the Bakersfield, California refinery in "hot idle" mode. Despite its best efforts, Debtors were unable to attract a bidder that was willing to assume the Expired CBA. (Huhn Decl., Exs. J & L.) Debtors repeatedly urged the sole bidder they could attract to assume the Expired CBA, but those efforts were unavailing. (Huhn Decl., Exs. J & L.) In these circumstances, application of any successorship provision would inevitably have killed the deal and resulted in the ultimate and final shutdown of operations at the Bakersfield refinery and the loss of all of the jobs of the USW's members. The Debtors acted promptly in notifying the USW of the need to negotiate about the purported successorship provision in order to salvage the sale and the USW's jobs, which bargaining had to be completed before entry into the 363 sales agreement to prevent the very issues now before the Court. As such, exigent circumstances within the meaning of Bottom Line existed.

24. The USW's claim that there was no bargaining impasse is unavailing. Clearly, the facts demonstrate that on December 7, 2009, Debtor demanded elimination of the asserted successorship restrictions which the USW refused. That the USW may belatedly have proposed successorship provisions that were unacceptable to Debtor and that sought to bind a purchaser to the Expired CBA, did not break the impasse of December 28, 2009. That there has not yet been agreement on a new overall CBA, does not undermine the impasse on successorship terms in the obvious exigent circumstances that existed on that date. See RBE Electronics of S.D., 320 NLRB 80, 81 (1995).[11] A prospective buyer has no obligations to a union that has members

---

11 The USW's assertion that there could be no impasse because it was not obligated to "discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period" is without merit. (Objection, ¶ 40.) Not only is it Debtors' position that no day-to-day extension requiring cancellation was ever in effect, or is in effect now, but any such day-to-day extension was not for a "fixed period" and thus never a bar to negotiation over new collective bargaining terms as the labor law requires, bargaining that the USW concedes was ongoing and that Debtors pursued with respect to the elimination of any successorship restrictions.

employed at a facility targeted for acquisition. That the prospective purchaser in this case was unwilling to assume the Expired CBA or meet with the USW to discuss a new agreement, even before it had hired any Debtor employees, in no way undermined the impasse or rendered Debtor's or the prospective purchaser's conduct unlawful in any way.

25. Moreover, as discussed above in footnote 6, the cases cited by the USW for the proposition that purchasers must be required to assume a debtor's CBA containing successorship terms, are simply inapposite. Here there was no existing CBA and certainly none with surviving successorship restrictions. Even under the USW's theory, at most there were (in the USW's words) post-expiration "rolling 24 hours (day-to-day)" terms and continuing negotiations for a new CBA during which either party was free to revise its bargaining demands consistent with materially changing circumstances. As previously mentioned, the USW cannot legitimately be under any remaining illusion that the Debtor has agreed that the long expired CBA is in effect on a day-to-day or any other basis.

## III. Section 363(f)(4) Also Permits the Sale of the Acquired Assets Free and Clear of Any Obligations Under the Expired CBA.

26. Section 363(f)(4) of the Bankruptcy Code also permits the sale of assets free and clear of any interest that is *bona fide* dispute and provides additional authority to grant the Motion and overtake the objection.. As discussed above: (a) since the Debtors' obligations under the Expired CBA have terminated, the successorship clause, if any, in the Expired CBA is no longer of any force or effect under applicable nonbankruptcy law; and (b) even if the successorship clause of the Expired CBA continued after the termination of the Expired CBA, the Debtors have eliminated that provision through the collective bargaining process in compliance with applicable nonbankrutpcy law.

27. Although the USW disputes these conclusions, it is clear that continued existence of the Expired CBA itself as well as the successorship clause are, at a minimum, in *bona fide* dispute. Since a *bona fide* dispute exists as to whether the USW holds an "interest," (i.e. claims under the Expired CBA,) in the Acquired Assets, BWOC can sell free and clear of any obligations under the Expired CBA pursuant to section 363(f)(4) of the Bankruptcy Code. See In re Gaylord Grain L.L.C., 306 B.R. 624, 627-28 (BAP 8th Cir. 2004); In re Bedford Square Assoc., L.P., 247 B.R. 140, 145 (Bankr. E.D. Pa. 2000) (stating that although the debtor has not commenced a § 544(a)(3) action, the fact that in all probability it could do so successfully is sufficient to establish that a "bona fide dispute" for purposes of § 363(f)(4) exists); In re Collins, 180 B.R. 447, 452, n. 8 (Bankr. E.D. Va. 1995) (citing In re Oneida Lake Dev., Inc., 114 B.R. 352, 358 (Bankr. N.D.N.Y. 1990) (stating that § 363(f)(4) is satisfied even though the debtor has not filed an adversary proceeding seeking to avoid the creditor's lien)). As a result, the Objection should be overruled and the Motion granted.

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court enter an order granting the Motion and such other and further relief as the Court deems appropriate.

Dated: March 18, 2010
Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

Pauline K. Morgan (Bar No. 3650)
Edmon L. Morton (Bar No. 3865)
Donald J. Bowman, Jr. (Bar No. 4383)
Ryan M. Bartley (Bar No. 4985)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571–6637
Facsimile: (302) 576–3320

- and -

**KIRKLAND & ELLIS LLP**
David L. Eaton (admitted *pro hac vice*)
Adam C. Paul (admitted *pro hac vice*)
Jeffrey W. Gettleman (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Counsel for the Debtors and Debtors in Possession

**EXHIBIT A**

EQUILON
ENTERPRISES LLC

MOST CONFIDENTIAL

January 31, 2002

Mr. Bob Johnston, International Representative
Paper, Allied-Industrial, Chemical and Energy Workers
International Union, Local 8-219
3415 Nighthawk Lane
Bakersfield, CA 93312

Gentlemen:

This will confirm understandings reached during the current negotiations between Equilon Enterprises LLC, Bakersfield Refinery and the Paper, Allied-Industrial, Chemical and Energy Workers' International Union and its Local 8-219. In this regard, the Union Negotiating Committee will recommend to the membership for ratification the following Agreement and our tentative agreements dated August 9, 2001 and August 17, 2001 that resolved all company-wide/council-wide and local proposals, respectively in full settlement of all issues in our negotiations.

## TERM OF AGREEMENT

February 1, 2002 through January 31, 2006.

## WAGES

Effective February 1, 2002, all hourly wage rates will be increased 85 cents per hour.

Effective February 1, 2003, all hourly wage rates will be increased 3.5% rounded to the nearest cent.

Effective February 1, 2004, all hourly wage rates will be increased 3.7% rounded to the nearest cent.

Effective February 1, 2005, all hourly wage rates will be increased 4.0% rounded to the nearest cent.

## MEDICAL PLAN CONTRIBUTIONS

The Company renews and extends its current commitments that the Company's contributions toward premiums for the Alliance Medical Plan and approved alternate company sponsored medical plans for active employees will be based on an employer contribution rate of 80% of the premium and an employee contribution rate of 20% of the premium in accordance with all provisions of the Alliance Company/OCAWIU Master Agreement Benefits dated August 21, 1998.

## DENTAL PLAN CONTRIBUTIONS

Effective April 1, 2002, the Company will increase its monthly contribution to the Dental Plan as follows:

| | | | | |
|---|---|---|---|---|
| Employee Only | from | $10.00 | to | $12.00 |

Martinez Refining Company
a Division of
Equilon Enterprises LLC
P.O. Box 711
Martinez, CA 94553-0071

| | | | | |
|---|---|---|---|---|
| Employee + Spouse | from | $19.00 | to | $22.50 |
| Employee + Child(ren) | from | $18.00 | to | $22.30 |
| Employee + Family | from | $29.50 | to | $34.50 |

## SHIFT BONUS

Effective February 1, 2002, the shift bonus now specified in the current contract to be $0.50 per hour for hours worked between 3:00pm and 11:00pm, and $1.00 per hour for hours worked between 11:00pm and 7:00am will be increased to $0.75 per hour and $1.50 per hour, respectively. Other agreements between the parties, if any, that deal with the subject of shift bonus will be revised accordingly.

## OCCUPATIONAL DEATH BENEFIT

Effective February 1, 2002 the existing occupational death benefit of $250,000 that is paid for work-related accidental death which occurs as a direct result of an accident while at work will be increased to $500,000.

## SUCCESSOR LETTER OF UNDERSTANDING

The Successor Letter of Understanding, applicable to Equilon Enterprises LLC, Bakersfield Refinery, agreed to by the parties on December 30, 1997 will continue in effect for the term of the Articles of Agreement effective February 1, 2002. This Successorship Letter of Understanding is clarified as follows:

This Successor Letter Agreement would be applicable to the sale of Bakersfield refinery where the seller retained (1) terminal operations such as tank farms or loading racks and wharf facilities, (2) lubricants base oil manufacturing or packaging and blending operations, (3) co-generation plants, (4) waste-water treatment facilities, (5) coke handling facilities, or other stand-alone assets of a similar nature and scope. However, this understanding does not create a separate successorship obligation with respect to facilities retained or sold separately to another entity, or the sale of such auxiliary facilities where there is no sale of the Bakersfield refinery.

## JOB SECURITY

The parties agree to execute the attached Letter Agreement regarding Job Security.

## NO RETROGRESSION

The Company agrees to renew the letter agreement on layoff notice, plant closure, rate retention, national health insurance, and health and safety, where such letter agreements exist.

Agreed to and accepted this 31st day of January, 2002.

Paper, Allied-Industrial, Chemical
And Energy Workers International
Union

Bob A. Johnston

International Representative, Local 8-219

Equilon Enterprises LLC
Bakersfield Refinery

[signature]

Human Resources Manager

# EXHIBIT B

**BIG WEST OF CALIFORNIA, LLC**
*A FLYING J Company*
6451 Rosedale Highway • Bakersfield, CA 93308 • Phone 661.326.4200 • www.flyingj.com

January 28, 2009

VIA HAND DELIVERY

*Ed Huhn* *Secretary/Treasurer Local 219*
*Kevin Cable* *Committee Chairman*
United Steelworkers, Local 219
607 19th Street,
Bakersfield, CA 93301

**Re: Demand for Immediate Bargaining**

Dear Ed and Kevin:

Over the past month since filing for Chapter 11 bankruptcy protection, Big West of California has been engaged in significant efforts on a number of different fronts to maintain operations at the Bakersfield facility. Notwithstanding the diligent efforts of our management team, we have so far been unsuccessful in finding alternative crude oil supply on normal terms, financing or other business solutions that would help keep the Bakersfield refinery in operation. Our efforts in this regard are continuing. However, in the absence of some new investment in the Bakersfield facility, we may be forced shortly to temporarily wind down operations, which will result in the layoff and/or termination of employees.

Our current Collective Bargaining Agreement, which expires on January 31, 2009, contains notice provisions for temporary layoffs (Article XIV 4); notice provisions for planned complete closure that will involve permanent layoff or permanent transfer of bargaining unit employees (Article XXXI); and provisions in the event that circumstances develop which make layoffs necessary prior to the expiration of the Agreement (Article XXIII). **We must meet and bargain with you immediately over modification or deletion of these notice provisions.** We would like to meet with you starting tomorrow and will make ourselves available at any time to accommodate your schedule. We will also make ourselves available any and all other days this week. The circumstances are exigent. It is imperative that negotiations on these provisions begin immediately.

We look forward to your prompt response. Thank you for your attention to this matter.

Very truly yours,

Gene Cotten