UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | . Case No. 08-13384(MFW) |
| | . |
| | . |
| FLYING J INC., et al., | . |
| | . 824 Market Street |
| | . Wilmington, DE 19801 |
| | . |
| Debtors. | . |
| | . March 23, 2010 |
| . . . . . . . . . . . . . . . | . 12:19 p.m. |

TRANSCRIPT OF HEARING
BEFORE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtor: | Kirkland & Ellis, LLP<br>By: ADAM C. PAUL, ESQ.<br>DAVID EATON, ESQ.<br>KATHELEEN A. EHRHART, ESQ.<br>300 North LaSalle Street<br>Chicago, IL 60654 |
| | Kirkland & Ellis, LLP<br>By: JOHN S. IRVING, ESQ.<br>655 Fifteenth Street, N.W.<br>Washington, D.C. 20005 |
| | Young, Conaway, Stargatt & Taylor, LLP<br>By: PAULINE MORGAN, ESQ.<br>RYAN M. BARTLEY, ESQ.<br>The Brandywine Building<br>1000 West Street<br>17th Floor<br>Wilmington, DE 19801 |
| Audio Operator: | Brandon McCarthy |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail: jjcourt@optonline.net**

**(609) 586-2311 Fax No. (609) 587-3599**

**APPEARANCES (Cont'd)**:

| | |
|---|---|
| For the Committee: | Pachulski Stang Ziehl & Jones LLP<br>By: JAMES E. O'NEILL, ESQ.<br>IRA D. KHARASCH, ESQ.<br>919 North Market Street<br>17th Floor<br>Wilmington, DE 19801 |
| For Pilot Travel Centers: | Landis, Roth & Cobb<br>By: KIM BROWN, ESQ.<br>919 Market Street<br>Suite 1800<br>Wilmington, DE 19899 |
| For TAB: | Gordon, Fournaris & Mammarella, P.A.<br>By: WILLIAM KELLEHER, ESQ.<br>CHRISTOPHER COGGINS, ESQ.<br>1925 Lovering Avenue<br>Wilmington, DE 19806 |
| For James Graham: | Zuckerman Spaeder, LLC<br>By: THOMAS G. MACAULEY, ESQ.<br>919 Market Street<br>Suite 990<br>Wilmington, DE 19801 |
| For Wilmington Trust: | Ashby & Geddes<br>By: WILLIAM P. BOWDEN, ESQ.<br>500 Delaware Avenue, 8th Flor.<br>Wilmington, NJ 19899 |
| For Paramount Petroleum: | Jones Day<br>By: GREGORY M. GORDON, ESQ.<br>2727 North Harwood Street<br>Dallas, TX 75201 |
| | Richards, Layton & Finger<br>By: JASON M. MADRON, ESQ.<br>One Rodney Square<br>920 North King Street<br>Wilmington, DE 19801 |

**APPEARANCES (Cont'd)**:

| | |
|---|---|
| For Shell Global: | Smith Katzenstein Furlow, LLP<br>By: MIKE P. MIGLIORE, ESQ.<br>The Corporate Plaza<br>800 Delaware Avenue<br>Suite 1000<br>Wilmington, DE 19899 |
| For Equilon: | Fulbright & Jaworski<br>By: SHARON M. BEAUSOLEIL, ESQ.<br>Fulbright Tower<br>1301 McKinney<br>Suite 5100<br>Houston, TX 77010 |
| For Total Western, Inc.: | Sullivan Hazelton Allinson, LLC<br>By: ELIHU ALLINSON, ESQ.<br>4 East 8th Street<br>Suite 400<br>Wilmington, DE 19801 |
| For Adena Penford: | Murphy & Landon<br>By: JONATHAN PARSHALL, ESQ.<br>1011 Centre Road<br>Suite 210<br>Wilmington, DE 19805 |
| For USW: | Cooch & Taylor, P.A.<br>By: G. KEVIN FASIC, ESQ.<br>The Brandywine Building<br>1000 West Street<br>10th Floor<br>Wilmington, DE 19801 |
| For Chevron: | Rosenthal, Monhait & Goddess, P.A<br>By: BRAD deLEEUW, ESQ.<br>919 Market Street<br>Suite 1401<br>Wilmington, DE 19899 |

**TELEPHONIC APPEARANCES**:

| | |
|---|---|
| For the Debtor: | Ray Quinny & Nebeker<br>By: JONATHAN A. DIBBLE, ESQ.<br>86 N University Ave #430<br>Provo, UT 84601 |

**TELEPHONIC APPEARANCES (Cont'd)**:

| | |
|---|---|
| For the Debtor: | Gibson Dunn & Crutcher, LLP<br>By: GREGORY J. KERWIN, ESQ.<br>1801 California Street<br>Suite 4200<br>Denver, CO 80202 |
| For Jones Walker: | Jones Walker<br>By: ERICA N. BECK, ESQ.<br>201 St. Charles Avenue<br>New Orleans, LA 70170 |
| For Oracle America: | Day Pitney<br>By: AMISH DOSHI, ESQ.<br>7 Times Square<br>New York, NY 10036 |
| For Chevron: | Pillsbury Winthrop Shaw Pittman, LLP<br>By: ROGER C. ELDER, ESQ.<br>1540 Broadway<br>New York, NY 10036 |
| For the Creditors Committee: | Pachulski, Stang, Ziehl & Jones<br>By: ROBERT FEINSTEIN, ESQ.<br>780 Third Avenue<br>36th Floor<br>New York, NY 10017 |
| For Pilot Travel Center: | White & Case, LLP<br>By: SCOTT GREISSMAN, ESQ.<br>1155 Avenue of the Americas<br>New York, NY 10036 |
| For Manatt, Phelps & Phillips, LLP: | Manatt, Phelps & Phillips, LLP<br>By: IVAN L. KALLICK, ESQ.<br>JACK S. YEH, ESQ.<br>11355 W. Olympic Blvd.<br>Los Angeles, CA 90064 |
| For Samson Resources Company: | Doerner, Saunders, Daniel & Anderson<br>By: CHAD KUTMAS, ESQ.<br>320 South Boston Avenue<br>Suite 500<br>Tulsa, OK 74103 |

**TELEPHONIC APPEARANCES (Cont'd):**

For Vince Murchison: Sonneschein, Nath & Rosenthal, LLP
By: VINCE MURCHISON, ESQ.
2000 McKinney Avenue
Suite 1900
Dallas, TX 75201

For Nexen Marketing: Stutzman, Bromberg, Esserman & Plifka
By: RACHEL STRINGER, ESQ.
2323 Bryan Street
Suite 2200
Dallas, TX 75201

THE COURT: Good afternoon.

MR. PAUL: Good afternoon, Your Honor. In fact, I was going -- in my prepared remarks I did have good morning written down, but it’s now afternoon.

THE COURT: Sorry about that. You can blame Mr. Rosen.

MR. PAUL: I’m sure it won’t be the first time he’s been blamed for something. Your Honor, for the record, Adam Paul appearing on behalf of the debtors and debtors in possession. Your Honor, I do understand from your chambers that you do have a commitment at --

THE COURT: I have a flight to catch.

MR. PAUL: -- a flight to catch. And so we have a hard deadline, I believe, of 1:30, is that right?

THE COURT: One-twenty.

MR. PAUL: One-twenty? One-fifteen, we’ll make it, Your Honor.

THE COURT: All right, good.

MR. PAUL: So with the Court’s permission, what I’d like to do is take some matters out of order. I did come prepared to talk about claims objections. I’m fully prepared to put those at the end, and to the extent that we don’t reach certain matters, Your Honor, the debtors, from their perspective, as long as we hit exclusivity and Bakersfield, we can carry some of the other matters over to the next omnibus.

So let me just begin, because again, we're limited with the amount of time that we have. Although the first matter I do want to touch upon, Your Honor, is Item Number 18. It's something near and dear to the professionals' hearts, that's our interim fee applications.

THE COURT: Did I continue these once before?

MR. PAUL: I don't believe so, Your Honor. Because I would have heard it from my partner, Mr. Eaton.

THE COURT: All right. I'm going to approve them on an interim basis. Give you all a pass this time and --

MR. PAUL: I appreciate that, Your Honor. I do have orders that I can hand up.

THE COURT: You may hand them up. Thank you. All right, I'll enter that order.

MR. PAUL: Thank you, Your Honor. Again, taking things slightly out of order, I'd like to turn now to Item Number 20, which is the debtor's really renewed or continued motion to extend their exclusive periods, now 90 days to the statutory maximum. Your Honor, as you will recall, at the time of the last hearing, we were in active negotiations with the FTC with respect to addressing any concerns that they had with respect to the Pilot transaction. We are still in active negotiations with the FTC, which I would characterize as fruitful negotiations. And they are centered around the certain divestiture of some of the travel plazas that would be

included within the Pilot transaction.  It's our belief that none of the divestitures would affect the ultimate distribution to creditors.  In other words, we would still be looking at a payment in full plan.

Now, as those negotiations continue, we did discuss the one outstanding objection that we had to exclusivity, which was the Big West Term Lenders' objection.  And given the fact that we're basically in the same place, what I agreed to do and what they've consented to is to have the identical bridge order entered, and this would be a second bridge order carrying out the exclusive periods through the April omnibus date, at which point we would hope to have, hopefully, a definitive determination from the FTC, again, cautiously optimistic, approving or consenting to the Pilot transaction.   And so what I do have here, Your Honor, and it's without objection, is a second bridge order, which is identical to the one that Your Honor entered last month, but just changing the dates to April.

THE COURT:  Okay.  I'll enter that then.   Thank you. Okay, now where to?

MR. PAUL:  We are now to the Bakersfield sale, which at some points during this case I never thought I would actually get to this point, but we are actually at the point of seeking the approval of the sale of our Bakersfield refinery to an affiliate of Alon.

Your Honor, before turning to the resolutions of all

of the objections, except for one, I did want to say for the record that this sale hearing has been a long time coming and represents the satisfaction of one of the last two essential elements for the debtors to consummate the proposed plan which provides for the payment in full of all other creditors as well as providing for a substantial distribution to shareholders.

Your Honor, the benefits of the motion are plain and the justifications for approving the motion are numerous.  Your Honor, our CRO, Mr. John Boken is in the courtroom today.  And with the Court’s permission, I would like to make the following proffer or Mr. Boken’s testimony in support of the motion.

THE COURT:  You may.

MR. PAUL:  Your Honor, as you will recall and as set forth in Mr. Boken’s declaration in support of the bidding procedures, which is already in evidence, the debtors conducted an exhaustive marketing process.  This marketing process was conducted over several months.  It involved the active marketing to over 180 potential purchasers.  Ultimately, out of all of the potential purchasers, only six submitted binding bids, and only one, Alon, submitted a definitive bid for substantially all of Big West of California’s assets.

Now, as I mentioned, Your Honor, all of that is included in the original declaration.  In addition, if called, Mr. Boken would testify that subsequent to this Court’s approval of the bidding procedures, the debtors and their

advisors took several steps in full compliance with the bidding procedures to ensure that a well-advertised sale took place.

Specifically, in consultation with Deutsche Bank, the debtors developed a list of every party that the debtors reasonably believed would be interested in purchasing the assets and had the financial resources to do so. This list included both strategic investors and potential financial investors. We published notice in the "Wall Street Journal" and the "Bakersfield Californian." And this marketing process was in addition to the already extensive marketing process conducted by the debtors before the bidding procedures were approved.

Mr. Boken would also testify that the debtors provided extensive notice of the proposed sale and proposed auction in accordance with the bidding procedures, and that this notice included, "All persons known or reasonably believed to have an expressed, to have expressed an interest in acquiring the acquired assets."

Mr. Boken would confirm that despite these marketing efforts, no other parties submitted bids, let alone ones that could be characterized as qualified under the bidding procedures order.

Mr. Boken would testify in support of the myriad benefits that the sale provides for the debtors and that the sale is in the best interest of the debtor's estates.

Specifically, the asset purchase agreement with Alon provides for a purchase price of $40 million subject to certain adjustments as set forth in the APA.

In addition, Mr. Boken would point to the fact that the APA provides for the assumption of certain liabilities including certain environmental liabilities at Big West of California. A term or condition that was critical to the debtor’s interest and their ability to consummate the plan that they have on file that will pay all creditors in full.

Finally, Mr. Boken would note that the sale will eliminate a substantial cash drain on the estates of the Big West entities. Specifically upon the earlier of closing or May first, the debtors will no longer be responsible for the approximately $3 million in curing costs that the refinery currently requires to be operated in a warm, idle mode.

Given the benefits, Your Honor, the debtors’ business judgment and the lack of any alternative bidder, Mr. Boken would testify that the consummation of the APA represents the highest and best offer for the assets, and is clearly in the best interest of the estates.

With respect to the sale itself, Mr. Boken would testify that the debtors and Alon engaged in thorough and lengthy -- as this Court knows -- arm’s length negotiations over the terms of the APA and that there has been no fraud or collusion in these negotiations.

Mr. Boken would also testify that upon execution of the APA and under the terms of the APA, Alon recognized that the debtors were free to deal with any party interested in acquiring the assets and that the buyer complied with the provisions of the bidding procedures order and allowed its bid to be subject to a competitive, albeit unfruitful bidding process.

Finally, Mr. Boken would confirm that there is no indication of fraud or improper inside dealing of any kind and that the buyer is not an insider of any debtor.

Mr. Boken would testify that the assigned contracts to be assumed by the debtors and assigned to the buyer are necessary for the buyer to conduct business, and since the buyer would not consummate the transaction without such contracts, the assumption and the assignment of the assigned contracts is essential to receiving the highest and best offer for the assets. As a consequence, and because the debtors will no longer operate the refinery following the sale, Mr. Boken would testify that the assumption and ultimate assignment of the assigned contracts is a sound exercise of the debtors' business judgment.

Finally, Your Honor, Mr. Boken would testify that the buyer, like all other buyers purchasing assets pursuant to 363 of the Bankruptcy Code, would not have entered into the APA and would not consummate the transactions contained therein without

the free and clear protections of Section 363(f) and the protection against any claims against the buyer based upon success or vicarious liability.

Your Honor, with that, that completes our proffer, Your Honor, and unless anyone wishes to cross Mr. Boken, I would like now to turn to the objections that we have resolved.

THE COURT: All right. Let me hear if anybody wishes to cross examine, Mr. Boken.

MR. JURY: Your Honor, David Jury for the United Steel Workers. We've objected to the sale and if I may ask debtors' counsel, will debtor be presenting proffers or witnesses on what I would call the labor issues in the case which would be outside of the proffer that you just provided for Mr. Boken?

MR. PAUL: Yes, Your Honor, and Mr. Jury. We believe that the Court can reach and overrule the terms of the objections just based upon legal questions. To the extent that the Court wishes to hear evidence based upon what we're characterizing as the labor issues, we would intend to put on evidence at that point specifically with respect to the labor issues.

What we're dealing with within this proffer and the reason for this proffer is for the general proposition that this sale ought to be approved under 363.

MR. JURY: Your Honor, on that basis, the Union will

not cross examine Mr. Boken. Thank you.

THE COURT: All right. Thank you. And I'll accept the proffered testimony.

MR. PAUL: Thank you, Your Honor. Now with respect to the objections. I am happy to report that we've been able to satisfy, as Mr. Jury mentioned, all but one. Specifically, there are nine formal and one informal objections to the sale, almost all of which were characterized as limited or a reservation of rights. Two objections, Your Honor, those by Oracle and the informal objection raised by Chevron have been continued while the debtors and the buyer work to resolve issues raised with respect to the assumption of certain contracts with Oracle and Chevron.

THE COURT: Okay.

MR. PAUL: Three objections, Your Honor, those by WESCO, that's in all caps, W-E-S-C-O Distribution Inc., Catalytic Distillation Technologies and Layton Consulting Inc., have been resolved without any further action by the debtors. And all four objections -- I'm sorry -- and four objections have been resolved by certain representations to be made on the record which we have agreed to. Specifically, the representations are as follows.

First, Your Honor, with respect to the limited objection and reservation of rights by Wilmington Trust, they had asked for the following to be read into the record to

resolve their limited objection. “There’s no express or implied consent on the part of Wilmington Trustee to the sale and a free and clear order is being entered by the Court with respect to Wilmington Trust’s objection pursuant to 363(f)(5) as was the case at the last hearing on the sale of the debtors’ Alci equipment.

Your Honor, the reservation of rights by Total Western Inc., they had asked for the following to be read into the record. “With respect to the rights and claims of Total Western Inc., as set forth in the reservation of rights filed by Total Western, Docket Number 3032, nothing contained in the sale orders intended to or shall be deemed to limit, alter or impact Total Western’s rights to prosecute and/or defend its claims against the debtors, including without limitation Total Western’s prepetition claims, administrative claims and secured claims. The debtors retain all rights to object to Total Western’s claims if necessary, and all such Total Western claims would remain subject to allowance by this Court. Additionally, Total Western’s lien will attach to the sale proceeds at the same priority with respect to other liens against the sale proceeds as it would attach absent the sale. Furthermore, Big West of California does not intend to impair any of Total Western’s claims or the value thereof in consummating a sale of acquired assets.”

THE COURT: Okay.

MR. PAUL: Maybe at this point, Your Honor, I could pause and see whether or not there are, either by the Big West term lenders or by Total Western, whether or not they needed to make any representations on the record.

THE COURT: Okay.

MR. BOWDEN: Your Honor, good afternoon. Briefly, Bill Bowden of Ashby and Geddes for Wilmington Trust. I appreciate Mr. Paul's statements on the record. One additional statement on the record, Your Honor. The agent is not waiving as against the debtors any event of default that will occur by virtue of the sale of the Big West refinery under the applicable loan agreements between Wilmington Trust and the term lenders and the debtors. Thank you, Your Honor.

THE COURT: Thank you.

MR. ALLINSON: Good afternoon, Your Honor. Elihu Allinson on behalf of Total Western, Inc. We concur with the representation read into the record and that does resolve our reservation of rights.

THE COURT: All right, thank you.

MR. PAUL: Continuing on, Your Honor, with respect to the limited objection of Equilon Enterprises, LLC, DBA Shell Oil Products, U.S., they had asked for the following to be read into the record, which the debtors agreed to. And it's our representation that these representations are correct. "Big West of California confirms that (1) a maximum amount of

$17,340,905 remains available for indemnifying the assignee under the environmental indemnity cap specified in Section 5.02(b)(i) of the environmental agreement dated March 15th, 2005, and (2) if Kern County has approved the subdivision of the terminal assets at the closing of the sale, Big West of California and Paramount Petroleum Corporation will deliver an executed terminal deed for the terminal property and an executed terminal bill of sale for the terminal assets other than the terminal property as required by Section 3.03 of the APA dated March 15th, 2005."

With that, Your Honor, I'll see whether or not Shell and anyone else want's to make any other representations on the record with respect to their limited objection.

THE COURT: Okay.

MR. DOSHI: Your Honor, if I may be heard on the phone.

THE COURT: You may. You are?

MR. DOSHI: For the record, Your Honor, Amish Doshi with Day Pitney on behalf of Oracle America, Inc.

THE COURT: Okay.

MR. DOSHI: I just wanted to add that counsel is correct that our objection is carried over to the next omnibus hearing date on April. I just want to clarify one thing that at the beginning of the presentation they had indicated that all the assigned contracts are going to be assumed and

assigned. Obviously since our objection is carried to the next hearing date, the Oracle agreements will not be part of all of that and all parties' rights are reserved until the next hearing date or, you know, until a further order of the Court. I just wanted to clarify that the Oracle agreements won't be part of the current sale that's being approved, because it's being carried. I just wanted to clarify that.

THE COURT: All right.

MR. DOSHI: I know it goes without saying.

THE COURT: Okay, that's clarified.

MR. DOSHI: Thank you, Your Honor.

THE COURT: Thank you.

MS. BEAUSOLEIL: Good afternoon, Your Honor. Sharon Beausoleil of Fulbright and Jaworski on behalf of Equilon Enterprises, LLC, DBA Shell Oil Products, U.S. As to the first part of Mr. Paul's statement, that is correct. Shell also agrees that the maximum availability of the environmental indemnity cap is $17,340,905, which would be subject to a settlement agreement which the parties are going to be filing for approval with this Court later.

And also, this Court, Shell had already asked this Court and obtained a relief from stay to submit any papers that they needed to and submit a subdivision package to Kern County. Shell has submitted that subdivision package and is now just waiting for Kern County to actually take action on that

subdivision package. Shell believes that the subdivision condition likely will be satisfied sometime between this hearing and closing, and should that occur, then the terminal assets would need to be delivered to Shell at closing.

THE COURT: All right.

MS. BEAUSOLEIL: And also, one other thing. One of the agreements that are being assumed, authorized to be assumed and assigned is the Shell APA, and Shell and Paramount are in negotiations for definitive agreements on those, that agreement. Thank you.

THE COURT: Okay, thank you.

MR. GORDON: Good afternoon, Your Honor. I'm sorry, I've lost my voice this morning, I hope you can hear me.

THE COURT: I can hear you fine.

MR. GORDON: My apologies. I had one yesterday when I flew in. Greg Gordon on behalf of the buyer, Paramount Petroleum. I just wanted to indicate, Your Honor, that we wish to reserve all our rights with respect to this agreement that's been reached with regard to the indemnity cap and also with respect to this settlement. The settlement is obviously compromising rights under agreements that we're taking under our purchase agreement. We have not yet seen that settlement agreement and we just wanted the record to be clear that we can't stand here today and say that we're fine with that in all respects, because we haven't seen it.

I did want to indicate to Your Honor, though, as counsel just indicated, that we also have a term sheet we've been working on with respect to the Shell APA, a non-binding term sheet between us and Shell which if that becomes documented in a manner satisfactory to us, will moot any concern that we could potentially have with the settlement agreement that was just announced to Your Honor. And we've committed and I know Shell's committed to attempt to get the documentation of that term sheet accomplished absolutely as quickly as possible. But until that plays out, this is proceeding in somewhat of a piecemeal fashion, and therefore we have to reserve all our rights either to enforce the agreement as it currently exists or to walk away from the agreement.

THE COURT: Okay.

MR. GORDON: But having said that, again, I don't expect a problem because we have a term sheet that outlines the deal we're comfortable with, that just needs to be documented.

THE COURT: Okay. Well you can reserve your rights to object to the Equilon settlement. But I hope it gets worked out.

MR. GORDON: Thank, Your Honor.

MR. PAUL: Again for the record, Your Honor, Adam Paul on behalf of the debtors and debtors in possession. That takes us to the one remaining objection that we've resolved, and that's the limited objection of Shell Global Solutions

(U.S.) Inc. And there the debtors have agreed to the cure amount that has been asserted by Shell Global Solutions. In addition, Shell Global Solutions has asked Paramount, the purchaser, to represent on the record that it will execute an assignment letter once Shell sends Paramount the assignment letter as executed by Shell. Once this representation is made, then the limited objection is resolved. So maybe I'll turn the podium over very quickly to Paramount's counsel to hopefully make that representation.

MS. BEAUSOLEIL: Your Honor, this is Sharon Beausoleil on behalf of Shell Global Solutions (U.S) Inc. Our understanding is Paramount has agreed to this condition.

MR. GORDON: Yes, Your Honor, Greg Gordon. Again, I can make that representation. It's obviously subject to seeing the form of the agreement, but we understand it is nothing more than an agreement that says we're agreeing to accept the contracts as they are.

THE COURT: Okay.

MR. PAUL: And I promised Mr. Gordon, I think this is the last one that you're going to have to stand up and say anything. Again, Your Honor, Adam Paul on behalf of the debtors and debtors in possession. As I started at the -- as I said at the outset, there's one remaining objection that we are not able to resolve and that's from the union representing the debtors' unionized Bakersfield employees. And also as I

mentioned earlier, Your Honor, we believe, as set forth in our papers, and as you'll hear from my partner, David Eaton, who will handle our response to the union's objection, we believe that the objection may be overruled as a matter of law and that there's no need to present evidence either in support of or in opposition to the objection. But with that, Your Honor, we've resolved all of the other objections and I'd like to turn the podium over to the union's counsel to present argument in support of the one remaining objection.

THE COURT: Okay.

MR. FASIC: Your Honor, if I may, Kevin Fasic from the Cooch and Taylor firm. I'm simply here to introduce Mr. Jury to the Court. Mr. Jury has been admitted pro hac vice and he will be handling argument on behalf of the steelworkers.

THE COURT: All right, thank you.

MR. JURY: Good afternoon, Your Honor. May it please the Court, David Jury, Associate General Counsel for the United Steelworkers. The United Steelworkers and its local Union 219 represents the workers at the Bakersfield, California refinery of Big West Oil of California. Your Honor, as much as anyone in this courtroom wishes to be here today, Your Honor, we wish that we were not here. We wish that circumstances despite -- that circumstances had worked out differently.

We filed our objection and with that objection, Your Honor, we submitted a declaration from Edward Huhn, who is a

local union officer from Local 219, the local union that represents employees at Bakersfield. Mr. Huhn is present here in court and would be subject to cross examination should the debtors seek to cross examine him. The union has also --

THE COURT: Any objection to my considering that declaration?

MR. EATON: Your Honor, David Eaton on behalf of the debtors. As Mr. Paul suggested, Your Honor, we believe that this objection can be decided as a matter of law without any evidence. If the Court -- and we’d like to address those issues, because we think it will be very efficient for the Court and very compelling.

THE COURT: So you’ll reserve on the Huhn declaration?

MR. EATON: Absolutely reserve.

THE COURT: Okay.

MR. EATON: And would suggest that if the Court feels that evidence is necessary that it be put on through live testimony.

THE COURT: Okay.

MR. JURY: Thank you. Your Honor, the union also has present today an international vice president of the union, Gary Beevers, who traveled here from Beaumont, Texas. Mr. Beevers is here today not expecting to be a witness, but rather expecting in the event that Alon finally wishes to meet with

the union in an attempt to resolve this matter prior to the sale to meet with Alon and to work constructively towards a resolution.

But again, Your Honor, the union wishes it did not have to appear here today for the -- we believe the evidence will show that for the last three and a half months, the union has urged the debtor and the union has urged Alon USA to attempt to reach a consensual resolution. We have urged debtors' counsel and we have every reason to believe that they have urged or sought to urge Alon to meet with us, and we've also conferred with Alon.

But yet, Your Honor, we are here today with Alon having refused at all to meet with us, to have a conference call, to exchange anything other than communications between counsel. And, Your Honor, we think that's unfortunate, and that is the reason for the union's objection.

Counsel for the debtor is correct that there are aspects of this case, large aspects of this case that are questions of law and we're prepared to address those and I will address those.

There are, however, it appears from the reply that the debtor filed on Saturday, substantial factual issues, points upon which the parties disagree, about, for example, the existence of a collective bargaining agreement that this Court may determine requires the presentation of evidence. The union

is fully entitled to address that.

THE COURT: Well, tell me what your position is.

MR. JURY: Your Honor, our position is that Big West and the steelworkers are parties to a collective bargaining agreement. A collective bargaining agreement that remains in effect by virtue of an extension that has been in place since February 1, 2009. That collective bargaining agreement includes what is called a successorship clause. It is a clause that requires, as a condition of sale, that the employer, Big West, include in any asset purchase agreement, a provision that the buyer agree to recognize the union and assume the existing collective bargaining agreement and other letters of agreement. The precise terms of that successorship clause are set forth in our objection as well as the documents attached to Mr. Huhn’s declaration.

Your Honor, the debtor and Alon --

THE COURT: The agreement did not expire by its own terms, the collective bargaining agreement?

MR. JURY: It is our position, Your Honor, that it has not. And --

THE COURT: Why?

MR. JURY: -- Your Honor, sever reasons. First, Your Honor, as set forth in the Huhn declaration, the union explained to the company at the outset of bargaining that there would be what’s called a rolling 24-hour extension of the

collective bargaining agreement after the expiration date of January 31st, a fact which recognized that the union at that time was negotiating with numerous other oil refiners throughout the United States through something called the Unions' National Oil Bargaining Program. The testimony, if presented, would indicate that among these numerous collective bargaining agreements, all of which expired around January 31, February 1st, February 2nd, 2009.

Through the union's bargaining program, the union has historically negotiated and did in fact this time negotiate a lead collective bargaining agreement with Shell. That lead collective bargaining agreement would become then a pattern and did become a pattern for the union's bargaining with other oil refiners, including Big West of California. The union had explained in a bargaining session that there would in fact be a 24-hour extension.

But, Your Honor, there is more. First, despite the fact that the debtor now contends that there's no collective bargaining agreement in place, debtors' labor counsel sent the union a letter dated February 5th, 2005, and that letter is Exhibit H to the Huhn declaration. It was a letter asking the union to bargain about changes to certain provisions of the collective bargaining agreement in connection with layoff notice and plant shutdown notice. That letter, written by debtors' labor counsel, who as a seasoned labor counsel

obviously chose his words carefully, refers on at least five occasions either to a contract or an existing contract rather than referring to an expired agreement or existing terms and conditions, all of which are terms of art that any seasoned labor lawyer would understand. The letter instead referred to a contract or existing contract.

Then, as Your Honor may recall, the parties -- the debtor presented to this Court in February of 2009 a motion seeking authorization to make certain modifications to the Bakersfield agreement where the parties in fact did conclude negotiations on certain changes to the layoff and plant shutdown notice provisions in exchange for some additional severance benefits. That agreement is Exhibit I to the Huhn declaration. And that agreement on its face refers to the parties' modifications to the collective bargaining agreement, not to an expired agreement or existing terms and conditions.

Moreover, Your Honor, the union in the Huhn declaration, particularly at Paragraph 19 notes the fact that at all times since February 1, 2009, which now the debtor purports is the expiration of the collective bargaining agreement, the employer has continued to withhold union dues pursuant to checkoff authorizations signed by the employees.

The debtor, in its reply brief, does not appear to contest this matter, nor does the debtor in its reply brief address the authority that the union has presented, two Seventh

Circuit cases, one U.S. Can v. NLRB, the other involving an employer named Wood County Telephone, cases in which the Seventh Circuit held, and we believe this is consistent with Labor Board authority, that as a matter of law, the fact that an employer continues to withhold union dues is evidence of the existence of a collective bargaining agreement, because as the Seventh Circuit explains in the Wood County case, the withholding of dues in the absence of a labor agreement could violate provisions of federal labor law.

Further, Your Honor, at no point until December --

THE COURT: Why can't the debtor sell free and clear of the contract, even if it exists?

MR. JURY: Your Honor, that also is another issue of law and it involves Section 1113(f) of the Bankruptcy Code. Section 1113(f) is the provision that generally stated, forbids an employer from unilaterally modifying any term or condition of employment absence -- or a term of a collective bargaining agreement absent compliance with the provisions of Section 1113(b) and (c), which are the provisions that a debtor can utilize to reject a collective bargaining agreement.

THE COURT: But the Courts have said that 363 sales can be free and clear of collective bargaining agreements, notwithstanding 1113(a).

MR. JURY: Your Honor, the case that the debtor relies upon primarily is Lady H Coal from the District Court

and Bankruptcy Court in West Virginia. Your Honor, I believe that the debtors' reliance upon Lady H Coal is in error. It's not a decision of this Circuit or of this Court --

THE COURT: Nor are the Seventh Circuit.

MR. JURY: -- and nor are the Seventh Circuit. But, Your Honor, it's also inconsistent -- Lady H Coal was decided in 1996. In 1999 the Third Circuit decided a case involving a debtor, Anchor Resolution. Anchor Resolution involved an application of Section 1113(f) and involved a case in which an employer, a debtor sold a facility without the purchaser agreeing to assume the collective bargaining agreement. And in the collective bargaining agreement between the debtor and the union it in fact had that condition. While in the Anchor Resolution case the union brought the matter not in the context of an objection to a sale, but rather an objection on a claim matter filed after the sale after it became apparent that notwithstanding the union's prior understanding that the agreements would be assumed cum onere, in fact that was not the case. The logic of Anchor Resolution, we believe, applies here.

Further, we've cited to this Court the decision of the Bankruptcy  Court in the Eastern District of Pennsylvania in a case called In re. Stein Henry, which also involved a sale of assets as well as we attached an unreported decision of a Court in Oregon, Agripac. Your Honor, Lady H, when read

closely, the reasoning of that case simply does not hold together. Lady H was a case in which the mineworkers' union and its various funds objected to a sale claiming, among other things, that the debtor employer failed to require the purchaser to become bound by the Mineworkers' National agreement. In Lady H, the debtor filed a motion under Section 1113 of the Bankruptcy Code to reject the labor agreement and to in effect, clear out of the way that successorship clause. The Bankruptcy Court in Lady H denied the debtors' motion under Section 1113 to reject the agreement, finding for certain equitable reasons or good faith reasons, that rejection was not appropriate. The Court in Lady H then moved on to consider the union's and the fund's objection to the sale, and ignoring 1113(f), the Court in Lady H approved the sale. Again, making no reference, no analysis to 1113(f), which was later analyzed in this Circuit by Anchor Resolution and has been analyzed in other cases.

Your Honor, Lady H simply does not hold together. The debtor argues in its reply brief that -- and notes that the Court in Lady H noted that the union, on behalf of the workers it represented, could file a damages claim in connection with the sale. Your Honor, we respectfully submit that the debtors have it wrong and that the Court in Lady H had it wrong. Because the nature of a successorship clause is to provide specific protections to unionized employees in advance of a

sale.

In this country, Your Honor, and the debtors cite a Supreme Court case, NLRB v. Burns, in this country, as this Court undoubtedly knows, when there is a sale of assets, it could mean for the employees covered by the sale that they're entire lives are turned upside down. A purchaser is generally not required to hire all or frankly any of the predecessor employer's workforce. While it cannot discriminate against them, it's free to hire from literally off the street. A purchaser is not required to assume existing collective bargaining agreements and is not required even to negotiate with the union unless the purchaser hires a majority of its workforce from the predecessors.

And even in that case, Your Honor, the cases are myriad where purchasers have simply refused to bargain and let the union proceed for years before the NLRB and the circuit courts try to enforce that right.

So for that reason, Your Honor, unions have negotiated, and this union here negotiated the successorship clause, which places preconditions to the sale. In this case, a condition that Big West place in the asset purchase agreement the condition that the buyer assume. These are rights that cannot simply be remedied by a later monetary remedy and indeed --

THE COURT: Well, unfortunately in Continental

Airlines, the Third Circuit held that seniority rights and other rights granted by a collective bargaining agreement are exactly that, claims that can be reduced to monetary damages. So why can't the successor clause be reduced to monetary damages?

MR. JURY: Your Honor, this Court should be aware that there is authority outside of the bankruptcy context, but as a general proposition, Courts are to refrain from issuing injunctions and labor disputes. However, the Supreme Court has held and Circuit Courts have held that in instances involving -- it's a Supreme Court called Boys Market, a case called Boys Market, Courts can enter injunctions in aid of arbitration. Oftentimes these are injunctions sought by an employer against union conduct for matters that can be resolved in arbitration.

There are other cases, Your Honor, called the Reverse Boys Market Doctrine which hold that a union likewise can obtain an injunction in court in aid of arbitration to enjoin an employer from taking certain conduct until the parties can arbitrate it.

And, Your Honor, in a number of cases involving successorship clauses, Courts across the country have entered these objections, including Local 1266 v. Panoramic, which is 688 F. 2d 276 (7th Cir. 1981). Another case, Local 590 v. National Tea, which is 346 F. Supp. 875, (W.D. PA 1972), Steelworkers v. Cooper-Standard, which was reported at 175 LRRM

3249, (N.D. Indiana, 2004).

And further, Your Honor, a case that involves a sale, but an injunction entered after the sale in the Third Circuit, which was Local 434 v. Skyvue Terrace, 759 F. 2d. 1094 (3d Cir. 1985). All of these cases, Your Honor, were cases involving injunctions in connection with a sale, injunctions in connection with a successorship clause. Injunctions which recognize that the nature of the benefit, the nature of the protection that a union negotiated for its members, and frankly the nature of the obligation that an employer undertakes by agreeing to a successorship clause are rights that simply cannot be reset by a later monetary remedy, because afterwards, after the transaction occurs, after the transaction closes, the presale conditions cannot be reset.

THE COURT: Okay.

MR. JURY: Your Honor, the debtor asked you in its reply brief to sit in essence as an Administrative Law Judge of the National Labor Relations Board. The debtor is apparently asking you to decide questions of core labor law which are solely within the subject matter jurisdiction of the National Labor Relations Board. Questions of whether the parties had bargained to impasse, questions of whether if we were to assume our collective bargaining agreement has expired whether the successorship is a term and condition that survives expiration --

THE COURT: I think they're first asking me to decide to legal issues, so -- as to whether or not they can sell free and clear of the successorship clause.

MR. JURY: Your Honor, I do understand that is their primary argument, but they've also tacked on these subsidiary arguments.

THE COURT: Okay.

MR. JURY: Your Honor, the union has remained willing to meet with the buyer, but instead has gotten simply the back of its hand. The union, again, has present here it's Chief National Union Negotiator and its Chief Local Union Negotiator. We believe that if the debtor and the buyer had simply paid attention to this issue, had simply dealt with this three and a half months ago, we would not be here, this Court's time would not be taken up, and this matter could proceed.

THE COURT: Thank you.

MR. JURY: Thank you, Your Honor.

THE COURT: Debtor wish to reply?

MR. EATON: Your Honor, David Eaton on behalf of the debtors. We do have sympathy for the union. They want to talk to the party that we hope will be the new owner of the facility to negotiate a contract for their members. We want the parties to talk. And Alon has indicated that they will sit down with the union if they are approved as purchaser. But it is incomprehensible for practical reasons and unjustifiable for

legal reasons that the union would seek to stop the sale, which no one in the courtroom, even the union, has questioned as being the last, best hope to sell this refinery intact. And while both parties have mentioned that they're ready for an evidentiary hearing, I believe that their objection so clearly fails as a matter of law that submitting additional testimony beyond the pleadings is not necessary.

The union's entire objection is premised on the assumption that there is a collective bargaining agreement in force that contains a successorship clause, and unless and until we reject it, we cannot sell the plant under Section 363 unless the buyer is settled with a CBA. The union's premise is flat out wrong, was we an demonstrate from the judicial admissions in their pleading. But I'll come back to that.

Your Honor, we do believe the Lady H Coal case set in our reply is on all fours with the current situation and dispositive. We cited the Lady H bankruptcy Court's recommended findings of facts and conclusions of law in our reply, but I have the District Court's decision which adopts the bankruptcy Court's disposition of the matter. The District Court's decision is at 199 Bankruptcy Reporter 595. We've circulated that to counsel for the USW and if I may I'd like to approach with a copy of the case.

THE COURT: You may.

MR. EATON: The District Court reiterates every

single item that we cited the Bankruptcy Court decision for. That Court explicitly authorized the sale free and clear of an unexpired collective bargaining agreement with explicit successorship clauses. So let’s assume that the union is correct in everything that it asserted. The Court held that Section 363's plain language governed the issue and that 363(f)(5) authorized the sale free and clear of any obligations under the collective bargaining agreement which were interests that could be satisfied by money.

The Court explicitly rejected the union’s Section 1113 argument, the very same one made here, noting that the debtors were not seeking to assume, reject or modify the collective bargaining agreement in connection with the sale, and neither are we. This is a motion to approve a sale of assets, not an 1113 hearing.

Further, the Court admonished the union for attempting to scuttle the only available sale of assets noting that no law allowed the Court to impose such a penalty on all creditors by blocking the sale, and that rings very true here as well. This is the last best hope.

The Lady H decision also cites International Union v. Morse Tool at 85 B.R. 666 where the Massachusetts District Court upheld a Bankruptcy Court decision selling assets free and clear of all encumbrances including a collective bargaining agreement.

The union cited an Agripac decision which is an unreported decision out of Oregon where the 363 arguments that are front and center here and in Lady H were not mentioned or addressed at all. Parties apparently didn't raise them and the Court did not address them.

We have additional grounds here not present in Lady H that provide even more reason to overrule their objection as a matter of law. Your Honor, Code Section 363(f)(4) allows the sale free and clear of any claims by the union, that 1113 should trump the sale, because the existence of any interest in the union in opposing a successorship obligation of the buyer under an expired CBA, obviously in bona fide dispute. The pleadings themselves make it very clear that at the very least a substantial question exists as to whether the collective bargaining agreement and successorship obligations are in existence. As a result, the sale should be allowed free and clear under 363(f)(4) as well as (f)(5).

And that should be the end of the inquiry, Your Honor, as a matter of law. But I would like to point out some of the internal inconsistencies and statement in the union's position that constitute judicial admissions that disprove their contention and should also obviate the need for additional evidence.

At the outset, it's clear that Section 1113 does not apply to an expired collective bargaining agreement. The union

doesn’t contest this, it hasn’t cited any cases to the contrary. We’ve cited a few, including San Rafael Baking Company 219 B.R. 860. But here is what is clear from the face of the union’s pleading. The collective bargaining agreement expired on its own terms on January 31st, 2009. The union does not dispute that. It’s in black and white. No amendment was executed to extend the contract. The union doesn’t dispute that. The union’s argument that the company agreed to a 24-hour rolling extension of the agreement is absurd from the four corners of their pleading. The asserted 24-hour extension is only mentioned in the union’s internal memoranda, not in any communication between the USW and --

THE COURT: I don’t want to get into the facts, but I’d like to restrict you to the legal arguments.

MR. EATON: Fair enough, Your Honor. But I would submit that in Paragraphs 14 and 16 of their pleading, and in a December 24th e-mail attached to their pleading, which really are judicial admissions, there are repeated, clear statements from the debtor that the contract is expired by its terms and there’s no agreement to extend. Those are judicial admissions. And I would say as a legal matter, it is nonsense for the union to say evidence is going to prove there was an agreement over those statements. And I’ll reiterate it now. There’s no 24-hour extension. It has expired. It takes a meeting of the minds for their to be an agreement.

One minor point that is made is that the debtors’s collection of dues after the expiration of the collective bargaining agreement is somehow evidence that a collective bargaining agreement is in effect. But the law is that the collection of dues is unrelated to the existence of a collective bargaining agreement. And for that we’d cite Tribune Publishing Company v. The NLRB 564 F. 3d 1330 and Cibao -- C-i-b-a-o -- Meat v. NLRB 547 F. 3d 336. And if the union prefers, we are ready to stop collecting dues immediately.

The only cases cited by the union that related to that point involved collective bargaining agreements that had not expired by their own terms.

Your Honor, in fact, the other arguments I was prepared to make do relate more to the bargaining to impasse type situations and more labor-specific issues that had been addressed, but for now I’ll come back to where I started. The law and the pleaded facts are clear. Even if everything the union dreamed were true, that is a collective bargaining agreement with a successorship clause were still in effect, the sale should be approved and they should be estopped from repudiating the admissions made in their pleading that clearly establish as a matter of law that there was no agreement to extend the life of the CDA.

Your Honor, with those bankruptcy matters of law issue, we would reserve the right for additional argument and

evidence if the Court deems it’s necessary.

THE COURT: All right. Thank you. Anybody else other than the debtor?

(No audible response)

THE COURT: All right.

MR. O’NEILL: Your Honor, James O’Neill, Pachulski, Stang, Ziehl and Jones on behalf of the Committee appearing today with my partner Ira Kharasch. Mr. Kharasch is a member of the bar of the State of California and has appeared in this court pro hac vice before. We will follow up after today’s hearing with an application in these proceedings. But I’d ask that he’d be permitted to speak.

THE COURT: Yes, he can.

MR. O’NEILL: Thank you.

MR. KHARASCH: Good afternoon, Your Honor. I’ll be extremely brief, in light of the time limit. The Committee strongly supports the sale. The company is losing millions of dollars every month, the estates are environmentally challenged and the buyer is taking those liabilities. And there is no other alternative. The issues in front of you have been briefed with regard to the union. The union is a member of our Committee, and the Committee feels it’s not necessary for us to get involved in the substance of those issues. And with that, Your Honor, that is the union’s position to --

THE COURT: All right.

MR. KHARASCH: -- strongly support the sale.

THE COURT: Thank you.

MR. KHARASCH: Thank you.

THE COURT: Reply by the union?

MR. JURY: Your Honor, again, David Jury for the Steelworkers. Briefly, counsel for the debtor refers to admissions in the union's pleading. And there hardly are admissions. Counsel refers to a letter written by the employer's counsel stating the employer's view of whether there's a collective bargaining agreement in place. That is not -- that is clearly a matter in dispute and it is hardly an admission on the union's part.

But on the legal point, Your Honor, we believe that the debtors are in error in suggesting that Section 363 creates a certain super priority, some superseding right to other provisions of the Bankruptcy Code. Section 363 and Section 1113(f) are coequal provisions of the Bankruptcy Code. There's no evidence that congress intended to make 1113(f) subordinate to Section 363. Indeed, Your Honor, if there is a collective bargaining agreement in effect with a successorship clause, the debtor has a tool available, a rather might tool of seeking relief under Section 1113 to reject that labor agreement. And while the facts in every case may differ, it certainly would be a cognizable case for a debtor to assert that eliminating a successorship clause is necessary to reorganization. No such

application has been filed here, Your Honor, and the suggestion that 363 trumps another coequal provision of the Bankruptcy Code simply has no support. Thank you.

THE COURT: Thank you. Well, let me issue my ruling. I disagree with the union that 1113 trumps 363. I think 363 has a couple of provisions that would allow the sale free and clear of this contract. Specifically 1113 does not require that a debtor assume and assign a collective bargaining agreement. It doesn’t deal at all with sale issues, it deals with a debtor’s duty to negotiate with the union before suggesting or asking the Court to modify the contract. But it does not require that the contract go with the assets. This is an asset sale. 363 is the more specific provision and 363 does allow a sale free and clear of contracts. And for the purposes of my ruling, I’ll assume that the contract is in place, but I do note that at a minimum there’s a bonafide dispute as to whether or not the contract is still in existence, and therefore 363(f)(4) would permit a sale free and clear of it.

But 363(f)(5) provides an alternative basis to sell free and clear of the collective bargaining agreement even if it is in existence, because the rights under that, including any rights under the successorship can be reduced to a claim. And I think my reference to the <u>Continental Air</u> case dealt with very similar rights, and that is seniority rights of employees under a collective bargaining agreement. And the Third Circuit

that is a type of a claim that can be reduced to monetary damages.

The cases cited, let me just say this, I found many of them not really relevant. The Agripac didn't really deal with the 363 arguments. Stein Henry dealt with the confirmation of a plan, albeit a sale under a plan, but did not again deal with the 363 issues. So I find the Lady H Coal is the most directly on point and I accept its reasoning that a sale can be free and clear of a collective bargaining agreement under 363(f)(5). So I will overrule the objection to the sale on that point.

MR. PAUL: Thank you, Your Honor. Again, Adam Paul appearing on behalf of the debtors and debtors in possession. I do have a clean and a red line order to hand up. The reason for the red line, one thing I did not mention in my opening remarks, we were able to resolve certain informal objections from environmental authorities. The red line shows those two paragraphs. It's on Page 15 of the red line if Your Honor wants to take a quick look at it. But that's the only reason for the red line other than changing, you know, dates and non-material changes.

THE COURT: All right, you may hand it up. Those revisions are fine and I'll enter the order then.

MR. PAUL: One second, Your Honor. I know you have a plane to catch, I'm going to be brief.

THE COURT: All the rest are claims objections that we can continue?

MR. PAUL: The only other matters that are on, we did have the objection by the Hot Fuel claimants to the sale motion. I am okay with carrying it over. I understand Your Honor has a flight to catch. And the other matters that were on were really related to claims' objections. Which again, Your Honor, we've been carrying over since October.

THE COURT: Okay.

(Pause)

MR. PAUL: Your Honor, I realize you have a plane to catch. Maybe we can submit the order to chambers unless you have --

THE COURT: You don't want me to sign this order?

MR. PAUL: Two minutes, Your Honor.

THE COURT: This is your chance.

(Pause)

MR. PAUL: Your Honor, I apologize. I thought we had -- that Alon had signed off on this language. In fact, I have an e-mail saying that they had signed off on this language, but we're going to have to resolve it with Alon. So I don't want you to miss your flight. We're going to file the order under cert of counsel and it should be, I believe, put in your docket shortly.

THE COURT: Well, I won't see it, I'll be in the air.

So you can ask another Judge to sign it.

MR. PAUL: I understand, Your Honor.

THE COURT: All right. We'll stand adjourned then.

MR. PAUL: Thank you.

* * * * *

**C E R T I F I C A T I O N**

I, RITA BERGEN, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

/s/ Rita Bergen DATE: March 28, 2010

RITA BERGEN

J&J COURT TRANSCRIBERS, INC.